1   Michael L. Schrag (SBN 185832)
    Joshua J. Bloomfield (SBN 212172)
2   **GIBBS LAW GROUP LLP**
    505 14th Street, Suite 1110
3   Oakland, California 94612
    Telephone: (510) 350-9700
4   Facsimile: (510) 350-9701
    mls@classlawgroup.com
5   jjb@classlawgroup.com

6
    Richard M. Paul III
7   Ashlea G. Schwarz
    **PAUL LLP**
8   601 Walnut Street, Suite 300
    Kansas City, Missouri 64106
9   Telephone: (816) 984-8100
    Facsimile:  (816) 984-8101
10  Rick@PaulLLP.com
    Ashlea@PaulLLP.com
11

12  *Counsel for Plaintiff and Proposed Class*

13

14              **UNITED STATES DISTRICT COURT FOR THE**
                **NORTHERN DISTRICT OF CALIFORNIA**
15

16  | Alicia Hernandez, individually and on behalf of all others similarly situated, | Case No. 3:18-cv-07354-WHA |
    | --- | --- |
17  |                      Plaintiff, | **PLAINTIFF'S OPPOSITION TO WELLS FARGO'S MOTION TO TRANSFER VENUE** |
18  | v. | |
19  | | Date: February 7, 2019 |
20  | Wells Fargo Bank, N.A., | Time: 8:00 am<br>Courtroom: 12 |
21  |                      Defendant. | Judge: Hon. William H. Alsup |

22

23

24

25

26

27

28

## I.    INTRODUCTION

Hundreds of Wells Fargo's customers lost their homes because of the bank's well-documented lack of central oversight.  For more than five years, Wells Fargo failed to audit the automated tool it created and used to determine whether customers were eligible for a federally-mandated mortgage modification that would have saved their homes from foreclosure.  When Wells Fargo did finally discover one of the errors in 2015, it neither disclosed the error to affected customers nor made any effort to detect related errors for three more years.

Now that customers have finally learned the truth and are seeking compensation through this class action, Wells Fargo asks the Court to further delay their quest for justice and transfer the proceeding to Iowa, where Wells Fargo says it would be more convenient for it to litigate.  While some of Wells Fargo's mortgage operations are located in Iowa, those responsible for monitoring Wells Fargo's auditing and compliance have ties to California.  In addition, California has evinced a greater policy interest in deterring the type of irresponsible business conduct at issue in this case, and this Court has more familiarity with applicable law and experience with this type of litigation.  So while Plaintiff is confident that this litigation could be effectively managed in either district, she does not believe that Wells Fargo has carried its burden to justify a transfer to Iowa or the delay that transfer would entail, and therefore ask the Court to deny Well Fargo's motion.

## II.   BACKGROUND

The putative class in this case consists of at least 870 Wells Fargo customers who were wrongfully denied mortgage modifications between 2010 and 2018 because Wells Fargo failed to detect multiple calculation errors in its automated mortgage modification software.  (Compl. [ECF No. 1], ¶ 4.) Under the Home Affordable Modification Program (HAMP), Wells Fargo was required to offer mortgage modifications to any borrower who met certain criteria.  (*See id.*, ¶¶ 26-30.)  Each class member met these criteria, but Wells Fargo's faulty software reported otherwise and each was denied a mortgage modification—leading to severe financial and emotional distress as class members struggled to endure the Great Recession and save their homes from foreclosure through other means.  (*Id.*, ¶¶ 49, 90.)  Some hung on, but most were ultimately unable to make ends meet: 545 class members lost their homes.  (*Id.*, ¶ 24.)

