Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile:  (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com

*Counsel for Plaintiffs and Proposed Classes*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Alicia Hernandez, et al, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Wells Fargo Bank, N.A., et al.,<br><br>Defendants. | Case No. 3:18-cv-07354-WHA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: May 23, 2019<br>Time: 8:00 a.m.<br>Courtroom: 12<br>Judge: Hon. William H. Alsup |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II. SUMMARY OF PLAINTIFFS' COMPLAINT ................................................... 2

    A.  Wells Fargo Wrongfully Forecloses on Its Customers' Homes ................. 2

    B.  The Foreclosures Are the Result of Years of Willful and Reckless Failure to Implement Adequate Testing ................................................................... 3

    C.  Wells Fargo Conceals Its Discovery of One of the Systemic Errors ......... 4

    D.  Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight ................. 5

    E.  Wells Fargo's Conduct Irrevocably Alters the Lives of Plaintiffs and Hundreds of Other Customers Forced From Their Homes ........................... 6

III. ARGUMENT ....................................................................................................... 7

    A.  Plaintiffs Are Not Seeking to Enforce the OCC Consent Order or HAMP ..................... 7

    B.  Plaintiffs State A Claim for Breach of Contract ....................................... 9

        1.  Wells Fargo Breached the Pre-Foreclosure Notice Provision Included in 10 of the 12 Plaintiffs' Mortgage Contracts ....................... 9

        2.  The Demartino and Hood Plaintiffs Seek Leave to Amend Their Allegations to State a Related Breach of Contract Claim ...................... 11

    C.  Plaintiffs State a Claim for Intentional Infliction of Emotional Distress ...................... 12

        1.  Wells Fargo's Misconduct Was Extreme and Outrageous .................. 12

        2.  The Non-Borrower Plaintiff May Also Pursue Her Claim .................. 13

    D.  Plaintiffs State a Claim for Negligence Under California Law ................. 14

        1.  Wells Fargo Owed Plaintiffs a Duty of Care ................................... 14

        2.  The Economic Loss Rule Does Not Bar Plaintiffs' Claim ................. 16

    E.  Plaintiffs State a Claim for Wrongful Foreclosure Under California and Georgia Law ...................................................................................... 17

F.    Plaintiffs State a Claim for Violation of California's Homeowner Bill of
      Rights ................................................................................................... 18

G.    Plaintiffs State a Claim for Violation of the UCL ........................................ 19

      1.    Plaintiffs' Claim May Proceed Under the Unlawful Prong .................. 19

      2.    Plaintiffs' Claim May Proceed Under the Unfair Prong ..................... 21

H.    Plaintiffs State a Claim for Violation of Five Other States' Consumer
      Protection Laws ..................................................................................... 22

IV.   CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Aleem v. Bank of America,*
    No. EDCV 09-01812-VAP, 2010 WL 532330 (C.D. Cal. Feb. 9, 2010) ............................................ 20

*Alvarez v. BAC Home Loans Servicing, L.P.,*
    228 Cal. App. 4th 941 (2014) .......................................................................................... 15, 16

*Arizona v. Tohono O'odham Nation,*
    818 F.3d 549 (9th Cir. 2016) ................................................................................................ 10

*Auriti v. Wells Fargo Bank, N.A.,*
    No. 3:12-CV-334, 2013 WL 2417832 (S.D. Tex. June 3, 2013) ........................................... 12

*Bal v. New Penn Fin., LLC,*
    No. SACV 14-1558-AG, 2015 WL 3867984 (C.D. Cal. June 22, 2015) ............................... 10

*Biakanja v. Irving,*
    49 Cal. 2d 647 (1958) ......................................................................................................... 15

*Block v. Seneca Mortg. Servicing,*
    221 F. Supp. 3d 559 (D.N.J. 2016) ...................................................................................... 23

*Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Tr., Series 2003-1,*
    787 F. Supp. 2d 747 (N.D. Ill. 2011) .................................................................................. 24

*Bukowski v. Wells Fargo Bank, N.A.,*
    757 F. App'x 124 (3d Cir. 2018) ......................................................................................... 23

*Bunce v. Ocwen Loan Servicing, LLC,*
    No. CIV. 2:13-00976 WBS, 2013 WL 3773950 (E.D. Cal. July 17, 2013) ......................... 19

*Bushell v. JPMorgan Chase Bank, N.A.,*
    220 Cal. App. 4th 915 (2013) ............................................................................................... 8

*Cave v. Saxon Mortg. Servs., Inc.,*
    No. CIV.A. 11-4586, 2012 WL 1957588 (E.D. Pa. May 30, 2012) ..................................... 24

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ........................................................................................................ 22

*Chavez v. Indymac Mortg. Servs.*,
   219 Cal. App. 4th 1052 (2013) ................................................................... 17

*Comm. On Children's Television, Inc. v. Gen. Foods Corp.*,
   35 Cal. 3d 197 (1983) ............................................................................... 20

*Diaz v. Intuit, Inc.*,
   No. 5:15-CV-01778-EJD, 2017 WL 4386451 (N.D. Cal. Sept. 29, 2017) ........................... 22

*Dumont v. Litton Loan Servicing, LP*,
   No. 12-CV-2677-ER-LMS, 2014 WL 815244 (S.D.N.Y. Mar. 3, 2014) ........................... 24

*Duronslet v. Cty. of Los Angeles*,
   266 F. Supp. 3d 1213 (C.D. Cal. 2017) ......................................................... 12

*Faulks v. Wells Fargo & Co.*,
   No. 13-CV-02871-MEJ, 2015 WL 4914986 (N.D. Cal. Aug. 17, 2015) ........................... 12

*Fowler v. Wells Fargo Bank, N.A.*,
   No. 17-CV-02092-HSG, 2017 WL 3977385 (N.D. Cal. Sept. 11, 2017) ........................... 20

*Gerstle v. Am. Honda Motor Co., Inc.*,
   No. 16-CV-04384-JST, 2017 WL 2797810 (N.D. Cal. June 28, 2017) ........................... 23

*Hall v. Washington Mut. Bank*,
   2011 WL 13213926 (C.D. Cal. Jan. 3, 2011) .................................................... 12

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ................................................................... 10

*Hodsdon v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018) ............................................................... 21, 22

*J'aire Corp. v. Gregory*,
   24 Cal. 3d 799 (1979) ............................................................................... 16

*Kaurloto v. U.S. Bank, N.A.*,
   No. 16-CV-06652-JFW-GJSX, 2016 WL 6808117 (C.D. Cal. Nov. 17, 2016) ................... 19

*Kemp v. Wells Fargo Bank, N.A.*,
   No. 17-CV-01259-MEJ, 2017 WL 4805567 (N.D. Cal. Oct. 25, 2017) ........................... 16

*Keosseian v. Bank of Am.*,

    2012 WL 458470 (D.N.J. Feb. 10, 2012) ........................................................................ 23

*Lucia v. Wells Fargo Bank, N.A.*,

    798 F. Supp. 2d 1059 (N.D. Cal. 2011) ........................................................................ 19

*Lucioni v. Bank of America, N.A.*,

    3 Cal. App. 5th 150 (2016) ........................................................................................... 18

*MacDonald v. Wells Fargo Bank N.A*,

    No. 14-CV-04970-HSG, 2015 WL 1886000 (N.D. Cal. Apr. 24, 2015) ................... 15, 16

*Mann v. Bank of New York Mellon*,

    No. 4:12-CV-2618, 2013 WL 5231482 (S.D. Tex. Sept. 16, 2013) ........................... 11

*McGinnis v. Am. Home Mortg. Servicing, Inc.*,

    817 F.3d 1241 (11th Cir. 2016) ................................................................................... 12

*McGrath v. Fahey*,

    126 Ill. 2d 78 (1988) .................................................................................................... 14

*McQuirk v. Donnelley*,

    189 F.3d 793 (9th Cir. 1999) ....................................................................................... 15

*Microsoft Corp. v. Motorola, Inc.*,

    795 F.3d 1024 (9th Cir. 2015) ....................................................................................... 7

*Newport v. Burger King Corp.*, No. C,

    No. 10-04511 WHA, 2011 WL 4632878 (N.D. Cal. Oct. 5, 2011) ........................... 17

*Nyhart v. PNC Bank, N.A.*,

    No. CV PX 15-2241, 2016 WL 6996744 (D. Md. Nov. 30, 2016) ........................... 23

*Nymark v. Heart Fed. Savings & Loan Assn.*,

    231 Cal. App. 3d 1089 (1991) ..................................................................................... 15

*Oskoui v. J.P. Morgan Chase Bank, N.A.*,

    851 F.3d 851 (9th Cir. 2017) ..................................................................................... 9, 22

*Penermon v. Wells Fargo Bank, N.A.*,

    47 F. Supp. 3d 982 (N.D. Cal. 2014) ......................................................................... 19, 21

*Potter v. Firestone Tire & Rubber Co.*,

    6 Cal. 4th 965 (1993) ................................................................................................ 14

