1   Amanda L. Groves (SBN: 187216)
    agroves@winston.com
2   Morgan E. Stewart (SBN: 321611)
    mstewart@winston.com
3   **WINSTON & STRAWN LLP**
    101 California Street, 35th Floor
4   San Francisco, CA  94111-5840
    Telephone:    (415) 591-1000
5   Facsimile:    (415) 591-1400

6   Kobi K. Brinson (Admitted *pro hac vice*)
    kbrinson@winston.com
7   Stacie C. Knight (Admitted *pro hac vice*)
    sknight@winston.com
8   **WINSTON & STRAWN LLP**
    300 South Tryon Street, 16th Floor
9   Charlotte, NC 28202
    Telephone:    (704) 350-7700
10  Facsimile:    (704) 350-7800

11  Attorneys for Defendant
    WELLS FARGO BANK, N.A.

12

13              **UNITED STATES DISTRICT COURT**

14          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                  **SAN FRANCISCO DIVISION**

16  ALICIA HERNANDEZ, *et al.*,          No. 3:18-cv-07354-WHA
    individually and on behalf of all others
17  similarly situated,

18              Plaintiffs,

19          v.                           **DEFENDANT WELLS FARGO BANK, N.A.'S**
                                         **ANSWER TO FIRST AMENDED CLASS**
20  WELLS FARGO & COMPANY and            **ACTION COMPLAINT**
    WELLS FARGO BANK, N.A.,

21              Defendants.

22

23

24

25

26

27

28

1    Defendant Wells Fargo Bank, N.A. (the "Bank"), for itself and no other individual or entity,

2  hereby responds to the First Amended Class Action Complaint in the above-captioned matter as

3  follows:

4                                          **INTRODUCTION**

5        1.    Plaintiffs are among the hundreds of homeowners who lost their homes to foreclosure

6  because Wells Fargo wrongly determined they did not qualify for a mortgage modification.

7  **ANSWER**:    The Bank denies the allegations in paragraph 1.

8        2.    This was not an accident, but rather the result of years of a willful and reckless lack

9  of central oversight by Wells Fargo's Board and executive leadership that has led to repeated

10  compliance breakdowns and billions of dollars in government fines.

11  **ANSWER**:    The Bank denies the allegations in paragraph 2.

12        3.    For years, Wells Fargo failed to verify or audit its loan modification software to

13  ensure it was properly calculating homeowners' eligibility for government-mandated mortgage

14  modifications.  Material errors remained uncorrected in the software for five to eight years, if not

15  longer.

16  **ANSWER**:    The Bank denies the allegations in paragraph 3.

17        4.    The federal government cited Wells Fargo in 2011 for failing to adequately audit its

18  mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive

19  leadership promised to implement ongoing testing to ensure that the Bank complied with

20  government requirements in the future. But they failed to live up to that promise and multiple errors

21  in Wells Fargo's decision-making software remained unaddressed.

22  **ANSWER**:    The Bank denies the allegations in paragraph 4.

23        5.    Wells Fargo's leadership failed to implement adequate testing even after the

24  government found that another error in the Bank's software had led the Bank to wrongfully deny

25  mortgage modifications in 2013-2014. Wells Fargo was cited again for failing to properly oversee

26  the Bank's mortgage modification and foreclosure operations, but still did nothing to stop others like

27  Plaintiffs from being wrongfully denied mortgage modifications and foreclosed upon.

28  **ANSWER**:    The Bank denies the allegations in paragraph 5.

1      6.     Not until 2015 did Wells Fargo discover one of the errors that led it to wrongfully

2   deny mortgage modifications to Plaintiffs and hundreds of other homeowners. But rather than

3   coming clean, Wells Fargo kept its discovery secret—likely in an effort to avoid additional

4   government penalties. The government had previously imposed restrictions on Wells Fargo's

5   mortgage servicing business and announced fines, with the amount of the fine and the duration of

6   business restrictions dependent on the length and severity of the Bank's continued non-compliance.

7   Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to

8   hundreds of customers, the government likely would not have lifted its business restrictions in 2016

9   and would have imposed a far more severe penalty than the $70 million fine it ultimately issued.

10   **ANSWER**:    The Bank denies the allegations in paragraph 6.

11      7.     The Wells Fargo Board's repeated failure to fulfill its oversight responsibilities,

12   despite promising to do so as part of multiple consent decrees, has grown so flagrant—and led to so

13   many scandals and consumer abuses—that the Federal Reserve just last year placed an asset-cap on

14   Wells Fargo that will not be lifted until Wells Fargo convinces the government it has finally

15   reformed its central oversight practices. The Federal Reserve's cease-and-desist order has been

16   described as a "Fear of God Penalty," with one expert opining that the Bank is "lucky it is too big to

17   shut down."

18   **ANSWER**:    The Bank admits that the Federal Reserve placed an asset cap on Wells Fargo &

19   Company in 2018.  The Bank denies the remaining allegations in paragraph 7.

20      8.     After the Federal Reserve issued the asset-cap in February 2018, Wells Fargo

21   announced an overhaul of its Board. Wells Fargo has since disclosed to its shareholders what it

22   learned in 2015— that hundreds of its customers were wrongfully and unlawfully denied mortgage

23   modifications, with many of those customers subsequently losing their homes. Following that initial

24   disclosure, Wells Fargo discovered yet another error in its automated decision-making tool, which

25   caused even more homeowners to be wrongfully denied mortgage modifications. Wells Fargo has

26   warned its customers that even more errors and more affected customers may be uncovered as its

27   review continues.

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

1    **ANSWER**:    The Bank admits that in 2018, it disclosed that a calculation error in its mortgage loan

2    modification underwriting tool led to borrowers being incorrectly denied a trial loan modification,

3    and that for some of those borrowers, a foreclosure was completed.  The Bank denies the remaining

4    allegations in paragraph 8.

5          9.    Although Wells Fargo publicly claims to be turning over a new leaf to make things

6    right for its customers, it is unwilling to fairly compensate the customers whose lives its reckless

7    behavior forever changed. Hundreds lost their homes and yet Wells Fargo told its shareholders it was

8    allocating less than $13,000 per person as remediation. Wells Fargo then moved to dismiss this

9    action with prejudice, so that its customers would receive nothing more than it pre-allocated for

10   them. Wells Fargo wants to be the sole arbiter of how much remediation it should pay—with little

11   regard for the financial and emotional devastation its reckless behavior has wrought on Plaintiffs'

12   and class members' lives.

13   **ANSWER**:    The Bank admits that it moved to dismiss this action with prejudice.  The Bank

14   denies the remaining allegations in paragraph 9.

15          10.    Plaintiffs are seeking to hold Wells Fargo and its leadership truly responsible for their

16   repeated and deliberate failure to ensure the Bank was complying with legal requirements. They seek

17   certification of a nationwide class of homeowners wrongly denied a mortgage modification; a larger

18   emotional distress class to address the claims of children and other family members who also lost

19   their homes as a result of Wells Fargo's conduct; and several statewide classes that will allow class

20   members to efficiently pursue additional claims under state consumer protection laws. Plaintiffs also

21   intend to pursue entry of an injunction or other equitable relief sufficient to prevent the continued

22   use of Wells Fargo's unfair practices, and treble and punitive damages pursuant to state law.

23   **ANSWER**:    The Bank admits that Plaintiffs seek certification of several classes, injunctive relief,

24   and treble and punitive damages pursuant to state law.  The Bank denies that this action may

25   properly be maintained as a class action and denies that Plaintiffs are entitled to any of the relief they

26   seek.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURISDICTION**

11.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; in the aggregate, there are more than 100 members in the proposed classes; and at least one class member is a citizen of a state different from any defendant.

**ANSWER**:     No response is required to the legal conclusions of paragraph 11.  To the extent a response is required, the Bank does not dispute the subject matter jurisdiction of this Court under 28 U.S.C. § 1332.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**ANSWER**:     No response is required to the legal conclusion of paragraph 12.  To the extent a response is required, the Bank denies the allegations of paragraph 12.

**INTRADISTRICT ASSIGNMENT**

13.     Assignment to the Oakland/San Francisco division is proper because Wells Fargo & Company is headquartered in San Francisco, California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred there.

**ANSWER**:     No response is required to the legal conclusion of paragraph 13.  To the extent a response is required, the Bank admits that Wells Fargo & Company is headquartered in San Francisco, California.  The Bank denies the remaining allegations in paragraph 13.

**PARTIES**

14.     Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania. Ms. Hernandez was denied a mortgage modification and her New Jersey condominium was foreclosed upon as a result of the conduct alleged herein.

**ANSWER**:     The Bank admits that Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania, upon information and belief.  The Bank also admits that Plaintiff Alicia Hernandez was denied a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 14.

1        15.    Plaintiff Debora Granja is a resident and citizen of Eugene, Oregon. Ms. Granja was

2 denied a mortgage modification and her home in Brentwood, California, was foreclosed upon as a

3 result of the conduct alleged herein.

4 **ANSWER**:    The Bank admits that Plaintiff Debora Granja is a resident and citizen of Eugene,

5 Oregon, upon information and belief.  The Bank also admits that Plaintiff Debora Granja was denied

6 a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.

7 The Bank denies the remaining allegations in paragraph 15.

8        16.    Plaintiff Keith Lindner is a resident and citizen of California. Mr. Lindner was denied

9 a mortgage modification and lost his home in Visalia, California, as a result of the conduct alleged

10 herein.

11 **ANSWER**:    The Bank admits that Plaintiff Keith Lindner is a resident and citizen of California,

12 upon information and belief.  The Bank also admits that Plaintiff Keith Lindner was denied a trial

13 mortgage modification and that the property securing his loan ultimately was foreclosed upon.  The

14 Bank denies the remaining allegations in paragraph 16.

15        17.    Plaintiff Emma White is a resident and citizen of Jacksonville, Florida. Ms. White

16 was denied a mortgage modification and her home in Callahan, Florida, was foreclosed upon as a

17 result of the conduct alleged herein.

18 **ANSWER**:    The Bank admits that Plaintiff Emma White is a resident and citizen Jacksonville,

19 Florida, upon information and belief.  The Bank also admits that Plaintiff Emma White was denied

20 a trial mortgage modification and that the property securing her loan ultimately was foreclosed

21 upon.  The Bank denies the remaining allegations in paragraph 17.

22        18.    Plaintiff Coszetta Teague is a resident and citizen of Homewood, Illinois. Ms.

23 Teague was denied a mortgage modification and her home in Calumet City, Illinois, was

24 foreclosed upon as a result of the conduct alleged herein.

25 **ANSWER**:    The Bank admits that Plaintiff Coszetta Teague is a resident and citizen of

26 Homewood, Illinois, upon information and belief.  The Bank also admits that Plaintiff Coszetta

27 Teague was denied a trial mortgage modification and that the property securing her loan

28 ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 18.

1

2

19.     Plaintiff Iesha Brown is Ms. Teague's daughter, and also a citizen and resident of Illinois.

3

4

**ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 19, and, on that basis, denies the allegations of paragraph 19.

5

6

7

20.     Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana. Mr. and Mrs. Simoneaux were denied a modification of the mortgage on their Louisiana home as a result of the conduct alleged herein.

8

9

10

11

**ANSWER**:     The Bank admits that Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana, upon information and belief.  The Bank also admits that Plaintiffs Russell and Brenda Simoneaux were denied a trial mortgage modification.  The Bank denies the remaining allegations in paragraph 20.

12

13

14

21.     Plaintiffs John and Yvonne Demartino are residents and citizens of Baltimore, Maryland. The Demartinos were denied a mortgage modification and their house in Baltimore, Maryland, was foreclosed upon as a result of the conduct alleged herein.

15

16

17

18

19

**ANSWER**:     The Bank admits that Plaintiffs John and Yvonne Demartino are residents and citizens of Baltimore, Maryland, upon information and belief.  The Bank also admits that Plaintiffs John and Yvonne Demartino were denied a trial mortgage modification and that the property securing their loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 21.

20

21

22

22.     Plaintiff Rose Wilson is a resident and citizen of New York. Ms. Wilson was denied a mortgage modification and her New York home was foreclosed upon as a result of the conduct alleged herein.

23

24

25

26

**ANSWER**:     The Bank admits that Plaintiff Rose Wilson is a resident and citizen of New York, upon information and belief.  The Bank also admits that Plaintiff Rose Wilson was denied a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 22.

27

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

23.     Plaintiff Tiffanie Hood is a resident and citizen of Ohio. Ms. Hood was denied a mortgage modification and her Ohio home was foreclosed upon as a result of the conduct alleged herein.

**ANSWER**:     The Bank admits that Plaintiff Tiffanie Hood is a resident and citizen of Ohio, upon information and belief.  The Bank also admits that Plaintiff Tiffanie Hood was denied a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 23.

24.     Plaintiffs George and Cyndi Floyd are residents and citizens of Philadelphia, Pennsylvania. The Floyds were denied a mortgage modification and their house in Lancaster, Pennsylvania, was foreclosed upon as a result of the conduct alleged herein.

**ANSWER**:     The Bank admits that Plaintiffs George and Cyndi Floyd are residents and citizens of Philadelphia, Pennsylvania, upon information and belief.  The Bank also admits that Plaintiffs George and Cyndi Floyd were denied a trial mortgage modification and that the property securing their loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 24.

25.     Plaintiff Troy Frye is a resident and citizen of Georgia. Mr. Frye was denied a mortgage modification and lost his home in Hephzibah, Georgia, as a result of the conduct alleged herein.

**ANSWER**:     The Bank admits that Plaintiff Troy Frye is a resident and citizen of Georgia, upon information and belief.  The Bank also admits that Plaintiff Troy Frye was denied a trial mortgage modification and that the property securing his loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 25.

26.     Plaintiff Diana Trevino is a resident and citizen of Richardson, Texas. Ms. Trevino was denied a mortgage modification and her Texas home was foreclosed upon as a result of the conduct alleged herein.

**ANSWER**:     The Bank admits that Plaintiff Diana Trevino is a resident and citizen of Richardson, Texas, upon information and belief.  The Bank also admits that Plaintiff Diana Trevino was denied

a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon. The Bank denies the remaining allegations in paragraph 26.

27.     Defendant Wells Fargo & Company, is a Delaware corporation headquartered in San Francisco, California, and a registered bank holding company that owns and controls Defendant Wells Fargo Bank, N.A.

**ANSWER**:     The Bank admits that Wells Fargo & Company is a registered bank holding company and a Delaware corporation headquartered in San Francisco, California.  The Bank denies the remaining allegations in paragraph 27.

28.     Defendant Wells Fargo Bank, N.A., is a national banking association with its main office in Sioux Falls, South Dakota, and designated principal place of business in San Francisco, California.

**ANSWER**:     The Bank admits that it is a national banking association with its main office in Sioux Falls, South Dakota.  The Bank denies the remaining allegations in paragraph 28.

29.     For purposes of this complaint, Plaintiffs will use "WFC" to refer to Wells Fargo & Company, "Bank" to refer to Wells Fargo Bank, N.A., and "Wells Fargo" when referring to both of the defendants. As explained in further detail below, the Bank and WFC shared responsibility for ensuring that the Bank's operations were properly tested to ensure compliance with HAMP and other government requirements, with ultimate responsibility lying with WFC's Board of Directors, and its Audit & Examination Committee in particular. There also exists a high-degree of built-in overlap between the two defendants due to the fact that WFC owns and controls the Bank, and that the Bank directors responsible for ensuring compliance with HAMP and other government requirements were also WFC executives and/or directors.

**ANSWER**:     The Bank admits that Plaintiffs use "WFC" to refer to Wells Fargo & Company and "Bank" to refer to Wells Fargo Bank, N.A.  The Bank denies the remaining allegations in paragraph 29.

