Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALICIA HERNANDEZ, et al., individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>    Defendant. | Case No. 3:18-cv-07354-WHA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Plaintiffs are among the hundreds of homeowners who lost their homes to foreclosure because Wells Fargo wrongly determined they did not qualify for a mortgage modification.

2.      This was not an accident, but rather the result of years of a willful and reckless lack of central oversight by Wells Fargo's Board and executive leadership that has led to repeated compliance breakdowns and billions of dollars in government fines.

3.      For years, Wells Fargo failed to verify or audit its loan modification software to ensure it was properly calculating homeowners' eligibility for government-mandated mortgage modifications. Material errors remained uncorrected in the software for five to eight years, if not longer.

4.      The federal government cited Wells Fargo in 2011 for failing to adequately audit its mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive leadership promised to implement ongoing testing to ensure that the Bank complied with government requirements in the future.  But they failed to live up to that promise and multiple errors in Wells Fargo's decision-making software remained unaddressed.

5.      Wells Fargo's leadership failed to implement adequate testing even after the government found that another error in the Bank's software had led the Bank to wrongfully deny mortgage modifications in 2013-2014.  Wells Fargo was cited again for failing to properly oversee the Bank's mortgage modification and foreclosure operations, but still did nothing to stop others like Plaintiffs from being wrongfully denied mortgage modifications and foreclosed upon.

6.      Not until August 2013 did Wells Fargo discover one of the errors that led it to wrongfully deny mortgage modifications to Plaintiffs and hundreds of other homeowners.  But rather than coming clean, Wells Fargo kept its discovery secret—likely in an effort to avoid additional government penalties.  The government had previously imposed restrictions on Wells Fargo's mortgage servicing business and announced fines, with the amount of the fine and the duration of business restrictions dependent on the length and severity of the Bank's continued non-compliance.  Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to hundreds of customers, the government likely would not have lifted its business restrictions in 2016 and would have imposed a far more severe penalty than the $70 million fine it ultimately issued.

Deleted: 2015

Deleted: FIRST AM.

-2-

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

7.      Moreover, despite knowing in 2013 that its mortgage modification software was faulty and had the potential to impact borrowers, Wells Fargo continued to use that faulty software when reviewing borrowers' loans for mortgage modifications.  As a result, Wells Fargo wrongfully denied mortgage modifications to Plaintiffs and class members, and in many cases foreclosed on their homes.

8.      The Wells Fargo Board's repeated failure to fulfill its oversight responsibilities, despite promising to do so as part of multiple consent decrees, has grown so flagrant—and led to so many scandals and consumer abuses—that the Federal Reserve just last year placed an asset-cap on Wells Fargo that will not be lifted until Wells Fargo convinces the government it has finally reformed its central oversight practices.  The Federal Reserve's cease-and-desist order has been described as a "Fear of God Penalty," with one expert opining that the Bank is "lucky it is too big to shut down."

9.      After the Federal Reserve issued the asset-cap in February 2018, Wells Fargo announced an overhaul of its Board.  Wells Fargo has since disclosed to its shareholders what it learned in 2015—that hundreds of its customers were wrongfully and unlawfully denied mortgage modifications, with many of those customers subsequently losing their homes.  Following that initial disclosure, Wells Fargo discovered yet another error in its automated decision-making tool, which caused even more homeowners to be wrongfully denied mortgage modifications.  Wells Fargo has warned its customers that even more errors and more affected customers may be uncovered as its review continues.

10.     Although Wells Fargo publicly claims to be turning over a new leaf to make things right for its customers, it is unwilling to fairly compensate the customers whose lives its reckless behavior forever changed.  Hundreds lost their homes and yet Wells Fargo told its shareholders it was allocating less than $13,000 per person as remediation.  Wells Fargo then moved to dismiss this action with prejudice, so that its customers would receive nothing more than it pre-allocated for them.  Wells Fargo wants to be the sole arbiter of how much remediation it should pay—with little regard for the financial and emotional devastation its reckless behavior has wrought on Plaintiffs' and class members' lives.

11.     Plaintiffs seek to hold Wells Fargo and its leadership truly responsible for their repeated and deliberate failure to ensure the Bank was complying with legal requirements.  They seek certification of a nationwide class of homeowners wrongly denied a mortgage modification; a larger emotional distress class; and several statewide classes that will allow class members to efficiently

**Deleted:** are seeking

**Deleted:** to address the claims of children and other family members who also lost their homes as a result of Wells Fargo's conduct

**Deleted:** FIRST AM.

1  pursue additional claims under state consumer protection laws.  Plaintiffs also intend to pursue entry of

2  an injunction or other equitable relief sufficient to prevent the continued use of Wells Fargo's unfair

3  practices, and treble and punitive damages pursuant to state law.

**JURISDICTION**

5      12.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2)

6  because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of

7  interest and costs; in the aggregate, there are more than 100 members in the proposed classes; and at

8  least one class member is a citizen of a state different from any defendant.

9      13.    Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendant resides in

10 this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims

11 occurred in this district.

**INTRADISTRICT ASSIGNMENT**

13     14.    Assignment to the Oakland/San Francisco division is proper because Wells Fargo's

14 designated principal place of business is in San Francisco, California and a substantial part of the events

15 or omissions giving rise to Plaintiffs' claims occurred there.

**PARTIES**

17     15.    Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania.  Ms.

18 Hernandez was denied a mortgage modification and her New Jersey condominium was foreclosed upon

19 as a result of the conduct alleged herein.

20     16.    Plaintiff Debora Granja is a resident and citizen of Eugene, Oregon.  Ms. Granja was

21 denied a mortgage modification and her home in Brentwood, California, was foreclosed upon as a

22 result of the conduct alleged herein.

23     17.    Plaintiff Keith Lindner is a resident and citizen of California.  Mr. Lindner was denied a

24 mortgage modification and lost his home in Visalia, California, as a result of the conduct alleged

25 herein.

26     18.    Plaintiff Emma White is a resident and citizen of Jacksonville, Florida.  Ms. White was

27 denied a mortgage modification and her home in Callahan, Florida, was foreclosed upon as a result of

28 the conduct alleged herein.

**Deleted:** Defendants reside

**Deleted:** Fargo & Company is headquartered

**Deleted:** FIRST AM.

19.     Plaintiff Coszetta Teague is a resident and citizen of Homewood, Illinois.  Ms. Teague was denied a mortgage modification and her home in Calumet City, Illinois, was foreclosed upon as a result of the conduct alleged herein.

20.     Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana.  Mr. and Mrs. Simoneaux were denied a modification of the mortgage on their Louisiana home as a result of the conduct alleged herein.

21.     Plaintiffs John and Yvonne DeMartino are residents and citizens of Baltimore, Maryland.  The DeMartinos were denied a mortgage modification and their house in Baltimore, Maryland, was foreclosed upon as a result of the conduct alleged herein.

22.     Plaintiff Rose Wilson is a resident and citizen of New York.  Ms. Wilson was denied a mortgage modification and her New York home was foreclosed upon as a result of the conduct alleged herein.

23.     Plaintiff Tiffanie Hood is a resident and citizen of Ohio.  Ms. Hood was denied a mortgage modification and her Ohio home was foreclosed upon as a result of the conduct alleged herein.

24.     Plaintiffs George and Cyndi Floyd are residents and citizens of Philadelphia, Pennsylvania.  The Floyds were denied a mortgage modification and their house in Lancaster, Pennsylvania, was foreclosed upon as a result of the conduct alleged herein.

25.     Plaintiff Troy Frye is a resident and citizen of Georgia.  Mr. Frye was denied a mortgage modification and lost his home in Hephzibah, Georgia, as a result of the conduct alleged herein.

26.     Plaintiff Diana Trevino is a resident and citizen of Richardson, Texas.  Ms. Trevino was denied a mortgage modification and her Texas home was foreclosed upon as a result of the conduct alleged herein.

27.     Wells Fargo & Company (WFC), is a Delaware corporation headquartered in San Francisco, California, and a registered bank holding company that owns and controls Defendant Wells Fargo Bank, N.A.

28.     Defendant Wells Fargo Bank, N.A., is a national banking association with its main office in Sioux Falls, South Dakota, and designated principal place of business in San Francisco,

**Deleted:** <#>Plaintiff Iesha Brown is Ms. Teague's daughter, and also a citizen and resident of Illinois.¶

**Deleted:** Demartino

**Deleted:** Demartinos

**Deleted:** Defendant

**Deleted:** ,

**Deleted:** FIRST AM.

1  California.

2      29.    Defendant, along with Wells Fargo & Company, shared responsibility for ensuring that

3  the Bank's operations were properly tested to ensure compliance with HAMP and other government

4  requirements, with ultimate responsibility lying with WFC's Board of Directors, and its Audit &

5  Examination Committee in particular.  There also exists a high-degree of built-in overlap between

6  Wells Fargo and WFC due to the fact that WFC owns and controls the Bank, and that the Bank

7  directors responsible for ensuring compliance with HAMP and other government requirements were

8  also WFC executives and/or directors.

9  <div align="center">**FACTUAL ALLEGATIONS**</div>

10      **A.**    **Wells Fargo Wrongfully Forecloses on Its Customers' Homes**

11      30.    Plaintiffs are among the millions of homeowners who had trouble making ends meet

12  during the Great Recession.  They fell behind on their mortgage payments and needed help to avoid

13  losing their homes.

14      31.    The Home Affordable Modification Program (HAMP) was designed to provide the very

15  help that Plaintiffs and class members needed.  Introduced pursuant to the Emergency Economic

16  Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers

17  who met certain threshold requirements.  These modifications would lower a borrower's mortgage

18  payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the

19  borrower to avoid foreclosure.

20      32.    Similar threshold requirements were incorporated into the mortgage modification

21  requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac,

22  and the Federal Housing Administration (FHA).

23      33.    Plaintiffs and class members met the threshold requirements for a mortgage modification

24  and as their mortgage servicer, Wells Fargo, was required to offer them a loan modification.  Wells

25  Fargo failed to do so, however, and instead foreclosed on Plaintiffs and more than five hundred other

26  class members who could not make their monthly payments without a modification.

27      34.    Another three hundred class members were just able to stave off foreclosure, but not

28  without overcoming numerous financial and emotional difficulties that could have been avoided if

**Deleted:** For purposes of this complaint, Plaintiffs will use "WFC" to refer to Wells Fargo & Company, "Bank" to refer to Wells Fargo Bank, N.A., and "Wells Fargo" when referring to both of the defendants.  As explained in further detail below, the Bank and WFC

**Deleted:** the two defendants

**Deleted:**  Bank

**Deleted:** FIRST AM.

1   Wells Fargo had lowered their mortgage payments as HAMP and other GSEs required.

2         **B.      Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a**

3                 **Period of at Least 8 Years**

4         35.     Wells Fargo has only recently acknowledged that it wrongfully denied Plaintiffs and

5   class members mortgage loan modifications to which they were entitled under HAMP and other

6   government requirements.

7         36.     In form letters sent to Plaintiffs and class members in late 2018, Wells Fargo claimed

8   that its decision was based on a "faulty calculation."  The problem goes much deeper than a single

9   miscalculation, however, and reflects the same type of extreme and outrageous conduct that has

10  embroiled Wells Fargo in a string of public scandals.

11        37.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its

12  automated decision-making tool.  This software determined customers' eligibility for a government-

13  mandated mortgage modification during a time of extreme financial distress.  Its importance to these

14  customers' lives cannot be overstated.  Yet Wells Fargo not only failed to verify that its software was

15  correctly calculating whether customers met threshold requirements for a mortgage modification, it

16  failed to regularly and properly audit the software for compliance with government requirements—

17  allowing life-changing errors to remain uncorrected for years on end.

18        38.     Wells Fargo was not required to develop its own tool to calculate whether its customers

19  were eligible for government-mandated mortgage modifications.  The government provided a free

20  software tool for mortgage servicers to use in determining whether homeowners met threshold

21  requirements.  If Wells Fargo was not going to properly verify and audit its own software, it could

22  have—and should have—used the free software instead.

23        39.     As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank

24  repeatedly violated HAMP and other government requirements over a period of at least eight years and

25  denied Plaintiffs and class members mortgage modifications that the Bank was legally required to offer.

26        **C.      Wells Fargo's Leadership Fails to Implement Adequate Testing Even After**

27                 **Promising to Do So as Part of 2011 Consent Decrees**

28        40.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a

**Deleted:** FIRST AM.

1  2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in

2  the Bank's mortgage modification and foreclosure practices.

3      41.    The OCC found, among other things, that the Bank had failed to devote adequate

4  oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to

5  adequately audit its foreclosure procedures.

6      42.    Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of

7  which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of

8  Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution passed

9  by WFC's Board of Directors.

10     43.    Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and

11 controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP;

12 and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed

13 and any deficiencies promptly detected and remedied.  The Bank also promised to maintain a

14 Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

15     44.    In one of the consent orders, the Federal Reserve specifically ordered WFC's Board of

16 Directors to take steps to ensure the Bank complied with its obligations under the consent orders,

17 including by strengthening the Board's oversight of compliance with HAMP and other government

18 requirements; to ensure that audit and compliance programs were adequately staffed; and to improve

19 the information and reports that would be regularly reviewed by WFC's Board of Directors.

20     45.    Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance

21 Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of

22 Directors would also assume ongoing responsibility for oversight and compliance based on improved

23 reporting, and that WFC's Chief Operational Risk Officer (CORO) was providing both the Compliance

24 Committee and the Audit & Examination Committee with the necessary information and testing results

25 for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure

26 compliance with HAMP and other government requirements.