1    Wells Fargo had long known that its auditing and HAMP-compliance procedures were deficient

2 and needed to be overhauled.  In 2011, after the Office of the Comptroller of the Currency (OCC)

3 found that Wells Fargo had failed to devote adequate oversight to its foreclosure processes, Wells

4 Fargo agreed to establish a "Compliance Committee." (Schrag Decl., Ex. 1, Art. II.)  That Compliance

5 Committee was supposed to meet monthly and ensure the bank's mortgage servicing and foreclosure

6 operations complied with HAMP, and that the bank implemented adequate controls and testing to

7 ensure that any non-compliance would be detected and remedied on a timely basis.  (*See id.*, Art. II;

8 III(3)(d); IV(1)(j), (o); VII(3)(g).)  Wells Fargo subsequently filed reports with the OCC that

9 represented its Compliance Committee was meeting as required, that its Chief Operational Risk Officer

10 (CORO) was providing the Compliance Committee with the necessary information and testing results

11 for it to effectively oversee the bank's compliance with all legal requirements, and that Wells Fargo's

12 Audit & Examination Committee would also assume ongoing responsibility for oversight and

13 compliance based on improved reporting from the CORO.  (*See id.*, Ex. 2 at 1-2, Ex. 3 at 1-2.)

14    Wells Fargo's Compliance Committee, CORO, and Audit & Examination Committee were

15 supposed to make sure that the bank conducted the necessary audits to detect and remedy any violations

16 of HAMP.  The stakes couldn't be higher for its customers, who needed the mortgage modifications

17 mandated by HAMP to avoid losing their homes.  Yet Wells Fargo apparently went over five years

18 without auditing the automated tool it used to determine HAMP eligibility and discovering any of the

19 several errors that were leading the bank to repeatedly deny deserving customers a HAMP mortgage

20 modification.

21    Wells Fargo finally detected one of its calculation errors in 2015 but decided not to tell anyone

22 about it or take any action to stop the foreclosures that were then in process or remedy the wrongful

23 foreclosures that had already taken place.  (*See* Compl., ¶ 22.)  It was not until September 2018 that

24 Wells Fargo informed 625 of its customers that they were wrongly denied a mortgage modification as a

25 result of a systematic error in how it calculated HAMP eligibility, and may have lost their homes as a

26 result.  (*See id.*, ¶¶ 40, 54.)  Three months later, Wells Fargo said it had found more errors and that an

27 additional 249 customers were also wrongly denied mortgage modifications between 2010 and 2018.

28 (*Id.*,¶ 41.)  Many of these customers also lost their homes.  The company is conducting a long-overdue

1   review of its automated mortgage modification software and told shareholders that the total number of

2   affected customers remains "subject to final validation."  *See* Wells Fargo & Co., Quarterly Report

3   (Form 10-Q), at 6 (Nov. 6, 2018).

4          Plaintiff Alicia Hernandez is one of the Wells Fargo customers who lost her home as a result of

5   Wells Fargo's failure to comply with HAMP, failure to properly audit its mortgage modification

6   software to ensure compliance with HAMP, and failure to tell the public when it uncovered one of its

7   errors in 2015.  (Compl., ¶¶ 51-55.)  She believes that the amounts Wells Fargo is belatedly offering its

8   customers are nowhere near enough to compensate people like her whose lives were irrevocably altered

9   when they were wrongfully denied mortgage modifications.  Her lawsuit seeks additional compensation

10  for all 874 customers affected by Wells Fargo's conduct and seeks to apply California law to all class

11  members' claims.  (*Id.*, ¶¶ 56-57, 67-71.)  Ms. Hernandez is currently the only plaintiff and proposed

12  class representative and Wells Fargo Bank, N.A. is currently the only defendant.  Wells Fargo correctly

13  points out that the bank's home office is in Sioux Falls, South Dakota.  (Bell Decl., ¶ 2.)  It also says,

14  however, that "Wells Fargo Bank, N.A. designates San Francisco as its principal place of business,"

15  and that the bank's parent company, Wells Fargo & Company, is headquartered in San Francisco.  (*Id.*,

16  ¶¶ 2-3.)