*Pub. Fin. Corp. v. Davis*,

    66 Ill. 2d 85 (1976) ................................................................................................ 14

*Romo v. Wells Fargo Bank, N.A.*,

    No. 15-CV-03708-EMC, 2016 WL 324286 (N.D. Cal. Jan. 27, 2016) ............................ 16

*Rowen v. Bank of Am., N.A.,*

    No. CV 12-1762 CAS, 2013 WL 1182947 (C.D. Cal. Mar. 18, 2013) ............................ 12

*Rowland v. JPMorgan Chase Bank, N.A.*, No. C 14-00036 LB,

    2014 WL 992005 (N.D. Cal. Mar. 12, 2014) .............................................................. 16

*Ryan-Beedy v. Bank of New York Mellon*,

    293 F. Supp. 3d 1101 (E.D. Cal. 2018) ...................................................................... 17

*Sheely v. Bank of Am., N.A.*,

    36 F. Supp. 3d 1364 (N.D. Ga. 2014) ........................................................................ 17

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,

    17 Cal. 4th 553 (1998) .............................................................................................. 20

*West v. JPMorgan Chase Bank, N.A.*,

    214 Cal. App. 4th 780 (2013) .............................................................................. 10, 21

*Zhang v. Superior Court*,

    57 Cal. 4th 364 (2013) .............................................................................................. 20

**Statutes**

12 U.S.C. § 1715u(a)-(b) .............................................................................................. 11

12 U.S.C.A. § 1715u .................................................................................................... 10

Cal. Civ. Code § 2924.17(b) ........................................................................................ 18

Cal. Civ. Code § 2924.19(b) ........................................................................................ 18

Civil Code section 2924.17 .................................................................................... 18, 19

**Regulations**

24 C.F.R. §§ 203.501, 203.605(a), 203.606(a) ........................................................................ 11

**Other Authorities**

Restatement (Second) of Contracts § 203 (1981) .................................................................... 10

1    **I.      INTRODUCTION**

2           Wells Fargo admitted last year that it wrongfully denied mortgage modifications to

3    approximately 870 customers—causing at least 545 of them to lose their homes to foreclosure.  It

4    blamed a "faulty calculation," but the problem runs much deeper and is only the latest example of

5    Wells Fargo's willingness to ignore repeated warnings, flout compliance obligations, and place

6    customers in financial peril to maximize its own profits.

7           Wells Fargo used an automated software tool that had not been properly tested to determine

8    whether the bank could foreclose on its customers' homes, or whether it was first required to offer a

9    mortgage modification.  Wells Fargo's board knew back in 2011 that the bank was not adequately

10   testing its mortgage modification and foreclosure processes, and even signed consent orders agreeing to

11   implement appropriate auditing and compliance procedures.  But it never did.  Not even after the

12   government concluded a different software error had caused Wells Fargo's customers to be wrongly

13   denied mortgage modifications.  Wells Fargo kept using its faulty software tool to justify wrongful

14   foreclosures.  And when it discovered another error in 2015, Wells Fargo kept its discovery a secret.  It

15   didn't tell the customers who lost their homes due to the error, didn't stop foreclosures then in process,

16   and didn't test for more errors (which remained undiscovered for another three years).  Even now,

17   Wells Fargo is only coming clean because the Federal Reserve has capped the scandal-ridden bank's

18   assets until it overhauls its oversight and compliance practices and passes a series of outside audits.

19          Despite admitting that it foreclosed on hundreds of its customers in error, Well Fargo now asks

20   the Court to dismiss this case and find, as a matter of law, that the bank is not liable.  To support its

21   request, Wells Fargo mischaracterizes the case as an impermissible attempt to enforce government

22   consent orders.  But Plaintiffs' complaint includes no such claims.  What it does include is a claim for

23   intentional infliction of emotional distress, which requires a showing that Wells Fargo acted

24   outrageously and in reckless disregard to the probability that its customers would suffer emotional

25   distress if it wrongly foreclosed on their homes.  The consent orders are highly relevant to that claim:

26   they show that Wells Fargo was aware—and aware at the very highest levels—that its testing was

27   inadequate, and yet it repeatedly refused to fix the problem.  It is this reckless indifference to the

28   wellbeing of others that elevates Wells Fargo's conduct from merely careless to truly outrageous.

Wells Fargo also tries to frame Plaintiffs' case as an impermissible attempt to enforce HAMP, a federal program that mandated mortgage modifications for distressed homeowners but that included no private right of action.  Wells Fargo made the same "end-run" argument before the Seventh Circuit years ago.  In a decision that has since been widely cited and followed, the Seventh Circuit found that HAMP was not intended to have preemptive effect, and so a borrower may pursue a bank's failure to offer a HAMP-mandated mortgage modification under state law.  Accordingly, Plaintiffs are pursuing claims under state law.  One of those claims is for breach of the parties' mortgage contracts, which required Wells Fargo to notify borrowers of actions they could take to cure their default and avoid foreclosure.  Because Plaintiffs qualified for a mortgage modification, Wells Fargo should have offered them that opportunity to avoid foreclosure.  Having failed to do so—instead choosing to rely on a faulty software tool to decide that it could proceed with foreclosure—Wells Fargo and not its customers should bear responsibility for the severe consequences that followed.

## II.     SUMMARY OF PLAINTIFFS' COMPLAINT

### A.     Wells Fargo Wrongfully Forecloses on Its Customers' Homes

Plaintiffs are among the millions of homeowners who had trouble making ends meet during the Great Recession. They fell behind on their mortgage payments and needed help to avoid losing their homes.  (First Am. Compl. [ECF No. 44], ¶ 30.)  The Home Affordable Modification Program (HAMP) was designed to provide the very help that Plaintiffs needed.  Introduced through the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers like Wells Fargo to offer loan modifications to borrowers who met certain threshold requirements.  (*Id.*, ¶ 31.)  These modifications lowered a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) so the borrower could avoid foreclosure.  (*Id.*)  Similar threshold requirements were adopted for loans guaranteed or owned by government-sponsored enterprises such as Fannie Mae and Freddie Mac, and for loans insured by the Federal Housing Administration (FHA).  (*Id.*, ¶ 32.)

Plaintiffs met the programs' threshold requirements for a mortgage modification and, as their mortgage servicer, Wells Fargo was required to offer them one.  (*Id.*, ¶ 33.)  Wells Fargo failed to do so and instead foreclosed on eleven of the named plaintiffs and more than five hundred other customers who could not make their monthly payments without a modification.  (*Id.*)

### B.     The Foreclosures Are the Result of Years of Willful and Reckless Failure to Implement Adequate Testing

Wells Fargo has only recently acknowledged that it wrongfully denied Plaintiffs mortgage modifications.  (FAC, ¶ 35.)  In form letters sent to Plaintiffs and some 860 other class members in late 2018, Wells Fargo claimed that its decision was based on a "faulty calculation."  (*Id.*, ¶ 36.)  The problem goes much deeper than a single miscalculation, however, and reflects the same extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.  (*Id.*)

To help mortgage servicers like Wells Fargo determine whether a customer qualified for a mandatory mortgage modification, the federal government provided servicers with a free software tool. (*Id.*, ¶ 38.)  Instead of using this free and well-vetted software, however, Wells Fargo developed its own automated decision-making tool.  (*Id.*, ¶ 37.)  The importance of this software to Wells Fargo's customers cannot be overstated—it determined whether they would receive relief in a time of extreme financial distress and, in many instances, meant the difference between keeping their homes or losing them to foreclosure.  Yet Wells Fargo repeatedly failed to verify that the tool correctly calculated whether customers qualified for government-mandated mortgage modifications.  Multiple systemic errors in the bank's decision-making tool went uncorrected for years on end—with life-changing consequences for hundreds of Wells Fargo's customers.  (*Id.*)

Wells Fargo's board and executive leadership were warned that the bank had not implemented adequate testing.  In 2011, the Office of the Comptroller of the Currency (OCC) found that Wells Fargo had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.  (*Id.*, ¶ 41.)  Wells Fargo Bank and its parent company, Wells Fargo & Company, submitted to separate consent orders with the OCC and the Federal Reserve, respectively.  (*Id.*, ¶ 42.)  The bank's board (consisting of executives and directors of the Wells Fargo parent company) was ordered to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied.  (*Id.*, ¶ 43.)  Wells Fargo & Company's board was ordered to ensure that the bank complied with its obligations, including by strengthening the board's oversight of compliance with HAMP and other government requirements; to ensure that audit

1  and compliance programs were adequately staffed; and to improve the information and reports that it

2  would regularly review.  (*Id.*, ¶ 44.)