1

**FACTUAL ALLEGATIONS**

2

A.       **Wells Fargo Wrongfully Forecloses on Its Customers' Homes**

3       30.      Plaintiffs are among the millions of homeowners who had trouble making ends meet

4  during the Great Recession. They fell behind on their mortgage payments and needed help to avoid

5  losing their homes.

6  **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

7  or falsity of the allegations of paragraph 30 and, on that basis, denies the allegations of paragraph 30.

8       31.      The Home Affordable Modification Program (HAMP) was designed to provide the

9  very help that Plaintiffs and class members needed. Introduced pursuant to the Emergency Economic

10  Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to

11  borrowers who met certain threshold requirements. These modifications would lower a borrower's

12  mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income)

13  and allow the borrower to avoid foreclosure.

14  **ANSWER**:      The Bank admits that the Home Affordable Modification Program ("HAMP") was

15  introduced pursuant to the Emergency Economic Stabilization Act of 2008.  The Bank denies the

16  remaining allegations in paragraph 31.

17       32.      Similar threshold requirements were incorporated into the mortgage modification

18  requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac,

19  and the Federal Housing Administration (FHA).

20  **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

21  or falsity of the allegations of paragraph 32 and, on that basis, denies the allegations of paragraph 32.

22       33.      Plaintiffs and class members met the threshold requirements for a mortgage

23  modification and as their mortgage servicer, Wells Fargo Bank, was required to offer them a loan

24  modification.  Wells Fargo failed to do so, however, and instead foreclosed on Plaintiffs and more

25  than five hundred other class members who could not make their monthly payments without a

26  modification.

27  **ANSWER**:      The Bank denies the allegations in paragraph 33.

28

34.     Another three hundred class members were just able to stave off foreclosure, but not without overcoming numerous financial and emotional difficulties that could have been avoided if Wells Fargo had lowered their mortgage payments as HAMP required.

**ANSWER**:     The Bank denies the allegations in paragraph 34.

**B.     Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a Period of at Least 8 Years**

35.     Wells Fargo has only recently acknowledged that it wrongfully denied Plaintiffs and class members mortgage loan modifications to which they were entitled under HAMP and other government requirements.

**ANSWER**:     The Bank denies the allegations in paragraph 34.

36.     In form letters sent to Plaintiffs and class members in late 2018, Wells Fargo claimed that its decision was based on a "faulty calculation." The problem goes much deeper than a single miscalculation, however, and reflects the same type of extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.

**ANSWER**:     The Bank admits that letters to Plaintiffs in 2018 stated that the Bank based its decision on a faulty calculation.  The Bank denies the remaining allegations in paragraph 36.

37.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet Wells Fargo not only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years on end.

**ANSWER**:     The Bank denies the allegations in paragraph 37.

38.     Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether homeowners met

threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

**ANSWER**:      The Bank admits that it was not required to develop its own tool to calculate whether borrowers were eligible for mortgage modifications and that a free software tool was available to mortgage servicers in connection with certain programs.  The Bank denies the remaining allegations in paragraph 38.

39.      As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other government requirements over a period of at least eight years and denied Plaintiffs and class members mortgage modifications that the Bank was legally required to offer.

**ANSWER**:      The Bank denies the allegations in paragraph 39.

> **C.      Wells Fargo's Leadership Fails to Implement Adequate Testing Even After Promising to Do So as Part of 2011 Consent Decrees**

40.      Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in the Bank's mortgage modification and foreclosure practices.

**ANSWER**:      The Bank denies the allegations in paragraph 40.

41.      The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

**ANSWER**:      To the extent paragraph 41 purports to describe specific findings by the OCC, the Bank refers to those findings for a complete statement of their terms.  The Bank denies the allegations of paragraph 41 to the extent they are inconsistent therewith.

42.      Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

**ANSWER**:     The Bank admits that its Board of Directors signed a document entitled "Consent Order" with the OCC on March 31, 2011 in the matter of *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-11-19 (the "Bank's 2011 OCC Consent Order").  To the extent paragraph 42 purports to describe the specific contents of the Bank's 2011 OCC Consent Order, the Bank refers to that document for a complete statement of its terms.  The Bank denies the allegations of paragraph 42 to the extent they are inconsistent with the terms of the Bank's 2011 OCC Consent Order.

43.     Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied. The Bank also promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

**ANSWER**:     To the extent paragraph 43 purports to describe the specific contents of the Bank's 2011 OCC Consent Order, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations of paragraph 43 to the extent they are inconsistent with the terms of the Bank's 2011 OCC Consent Order.

44.     In one of the consent orders, the Federal Reserve specifically ordered the WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

**ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 44, and, on that basis, denies the allegations of paragraph 44.

45.     Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance

1   based on improved reporting, and that WFC's Chief Operational Risk Officer (CORO) was

2   providing both the Compliance Committee and the Audit & Examination Committee with the

3   necessary information and testing results for them to effectively oversee the Bank's mortgage

4   modification and foreclosure practices and ensure compliance with HAMP and other government

5   requirements.

6   **ANSWER**:      To the extent paragraph 45 purports to describe the specific contents of the Bank's

7   reports to the Federal Reserve, the Bank refers to those reports for a complete statement of their

8   contents.  The Bank denies the allegations of paragraph 45 to the extent they are inconsistent with

9   the Bank's reports to the Federal Reserve.

10          46.      Together, Wells Fargo's executives and board members—in particular, Wells Fargo's

11   Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—

12   were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any

13   violations of HAMP and other government requirements. They repeatedly failed to fulfill these

14   obligations over the course of several years, however—in violation of the promises they made in the

15   2011 Consent Order and in callous disregard of the well-being of their customers.

16   **ANSWER**:      The Bank denies the allegations in paragraph 46.

17          47.      Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June

18   2015, the OCC found that the Bank was still in continuing noncompliance. Among other things, the

19   OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and

20   other government requirements; had not ensured that the Bank's audit and compliance programs had

21   the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage

22   modification and foreclosure practices would be identified and promptly remedied; and had not

23   ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other

24   government requirements, to modify delinquent mortgage loans and prevent foreclosures of its

25   customers' homes.

26   **ANSWER**:      The Bank admits that its Board of Directors signed a document entitled "Consent

27   Order Amending the 2011 Consent Order and 2013 Amendment to the 2011 Consent Order" with

28   the OCC on June 9, 2015 in the matter of *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, which

1
2
3
4
5

amended AA-EC-11-19 and #2013-132 (the "Bank's 2015 OCC Consent Order").  To the extent paragraph 47 purports to describe the specific contents of the Bank's 2015 OCC Consent Order, the Bank refers to that document for a complete statement of its terms.  The Bank denies the allegations of paragraph 47 to the extent they are inconsistent with the terms of the Bank's 2015 OCC Consent Order.

6
7

### D.  Wells Fargo Conceals Its Discovery of One of the Systematic Errors from Regulators and Consumers

8
9
10
11
12
13

48.     In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

14
15
16
17

**ANSWER**:     To the extent paragraph 48 purports to describe the specific contents of the Bank's 2015 OCC Consent Order, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations of paragraph 48 to the extent they are inconsistent with the terms of the Bank's 2015 OCC Consent Order.

18
19
20
21
22

49.     As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

23
24
25
26

**ANSWER**:     The Bank denies the allegations in paragraph 49, except it admits that it executed a document entitled "Consent Order for a Civil Monetary Penalty" on May 17, 2016 in the matter of *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-2016-30 (the "Bank's 2016 Consent Order").

27
28

50.     Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in October 2015—*one of the errors at issue in this case*—which caused the

Bank to wrongly deny mortgage modifications to 625 customers. Well Fargo decided not to tell anybody it had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the business restrictions it had imposed in 2015.

**ANSWER**:       The Bank denies the allegations in paragraph 50.

51.       The Bank's seven-member Board of Directors, each of whom also served on WFC's Board of Directors, signed the stipulation under which the Bank accepted the $70 million penalty and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in 2013-2014. These directors did not disclose that the Bank had discovered another error—either because their oversight was so non-existent that they did not know, or because they chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the business restrictions it had imposed on the Bank.

**ANSWER**:       The Bank denies the allegations in paragraph 51.

52.       To make matters worse, even after discovering the 2015 error, Wells Fargo still did not reform its auditing and verification practices. Related errors that would affect an additional 145 customers were not discovered until three years later.

**ANSWER**:       The Bank denies the allegations in paragraph 52.

###    E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight

53.       The failure of Wells Fargo's executives and board members to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Wells Fargo's leaders intentionally abandoned their oversight responsibilities—and did so to a shocking degree.

**ANSWER**:       The Bank denies the allegations in paragraph 53.

54.       The most notorious example is the fraudulent account scandal uncovered in 2016, when it was revealed that Wells Fargo employees were encouraged to sign up customers for some 3.5 million checking and credit card accounts without their knowledge. Wells Fargo was fined $185

million by federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce) were fired for their involvement in the scandal.

**ANSWER**:   The Bank admits that it was fined $185 million by various entities, including some of its federal regulators.  The Bank denies the remaining allegations in paragraph 54.

55.   The fraudulent account scandal also involved the Audit & Examination Committee, which ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an institutional investor's request that the Board address its lack of comprehensive audit procedures and adjust compensation policies to discourage abusive sales practices. The two executives most associated with the fraudulent account scandal—John G. Stumpf and Carrie L. Tolstedt—were signatories to one of the 2011 consent orders discussed above and among those responsible for Wells Fargo's failure to comply with the orders by implementing adequate auditing and compliance procedures.

**ANSWER**:   The Bank admits that John G. Stumpf and Carrie L. Tolstedt signed the Bank's 2011 OCC Consent Order.  The Bank denies the remaining allegations in paragraph 55.

56.   This case and the fraudulent account scandal are far from the only examples of Wells Fargo's Board and executive leadership abdicating their oversight responsibilities. Wells Fargo's Board and executive leadership have consistently ignored unlawful practices throughout the Bank's lending divisions, leading to an unprecedented series of government fines. To give just a few more examples:

1. In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage lending practices discriminated against African-American and Hispanic borrowers

2. In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses

3. In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had misrepresented the quality of mortgage loans it sold to Freddie Mac

4. In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for falsely certifying that mortgage loans were eligible for FHA insurance

5. In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations that it engaged in illegal student loan servicing practices

6.   In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing insurance on its auto-loan customers (often leading to wrongful vehicle repossessions) and charging its mortgage-loan customers excessive rate-lock fees

7.   In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it engaged in a variety of improper practices, including selling customers renters' and life insurance they did not ask for and overcharging for GAP auto insurance

**ANSWER**:     To the extent paragraph 56 purports to describe the terms of various settlements, the Bank refers to those settlements for a complete statement of their terms.  The Bank denies the allegations of paragraph 56 to the extent they are inconsistent with those settlements.  The Bank also denies the allegations made in the matters underlying those settlements.

57.     Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law."

**ANSWER**:     The Bank denies the allegations in paragraph 57.

58.     Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

**ANSWER**:     The Bank denies the allegations in paragraph 58.

59.     In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

**ANSWER**:     To the extent paragraph 59 purports to describe the contents of the "Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act,

as Amended" in the matter of *Wells Fargo & Company, San Francisco, California*, Docket No. 18-007-B-HC (the "2018 Order"), the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations of paragraph 59 to the extent they are inconsistent with the terms of the 2018 Order.

60.     Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

**ANSWER**:     To the extent paragraph 60 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations of paragraph 60 to the extent they are inconsistent with the terms of the 2018 Order.

61.     Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

**ANSWER**:     To the extent paragraph 61 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations of paragraph 61 to the extent they are inconsistent with the terms of the 2018 Order.

62.     Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger.

**ANSWER**:     To the extent paragraph 62 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations of paragraph 62 to the extent they are inconsistent with the terms of the 2018 Order.

63.     As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

**ANSWER**:     To the extent paragraph 63 purports to describe the contents of specific articles or writings, the Bank refers to those writings for a complete statement of their contents.

1

**F.     Wells Fargo's Disclosure of the 2015 Error and Discovery of More Errors**

2       64.     A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing

3   the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2015 error—first to

4   its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage

5   modifications, many of whom lost their homes as a result of the error. Wells Fargo wrote in its 10-Q

6   that approximately 625 customers were incorrectly denied a loan modification between April 12,

7   2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those

8   instances resulted in a foreclosure. Wells Fargo also wrote that it had "accrued $8 million to

9   remediate customers," which amounts to an average of only $12,800 per customer.

10  **ANSWER**:     To the extent paragraph 64 purports to describe the contents of Wells Fargo &

11  Company's Form 10-Q for the quarterly period ended June 30, 2018 (the "Q2 2018 10-Q"), the Bank

12  refers to that document for a complete statement of its contents.  The Bank denies the allegations of

13  paragraph 64 to the extent they are inconsistent with the contents of the Q2 2018 10-Q.

14      65.     Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had

15  discovered related errors that affected approximately 245 more customers who were incorrectly

16  denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo

17  says that "new controls were implemented." These related errors raised the number of affected

18  customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

19  **ANSWER**:      To the extent paragraph 65 purports to describe the contents of Wells Fargo &

20  Company's Form 10-Q for the quarterly period ended September 30, 2018 (the "Q3 2018 10-Q"),

21  the Bank refers to that document for a complete statement of its contents.  The Bank denies the

22  allegations of paragraph 65 to the extent they are inconsistent with the contents of the Q3 2018 10-Q.

23      66.     Wells Fargo's long-overdue review of its automated mortgage modification software

24  is apparently still not complete. In its recently filed 10-K Annual Report, Wells Fargo disclosed to

25  shareholders that the "effort to identify other instances in which customers may have experienced

26  harm is ongoing, and it is possible that we may identify other areas of potential concern."

27  **ANSWER**:     To the extent paragraph 66 purports to describe the contents of Wells Fargo &

28  Company's 2018 Form 10-K, the Bank refers to that document for a complete statement of its

1  contents.  The Bank denies the allegations of paragraph 66 to the extent they are inconsistent with

2  the contents of Wells Fargo & Company's 2018 Form 10-K.  The bank denies Plaintiffs' allegation

3  of a "long-overdue review of its mortgage modification software."

4      67.    In late 2018, Wells Fargo began sending form letters to the customers affected by the

5  errors in its automated decision-making tools. The letters typically included a check for around

6  $15,000, and informed customers that if they were not satisfied with that amount, they could

7  consider mediation through a third-party mediator that Wells Fargo has retained.

8  **ANSWER**:      The Bank admits that it began a voluntary remediation program in the fall of 2018,

9  and that the remediation program included payments to borrowers and invited them to participate in

10  cost-free, voluntary, and non-binding mediation if they believed their concerns had not been

11  sufficiently addressed.  The Bank denies the remaining allegations in paragraph 67.

12      68.    The amounts that Wells Fargo is offering its customers is nowhere near enough to

13  compensate them for the damage that Wells Fargo's conduct caused them, and indicates that while

14  Wells Fargo wants the Federal Reserve to believe it has changed its ways, the company is unwilling

15  to accept full responsibility for the life-altering consequences its behavior has wrought.

16  **ANSWER**:      The Bank denies the allegations in paragraph 68.

17      69.    As a result of Wells Fargo's conduct, the lives of Plaintiffs and class members have

18  been irrevocably altered. Their damages include loss of their homes; loss of equity in their homes;

19  loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and

20  money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of

21  time and money to find new housing and move their families; loss of favorable interest rates or other

22  favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage

23  payments; stress-related illnesses; broken marriages; children coping with the financial and

24  emotional consequences of their parents losing the family home; and severe emotional distress.

25  **ANSWER**:      The Bank denies the allegations in paragraph 69.

26

27

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT
No. 3:18-cv-07354-WHA**

**PLAINTIFFS' EXPERIENCES**

**1.      Debora Granja (California)**

70.      Plaintiff Debora Granja purchased her home, located in Brentwood, California, with her then-husband in 2004. The couple eventually had three daughters living with them and put substantial time and money into making the house their own. Wells Fargo became Ms. Granja's mortgage lender following a refinance in 2006.