27     46.    Together, Wells Fargo's executives and board members—in particular, Wells Fargo's

28 Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—were

| Deleted: the |

| Deleted: FIRST AM. |

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1  supposed to make sure that the Bank conducted the necessary testing to detect and remedy any

2  violations of HAMP and other government requirements.  They repeatedly failed to fulfill these

3  obligations over the course of several years, however—in violation of the promises they made in the

4  2011 Consent Order and in callous disregard of the well-being of their customers.

5      47.   Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June

6  2015, the OCC found that the Bank was still in continuing noncompliance.  Among other things, the

7  OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other

8  government requirements; had not ensured that the Bank's audit and compliance programs had the

9  requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage

10 modification and foreclosure practices would be identified and promptly remedied; and had not ensured

11 that the Bank was making reasonable good faith efforts, consistent with HAMP and other government

12 requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' homes.

13
14 **D.    Wells Fargo Conceals Its Discovery of One of the Systematic Errors from
        Regulators and Consumers**

15     48.   In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC

16 prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought

17 its operations into compliance with an amended consent order.  The OCC also stated that it would be

18 taking additional action against Wells Fargo, the nature and severity of which would depend on the

19 nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

20     49.   As a result of Wells Fargo's continuing failure to implement adequate auditing and

21 compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that

22 led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and

23 October 2014.  The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo

24 to pay a civil money penalty of $70 million.

25     50.   Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage

26 modification software in August 2013—*one of the errors at issue in this case*—which caused the Bank

27 to wrongly deny mortgage modifications to 625 customers.  Well Fargo decided not to tell anybody it

28 had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure

**Deleted:** October 2015

**Deleted:** FIRST AM.

1   that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the

2   business restrictions it had imposed in 2015.

3       51.    The Bank's seven-member Board of Directors, each of whom also served on WFC's

4   Board of Directors, signed the stipulation under which the Bank accepted the $70 million penalty and

5   acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in

6   2013-2014.  These directors did not disclose that the Bank had discovered another error—either

7   because their oversight was so non-existent that they did not know, or because they chose to

8   deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the

9   business restrictions it had imposed on the Bank.

10       52.    To make matters worse, even after discovering the 2013 error, Wells Fargo still did not

11   reform its auditing and verification practices.  Related errors that would affect an additional 145

12   customers were not discovered until five years later.

**E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight**

15       53.    The failure of Wells Fargo's executives and board members to implement adequate

16   auditing and compliance procedures was not an accident.  As scandal after scandal comes to light, it has

17   become all too clear that Wells Fargo's leaders intentionally abandoned their oversight

18   responsibilities—and did so to a shocking degree.

19       54.    The most notorious example is the fraudulent account scandal uncovered in 2016, when

20   it was revealed that Wells Fargo employees were encouraged to sign up customers for some 3.5 million

21   checking and credit card accounts without their knowledge.  Wells Fargo was fined $185 million by

22   federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce) were fired for

23   their involvement in the scandal.

24       55.    The fraudulent account scandal also involved the Audit & Examination Committee,

25   which ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an

26   institutional investor's request that the Board address its lack of comprehensive audit procedures and

27   adjust compensation policies to discourage abusive sales practices.  The two executives most associated

28   with the fraudulent account scandal—John G. Stumpf and Carrie L. Tolstedt—were signatories to one

Deleted: 2015

Deleted: three

Deleted: FIRST AM.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1   of the 2011 consent orders discussed above and among those responsible for Wells Fargo's failure to

2   comply with the orders by implementing adequate auditing and compliance procedures.

3       56.     This case and the fraudulent account scandal are far from the only examples of Wells

4   Fargo's Board and executive leadership abdicating their oversight responsibilities.  Wells Fargo's

5   Board and executive leadership have consistently ignored unlawful practices throughout the Bank's

6   lending divisions, leading to an unprecedented series of government fines.  To give just a few more

7   examples:

8       1.  In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage
            lending practices discriminated against African-American and Hispanic borrowers
9

10      2.  In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of
            $8.5 billion to resolve claims of foreclosure abuses

11      3.  In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had
            misrepresented the quality of mortgage loans it sold to Freddie Mac
12

13      4.  In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for
            falsely certifying that mortgage loans were eligible for FHA insurance

14      5.  In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations
            that it engaged in illegal student loan servicing practices
15

16      6.  In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing
            insurance on its auto-loan customers (often leading to wrongful vehicle repossessions)
17          and charging its mortgage-loan customers excessive rate-lock fees

18      7.  In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it
            engaged in a variety of improper practices, including selling customers renters' and life
19          insurance they did not ask for and overcharging for GAP auto insurance

20      57.     Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its

21  central oversight as part of its settlements with the government.  Each time, Wells Fargo's Board and

22  executives failed to live up to those promises and continued to abdicate their oversight responsibilities.

23  As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a

24  compliance risk management program commensurate with the Bank's size, complexity and risk

25  profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations

26  of law."

27      58.     Wells Fargo's persistent failure to implement adequate auditing and compliance

28  procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the

**Deleted:** FIRST AM.

-11-

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1   Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until

2   it sufficiently improves its governance and controls.

3        59.    In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that

4   Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that

5   senior management had maintained an adequate risk management framework, which resulted in weak

6   compliance practices.

7        60.    Wells Fargo was ordered to submit a plan for reforming Board oversight and

8   governance, including steps that it will take to hold senior management accountable, maintain a

9   management structure that promotes effective oversight and compliance control, and ensure the

10  comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance

11  control program.

12       61.    Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance

13  program, which must include effective testing and validation measures for compliance with applicable

14  laws.

15       62.    Until Wells Fargo's plans for reform are approved by the Federal Reserve and the

16  implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is

17  subject to an asset cap that restricts the company from growing larger.

18       63.    As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to

19  shut down." "A smaller bank might have lost its banking licenses."

20      **F.    Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors**

21       64.    A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the

22  prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its

23  shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage

24  modifications, many of whom lost their homes as a result of the error.  Wells Fargo wrote in its 10-Q

25  that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010,

26  and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances

27  resulted in a foreclosure.  Wells Fargo also wrote that it had "accrued $8 million to remediate

28  customers," which amounts to an average of only $12,800 per customer.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

Deleted: 2015

Deleted: 2015

Deleted: FIRST AM.

1      65.    Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered

2    related errors that affected approximately 245 more customers who were incorrectly denied a mortgage

3    modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls

4    were implemented." These related errors raised the number of affected customers to approximately 870

5    and the resulting wrongful foreclosures to approximately 545.

6      66.    Wells Fargo's long-overdue review of its automated mortgage modification software is

7    apparently still not complete. In its recently filed 10-K Annual Report, Wells Fargo disclosed to

8    shareholders that the "effort to identify other instances in which customers may have experienced harm

9    is ongoing, and it is possible that we may identify other areas of potential concern."

10      67.    In late 2018, Wells Fargo began sending form letters to the customers affected by the

11    errors in its automated decision-making tools. The letters typically included a check for around

12    $15,000, and informed customers that if they were not satisfied with that amount, they could consider

13    mediation through a third-party mediator that Wells Fargo has retained.

14      68.    The amounts that Wells Fargo is offering its customers is nowhere near enough to

15    compensate them for the damage that Wells Fargo's conduct caused them, and indicates that while

16    Wells Fargo wants the Federal Reserve to believe it has changed its ways, the company is unwilling to

17    accept full responsibility for the life-altering consequences its behavior has wrought.

18      69.    As a result of Wells Fargo's conduct, the lives of Plaintiffs and class members have been

19    irrevocably altered. Their damages include loss of their homes; loss of equity in their homes; loss of

20    tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

21    spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

22    money to find new housing and move their families; loss of favorable interest rates or other favorable

23    loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments;

24    stress-related illnesses; broken marriages; children coping with the financial and emotional

25    consequences of their parents losing the family home; and severe emotional distress.

26    //

27    //

28    //

**Deleted:** FIRST AM.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

**PLAINTIFFS' EXPERIENCES**

**1.      Debora Granja (California)**

70.      Plaintiff Debora Granja purchased her home, located in Brentwood, California, with her then-husband in 2004.  The couple eventually had three daughters living with them and put substantial time and money into making the house their own.  Wells Fargo became Ms. Granja's mortgage lender following a refinance in 2006.

71.      Around 2009, Ms. Granja's husband lost his job as a landscaping manager.  Ms. Granja, who had been working only part-time, returned to full-time work to support her family.

72.      Ms. Granja began seeking a loan modification from Wells Fargo in 2010.  Each time she called Wells Fargo, she spoke to a different representative.  Initially, the representatives told her that she would easily qualify for a modification based on her circumstances.  Ms. Granja tried submitting her loan modification application numerous times. Each time, Wells Fargo would claim it lost her paperwork and would ask her to resend it.

73.      Eventually, around 2012, Wells Fargo representatives falsely told Ms. Granja that she did not qualify for a modification.  The Bank ultimately foreclosed on her house in 2014 and Ms. Granja was forced to find a rental home for her family.  Her daughters had to change schools and leave the only environment they knew.

74.      Wells Fargo's failure to grant Ms. Granja a loan modification caused great strain on her marriage.  Ms. Granja and her husband legally separated around the time of the foreclosure.  The stress of the foreclosure also severely affected Ms. Granja's health.  She was diagnosed with severe depression in 2013.  Four years later, Ms. Granja was diagnosed with acute traumatic stress disorder.  Her breakdown was triggered by a minor car accident but caused by an accumulation of stress over recent years, including from the foreclosure.

75.      In September 2018, Ms. Granja's ex-husband received a letter from Wells Fargo informing him and Ms. Granja that their mortgage modification should have been approved but was not approved due to an error.  He notified Ms. Granja of the letter and she contacted Wells Fargo to provide it with her contact information.  Ms. Granja was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

**Deleted:** FIRST AM.

76.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Granja's life has been irrevocably altered.  Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

**2.     Keith Lindner (California)**

77.     Mr. Lindner bought a home for his family in Visalia, California in 2003, financing the purchase with a mortgage loan from Wells Fargo.  He moved in shortly thereafter with his partner, daughter, and two young stepsons.

78.     As a seasoned professional in the construction industry, Mr. Lindner made wholesale improvements to the home.  He built a 16-by-24-foot addition, replaced the windows, carpeting, flooring and interior doors, installed new lighting, and rebuilt showers and closets, among other things.

79.     In 2006, Mr. Lindner began to experience some medical issues.  It took a long time for doctors to arrive at the correct diagnosis, and he eventually had surgery in 2008.  Following the surgery, he was unable to work for two months.  Around the same time, the construction industry began to suffer from the effects of the Great Recession.  Mr. Lindner's partner, who by this time was his wife, had recently obtained a master's degree, but was having a hard time finding work.  Mr. Lindner's father also fell ill, and Mr. Lindner missed more time at work to be with his ailing father.

80.     In 2009, Mr. Lindner was laid off from his job with the company that had employed him for the previous seven years.  This caused the Lindners' already-difficult financial situation to become critical.  Mr. Lindner reached out to Wells Fargo to tell them about his financial difficulties and asked them if they could provide any assistance with his mortgage so that his family could stay in their home.  Wells Fargo denied his request.

81.     Mr. Lindner did everything he could to make ends meet, but money became tighter and tighter every month.  This took a tremendous toll on the Lindners' marriage, and they separated in September of 2009.  Mrs. Lindner moved out of the house with her two sons from a previous relationship, leaving Mr. Lindner with their son, who was about three years old at the time.

**Deleted:** FIRST AM.

82.     Mr. Lindner continued to write hardship letters to Wells Fargo and to apply for a mortgage modification, but was rejected time and time again, both verbally and in writing.  Eventually, Mr. Lindner realized that his situation was untenable, and he would have to leave the home.  In 2011, Wells Fargo offered him a "cash for keys" deal and paid him $2,000 to leave his home with his young son.

83.     Mr. Lindner and his son, who was in kindergarten or first grade at the time, were forced to live in a series of uncomfortable situations, renting rooms in other people's houses until Mr. Lindner obtained his contractor's license in 2013, and was finally able to rent a house in 2014.

84.     Mr. Lindner and his son suffered significant depression and anguish as a result of losing their home.  The boy was sad about having to move from the only home he had known, and still fondly remembers it and the friends he left behind.  Mr. Lindner was prescribed anti-depressants but did not have a good reaction to them.  Mr. Lindner is still recovering from the impact of losing his home, having his credit destroyed, and everything else that he endured as a result of being denied a mortgage modification.  His goal now is to be able to buy a home near his ex-wife so that he can be closer to his son and provide him with a secure home.

85.     In late 2018, Mr. Lindner received a letter from Wells Fargo informing him that his mortgage modification should have been approved but was not approved due to an error.  Mr. Lindner was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

86.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Mr. Lindner's life has been irrevocably altered.  His injuries include loss of his family's home and the time and money put into that home; loss of equity in his home; loss of tax benefits; loss of appreciation in his home's value; loss of time and money spent to find replacement housing and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his credit and resulting opportunity costs; and severe emotional distress.

**3.     Emma White (Florida)**

87.     Plaintiff Emma White purchased her home, located in Callahan, Florida, in 2006.  She was a single mother who moved into the house with her four children.  The property was purchased

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

Deleted: FIRST AM.

1  through a mortgage loan that Wells Fargo later acquired.

2      88.     Around 2009, Ms. White began experiencing financial hardship. She had accumulated

3  debt supporting her children and applied for a mortgage loan modification so that the family could keep

4  their home.  The loan modification process was long and complicated. Ms. White kept having to send

5  in the same paperwork over and over again, only to ultimately receive a letter from Wells Fargo in 2013

6  saying that she did not qualify for a modification.

7      89.     Wells Fargo had already initiated foreclosure proceedings, so after it denied her request

8  for a mortgage modification, Ms. White was forced to leave her house.  She found a rental apartment in

9  Jacksonville, Florida, for her and three of her children, while Wells Fargo completed its foreclosure of

10  their old home.