17  **III.    LEGAL ANALYSIS**

18         Wells Fargo does not contend that this proposed class action is improperly venued in this

19  district, but instead argues it would be more convenient if venue was moved to the Southern District of

20  Iowa.  Whether or not to transfer a properly venued case is a matter that requires individualized, case-

21  by-case consideration of both private factors, which go to the convenience of the parties and witnesses,

22  and public factors, which go to the interest of justice.  *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d

23  1353, 1362 (N.D. Cal. 2007).  Plaintiff believes that, on balance, these factors favor keeping the case in

24  this district.

25         **A.     Convenience and Fairness Factors**

26         The private convenience and fairness factors include the ease of access to sources of proof, the

27  plaintiff's choice of forum, the convenience of parties and witnesses, and the availability of compulsory

28  process for unwilling witnesses.  *Swamy v. Title Source, Inc.*, No. C 17-01175 WHA, 2017 WL

2533252, at *2 (N.D. Cal. June 12, 2017).

### 1.     Access to Proof and Plaintiff's Choice of Forum

The first two factors are neutral.  Ease of access to proof is seldom a significant factor in this age of electronic discovery, and while a plaintiff's choice of forum is ordinarily accorded some deference, that deference is attenuated in class actions, particularly when the named plaintiff does not reside within the forum district.  *See Van Slyke*, 503 F. Supp. 2d at 1362; *Swamy*, 2017 WL 2533252 at *2.

### 2.     Convenience to the Parties

Wells Fargo contends that convenience to the parties weighs in favor of transfer.  It quotes the Court's observation in *Funeral Consumers Antitrust Litigation* that "[c]orporate representatives can be reasonably expected to attend various hearings and trial," and posits that this case will include more days spent in court by the parties themselves than in the usual case.  (Mot. at 6-7 (quoting No. 05-cv-01804 WHA, 2005 WL 2334362, at *3).  But the corporate representative who appears to be overseeing this litigation for Wells Fargo, and who has already submitted two declarations in support of Wells Fargo's positions, lives in Chandler, Arizona.  (Bell Decl., ¶ 6; *see also* 12/31/18 Bell Decl. [ECF No. 24-1].)  Moreover, neither that representative nor any other Wells Fargo employee attended the initial hearing in this matter.  (1/14/19 Tr. [ECF No. 33] at 15.)  That was an important hearing, as it concerned the bank's ongoing communications with its customers about the subject matter of this lawsuit.  (*See* ECF Nos. 14-15.)  It is therefore far from a given that anyone other than Wells Fargo's outside counsel (based in San Francisco and North Carolina) will be attending hearings in this matter—much less that a transfer to Iowa would be more convenient.

### 3.     Convenience to Witnesses

Wells Fargo also contends that Iowa will prove more convenient for witnesses.  It says that the officers and employees responsible for the practices at issue in the litigation are located in Iowa, where Wells Fargo's home mortgage department is headquartered.  (*Id.*, ¶¶ 6-7.)  But Wells Fargo appears to be taking a narrow view of the practices at issue in the litigation.  From Plaintiff's perspective, this litigation is not primarily about underwriting, the processing of loan modification applications, or even the programming of Wells Fargo's automated tools.  (*See* Mot. at 2-3.)  All of that is useful background

1   and will be a subject of discovery.  But what is at the heart of this case (and of Wells Fargo's other

2   scandals of late) is the company's utter inability to effectively audit its operations to ensure compliance

3   with federal and state law.  It was one thing for Wells Fargo to incorrectly program software that

4   automates the process of determining eligibility for mortgage modifications.  It was quite another for

5   Wells Fargo to fail to discover its non-compliance for 5 years, to hide its discovery for 3 more years,

6   and to leave other related errors undetected for 3 more years as well—all while it was continuing to

7   improperly foreclose on more and more homes.