3       Despite being clearly warned in 2011 that it needed to implement testing procedures that would

4  have detected and remedied the systemic errors at issue in this case, Wells Fargo failed to do so.  Four

5  years later, the OCC found Wells Fargo was still not complying with the consent orders.  (*Id.*, ¶ 47.)  It

6  had not maintained ongoing testing for compliance with HAMP and other government programs; had

7  not ensured the bank's audit and compliance programs had the requisite authority and status so that

8  deficiencies in the bank's mortgage modification and foreclosure practices would be identified and

9  promptly remedied; and had not ensured that the bank was making reasonable good faith efforts,

10  consistent with HAMP and other government requirements, to modify delinquent mortgage loans and

11  prevent foreclosures of its customers' homes.  (*Id.*)

12      **C.**    **Wells Fargo Conceals Its Discovery of One of the Systemic Errors**

13       As a result of Wells Fargo's refusal to implement appropriate testing procedures, Wells Fargo

14  failed to detect a software error that led it to wrongly deny mortgage modifications to 184 Wells Fargo

15  customers between March 2013 and October 2014.  (FAC, ¶ 49.)  The OCC specifically noted this error

16  in a May 2016 order requiring Wells Fargo to pay a civil money penalty.  (*Id.*)  That error is not one of

17  the errors at issue in this case.  But unbeknownst to the OCC, Wells Fargo had discovered a different

18  error—one that is at issue in this case—in October 2015.  (*Id.,* ¶ 50.)  Wells Fargo kept this additional

19  error a secret—likely because the OCC announced it might penalize Wells Fargo for its continued non-

20  compliance and Wells Fargo knew that disclosing the error would impact the severity of that penalty.

21  (*Id.*)  Wells Fargo did not tell any of the 625 affected customers, did not stop foreclosures then in

22  progress, and did not test the automated decision-making tool for other errors (which remained

23  undiscovered for three more years).  (*Id.,* ¶ 52.)  Wells Fargo's board then reached an agreement with

24  the OCC under which the bank would pay a $70 million fine and the OCC would lift certain restrictions

25  it had placed on Wells Fargo's mortgage servicing business.  Although the fine was assessed for failing

26  to implement adequate testing procedures, and specifically cited the 184 mortgage modifications that

27  had been wrongly denied due to an error in Wells Fargo's software, none of the signing directors

28  disclosed that Wells Fargo had discovered a different software error that affected hundreds more of its

customers.  (*Id.*, ¶ 51.)

### D.     Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight

The failure of Wells Fargo's leadership to ensure the bank implemented adequate testing procedures was not an accident.  As scandal after scandal comes to light, it has become clear that Wells Fargo's leaders intentionally abandoned their oversight responsibilities in the name of unfettered profits and growth.  (FAC, ¶ 53.)  The most notorious example is the fraudulent account scandal uncovered in 2016, where Wells Fargo employees were encouraged to sign up customers for some 3.5 million checking and credit card accounts without their knowledge.  Wells Fargo was fined $185 million by federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce) were fired for their involvement in the scandal.  (*Id.*, ¶ 54.)  Wells Fargo's board, which itself ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an institutional investor's request that the board address its lack of comprehensive audit procedures, later released a report that primarily blamed executives John G. Stumpf and Carrie L. Tolstedt for the scandal.  (*Id.*, ¶ 56.)  Mr. Stump and Ms. Tolstedt will also play a prominent role in this case: they were two of the signatories to the 2011 OCC consent order discussed above and were among those responsible for Wells Fargo's decision not to implement the auditing and compliance procedures called for by the consent order.  (*Id.*)

This case and the fraudulent account scandal are far from the only examples of Wells Fargo's board and executive leadership abdicating their oversight responsibilities.  Wells Fargo's leadership has ignored unlawful practices throughout the bank's lending divisions, leading to a series of scandals and public outrage.  (*See id.*, ¶ 56 (citing examples).)  Wells Fargo has often promised to reform its oversight practices as part of its settlements with the government.  But each time, Wells Fargo's board and executive leadership have failed to live up to those promises.  As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law."  (*Id.*, ¶ 57.)

Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve

board announced it was barring Wells Fargo from expanding its business until the bank sufficiently

improves its governance and controls.  (*Id.*, ¶ 58.)  Among other things, Wells Fargo will have to

overhaul its oversight practices, implement effective testing and compliance programs, and pass

multiple outside audits before it will be permitted to acquire additional assets.  (*Id.*, ¶¶ 60-62.)  The

Federal Reserve's cease-and-desist order has been described as a "Fear of God Penalty," with one

expert opining that Wells Fargo is "lucky it is too big to shut down."  (*Id.*, ¶ 7.)

### E.    Wells Fargo's Conduct Irrevocably Alters the Lives of Plaintiffs and Hundreds of Other Customers Forced From Their Homes

In the fall of 2018, with outside audits looming, Wells Fargo was forced to reveal what it

learned in 2015: that systemic errors in Wells Fargo's automated decision-making tool led it to wrongly

deny government-mandated mortgages to 625 of its customers and then to wrongfully foreclose on

approximately 400 of those customers.  (FAC, ¶ 64.)  Three months later, Wells Fargo disclosed that it

had discovered related errors in its automated decision-making tool, which had led the bank to wrongly

deny mortgage modifications to another 245 customers.  (*Id.*, ¶65.)  Altogether, Wells Fargo estimates

that the errors affected about 870 customers and led to about 545 foreclosures.  (*Id.*)

Wells Fargo's conduct has irrevocably altered Plaintiffs' and class members' lives.  Plaintiff

Coszetta Teague and her family were forced to live in their car for three years after Wells Fargo forced

them from their home.  (*Id.*, ¶ 105.)  Ms. Teague suffered from deep depression and was prescribed

anti-depressants; her daughter, Plaintiff Iesha Brown, experienced suicidal ideations and was in therapy

for five years; and Ms. Teague's young grandchildren were also traumatized—they were forced to

change schools and stopped interacting with their friends and family.  (*Id.*, ¶ 106.)  Plaintiff Rose

Wilson was forced to move her children and grandchildren to a cramped, mold- and rodent-infested

rental property after Wells Fargo foreclosed on their home.  (*Id.*, ¶ 133.)  Plaintiff Debora Granja had to

remove her daughters from the only environment they ever knew when Well Fargo foreclosed on her

home; the foreclosure put great strain on her marriage and contributed to the couple's legal separation;

and Ms. Granja was diagnosed with severe depression and, later, acute traumatic stress disorder caused

by an accumulation of stress, including the foreclosure.  (*Id.*, ¶ 75.)  Plaintiff Yvonne DeMartino was

forced to place her elderly mother, who suffers from Parkinson's disease, into a far-away rest home

1    after Wells Fargo foreclosed on the home they had purchased for her next door to their own.  (*Id.*, ¶¶

2    114, 118.)  Ms. DeMartino's credit scores plummeted as a result of the foreclosure, she had difficulty

3    obtaining a security clearance she needed for work because of her poor credit, and she was forced to

4    retire early from her job at the Department of Defense.  (*Id.*, ¶ 116.)

5        This proposed class action seeks compensation for Plaintiffs and hundreds of other class

6    members who were forced to endure a great deal of financial and emotional suffering as a result of

7    Wells Fargo's conduct.  Their damages include loss of their homes; loss of equity in their homes; loss

8    of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

9    spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

10   money to find new housing and move their families; loss of favorable interest rates or other favorable

11   loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments;

12   stress-related illnesses; broken marriages; children coping with the financial and emotional

13   consequences of their parents losing the family home; and severe emotional distress.  (*Id.*, ¶ 69.)

14   **III.    ARGUMENT**

15       **A.    Plaintiffs Are Not Seeking to Enforce the OCC Consent Order or HAMP**

16       In an effort to avoid responsibility for the severe harm caused by its conduct, Wells Fargo tries

17   to recast the complaint as an improper attempt to enforce either the OCC's consent order or HAMP.

18   (Mot. at 1, 4-8.)  But Plaintiffs have not pled a cause of action under either HAMP or the OCC consent

19   order.  Instead, Plaintiffs are pursuing claims for breach of their mortgage contracts, intentional

20   infliction of emotional distress, negligence, wrongful foreclosure, violation of California's

21   Homeowners Bill of Rights and Unfair Competition Law, and violation of five other state consumer

22   protection laws.  (FAC, ¶¶ 184-262.)