**ANSWER**:      The Bank admits that it became Plaintiff Debora Granja's mortgage lender in 2006, after she refinanced her existing mortgage loan.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 70, and, on that basis, denies the remaining allegations of paragraph 70.

71.      Around 2009, Ms. Granja's husband lost his job as a landscaping manager. Ms. Granja, who had been working only part-time, returned to full-time work to support her family.

**ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 71, and, on that basis, denies the allegations of paragraph 71.

72.      Ms. Granja began seeking a loan modification from Wells Fargo in 2010. Each time she called Wells Fargo, she spoke to a different representative. Initially, the representatives told her that she would easily qualify for a modification based on her circumstances. Ms. Granja tried submitting her loan modification application numerous times. Each time, Wells Fargo would claim it lost her paperwork and would ask her to resend it.

**ANSWER**:      The Bank admits that Ms. Granja began seeking a trial loan modification from the Bank in 2010.  The Bank denies the remaining allegations in paragraph 72.

73.      Eventually, around 2012, Wells Fargo representatives falsely told Ms. Granja that she did not qualify for a modification. The Bank foreclosed on her house and Ms. Granja was forced to find a rental home for her family. Her daughters had to change schools and leave the only environment they knew.

**ANSWER**:      The Bank admits that a foreclosure was completed on the property securing Ms. Granja's loan.  The Bank denies that its representatives "falsely told Ms. Granja that she did not

1    qualify for a loan modification."  The Bank lacks knowledge and information sufficient to form a

2    basis as to the truth or falsity of the remaining allegations of paragraph 73, and, on that basis, denies

3    the remaining allegations of paragraph 73.

4           74.    Wells Fargo's failure to grant Ms. Granja a loan modification caused great strain on

5    her marriage. Ms. Granja and her husband legally separated around the time of the foreclosure. The

6    stress of the foreclosure also severely affected Ms. Granja's health. She was diagnosed with severe

7    depression in 2013. Four years later, Ms. Granja was diagnosed with acute traumatic stress disorder.

8    Her breakdown was triggered by a minor car accident but caused by an accumulation of stress over

9    recent years, including from the foreclosure.

10   **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

11   or falsity of the allegations of paragraph 74, and, on that basis, denies the allegations of paragraph

12   74.

13          75.    In September 2018, Ms. Granja's ex-husband received a letter from Wells Fargo

14   informing him and Ms. Granja that their mortgage modification should have been approved but was

15   not approved due to an error. He notified Ms. Granja of the letter and she contacted Wells Fargo to

16   provide it with her contact information. Ms. Granja was one of the customers wrongly denied a

17   mortgage modification because of systematic errors in Wells Fargo's automated decision-making

18   tool.

19   **ANSWER**:    The Bank denies that "Ms. Granja was one of the customers wrongly denied a

20   mortgage modification because of systematic errors in Wells Fargo's automated decision-making

21   tool."  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity

22   of the remaining allegations of paragraph 75, and, on that basis, denies the remaining allegations of

23   paragraph 75.

24          76.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

25   making tool, Ms. Granja's life has been irrevocably altered. Her injuries include loss of her family's

26   home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

27   loss of appreciation in her home's value following the sale; loss of time and money spent to find

28

1  replacement housing and move her family; loss of time and money spent in an effort to avoid

2  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

3  **ANSWER**:     The Bank denies the allegations in paragraph 76.

4           **2.     Keith Lindner (California)**

5           77.     Mr. Lindner bought a home for his family in Visalia, California in 2003, financing the

6  purchase with a mortgage loan from Wells Fargo. He moved in shortly thereafter with his partner,

7  daughter, and two young stepsons.

8  **ANSWER**:     The Bank admits that Mr. Lindner purchased property in Visalia, California in 2003

9  and that he financed the purchase with a loan from Wells Fargo Home Mortgage, Inc., upon

10  information and belief.  The Bank lacks knowledge and information sufficient to form a basis as to

11  the truth or falsity of the remaining allegations of paragraph 77, and, on that basis, denies the

12  remaining allegations of paragraph 77.

13           78.     As a seasoned professional in the construction industry, Mr. Lindner made wholesale

14  improvements to the home. He built a 16-by-24-foot addition, replaced the windows, carpeting,

15  flooring and interior doors, installed new lighting, and rebuilt showers and closets, among other

16  things.

17  **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

18  or falsity of the allegations of paragraph 78, and, on that basis, denies the allegations of paragraph

19  78.

20           79.     In 2006, Mr. Lindner began to experience some medical issues. It took a long time for

21  doctors to arrive at the correct diagnosis, and he eventually had surgery in 2008. Following the

22  surgery, he was unable to work for two months. Around the same time, the construction industry

23  began to suffer from the effects of the Great Recession. Mr. Lindner's partner, who by this time was

24  his wife, had recently obtained a master's degree, but was having a hard time finding work. Mr.

25  Lindner's father also fell ill, and Mr. Lindner missed more time at work to be with his ailing father.

26  **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

27  or falsity of the allegations of paragraph 79, and, on that basis, denies the allegations of paragraph

28  79.

1    80.    In 2009, Mr. Lindner was laid off from his job with the company that had employed

2    him for the previous seven years. This caused the Lindners' already-difficult financial situation to

3    become critical. Mr. Lindner reached out to Wells Fargo to tell them about his financial difficulties

4    and asked them if they could provide any assistance with his mortgage so that his family could stay

5    in their home. Wells Fargo denied his request.

6    **ANSWER**:    The Bank admits that it opened a home preservation review for Mr. Lindner in May

7    2009, and that it entered into a Special Forbearance Plan with Mr. Lindner in June 2009.  The Bank

8    lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

9    allegations of paragraph 80, and, on that basis, denies the remaining allegations of paragraph 80.

10    81.    Mr. Lindner did everything he could to make ends meet, but money became tighter

11    and tighter every month. This took a tremendous toll on the Lindners' marriage, and they separated

12    in September of 2009. Mrs. Lindner moved out of the house with her two sons from a previous

13    relationship, leaving Mr. Lindner with their son, who was about three years old at the time.

14    **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

15    or falsity of the allegations of paragraph 81, and, on that basis, denies the allegations of paragraph

16    81.

17    82.    Mr. Lindner continued to write hardship letters to Wells Fargo and to apply for a

18    mortgage modification, but was rejected time and time again, both verbally and in writing.

19    Eventually, Mr. Lindner realized that his situation was untenable, and he would have to leave the

20    home. In 2011, Wells Fargo offered him a "cash for keys" deal and paid him $2,000 to leave his

21    home with his young son.

22    **ANSWER**:    The Bank admits that it opened several more home preservation reviews for Mr.

23    Lindner.  The Bank denies that Mr. Lindner was "rejected time and time again, both verbally and in

24    writing."  The Bank also denies that "in 2011, [it] offered [Mr. Lindner] a 'cash for keys' deal and

25    paid him $2,000 to leave his home with his young son."  The Bank lacks knowledge and information

26    sufficient to form a basis as to the truth or falsity of the remaining allegations in paragraph 82, and,

27    on that basis, denies the remaining allegations of paragraph 82.

28

1     83.     Mr. Lindner and his son, who was in kindergarten or first grade at the time, were

2 forced to live in a series of uncomfortable situations, renting rooms in other people's houses until

3 Mr. Lindner obtained his contractor's license in 2013, and was finally able to rent a house in 2014.

4 **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

5 or falsity of the allegations of paragraph 83, and, on that basis, denies the allegations of paragraph

6 83.

7     84.     Mr. Lindner and his son suffered significant depression and anguish as a result of

8 losing their home. The boy was sad about having to move from the only home he had known, and

9 still fondly remembers it and the friends he left behind. Mr. Lindner was prescribed anti-depressants

10 but did not have a good reaction to them. Mr. Lindner is still recovering from the impact of losing

11 his home, having his credit destroyed, and everything else that he endured as a result of being denied

12 a mortgage modification. His goal now is to be able to buy a home near his ex-wife so that he can be

13 closer to his son and provide him with a secure home.

14 **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

15 or falsity of the allegations of paragraph 84, and, on that basis, denies the allegations of paragraph

16 84.

17     85.     In late 2018, Mr. Lindner received a letter from Wells Fargo informing him that his

18 mortgage modification should have been approved but was not approved due to an error. Mr.

19 Lindner was one of the customers wrongly denied a mortgage modification because of systematic

20 errors in Wells Fargo's automated decision-making tool.

21 **ANSWER**:     The Bank admits that Mr. Lindner received a letter from the Bank in the fall of 2018,

22 upon information and belief.  To the extent paragraph 85 purports to describe the contents of that

23 letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

24 the allegations of paragraph 85 to the extent they are inconsistent with the contents of the letter.  The

25 Bank also denies that "Mr. Lindner was one of the customers wrongly denied a mortgage

26 modification because of systematic errors in Wells Fargo's automated decision-making tool."

27     86.     As a result of Wells Fargo's repeated failure to properly test its automated decision-

28 making tool, Mr. Lindner's life has been irrevocably altered. His injuries include loss of his family's

1   home and the time and money put into that home; loss of equity in his home; loss of tax benefits;

2   loss of appreciation in his home's value; loss of time and money spent to find replacement housing

3   and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his

4   credit and resulting opportunity costs; and severe emotional distress.

5   **ANSWER**:   The Bank denies the allegations in paragraph 86.

6           **3.**   **Emma White (Florida)**

7         87.   Plaintiff Emma White purchased her home, located in Callahan, Florida, in 2006. She

8   was a single mother who moved into the house with her four children. The property was purchased

9   through a mortgage loan that Wells Fargo later acquired.

10   **ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth

11   or falsity of the allegations of paragraph 87, and, on that basis, denies the allegations of paragraph

12   87.

13         88.   Around 2009, Ms. White began experiencing financial hardship. She had

14   accumulated debt supporting her children and applied for a mortgage loan modification so that the

15   family could keep their home. The loan modification process was long and complicated. Ms. White

16   kept having to send in the same paperwork over and over again, only to ultimately receive a letter

17   from Wells Fargo in 2013 saying that she did not qualify for a modification.

18   **ANSWER**:   The Bank denies that Ms. White received a letter from the Bank in 2013 "saying that

19   she did not qualify for a modification." The Bank lacks knowledge and information sufficient to

20   form a basis as to the truth or falsity of the remaining allegations of paragraph 88, and, on that basis,

21   denies the remaining allegations of paragraph 88.

22         89.   Wells Fargo had already initiated foreclosure proceedings, so after it denied her

23   request for a mortgage modification, Ms. White was forced to leave her house. She found a rental

24   apartment in Jacksonville, Florida, for her and three of her children, while Wells Fargo completed its

25   foreclosure of their old home.

26   **ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth

27   or falsity of the allegations of paragraph 89, and, on that basis, denies the allegations of paragraph

28   89.

1    90.    Wells Fargo's actions caused Ms. White significant emotional distress. The
2  foreclosure devastated her, especially because she had to support her children and work to make sure
3  the family had a place to live. Ms. White had been suffering from the stress of supporting her
4  children and other recent events in her life, and the foreclosure multiplied that stress. As a result of
5  everything that was going on in her life, including the foreclosure, Ms. White was diagnosed with
6  depression and began taking antidepressants. Ms. White's children were also affected by the
7  foreclosure. She had to explain to them that she tried her best to keep the house, but ultimately could
8  not do so.

9  **ANSWER**:    The Bank denies the allegations in paragraph 90.

10    91.    In late 2018, Ms. White received a letter from Wells Fargo informing her that her
11  mortgage modification should have been approved but was not approved due to an error. Ms. White
12  was one of the customers wrongly denied a mortgage modification because of systematic errors in
13  Wells Fargo's automated decision-making tool.

14  **ANSWER**:    The Bank admits that Ms. White received a letter from the Bank in the fall of 2018,
15  upon information and belief.  To the extent paragraph 91 purports to describe the contents of that
16  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies
17  the allegations of paragraph 91 to the extent they are inconsistent with the contents of the letter.  The
18  Bank denies that "Ms. White was one of the customers wrongly denied a mortgage modification
19  because of systematic errors in Wells Fargo's automated decision-making tool."

20    92.    As a result of Wells Fargo's repeated failure to properly test its automated decision-
21  making tool, Ms. White's life has been irrevocably altered. Her injuries include loss of her family's
22  home and the time and money put into that home; loss of equity in her home; loss of tax benefits;
23  loss of appreciation in her home's value following the sale; loss of time and money spent to find
24  replacement housing and move her family; loss of time and money spent in an effort to avoid
25  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

26  **ANSWER**:    The Bank denies the allegations in paragraph 92.

27
28

1

### 4.    Troy Frye (Georgia)

2        93.    In 2009, Mr. Frye bought a home in Hephzibah, GA for he and his wife, their two

3    young sons (who were about five and seven years old at the time), and his wife's daughter.

4    **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

5    or falsity of the allegations of paragraph 93, and, on that basis, denies the allegations of paragraph

6    93.

7        94.    Around the beginning of 2013, Mr. Frye was laid off from his job at a local

8    manufacturing plant where he had been employed for about eight to ten years. He applied for and

9    received unemployment assistance, but still was not able to make the monthly mortgage payments

10   on his home. He reached out to Wells Fargo (his mortgage servicer), to see if they would grant him a

11   mortgage modification, which they did in late February 2013.

12   **ANSWER**:    The Bank admits that it entered into a document entitled "Loan Modification

13   Agreement" with Mr. Frye in February 2013.  The Bank lacks knowledge and information sufficient

14   to form a basis as to the truth or falsity of the remaining allegations of paragraph 94, and, on that

15   basis, denies the remaining allegations of paragraph 94.

16       95.    Unfortunately, Mr. Frye's new monthly mortgage payment was not significantly

17   lower, and Mr. Frye continued to have difficulty making his payments. He attempted to get a second

18   modification from Wells Fargo, but this time he was denied—both verbally and in writing. Wells

19   Fargo then initiated foreclosure proceedings.

20   **ANSWER**:    The Bank admits that Mr. Frye attempted to get a second trial loan modification and

21   that his request for a trial modification was denied.  The Bank also admits that it initiated foreclosure

22   proceedings.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or

23   falsity of the remaining allegations of paragraph 95, and, on that basis, denies the remaining

24   allegations of paragraph 95.

25       96.    The strain of Mr. Frye's financial hardship, coupled with the uncertainty and stress of

26   the impending foreclosure, had a big impact on Mr. Frye and his family. The relationship between

27   Mr. Frye and the mother of his children became very strained, and in 2014, she moved out with their

28   two boys and her daughter, leaving Mr. Frye alone in the home.

1    **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

2    or falsity of the allegations of paragraph 96, and, on that basis, denies the allegations of paragraph

3    96.

4         97.     Mr. Frye was able to delay foreclosure proceedings for a while, but Wells Fargo

5    persisted in their efforts to remove him from his home. Around the beginning of 2015, Wells Fargo

6    asked him how much they would need to pay him to leave. Confused and frustrated by the situation,

7    Mr. Frye said he would accept $2,000. The house had recently been damaged by a kitchen fire that

8    broke out while Mr. Frye was sleeping, and from which he was fortunate to escape with his life. He

9    accepted the $2,000 from Wells Fargo and moved out, as the house was no longer habitable.

10   **ANSWER**:     The Bank admits that it provided Mr. Frye $2,000 in relocation assistance.  The Bank

11   denies that it "persisted" in "efforts to remove him from his home."  The Bank lacks knowledge and

12   information sufficient to form a basis as to the truth or falsity of the remaining allegations of

13   paragraph 97, and, on that basis, denies the remaining allegations of paragraph 97.