11      90.     Wells Fargo's actions caused Ms. White significant emotional distress.  The foreclosure

12  devastated her, especially because she had to support her children and work to make sure the family

13  had a place to live.  Ms. White had been suffering from the stress of supporting her children and other

14  recent events in her life, and the foreclosure multiplied that stress.  As a result of everything that was

15  going on in her life, including the foreclosure, Ms. White was diagnosed with depression and began

16  taking antidepressants.  Ms. White's children were also affected by the foreclosure.  She had to explain

17  to them that she tried her best to keep the house, but ultimately could not do so.

18      91.     In late 2018, Ms. White received a letter from Wells Fargo informing her that her

19  mortgage modification should have been approved but was not approved due to an error.  Ms. White

20  was one of the customers wrongly denied a mortgage modification because of systematic errors in

21  Wells Fargo's automated decision-making tool.

22      92.     As a result of Wells Fargo's repeated failure to properly test its automated decision-

23  making tool, Ms. White's life has been irrevocably altered.  Her injuries include loss of her family's

24  home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss

25  of appreciation in her home's value following the sale; loss of time and money spent to find

26  replacement housing and move her family; loss of time and money spent in an effort to avoid

27  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

28

**Deleted:** FIRST AM.

#### 4.    Troy Frye (Georgia)

93.    In 2009, Mr. Frye bought a home in Hephzibah, GA for himself and his partner, their two young sons (who were about five and seven years old at the time), and his partner's daughter.

94.    Around the beginning of 2013, Mr. Frye was laid off from his job at a local manufacturing plant where he had been employed for about eight to ten years.  He applied for and received unemployment assistance, but still was not able to make the monthly mortgage payments on his home.  He reached out to Wells Fargo (his mortgage servicer), to see if they would grant him a mortgage modification, which they did in late February 2013.

95.    Unfortunately, Mr. Frye's new monthly mortgage payment was not significantly lower, and Mr. Frye continued to have difficulty making his payments.  He attempted to get a second modification from Wells Fargo, but this time he was denied—both verbally and in writing.  Wells Fargo then initiated foreclosure proceedings.

96.    The strain of Mr. Frye's financial hardship, coupled with the uncertainty and stress of the impending foreclosure, had a big impact on Mr. Frye and his family.  The relationship between Mr. Frye and the mother of his children became very strained, and in 2014, she moved out with their two boys and her daughter, leaving Mr. Frye alone in the home.

97.    Mr. Frye was able to delay foreclosure proceedings for a while, but Wells Fargo persisted in their efforts to remove him from his home.  Around the beginning of 2015, Wells Fargo asked him how much they would need to pay him to leave.  Confused and frustrated by the situation, Mr. Frye said he would accept $2,000.  The house had recently been damaged by a kitchen fire that broke out while Mr. Frye was sleeping, and from which he was fortunate to escape with his life.  He accepted the $2,000 from Wells Fargo and moved out, as the house was no longer habitable.

98.    Mr. Frye and his children suffered emotional trauma and depression as a result of the foreclosure and the effects that it had on their lives.  They all tried to move on as best they could.

99.    In late 2018, Mr. Frye received a letter from Wells Fargo informing him that his second mortgage modification request should have been approved but was not approved due to an error.  Mr. Frye was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

**Deleted:** he

**Deleted:** wife

**Deleted:** wife's

**Deleted:** FIRST AM.

100.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Mr. Frye's life has been irrevocably altered.  His injuries include loss of his family's home and the time and money put into that home; loss of equity in his home; loss of tax benefits; loss of appreciation in his home's value; loss of time and money spent to find replacement housing and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his credit and resulting opportunity costs; and severe emotional distress.

**5.      Coszetta Teague (Illinois)**

101.    Plaintiff Coszetta Teague purchased a home in Calumet City, Illinois, for herself and her daughter, Iesha Brown, in June 2010.  Ms. Teague's two young grandchildren moved in shortly thereafter.  The property was purchased through a mortgage loan with Wells Fargo.

102.    In 2010, Ms. Teague was laid off from her job at Chase Bank.  In 2011, Ms. Teague lost her mother and her property taxes went up.  As a result, Ms. Teague could no longer afford to make her monthly payments, and reached out to Wells Fargo to see if they could help.

103.    Wells Fargo told Ms. Teague to fill out paperwork.  Ms. Teague did as she was told, but when she later inquired about the status of her modification request, she was told that it had been lost and that she would have to redo it.  It took a long time for Wells Fargo to process Ms. Teague's application, and Wells Fargo's representatives were often impolite during the process, but eventually Wells Fargo told Ms. Teague that she did not qualify for a mortgage modification and it was going to initiate foreclosure proceedings.

104.    Afraid that the sheriff was going to remove her from her home, Ms. Teague asked her brother to help move her belongings to storage.  She hired a foreclosure defense attorney, who charged her $4,000 but was unable to help.  Ms. Teague and her family vacated the home in the latter part of 2014 and Wells Fargo foreclosed shortly thereafter.

105.    Ms. Teague, her daughter, and her two grandchildren lived in Ms. Teague's car for several months, until she was able to find an apartment sometime around March 2015.

106.    The experience was emotionally devastating for all concerned.  Ms. Brown was very depressed and had suicidal ideations.  She was prescribed antidepressants, including Zoloft.  The grandchildren, who were around four and nine at the time, were sad and confused about losing their

-19-

Deleted: and Iesha Brown

Deleted: Plaintiff

Deleted: 2011

Deleted: That same year

Deleted: In or around March 2012, Wells Fargo told Ms. Teague she had 30 days before the sheriff would come and evict her.  Ms.

Deleted: March or April

Deleted: that year

Deleted: were forced to live

Deleted: roughly the next three years

Deleted: She was in therapy from 2012 until 2017, and

Deleted: FIRST AM.

home and having to live in a car, change schools, and leave all their friends. They shut down, stopped interacting with people, and attended therapy. Ms. Teague also experienced depression following the foreclosure, and was prescribed antidepressants, including Zoloft. She is currently on Social Security and disability benefits.

107.   In late 2018, Ms. Teague received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error. Ms. Teague was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

108.   As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Teague her family's lives have been irrevocably altered. Their injuries include loss of their home and the time and money put into that home; loss of equity in the home; loss of tax benefits; loss of appreciation in the home's value following the sale; loss of time and money spent to find replacement shelter and relocate; loss of time and money spent in an effort to avoid foreclosure; damage to Ms. Teague's credit and resulting opportunity costs; and severe emotional distress.

**6.   Russell and Brenda Simoneaux (Louisiana)**

109.   Plaintiffs Russell and Brenda Simoneaux purchased their home in Baton Rouge, Louisiana, in 1992.

110.   Mr. and Mrs. Simoneaux contacted Wells Fargo, their mortgage loan servicer, in 2013 because Mr. Simoneaux had recently retired and the couple was living on a fixed income. They applied for a mortgage modification, but were denied.

111.   Without a mortgage modification, Mr. and Mrs. Simoneaux had a very difficult time meeting their mortgage obligations. Mr. and Mrs. Simoneaux were both forced to take side jobs for extra income, the couple avoided eating out, and they watched every penny they spent for several years—until their mortgage was finally paid off in late 2018. It was an extremely stressful time.

112.   In October 2018, Mr. and Mrs. Simoneaux received a letter from Wells Fargo informing them that their request for a mortgage modification should have been approved but was not approved due to an error. Mr. and Mrs. Simoneaux were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

Deleted: were in
Deleted: from 2012 to 2017.
Deleted: was
Deleted: diagnosed with
Deleted: She began therapy in 2012 and has continued with it to the present day. She is
Deleted: social security

Deleted: Ms. Brown's

Deleted: FIRST AM.

113. As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Mr. and Mrs. Simoneaux were forced to make numerous sacrifices and endure significant stress as they struggled to meet mortgage payments that should have been lowered. Their injuries include loss of more beneficial loan terms; loss of time spent avoiding foreclosure; and opportunity costs resulting from higher mortgage payments.

**7. John and Yvonne DeMartino (Maryland)**

114. In 2008, Plaintiffs John and Yvonne DeMartino bought a single-family home for $239,000 in Baltimore, Maryland, with a mortgage loan from Wells Fargo. The home was located next door to their residence. The plan was for Yvonne's mother, Margaret, then in her late seventies and suffering from Parkinson's disease, to move in to be cared for by Yvonne when she was no longer able to live by herself.

115. After the DeMartinos bought the home, their pregnant daughter and son-in-law moved in, with the understanding that they would pay the mortgage and live there until Margaret needed to move in. They got behind on their mortgage payments, however, and the DeMartinos had to tap into their savings to bring the mortgage current. In or around 2013, the DeMartinos' daughter and son-in-law fell behind on the mortgage payments again, but this time the DeMartinos couldn't afford to bring the debt current. The DeMartinos applied for a mortgage modification from Wells Fargo but were denied. Wells Fargo foreclosed on the home in around 2013 or 2014.

116. Mr. and Mrs. DeMartino suffered great stress and anxiety as a result of the foreclosure. They were humiliated and afraid to pick up the phone. Mr. DeMartino has tried to get the foreclosure removed from his record. He was told by Wells Fargo that it cannot be erased, however, because even though it was in error, the foreclosure did in fact occur.

117. Margaret, now 87, lives in a nursing home some distance away, and Mrs. DeMartino has a difficult time getting there to see her. The DeMartinos feel terrible every time they look at the house next door, where Margaret would be living under Mrs. DeMartino's care had Wells Fargo not foreclosed on the home.

118. In late 2018, the DeMartinos received a letter from Wells Fargo informing them that their request for a mortgage modification should have been approved but was not approved due to an

**Deleted:** Demartino

**Deleted:** Demartino

**Deleted:** Demartinos

**Deleted:** Demartinos

**Deleted:** Demartinos'

**Deleted:** Demartinos

**Deleted:** Demartinos

**Moved (insertion) [1]**

**Deleted:** As a result of the foreclosure, the Demartinos' credit scores plummeted—they were forced to pay higher interest on auto loans

**Deleted:** were not able to get a home equity line of credit.

**Deleted:** Demartino worked for the Department of Defense, and her credit problems caused her great difficulty at work and threatened the security clearance that she needed for her job. She was eventually forced to retire early as a result of these issues.¶

**Moved up [1]:** Mr.

**Moved down [2]:** and Mrs.

**Deleted:** Demartino

**Deleted:** and its effect on their credit.

**Deleted:** both developed high blood pressure, and they

**Deleted:** Demartino

**Deleted:** Demartino

**Deleted:** Demartinos

**Deleted:** Demartino's

**Deleted:** Demartinos

**Deleted:** FIRST AM.

1   error.  The DeMartinos were among the customers wrongly denied a mortgage modification because of

2   systematic errors in Wells Fargo's automated decision-making tool.

3        119.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

4   making tool, the DeMartinos has suffered life-altering consequences.  Their injuries include loss of

5   their house time and money put into that house; loss of equity in the house; loss of appreciation in the

6   house's value following the sale; loss of time and money spent to find replacement housing for Ms.

7   DeMartino's mother; loss of time and money spent in an effort to avoid foreclosure; damage to their

8   credit and resulting opportunity costs; and severe emotional distress.

9        **8.   Alicia Hernandez (New Jersey)**

10        120.   Plaintiff Alicia Hernandez bought her studio condominium, located in North Bergen,

11   New Jersey, in 2006.  The property was purchased through a mortgage loan with Wells Fargo.

12        121.   Ms. Hernandez already owned another unit in the complex and thought the studio, with a

13   lot of work, could be developed into an attractive rental due to its close proximity to New York

14   City.  It's right across the river from Manhattan, and only a seven-minute drive from Times Square with

15   no traffic.  Ms. Hernandez planned to keep the property in her family forever.  The unit also had a

16   deeded parking spot, and parking is very difficult to come by in that area.

17        122.   When Ms. Hernandez purchased her studio, it was just a shell—it had no kitchen and

18   there were bullet holes in the door.  But Ms. Hernandez was willing to put in the work, time, and

19   money to create an income-generating property that could provide for her and her family.  She tapped

20   into her retirement account and installed new flooring, new appliances, new bathroom fixtures, recessed

21   lighting, and a new air conditioning unit.  She also had to contribute additional money when the

22   homeowners' association imposed special assessments.

23        123.   During the Great Recession, Ms. Hernandez lost her job in a mass layoff, and with the

24   property now her only source of income, had difficulty making her monthly mortgage payment.  She

25   applied for a mortgage modification in 2012-13, but Wells Fargo told her that she didn't qualify and

26   instituted foreclosure proceedings in late 2013.

27        124.   Ms. Hernandez fought foreclosure for several years, but Wells Fargo eventually

28   foreclosed on her property in late 2015.  The stress of the foreclosure process had a devastating effect

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

Deleted: Demartinos

Deleted: Demartinos

Deleted: Demartino's

Deleted: FIRST AM.

1   on Ms. Hernandez and her husband.  As non-lawyers, the anxiety and confusion of dealing with the

2   court system and the legal process took a severe toll on them emotionally.  Ms. Hernandez had a

3   miscarriage during the foreclosure process and was hospitalized for the first time in her life.  She also

4   suffered insomnia, panic attacks, and difficulty breathing.

5       125.   Ms. Hernandez's husband is a police officer, and both were very concerned about the

6   effects that the foreclosure might have on him professionally.  This put a lot of strain on their marriage

7   and caused embarrassment when they ran into colleagues of his while attending court to fight

8   foreclosure.  Eventually, Ms. Hernandez and her husband moved to Easton, Pennsylvania, to escape the

9   stress of being in the same community, and her husband now commutes approximately an hour and 15

10  minutes to work.