8           Notably, while Wells Fargo claims that Des Moines-area employees can testify about the

9   company's HAMP compliance and testing, it does not say that those employees were the ones

10  responsible for HAMP compliance and testing.  (Bell Decl., ¶ 7.)  That was the responsibility of Wells

11  Fargo's Compliance Committee, Chief Operational Risk Officer (CORO), and Audit & Examination

12  Committee.  (*See* Section II, *supra*.)  Plaintiff has not been able to identify the members of the

13  Compliance Committee from public records, but has determined that Caryl J. Athanasiu served as

14  CORO from approximately 2010-2014 and Joseph J. Rice took over from Ms. Athanasiu sometime in

15  2014 or early 2015.  (Schrag Decl., ¶ 6, Exs. 5-10.)  Ms. Athanasiu has left Wells Fargo but was last

16  reported working for another San Francisco bank and living in San Mateo, California.  (*Id.*, ¶ 7, Ex. 13.)

17  Plaintiff has not been able to determine where Mr. Rice currently lives or works.  As to the Audit &

18  Examination Committee, public records indicate that four of the ten members who served on the

19  committee at any point between February 2010 and February 2017, worked in California—more than

20  any other state.  (*Id.*, ¶ 6, Exs. 4-11.)  It appears that at least three of those members continue to work in

21  California.  (*Id.*, ¶¶ 8-11, Exs. 14-16.)  None of the Auditing & Examination Committee members have

22  ever been listed as working in Iowa.  (*Id.*, ¶ 6, Exs. 4-12.)

23          As the party seeking transfer, the burden is with Wells Fargo to demonstrate that witness

24  convenience weighs in favor of transferring these proceedings to Iowa.  *True Health Chiropractic Inc v.*

25  *McKesson Corp.,* No. 13-CV-02219-JST, 2013 WL 6000539, at *2 (N.D. Cal. Nov. 12, 2013).

26  Pointing to knowledgeable employees who work in Iowa is not enough, as that information can be

27  collected through written discovery or through depositions conducted where the employees work.  *Van*

28  *Slyke*, 503 F. Supp. 2d at 1363.  "*Trial* convenience is what matters," and Wells Fargo has not shown

1    that the Iowa employees discussed in its motion papers are likely to testify at trial.  *Id.* (emphasis in

2    original).  At this point in the litigation, it appears more likely that Ms. Athanasiu, Mr. Rice, and the

3    members of Wells Fargo's Compliance Committee and Audit & Examination Committee—those Wells

4    Fargo representatives who were supposed to ensure that appropriate controls and testing were in place

5    to detect HAMP violations—will be vital witnesses at trial.  At least some of these likely witnesses

6    reside in California, making it unclear at best whether Iowa really would be a more convenient locale

7    for trial.

8    ### 4.    Convenience to Absent Class Members

9         In addition to witnesses associated with Wells Fargo, Plaintiff also expects that absent class

10   members would testify at trial.  Some may become plaintiffs in their own right, others would likely be

11   called to testify about their experiences with Wells Fargo, and all class members could be asked to

12   appear as witnesses during the damages phase of trial to testify about the harm they suffered as a result

13   of Wells Fargo's conduct.  According to data provided by Wells Fargo, 3.2% of these putative class

14   members reside in California and 2.1% reside in Iowa.  (Schrag Decl., Ex. 17.)  The states with the

15   highest concentration of absent class members are Florida (12.9%), Pennsylvania (9.9%), Ohio (7.4%),

16   New Jersey (6.9%), and New York (6.8%).  (*Id.*)

17        These figures indicate that no one venue is likely to be particularly convenient for most class

18   members.  But Plaintiffs disagree with Wells Fargo's contention that class-member convenience is of

19   no importance.  (*See* Mot. at 10, 15 & n.10.)  Wells Fargo cites *Ambriz v. Coca Cola* for the notion that

20   the residence of absent class members is irrelevant, but the portions it cites concerned whether venue

21   was proper in the first place—not whether one proper venue was likely to prove more convenient to

22   witnesses than another proper venue.  No. 13-CV-03539-JST, 2014 WL 296159, at *5 (N.D. Cal. Jan.