23       Plaintiffs recognize that Wells Fargo's violation of the OCC consent order is a matter for the

24   federal government to enforce.  (*Id.*, ¶ 47.)  But the facts behind the OCC consent order remain relevant

25   to Plaintiffs' case.  Those facts show that Wells Fargo was warned about the testing deficiencies at

26   issue in this case, that Wells Fargo's board knew it was responsible for implementing corrective

27   measures, and that the board quite deliberately chose not to fix the problem.  *See Microsoft Corp. v.*

28   *Motorola, Inc.*, 795 F.3d 1024, 1055 (9th Cir. 2015) ("Consent decrees can be introduced … to show

notice or knowledge").  The board's level of knowledge and recklessness is relevant to many aspects of the claims that Plaintiffs have asserted, including Plaintiffs' requests for emotional-distress damages, punitive damages, and treble damages.  (*See, e.g.,* FAC, ¶¶ 192-197, 209, 216-220, 239.)  So while Plaintiffs' complaint does discuss the OCC's consent order (as well as several other consent orders between Wells Fargo and the government), that does not mean Plaintiffs are trying to enforce the OCC order.  The complaint does not include a claim for violation of any consent order, whether under a third-party beneficiary theory or otherwise.  And although Plaintiffs do assert a negligence claim under California law, they are not attempting to use the consent order to create a duty of care (as occurred in some of the cases Wells Fargo cites).  (*See id.*, ¶¶ 199-201.)

Plaintiffs are also not attempting to proceed under HAMP, which as Wells Fargo points out, does not include a private right of action.  HAMP does play a role in the case, of course, as it prescribed the threshold requirements that Wells Fargo was required to use in determining whether Plaintiffs qualified for a mortgage modification (and that other programs such as Fannie Mae, Freddie Mac, and the FHA then adopted).  But the vehicle under which Plaintiffs seek to recover from Wells Fargo is state law.  The question is therefore not whether Plaintiffs have standing to enforce HAMP, but whether Congress's decision not to grant Plaintiffs a private right of action under HAMP precludes Plaintiffs from proceeding under state law.

This issue was addressed extensively in *Wigod v. Wells Fargo*, where Wells Fargo took the same position it does here: that plaintiffs should not be permitted to make an "end-run around the lack of a private action in … HAMP."  673 F.3d 547, 581 (7th Cir. 2012).  The district court had dismissed the plaintiffs' contract and consumer protection claims, reasoning that they were "premised chiefly on the terms and procedures set forth via HAMP and … not sufficiently independent to state a separate state law cause of action."  *Id.*  But the Seventh Circuit reversed, holding that "[t]he absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law."  *Id.* at 581.  "To find otherwise would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead."  *Id.; Bushell v. JPMorgan Chase Bank, N.A.,* 220 Cal. App. 4th 915, 928 n.9 (2013) (quoting *Wigod*).

The Ninth Circuit has twice followed *Wigod* in overturning dismissals of state law claims in HAMP-related actions.  In *Corvello v. Wells Fargo*, the Ninth Circuit overturned the dismissal of contract and UCL claims (among others) premised on Wells Fargo's failure to comply with the terms of a HAMP trial-period plan by offering a good-faith permanent modification consistent with HAMP guidelines.  728 F.3d 878, 880, 882-83 (9th Cir. 2013).  Four years later, in a decision reversing summary judgment, the Ninth Circuit found the evidence supported the plaintiffs' claim that Chase had violated state contract law by failing to abide by the terms of a HAMP trial-period plan, and violated the UCL by failing to inform the plaintiff she did not actually qualify for a mortgage modification under HAMP.  *Oskoui v. J.P. Morgan Chase Bank, N.A.*, 851 F.3d 851, 857-59 (9th Cir. 2017).  Both cases rely on *Wigod* and follow its holding that trial-period plans offered under HAMP may form the basis for state contract claims.  *Corvello*, 728 F.3d at 880-81, 883-85; *Oskoui*, 851 F.3d at 858-59.  And while they do not explicitly mention *Wigod*'s rejection of Wells Fargo's "end-run" argument (likely because the banks subsequently dropped the argument), the holdings of both cases are inconsistent with the notion that HAMP's lack of a private right of action automatically precludes state law claims.

### B.    Plaintiffs State A Claim for Breach of Contract

#### 1.    Wells Fargo Breached the Pre-Foreclosure Notice Provision Included in 10 of the 12 Plaintiffs' Mortgage Contracts

Plaintiffs allege that Wells Fargo breached Plaintiffs' mortgage agreements by accelerating payments and commencing foreclosure without first notifying them that they could cure the default by accepting a mortgage modification.  (FAC, ¶¶ 188-89.)  Wells Fargo acknowledges that ten of the twelve Plaintiffs' mortgage contracts include a provision that permitted Wells Fargo to accelerate payments and initiate foreclosure only after it delivered a notice to Plaintiffs that specified: how they defaulted on the agreement, the action required to cure the default, and the date by which the default must be cured to avoid acceleration of the loan payments and possible foreclosure.  (*Id.*, ¶186; *see also* Def.'s RJN, Ex. 3 [ECF No. 60-3] at 26, ¶ 22 (Floyds); *id.* at 56, ¶ 22 (Hernandez); *id.* at 76, ¶ 21 (Wilson).)  Where the parties disagree is on the meaning of the phrase "action required to cure the default."  Wells Fargo contends that "the plain meaning of 'the action required to cure [the] default' is the amount required to bring the loan current.'"  (Mot. at 9-10.)  Plaintiffs contend that "action required

to cure the default" is not so limited and refers to any action borrowers could take to cure their default.

Wells Fargo's interpretation of its contractual duty would render the broad language in Plaintiffs' contracts meaningless and should be rejected—either because it is incorrect as a matter of law or because it raises a question of fact that cannot be resolved through a motion to dismiss. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1118 (9th Cir. 2018) ("If a contract is ambiguous, it presents a question of fact inappropriate for resolution on a motion for dismiss."). If the parties' mortgage agreements intended that lenders would only be required to notify delinquent borrowers of "the amount required to bring the loan current," as Wells Fargo claims, the contracts could have specified as much. Instead, the mortgage contracts used language that would capture any action that could cure the default. Any interpretation of the mortgage provisions should give full effect to that expansive language. *See* Restatement (Second) of Contracts § 203 (1981) (an interpretation that gives a reasonable and effective meaning to all the terms is preferred to an interpretation that leaves a part unreasonable or of no effect); *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 557 n.4 (9th Cir. 2016) ("General words are to be understood in a general sense.").

Wells Fargo's interpretation would also undermine the purpose of the mortgage's notice provision, which is to limit foreclosures by giving borrowers a fair opportunity to address defaults. The more reasonable interpretation would require lenders like Wells Fargo to notify borrowers of any action they can take to cure their deficiency. Accepting a mortgage modification that the lender is required to offer is one such way. It meets the definition of "cure," which *Merriam Webster* defines as "to deal with in a way that eliminates or corrects." *Merriam–Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/cure (legal definition). The mortgage modifications for which Plaintiffs qualified under HAMP or related programs would have eliminated Plaintiffs' defaults by replacing their existing repayment schedule with a new one that provides for lower, sustainable monthly payments. (*See* FAC, ¶ 31); *see also West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 785 (2013) (describing goal of HAMP). Accepting such a mortgage modification thus qualifies as an action Plaintiffs could have taken to cure their defaults. *See also* 12 U.S.C.A. § 1715u (HUD regulation illustrating that mortgage modification can "cure the default") *Bal v. New Penn Fin., LLC*, No. SACV 14-1558-AG, 2015 WL 3867984, at *3 (C.D. Cal. June 22, 2015) (mentioning loan

1  modification as a potentially viable option to cure a default); *Mann v. Bank of New York Mellon,* No.

2  4:12-CV-2618, 2013 WL 5231482, at *4 (S.D. Tex. Sept. 16, 2013) (finding no breach where plaintiffs

3  were "given the opportunity to seek a loan modification as a way to cure the default").

4      In many circumstances, such as the cases cited by Wells Fargo, a lender is not required to offer

5  borrowers a mortgage modification.  (Mot. at 10.)  In those cases, accepting a mortgage modification is

6  not an action available to borrowers to cure their default and so lenders need not notify borrowers about

7  that action before accelerating payments and initiating foreclosure proceedings.  But here, Wells Fargo

8  was required to offer Plaintiffs mortgage modifications.  (FAC, ¶¶ 33, 189.)  By failing to do so, Wells

9  Fargo not only violated government requirements, they violated the terms of their mortgage agreements

10  with Plaintiffs.  Plaintiffs were not given the full and fair opportunity to avoid acceleration and

11  foreclosure contemplated by the mortgage agreements, and they should not be forced to shoulder the

12  severe consequences that resulted from Wells Fargo's failure to fulfill its contractual obligations.