14        98.     Mr. Frye and his children suffered emotional trauma and depression as a result of the

15   foreclosure and the effects that it had on their lives. They all tried to move on as best they could.

16   **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

17   or falsity of the allegations of paragraph 98, and, on that basis, denies the allegations of paragraph

18   98.

19        99.     In late 2018, Mr. Frye received a letter from Wells Fargo informing him that his

20   second mortgage modification request should have been approved but was not approved due to an

21   error. Mr. Frye was one of the customers wrongly denied a mortgage modification because of

22   systematic errors in Wells Fargo's automated decision-making tool.

23   **ANSWER**:     The Bank admits that Mr. Frye received a letter from the Bank in the fall of 2018,

24   upon information and belief.  To the extent paragraph 99 purports to describe the contents of that

25   letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

26   the allegations of paragraph 99 to the extent they are inconsistent with the contents of the letter.  The

27   Bank denies that "Mr. Frye was one of the customers wrongly denied a mortgage modification

28   because of systematic errors in Wells Fargo's automated decision-making tool."

1       100.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

2   making tool, Mr. Frye's life has been irrevocably altered. His injuries include loss of his family's

3   home and the time and money put into that home; loss of equity in his home; loss of tax benefits;

4   loss of appreciation in his home's value; loss of time and money spent to find replacement housing

5   and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his

6   credit and resulting opportunity costs; and severe emotional distress.

7   **ANSWER**:   The Bank denies the allegations in paragraph 100.

8         **5.**    **Coszetta Teague and Iesha Brown (Illinois)**

9       101.   Plaintiff Coszetta Teague purchased a home in Calumet City, Illinois, for herself and

10   her daughter, Plaintiff Iesha Brown, in June 2010. Ms. Teague's two young grandchildren moved in

11   shortly thereafter. The property was purchased through a mortgage loan with Wells Fargo.

12   **ANSWER**:   The Bank admits that Ms. Teague financed her purchase of the subject property

13   through a mortgage loan with the Bank.  The Bank lacks knowledge and information sufficient to

14   form a basis as to the truth or falsity of the remaining allegations of paragraph 101, and, on that

15   basis, denies the remaining allegations of paragraph 101.

16       102.   In 2011, Ms. Teague was laid off from her job at Chase Bank. That same year, Ms.

17   Teague lost her mother and her property taxes went up. As a result, Ms. Teague could no longer

18   afford to make her monthly payments, and reached out to Wells Fargo to see if they could help.

19   **ANSWER**:   The Bank admits that Ms. Teague requested assistance from the Bank.  The Bank

20   lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

21   allegations of paragraph 102, and, on that basis, denies the remaining allegations of paragraph 102.

22       103.   Wells Fargo told Ms. Teague to fill out paperwork. Ms. Teague did as she was told,

23   but when she later inquired about the status of her modification request, she was told that it had been

24   lost and that she would have to redo it. It took a long time for Wells Fargo to process Ms. Teague's

25   application, and Wells Fargo's representatives were often impolite during the process, but eventually

26   Wells Fargo told Ms. Teague that she did not qualify for a mortgage modification and it was going

27   to initiate foreclosure proceedings.

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

1    **ANSWER**:      The Bank admits that it asked Ms. Teague to fill out paperwork and that it eventually

2    told her it could not offer her a trial mortgage modification.  The Bank denies the remaining

3    allegations in paragraph 103.

4         104.    Afraid that the sheriff was going to remove her from her home, Ms. Teague asked her

5    brother to help move her belongings to storage. She hired a foreclosure defense attorney, who

6    charged her $4,000 but was unable to help. In or around March 2012, Wells Fargo told Ms. Teague

7    she had 30 days before the sheriff would come and evict her. Ms. Teague and her family vacated the

8    home in March or April of that year and Wells Fargo foreclosed shortly thereafter.

9    **ANSWER**:      The Bank denies that it told Ms. Teague she had 30 days before the sheriff would

10   come and evict her.  The Bank lacks knowledge and information sufficient to form a basis as to the

11   truth or falsity of the remaining allegations of paragraph 104, and, on that basis, denies the

12   remaining allegations of paragraph 104.

13        105.    Ms. Teague, her daughter, and her two grandchildren were forced to live in Ms.

14   Teague's car for roughly the next three years, until sometime around March 2015.

15   **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

16   or falsity of the allegations of paragraph 105, and, on that basis, denies the allegations of paragraph

17   105.

18        106.    The experience was emotionally devastating for all concerned. Ms. Brown was very

19   depressed and had suicidal ideations. She was in therapy from 2012 until 2017, and was prescribed

20   antidepressants, including Zoloft. The grandchildren, who were around four and nine at the time,

21   were sad and confused about losing their home and having to live in a car, change schools, and leave

22   all their friends. They shut down, stopped interacting with people, and were in therapy from 2012 to

23   2017. Ms. Teague was also diagnosed with depression following the foreclosure, and was prescribed

24   antidepressants, including Zoloft. She began therapy in 2012 and has continued with it to the present

25   day. She is on social security and disability.

26   **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

27   or falsity of the allegations of paragraph 106, and, on that basis, denies the allegations of paragraph

28   106.

1    107.   In late 2018, Ms. Teague received a letter from Wells Fargo informing her that her

2  mortgage modification should have been approved but was not approved due to an error. Ms. Teague

3  was one of the customers wrongly denied a mortgage modification because of systematic errors in

4  Wells Fargo's automated decision-making tool.

5  **ANSWER**:      The Bank admits that Ms. Teague received a letter from the Bank in the fall of 2018,

6  upon information and belief.  To the extent paragraph 107 purports to describe the contents of that

7  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

8  the allegations of paragraph 107 to the extent they are inconsistent with the contents of the letter.

9  The Bank denies that "Ms. Teague was one of the customers wrongly denied a mortgage

10  modification because of systematic errors in Wells Fargo's automated decision-making tool."

11    108.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

12  making tool, Ms. Teague and Ms. Brown's lives have been irrevocably altered. Their injuries include

13  loss of their home and the time and money put into that home; loss of equity in the home; loss of tax

14  benefits; loss of appreciation in the home's value following the sale; loss of time and money spent to

15  find replacement shelter and relocate; loss of time and money spent in an effort to avoid foreclosure;

16  damage to Ms. Teague's credit and resulting opportunity costs; and severe emotional distress.

17  **ANSWER**:      The Bank denies the allegations in paragraph 108.

18           **6.    Russell and Brenda Simoneaux (Louisiana)**

19    109.   Plaintiffs Russell and Brenda Simoneaux purchased their home in Baton Rouge,

20  Louisiana, in 1992.

21  **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

22  or falsity of the allegations of paragraph 109, and, on that basis, denies the allegations of paragraph

23  109.

24    110.   Mr. and Mrs. Simoneaux contacted Wells Fargo, their mortgage loan servicer, in

25  2013 because Mr. Simoneaux had recently retired and the couple was living on a fixed income. They

26  applied for a mortgage modification, but were denied.

27  **ANSWER**:      The Bank admits that Mr. and Mrs. Simoneaux applied for a trial mortgage

28  modification and were denied a trial mortgage modification.  The Bank lacks knowledge and

1    information sufficient to form a basis as to the truth or falsity of the remaining allegations of

2    paragraph 110, and, on that basis, denies the remaining allegations of paragraph 110.

3        111.    Without a mortgage modification, Mr. and Mrs. Simoneaux had a very difficult time

4    meeting their mortgage obligations. Mr. and Mrs. Simoneaux were both forced to take side jobs for

5    extra income, the couple avoided eating out, and they watched every penny they spent for several

6    years—until their mortgage was finally paid off in late 2018. It was an extremely stressful time.

7    **ANSWER**:    The Bank admits that Mr. and Mrs. Simoneaux paid off their mortgage in 2018.  The

8    Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the

9    remaining allegations of paragraph 111, and, on that basis, denies the remaining allegations of

10   paragraph 111.

11       112.    In October 2018, Mr. and Mrs. Simoneaux received a letter from Wells Fargo

12   informing them that their request for a mortgage modification should have been approved but was

13   not approved due to an error. Mr. and Mrs. Simoneaux were among the customers wrongly denied a

14   mortgage modification because of systematic errors in Wells Fargo's automated decision-making

15   tool.

16   **ANSWER**:    The Bank admits that Mr. and Mrs. Simoneaux received a letter from the Bank in the

17   fall of 2018, upon information and belief.  To the extent paragraph 112 purports to describe the

18   contents of that letter, the Bank refers to that document for a complete statement of its contents.  The

19   Bank denies the allegations of paragraph 112 to the extent they are inconsistent with the contents of

20   the letter.  The Bank denies that "Mr. and Mrs. Simoneaux were among the customers wrongly

21   denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-

22   making tool."

23       113.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

24   making tool, Mr. and Mrs. Simoneaux were forced to make numerous sacrifices and endure

25   significant stress as they struggled to meet mortgage payments that should have been lowered. Their

26   injuries include loss of more beneficial loan terms; loss of time spent avoiding foreclosure; and

27   opportunity costs resulting from higher mortgage payments.

28   **ANSWER**:    The Bank denies the allegations in paragraph 113.

### 7.   John and Yvonne Demartino (Maryland)

114.   In 2008, Plaintiffs John and Yvonne Demartino bought a single-family home for $239,000 in Baltimore, Maryland, with a mortgage loan from Wells Fargo. The home was located next door to their residence. The plan was for Yvonne's mother, Margaret, then in her late seventies and suffering from Parkinson's disease, to move in to be cared for by Yvonne when she was no longer able to live by herself.

**ANSWER**:   The Bank denies that Plaintiffs John and Yvonne Martino financed their purchase of the subject property through a mortgage loan with the Bank.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 114, and, on that basis, denies the remaining allegations of paragraph 114.

115.   After the Demartinos bought the home, their pregnant daughter and son-in-law moved in, with the understanding that they would pay the mortgage and live there until Margaret needed to move in. They got behind on their mortgage payments, however, and the Demartinos had to tap into their savings to bring the mortgage current. In or around 2013, the Demartinos' daughter and son-in-law fell behind on the mortgage payments again, but this time the Demartinos couldn't afford to bring the debt current. The Demartinos applied for a mortgage modification from Wells Fargo but were denied. Wells Fargo foreclosed on the home in around 2013 or 2014.

**ANSWER**:   The Bank admits that the DeMartinos applied for a trial mortgage modification in early 2013 and that the application for a trial mortgage modification was denied.  The Bank denies that it foreclosed on the home in around 2013 or 2014.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 115, and, on that basis, denies the remaining allegations of paragraph 115.

116.   As a result of the foreclosure, the Demartinos' credit scores plummeted—they were forced to pay higher interest on auto loans and were not able to get a home equity line of credit. Mrs. Demartino worked for the Department of Defense, and her credit problems caused her great difficulty at work and threatened the security clearance that she needed for her job. She eventually forced to retire early as a result of these issues.

1
2
3

**ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 116, and, on that basis, denies the allegations of paragraph 116.

4
5
6
7
8

117.    Mr. and Mrs. Demartino suffered great stress and anxiety as a result of the foreclosure and its effect on their credit. They both developed high blood pressure, and they were humiliated and afraid to pick up the phone. Mr. Demartino has tried to get the foreclosure removed from his record. He was told by Wells Fargo that it cannot be erased, however, because even though it was in error, the foreclosure did in fact occur.

9
10
11

**ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 117, and, on that basis, denies the allegations of paragraph 117.

12
13
14
15

118.    Margaret, now 87, lives in a nursing home some distance away, and Mrs. Demartino has a difficult time getting there to see her. The Demartinos feel terrible every time they look at the house next door, where Margaret would be living under Mrs. Demartino's care had Wells Fargo not foreclosed on the home.

16
17
18

**ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 118, and, on that basis, denies the allegations of paragraph 118.

19
20
21
22

119.    In late 2018, the Demartinos received a letter from Wells Fargo informing them that their request for a mortgage modification should have been approved but was not approved due to an error. The Demartinos were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

23
24
25
26
27

**ANSWER**:      The Bank admits that Mr. and Mrs. Demartino received a letter from the Bank in the fall of 2018, upon information and belief.  To the extent paragraph 119 purports to describe the contents of that letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations of paragraph 119 to the extent they are inconsistent with the contents of the letter.  The Bank denies that "Mr. and Mrs. Demartino were among the customers wrongly

28

1  denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-

2  making tool."

3          120.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

4  making tool, the Demartinos has suffered life-altering consequences. Their injuries include loss of

5  their house time and money put into that house; loss of equity in the house; loss of appreciation in

6  the house's value following the sale; loss of time and money spent to find replacement housing for

7  Ms. Demartino's mother; loss of time and money spent in an effort to avoid foreclosure; damage to

8  their credit and resulting opportunity costs; and severe emotional distress.

9  **ANSWER**:    The Bank denies the allegations in paragraph 120.

10                 **8.    Alicia Hernandez (New Jersey)**

11          121.    Plaintiff Alicia Hernandez bought her studio condominium, located in North Bergen,

12  New Jersey, in 2006. The property was purchased through a mortgage loan with Wells Fargo.

13  **ANSWER**:    The Bank admits that Plaintiff Alicia Hernandez purchased the subject property in

14  North Bergen, New Jersey in 2006 and that she financed that purchase through a mortgage loan with

15  the Bank.   The Bank lacks knowledge and information sufficient to form a basis as to the truth or

16  falsity of the remaining allegations of paragraph 121, and, on that basis, denies the remaining

17  allegations of paragraph 121.

18          122.    Ms. Hernandez already owned another unit in the complex and thought the studio,

19  with a lot of work, could be developed into an attractive rental due to its close proximity to New

20  York City. It's right across the river from Manhattan, and only a seven-minute drive from Times

21  Square with no traffic. Ms. Hernandez planned to keep the property in her family forever. The unit

22  also had a deeded parking spot, and parking is very difficult to come by in that area.

23  **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

24  or falsity of the allegations of paragraph 122, and, on that basis, denies the allegations of paragraph

25  122.

26          123.    When Ms. Hernandez purchased her studio, it was just a shell—it had no kitchen and

27  there were bullet holes in the door. But Ms. Hernandez was willing to put in the work, time, and

28  money to create an income-generating property that could provide for her and her family. She tapped

1   into her retirement account and installed new flooring, new appliances, new bathroom fixtures,

2   recessed lighting, and a new air conditioning unit. She also had to contribute additional money when

3   the homeowners' association imposed special assessments.

4   **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

5   or falsity of the allegations of paragraph 123, and, on that basis, denies the allegations of paragraph

6   123.

7           124.    During the Great Recession, Ms. Hernandez lost her job in a mass layoff, and with the

8   property now her only source of income, had difficulty making her monthly mortgage payment. She

9   applied for a mortgage modification in 2012-13, but Wells Fargo told her that she didn't qualify and

10  instituted foreclosure proceedings in late 2013.

11  **ANSWER**:      The Bank denies that "Ms. Hernandez applied for a mortgage modification in 2012-

12  13, but [the Bank] told her that she didn't qualify" and denies that the Bank "instituted foreclosure

13  proceedings in late 2013."  The Bank lacks knowledge and information sufficient to form a basis as

14  to the truth or falsity of the remaining allegations of paragraph 124, and, on that basis, denies the

15  remaining allegations of paragraph 124.

16          125.    Ms. Hernandez fought foreclosure for several years, but Wells Fargo eventually

17  foreclosed on her property in late 2015. The stress of the foreclosure process had a devastating effect

18  on Ms. Hernandez and her husband. As non-lawyers, the anxiety and confusion of dealing with the

19  court system and the legal process took a severe toll on them emotionally. Ms. Hernandez had a

20  miscarriage during the foreclosure process and was hospitalized for the first time in her life. She also

21  suffered insomnia, panic attacks, and difficulty breathing.