11      126.   In late 2018, Ms. Hernandez received a letter from Wells Fargo informing her that her

12  request for a mortgage modification should have been approved but was not approved due to an error.

13  Ms. Hernandez was one of the customers wrongly denied a mortgage modification because of

14  systematic errors in Wells Fargo's automated decision-making tool.

15      127.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

16  making tool, Ms. Hernandez has suffered life-altering consequences.  Her injuries include loss of her

17  property and the time and money put into that property; loss of equity in her property; loss of

18  appreciation in her property's value following the sale; loss of time and money spent fighting

19  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

20      **9.   Rose Wilson (New York)**

21      128.   Plaintiff Rose Wilson purchased her home, located in Rochester, New York, in or

22  around 1995.  Ms. Wilson lived in the home for many years with her family, and put a lot of time and

23  money into the property—including by renovating the kitchen and bathroom.

24      129.   After Ms. Wilson lost her job due to the economic downturn, however, she struggled to

25  make the mortgage payments on her home.

26      130.   She applied for a mortgage modification from Wells Fargo (her mortgage servicer)

27  multiple times over the course of several years.  Wells Fargo kept stringing her along, requiring her to

28  make monthly payments she could not afford in order to qualify for a mortgage modification, and then

**Deleted:** FIRST AM.

1   telling her the request had been denied and she would need to reapply and start the process all over

2   again.

3       131.   Ms. Wilson's attempt to obtain a mortgage modification from Wells Fargo and save her

4   home went on for years.  During this time, Ms. Wilson had to make many sacrifices to keep making her

5   mortgage payments.  She tapped into her retirement account early, incurring tax penalties to do so.

6       132.   Ms. Wilson's efforts to save her home were ultimately unsuccessful, however, and Wells

7   Fargo foreclosed in 2014.  At the time of the foreclosure, Ms. Wilson's daughter, son-in-law, and their

8   two children lived with her. They were all forced to move from their home to a cramped, moldy,

9   rodent-infested rental property.  The aftermath of the foreclosure caused Ms. Wilson significant stress

10  and depression.  She had worked hard to purchase a home and provide for her family, but after the

11  foreclosure, Ms. Wilson felt utterly defeated and left with nothing.  It has taken many years for the pain

12  to subside, but she still feels immense sadness whenever she drives by her former house or thinks about

13  her old life.

14      133.   In late 2018, Ms. Wilson received a letter from Wells Fargo informing her that her

15  request for a mortgage modification should have been approved but was not approved due to an error.

16  Ms. Wilson was one of the customers wrongly denied a mortgage modification because of systematic

17  errors in Wells Fargo's automated decision-making tool.

18      134.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

19  making tool, Ms. Wilson has suffered life-altering consequences.  Her injuries include loss of her home

20  and the time and money put into that property; loss of equity in her property; loss of appreciation in her

21  property's value following the sale; loss of time and money spent fighting foreclosure; damage to her

22  credit and resulting opportunity costs; and severe emotional distress.

23      **10.   Tiffanie Hood (Ohio)**

24      135.   In May of 2001, Ms. Hood bought a three-bedroom home for her family in Cincinnati,

25  Ohio.  She moved in with her young children—her son was about eight years old at the time, and her

26  daughter was about 11.

27      136.   The home was built in 1926 and needed quite a bit of work.  Ms. Hood invested

28  significant resources putting in a kitchen, repairing the roof, replacing the garage door and front door,

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

Deleted: FIRST AM.

and completing various other necessary repairs.

137.    In or around 2013, Ms. Hood had difficulty making the monthly payment and reached out to Wells Fargo for help. Her request for a mortgage modification was denied, and Wells Fargo initiated foreclosure proceedings. Ms. Hood and her family were forced out of their home in late 2014.

138.    Ms. Hood and her children suffered emotional trauma and depression as a result of the foreclosure and the effects that it had on their lives. They all tried to move on as best they could.

139.    In late 2018, Ms. Hood received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error. Ms. Hood was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

140.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Hood life has been irrevocably altered. Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following foreclosure; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

**11.    George and Cyndi Floyd (Pennsylvania)**

141.    Plaintiffs George and Cyndi Floyd purchased their home, located in Lancaster, Pennsylvania, in 2004. The property was purchased through a mortgage loan with Wachovia, which was later transferred to Wells Fargo.

142.    After the financial crisis hit, the Floyds had difficulty making their mortgage payments. Mr. Floyd lost his job when the company he worked for closed, and Mrs. Floyd later lost her job due to the economic recession as well.

143.    In an effort to save their home, the Floyds went to great lengths: they applied for numerous mortgage modifications over a period of two years; they paid a company to help them avoid foreclosure; and they spent countless hours reaching out to various other companies, government agencies, and even Congressional representatives for help.

144.    The Floyds' efforts were ultimately unsuccessful. Wells Fargo denied their final request

---

Deleted: Over the course of the next decade

Deleted: Hood's monthly payment obligation kept increasing—largely due to rising property taxes. She began having

Deleted: She applied several times

Deleted: but

Deleted: rejected every time.¶
Ms. Hood went through several appeals processes in her efforts to obtain a mortgage modification that would allow her to keep her home but was stymied at every turn.

Deleted: , and

Deleted: <#>With her credit destroyed by the foreclosure, Ms. Hood had a hard time finding a new place to live. Fortunately, her children's aunt owned a townhome that allowed Ms. Hood to rent at a below-market rate, but after a year, they had to move again. Ms. Hood found an apartment that they were able to rent, but it was condemned by the city. Ms. Hood and her children were evicted and had to move yet again. ¶

Deleted: FIRST AM.

1   for a mortgage modification in November 2011 and initiated foreclosure proceedings.  The Floyds were

2   forced to move to a new home in Philadelphia.

3          145.    The foreclosure process was emotionally devastating for the Floyds.  Mr. Floyd is

4   disabled and suffers from degenerative disc disease, arthritis throughout his body, and the aftereffects

5   of failed bilateral knee replacements.  Being forced to move by Wells Fargo was an extreme hardship

6   that caused Mr. Floyd severe depression and emotional distress.  He was hospitalized during the

7   foreclosure process, and though he was eventually able to get through the move to Philadelphia, it took

8   weeks and required the help of Mr. Floyd's nephew and high doses of pain medication.  To this day,

9   Mr. Floyd suffers from deep depression and anxiety because of what Wells Fargo has done to him and

10  his family.

11         146.    In late 2018, the Floyds received a letter from Wells Fargo informing them that their

12  mortgage modification should have been approved but was not approved due to an error.  The Floyds

13  were among the customers wrongly denied a mortgage modification because of systematic errors in

14  Wells Fargo's automated decision-making tool.

15         147.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

16  making tool, the Floyds lives were irrevocably altered.  Their injuries include loss of their home and the

17  time and money put into that home; loss of equity in their home; loss of tax benefits; loss of

18  appreciation in their home's value following the sale; loss of time and money spent to find replacement

19  housing and move their belongings; loss of time and money spent in their efforts to avoid foreclosure;

20  damage to their credit and resulting opportunity costs; and severe emotional distress.

21         **12.    Diana Trevino (Texas)**

22         148.    In 2007, Plaintiff Diana Trevino purchased a three-bedroom home in Garland, Texas,

23  where she lived with her husband and four children.  Close family friend Roder Contreras co-signed the

24  mortgage loan and resided in the home as well.  When Mr. Contreras's grandmother became ill in 2010,

25  he moved to El Salvador to take care of her.  He stopped making his share of the payments on the

26  Trevino home, and quitclaimed his interest in it to the Trevinos.

27         149.    Because the Trevinos were unable to make the entire monthly mortgage payment

28  without Mr. Contreras's contribution, Ms. Trevino applied for a mortgage modification from Wells

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

**Deleted:** FIRST AM.

1   Fargo and was approved.  After making approximately five to eight payments under the modification

2   plan, Ms. Trevino suffered another setback when her mother became ill with cancer.  Ms. Trevino

3   began missing a significant amount of work because she was taking time off to take care of her

4   mother.  She fell behind on the mortgage payments, and again sought assistance from Wells Fargo.

5         150.    Wells Fargo told Ms. Trevino to stop making mortgage payments so that she could

6   qualify for another mortgage modification, which they assured her she was likely to get.  Ms. Trevino

7   stopped making payments as instructed, instead devoting her limited financial resources to her children

8   and ailing mother.

9         151.    In 2013, Ms. Trevino received a call from Wells Fargo notifying her that she had not

10  been approved for a mortgage modification, and that Wells Fargo planned to initiate foreclosure

11  proceedings.  She was told she had 60 days to vacate the premises; a follow-up letter conveyed the

12  same information.

13        152.    Ms. Trevino had great difficulty finding a new place for her family to live, but

14  eventually found a three-bedroom apartment in an undesirable neighborhood in Richardson,

15  Texas.  The lease was solely in her husband's name, because the foreclosure had ruined Ms. Trevino's

16  credit.

17        153.    In April of 2013, the Trevinos moved into the apartment.  Ms. Trevino tried to keep her

18  children in the same school in Garland, but the travel proved very difficult for the family.  At times,

19  some of the children were forced to live with their aunt so they could be nearer to their school.  This

20  was hard on the children, who couldn't understand why they had lost their home, or why their mother

21  was so sad all of the time.  Some of the children lost friends and started acting out at

22  school.  Uncharacteristically, her son and daughter were both suspended from school for misbehavior

23  during this time period.

24        154.    The stress of the foreclosure, among other factors, strained the Trevinos' marriage, and

25  in 2013 they separated.  Eventually they divorced.  When the lease on their apartment expired, Ms.

26  Trevino was unable to renew it because she had not been on the original lease, and her poor credit

27  prevented her from getting a lease on her own.  The Trevinos were evicted from the apartment and had

28  a very hard time finding a new place to live.

**Deleted:** FIRST AM.

1    155.   Around the same time, Ms. Trevino's stress and depression got to the point that she

2    wasn't eating or sleeping, and she had to be hospitalized with a bacterial infection.  She lost her job and

3    was unemployed for around ten months.  She and her children survived on her unemployment benefits

4    and the financial assistance of her sister.  Two of Ms. Trevino's sons left college so that they could

5    work and help support the family.  Ms. Trevino and her family have worked hard to try to rebuild their

6    lives in the wake of the foreclosure in 2013, and continue to do so to this day.

7    156.   In late 2018, Ms. Trevino received a letter from Wells Fargo informing her that her

8    mortgage modification should have been approved but was not approved due to an error.  Ms. Trevino

9    was one of the customers wrongly denied a mortgage modification because of systematic errors in

10   Wells Fargo's automated decision-making tool.

11   157.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

12   making tool, Ms. Trevino's life has been irrevocably altered.  Her injuries include loss of her family's

13   home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss

14   of appreciation in her home's value following the sale; loss of time and money spent to find

15   replacement housing and move her family; loss of time and money spent in an effort to avoid

16   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

17                                   **CLASS ALLEGATIONS**

18   158.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to pursue

19   their claims on behalf of a class of similarly situated persons.  The parameters of the class may be

20   refined through discovery and will be subject to Court approval and modification, but for purposes of

21   this Complaint, Plaintiffs propose the following class definition:

22                                   <u>Nationwide Class</u>

23        All persons who (i) qualified for a mortgage loan modification or repayment plan
           pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae
24         and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of
           Treasury's Home Affordable Modification Program (HAMP), or any other governmental
25         entity or program; and (ii) were not offered a mortgage loan modification by Wells Fargo
           due to a systematic error in Wells Fargo's automated mortgage loan modification
26         underwriting tool.

27

28   159.   For purposes of this proposed class definition, "mortgage loan" refers to any loan

**Deleted:** FIRST AM.

1   secured by real property.

2       160.    The Nationwide Class will pursue contract claims and UCL claims. Plaintiffs also

3   propose that the Court consider several subclasses so that class members may pursue unique state law

4   claims available to them.

5       161.    The first group of subclasses would only be necessary if the Court determines that the

6   UCL should not be applied to all class members.  These subclasses would be defined as followed and

7   cover the following states: California, Florida, Georgia, Illinois, Louisiana, Maryland, New Jersey,

8   New York, Ohio, Pennsylvania, and Texas.

9                   [State] Subclass

10      All members of the Nationwide Class whose mortgage loan was secured by real property
        located in [State].

11

12      162.    The second group of subclasses would be defined as follows, and permit Plaintiffs to

13   pursue wrongful foreclosure claims that exist under California and Georgia law.

14              [California / Georgia] Foreclosure Subclass

15      All members of the Nationwide Class whose mortgage loan was secured by real property
        located in [California / Georgia] who subsequently lost that property through a
16      foreclosure.

17      163.    The third subclass would be defined as follows, and permit Plaintiffs to pursue

18   fraudulent omission claims.

19                   Fraud Subclass

20      All members of the Nationwide Class to whom Wells Fargo sent a letter in or after
21   August 2013 stating that his or her request for a modification had been denied and made
     no mention of the fact that Wells Fargo used software with inaccurate attorneys' fees
22   inputs and/or other errors to calculate eligibility for modifications.

23

24      164.    The fourth subclass would be defined as follows, and permit Plaintiffs to pursue

25   negligent misrepresentation claims.

26               Misrepresentation Subclass

27      All members of the Nationwide Class to whom Wells Fargo sent a letter between 2010
     and August 2013 stating that his or her request for a modification had been denied based
28   on any reason, and made no mention of the actual cause of the denial: inaccurate

Deleted:

Deleted: ¶

Deleted: FIRST AM.

attorneys' fees inputs and/or other errors in the software Wells Fargo was using to calculate eligibility for modifications.