23   27, 2014).  This Court has considered the convenience of absent class members in other transfer

24   motions and Plaintiff believes it would be appropriate to do so here as well.  *See, e.g., Swamy*, 2017

25   WL 2533252 at *3.

26   ### 5.    Availability of Compulsory Process for Unwilling Witnesses

27        Wells Fargo has not identified any potential unwilling witnesses who could be subpoenaed to

28   testify in the Southern District of Iowa.  (*See* Mot. at 13.)  But Plaintiff has identified at least two

potential witnesses who reside within the subpoena power of this Court and are unlikely to testify voluntarily: Caryl J. Athanasiu and Lloyd H. Dean.  As discussed above, Ms. Athanasiu was the Chief Operational Risk Officer (CORO) from approximately 2010-14, and in that capacity provided auditing and compliance information to the Wells Fargo Compliance Committee and Audit & Examination Committee—the committees that were supposed to be ensuring that the bank maintained appropriate auditing procedures needed to detect and remedy any violations of HAMP.  (*See* Section III.A.3, *supra*.)  Ms. Athanasiu would be a third-party witness, as she has left Wells Fargo and is currently working for another San Francisco bank and living in San Mateo, California.  (Schrag Decl., ¶ 7, Ex 13.)  Mr. Dean served on Wells Fargo's Audit & Examination Committee in 2010 and 2011, and could also be compelled to testify, as he also resides in the Bay Area.  (*Id.*, ¶ 9, Ex. 14.)

The ability to present live testimony from Ms. Athanasiu and Mr. Dean if trial is held in San Francisco is another reason for keeping proceedings in this district.  *See Van Slyke*, 503 F. Supp. 2d at 1364 (discussing advantages of live testimony over deposition testimony).  Particularly when taking into account this Court's subpoena power and the known residences of those most responsible for Wells Fargo's failures of oversight, it does not appear that a transfer to Iowa would carry significant advantages of convenience.  Collectively, the convenience factors should be considered neutral or weighted against transfer.

## B.    The Interest of Justice

When considering transfer requests, courts also consider public-interest factors such as relative degrees of court congestion, any local interest in deciding localized controversies, and familiarity with governing law.  *Swamy*, 2017 WL 2533252 at *3.  These factors weigh against transfer.

### 1.    Relative Degrees of Court Congestion

As Wells Fargo points out, judges in this district are required to handle more cases each year, on average, than judges in the Southern District of Iowa.  (Mot. at 14.)  The median time to disposition for civil cases is shorter in this district, however: only 7.2 months versus 9.5 months in the Southern District of Iowa.  *Federal Court Management Statistics* (Sept. 30, 2018), www.uscourts.gov/report-name/federal-court-management-statistics.  These figures suggest that a transfer to the Southern District of Iowa would not expedite proceedings, particularly when the delay in effecting transfer and restarting

1  the case in a new forum are considered.  The goal of securing a just, speedy, and inexpensive resolution

2  of this matter would be best served by keeping here.  *Van Slyke*, 503 F. Supp. 2d at 1365.

### 2.  Any Local Interest in Deciding Localized Controversies

4  This controversy, like the many other controversies that have stemmed from Wells Fargo's

5  chronic lack of oversight, is far from localized—it is a matter of national concern that has harmed

6  borrowers throughout the country.  Insofar as this action seeks relief for those who lost their homes as a

7  result of Wells Fargo's conduct, both California and Iowa have interests in ensuring that their residents

8  are compensated appropriately.  But insofar as this litigation also seeks to hold Wells Fargo responsible

9  for its lack of oversight and deter future violations, California has the superior interest.  Wells Fargo

10  has long-standing ties to the San Francisco Bay Area and California has evinced a strong policy interest

11  in deterring irresponsible business practices.  *See, e.g., Diamond Multimedia Sys., Inc. v. Sup. Ct.*, 19

12  Cal. 4th 1036, 1064, 968 P.2d 539 (1999) (recognizing state's "compelling interest in preserving a

13  business climate free of fraud and deceptive practices"); *In re Tobacco II Cases,* 46 Cal. 4th 298, 312

14  (2009) (observing that California legislature enacted UCL to deter unfair business practices).  Iowa has

15  shown much less of an interest in deterring irresponsible business practices.  It was the last state in the

16  nation to give consumers a private right of action to enjoin unfair trade practices, and even now

17  consumers are not permitted to sue financial institutions like Wells Fargo under the state's UDAP

18  statute.  Iowa Code §§ 714H.4(1)(a)(3).