13

14      **2.**       **The Demartino and Hood Plaintiffs Seek Leave to Amend Their Allegations to State a Related Breach of Contract Claim**

15      Most Plaintiffs' and class members' mortgage contracts are based on the uniform Fannie Mae /

16  Freddie Mac Security Instruments, and so include similar pre-acceleration notice requirements.  But as

17  Wells Fargo points out, two of the twelve named plaintiffs—the Demartino and Hood plaintiffs—used

18  FHA security agreements that do not contain the "action required to cure the default" language.  (Mot.

19  at 9 n.11.)  Instead, the FHA security agreements provide that a lender may not accelerate loan

20  payments and initiate foreclosure "if not permitted by regulations of the [HUD] Secretary."  (Def.'s

21  RJN, Ex. 3 [ECF No. 60-3] at 6 (Demartino), ¶ 9(d); *id.* at 35, ¶ 9(d) (Hood).)  This language gives rise

22  to similar breach of contract claims, as HUD regulations prohibit lenders from foreclosing without first

23  offering loan modifications to qualifying borrowers.  *See* 24 C.F.R. §§ 203.501, 203.605(a), 203.606(a).

24  The Demartino and Hood Plaintiffs qualified for a loan modification under the FHA-HAMP program

25  but were not offered that modification by Wells Fargo, in violation of the HUD regulations and

26  Sections 230(a)-(b) of the National Housing Act (12 U.S.C. § 1715u(a)-(b)).

27      Because Wells Fargo accelerated loan payments and initiated foreclosure under circumstances

28  not permitted by HUD regulations, Wells Fargo breached its contractual obligations under its mortgage

1  agreements with the Demartino and Hood Plaintiffs.  This breach of contract is similar to those alleged

2  by the other Plaintiffs, but it utilizes HUD regulations that are incorporated by reference into the

3  contracts by reference.  Plaintiffs therefore seek leave to correct their contract allegations as to the

4  Demartino and Hood Plaintiffs and specify the distinct basis for their breach-of-contract claims.

5      **C.**    **Plaintiffs State a Claim for Intentional Infliction of Emotional Distress**

6      **1.**    **Wells Fargo's Misconduct Was Extreme and Outrageous**

7      Plaintiffs' second claim is for intentional infliction of emotional distress.  Plaintiffs allege that

8  Wells Fargo (i) engaged in extreme and outrageous conduct, (ii) recklessly disregarded the probability

9  that its conduct would cause emotional distress to its customers, and (iii) did in fact cause Plaintiffs to

10  suffer severe emotional distress.  (FAC, ¶¶ 192-96.)  Wells Fargo challenges only the first element,

11  citing cases that found an absence of extreme and outrageous conduct.  (Mot. at 11-12.)  The

12  defendants' conduct in those cases may not have been "so extreme as to exceed all bounds of that

13  usually tolerated in a civilized community."  *Hall v. Washington Mut. Bank*, 2011 WL 13213926, at *3

14  (C.D. Cal. Jan. 3, 2011).  And the plaintiffs in those cases may have lacked the "more unusual and

15  severe allegations" necessary to elevate the alleged conduct from merely bad to outrageous.  *Auriti v.*

16  *Wells Fargo Bank, N.A.*, No. 3:12-CV-334, 2013 WL 2417832, at *9 (S.D. Tex. June 3, 2013).  But

17  that does not mean that the Wells Fargo's conduct in this case falls short on the outrageousness scale.

18      "Whether conduct is 'extreme and outrageous' is a question of fact for a jury to resolve unless

19  reasonable minds could not differ on the issue."  *Duronslet v. Cty. of Los Angeles*, 266 F. Supp. 3d

20  1213, 1219 (C.D. Cal. 2017).  Not all wrongful foreclosures qualify—something more is needed.  But

21  "where bad faith or other outrageous conduct is present, courts have permitted plaintiffs to maintain

22  their IIED claims."  *Faulks v. Wells Fargo & Co.*, No. 13-CV-02871-MEJ, 2015 WL 4914986, at *5

23  (N.D. Cal. Aug. 17, 2015); *see also Rowen v. Bank of Am., N.A.,* No. CV 12-1762 CAS, 2013 WL

24  1182947, at *4 (C.D. Cal. Mar. 18, 2013) ("when a lender exhibits either bad faith or gross negligence

25  … [and] defendant had no right to foreclose, the 'outrageous' standard can be met"); *McGinnis v. Am.*

26  *Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1258 (11th Cir. 2016) ("When there is evidence of more

27  egregious conduct … Georgia courts have held that a jury can properly infer intentional infliction of

28  emotional distress in actions related to a wrongful foreclosure").

It is difficult to describe Wells Fargo's conduct in this case as anything but outrageous: it features years of bad faith and gross negligence, coupled with egregious refusals by the company's board of directors to remedy a known problem—even in the face of multiple government orders requiring it to do so.  (*See* FAC, ¶¶ 35-52.)  Over the course of nearly a decade, Wells Fargo repeatedly failed to test the automated decision-making tool on which its customers' homes and wellbeing depended, ignored multiple consent decrees requiring it to implement adequate testing, and then concealed its discovery of systemic errors from regulators and the customers whose homes were foreclosed upon as a result of the errors.  (*Id.*, ¶ 192.)  Plaintiffs lost their homes not because of a good-faith mistake but because of Wells Fargo's repeated refusal to address a known problem.  They lost their homes not because of an isolated incident of mistreatment at the hands of lower-level employees, but because of a deliberate and callous decision by Wells Fargo's board of directors to ignore unlawful conduct throughout the company in the name of profits and unfettered growth.  (*Id.*, ¶¶ 59, 193.)  The board knew that its mortgage modification and foreclosure practices were deficient and repeatedly told the government that it would more closely oversee those activities and ensure adequate testing was conducted.  But the board repeatedly failed to act, just as it failed to act to address the fraudulent-account scandal and other consumer abuses at Wells Fargo.  (*Id.*, ¶¶ 40-47, 53-57, 194.)  Wells Fargo as a financial institution has become virtually synonymous with extreme and outrageous conduct as scandal after scandal has come to light.  (*Id.*, ¶¶ 56, 193.)  Plaintiffs are victims of one of those scandals, and should be compensated for the severe emotional distress they suffered due to years of gross negligence and bad-faith refusals to address known problems in the bank's mortgage modification and foreclosure practices.

### 2. The Non-Borrower Plaintiff May Also Pursue Her Claim

Plaintiffs propose certifying an IIED class that would allow all persons affected by Wells Fargo's extreme and outrageous conduct the opportunity to come forward and prove their claims—including, for example, the children who were evicted from their homes when Wells Fargo foreclosed on their parents' properties.  (FAC, ¶ 166.)  Wells Fargo argues that, under California law, non-borrower class members cannot recover without showing that Wells Fargo was aware of their presence in the home.  (Mot. at 13-14.)  California law is unusual in that it distinguishes between situations

1  where (i) the defendant knew that "particular plaintiffs" would be affected by its conduct, and (ii) the

2  defendant knew that its conduct would affect any persons who might foreseeably be present.  The

3  elements of IIED may be satisfied in the first situation, but not in the second.  *Potter v. Firestone Tire*

4  *& Rubber Co.*, 6 Cal. 4th 965, 1002-3 (1993).  This distinction may ultimately require absent class

5  members from California to produce evidence showing Wells Fargo knew they resided in the home

6  prior to its foreclosure, but it has no bearing on the present motion.

7       The only issue at this stage in the litigation is whether the one non-borrower plaintiff named in

8  the complaint—Plaintiff Iesha Brown from Illinois—has adequately alleged an IIED claim against

9  Wells Fargo.  Ms. Brown's claim is governed by Illinois law, which only requires that a defendant

10  "know that there is at least a high probability that [its] conduct will cause severe emotional distress."

11  *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988).  Illinois follows the Restatement (Second) of Torts in this

12  regard.  *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976) (citing sec. 46, comment i, and adopting

13  recklessness standard).  And as Justice Mosk recognized in *Potter*, the Restatement does not require the

14  defendant to be aware that a "particular person" would be affected by its conduct.  *Potter*, 6 Cal. 4th at

15  1014-15 (Mosk, J., concurring and dissenting).  Accordingly, there is no requirement that Ms. Brown

16  allege that Wells Fargo knew that she was living at the house.  It is enough that Plaintiffs have alleged

17  facts showing that Wells Fargo acted with reckless disregard for the probability that its conduct would

18  lead to wrongful foreclosures and cause severe emotional distress to those—like Ms. Brown—who

19  were displaced as a result of that conduct.  (*See* FAC, ¶¶ 1-7, 35-63, 191-96.)