22  **ANSWER**:      The Bank admits that Ms. Hernandez contested the foreclosure of the subject

23  property.  The Bank denies that it "eventually foreclosed on her property in late 2015."  The Bank

24  lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

25  allegations of paragraph 125, and, on that basis, denies the remaining allegations of paragraph 125.

26          126.    Ms. Hernandez's husband is a police officer, and both were very concerned about the

27  effects that the foreclosure might have on him professionally. This put a lot of strain on their

28  marriage and caused embarrassment when they ran into colleagues of his while attending court to

1  fight foreclosure. Eventually, Ms. Hernandez and her husband moved to Easton, Pennsylvania, to

2  escape the stress of being in the same community, and her husband now commutes approximately an

3  hour and 15 minutes to work.

4  **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

5  or falsity of the allegations of paragraph 126, and, on that basis, denies the allegations of paragraph

6  126.

7       127.    In late 2018, Ms. Hernandez received a letter from Wells Fargo informing her that her

8  request for a mortgage modification should have been approved but was not approved due to an

9  error. Ms. Hernandez was one of the customers wrongly denied a mortgage modification because of

10  systematic errors in Wells Fargo's automated decision-making tool.

11  **ANSWER**:      The Bank admits that Ms. Hernandez received a letter from the Bank in the fall of

12  2018, upon information and belief.  To the extent paragraph 127 purports to describe the contents of

13  that letter, the Bank refers to that document for a complete statement of its contents.  The Bank

14  denies the allegations of paragraph 127 to the extent they are inconsistent with the contents of the

15  letter.  The Bank denies that "Ms. Hernandez was one of the customers wrongly denied a mortgage

16  modification because of systematic errors in Wells Fargo's automated decision-making tool."

17       128.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

18  making tool, Ms. Hernandez has suffered life-altering consequences. Her injuries include loss of her

19  property and the time and money put into that property; loss of equity in her property; loss of

20  appreciation in her property's value following the sale; loss of time and money spent fighting

21  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

22  **ANSWER**:      The Bank denies the allegations in paragraph 128.

23              **9.    Rose Wilson (New York)**

24       129.    Plaintiff Rose Wilson purchased her home, located in Rochester, New York, in or

25  around 1995. Ms. Wilson lived in the home for many years with her family, and put a lot of time and

26  money into the property—including by renovating the kitchen and bathroom.

27

28

1  **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

2  or falsity of the allegations of paragraph 129, and, on that basis, denies the allegations of paragraph

3  129.

4          130.    After Ms. Wilson lost her job due to the economic downturn, however, she struggled

5  to make the mortgage payments on her home.

6  **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

7  or falsity of the allegations of paragraph 130, and, on that basis, denies the allegations of paragraph

8  130.

9          131.    She applied for a mortgage modification from Wells Fargo (her mortgage servicer)

10  multiple times over the course of several years. Wells Fargo kept stringing her along, requiring her

11  to make monthly payments she could not afford in order to qualify for a mortgage modification, and

12  then telling her the request had been denied and she would need to reapply and start the process all

13  over again.

14  **ANSWER**:      The Bank denies the allegations in paragraph 131.

15          132.    Ms. Wilson's attempt to obtain a mortgage modification from Wells Fargo and save

16  her home went on for years. During this time, Ms. Wilson had to make many sacrifices to keep

17  making her mortgage payments. She tapped into her retirement account early, incurring tax penalties

18  to do so.

19  **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

20  or falsity of the allegations of paragraph 132, and, on that basis, denies the allegations of paragraph

21  132.

22          133.    Ms. Wilson's efforts to save her home were ultimately unsuccessful, however, and

23  Wells Fargo foreclosed in 2014. At the time of the foreclosure, Ms. Wilson's daughter, son-in-law,

24  and their two children lived with her. They were all forced to move from their home to a cramped,

25  moldy, rodent-infested rental property. The aftermath of the foreclosure caused Ms. Wilson

26  significant stress and depression. She had worked hard to purchase a home and provide for her

27  family, but after the foreclosure, Ms. Wilson felt utterly defeated and left with nothing. It has taken

28

1    many years for the pain to subside, but she still feels immense sadness whenever she drives by her

2    former house or thinks about her old life.

3    **ANSWER**:    The Bank admits that a foreclosure was completed on the property securing Ms.

4    Wilson's loan in 2014.  The Bank lacks knowledge and information sufficient to form a basis as to

5    the truth or falsity of the remaining allegations of paragraph 133, and, on that basis, denies the

6    remaining allegations of paragraph 133.

7        134.    In late 2018, Ms. Wilson received a letter from Wells Fargo informing her that her

8    request for a mortgage modification should have been approved but was not approved due to an

9    error. Ms. Wilson was one of the customers wrongly denied a mortgage modification because of

10   systematic errors in Wells Fargo's automated decision-making tool.

11   **ANSWER**:    The Bank admits that Ms. Wilson received a letter from the Bank in the fall of 2018,

12   upon information and belief.  To the extent paragraph 134 purports to describe the contents of that

13   letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

14   the allegations of paragraph 134 to the extent they are inconsistent with the contents of the letter.

15   The Bank denies that "Ms. Wilson was one of the customers wrongly denied a mortgage

16   modification because of systematic errors in Wells Fargo's automated decision-making tool."

17       135.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

18   making tool, Ms. Wilson has suffered life-altering consequences. Her injuries include loss of her

19   home and the time and money put into that property; loss of equity in her property; loss of

20   appreciation in her property's value following the sale; loss of time and money spent fighting

21   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

22   **ANSWER**:    The Bank denies the allegations in paragraph 135.

23               **10.    Tiffanie Hood (Ohio)**

24       136.    In May of 2001, Ms. Hood bought a three-bedroom home for her family in

25   Cincinnati, Ohio. She moved in with her young children—her son was about eight years old at the

26   time, and her daughter was about 11.

27

28

**ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 136, and, on that basis, denies the allegations of paragraph 136.

137.    The home was built in 1926 and needed quite a bit of work. Ms. Hood invested significant resources putting in a kitchen, repairing the roof, replacing the garage door and front door, and completing various other necessary repairs.

**ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 137, and, on that basis, denies the allegations of paragraph 137.

138.    Over the course of the next decade, Ms. Hood's monthly payment obligation kept increasing—largely due to rising property taxes. She began having difficulty making the monthly payment and reached out to Wells Fargo for help. She applied several times for a mortgage modification but was rejected every time.

**ANSWER**:  The Bank admits that it reviewed Ms. Hood for home preservation assistance, but denies that she "was rejected every time." The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 138, and, on that basis, denies the remaining allegations of paragraph 138.

139.    Ms. Hood went through several appeals processes in her efforts to obtain a mortgage modification that would allow her to keep her home but was stymied at every turn. Wells Fargo initiated foreclosure proceedings, and Ms. Hood and her family were forced out of their home in late 2014.

**ANSWER**:     The Bank denies the allegations in paragraph 139.

140.    With her credit destroyed by the foreclosure, Ms. Hood had a hard time finding a new place to live. Fortunately, her children's aunt owned a townhome that she allowed Ms. Hood to rent at a below-market rate, but after a year, they had to move again. Ms. Hood found an apartment that they were able to rent, but it was condemned by the city. Ms. Hood and her children were evicted and had to move yet again.

1   **ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth

2   or falsity of the allegations of paragraph 140, and, on that basis, denies the allegations of paragraph

3   140.

4          141.   Ms. Hood and her children suffered emotional trauma and depression as a result of

5   the foreclosure and the effects that it had on their lives. They all tried to move on as best they

6   could.

7   **ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth

8   or falsity of the allegations of paragraph 141, and, on that basis, denies the allegations of

9   paragraph 141.

10          142.   In late 2018, Ms. Hood received a letter from Wells Fargo informing her that her

11   mortgage modification should have been approved but was not approved due to an error. Ms. Hood

12   was one of the customers wrongly denied a mortgage modification because of systematic errors in

13   Wells Fargo's automated decision-making tool.

14   **ANSWER**:   The Bank admits that Ms. Hood received a letter from the Bank in the fall of 2018,

15   upon information and belief.  To the extent paragraph 142 purports to describe the contents of that

16   letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

17   the allegations of paragraph 142 to the extent they are inconsistent with the contents of the letter.

18   The Bank denies that "Ms. Hood was one of the customers wrongly denied a mortgage modification

19   because of systematic errors in Wells Fargo's automated decision-making tool."

20          143.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

21   making tool, Ms. Hood life has been irrevocably altered. Her injuries include loss of her family's

22   home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

23   loss of appreciation in her home's value following foreclosure; loss of time and money spent to find

24   replacement housing and move her family; loss of time and money spent in an effort to avoid

25   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

26   **ANSWER**:   The Bank denies the allegations in paragraph 143.

27

28

**11.   George and Cyndi Floyd (Pennsylvania)**

144.    Plaintiffs George and Cyndi Floyd purchased their home, located in Lancaster, Pennsylvania, in 2004. The property was purchased through a mortgage loan with Wachovia, which was later transferred to Wells Fargo.

**ANSWER**:    The Bank admits the allegations in paragraph 144.

145.    After the financial crisis hit, the Floyds had difficulty making their mortgage payments. Mr. Floyd lost his job when the company he worked for closed, and Mrs. Floyd later lost her job due to the economic recession as well.

**ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 145, and, on that basis, denies the allegations of paragraph 145.

146.    In an effort to save their home, the Floyds went to great lengths: they applied for numerous mortgage modifications over a period of two years; they paid a company to help them avoid foreclosure; and they spent countless hours reaching out to various other companies, government agencies, and even Congressional representatives for help.

**ANSWER**:    The Bank admits that the Floyds requested home preservation assistance from the Bank.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 146, and, on that basis, denies the remaining allegations of paragraph 146.

147.    The Floyds' efforts were ultimately unsuccessful. Wells Fargo denied their final request for a mortgage modification in November 2011 and initiated foreclosure proceedings. The Floyds were forced to move to a new home in Philadelphia.

**ANSWER**:    The Bank admits that it denied the Floyds a trial mortgage modification in November 2011 but denies that it initiated foreclosure proceedings in November 2011.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 147, and, on that basis, denies the remaining allegations of paragraph 147.

148.    The foreclosure process was emotionally devastating for the Floyds. Mr. Floyd is disabled and suffers from degenerative disc disease, arthritis throughout his body, and the

aftereffects of failed bilateral knee replacements. Being forced to move by Wells Fargo was an extreme hardship that caused Mr. Floyd severe depression and emotional distress. He was hospitalized during the foreclosure process, and though he was eventually able to get through the move to Philadelphia, it took weeks and required the help of Mr. Floyd's nephew and high doses of pain medication. To this day, Mr. Floyd suffers from deep depression and anxiety because of what Wells Fargo has done to him and his family.

**ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 148, and, on that basis, denies the allegations of paragraph 148.

149.    In late 2018, the Floyds received a letter from Wells Fargo informing them that their mortgage modification should have been approved but was not approved due to an error. The Floyds were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

**ANSWER**:     The Bank admits that the Floyds received a letter from the Bank in the fall of 2018, upon information and belief.  To the extent paragraph 149 purports to describe the contents of that letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations of paragraph 149 to the extent they are inconsistent with the contents of the letter. The Bank denies that "the Floyds were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool."

150.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, the Floyds lives were irrevocably altered. Their injuries include loss of their home and the time and money put into that home; loss of equity in their home; loss of tax benefits; loss of appreciation in their home's value following the sale; loss of time and money spent to find replacement housing and move their belongings; loss of time and money spent in their efforts to avoid foreclosure; damage to their credit and resulting opportunity costs; and severe emotional distress.

**ANSWER**:     The Bank denies the allegations in paragraph 150.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 12.    Diana Trevino (Texas)

151.    In 2007, Plaintiff Diana Trevino purchased a three-bedroom home in Garland, Texas, where she lived with her husband and four children. Close family friend Roder Contreras co-signed the mortgage loan and resided in the home as well. When Mr. Contreras's grandmother became ill in 2010, he moved to El Salvador to take care of her. He stopped making his share of the payments on the Trevino home, and quitclaimed his interest in it to the Trevinos.

**ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 151, and, on that basis, denies the allegations of paragraph 151.

152.    Because the Trevinos were unable to make the entire monthly mortgage payment without Mr. Contreras's contribution, Ms. Trevino applied for a mortgage modification from Wells Fargo and was approved. After making approximately five to eight payments under the modification plan, Ms. Trevino suffered another setback when her mother became ill with cancer. Ms. Trevino began missing a significant amount of work because she was taking time off to take care of her mother. She fell behind on the mortgage payments, and again sought assistance from Wells Fargo.

**ANSWER**:    The Bank admits that it entered into a document entitled "Loan Modification Agreement" with Ms. Trevino on or about October 13, 2009.  The Bank also admits that it entered into a document entitled "Loan Modification Agreement" with Ms. Trevino on or about May 18, 2011.  The Bank also admits that Ms. Trevino fell behind on her modified mortgage payments and that she contacted the Bank to request assistance.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 152, and, on that basis, denies the remaining allegations of paragraph 152.

153.    Wells Fargo told Ms. Trevino to stop making mortgage payments so that she could qualify for another mortgage modification, which they assured her she was likely to get. Ms. Trevino stopped making payments as instructed, instead devoting her limited financial resources to her children and ailing mother.

**ANSWER**:    The Bank denies the allegations in paragraph 153.

1    154.    In 2013, Ms. Trevino received a call from Wells Fargo notifying her that she had not

2    been approved for a mortgage modification, and that Wells Fargo planned to initiate foreclosure

3    proceedings. She was told she had 60 days to vacate the premises; a follow-up letter conveyed the

4    same information.

5    **ANSWER**:    The Bank admits that in 2013, Ms. Trevino received a call notifying her that she had

6    not been approved for a trial mortgage modification.  The Bank lacks knowledge and information

7    sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 154, and,

8    on that basis, denies the allegations of paragraph 154.

9    155.    Ms. Trevino had great difficulty finding a new place for her family to live, but

10   eventually found a three-bedroom apartment in an undesirable neighborhood in Richardson,

11   Texas. The lease was solely in her husband's name, because the foreclosure had ruined Ms.

12   Trevino's credit.

13   **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

14   or falsity of the allegations of paragraph 155, and, on that basis, denies the allegations of paragraph

15   155.

16   156.    In April of 2013, the Trevinos moved into the apartment. Ms. Trevino tried to keep

17   her children in the same school in Garland, but the travel proved very difficult for the family. At

18   times, some of the children were forced to live with their aunt so they could be nearer to their school.

19   This was hard on the children, who couldn't understand why they had lost their home, or why their

20   mother was so sad all of the time. Some of the children lost friends and started acting out at

21   school. Uncharacteristically, her son and daughter were both suspended from school for misbehavior

22   during this time period.

23   **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

24   or falsity of the allegations of paragraph 156, and, on that basis, denies the allegations of paragraph

25   156.

26   157.    The stress of the foreclosure, among other factors, strained the Trevinos' marriage,

27   and in 2013 they separated. Eventually they divorced. When the lease on their apartment expired,

28   Ms. Trevino was unable to renew it because she had not been on the original lease, and her poor

1    credit prevented her from getting a lease on her own. The Trevinos were evicted from the apartment

2    and had a very hard time finding a new place to live.

3    **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

4    or falsity of the allegations of paragraph 157, and, on that basis, denies the allegations of paragraph

5    157.

6          158.    Around the same time, Ms. Trevino's stress and depression got to the point that she

7    wasn't eating or sleeping, and she had to be hospitalized with a bacterial infection. She lost her job

8    and was unemployed for around ten months. She and her children survived on her unemployment

9    benefits and the financial assistance of her sister. Two of Ms. Trevino's sons left college so that they

10   could work and help support the family. Ms. Trevino and her family have worked hard to try to

11   rebuild their lives in the wake of the foreclosure in 2013, and continue to do so to this day.