165.    Plaintiffs also propose that the Court certify a larger class for purposes of advancing Plaintiffs' claims for intentional infliction of emotional distress.  This class would be defined as follows:

<div align="center">IIED Class</div>

All members of the Nationwide Class.

166.    Plaintiffs anticipate that they will be able to identify all class and subclass members from Wells Fargo's records and that they can be notified of the pendency of this class action by mail.

167.    The proposed class and subclasses meet each of the requirements for class certification pursuant to Rule 23(a) and Rule 23(b)(3).

168.    Numerosity.  The classes and subclasses are sufficiently numerous such that individual joinders are impracticable and less advantageous than proceeding through the class device.  Based on Wells Fargo's public disclosures to date, the Nationwide Class consists of at least 870 persons.  And based on information Wells Fargo has provided to Plaintiffs in this case, Plaintiffs estimate that each proposed Subclass consists of at least 20 persons, with the possible exception of the Georgia Foreclosure Subclass.

169.    Commonality & Predominance.  Common questions of law and fact exist as to the proposed classes and subclasses, and those common questions predominate over questions affecting only individual class members.  These common questions include:

1.  Whether Wells Fargo breached a standard notice requirement in mortgage contracts by failing to notify class members they qualified for a mortgage modification;

2.  Whether Wells Fargo's conduct, as alleged herein, was extreme and outrageous;

3.  Whether Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to its customers;

4.  Wells Fargo owed Plaintiffs and class members a duty to exercise reasonable care when determining their eligibility for a mortgage modification; and

5.  Whether Wells Fargo's failure to properly verify or audit its automated decision-making software constitutes an unfair practice.

**Deleted:** include children and other family members affected by Wells Fargo's wrongful conduct, and would

**Deleted:** and all persons who resided at the subject property when Wells Fargo denied Nationwide Class members a mortgage modification and/or foreclosed on the property

**Deleted:** FIRST AM.

170.   <u>Typicality</u>.  Plaintiffs' claims are typical of those asserted by the proposed classes and subclasses.  Both Plaintiffs and class members seek to recover for injuries caused by Wells Fargo's failure to properly verify or audit its automated decision-making tool, which caused both Plaintiffs and class members to be denied mortgage modifications and/or to suffer emotional distress.

171.   <u>Adequacy</u>. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class, as their interests do not conflict with the interest of the class members they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation and intend to prosecute this action vigorously.

172.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Successfully prosecuting class members' claims will require an in-depth knowledge of HAMP-related jurisprudence; intensive discovery of a banking giant defended by a large, global law firm; and depositions of several sophisticated banking executives and board members.  These are matters that can only realistically be handled through unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings.  A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

173.   In the alternative to class certification under Rule 23(b)(3), the proposed class and subclasses may also be certified under Rule 23(b)(2) or Rule 23(c)(4).  Wells Fargo has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory appropriate with respect to the class as a whole.  And Plaintiffs' claims present a number of discrete but complex factual and legal issues that could be resolved for all class members in a single proceeding.

**TOLLING ALLEGATIONS**

174.   The causes of actions alleged herein did not accrue or were tolled until Plaintiffs and class members discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims.

175.   Plaintiffs and class members were not aware that they qualified for a mortgage modification, and that Wells Fargo's automated decision-making tool had miscalculated their

**Deleted:** FIRST AM.

1  eligibility, until Wells Fargo informed them through letters mailed the second half of 2018.

2      176.   Plaintiffs and class members had no realistic ability to discover these facts on their own.

3  Wells Fargo's automated decision-making tool is not public, and the mathematical calculations used to

4  determine eligibility for a mortgage modification depended on variables within Wells Fargo's exclusive

5  control.

6      177.   Any applicable statues of limitations are also tolled by Wells Fargo's knowing, active,

7  and ongoing concealment of the facts alleged herein.  Wells Fargo discovered one of the software errors

8  in August 2013 but deliberately concealed its discovery from Plaintiffs and from class members until

9  the second half of 2018.  Wells Fargo was under a continuous duty to disclose the truth to Plaintiffs and

10  class members, and Plaintiffs and class members reasonably relied on Wells Fargo's ongoing

11  concealment.

12                      **CHOICE OF LAW ALLEGATIONS**

13      178.   The State of California has sufficient contacts to the claims of nonresident Plaintiffs and

14  class members such that application of California's Unfair Competition Law (UCL) is appropriate.

15      179.   Wells Fargo does substantial business in California; WFC is headquartered in California;

16  the Bank's principal place of business is in California; and a significant portion of the proposed

17  Nationwide Class is located in California.

18      180.   In addition, the practices that form the basis of Plaintiffs' and class members' UCL

19  claims against Wells Fargo are centered in California, where WFC is headquartered.  WFC owns and

20  controlled the Bank, and is responsible for testing and auditing its mortgage modification operations for

21  compliance with HAMP and other government regulations.

22      181.   Several of the executives and board members who failed to ensure that Wells Fargo

23  properly tested and audited its mortgage modification operations were based in California.  For

24  example, public records indicate that at least four of the ten members who served on the Audit &

25  Examination Committee between 2010 and 2017 were based in California—far more than any other

26  state.  In addition, at least one—and likely both—of the executives who served as WFC's Chief

27  Operational Risk Officer between 2010 and 2017, and thus were responsible for the compliance and

28  audit reporting provided to the Compliance Committee and the Audit & Examination Committee, were

**Deleted:** October 2015

**Deleted:** FIRST AM.

1   based in WFC's San Francisco office.

2       182.    The State of California also has the strong regulatory interest in applying the UCL to all

3   class members' claims.  The UCL is designed to preserve a business climate in California free of unfair

4   and deceptive practices.  If California were only able to address unfair business conduct when the

5   injured consumer resides in California, the UCL would be largely ineffective at regulating companies

6   who do business in all fifty states.  Violators would be able to keep the vast majority of their ill-gotten

7   gains (all those obtained from non-California consumers), leaving California-based companies like

8   Wells Fargo undeterred from engaging in similar conduct in the future.

9       **<u>FIRST CAUSE OF ACTION</u>**
**Breach of Contract**

10

11   **Brought on behalf of the Nationwide Class**

> **Deleted:** Against Wells Fargo Bank

12       183.    Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague,

13   John and Yvonne DeMartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson, Tiffanie

> **Deleted:** Demartino

14   Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set

15   forth herein.  They bring this claim on behalf of themselves and the Nationwide Class or, in the

16   alternative, on behalf of themselves and the State Subclasses.

17       184.    When Plaintiffs and class members financed their homes, they entered into Security

18   Instruments (typically referred to as a mortgage, deed of trust, or security deed) that set forth the

19   conditions under which the lender could accelerate the borrower's payments and foreclose on the

20   property.

21       185.    Plaintiffs' and class members' mortgage loans were insured, guaranteed, or held by a

22   federal government agency and their Security Instruments were typically government-issued, form

23   Federal Housing Administration (FHA) and/or Fannie Mae/Freddie Mac Security Instruments.[1] Twelve

24   of the fifteen Plaintiffs had their homes secured by Fannie/Freddie Security Instruments, while the

25   remaining three had their homes secured by FHA Security Instruments. Wells Fargo breached the terms

26   _____

27   [1] *See* Wells Fargo's Request for Judicial Notice, Dkt. 60, attaching copies of certain Plaintiffs' Security Instruments as "exemplars" that were "substantially similar to the security instruments of the remaining named Plaintiffs." The exemplars included Security Instruments for Plaintiffs DeMartino (FHA Maryland Deed of Trust), Floyd (Fannie Mae/Freddie Mac

28   UNIFORM INSTRUMENT), Hood (FHA Ohio Open-End Mortgage), Hernandez (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), and Wilson (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT).

> **Deleted:** FIRST AM.

of both types of Security Instruments. Plaintiffs Hood and DeMartino entered into FHA Security Instruments, while the remaining Plaintiffs' Security Instruments are Fannie Mae/Freddie Mac documents. References to "Security Instruments" in this complaint refer to all Plaintiffs' mortgage contracts. Reference to "FHA Security Instruments" is to Plaintiffs Hood and DeMartino's mortgage contracts, while reference to "Fannie/Freddie Security Instruments" is to the remaining Plaintiffs' mortgage contracts.

186.    Wells Fargo Bank was subject to the terms of these Security Instruments, either as the original lender, an assignee, or as the mortgage servicer authorized to act on behalf of the lender.

187.    Under the Fannie/Freddie Security Instruments, the Bank was required to give notice to Plaintiffs and class members before it was permitted to accelerate the remaining balance on their loans and initiate the foreclosure process.  That notice was required to specify the borrower's default, the action required by the borrower to cure the default, and the date by which the borrower must cure the default to avoid acceleration and foreclosure proceedings.

188.    The Bank also agreed that "[i]f the Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued…" prior to the sale of the property. Those conditions included, among other things, that the Borrower "(a) pays Lender all sums which then would be due under this Security Instrument…" and "(b) cures any defaults of any other covenants or agreements."[2]

189.    The Fannie/Freddie Security Instruments specifically contemplated the possibility of both a forbearance and modification of the sums secured by the Security Instruments. The Fannie/Freddie Security Instruments provided, "Extension of the time for payment *or modification* of amortization of the sums secured by this Security Instrument … shall not operate to release the liability of Borrower…"[3] (emphasis added).

190.    Similarly, under the FHA Security Instruments, the Bank agreed it was not able to

---

[2] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at pg. 24, ¶ 19; *see also* Plaintiff Hernandez at p. 56, ¶ 19; Plaintiff Wilson at p. 76, ¶ 21(B).

[3] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at p. 23, ¶ 12; *see also* Plaintiff Hernandez at p. 52, ¶ 12.

**Deleted:** FIRST AM.

require full payment and its rights were otherwise limited "by regulations issued by the Secretary in the case of payment defaults…"[4] The Bank also agreed that, "In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary."[5]

191.     Consistent with the Security Instruments, once a borrower missed a mortgage payment, Wells Fargo sent correspondence advising of the amount owed and invited borrowers to call Wells Fargo's "trained professionals" who are "available to assist you in bringing your loan current … [and] will work with you to determine the best option available to you." These letters show Wells Fargo's understanding that there is more than one way to bring a loan current under the Security Instruments.

192.     One of the ways a loan could be brought current was a loan modification. In a recent Rule 30(b)(6) deposition, Wells Fargo's corporate representative testified that a mortgage modification could cure a default and bring a loan current.

193.     This testimony is consistent with other correspondence Wells Fargo sent in response to a request for mortgage assistance. In one letter, Wells Fargo told Plaintiff Troy Frye it was "considering a program that may assist you in bringing your loan current … This program, known as a loan modification, would provide you with the opportunity for a fresh start by adjusting the current terms of your loan."

194.     In a different letter, Wells Fargo advised Plaintiffs and class members that a loan modification is "an agreement that changes the terms of your existing mortgage. It brings your account up-to-date and may result in a lower monthly payment."

195.     Once borrowers, such as Plaintiffs, requested mortgage assistance from Wells Fargo, the Bank would tell borrowers: "We'll continue to work with you to help avoid a foreclosure sale. If your loan has not previously been referred to foreclosure and you have submitted all of the required documentation needed to evaluate for an alternative, this loan will not be referred to foreclosure while

---

[4] *See, e.g.*, Plaintiff DeMartino FHA Security Instrument (Dkt. 60-3) at p. 6, ¶ 9(a); *see also* Plaintiff Hood FHA Security Instrument (Doc. 60-3) at p. 33, ¶ 9(a).

[5] *See id.* at ¶ 9(d).

**Deleted:** FIRST AM.

1  the application is evaluated. If your loan has been referred to foreclosure, we will not conduct a

2  foreclosure sale on this loan while your documents are being reviewed and if allowed by state law

3  and/or investor guidelines." This message from Wells Fargo shows its understanding that a

4  modification would bring an account current, and allow the borrower to avoid foreclosure.

5        196.    The Bank breached its contractual obligations to Plaintiffs and class members by failing

6  to give Plaintiffs and class members adequate notice prior to accelerating their loan payments,

7  commencing the foreclosure process, and, in many instances, foreclosing on Plaintiffs' and class

8  members' homes.

9        197.    In particular, the Bank did not notify Plaintiffs and class members that they could cure

10  their default and avoid acceleration and foreclosure by accepting a mortgage modification.  Plaintiffs

11  and class members qualified for a government-mandated mortgage modification, and the Bank was

12  required to offer them a mortgage modification but failed to do so. While HAMP and other types of

13  government-mandated mortgage modifications might have come into effect after Plaintiffs and class

14  members signed their Security Instruments, a reasonable interpretation of these contracts required

15  Wells Fargo to inform Plaintiffs of actions available to cure their default *at the time of the default* – not

16  just any action available at the time the parties executed the contract. And at the time of Plaintiffs'

17  defaults, a mortgage modification was an option that should have been available to them.

18       198.    Plaintiffs Hood and DeMartinos' FHA Security Instruments specifically contemplated

19  HUD Secretary regulations placing a limitation on Wells Fargo's right to foreclose in the event of a

20  default. These contracts stated, "In many circumstances regulations issued by the [HUD] Secretary will

21  limit Lender's rights, in the case of payment defaults, to require immediate payment in full and

22  foreclose if not paid.  This Security Instrument does not authorize acceleration or foreclosure if not

23  permitted by regulations of the Secretary."[6] Indeed, as a part of the financial crisis, the HUD Secretary

24  stated in a report to Congress that "During this time of elevated financial stress on households, FHA

25  maintained a robust set of policies…to provide assistance in *curing* mortgage delinquencies." Those

26

27  _____

28  [6] *See id.* at ¶ 9(d).

**Deleted:** FIRST AM.

tools included, among other things, loan modifications.[7] The FHA (Federal Housing Administration) is a part of HUD. And HUD was one of the administering offices for HAMP; thus HUD was responsible for issuing regulations on borrower eligibility for a modification under the program.