### 3.  Familiarity with Governing Law

20  Wells Fargo is correct that consumers cannot bring suit directly under HAMP.  (*See* Mot. at 11.)

21  But that does not mean that Wells Fargo automatically escapes responsibility for the lack of oversight

22  that caused so many to lose their homes.  In prior cases alleging non-compliance with HAMP, courts

23  have permitted borrowers to pursue remedies through common law claims like negligence, as well as

24  through statutes that broadly prohibit unfair and unlawful conduct, such as California's Unfair

25  Competition Law.  *See, e.g., Pimentel v. Wells Fargo Bank, N.A.*, No. 14-CV-05004-EDL, 2016 WL

26  8902601, at *6 (N.D. Cal. Dec. 6, 2016); *Majd v. Bank of Am., N.A.*, 243 Cal. App. 4th 1293, 1304

27  (2015).

28  This Court has presided over several cases involving HAMP and so is well-versed in the

1  governing legal framework and well-suited to address the legal issues that are likely to arise as the

2  litigation unfolds.  *See, e.g., Ansanelli v. JP Morgan Chase Bank, N.A.,* No. C 10-03892 WHA, 2011

3  WL 1134451 (N.D. Cal. Mar. 28, 2011); *Pitre v. Wells Fargo Bank, N.A. Mortg. Servicer*, No. C 13-

4  00552 WHA, 2013 WL 2156315, at *6 (N.D. Cal. May 17, 2013); *Sun v. Wells Fargo Bank, Nat'l*

5  *Ass'n*, No. C 14-00063 WHA, 2014 WL 1245299, at *2 (N.D. Cal. Mar. 25, 2014).

6         The Southern District of Iowa, on the other hand, does not appear to have encountered much in

7  the way of HAMP-related litigation.  Westlaw searches within that district for "Home Affordable

8  Modification Program" or "HAMP" turn up only one case: the *Vesey* case cited by Wells Fargo, which

9  did not involve a negligence claim.  *Vesey v. Wells Fargo Bank, N.A.*, No. 3:13-CV-21, 2014 WL

10  11514499, at * (S.D. Iowa Nov. 6, 2014).

11         This Court is also more familiar with California's choice-of-law rules, which under well-settled

12  *Erie* principles, will apply regardless of whether this case is transferred to Iowa or remains in

13  California.  *See Van Dusen v. Barrack*, 376 U.S. 612 (1964).  So while Plaintiff is confident that this

14  litigation could be managed effectively in the Southern District of Iowa, and has the utmost confidence

15  in the judges of that district, this Court's greater familiarity with the relevant law is a significant

16  advantage that is likely to lead to a speedier and more efficient resolution for class members.

17  **IV.**   **CONCLUSION**

18         For the reasons stated above, Plaintiff requests that the Court deny Wells Fargo's motion to

19  transfer.  The interest of justice and the convenience of the parties and witnesses would be better served

20  if the class litigation were permitted to continue in this district.

21                                         Respectfully submitted,

22

23  Dated: January 14, 2019                   */s/ Michael L. Schrag*

24                             **GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)

25                             Joshua J. Bloomfield (SBN 212172)
505 14th Street, Ste. 1110

26                             Oakland, California 94612
Telephone:  510-350-9700

27                             Facsimile:  510-350-9701
mls@classlawgroup.com

28                             jjb@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: 816-984-8100
Facsimile:  816-984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com