20       **D.      Plaintiffs State a Claim for Negligence Under California Law**

21            **1.      Wells Fargo Owed Plaintiffs a Duty of Care**

22       The California Plaintiffs (Debora Granja and Keith Lindner) also seek to hold Wells Fargo

23  liable under a negligence theory.  (FAC, ¶¶ 198-203.)  They allege Wells Fargo failed to use reasonable

24  care in determining whether they were eligible for a mortgage modification—including by failing to

25  properly audit its mortgage modification software for nearly a decade.  (*Id.*, ¶ 200.)  Wells Fargo seeks

26  dismissal of this claim on the grounds that it owed Plaintiffs no such duty as a matter of law.  It relies

27  on the California Court of Appeal's decision in *Lueras v. BAC Home Loans Servicing*, which found that

28  lenders do not owe borrowers a common law duty "to offer, consider or approve a loan modification."

221 Cal. App. 4th 49, 67 (2013).  The next year, however, a different California Court of Appeal

reached the opposite conclusion.  *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal. App. 4th 941

(2014).  The *Alvarez* court found that once a lender undertakes to review a loan for potential

modification, it owes the borrower a duty to use reasonable care during the course of that review.  *Id.* at

948.  The split between *Alvarez* and *Lueras* persists to this day, and so this Court must predict how the

California Supreme Court would resolve the issue.  *McQuirk v. Donnelley*, 189 F.3d 793, 797 (9th Cir.

1999).  District courts have not reached a uniform answer to that question, but "district courts applying

California law after *Alvarez* overwhelmingly hold that the California Supreme Court would recognize a

duty of care during the loan modification review process."  *MacDonald v. Wells Fargo Bank N.A*, No.

14-CV-04970-HSG, 2015 WL 1886000, at *5 (N.D. Cal. Apr. 24, 2015) (collecting cases).

    Wells Fargo urges the Court to follow its prior decision in *Sun v. Wells Fargo Bank*, where it

found that Wells Fargo did not owe the plaintiff a duty of care.  No. C 14-00063 WHA, 2014 WL

1245299, at *4 (N.D. Cal. Mar. 25, 2014).  The *Sun* decision was issued prior to *Alvarez*, however, and

was based on the notion that a financial institution owes no duty of care so long as its involvement

"does not exceed the scope of its conventional role as a mere lender of money."  *Id.* (quoting *Nymark v.

Heart Fed. Savings & Loan Assn*., 231 Cal. App. 3d 1089, 1096 (1991)).  The Court therefore

distinguished between cases where a lender had offered a modification and a trial period plan (which

suggest that the lender was actively participating beyond the role of the usual money lender) and cases

where the lender had not yet offered a modification and trial period plan.  *Id.*  Following *Sun*, the

*Alvarez* court clarified that *Nymark* does not mean that a lender can *never* be liable for negligence when

acting within its conventional role.  *Alvarez*, 228 Cal. App. 4th at 945.  As *Nymark* itself recognized,

the question of whether a lender owes a duty of care requires a balancing of six factors laid out by the

California Supreme Court in *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).  *Nymark*, 231 Cal. App. 3d

at 1098.  The *Nymark* court found that those factors did not support imposition of a duty when a lender

prepares a property appraisal to protect its own interest.  *Id.* at 1099.  But the *Alvarez* court found the

*Biakanja* factors tilted the other way when a lender reviews a mortgage loan for potential modification.

228 Cal. App. 4th at 948.  It was the *Alvarez* court's analysis of the *Biakanja* factors—and not whether

the defendant had exceeded the role of the usual money lender—that led it to conclude that a duty of

1   care attaches once a defendant agrees to consider a mortgage modification. *Alvarez*, 228 Cal. App. 4th

2   at 948-950. The plaintiffs in *Alvarez* were in a similar position as the plaintiff in *Sun*: they had not been

3   offered a loan modification or a trial period plan. *Id.* at 944-45. As were the plaintiff in *MacDonald*

4   and the plaintiffs in many of the other district court cases that have followed *Alvarez*. *See, e.g.,*

5   *MacDonald*, 2015 WL 1886000 at *1; *Kemp v. Wells Fargo Bank, N.A.*, No. 17-CV-01259-MEJ, 2017

6   WL 4805567, at *1-2, *5-6 (N.D. Cal. Oct. 25, 2017) (finding duty of care applies regardless of

7   privity); *Romo v. Wells Fargo Bank, N.A.*, No. 15-CV-03708-EMC, 2016 WL 324286, at *1, 8-9 (N.D.

8   Cal. Jan. 27, 2016) ("most federal district courts have followed *Alvarez*").

9       This Court has previously indicated that it finds *Alvarez* persuasive. In *Kaar v. Wells Fargo*, the

10   Court rejected Wells Fargo's contention that *Alvarez* represents a minority view and endorsed the

11   *MacDonald* court's observation that "*Alvarez* marked a sea change in jurisprudence" on the issue of

12   lenders' duty of care with respect to mortgage modification. No. C 16-01290 WHA, 2016 WL

13   3068396, at *4 (N.D. Cal. June 1, 2016) (quoting *MacDonald*, 2015 WL 1886000 at *4). The plaintiffs

14   in *Kaar* were offered a modification and trial period plan, however, so its finding of a duty was

15   consistent with both *Alvarez* and *Sun*. *Id.* Here, while Wells Fargo agreed to consider Plaintiffs'

16   applications for loan modification, it did not offer a mortgage modification or trial period plan—though

17   it should have and would have if the bank had exercised ordinary care. (FAC, ¶¶ 72-75, 80-85.)

18   Plaintiffs request that the Court follow *Alvarez* and find Wells Fargo owed them a duty to do just that.

19         **2.**    **The Economic Loss Rule Does Not Bar Plaintiffs' Claim**

20       Wells Fargo also contends that Plaintiffs' negligence claim is barred by the economic loss rule.

21   (Mot. at 16-17.) This is just another way of arguing that Wells Fargo did not owe Plaintiffs a legal

22   duty: "The economic loss rule does not apply … in cases where a 'special relationship exists,' and this

23   is articulated alternatively as 'a legal duty'." *Rowland v. JPMorgan Chase Bank, N.A.*, No. C 14-00036

24   LB, 2014 WL 992005, at *10–11 (N.D. Cal. Mar. 12, 2014) (quoting *J'aire Corp. v. Gregory,* 24 Cal.

25   3d 799, 804 (1979)). Plaintiffs have already established that Wells Fargo did in fact owe them a legal

26   duty to process their applications for mortgage modifications using ordinary care. That duty is separate

27   from Wells Fargo's contractual duty to notify Plaintiffs prior to foreclosure of actions they can take to

28   cure their defaults. So just as in *Kaar*—when Wells Fargo raised the same argument before this

1   Court—the economic loss rule does not apply because "plaintiffs' allegations do establish a separate

2   duty of care." *Kaar*, 2016 WL 3068396 at *4.

3       The economic loss rule is also inapplicable for another reason: Plaintiffs "claim[] more than

4   purely economic damages." *Newport v. Burger King Corp.*, No. C 10-04511 WHA, 2011 WL

5   4632878, at *5 (N.D. Cal. Oct. 5, 2011).  Wells Fargo's conduct caused Plaintiffs to lose their homes

6   and suffer severe stress, anguish, depression, and other forms of physical and emotional distress.

7   (FAC, ¶¶ 69, 73-76, 81-86, 202.)  These non-economic damages remove Plaintiffs' claim from the

8   realm of the economic loss rule, which only applies to losses that are solely economic in nature.  *See*

9   *Newport*, 2011 WL 4632878 at *5 (finding economic loss rule inapplicable where plaintiff was seeking

10   recovery for embarrassment, mental anguish, and emotional and physical distress).

11             **E.**    **Plaintiffs State a Claim for Wrongful Foreclosure Under California and**

12                   **Georgia Law**

13       Wells Fargo correctly observes that Plaintiffs' claim for wrongful foreclosure largely mirrors

14   their claim for breach of contract.  (Mot. at 17.)  Under California and Georgia law, Wells Fargo's

15   failure to exercise its power of sale fairly and in compliance with the mortgage agreement's terms gives

16   rise to a wrongful foreclosure claim as well as a contract claim.  *See Chavez v. Indymac Mortg. Servs.,*

17   219 Cal. App. 4th 1052, 1062-63 (2013) (plaintiffs stated claim for wrongful foreclosure where

18   "Defendants lacked a contractual basis to exercise the power of sale"); *Sheely v. Bank of Am., N.A.*, 36

19   F. Supp. 3d 1364, 1376-77 (N.D. Ga. 2014) (borrower may sue for wrongful foreclosure when lender

20   wrongly exercises power of sale in mortgage agreement).

21       Wells Fargo repeats the arguments it made as to Plaintiffs' contract claims and asserts that the

22   wrongful foreclosure claims "fail for the same reasons that Plaintiffs' breach of contract claims fails."