12   **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

13   or falsity of the allegations of paragraph 158, and, on that basis, denies the allegations of paragraph

14   158.

15         159.    In late 2018, Ms. Trevino received a letter from Wells Fargo informing her that her

16   mortgage modification should have been approved but was not approved due to an error. Ms.

17   Trevino was one of the customers wrongly denied a mortgage modification because of systematic

18   errors in Wells Fargo's automated decision-making tool.

19   **ANSWER**:      The Bank admits that Ms. Trevino received a letter from the Bank in the fall of 2018,

20   upon information and belief.  To the extent paragraph 159 purports to describe the contents of that

21   letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

22   the allegations of paragraph 159 to the extent they are inconsistent with the contents of the letter.

23   The Bank denies that "Ms. Trevino was one of the customers wrongly denied a mortgage

24   modification because of systematic errors in Wells Fargo's automated decision-making tool."

25         160.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

26   making tool, Ms. Trevino's life has been irrevocably altered. Her injuries include loss of her family's

27   home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

28   loss of appreciation in her home's value following the sale; loss of time and money spent to find

1   replacement housing and move her family; loss of time and money spent in an effort to avoid

2   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

3   **ANSWER**:      The Bank denies the allegations in paragraph 160.

4                                       **CLASS ALLEGATIONS**

5           161.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to pursue

6   their claims on behalf of a class of similarly situated persons. The parameters of the class may be

7   refined through discovery and will be subject to Court approval and modification, but for purposes

8   of this Complaint, Plaintiffs propose the following class definition:

9                                       Nationwide Class

10          All persons who (i) qualified for a mortgage loan modification or repayment plan
            pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae
11          and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of
            Treasury's Home Affordable Modification Program (HAMP), or any other
12          governmental entity or program; and (ii) were not offered a mortgage loan modification
            by Wells Fargo due to a systematic error in Wells Fargo's automated mortgage loan
13          modification underwriting tool.

14

15  **ANSWER**:      The allegations of paragraph 161 constitute characterizations of Plaintiffs' First

16  Amended Class Action Complaint to which no response is required.  To the extent a response is

17  required, the Bank denies the allegations of paragraph 161.  The Bank specifically denies that the

18  proposed class definition is proper or that this action is appropriate for class treatment.

19          162.    For purposes of this proposed class definition, "mortgage loan" refers to any loan

20  secured by real property.

21  **ANSWER**:      The Bank admits that Plaintiffs have defined "mortgage loan" to refer to any loan

22  secured by real property.  The Bank denies that the proposed class definition is proper or that this

23  action is appropriate for class treatment.

24          163.    The Nationwide Class will pursue contract claims and UCL claims. Plaintiffs also

25  propose that the Court consider several subclasses so that class members may pursue unique state

26  law claims available to them.

27  **ANSWER**:      The allegations of paragraph 163 constitute characterizations of Plaintiffs' First

28  Amended Class Action Complaint to which no response is required.  To the extent a response is

1    required, the Bank denies the allegations of paragraph 163.  The Bank specifically denies that the

2    proposed class definition is proper or that this action is appropriate for class treatment.

3         164.    The first group of subclasses would only be necessary if the Court determines that the

4    UCL should not be applied to all class members. These subclasses would be defined as followed and

5    cover the following states: California, Florida, Georgia, Illinois, Louisiana, Maryland, New Jersey,

6    New York, Ohio, Pennsylvania, and Texas.

7                              [State] Subclass

8         All members of the Nationwide Class whose mortgage loan was secured by real property
          located in [State],

9

10   **ANSWER**:    The allegations of paragraph 164 constitute characterizations of Plaintiffs' First

11   Amended Class Action Complaint to which no response is required.  To the extent a response is

12   required, the Bank denies the allegations of paragraph 164.  The Bank specifically denies that the

13   proposed class definition is proper or that this action is appropriate for class treatment.

14        165.    The second group of subclasses would be defined as follows, and permit Plaintiffs to

15   pursue wrongful foreclosure claims that exist under California and Georgia law.

16                    [California/Georgia] Foreclosure Subclass

17        All members of the Nationwide Class whose mortgage loan was secured by real
          property located in [California / Georgia] who subsequently lost that property through
18        a foreclosure.

19   **ANSWER**:    The allegations of paragraph 165 constitute characterizations of Plaintiffs' First

20   Amended Class Action Complaint to which no response is required.  To the extent a response is

21   required, the Bank denies the allegations of paragraph 165.  The Bank specifically denies that the

22   proposed class definition is proper or that this action is appropriate for class treatment.

23        166.    Plaintiffs also propose that the Court certify a larger class for purposes of advancing

24   Plaintiffs' claims for intentional infliction of emotional distress. This class would include children

25   and other family members affected by Wells Fargo's wrongful conduct, and would be defined as

26   follows:

27

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

IIED Class

All members of the Nationwide Class and all persons who resided at the subject property when Wells Fargo denied Nationwide Class members a mortgage modification and/or foreclosed on the property.

**ANSWER**:      The allegations of paragraph 166 constitute characterizations of Plaintiffs' First Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 166.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

167.    Plaintiffs anticipate that they will be able to identify all class and subclass members from Wells Fargo's records and that they can be notified of the pendency of this class action by mail.

**ANSWER**:      The allegations of paragraph 167 constitute characterizations of Plaintiffs' First Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 167.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

168.    The proposed class and subclasses meet each of the requirements for class certification pursuant to Rule 23(a) and Rule 23(b)(3).

**ANSWER**:      The Bank denies the allegations in paragraph 168.

169.    Numerosity. The classes and subclasses are sufficiently numerous such that individual joinders are impracticable and less advantageous than proceeding through the class device. Based on Wells Fargo's public disclosures to date, the Nationwide Class consists of at least 870 persons. And based on information Wells Fargo has provided to Plaintiffs in this case, Plaintiffs estimate that each proposed Subclass consists of at least 20 persons, with the possible exception of the Georgia Foreclosure Subclass.

**ANSWER**:      The Bank denies the allegations in paragraph 169.

170.    Commonality & Predominance. Common questions of law and fact exist as to the proposed classes and subclasses, and those common questions predominate over questions affecting only individual class members. These common questions include:

1.   Whether Wells Fargo breached a standard notice requirement in mortgage contracts by failing to notify class members they qualified for a mortgage modification;

2.   Whether Wells Fargo's conduct, as alleged herein, was extreme and outrageous;

3.   Whether Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to its customers;

4.   Wells Fargo owed Plaintiffs and class members a duty to exercise reasonable care when determining their eligibility for a mortgage modification; and

5.   Whether Wells Fargo's failure to properly verify or audit its automated decision-making software constitutes an unfair practice.

**ANSWER**:   The Bank denies the allegations in paragraph 170.

171.   Typicality. Plaintiffs' claims are typical of those asserted by the proposed classes and subclasses. Both Plaintiffs and class members seek to recover for injuries caused by Wells Fargo's failure to properly verify or audit its automated decision-making tool, which caused both Plaintiffs and class members to be denied mortgage modifications and/or to suffer emotional distress.

**ANSWER**:   The Bank denies the allegations in paragraph 171.

172.   Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class, as their interests do not conflict with the interest of the class members they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation and intend to prosecute this action vigorously.

**ANSWER**:   The Bank denies the allegations in paragraph 172.

173.   Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims will require an in-depth knowledge of HAMP-related jurisprudence; intensive discovery of a banking giant defended by a large, global law firm; and depositions of several sophisticated banking executives and board members. These are matters that can only realistically be handled through unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

**ANSWER**:   The Bank denies the allegations in paragraph 173.

1    174.    In the alternative to class certification under Rule 23(b)(3), the proposed class and

2    subclasses may also be certified under Rule 23(b)(2) or Rule 23(c)(4). Wells Fargo has acted or

3    refused to act on grounds generally applicable to the class, thereby making final injunctive relief or

4    corresponding declaratory appropriate with respect to the class as a whole. And Plaintiffs' claims

5    present a number of discrete but complex factual and legal issues that could be resolved for all class

6    members in a single proceeding.

7    **ANSWER**:    The Bank denies the allegations in paragraph 174.

8                                          **TOLLING ALLEGATIONS**

9    175.    The causes of actions alleged herein did not accrue or were tolled until Plaintiffs and

10    class members discovered, or could have discovered with the exercise of reasonable diligence, the

11    facts giving rise to their legal claims.

12    **ANSWER**:    The Bank denies the allegations in paragraph 175.

13    176.    Plaintiffs and class members were not aware that they qualified for a mortgage

14    modification, and that Wells Fargo's automated decision-making tool had miscalculated their

15    eligibility, until Wells Fargo informed them through letters mailed the second half of 2018.

16    **ANSWER**:    The Bank denies the allegations in paragraph 176.

17    177.    Plaintiffs and class members had no realistic ability to discover these facts on their

18    own. Wells Fargo's automated decision-making tool is not public, and the mathematical calculations

19    used to determine eligibility for a mortgage modification depended on variables within Wells

20    Fargo's exclusive control.

21    **ANSWER**:    The Bank denies the allegations in paragraph 177.

22    178.    Any applicable statues of limitations are also tolled by Wells Fargo's knowing,

23    active, and ongoing concealment of the facts alleged herein. Wells Fargo discovered one of the

24    software errors in October 2015 but deliberately concealed its discovery from Plaintiffs and from

25    class members until the second half of 2018. Wells Fargo was under a continuous duty to disclose

26    the truth to Plaintiffs and class members, and Plaintiffs and class members reasonably relied on

27    Wells Fargo's ongoing concealment.

28    **ANSWER**:    The Bank denies the allegations in paragraph 178.

**CHOICE OF LAW ALLEGATIONS**

179.   The State of California has sufficient contacts to the claims of nonresident Plaintiffs and class members such that application of California's Unfair Competition Law (UCL) is appropriate.

**ANSWER**:   The Bank denies the allegations in paragraph 179.

180.   Wells Fargo does substantial business in California; WFC is headquartered in California; the Bank's principal place of business is in California; and a significant portion of the proposed Nationwide Class is located in California.

**ANSWER**:   The Bank admits that Wells Fargo & Company is headquartered in California.  The Bank denies the remaining allegations in paragraph 180.

181.   In addition, the practices that form the basis of Plaintiffs' and class members' UCL claims against Wells Fargo are centered in California, where WFC is headquartered. WFC owns and controlled the Bank, and is responsible for testing and auditing its mortgage modification operations for compliance with HAMP and other government regulations.

**ANSWER**:   The Bank denies the allegations in paragraph 181.

182.   Several of the executives and board members who failed to ensure that Wells Fargo properly tested and audited its mortgage modification operations were based in California. For example, public records indicate that at least four of the ten members who served on the Audit & Examination Committee between 2010 and 2017 were based in California—far more than any other state. In addition, at least one—and likely both—of the executives who served as WFC's Chief Operational Risk Officer between 2010 and 2017, and thus were responsible for the compliance and audit reporting provided to the Compliance Committee and the Audit & Examination Committee, were based in WFC's San Francisco office.

**ANSWER**:   The Bank denies the allegations in paragraph 182.

183.   The State of California also has the strong regulatory interest in applying the UCL to all class members' claims. The UCL is designed to preserve a business climate in California free of unfair and deceptive practices. If California were only able to address unfair business conduct when the injured consumer resides in California, the UCL would be largely ineffective at regulating

companies who do business in all fifty states. Violators would be able to keep the vast majority of their ill-gotten gains (all those obtained from non-California consumers), leaving California-based companies like Wells Fargo undeterred from engaging in similar conduct in the future.

**ANSWER**:     The Bank denies the allegations in paragraph 183.

**FIRST CAUSE OF ACTION**
**Breach Of Contract Against Wells Fargo Bank**
**Brought On Behalf Of The Nationwide Class**

184.    Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague, John and Yvonne Demartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of themselves and the State Subclasses.

**ANSWER**:     The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action is appropriate for class treatment.

185.    When Plaintiffs and class members financed their homes, they entered into Security Instruments (typically referred to as a mortgage, deed of trust, or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and foreclose on the property.

**ANSWER**:     The Court dismissed Plaintiffs' First Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 185 is required.

186.    Wells Fargo Bank was subject to the terms of these Security Instruments, either as the original lender, an assignee, or as the mortgage servicer authorized to act on behalf of the lender.

**ANSWER**:     The Court dismissed Plaintiffs' First Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 186 is required.

187.    Under the Security Instruments, the Bank was required to give notice to Plaintiffs and class members before it was permitted to accelerate the remaining balance on their loans and initiate the foreclosure process. That notice was required to specify the borrower's default, the action

55

1    required by the borrower to cure the default, and the date by which the borrower must cure the

2    default to avoid acceleration and foreclosure proceedings.

3    **ANSWER**:    The Court dismissed Plaintiffs' First Cause of Action pursuant to its June 3, 2019

4    "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 187 is required.

5            188.    The Bank breached its contractual obligations to Plaintiffs and class members by

6    failing to give Plaintiffs and class members adequate notice prior to accelerating their loan

7    payments, commencing the foreclosure process, and, in many instances, foreclosing on Plaintiffs'

8    and class members' homes.

9    **ANSWER**:    The Court dismissed Plaintiffs' First Cause of Action pursuant to its June 3, 2019

10   "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 188 is required.

11           189.    In particular, the Bank did not notify Plaintiffs and class members that they could

12   cure their default and avoid acceleration and foreclosure by accepting a mortgage modification.

13   Plaintiffs and class members qualified for a government-mandated mortgage modification, and the

14   Bank was required to offer them a mortgage modification but failed to do so.

15   **ANSWER**:    The Court dismissed Plaintiffs' First Cause of Action pursuant to its June 3, 2019

16   "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 189 is required.

17           190.    As a result of the Bank's breach, Plaintiffs and class members suffered damages in an

18   amount subject to proof, including loss of their homes; loss of equity in their homes; loss of tax

19   benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

20   spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

21   money to find new housing and move their families and belongings; loss of favorable interest rates

22   or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher

23   mortgage payments.

24   **ANSWER**:    The Court dismissed Plaintiffs' First Cause of Action pursuant to its June 3, 2019

25   "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 190 is required.

26

27

28

1

2

**SECOND CAUSE OF ACTION**
**Intentional Infliction Of Emotional Distress Against All Defendants**
**Brought On Behalf Of The IIED Class**

3    191.    Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague,

4   Iesha Brown, John and Yvonne Demartino, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George

5   and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein.

6   They bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on

7   behalf of themselves and the State Subclasses.

8   **ANSWER**:    The Bank incorporates by reference its responses to each and every allegation

9   contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action

10  is appropriate for class treatment.

11    192.    Wells Fargo engaged in extreme and outrageous conduct as alleged herein. Wells

12  Fargo repeatedly failed to properly verify or audit mortgage modification software on which its

13  customers' homes and wellbeing depended. It allowed systemic errors to persist for five to eight

14  years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure

15  practices; failed to reform its verification and auditing practices even after the government found a

16  software error had led the Bank to wrongfully deny mortgage modifications; concealed its discovery

17  of an additional software error from regulators and customers; and failed to identify other related

18  errors for an additional three years.

19  **ANSWER**:    The Bank denies the allegations in paragraph 192.

20    193.    The same extreme and outrageous conduct that caused a series of scandals and

21  consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines

22  and to forbid Wells Fargo from growing until reforms were implemented—was also responsible for

23  Plaintiffs and class members losing their homes here. Wells Fargo's Board and executive leadership

24  abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance

25  failures, government fines, and consent decrees requiring leadership to implement appropriate

26  auditing and compliance procedures.

27  **ANSWER**:    The Bank denies the allegations in paragraph 193.