199.   As a result of the Bank's breach, Plaintiffs and class members suffered damages in an amount subject to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families and belongings; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments.

### SECOND CAUSE OF ACTION
**Intentional Infliction of Emotional Distress**
**Brought on Behalf of the IIED Class**

> **Deleted: Against All Defendants**

200.   Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague, John and Yvonne DeMartino, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of themselves and the State Subclasses.

> **Deleted: Iesha Brown,**
> **Deleted: Demartino**

201.   Wells Fargo engaged in extreme and outrageous conduct as alleged herein.  Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its customers' homes and wellbeing depended.  It allowed systemic errors to persist for five to eight years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices; failed to reform its verification and auditing practices even after the government found a software error had led the Bank to wrongfully deny mortgage modifications; concealed its discovery of an additional software error from regulators and customers; and failed to identify other related errors for an additional three years.

---

[7] *See* U.S. Department of Housing and Urban Development November 15, 2011 Annual Report to Congress Fiscal Year 2011 Financial Status FHA Mutual Mortgage Insurance Fund at p. 23-24, available at https://www.hud.gov/sites/documents/FHAMMIFANNRPTFY2011.PDF (last accessed July 10, 2019).

> **Deleted: FIRST AM.**

202.    The same extreme and outrageous conduct that caused a series of scandals and consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines and to forbid Wells Fargo from growing until reforms were implemented—was also responsible for Plaintiffs and class members losing their homes here.  Wells Fargo's Board and executive leadership abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance failures, government fines, and consent decrees requiring leadership to implement appropriate auditing and compliance procedures.

203.    With regard to the Bank's mortgage modification and foreclosure processes in particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP or other government requirements.  Wells Fargo's leadership ignored its oversight responsibilities even after the government found it had not adequately overseen the Bank's mortgage modification and foreclosure operations, even after it agreed to implement proper oversight as part of two 2011 consent orders, and even after the government found in 2015 that Wells Fargo had continuously failed to comply with the consent.  Leadership so flagrantly and repeatedly disregarded its oversight responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it will be prohibited from growing unless and until it reforms its oversight and governance.

204.    Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to customers, including Plaintiffs and class members, who were wrongfully denied mortgage modifications and foreclosed upon.

205.    As a result of Wells Fargo's conduct, Plaintiffs and class members have suffered severe emotional distress, as alleged herein, which has contributed to diagnoses of anxiety and depression, extended psychological therapy, hospitalizations, high blood pressure, various health problems, marital struggles, social withdrawal, childhood trauma, suicidal ideation, stress disorders, and a number of other physical, psychological, and social afflictions.

206.    Plaintiffs and class members seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiffs and class members.

**Deleted:** FIRST AM.

**THIRD CAUSE OF ACTION**
**Negligence Brought on Behalf of the California Subclass**

207.    Plaintiffs Debora Granja and Keith Lindner incorporate all preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the California Subclass.

208.    Wells Fargo owes a duty of care to Plaintiffs and class members because Wells Fargo's conduct is not that of an ordinary lender. Instead, Wells Fargo relied on information that it knew was false to deny Plaintiffs and class members a mortgage modification.  Wells Fargo told half-truths to Plaintiffs and class members: it told these individuals that they did not qualify for a modification, while hiding the fact that these determinations were based on faulty software – and likely inaccurate. Wells Fargo knew in 2013 that the software tool was pulling incorrect inputs in its calculations, yet continued to use the tool without fixing it, and without telling Plaintiffs and class members about the problem.

209.    Under California law, courts consider the *Biakanja* factors in assessing whether to recognize a duty of care, which include: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. *See Biakanja v. Irving*, 49 Cal.2d 647 (1958). These factors weigh in favor of finding that Wells Fargo owed Plaintiffs and class members a duty of care with respect to the mortgage modification process.

210.    First, the transactions at issue here, Plaintiffs' and class members' application for a mortgage modification, were intended to affect Plaintiffs' and class members as they directly related to their mortgages, including the amount they would pay each month for their mortgages during a time of financial stress, and ultimately whether Plaintiffs and class members would be able to keep their homes.

211.    Second, the harm to Plaintiffs and class members resulting from Wells Fargo's mishandling of their mortgage modification applications was readily foreseeable. Wells Fargo knew that its software tool was using incorrect inputs in calculating whether borrowers were eligible for a modification, but proceeded to use the tool anyway.

212.    Although Wells Fargo previously indicated it initially discovered the error in 2015,

**Deleted:** Against All Defendants .

**Deleted:** FIRST AM.

internal documents reveal that the error was found much earlier, in August 2013. After the error was discovered in August 2013, the issue was "escalated to senior leadership." Senior leadership received presentations about the error, including a "recommendation on how to correct [the error] as well an interim process …"

213.    As early as 2014, Wells Fargo recognized that the alleged error in this case "does have the potential to impact customers "who are on the edge."' Through 2014 and 2015, Wells Fargo acknowledged potential customer harm in discussing how to fix the error, questioning "will we know there is an issue before there is customer harm?" These facts speak to the third factor, which is the degree of certainty that the plaintiff suffered harm. Wells Fargo has already admitted that this error caused it to deny mortgage modifications to Plaintiffs and class members in a time of need, and for many, resulted in the loss of their homes through foreclosure. In its second quarter 2018 Form 10-Q, when Wells Fargo first publicly disclosed the error, Wells Fargo acknowledged that "as a result of this error…" Plaintiffs and class members were "incorrectly denied a loan modification or were not offered a modification in cases where they could have otherwise qualified."

214.    Moreover, in the late 2018 letters from Wells Fargo to Plaintiffs and class members where Wells Fargo disclosed the error to them, Wells Fargo apologized and typically provided payment to "help make up for your financial loss." Wells Fargo also acknowledged that in the absence of the error, Plaintiffs and class members would have been approved for a trial modification.

215.    Fourth, there is a close connection between Wells Fargo's knowledge of an issue in its mortgage modification software and failure to fix it, and the harm that Plaintiffs suffered. In its second quarter 2018 Form 10-Q, when Wells Fargo first publicly disclosed the error, it acknowledged that "after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification, a foreclosure was completed."

216.    Plaintiffs and class members were injured as a result of the loan modification denial, including, but not limited to, loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage

**Deleted:** FIRST AM.

1  to credit; and opportunity costs due to damage credit or higher mortgage payments; and emotional

2  distress.

3      217.   Fifth, Wells Fargo's conduct is worthy of blame. Wells Fargo had knowledge of this

4  particular error and failed fix it and disclose it to Plaintiffs and class members until 2018 – well after

5  most Plaintiffs lost their homes after being unable to receive a mortgage modification. Even more

6  egregious, for some class members, Wells Fargo continued to accept applications for mortgage

7  modifications even after acknowledging that customers who were "on the edge" were most likely to be

8  impacted by the error in early 2014.

9      218.   Even before the error was discovered, Wells Fargo permitted multiple, systemic errors in

10  its automated mortgage software because the software was not properly audited to ensure for accuracy.

11  This conduct persisted even though Wells Fargo was on notice and promised to correct deficiencies in

12  its mortgage modification and foreclosure practices after a 2010 investigation by the Office of the

13  Comptroller of the Currency, which led to a 2011 Consent Order in which Wells Fargo promised to

14  improve oversight on its mortgage modification practices.

15      219.   Finally, for the sixth factor, there is a strong policy interest in recognizing a duty of care

16  here. If Wells Fargo is not held accountable for knowingly denying government-mandated

17  modifications to Plaintiffs and class members, while accepting stimulus money for participating in

18  government mortgage assistance programs, then banks will have little incentive to abide by government

19  regulations that directly affect homeowners. Unless Wells Fargo is held accountable for its actions,

20  Wells Fargo will not have an incentive to properly audit its mortgage modification software, promptly

21  disclose errors, or notify borrowers of errors.

22      220.   Wells Fargo undertook to review Plaintiffs' and class members' mortgage loans for

23  potential modification.  In doing so, Wells Fargo owed Plaintiffs and class members a duty to exercise

24  reasonable care when determining whether Plaintiffs and class members were eligible for a mortgage

25  modification.

26      221.   Wells Fargo breached its duty by evaluating Plaintiffs' and class members' eligibility

27  using automated software that had not been properly verified or audited to ensure its accuracy.  Wells

28  Fargo permitted multiple systemic errors in its automated software to remain uncorrected for five to

**Deleted:**

**Deleted:** FIRST AM.

1  eight years.  It failed to properly verify or audit its software even after the government required it to

2  reform its mortgage modification and foreclosure process in 2011; even after the government found a

3  software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even

4  after it discovered the error at issue in 2013.

5  222.  Moreover, Wells Fargo owed Plaintiffs and class members a duty not to make a material

6  misrepresentation about the status of Plaintiffs' and class members' mortgage modifications, as well as

7  a duty not to make negligent misrepresentations of fact. California law imposes a duty not to deceive

8  others, which is defined as "[t]he assertion, as a fact, of that which is not true, by one who has no

9  reasonable ground for believing it to be true" and "[t]he suppression of a fact, by one who is bound to

10  disclose it, or who gives information of other facts which are likely to mislead for want of

11  communication of that fact." Civ. Code § 1710, subd. 2, and 3.

12  223.  Wells Fargo breached its duty not to make a material misrepresentation about the status

13  of a loan modification and other facts regarding the mortgage modification process by continuing to

14  offer mortgage modifications using a software tool it knew to provide false information, and failing to

15  advise Plaintiffs and class members that the decision to deny their mortgage modifications was

16  determined by faulty software.

17  224.  Wells Fargo provided reasons for the denial of Plaintiffs' and class members' mortgage

18  modifications that were false and that it had reason to know were false.

19  225.  Wells Fargo advised Plaintiffs and class members that their mortgage modifications

20  were denied based on reasons that were false, such as:

21    1.  "Your pending mortgage assistance required approval from the investor that ultimately

22      owns your mortgage, and the investor has declined the request."

23    2.  "Unfortunately, after carefully reviewing the information you've provided, we are

24      unable to adjust the terms of your mortgage through the Home Affordable Modification

25      Program because your current monthly housing expense…less than or equal to 31% of

26      your gross monthly income…"

27    3.  "Based on your documented monthly income, we are unable to create an affordable

28      payment that meets the requirements of the program."

**Deleted:** another

**Deleted:** its software in 2015.

**Deleted:** Wells Fargo's negligence is also presumed under the doctrine of negligence per se, as Wells Fargo's conduct violated HAMP; Wells Fargo's HAMP violations caused

**Deleted:** to be wrongfully denied

**Deleted:** and suffer damages, including loss

**Deleted:** their homes to foreclosure; HAMP was designed

**Deleted:** maximize assistance to homeowners

**Deleted:** prevent foreclosures;

**Deleted:** are among the homeowners for whose protection HAMP was adopted

**Deleted:** FIRST AM.

226.   All those reasons were false. Plaintiffs and class members were denied modifications due to incorrect attorneys' fees inputs in Wells Fargo's software – not for the reasons Wells Fargo provided to Plaintiffs at the time.

227.   Wells Fargo's negligence caused Plaintiffs and class member to be wrongly denied a mortgage modification, resulting in damages subject to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments; and emotional distress.

228.   Plaintiffs and class members seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiffs and class members.

**FOURTH CAUSE OF ACTION**
**Wrongful Foreclosure Brought on Behalf of the California and Georgia Foreclosure Subclasses**

| Deleted: Against All Defendants |
| --- |

229.   Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

**California Foreclosure Subclass**

230.   Plaintiffs Debora Granja and Keith Lindner bring this claim on behalf of themselves and the California Foreclosure Subclass.

231.   Wells Fargo wrongfully foreclosed on Plaintiffs' and the California Foreclosure Subclass's real property pursuant to a power of sale in their Security Instruments.  The foreclosure was unlawful and/or unfair because Wells Fargo did not first notify Plaintiffs and the California Foreclosure Subclass that they could cure their default by accepting a mortgage modification.  Plaintiffs and class members qualified for the mortgage modification and Wells Fargo was required by the Security Agreements to notify Plaintiffs and class members of actions they could take to cure their default before exercising its power of sale.

232.   Plaintiffs and class members were excused from tendering the amount of their secured indebtedness, and no breach of condition or failure of performance existed on the part of Plaintiffs and

| Deleted: FIRST AM. |
| --- |

1  class members that would have authorized the foreclosure, because Wells Fargo was required to offer

2  Plaintiffs and class members a mortgage modification before it could accelerate their secured

3  indebtedness and initiate foreclosure proceedings.

4       233.    Plaintiffs and class members were harmed by the wrongful foreclosure and suffered

5  damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax

6  benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent

7  in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money

8  to find new housing and move their families; loss of favorable interest rates or other favorable loan

9  terms; damage to credit; opportunity costs due to damaged credit; and emotional distress.

10       234.    Plaintiffs and the California Foreclosure Subclass seek compensatory damages as well as

11  punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless

12  disregard for the rights of Plaintiffs and class members.

13                             **Georgia Foreclosure Subclass**

14       235.    Plaintiff Troy Frye brings this claim on behalf of himself and the Georgia subclass

15       236.    Wells Fargo owed Plaintiff Frye and the Georgia Foreclosure Subclass a duty to exercise

16  the power of sale afforded it by Plaintiff's and class members' Security Instruments in conformance

17  with the terms of the Security Instruments and in good faith.

18       237.    Wells Fargo breached its duty by foreclosing on Plaintiff's and class members' homes

19  without first giving Plaintiff and class members notice that the could cure their default by accepting a

20  mortgage modification.  Wells Fargo was required to do so under the terms of the Security Instruments.