23   (Mot. at 17.)  That is not strictly true, since California law also permits wrongful foreclosure claims to

24   be premised on unfair business practices, and as discussed in Section III.G.2 below, Plaintiffs have

25   adequately alleged that Wells Fargo engaged in unfair business practices.  *Ryan-Beedy v. Bank of New*

26   *York Mellon*, 293 F. Supp. 3d 1101, 1115 (E.D. Cal. 2018).  But it is true that if Wells Fargo's request

27   to dismiss the contract claims are denied, its request to dismiss Plaintiffs' wrongful foreclosure claims

28   should be denied as well.

### F.  Plaintiffs State a Claim for Violation of California's Homeowner Bill of Rights

California's Homeowner Bill of Rights (HBOR) was enacted "to ensure that borrowers who may qualify for a foreclosure alternative are considered for, and have a meaningful opportunity to obtain, available loss mitigation options." *Lucioni v. Bank of America, N.A.*, 3 Cal. App. 5th 150, 157 (2016).  It includes a number of provisions that were designed to fulfill that goal and avoid worsening the foreclosure crisis.  *Id.*  Among those provisions is Civil Code section 2924.17, which requires mortgage servicers like Wells Fargo to ensure they review competent and reliable evidence before foreclosing on a borrower's home.  Mortgage servicers who materially violate 2924.17, and foreclose without competent and reliable evidence, are liable for actual economic damages.  Cal. Civ. Code § 2924.19(b).  And if the Court finds the violations were reckless, or resulted from willful misconduct, it may award the borrower treble damages or statutory damages of $50,000, whichever is greater.  *Id.*

Plaintiffs allege that Wells Fargo violated section 2924.17 by failing to ensure that its right to foreclose was supported by competent and reliable information.  (FAC, ¶¶ 217-218.)  Wells Fargo instead based its foreclosure activities on automated software that had not been properly verified or audited, and was therefore unreliable.  (*Id.*, ¶ 218.)  Wells Fargo willfully and recklessly continued to use its faulty software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.  (*Id.*)

Wells Fargo's motion sidesteps these serious allegations and argues that it cannot be held responsible under section 2924.17 because the provision only protects against "robo-signing." (Mot. at 18-19.)  But neither the plain language of section 2924.17 nor case law supports Wells Fargo's narrow reading.  Section 2924.17 does not use the term robo-signing at all; instead, it broadly prohibits mortgage servicers from filing foreclosure documents without first "ensure[ing] that it has reviewed *competent and reliable evidence* to substantiate … the right to foreclose."  Cal. Civ. Code § 2924.17(b) (emphasis added).  While robo-signing may be an example of the practices prohibited by section 2924.17, it is certainly not the *only* practice the statute prohibits. There are many ways in which a servicer might fail to review competent and reliable evidence, such as here, where Wells Fargo

1   repeatedly used an unreliable automated tool to justify wrongful foreclosures.

2   Wells Fargo cites several cases that discuss robo-signing, but none of those cases say that robo-

3   signing is the *only* way to violate section 2924.17.   The *Kaurloto* case, for example, states that section

4   2924.17 both "prohibits robo-signing *and* requires that 'a mortgage servicers shall insure that it had

5   reviewed competent and reliable evidence …'"   *Kaurloto v. U.S. Bank, N.A.*, No. 16-CV-06652-JFW-

6   GJSX, 2016 WL 6808117, at *5 (C.D. Cal. Nov. 17, 2016) (emphasis added).   And other cases have

7   upheld claims asserting violations of section 2924.17 outside the robo-signing context.   For instance, in

8   *Penermon v. Wells Fargo*, the court found that an alleged inaccuracy in a notice of default filed by

9   Wells Fargo "could be explained by Defendant's failure to verify the amount with competent and

10   reliable evidence," and denied Wells Fargo's motion to dismiss the plaintiff's claim for violation of

11   Section 2924.17.   *Penermon*, 47 F. Supp. 3d 982, 997-98 (N.D. Cal. 2014).   And in *Green v. Central*

12   *Mortgage Company*, the court found that the mortgage servicer's filed statement that it had made

13   multiple attempts to contact the borrower might not be "accurate and complete and supported by

14   competent and reliable evidence," and so was enough to state a plausible claim for violation of section

15   2924.17.   *Green,* 148 F. Supp. 3d 852, 876 (N.D. Cal. 2015).

16   **G.      Plaintiffs State a Claim for Violation of the UCL**

17   **1.      Plaintiffs' Claim May Proceed Under the Unlawful Prong**

18   Plaintiffs allege that Wells Fargo violated both the unlawful and the unfair prongs of

19   California's Unfair Competition Law.   (FAC, ¶ 223.)   Plaintiffs' claim under the unlawful prong is

20   based on Wells Fargo's failure to comply with HAMP, which required that Plaintiffs be offered

21   mortgage modifications.   (*Id.*, ¶ 224.)   Wells Fargo admitted to its shareholders that it denied mortgage

22   modifications to customers who qualified under HAMP, but contends that because HAMP lacks a

23   private cause of action, Wells Fargo's violation does not constitute an unlawful practice under the UCL.

24   (Mot. at 20.)   Wells Fargo cites two cases that dismissed UCL claims on those grounds: one that quoted

25   a case that was subsequently overturned by the Ninth Circuit, and another that was recently found

26   "unpersuasive" and based on "little analysis" in *Fowler v. Wells Fargo*.   *See Bunce v. Ocwen Loan*

27   *Servicing, LLC*, No. CIV. 2:13-00976 WBS, 2013 WL 3773950, at *7 (E.D. Cal. July 17, 2013)

28   (quoting *Lucia v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 1059, 1066 (N.D. Cal. 2011) *rev'd sub*

*nom. Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013)); *Fowler v. Wells Fargo Bank, N.A.*, No. 17-CV-02092-HSG, 2017 WL 3977385, at *3 (N.D. Cal. Sept. 11, 2017) (discussing *Aleem v. Bank of America*, No. EDCV 09-01812-VAP, 2010 WL 532330, at *3 (C.D. Cal. Feb. 9, 2010).

As the *Fowler* court correctly concluded, "[t]he UCL … provides a vehicle to challenge any unlawful business practice, including violations of laws for which there is no direct private right of action." *Fowler*, 2017 WL 3977385 at *2 (citing *Zhang v. Superior Court*, 57 Cal. 4th 364, 376-77 (2013)).  The California Supreme Court has emphasized this fundamental aspect of the UCL's unlawful prong on several occasions.  In *Children's Television*, the Court observed that "whether a private right of action should be implied … is immaterial since *any* unlawful business practice … may be redressed" under the UCL.  *Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 210–11 (1983) (emphasis added).  In *Stop Youth Addiction*, the Court wrote that it does not "follow that a private plaintiff lacks UCL standing whenever the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action."  *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 565 (1998).  And in *Rose v. Bank of America*, the Court once again explained that the UCL does not "enforce" other laws; it "'borrows' violations of other laws and treats them as unlawful practices' that the [UCL] makes *independently* actionable."  57 Cal. 4th 390, 396 (2013) (emphasis and alteration in original).  Accordingly, a UCL claim could still be "based on violations of a federal statute, [even] after Congress has repealed a provision of that statute authorizing civil actions for damages."  *Id.* at 393.  Only in the rare instances when a legislature goes so far as to affirmatively bar state law claims or "clearly permit the conduct," will private relief under the UCL be unavailable.  *Id.* at 398; *Zhang*, 57 Cal. 4th at 377.  HAMP is not one of these rare instances.  As discussed at length above, "[t]here is no indication that Congress meant to foreclose suits against servicers for violating state laws that impose obligations parallel to those established in a federal program."  *Wigod*, 673 F.3d at 580.  So while Wells Fargo is correct that some district court cases have incorrectly dismissed UCL claims on the grounds that the "borrowed" law lacked a private right of action, this Court should instead follow the lead of the *Fowler* court and "decline[] to deviate from the California Supreme Court's explanation that a UCL claim may stand, whether or not the underlying statute provides a private right of action."  *Fowler*, 2017 WL 3977385 at *3.

1

### 2.     Plaintiffs' Claim May Proceed Under the Unfair Prong

2     The Court should also permit Plaintiffs' claim under the UCL's unfair prong to proceed.  The

3 Ninth Circuit has endorsed two tests for unfairness: the *Cel-Tech* test and the *South Bay* test.  *Hodsdon*

4 *v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018).  The *Cel-Tech* test requires the alleged conduct to be

5 tethered to some legislatively declared policy or have some impact on competition, while the *South Bay*

6 test requires the alleged conduct to offend established public policy or be immoral, unethical,

7 oppressive, unscrupulous, or substantially injurious to consumers.  *Id.*  Here, Wells Fargo's conduct

8 constitutes unfair competition under either test.