28

1     194.    With regard to the Bank's mortgage modification and foreclosure processes in

2  particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank

3  conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP

4  or other government requirements. Wells Fargo's leadership ignored its oversight responsibilities

5  even after the government found it had not adequately overseen the Bank's mortgage modification

6  and foreclosure operations, even after it agreed to implement proper oversight as part of two 2011

7  consent orders, and even after the government found in 2015 that Wells Fargo had continuously

8  failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight

9  responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it

10  will be prohibited from growing unless and until it reforms its oversight and governance.

11  **ANSWER**:    The Bank denies the allegations in paragraph 194.

12     195.    Wells Fargo acted with reckless disregard for the probability that its conduct would

13  cause emotional distress to customers, including Plaintiffs and class members, who were wrongfully

14  denied mortgage modifications and foreclosed upon.

15  **ANSWER**:    The Bank denies the allegations in paragraph 195.

16     196.    As a result of Wells Fargo's conduct, Plaintiffs and class members have suffered

17  severe emotional distress, as alleged herein, which has contributed to diagnoses of anxiety and

18  depression, extended psychological therapy, hospitalizations, high blood pressure, various health

19  problems, marital struggles, social withdrawal, childhood trauma, suicidal ideation, stress disorders,

20  and a number of other physical, psychological, and social afflictions.

21  **ANSWER**:    The Bank denies the allegations in paragraph 196.

22     197.    Plaintiffs and class members seek compensatory damages as well as punitive

23  damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for

24  the rights of Plaintiffs and class members.

25  **ANSWER**:    The Bank admits that Plaintiffs seek compensatory and punitive damages, but denies

26  that Plaintiffs or the putative class members are entitled to any such damages.  The Bank denies the

27  remaining allegations in paragraph 197.

28

1

2

**THIRD CAUSE OF ACTION**
**Negligence Against All Defendants**
**Brought On Behalf Of The California Subclass**

3

4

198.     Plaintiffs Debora Granja and Keith Lindner incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on behalf of themselves and the California Subclass.

5

6

7

**ANSWER**:     The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action is appropriate for class treatment.

8

9

10

11

199.     Wells Fargo undertook to review Plaintiffs' and class members' mortgage loans for potential modification. In doing so, Wells Fargo owed Plaintiffs and class members a duty to exercise reasonable care when determining whether Plaintiffs and class members were eligible for a mortgage modification.

12

13

**ANSWER**:     The Court dismissed Plaintiffs' Third Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 199 is required.

14

15

16

17

18

19

20

200.     Wells Fargo breached its duty by evaluating Plaintiffs' and class members' eligibility using automated software that had not been properly verified or audited to ensure its accuracy. Wells Fargo permitted multiple systemic errors in its automated software to remain uncorrected for five to eight years. It failed to properly verify or audit its software even after the government required it to reform its mortgage modification and foreclosure process in 2011; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after it discovered another error in its software in 2015.

21

22

**ANSWER**:     The Court dismissed Plaintiffs' Third Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 200 is required.

23

24

25

26

201.     Wells Fargo's negligence is also presumed under the doctrine of negligence per se, as Wells Fargo's conduct violated HAMP; Wells Fargo's HAMP violations caused Plaintiffs and class members to be wrongfully denied mortgage modifications and suffer damages, including loss of their homes to foreclosure; HAMP was designed to maximize assistance to homeowners and prevent

27

28

foreclosures; and Plaintiffs and class members are among the homeowners for whose protection HAMP was adopted.

**ANSWER**:   The Court dismissed Plaintiffs' Third Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 201 is required.

202.   Wells Fargo's negligence caused Plaintiffs and class member to be wrongly denied a mortgage modification, resulting in damages subject to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments; and emotional distress.

**ANSWER**:   The Court dismissed Plaintiffs' Third Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 202 is required.

203.   Plaintiffs and class members seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiffs and class members.

**ANSWER**:   The Court dismissed Plaintiffs' Third Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 203 is required.

**FOURTH CAUSE OF ACTION**
**Wrongful Foreclosure Against All Defendants**
**Brought On Behalf Of The California And Georgia Foreclosure Subclasses**

204.   Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

**ANSWER**:   The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

**California Foreclosure Subclass**

205.   Plaintiffs Debora Granja and Keith Lindner bring this claim on behalf of themselves and the California Foreclosure Subclass.

1    **ANSWER**:      The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019

2    "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 205 is required.

3          206.    Wells Fargo wrongfully foreclosed on Plaintiffs' and the California Foreclosure

4    Subclass's real property pursuant to a power of sale in their Security Instruments. The foreclosure

5    was unlawful and/or unfair because Wells Fargo did not first notify Plaintiffs and the California

6    Foreclosure Subclass that they could cure their default by accepting a mortgage modification.

7    Plaintiffs and class members qualified for the mortgage modification and Wells Fargo was required

8    by the Security Agreements to notify Plaintiffs and class members of actions they could take to cure

9    their default before exercising its power of sale.

10    **ANSWER**:      The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019

11    "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 206 is required.

12          207.    Plaintiffs and class members were excused from tendering the amount of their

13    secured indebtedness, and no breach of condition or failure of performance existed on the part of

14    Plaintiffs and class members that would have authorized the foreclosure, because Wells Fargo was

15    required to offer Plaintiffs and class members a mortgage modification before it could accelerate

16    their secured indebtedness and initiate foreclosure proceedings.

17    **ANSWER**:      The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019

18    "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 207 is required.

19          208.    Plaintiffs and class members were harmed by the wrongful foreclosure and suffered

20    damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax

21    benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

22    spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

23    money to find new housing and move their families; loss of favorable interest rates or other

24    favorable loan terms; damage to credit; opportunity costs due to damaged credit; and emotional

25    distress.

26    **ANSWER**:      The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019

27    "Order Re Motion to Dismiss."  Accordingly, no response to paragraph 208 is required.

28

1      209.    Plaintiffs and the California Foreclosure Subclass seek compensatory damages as

2 well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and

3 reckless disregard for the rights of Plaintiffs and class members.

4 **ANSWER**:    The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019

5 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 209 is required.

6 **Georgia Foreclosure Subclass**

7      210.    Plaintiff Troy Frye brings this claim on behalf of himself and the Georgia subclass.

8 **ANSWER**:    The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019

9 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 210 is required.

10      211.    Wells Fargo owed Plaintiff Frye and the Georgia Foreclosure Subclass a duty to

11 exercise the power of sale afforded it by Plaintiffs and class members' Security Instruments in

12 conformance with the terms of the Security Instruments and in good faith.

13 **ANSWER**:    The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019

14 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 211 is required.

15      212.    Wells Fargo breached its duty by foreclosing on Plaintiffs and class members' homes

16 without first giving Plaintiff and class members notice that they could cure their default by accepting

17 a mortgage modification. Wells Fargo was required to do so under the terms of the Security

18 Instruments. Alternatively, foreclosing on Plaintiffs and class members' homes without first offering

19 them a mortgage modification to which they were entitled constitutes bad faith and unfair execution

20 of the Wells Fargo's power of sale.

21 **ANSWER**:    The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019

22 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 212 is required.

23      213.    As a result of Wells Fargo's conduct, Plaintiff Frye and the Georgia Foreclosure

24 Subclass lost their homes to foreclosure and suffered other damages to be proven at trial, including

25 loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value

26 following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time

27 and money put into their homes; loss of time and money to find new housing and move their

28

families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit; and emotional distress.

**ANSWER**:    The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 213 is required.

214.    Plaintiff and the Georgia Foreclosure Subclass seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiffs and class members.

**ANSWER**:    The Court dismissed Plaintiffs' Fourth Cause of Action pursuant to its June 3, 2019 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 214 is required.

### FIFTH CAUSE OF ACTION
**Violation Of California's Homeowners Bill Of Rights Against All Defendants
Brought On Behalf Of The California Subclass**

215.    Plaintiffs Debora Granja and Keith Lindner incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on behalf of themselves and the California Foreclosure Subclass.

**ANSWER**:    The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein. The Bank denies that this action is appropriate for class treatment.

216.    Under California's Homeowners Bill of Rights, Wells Fargo had an obligation to ensure that competent and reliable evidence, including the borrower's loan status and information, supported its right to foreclose before it filed a notice of default or notice or sale in connection with the foreclosure of Plaintiffs' and class members' real property. Cal. Civ. Code § 2924.17.

**ANSWER**:    To the extent paragraph 216 states a legal conclusion, no response is required. To the extent a response is required, the Bank denies the allegations in paragraph 216.

217.    Wells Fargo materially and recklessly violated its obligation because Plaintiffs' and class members' loan information did not support Wells Fargo's right to foreclose. Plaintiffs' and class members' loan information showed that they qualified for a mortgage modification. Wells Fargo was therefore required to offer Plaintiffs and class members the opportunity to cure their

1  default by accepting a mortgage modification before it could exercise its right to foreclose under

2  Plaintiffs' and class members' Security Instruments.

3  **ANSWER**:       The Bank denies the allegations in paragraph 217.

4         218.    The automated software that Wells Fargo used to wrongly determine that Plaintiffs

5  and class members did not qualify for a mortgage modification was not reliable and Wells Fargo was

6  reckless in using the software and relying upon it to support its right to foreclose. The software's

7  results had not been properly verified or audited, and as a result, multiple material errors remained

8  uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to

9  rely on its software even after the government cited it for failing to adequately audit its mortgage

10  modification and foreclosure procedures; even after the government found a software error had led

11  the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo

12  discovered another software error that caused it to wrongly deny modifications in 2015.

13  **ANSWER**:       The Bank denies the allegations in paragraph 218.

14         219.    As a result of Wells Fargo's violation of the Homeowners Bill of Rights, Plaintiffs

15  Granja and the California Foreclosure Subclass suffered damages according to proof, including loss

16  of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes'

17  value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of

18  time and money put into their homes; loss of time and money to find new housing and move their

19  families; loss of favorable interest rates or other favorable loan terms; damage to credit; and

20  opportunity costs due to damaged credit.

21  **ANSWER**:       The Bank denies the allegations in paragraph 219.

22         220.    Pursuant to California Civil Code section 2924.19(b), Plaintiffs Granja and each

23  member of the California Foreclosure Subclass seek an award of treble actual damages or statutory

24  damages of $50,000, whichever is greater.

25  **ANSWER**:       The Bank admits that Plaintiffs seek treble actual damages or statutory damages of

26  $50,000, whichever is greater, but denies that Plaintiffs or the putative class members are entitled to

27  any such damages.  The Bank denies the remaining allegations in paragraph 220.

28

1
2

**SIXTH CAUSE OF ACTION**
**Violation Of California's Unfair Competition Law Against All Defendants**
**Brought On Behalf Of The Nationwide Class**

3

221.    Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague,

4

John and Yvonne Demartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson,

5

Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as

6

if fully set forth herein. They bring this claim on behalf of themselves and the Nationwide Class.

7

**ANSWER**:    The Bank incorporates by reference its responses to each and every allegation

8

contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action

9

is appropriate for class treatment.

10

222.    In the alternative, should the Court decide that out-of-state plaintiffs may not

11
12

maintain this claim against Wells Fargo, Plaintiffs Debora Granja and Keith Lindner bring this claim

on behalf of themselves and the California Subclass.

13

**ANSWER**:    The allegations of paragraph 222 constitute characterizations of Plaintiffs' First

14

Amended Class Action Complaint to which no response is required.  To the extent a response is

15

required, the Bank denies the allegations of paragraph 222.  The Bank specifically denies that the

16

proposed class definition is proper or that this action is appropriate for class treatment.

17

223.    Wells Fargo has violated and continues to violate California's Unfair Competition

18

Law (UCL), which prohibits unlawful, unfair, or fraudulent practices.

19

**ANSWER**:    The Bank denies the allegations in paragraph 223.

20

224.    Wells Fargo engaged in unlawful practices by denying mortgage modifications to

21

Plaintiffs and class members in violation of HAMP and other governmental requirements.

22

**ANSWER**:    The Bank denies the allegations in paragraph 224.

23

225.    Wells Fargo engaged in unfair practices by failing to properly verify or audit the

24

automated software it used to determine whether Plaintiffs and class members were eligible for a

25

mortgage modification. Wells Fargo's faulty verification and auditing practices allowed multiple

26

systemic errors to remain uncorrected for five to eight years and persisted even after the government

27

cited Wells Fargo for failing to adequately audit its mortgage modification and foreclosure

28

processes; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER**:   The Bank denies the allegations in paragraph 225.

226.   Wells Fargo's Board and executive leadership further engaged in unfair practices by failing to properly oversee the Bank's compliance with HAMP and other governmental requirements. Wells Fargo's lack of central oversight has led to series of consumer abuses and billions of dollars in government fines. Yet despite repeatedly promising to reform its oversight practices, Wells Fargo's Board and executive leadership repeatedly failed to implement or maintain procedures to ensure the Bank was complying with HAMP or other applicable government requirements.

**ANSWER**:   The Bank denies the allegations in paragraph 226.

227.   Both Wells Fargo's verification and auditing practices and its oversight practices are unethical, unscrupulous, or substantially injurious to consumers; any legitimate utility of the practices are outweighed by the harm to consumers; and the practices run afoul of the public policies underlying HAMP and California Homeowners Bill or Rights, which seek to help homeowners avoid foreclosure and promote fair mortgage lending and servicing practices.

**ANSWER**:   The Bank denies the allegations in paragraph 227.

228.   As a result of Wells Fargo's violations of the UCL, Plaintiffs have suffered injury in fact and lost money and property, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit.

**ANSWER**:   The Bank denies the allegations in paragraph 228.

229.   Pursuant to California Business and Professions Code section 17203, Plaintiffs and class members seek such orders or judgments as may be necessary to prevent the Wells Fargo's

future use of its unfair and unlawful practices, and to restore to Plaintiffs and class members any money or property that may have been acquired by means of Wells Fargo's unfair competition.

**ANSWER**:    The Bank admits that Plaintiffs seek relief under California Business and Professions Code section 17203, but denies that Plaintiffs or the putative class members are entitled to any such relief.  The Bank denies the remaining allegations in paragraph 229.

**SEVENTH CAUSE OF ACTION**
**Violation Of State Consumer Protection Laws Against All Defendants**
**Brought On Behalf Of Five State Subclasses**

230.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein. In the alternative or in addition to the preceding claim for violation of the UCL, Plaintiffs and class members seek recovery under the following state consumer protection statutes as detailed below.

**ANSWER**:    The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action is appropriate for class treatment.

**Illinois Subclass**

231.    Plaintiff Coszetta Teague brings this claim on behalf of herself and the Illinois Subclass.

**ANSWER**:    The allegations of paragraph 231 constitute characterizations of Plaintiffs' First Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 231.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

232.    Wells Fargo's conduct as alleged herein violates the Illinois Consumer Fraud Act (ICFA), 815 ILCS 505/2, which prohibits unfair acts or practices in the conduct of any trade or commerce.

**ANSWER**:    The Bank denies the allegations in paragraph 232.

233.    Wells Fargo engaged in unfair practices by denying mortgage modifications to Plaintiffs and class members in violation of HAMP and other governmental requirements; by failing to properly verify or audit the automated software it used to determine whether Plaintiffs and class

67

1   members were eligible for a mortgage modification; and by failing to implement or maintain

2   procedures to ensure the Bank was complying with HAMP or other government requirements.

3   **ANSWER**:   The Bank denies the allegations in paragraph 233.

4   234.   As a result of Wells Fargo's violation of the ICFA, Plaintiff Teague and the Illinois

5   Subclass suffered damages according to proof, including loss of their homes; loss of equity in their

6   homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of

7   time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes;

8   loss of time and money to find new housing and move their families; loss of favorable interest rates

9   or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or

10  higher mortgage payments.

11  **ANSWER**:   The Bank denies the allegations in paragraph 234.

12  235.   Pursuant to 815 ILCS 505/10a, Plaintiff and the Illinois Subclass seek recovery of

13  their actual economic damages, punitive damages, injunctive relief, and attorneys' fees and costs.