21  Alternatively, foreclosing on Plaintiff's and class members' homes without first offering them a

22  mortgage modification to which they were entitled constitutes bad faith and unfair execution of the

23  Wells Fargo's power of sale.

24       238.    As a result of Wells Fargo's conduct, Plaintiff Frye and the Georgia Foreclosure

25  Subclass lost their homes to foreclosure and suffered other damages to be proven at trial, including loss

26  of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following

27  foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put

28  into their homes; loss of time and money to find new housing and move their families; loss of favorable

**Deleted:** FIRST AM.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit;
and emotional distress.

239.    Plaintiff and the Georgia Foreclosure Subclass seek compensatory damages as well as
punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless
disregard for the rights of Plaintiffs and class members.

**FIFTH CAUSE OF ACTION**
**Violation of California's Homeowners Bill of Rights**
**Brought on Behalf of the California Subclass**

240.    Plaintiffs Debora Granja and Keith Lindner incorporate all preceding paragraphs as if
fully set forth herein.  They bring this claim on behalf of themselves and the California Foreclosure
Subclass.

241.    Under California's Homeowners Bill of Rights, Wells Fargo had an obligation to ensure
that competent and reliable evidence, including the borrower's loan status and information, supported
its right to foreclose before it filed a notice of default or notice or sale in connection with the
foreclosure of Plaintiffs' and class members' real property.  Cal. Civ. Code § 2924.17.

242.    Wells Fargo materially and recklessly violated its obligation because Plaintiffs' and
class members' loan information did not support Wells Fargo's right to foreclose.  Plaintiffs' and class
members' loan information showed that they qualified for a mortgage modification.  Wells Fargo was
therefore required to offer Plaintiffs and class members the opportunity to cure their default by
accepting a mortgage modification before it could exercise its right to foreclose under Plaintiffs' and
class members' Security Instruments.

243.    The automated software that Wells Fargo used to wrongly determine that Plaintiffs and
class members did not qualify for a mortgage modification was not reliable and Wells Fargo was
reckless in using the software and relying upon it to support its right to foreclose.  The software's
results had not been properly verified or audited, and as a result, multiple material errors remained
uncorrected in the software for five to eight years.  Wells Fargo willfully and recklessly continued to
rely on its software even after the government cited it for failing to adequately audit its mortgage
modification and foreclosure procedures; even after the government found a software error had led the

**Deleted: Against All Defendants**

**Deleted: FIRST AM.**

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1    Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered

2    another software error that caused it to wrongly deny modifications in 2015.

3        244.    As a result of Wells Fargo's violation of the Homeowners Bill of Rights, Plaintiffs

4    Granja and the California Foreclosure Subclass suffered damages according to proof, including loss of

5    their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes'

6    value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time

7    and money put into their homes; loss of time and money to find new housing and move their families;

8    loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs

9    due to damaged credit.

10       245.    Pursuant to California Civil Code section 2924.19(b), Plaintiffs Granja and each member

11   of the California Foreclosure Subclass seek an award of treble actual damages or statutory damages of

12   $50,000, whichever is greater.

13
                          **SIXTH CAUSE OF ACTION**
14               **Violation of California's Unfair Competition Law**
                   **Brought on Behalf of the Nationwide Class**
15

16       246.    Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague,

17   John and Yvonne DeMartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson, Tiffanie

18   Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set

19   forth herein.  They bring this claim on behalf of themselves and the Nationwide Class.

20       247.    In the alternative, should the Court decide that out-of-state plaintiffs may not maintain

21   this claim against Wells Fargo, Plaintiffs Debora Granja and Keith Lindner bring this claim on behalf

22   of themselves and the California Subclass.

23       248.    Wells Fargo has violated and continues to violate California's Unfair Competition Law

24   (UCL), which prohibits unlawful, unfair, or fraudulent practices.

25       249.    Wells Fargo engaged in unlawful practices by denying mortgage modifications to

26   Plaintiffs and class members in violation of HAMP and other governmental requirements.

27       250.    Wells Fargo engaged in unfair practices by failing to properly verify or audit the

28   automated software it used to determine whether Plaintiffs and class members were eligible for a

**Deleted:** Against All Defendants

**Deleted:** Demartino

**Deleted:** FIRST AM.

1    mortgage modification.  Wells Fargo's faulty verification and auditing practices allowed multiple

2    systemic errors to remain uncorrected for five to eight years and persisted even after the government

3    cited Wells Fargo for failing to adequately audit its mortgage modification and foreclosure processes;

4    even after the government found a software error had led the Bank to wrongfully deny mortgage

5    modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused

6    it to wrongly deny modifications in 2015.

7           251.    Wells Fargo's Board and executive leadership further engaged in unfair practices by

8    failing to properly oversee the Bank's compliance with HAMP and other governmental requirements.

9    Wells Fargo's lack of central oversight has led to series of consumer abuses and billions of dollars in

10   government fines.  Yet despite repeatedly promising to reform its oversight practices, Wells Fargo's

11   Board and executive leadership repeatedly failed to implement or maintain procedures to ensure the

12   Bank was complying with HAMP or other applicable government requirements.

13          252.    Both Wells Fargo's verification and auditing practices and its oversight practices are

14   unethical, unscrupulous, or substantially injurious to consumers; any legitimate utility of the practices

15   are outweighed by the harm to consumers; and the practices run afoul of the public policies underlying

16   HAMP and California Homeowners Bill or Rights, which seek to help homeowners avoid foreclosure

17   and promote fair mortgage lending and servicing practices.

18          253.    As a result of Wells Fargo's violations of the UCL, Plaintiffs have suffered injury in fact

19   and lost money and property, including loss of their homes; loss of equity in their homes; loss of tax

20   benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent

21   in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money

22   to find new housing and move their families; loss of favorable interest rates or other favorable loan

23   terms; damage to credit; and opportunity costs due to damaged credit.

24          254.    Pursuant to California Business and Professions Code section 17203, Plaintiffs and class

25   members seek such orders or judgments as may be necessary to prevent the Wells Fargo's future use of

26   its unfair and unlawful practices, and to restore to Plaintiffs and class members any money or property

27   that may be acquired by means of Wells Fargo's unfair competition.

28

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

**Deleted:** FIRST AM.

**SEVENTH CAUSE OF ACTION**
**Violation of State Consumer Protection Laws**
**Brought on Behalf of Five State Subclasses**

255.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.  In the alternative or in addition to the preceding claim for violation of the UCL, Plaintiffs and class members seek recovery under the following state consumer protection statutes as detailed below.

**Illinois Subclass**

256.    Plaintiff Coszetta Teague brings this claim on behalf of herself and the Illinois Subclass.

257.    Wells Fargo's conduct as alleged herein violates the Illinois Consumer Fraud Act (ICFA), 815 ILCS 505/2, which prohibits unfair acts or practices in the conduct of any trade or commerce. Wells Fargo engaged in unfair practices by denying mortgage modifications to Plaintiffs and class members in violation of HAMP and other governmental requirements; by failing to properly verify or audit the automated software it used to determine whether Plaintiffs and class members were eligible for a mortgage modification; and by failing to implement or maintain procedures to ensure the Bank was complying with HAMP or other government requirements.

258.    As a result of Wells Fargo's violation of the ICFA, Plaintiff Teague and the Illinois Subclass suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

259.    Pursuant to 815 ILCS 505/10a, Plaintiff and the Illinois Subclass seek recovery of their actual economic damages, punitive damages, injunctive relief, and attorneys' fees and costs.

**Maryland Subclass**

260.    Plaintiffs John and Yvonne DeMartino bring this claim on behalf of themselves and the Maryland Subclass.

261.    Wells Fargo's conduct as alleged herein violates the Maryland Consumer Protection Act (MCPA), Md. Code Ann., Com. Law. §13-303, which prohibits unfair, abusive or deceptive practices.

Deleted: Against All Defendants

Deleted: ¶

Deleted: Demartino

Deleted: FIRST AM.

262.   Wells Fargo engaged in unfair practices by denying mortgage modifications to Plaintiffs and class members in violation of HAMP and other governmental requirements; by failing to properly verify or audit the automated software it used to determine whether Plaintiffs and class members were eligible for a mortgage modification; and by failing to implement or maintain procedures to ensure the Bank was complying with HAMP or other applicable government requirements.

263.   Wells Fargo also violated both the MCPA and the Maryland Consumer Debt Collection Act (MDCA), Md. Code Ann. Com. Law § 14-202(8), by attempting to enforce a right to foreclose on Plaintiffs and class member's property with reckless disregard as to the falsity of the existence of the right.

264.   The automated software that Wells Fargo used to wrongly determine that Plaintiffs and class members did not qualify for a mortgage modification was not reliable and Wells Fargo was reckless in using the software and relying upon it to support its right to foreclose.  The software's results had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years.  Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

265.   As a result of Wells Fargo's violations of the MCPA and MDCA, Plaintiffs and the Maryland Subclass suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments; and emotional distress.

266.   Pursuant to Maryland Code Annotated, Commercial Law sections 13-408 and 14-203, Plaintiffs and the Maryland Subclass seek to recover damages, including damages for emotional distress and mental anguish, and an award of attorneys' fees and costs.

**Deleted:** FIRST AM.

**New Jersey Subclass**

267.    Plaintiff Alicia Hernandez brings this claim on behalf of herself and the New Jersey Subclass.

268.    Wells Fargo's conduct as alleged herein violates the New Jersey Consumer Fraud Act (NJCFA), N.J.S.A. 56:8-2, which prohibits the use of any misrepresentation or deception in connection with the extension of credit or subsequent servicing of that credit.

269.    Wells Fargo represented to Plaintiff and class members that they did not qualify for a mortgage modification.  That representation was false and caused Plaintiff and class members ascertainable loss, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

270.    Had Wells Fargo presented accurate information to Plaintiff and class members, they would have opted for the mortgage modification for which the qualified.  If Wells Fargo still refused to provide Plaintiff and class members with a mortgage modification, they could and would have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

271.    Pursuant to N.J.S.A 56:8-19, Plaintiff and the New Jersey Subclass request seek an award of treble damages, injunctive relief, and attorneys' fees and costs.

**New York Subclass**

272.    Plaintiff Rose Wilson brings this claim on behalf of herself and the New York Subclass

273.    Wells Fargo's conduct as alleged herein violates Section 349(a) of New York's General Business Law (GBL), which prohibits deceptive acts or practices

274.    Wells Fargo's acts and practices were consumer-oriented, as they affected not only Plaintiff but similarly-situated consumers as well, and they had the potential to affect even more consumers.  The automated software that used to determine Plaintiff's and other consumers' eligibility for mortgage modifications was systematically flawed and generated inaccurate calculations.

275.    The automated software's calculations had not been properly verified or audited, and as

**Deleted:** FIRST AM.

a result, multiple material errors remained uncorrected in the software for five to eight years.  Wells

Fargo willfully and recklessly continued to rely on its software even after the government cited it for

failing to adequately audit its mortgage modification and foreclosure procedures; even after the

government found a software error had led the Bank to wrongfully deny mortgage modifications in

2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly

deny modifications in 2015.

276.    Wells Fargo's practice of using systematically-flawed software was deceptive or

misleading in a material respect, as it led Plaintiff and class members to believe that they did not

qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

277.    Had Wells Fargo presented accurate information to Plaintiff and class members, they

would have opted for the mortgage modification for which the qualified.  If Wells Fargo still refused to

provide Plaintiff and class members with a mortgage modification, they could and would have used the

knowledge that they qualified for a mortgage modification to fight foreclosure.

278.    As a result of Wells Fargo's violation of the GBL, Plaintiff and class members suffered

damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of

appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to

avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new

housing and move their families; loss of favorable interest rates or other favorable loan terms; damage

to credit; and opportunity costs due to damaged credit or higher mortgage payments.

279.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the New York Subclass seek an

award of damages, injunctive relief, and attorneys' fees.

**Pennsylvania Subclass**

280.    Plaintiffs Cyndi and George Floyd bring this claim on behalf of themselves and the

Pennsylvania Subclass.

281.    Wells Fargo's conduct as alleged herein constitutes a violation of the Pennsylvania

Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Stat. Ann. § 201-3, which

prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.

282.    Wells Fargo's practice of using systematically-flawed software to calculate Plaintiffs'

**Deleted:** FIRST AM.

1   and class members' eligibility for mortgage loan modifications was unfair and deceptive, as it led

2   Plaintiffs and class members to believe that they did not qualify for a mortgage modification and

3   caused them to be wrongly denied a mortgage modification.

4       283.   The automated software's calculations had not been properly verified or audited, and as

5   a result, multiple material errors remained uncorrected in the software for five to eight years.  Wells

6   Fargo willfully and recklessly continued to rely on its software even after the government cited it for

7   failing to adequately audit its mortgage modification and foreclosure procedures; even after the

8   government found a software error had led the Bank to wrongfully deny mortgage modifications in

9   2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly

10  deny modifications in 2015.

11      284.   Plaintiffs and class members justifiably relied on Wells Fargo's determination that they

12  did not qualify for a mortgage modification.  Had Wells Fargo presented accurate information to

13  Plaintiffs and class members, they would have opted for the mortgage modification for which the

14  qualified.  If Wells Fargo still refused to provide Plaintiffs and class members with a mortgage

15  modification, they could and would have used the knowledge that they qualified for a mortgage

16  modification to fight foreclosure.

17      285.   As a result of Wells Fargo's violation of the UTPCPL, Plaintiffs and class members

18  suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss

19  of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to

20  avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new

21  housing and move their families; loss of favorable interest rates or other favorable loan terms; damage

22  to credit; and opportunity costs due to damaged credit or higher mortgage payments.