9     Wells Fargo's conduct is unfair under the *Cel-Tech* test because it undermines the legislatively-

10 declared policies underlying HAMP and HBOR, both of which seek to avoid unnecessary foreclosures

11 and promote fair mortgage servicing practices.  *See West*, 214 Cal. App. 4th at 785 ("The goal of

12 HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are

13 likely to default by reducing mortgage payments to sustainable levels …. "); *Penermon*, 47 F. Supp. 3d

14 at 993 ("HBOR's purpose is to ensure that homeowners 'who may qualify for a foreclosure alternative

15 are considered for, and have a meaningful opportunity to obtain, available loss mitigation options,' such

16 as loan modifications or other alternatives to foreclosure.") (quoting A.B. 278 § 1(b)).

17     Wells Fargo's failure to properly test its mortgage modification software, even after it was

18 ordered to do so by the government, resulted in the unnecessary foreclosures that HAMP and HBOR

19 were enacted to prevent.  (*See* FAC, ¶¶ 35-47, 64-65, 225.)  Wells Fargo's oversight practices, under

20 which the board repeatedly declined to implement adequate auditing and legal compliance procedures,

21 had the same result and also negatively impacted competition.  (*See id.*, ¶¶ 40-52 226.)  As the Federal

22 Reserve noted in its 2018 Cease and Desist Order, Wells Fargo's deficient oversight practices were a

23 fundamental part of a detrimental business strategy that emphasized profits and growth over all else.

24 (*Id.*, ¶ 59.)  If Wells Fargo refuses to devote resources to testing its mortgage modification systems and

25 ensuring compliance with legal requirements, it will gain an unfair competitive advantage over those

26 firms who play fairly and devote a significant part of their capital and workforce to auditing and

27 compliance.

28     For similar reasons, Wells Fargo's testing and oversight practices are unfair under the *South Bay*

1  test.  They offend establish public policy as reflected in HAMP and HBOR.  They are substantially

2  injurious to consumers, having resulted in hundreds of wrongful foreclosures with far-reaching

3  financial and emotional consequences.  And they are unscrupulous, if not unethical and downright

4  immoral, in their reckless disregard for the homes and wellbeing of Wells Fargo's customers.

5      Wells Fargo contends that its testing and oversight practices cannot be considered unfair under

6  the UCL because, in its view, none of the practices are unlawful.  (Mot. at 21-22.)  It repeats the same

7  arguments it raised as to Plaintiffs' previous claims, including that lenders traditionally do not owe

8  borrowers a duty of care and that HAMP lacks a private right of action.  But even if Wells Fargo were

9  correct and Plaintiffs' other claims were not viable, that would not preclude a finding that the conduct

10  was nonetheless unfair under the UCL and should not be permitted in a fair marketplace (with

11  appropriate restitution given to deter similar practices in the future).  The very purpose of the UCL's

12  unfair prong is to allow courts to confront conduct that, while not strictly unlawful, nonetheless

13  "violates the fundamental rules of honesty and fair dealing."  *Cel-Tech Commc'ns, Inc. v. Los Angeles*

14  *Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999).  That is why Plaintiffs "need not allege a direct violation

15  of a statute to satisfy the tethering test,"—only a violation of "the policy or spirit" of the law.  *Diaz v.*

16  *Intuit, Inc.*, No. 5:15-CV-01778-EJD, 2017 WL 4386451, at *6 (N.D. Cal. Sept. 29, 2017); *Hodsdon*,

17  891 F.3d at 866.  And it is why the Ninth Circuit has had no difficulty agreeing that a bank's mortgage

18  modification practices can satisfy the UCL's unfair prong—even where the borrower, unlike Plaintiffs

19  here, did not qualify for a mandatory loan modification under HAMP.  *See Oskoui*, 851 F.3d at 857.

20  Neither HAMP's lack of a private right of action, nor the arm's-length nature of lender-borrower

21  relations, is an excuse for fundamentally unfair and unscrupulous business behavior.

22

23  **H.      Plaintiffs State a Claim for Violation of Five Other States' Consumer Protection Laws**

24      Plaintiffs seek restitution under the UCL for all Plaintiffs and class members, regardless of their

25  state of residency.  (FAC, ¶¶ 179-183.)  Wells Fargo notes that Plaintiffs' mortgage agreements contain

26  a choice-of-law provision, but that provision applies only to the agreement itself and does not extend to

27  non-contract claims.  (Mot. at 9 n.13.)  Plaintiffs have included preliminary allegations to support the

28  application of the UCL on a nationwide basis, but a final choice-of-law determination is generally

deferred until a factual record can be developed.  *Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2017 WL 2797810, at *4 (N.D. Cal. June 28, 2017).

In the event that the UCL is not ultimately applied on a nationwide basis, Plaintiffs have also alleged claims under the consumer protection laws of five other states:  Illinois, Maryland, New Jersey, New York, and Pennsylvania.  (FAC, ¶¶ 230-62.)  Wells Fargo asks for dismissal of all five claims.  It cites two Maryland cases for the proposition that a lender who complies with the terms of the parties' mortgage contract does not violate the Maryland Consumer Debt Collection Act (MCDCA) or Maryland Consumer Protection Act (MCPA) even if the lender failed to abide by HAMP guidelines. (Mot. at 22-23.)  As discussed in Section II.B.2 above, Plaintiffs intend to add allegations that will establish Wells Fargo did not comply with the parties' mortgage contract.  When added to Plaintiffs existing allegations, these new contract allegations will establish violations of Maryland consumer protection law as well.  *See Nyhart v. PNC Bank, N.A.*, No. CV PX 15-2241, 2016 WL 6996744, at *6 (D. Md. Nov. 30, 2016) (enforcing a right of foreclosure "with reckless disregard as to the falsity of the existence of the right" violates both the MCDCA and MCPA).

Wells Fargo also cites a New Jersey case that dismissed a claim under the New Jersey Consumer Fraud Act (NJCFA) because "borrowers have no standing under HAMP."  (Mot. at 23 (summarizing *Keosseian v. Bank of Am.*, 2012 WL 458470, at *2 (D.N.J. Feb. 10, 2012).)  Since that case was decided, however, "New Jersey courts … have 'adopt[ed] the Seventh Circuit's *Wigod* position that HAMP does not preclude state-law based claims.'"  *Bukowski v. Wells Fargo Bank, N.A.*, 757 F. App'x 124, 129 (3d Cir. 2018).  Borrowers may therefore maintain a claim under the NJCFA if they can allege, for example, "that they were misled by Wells Fargo's representations concerning their eligibility for a permanent HAMP modification."  *Id.*  Plaintiffs have done just that, alleging that Wells Fargo falsely represented that Plaintiffs did not qualify for a mortgage modification.  (FAC, ¶ 245); *see also Block v. Seneca Mortg. Servicing,* 221 F. Supp. 3d 559, 593 (D.N.J. 2016) (an affirmative misrepresentation violates the NCFA even if unaccompanied by knowledge of its falsity or an intention to deceive).

Wells Fargo also requests dismissal of Plaintiffs' Illinois, New York, and Pennsylvania consumer protection claims—though it does not cite any case law from those states to support its

argument.  (Mot. at 22-23.)  The case law confirms that Plaintiffs' claims are viable.  Illinois law broadly prohibits unfair business practices and permits plaintiffs to predicate "an ICFA unfairness claim on violations of other statutes or regulations, like HAMP … that themselves do not allow for private enforcement."  *Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Tr., Series 2003-1*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011); *see also* FAC, ¶¶ 232-33.  New York law prohibits consumer-oriented conduct that is deceptive or misleading in a material respect—including systematically-flawed loan modification processes. *Dumont v. Litton Loan Servicing, LP*, No. 12-CV-2677-ER-LMS, 2014 WL 815244, at *10 (S.D.N.Y. Mar. 3, 2014).  And Pennsylvania law bars "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," which encompasses misrepresentations regarding the status of a loan modification and conduct that prevents borrowers from obtaining mortgage modifications for which they qualified.  *Cave v. Saxon Mortg. Servs., Inc.*, No. CIV.A. 11-4586, 2012 WL 1957588, at *10 (E.D. Pa. May 30, 2012).

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that they be permitted leave to amend the Demartino and Hood Plaintiffs' contract claims and the Demartino Plaintiffs' consumer protection claims under Maryland law.  In all other respects, Wells Fargo's motion should be denied.


Dated: April 25, 2019

Respectfully submitted,

*/s/ Michael L. Schrag*

**GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
505 14th Street, Ste. 1110
Oakland, California 94612
Telephone:  510-350-9700
Facsimile:  510-350-9701
mls@classlawgroup.com
jjb@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: 816-984-8100
Facsimile:  816-984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com