14  **ANSWER**:   The Bank admits that Plaintiff Teague seeks recovery of actual damages, punitive

15  damages, injunctive relief, and attorneys' fees and costs, but denies that Plaintiff Teague or the

16  putative class members are entitled to any such relief.

17  **Maryland Subclass**

18  236.   Plaintiffs John and Yvonne Demartino bring this claim on behalf of themselves and

19  the Maryland Subclass.

20  **ANSWER**:   The Court dismissed the Maryland Consumer Protection Act and Maryland

21  Consumer Debt Collection Act claims pursuant to its June 3, 2019 "Order Re Motion to Dismiss."

22  Accordingly, no response to paragraph 236 is required.

23  237.   Wells Fargo's conduct as alleged herein violates the Maryland Consumer Protection

24  Act (MCPA), Md. Code Ann., Com. Law. § 13-303, which prohibits unfair, abusive or deceptive

25  practices.

26

27

28

1

**ANSWER**:      The Court dismissed the Maryland Consumer Protection Act and Maryland Consumer

2

Debt Collection Act claims pursuant to its June 3, 2019 "Order Re Motion to Dismiss."

3

Accordingly, no response to paragraph 237 is required.

4

238.     Wells Fargo engaged in unfair practices by denying mortgage modifications to

5

Plaintiffs and class members in violation of HAMP and other governmental requirements; by failing

6

to properly verify or audit the automated software it used to determine whether Plaintiffs and class

7

members were eligible for a mortgage modification; and by failing to implement or maintain

8

procedures to ensure the Bank was complying with HAMP or other applicable government

9

requirements.

10

**ANSWER**:      The Court dismissed the Maryland Consumer Protection Act and Maryland Consumer

11

Debt Collection Act claims pursuant to its June 3, 2019 "Order Re Motion to Dismiss."

12

Accordingly, no response to paragraph 238 is required.

13

239.     Wells Fargo also violated both the MCPA and the Maryland Consumer Debt

14

Collection Act (MDCA), Md. Code Ann. Com. Law § 14-202(8), by attempting to enforce a right to

15

foreclose on Plaintiffs and class member's property with reckless disregard as to the falsity of the

16

existence of the right.

17

**ANSWER**:      The Court dismissed the Maryland Consumer Protection Act and Maryland Consumer

18

Debt Collection Act claims pursuant to its June 3, 2019 "Order Re Motion to Dismiss."

19

Accordingly, no response to paragraph 239 is required.

20

240.     The automated software that Wells Fargo used to wrongly determine that Plaintiffs

21

and class members did not qualify for a mortgage modification was not reliable and Wells Fargo was

22

reckless in using the software and relying upon it to support its right to foreclose. The software's

23

results had not been properly verified or audited, and as a result, multiple material errors remained

24

uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to

25

rely on its software even after the government cited it for failing to adequately audit its mortgage

26

modification and foreclosure procedures; even after the government found a software error had led

27

the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo

28

discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER**: The Court dismissed the Maryland Consumer Protection Act and Maryland Consumer Debt Collection Act claims pursuant to its June 3, 2019 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 240 is required.

241. As a result of Wells Fargo's violations of the MCPA and MDCA, Plaintiffs and the Maryland Subclass suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments; and emotional distress.

**ANSWER**: The Court dismissed the Maryland Consumer Protection Act and Maryland Consumer Debt Collection Act claims pursuant to its June 3, 2019 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 241 is required.

242. Pursuant to Maryland Code Annotated, Commercial Law sections 13-408 and 14-203, Plaintiffs and the Maryland Subclass seek to recover damages, including damages for emotional distress and mental anguish, and an award of attorneys' fees and costs.

**ANSWER**: The Court dismissed the Maryland Consumer Protection Act and Maryland Consumer Debt Collection Act claims pursuant to its June 3, 2019 "Order Re Motion to Dismiss." Accordingly, no response to paragraph 242 is required.

### New Jersey Subclass

243. Plaintiff Alicia Hernandez brings this claim on behalf of herself and the New Jersey Subclass.

**ANSWER**: The allegations of paragraph 243 constitute characterizations of Plaintiffs' First Amended Class Action Complaint to which no response is required. To the extent a response is required, the Bank denies the allegations of paragraph 243. The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

244.     Wells Fargo's conduct as alleged herein violates the New Jersey Consumer Fraud Act (NJCFA), N.J.S.A. 56:8-2, which prohibits the use of any misrepresentation or deception in connection with the extension of credit or subsequent servicing of that credit.

**ANSWER**:     The Bank denies the allegations in paragraph 244.

245.     Wells Fargo represented to Plaintiff and class members that they did not qualify for a mortgage modification. That representation was false and caused Plaintiff and class members ascertainable loss, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

**ANSWER**:     The Bank denies the allegations in paragraph 245.

246.     Had Wells Fargo presented accurate information to Plaintiff and class members, they would have opted for the mortgage modification for which the qualified. If Wells Fargo still refused to provide Plaintiff and class members with a mortgage modification, they could and would have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

**ANSWER**:     The Bank denies the allegations in paragraph 246.

247.     Pursuant to N.J.S.A 56:8-19, Plaintiff and the New Jersey Subclass request seek an award of treble damages, injunctive relief, and attorneys' fees and costs.

**ANSWER**:     The Bank admits that Plaintiff Hernandez seeks an award of treble damages, injunctive relief, and attorneys' fees and costs, but denies that Plaintiff Hernandez or the putative class members are entitled to any such relief.

### New York Subclass

248.     Plaintiff Rose Wilson brings this claim on behalf of herself and the New York Subclass.

**ANSWER**:     The allegations of paragraph 248 constitute characterizations of Plaintiffs' First Amended Class Action Complaint to which no response is required.  To the extent a response is

required, the Bank denies the allegations of paragraph 248.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

249.    Wells Fargo's conduct as alleged herein violates Section 349(a) of New York's General Business Law (GBL), which prohibits deceptive acts or practices.

**ANSWER**:    The Bank denies the allegations in paragraph 249.

250.    Wells Fargo's acts and practices were consumer-oriented, as they affected not only Plaintiff but similarly-situated consumers as well, and they had the potential to affect even more consumers.  The automated software that used to determine Plaintiffs and other consumers' eligibility for mortgage modifications was systematically flawed and generated inaccurate calculations.

**ANSWER**:    The Bank denies the allegations in paragraph 250.

251.    The automated software's calculations had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER**:    The Bank denies the allegations in paragraph 251.

252.    Wells Fargo's practice of using systematically-flawed software was deceptive or misleading in a material respect, as it led Plaintiff and class members to believe that they did not qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

**ANSWER**:    The Bank denies the allegations in paragraph 252.

253.    Had Wells Fargo presented accurate information to Plaintiff and class members, they would have opted for the mortgage modification for which the qualified. If Wells Fargo still refused to provide Plaintiff and class members with a mortgage modification, they could and would have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

**ANSWER**:    The Bank denies the allegations in paragraph 253.

254.    As a result of Wells Fargo's violation of the GBL, Plaintiff and class members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

**ANSWER**:    The Bank denies the allegations in paragraph 254.

255.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the New York Subclass seek an award of damages, injunctive relief, and attorneys' fees.

**ANSWER**:    The Bank admits that Plaintiff Wilson seeks an award of damages, injunctive relief, and attorneys' fees, but denies that Plaintiff Wilson or the putative class members are entitled to any such relief.

### Pennsylvania Subclass

256.    Plaintiffs Cyndi and George Floyd bring this claim on behalf of themselves and the Pennsylvania Subclass.

**ANSWER**:    The allegations of paragraph 256 constitute characterizations of Plaintiffs' First Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 256.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

257.    Wells Fargo's conduct as alleged herein constitutes a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Stat. Ann. § 201-3, which prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.

**ANSWER**:    The Bank denies the allegations in paragraph 257.

258.    Wells Fargo's practice of using systematically-flawed software to calculate Plaintiffs' and class members' eligibility for mortgage loan modifications was unfair and deceptive, as it led Plaintiffs and class members to believe that they did not qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

**ANSWER**:    The Bank denies the allegations in paragraph 258.

259.    The automated software's calculations had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER**:    The Bank denies the allegations in paragraph 259.

260.    Plaintiffs and class members justifiably relied on Wells Fargo's determination that they did not qualify for a mortgage modification. Had Wells Fargo presented accurate information to Plaintiffs and class members, they would have opted for the mortgage modification for which the qualified. If Wells Fargo still refused to provide Plaintiffs and class members with a mortgage modification, they could and would have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

**ANSWER**:    The Bank denies the allegations in paragraph 260.

261.    As a result of Wells Fargo's violation of the UTPCPL, Plaintiffs and class members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

**ANSWER**:    The Bank denies the allegations in paragraph 261.

262.    Pursuant to 73 Pa. Stat. Ann. § 201-9.2, Plaintiffs and the Pennsylvania Subclass seek an award of treble damages, equitable relief, and attorneys' fees and costs.

**ANSWER**:    The Bank admits that Plaintiffs Floyd seek an award of treble damages, injunctive relief, equitable relief, and attorneys' fees and costs, but denies that Plaintiffs Floyd or the putative class members are entitled to any such relief

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

The Bank denies that Plaintiffs have any valid claim and denies that Plaintiffs are entitled to any of the relief requested in their Prayer for Relief.

**AFFIRMATIVE DEFENSES**

Without conceding that it bears the burden of proof or persuasion as to any of the issues raised in these defenses (whether denominated as affirmative defenses or otherwise), as separate and distinct affirmative defenses to Plaintiffs' First Amended Class Action Complaint, the Bank alleges as follows:

**FIRST DEFENSE**

(Failure to State a Claim for Relief)

Neither the First Amended Class Action Complaint nor any claim for relief asserted therein states facts sufficient to constitute a claim for relief against the Bank.

**SECOND DEFENSE**

(Lack of Standing)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing to sue, including because Plaintiffs lack standing to assert claims under the laws of states in which they do not reside.

**THIRD DEFENSE**

(Statute of Limitations)

Some or all of Plaintiffs' and the putative class members' claims are barred by the applicable statutes of limitation and repose.

**FOURTH DEFENSE**

(Actual and Proximate Injury)

The relief sought by Plaintiffs is barred, in whole or in part, because Plaintiffs were not actually and proximately injured by reason of any action(s) or omission(s) of the Bank.

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

1

**FIFTH DEFENSE**

2

(Failure to Satisfy Rule 23)

3          This action cannot be maintained as a class action because the named Plaintiffs and the

4   putative class cannot satisfy requirements of Fed. R. Civ. P. 23.

5

**SIXTH DEFENSE**

6

(Preemption)

7          Plaintiffs' claims are barred because they are preempted by applicable federal law and

8   regulations, including the National Bank Act.

9

**SEVENTH DEFENSE**

10

(Unjust Enrichment)

11          Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and members of the

12   putative class would be unjustly enriched if allowed to recover any portion of the damages alleged in

13   the First Amended Class Action Complaint.

14

**EIGHTH DEFENSE**

15

(Waiver and Estoppel)

16          Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

17

**NINTH DEFENSE**

18

(Failure to Mitigate)

19          The Bank alleges Plaintiffs' claims for relief are barred, in whole or in part, because

20   Plaintiffs failed to mitigate, reduce, or otherwise avoid the damages that they allegedly suffered.

21

**TENTH DEFENSE**

22

(Unclean Hands)

23          The Bank alleges some or all of Plaintiffs' claims are barred, in whole or in part, by the

24   doctrine of unclean hands.

25

26

27

28

1

**ELEVENTH DEFENSE**

2

(Homeowner Bill of Rights Not Retroactive)

3

The California Homeowner Bill of Rights does not apply to conduct that occurred before

4

January 1, 2013.

5

**TWELFTH DEFENSE**

6

(Compliance with the National Mortgage Settlement)

7

Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank complied

8

with the terms of the National Mortgage Settlement.

9

**THIRTEENTH DEFENSE**

10

(Non Owner-Occupied Properties)

11

Some or all of Plaintiffs' claims are barred, in whole or in part, because their loans were

12

secured by non-owner occupied properties.

13

**FOURTEENTH DEFENSE**

14

(Voluntary Payment Doctrine)

15

Some or all of Plaintiffs' claims are barred, in whole or in part, by the voluntary payment

16

doctrine.

17

**FIFTEENTH DEFENSE**

18

(Compliance With Federal Rules and Regulations)

19

Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank complied

20

with applicable federal rules and regulations.

21

**SIXTEENTH DEFENSE**

22

(HAMP Does Not Have the Force of Law)

23

Some or all of Plaintiffs' claims are barred, in whole or in part, because HAMP does not

24

have the force of law.

25

26

27

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT
No. 3:18-cv-07354-WHA**

## SEVENTEENTH DEFENSE

(No Intent)

Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank's alleged actions were not intentional or reckless.

## EIGHTEENTH DEFENSE

(Contributory and/or Comparative Negligence)

Plaintiffs' damages or injuries, if any, were the direct and proximate result of Plaintiffs' own negligence.

## NINETEENTH DEFENSE

(No Duty)

Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank had no duty to modify their loans as a matter of law.

## TWENTIETH DEFENSE

(Claims Barred by Contract)

The Bank's relationship with Plaintiffs was governed by the contract documents entered into by and between the parties.  The contract documents set forth the various terms concerning duties and limitations of liability; and those terms are incorporated herein by reference.  Because the First Amended Class Action Complaint seeks relief contrary to the terms of those contract documents, it fails to state facts sufficient to constitute causes of action upon which relief can be granted and is, accordingly, barred.

## TWENTY-FIRST DEFENSE

(Lack of Deception or Misrepresentation)

Plaintiffs' claims are barred, in whole or in part, because there was no deceptive act or practice, and no misrepresentation or omission.

## TWENTY-SECOND DEFENSE

(Unjustified Reliance)

Plaintiffs' claims are barred, in whole or in part, because the challenged actions are not material enough to justify reliance on them.

1

**TWENTY-THIRD DEFENSE**

2

(Lack of Detrimental Reliance)

3       Plaintiffs' claims are barred, in whole or in part, because Plaintiffs did not detrimentally rely

4   upon any conduct alleged in the First Amended Class Action Complaint.

5

**TWENTY-FOURTH DEFENSE**

6

(Improper Venue)

7       Plaintiffs' claims are barred, in whole or in part, because venue is not proper in this District.

8

**RESERVATION OF DEFENSES**

9

(Additional Defenses)

10       The Bank presently has insufficient knowledge or information on which to form a belief as to

11   whether it may have available additional, as yet unstated, defenses.  The Bank hereby reserves the

12   right to assert other defenses and affirmative defenses as this action proceeds, the right to file an

13   amended answer asserting additional defenses or affirmative defenses, and/or file a cross-complaint,

14   in the event that discovery indicates that such pleadings are appropriate.

15

16   Dated:  June 24, 2019                    **WINSTON & STRAWN LLP**

17

18                                    By:   /s/ *Amanda L. Groves*
                                          Amanda L. Groves (SBN: 187216)
19                                        Morgan E. Stewart (SBN: 321611)
                                          101 California Street, 34th Floor
20                                        San Francisco, CA 94111
                                          Telephone: (415) 591-1000
21                                        Facsimile: (415) 591-1400
                                          agroves@winston.com
22                                        mstewart@winston.com

23                                        Kobi K. Brinson*
                                          Stacie C. Knight*
24                                        300 South Tryon Street, 16th Floor
                                          Charlotte, NC 28202
25                                        Telephone: (704) 350-7700
                                          Facsimile: (704) 350-7800
26                                        kbrinson@winston.com
                                          sknight@winston.com
27                                        *Admitted pro hac vice*

28                                        Attorneys for Defendant
                                          WELLS FARGO BANK, N.A.