23      286.   Pursuant to 73 Pa. Stat. Ann. § 201-9.2, Plaintiffs and the Pennsylvania Subclass seek an

24  award of treble damages, equitable relief, and attorneys' fees and costs.

25

26              **EIGHTH CAUSE OF ACTION**

               **Fraud by Concealment**

27        **Brought on behalf of the Fraud Subclass**

28      287.   Plaintiffs Troy Frye, Coszetta Teague, Russell and Brenda Simoneaux, Tiffanie Hood,

| Deleted: FIRST AM. |
|---|

and Emma White incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on behalf of themselves and the Fraud Subclass.

288. Wells Fargo knew starting in 2013 that its software tool was yielding inaccurate determinations as to whether borrowers qualified for a modification, but hid that fact from borrowers. Instead, Wells Fargo sent each Plaintiff and class member a letter stating that his or her request for a modification had been denied based on a different reason (or without any reason at all), and made no mention of the real cause of the denial: inaccurate attorneys' fees inputs in the software Wells Fargo was using to calculate eligibility for modifications.

289. Wells Fargo told Plaintiffs and class members these half-truths by letter. For example, by letter dated March 4, 2014, Wells Fargo told Plaintiff Frye that his mortgage modification application was denied because he "exceeded the number of modifications allowed by the investor." Similarly, Wells Fargo told Plaintiff Teague by letter dated December 16, 2013 that her mortgage modification application was denied because: "[b]ased on your documented monthly income, we are unable to create an affordable payment that meets the requirements of the program." Plaintiff White received a similar letter on October 31, 2013, in which Wells Fargo told her that she did not meet the requirements for a modification because "[b]ased on [her] documented monthly income, [Wells Fargo was] unable to create an affordable payment that meets the requirements of the program." Each denial letter provided an alleged reason for the denial of a mortgage modification, but failed to disclose a material fact: their denials were based on faulty software, and thus were likely erroneous.

290. Wells Fargo became aware of deficiencies in its loan modification software no later than August 2013, when it "learned there is a table in HPA which has attorney fees by state programmed and these amounts were being pulled into the trial decision but the tool also pulled in any assessed attorney fees. In some cases attorney fees could have been double counted therefore impacting the modification decision."

291. In October 2014, having known for more than a year that its faulty software could be causing mortgage modifications to be wrongfully denied, Wells Fargo decided to do nothing: "[W]e will continue with the process that is currently in place for obtaining the attorney fees."

292. In the second quarter of 2015, more than a year and half after learning of the faulty

Deleted: FIRST AM.

1   software issue and having actively studied it for some time, Wells Fargo continued to do nothing to

2   correct it.  It likewise failed to disclose the issue to potentially affected borrowers, despite recognizing

3   that: "Inaccurate fees will continue to be quoted, which causes a negative customer experience in

4   addition to a reconciling discrepancy."

5   293.   In April and May of 2015, despite some of its employees expressing concern about the

6   continued use of the faulty software, Wells Fargo made the decision that "No fix is going to take place

7   at this time."  This was apparently based on its assessment that "there is really low risk."

8   294.   Wells Fargo had a duty to disclose the software error – a material fact -- to Plaintiffs and

9   class members. By informing Plaintiffs and class members that they were denied mortgage

10  modifications, but not that those denials were based on calculations made by software it knew to be

11  faulty, Wells Fargo stated half-truths. One who undertakes to make a statement must not only state the

12  truth, but may not conceal any facts within his knowledge which materially qualifies his statement.

13  Since Wells Fargo chose to speak in stating that Plaintiffs did not qualify for a modification, it was

14  required to make a full disclosure. This is particularly true because Wells Fargo had superior

15  knowledge as to all material facts surrounding Plaintiffs' eligibility for a modification.

16  295.   Wells Fargo knew Plaintiffs and class members would reasonably rely upon its

17  representations and intended that Plaintiffs and class members rely upon its statements that Plaintiffs

18  and class members did not qualify for a mortgage modification.

19  296.   Plaintiffs reasonably believed Wells Fargo's representation that they did not qualify for

20  a modification. They had no reason to know Wells Fargo based that determination on a software tool

21  that had a material error in it.

22  297.   Had Wells Fargo disclosed the whole truth to Plaintiffs and class members, they would

23  have been able to seek review of the incorrect decisions on their mortgage modifications by a

24  competent third party, such as an attorney, agency, or other organization or individual with knowledge

25  of mortgage modification requirements and processes.  They would then have become aware that the

26  denials of their mortgage modifications were erroneous, and would have been able to prevent the

27  wrongful foreclosures and other harm that flowed from Wells Fargo's error.

28  298.   As a result of Wells Fargo's fraudulent omissions and failures to disclose, Plaintiffs and

**Deleted:** FIRST AM.

class members have been injured in fact and suffered a loss of money and/or property. Plaintiffs and class members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

**NINTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**Brought on behalf of the Misrepresentation Subclass**

299.    Plaintiffs Keith Lindner and George and Cyndi Floyd incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on behalf of themselves and the Misrepresentation Subclass.

300.    Wells Fargo made a misrepresentation to Plaintiffs and class members by telling them that they did not qualify for a mortgage modification, while hiding the fact that those determinations were based on faulty software.

301.    Wells Fargo made these negligent misrepresentations to Plaintiffs and class members by letter. For example, by letter dated February 18, 2010, Wells Fargo stated that Mr. Lindner had not been approved for a modification because Wells Fargo was unable to provide "a modified payment amount that [Mr. Lindner] could afford per investor guidelines on [his] mortgage." In a similar letter dated November 18, 2011, Wells Fargo told Mr. and Mrs. Floyd that the investor that owned their mortgage declined their request for a modification. Each denial letter provided an alleged reason for the denial of a mortgage modification that turned out to be false.

302.    Wells Fargo did not have reasonable grounds for believing that the misrepresentations of fact were true because Wells Fargo had notice starting in 2011, when it entered into consent orders with the government, that it had inadequate mortgage modification and foreclosure practices. The OCC's investigation began in 2010, so Wells Fargo had reason at that point to question the accuracy of its modification decisions. Wells Fargo received repeated warnings that it needed to more closely audit and test its mortgage modification procedures, but unreasonably failed to do so.

-55-

Moved (insertion) [2]

Deleted: FIRST AM.

303.    Wells Fargo had a duty to disclose accurate information to Plaintiffs. By informing Plaintiffs and class members that they were not qualified mortgage modifications based on specific reasons, Wells Fargo chose to speak. One who undertakes to make a statement must not only state the truth, but must not make factual misrepresentations. Since Wells Fargo chose to speak in stating that Plaintiffs did not qualify for a modification, it was required to make an accurate disclosure and not to misrepresent facts. This is particularly true because Wells Fargo had superior knowledge as to all material facts surrounding Plaintiffs' eligibility for a modification.

304.    Wells Fargo knew Plaintiffs and class members would reasonably rely upon its factual representations and intended that Plaintiffs and class members rely upon its statements.

305.    Plaintiffs reasonably believed Wells Fargo's representation that they did not qualify for a modification. They had no reason to know Wells Fargo based that determination on a software tool that had a material error in it.

306.    Had Wells Fargo not mispresented the reason that Plaintiffs and class members were denied a mortgage modification, they would have been able to seek review of the incorrect decisions on their mortgage modifications by a competent third party, such as an attorney, agency, or other organization or individual with knowledge of mortgage modification requirements and processes.  They would then have become aware that the denials of their mortgage modifications were erroneous, and would have been able to prevent the wrongful foreclosures and other harm that flowed from Wells Fargo's error.

307.    As a result of Wells Fargo's negligent misrepresentations, Plaintiffs and class members have been injured in fact and suffered a loss of money and/or property.  Plaintiffs and class members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

| Deleted: FIRST AM. |
| --- |

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, request the following relief:

    a.  A determination that this action may be maintained as a class action;

    b.  An award of all damages and restitution to be paid according to proof, including statutory damages, treble damages, and punitive damages where appropriate;

    c.  Appropriate injunctive and equitable relief, including an order enjoining Wells Fargo from continuing its unlawful practices;

    d.  Pre-judgment interest and post-judgment interest, as provided by law;

    e.  Attorneys' fees and costs of suit, including expert fees and costs;

    f.  Any and all other legal and equitable relief that the Court may find appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury for all issues so triable.

Dated: July 29, 2019              */s/ Michael L. Schrag*

                        **GIBBS LAW GROUP LLP**
                        Michael L. Schrag (SBN 185832)
                        Joshua J. Bloomfield (SBN 212172)
                        Linda Lam (SBN 301461)
                        505 14th Street, Suite 1110
                        Oakland, California 94612
                        Telephone:  510-350-9700
                        Facsimile:  510-350-9701
                        mls@classlawgroup.com
                        jjb@classlawgroup.com
                        lpl@classlawgroup.com

                        Richard M. Paul III
                        Ashlea G. Schwarz
                        Laura C. Fellows
                        **PAUL LLP**
                        601 Walnut Street, Suite 300
                        Kansas City, Missouri 64106
                        Telephone: 816-984-8100
                        Facsimile:  816-984-8101
                        Rick@PaulLLP.com
                        Ashlea@PaulLLP.com
                        Laura@PaulLLP.com

Formatted: English (United States)

Deleted: FIRST AM.

Deleted: ¶

Deleted: FIRST AM.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................... 2

JURISDICTION ................................................................................ 4

INTRADISTRICT ASSIGNMENT.................................................... 4

PARTIES ........................................................................................... 4

FACTUAL ALLEGATIONS ............................................................ 6

    A.    Wells Fargo Wrongfully Forecloses on Its Customers' Homes .............................. 6

    B.    Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a Period of at Least 8 Years ....................................... 7

    C.    Wells Fargo's Leadership Fails to Implement Adequate Testing Even After Promising to Do So as Part of 2011 Consent Decrees ............................... 7

    D.    Wells Fargo Conceals Its Discovery of One of the Systematic Errors from Regulators and Consumers ............................... 9

    E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight ....................................... 10

    F.    Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors ................... 12

PLAINTIFFS' EXPERIENCES ...................................................... 14

    1.    Debora Granja (California) ........................................... 14

    2.    Keith Lindner (California) ............................................ 15

    3.    Emma White (Florida) ................................................. 16

    4.    Troy Frye (Georgia) .................................................... 18

    5.    Coszetta Teague and Iesha Brown (Illinois) .................... 19

    6.    Russell and Brenda Simoneaux (Louisiana) .................... 20

    7.    John and Yvonne Demartino (Maryland) ........................ 21

    8.    Alicia Hernandez (New Jersey) ..................................... 22

i

**Formatted:** Centered

**Deleted:** 7

**Deleted:** 2015

**Deleted:** FIRST AM.

9.   Rose Wilson (New York)........................................................23

10.  Tiffanie Hood (Ohio)..........................................................24

11.  George and Cyndi Floyd (Pennsylvania)...............................25

12.  Diana Trevino (Texas)........................................................26

CLASS ALLEGATIONS..............................................................................28

TOLLING ALLEGATIONS..........................................................................31

CHOICE OF LAW ALLEGATIONS.............................................................32

FIRST CAUSE OF ACTION........................................................................33

Breach of Contract brought on behalf of the Nationwide Class ............33

SECOND CAUSE OF ACTION....................................................................37

Intentional Infliction of Emotional Distress brought on behalf of the IIED Class ............37

THIRD CAUSE OF ACTION.......................................................................39

Negligence brought on behalf of the California Subclass ..................39

FOURTH CAUSE OF ACTION....................................................................43

Wrongful Foreclosure Brought on Behalf of the California

and Georgia Foreclosure Subclasses..................................................43

California Foreclosure Subclass ........................................................43

Georgia Foreclosure Subclass ...........................................................44

FIFTH CAUSE OF ACTION.......................................................................45

Violation of California's Homeowners Bill of Rights brought

on behalf of the California Subclass................................................4545

SIXTH CAUSE OF ACTION.......................................................................46

Violation of California's Unfair Competition Law brought on

behalf of the Nationwide Class.......................................................46

SEVENTH CAUSE OF ACTION..................................................................48

Violation of State Consumer Protection Laws brought on behalf of Five State Subclasses .......48

Illinois Subclass ...............................................................................48

Maryland Subclass ...........................................................................48

**Deleted:** Against Wells Fargo Bank Brought

**Deleted:**

**Deleted:** Against All Defendants Brought

**Deleted:** Behalf

**Deleted:** Against All Defendants Brought

**Deleted:** Behalf

**Deleted:** 43

**Deleted:** Against All Defendants

**Deleted:** 43

**Deleted:** 43

**Deleted:** 44

**Deleted:** 45

**Deleted:** Against All Defendants Brought

**Deleted:** Behalf

**Deleted:** 45

**Deleted:** Against All Defendants Brought

**Deleted:** Behalf

**Deleted:** Against All Defendants Brought

**Deleted:**
Behalf

**Deleted:** FIRST AM.

New Jersey Subclass .................................................................................................... 50

New York Subclass ....................................................................................................... 50

Pennsylvania Subclass .................................................................................................. 51

EIGHTH CAUSE OF ACTION .................................................................................. 48

    Fraud by Concealment brought on behalf of the Fraud Subclass ............................ 52

NINTH CAUSE OF ACTION ...................................................................................... 48

    Negligent Misrepresentation brought on behalf of the Misrepresentation Subclass ................. 55

PRAYER FOR RELIEF .................................................................................................. 57

DEMAND FOR JURY TRIAL ...................................................................................... 57

Deleted: 50

Deleted: 50

Deleted: 51

Formatted: Font: Times New Roman, 12 pt

Deleted: PRAYER FOR RELIEF   57¶
DEMAND FOR JURY TRIAL   57¶

Formatted: Centered

Formatted: Line spacing:  Exactly 24 pt

Deleted: FIRST AM.