Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HERNANDEZ et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 3:18-cv-07354-WHA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

JURISDICTION ......................................................................................................................... 3

INTRADISTRICT ASSIGNMENT ............................................................................................. 3

PARTIES ................................................................................................................................... 3

FACTUAL ALLEGATIONS ....................................................................................................... 5

    A.    Wells Fargo Wrongfully Forecloses on Its Customers' Homes ................................. 5

    B.    Wells Fargo Fails to Adequately Test Its Automated Decision-Making
        Tool Over a Period of at Least 8 Years ................................................................... 6

    C.    Wells Fargo's Leadership Fails to Implement Adequate Testing Even
        After Promising to Do So as Part of 2011 Consent Decrees ................................... 6

    D.    Wells Fargo Conceals Its Discovery of One of the Systematic Errors
        from Regulators and Consumers .............................................................................. 8

    E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from
        the Company's Chronic and Intentional Lack of Central Oversight ....................... 9

    F.    Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors ................. 11

PLAINTIFFS' EXPERIENCES ................................................................................................. 12

        1.    Debora Granja (California) ........................................................................ 12

        2.    Keith Lindner (California) .......................................................................... 14

        3.    Emma White (Florida) ............................................................................... 15

        4.    Troy Frye (Georgia) ................................................................................... 16

        5.    Coszetta Teague (Illinois) .......................................................................... 18

        6.    Russell and Brenda Simoneaux (Louisiana) .............................................. 19

        7.    John and Yvonne DeMartino (Maryland) .................................................. 20

        8.    Alicia Hernandez (New Jersey) ................................................................. 21

9.    Rose Wilson (New York).................................................................22

10.   Tiffanie Hood (Ohio)...................................................................23

11.   George and Cyndi Floyd (Pennsylvania)............................................24

12.   Diana Trevino (Texas)..................................................................25

CLASS ALLEGATIONS ...........................................................................27

TOLLING ALLEGATIONS .......................................................................30

CHOICE OF LAW ALLEGATIONS ............................................................30

FIRST CAUSE OF ACTION ......................................................................31

    Breach of Contract Brought on behalf of the Nationwide Class ....................31

SECOND CAUSE OF ACTION ..................................................................35

    Intentional Infliction of Emotional Distress Brought on Behalf of the IIED Class....................35

THIRD CAUSE OF ACTION .....................................................................37

    Wrongful Foreclosure Brought on Behalf of the

    California and Georgia Foreclosure Subclasses ......................................37

        California Foreclosure Subclass ...............................................37

        Georgia Foreclosure Subclass .................................................38

FOURTH CAUSE OF ACTION ...................................................................38

    Violation of California's Homeowners Bill of Rights Brought

        on Behalf of the California Subclass ........................................38

FIFTH CAUSE OF ACTION ......................................................................40

    Violation of California's Unfair Competition Law Brought

        on Behalf of the Nationwide Class ..........................................40

SIXTH CAUSE OF ACTION ......................................................................41

    Violation of State Consumer Protection Laws  Brought on Behalf

        of Five State Subclasses......................................................41

Illinois Subclass ...................................................................................................... 41

Maryland Subclass .................................................................................................. 42

New Jersey Subclass ............................................................................................... 43

New York Subclass .................................................................................................. 44

Pennsylvania Subclass ............................................................................................ 45

PRAYER FOR RELIEF ....................................................................................................... 46

DEMAND FOR JURY TRIAL ............................................................................................. 47

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

# INTRODUCTION

1. Plaintiffs are among the hundreds of homeowners who lost their homes to foreclosure because Wells Fargo wrongly determined they did not qualify for a mortgage modification.

2. This was not an accident, but rather the result of years of a willful and reckless lack of central oversight by Wells Fargo's Board and executive leadership that has led to repeated compliance breakdowns and billions of dollars in government fines.

3. For years, Wells Fargo failed to verify or audit its loan modification software to ensure it was properly calculating homeowners' eligibility for government-mandated mortgage modifications. Material errors remained uncorrected in the software for five to eight years, if not longer.

4. The federal government cited Wells Fargo in 2011 for failing to adequately audit its mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive leadership promised to implement ongoing testing to ensure that the Bank complied with government requirements in the future. But they failed to live up to that promise and multiple errors in Wells Fargo's decision-making software remained unaddressed.

5. Wells Fargo's leadership failed to implement adequate testing even after the government found that another error in the Bank's software had led the Bank to wrongfully deny mortgage modifications in 2013-2014. Wells Fargo was cited again for failing to properly oversee the Bank's mortgage modification and foreclosure operations, but still did nothing to stop others like Plaintiffs from being wrongfully denied mortgage modifications and foreclosed upon.

6. Not until August 2013 did Wells Fargo discover one of the errors that led it to wrongfully deny mortgage modifications to Plaintiffs and hundreds of other homeowners. But rather than coming clean, Wells Fargo kept its discovery secret—likely in an effort to avoid additional government penalties. The government had previously imposed restrictions on Wells Fargo's mortgage servicing business and announced fines, with the amount of the fine and the duration of business restrictions dependent on the length and severity of the Bank's continued non-compliance. Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to hundreds of customers, the government likely would not have lifted its business restrictions in 2016 and would have imposed a far more severe penalty than the $70 million fine it ultimately issued.

7.      Moreover, despite knowing in 2013 that its mortgage modification software was faulty and had the potential to impact borrowers, Wells Fargo continued to use that faulty software when reviewing borrowers' loans for mortgage modifications.  As a result, Wells Fargo wrongfully denied mortgage modifications to Plaintiffs and class members, and in many cases foreclosed on their homes.

8.      The Wells Fargo Board's repeated failure to fulfill its oversight responsibilities, despite promising to do so as part of multiple consent decrees, has grown so flagrant—and led to so many scandals and consumer abuses—that the Federal Reserve just last year placed an asset-cap on Wells Fargo that will not be lifted until Wells Fargo convinces the government it has finally reformed its central oversight practices.  The Federal Reserve's cease-and-desist order has been described as a "Fear of God Penalty," with one expert opining that the Bank is "lucky it is too big to shut down."

9.      After the Federal Reserve issued the asset-cap in February 2018, Wells Fargo announced an overhaul of its Board.  Wells Fargo has since disclosed to its shareholders what it learned in 2015— that hundreds of its customers were wrongfully and unlawfully denied mortgage modifications, with many of those customers subsequently losing their homes.  Following that initial disclosure, Wells Fargo discovered yet another error in its automated decision-making tool, which caused even more homeowners to be wrongfully denied mortgage modifications.  Wells Fargo has warned its customers that even more errors and more affected customers may be uncovered as its review continues.

10.     Although Wells Fargo publicly claims to be turning over a new leaf to make things right for its customers, it is unwilling to fairly compensate the customers whose lives its reckless behavior forever changed.  Hundreds lost their homes and yet Wells Fargo told its shareholders it was allocating less than $13,000 per person as remediation.  Wells Fargo then moved to dismiss this action with prejudice, so that its customers would receive nothing more than it pre-allocated for them.  Wells Fargo wants to be the sole arbiter of how much remediation it should pay—with little regard for the financial and emotional devastation its reckless behavior has wrought on Plaintiffs' and class members' lives.

11.     Plaintiffs seek to hold Wells Fargo and its leadership truly responsible for their repeated and deliberate failure to ensure the Bank was complying with legal requirements.  They seek certification of a nationwide class of homeowners wrongly denied a mortgage modification and several statewide classes that will allow class members to efficiently pursue additional claims under state

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

consumer protection laws.  Plaintiffs also intend to pursue entry of an injunction or other equitable

relief sufficient to prevent the continued use of Wells Fargo's unfair practices, and treble and punitive

damages pursuant to state law.

## JURISDICTION

12.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2)

because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of

interest and costs; in the aggregate, there are more than 100 members in the proposed classes; and at

least one class member is a citizen of a state different from any defendant.

13.     Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendant resides in

this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims

occurred in this district.

## INTRADISTRICT ASSIGNMENT

14.     Assignment to the Oakland/San Francisco division is proper because Wells Fargo's

designated principal place of business is in San Francisco, California and a substantial part of the events

or omissions giving rise to Plaintiffs' claims occurred there.

## PARTIES

15.     Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania.  Ms.

Hernandez was denied a mortgage modification and her New Jersey condominium was foreclosed upon

as a result of the conduct alleged herein.

16.     Plaintiff Debora Granja is a resident and citizen of Eugene, Oregon.  Ms. Granja was

denied a mortgage modification and her home in Brentwood, California, was foreclosed upon as a

result of the conduct alleged herein.

17.     Plaintiff Keith Lindner is a resident and citizen of California.  Mr. Lindner was denied a

mortgage modification and lost his home in Visalia, California, as a result of the conduct alleged

herein.

18.     Plaintiff Emma White is a resident and citizen of Jacksonville, Florida.  Ms. White was

denied a mortgage modification and her home in Callahan, Florida, was foreclosed upon as a result of

the conduct alleged herein.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

19.     Plaintiff Coszetta Teague is a resident and citizen of Homewood, Illinois.  Ms. Teague was denied a mortgage modification and her home in Calumet City, Illinois, was foreclosed upon as a result of the conduct alleged herein.

20.     Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana.  Mr. and Mrs. Simoneaux were denied a modification of the mortgage on their Louisiana home as a result of the conduct alleged herein.

21.     Plaintiffs John and Yvonne DeMartino are residents and citizens of Baltimore, Maryland.  The DeMartinos were denied a mortgage modification and their house in Baltimore, Maryland, was foreclosed upon as a result of the conduct alleged herein.

22.     Plaintiff Rose Wilson is a resident and citizen of New York.  Ms. Wilson was denied a mortgage modification and her New York home was foreclosed upon as a result of the conduct alleged herein.

23.     Plaintiff Tiffanie Hood is a resident and citizen of Ohio.  Ms. Hood was denied a mortgage modification and her Ohio home was foreclosed upon as a result of the conduct alleged herein.

24.     Plaintiffs George and Cyndi Floyd are residents and citizens of Philadelphia, Pennsylvania.  The Floyds were denied a mortgage modification and their house in Lancaster, Pennsylvania, was foreclosed upon as a result of the conduct alleged herein.

25.     Plaintiff Troy Frye is a resident and citizen of Georgia.  Mr. Frye was denied a mortgage modification and lost his home in Hephzibah, Georgia, as a result of the conduct alleged herein.

26.     Plaintiff Diana Trevino is a resident and citizen of Richardson, Texas.  Ms. Trevino was denied a mortgage modification and her Texas home was foreclosed upon as a result of the conduct alleged herein.

27.     Wells Fargo & Company (WFC), is a Delaware corporation headquartered in San Francisco, California, and a registered bank holding company that owns and controls Defendant Wells Fargo Bank, N.A.

28.     Defendant Wells Fargo Bank, N.A., is a national banking association with its main office in Sioux Falls, South Dakota, and designated principal place of business in San Francisco,

California.

29.    Defendant, along with Wells Fargo & Company, shared responsibility for ensuring that the Bank's operations were properly tested to ensure compliance with HAMP and other government requirements, with ultimate responsibility lying with WFC's Board of Directors, and its Audit & Examination Committee in particular.  There also exists a high-degree of built-in overlap between Wells Fargo and WFC due to the fact that WFC owns and controls the Bank, and that the Bank directors responsible for ensuring compliance with HAMP and other government requirements were also WFC executives and/or directors.

## FACTUAL ALLEGATIONS

### A.    Wells Fargo Wrongfully Forecloses on Its Customers' Homes

30.    Plaintiffs are among the millions of homeowners who had trouble making ends meet during the Great Recession.  They fell behind on their mortgage payments and needed help to avoid losing their homes.

31.    The Home Affordable Modification Program (HAMP) was designed to provide the very help that Plaintiffs and class members needed.  Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements.  These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

32.    Similar threshold requirements were incorporated into the mortgage modification requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac, and the Federal Housing Administration (FHA).

33.    Plaintiffs and class members met the threshold requirements for a mortgage modification and as their mortgage servicer, Wells Fargo, was required to offer them a loan modification.  Wells Fargo failed to do so, however, and instead foreclosed on Plaintiffs and more than five hundred other class members who could not make their monthly payments without a modification.

34.    Another three hundred class members were just able to stave off foreclosure, but not without overcoming numerous financial and emotional difficulties that could have been avoided if

Wells Fargo had lowered their mortgage payments as HAMP and other GSEs required.

**B.  Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a Period of at Least 8 Years**

35.     Wells Fargo has only recently acknowledged that it wrongfully denied Plaintiffs and class members mortgage loan modifications to which they were entitled under HAMP and other government requirements.

36.     In form letters sent to Plaintiffs and class members in late 2018, Wells Fargo claimed that its decision was based on a "faulty calculation."  The problem goes much deeper than a single miscalculation, however, and reflects the same type of extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.

37.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool.  This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress.  Its importance to these customers' lives cannot be overstated.  Yet Wells Fargo not only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years on end.

38.     Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications.  The government provided a free software tool for mortgage servicers to use in determining whether homeowners met threshold requirements.  If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

39.     As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other government requirements over a period of at least eight years and denied Plaintiffs and class members mortgage modifications that the Bank was legally required to offer.

**C.  Wells Fargo's Leadership Fails to Implement Adequate Testing Even After Promising to Do So as Part of 2011 Consent Decrees**

40.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in the Bank's mortgage modification and foreclosure practices.

41.     The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

42.     Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

43.     Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied.  The Bank also promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

44.     In one of the consent orders, the Federal Reserve specifically ordered WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

45.     Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance based on improved reporting, and that WFC's Chief Operational Risk Officer (CORO) was providing both the Compliance Committee and the Audit & Examination Committee with the necessary information and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure compliance with HAMP and other government requirements.

46.     Together, Wells Fargo's executives and board members—in particular, Wells Fargo's Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—were

supposed to make sure that the Bank conducted the necessary testing to detect and remedy any

violations of HAMP and other government requirements.  They repeatedly failed to fulfill these

obligations over the course of several years, however—in violation of the promises they made in the

2011 Consent Order and in callous disregard of the well-being of their customers.

47.     Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June

2015, the OCC found that the Bank was still in continuing noncompliance.  Among other things, the

OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other

government requirements; had not ensured that the Bank's audit and compliance programs had the

requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage

modification and foreclosure practices would be identified and promptly remedied; and had not ensured

that the Bank was making reasonable good faith efforts, consistent with HAMP and other government

requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' homes.

**D.      Wells Fargo Conceals Its Discovery of One of the Systematic Errors from Regulators and Consumers**

48.     In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC

prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought

its operations into compliance with an amended consent order.  The OCC also stated that it would be

taking additional action against Wells Fargo, the nature and severity of which would depend on the

nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

49.     As a result of Wells Fargo's continuing failure to implement adequate auditing and

compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that

led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and

October 2014.  The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo

to pay a civil money penalty of $70 million.

50.     Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage

modification software in August 2013—*one of the errors at issue in this case*—which caused the Bank

to wrongly deny mortgage modifications to 625 customers.  Well Fargo decided not to tell anybody it

had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure

that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the

business restrictions it had imposed in 2015.

51.    The Bank's seven-member Board of Directors, each of whom also served on WFC's

Board of Directors, signed the stipulation under which the Bank accepted the $70 million penalty and

acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in

2013-2014.  These directors did not disclose that the Bank had discovered another error—either

because their oversight was so non-existent that they did not know, or because they chose to

deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the

business restrictions it had imposed on the Bank.

52.    To make matters worse, even after discovering the 2013 error, Wells Fargo still did not

reform its auditing and verification practices.  Related errors that would affect an additional 145

customers were not discovered until five years later.

**E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight**

53.    The failure of Wells Fargo's executives and board members to implement adequate

auditing and compliance procedures was not an accident.  As scandal after scandal comes to light, it has

become all too clear that Wells Fargo's leaders intentionally abandoned their oversight

responsibilities—and did so to a shocking degree.

54.    The most notorious example is the fraudulent account scandal uncovered in 2016, when

it was revealed that Wells Fargo employees were encouraged to sign up customers for some 3.5 million

checking and credit card accounts without their knowledge.  Wells Fargo was fined $185 million by

federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce) were fired for

their involvement in the scandal.

55.    The fraudulent account scandal also involved the Audit & Examination Committee,

which ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an

institutional investor's request that the Board address its lack of comprehensive audit procedures and

adjust compensation policies to discourage abusive sales practices.  The two executives most associated

with the fraudulent account scandal—John G. Stumpf and Carrie L. Tolstedt—were signatories to one

of the 2011 consent orders discussed above and among those responsible for Wells Fargo's failure to comply with the orders by implementing adequate auditing and compliance procedures.

56. This case and the fraudulent account scandal are far from the only examples of Wells Fargo's Board and executive leadership abdicating their oversight responsibilities. Wells Fargo's Board and executive leadership have consistently ignored unlawful practices throughout the Bank's lending divisions, leading to an unprecedented series of government fines. To give just a few more examples:

1. In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage lending practices discriminated against African-American and Hispanic borrowers

2. In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses

3. In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had misrepresented the quality of mortgage loans it sold to Freddie Mac

4. In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for falsely certifying that mortgage loans were eligible for FHA insurance

5. In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations that it engaged in illegal student loan servicing practices

6. In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing insurance on its auto-loan customers (often leading to wrongful vehicle repossessions) and charging its mortgage-loan customers excessive rate-lock fees

7. In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it engaged in a variety of improper practices, including selling customers renters' and life insurance they did not ask for and overcharging for GAP auto insurance

57. Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law."

58. Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the

Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

59.     In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

60.     Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

61.      Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

62.     Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger.

63.     As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

**F.     Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors**

64.     A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error.  Wells Fargo wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure.  Wells Fargo also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

65.     Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

66.     Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its recently filed 10-K Annual Report, Wells Fargo disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

67.     In late 2018, Wells Fargo began sending form letters to the customers affected by the errors in its automated decision-making tools. The letters typically included a check for around $15,000, and informed customers that if they were not satisfied with that amount, they could consider mediation through a third-party mediator that Wells Fargo has retained.

68.     The amounts that Wells Fargo is offering its customers is nowhere near enough to compensate them for the damage that Wells Fargo's conduct caused them, and indicates that while Wells Fargo wants the Federal Reserve to believe it has changed its ways, the company is unwilling to accept full responsibility for the life-altering consequences its behavior has wrought.

69.     As a result of Wells Fargo's conduct, the lives of Plaintiffs and class members have been irrevocably altered. Their damages include loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments; stress-related illnesses; broken marriages; children coping with the financial and emotional consequences of their parents losing the family home; and severe emotional distress.

**PLAINTIFFS' EXPERIENCES**

**1.     Debora Granja (California)**

70.     Plaintiff Debora Granja purchased her home, located in Brentwood, California, with her

then-husband in 2004.  The couple eventually had three daughters living with them and put substantial time and money into making the house their own.  Wells Fargo became Ms. Granja's mortgage lender following a refinance in 2006.

71.     Around 2009, Ms. Granja's husband lost his job as a landscaping manager.  Ms. Granja, who had been working only part-time, returned to full-time work to support her family.

72.     Ms. Granja began seeking a loan modification from Wells Fargo in 2010.  Each time she called Wells Fargo, she spoke to a different representative.  Initially, the representatives told her that she would easily qualify for a modification based on her circumstances.  Ms. Granja tried submitting her loan modification application numerous times. Each time, Wells Fargo would claim it lost her paperwork and would ask her to resend it.

73.     Eventually, around 2012, Wells Fargo representatives falsely told Ms. Granja that she did not qualify for a modification.  The Bank ultimately foreclosed on her house in 2014 and Ms. Granja was forced to find a rental home for her family.  Her daughters had to change schools and leave the only environment they knew.

74.     Wells Fargo's failure to grant Ms. Granja a loan modification caused great strain on her marriage.  Ms. Granja and her husband legally separated around the time of the foreclosure.  The stress of the foreclosure also severely affected Ms. Granja's health.  She was diagnosed with severe depression in 2013.  Four years later, Ms. Granja was diagnosed with acute traumatic stress disorder.  Her breakdown was triggered by a minor car accident but caused by an accumulation of stress over recent years, including from the foreclosure.

75.     In September 2018, Ms. Granja's ex-husband received a letter from Wells Fargo informing him and Ms. Granja that their mortgage modification should have been approved but was not approved due to an error.  He notified Ms. Granja of the letter and she contacted Wells Fargo to provide it with her contact information.  Ms. Granja was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

76.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Granja's life has been irrevocably altered.  Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1  of appreciation in her home's value following the sale; loss of time and money spent to find
2  replacement housing and move her family; loss of time and money spent in an effort to avoid
3  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

4  **2.   Keith Lindner (California)**

5  77.   Mr. Lindner bought a home for his family in Visalia, California in 2003, financing the
6  purchase with a mortgage loan from Wells Fargo.  He moved in shortly thereafter with his partner,
7  daughter, and two young stepsons.

8  78.   As a seasoned professional in the construction industry, Mr. Lindner made wholesale
9  improvements to the home.  He built a 16-by-24-foot addition, replaced the windows, carpeting,
10  flooring and interior doors, installed new lighting, and rebuilt showers and closets, among other things.

11  79.   In 2006, Mr. Lindner began to experience some medical issues.  It took a long time for
12  doctors to arrive at the correct diagnosis, and he eventually had surgery in 2008.  Following the
13  surgery, he was unable to work for two months.  Around the same time, the construction industry began
14  to suffer from the effects of the Great Recession.  Mr. Lindner's partner, who by this time was his wife,
15  had recently obtained a master's degree, but was having a hard time finding work.  Mr. Lindner's father
16  also fell ill, and Mr. Lindner missed more time at work to be with his ailing father.

17  80.   In 2009, Mr. Lindner was laid off from his job with the company that had employed him
18  for the previous seven years.  This caused the Lindners' already-difficult financial situation to become
19  critical.  Mr. Lindner reached out to Wells Fargo to tell them about his financial difficulties and asked
20  them if they could provide any assistance with his mortgage so that his family could stay in their
21  home.  Wells Fargo denied his request.

22  81.   Mr. Lindner did everything he could to make ends meet, but money became tighter and
23  tighter every month.  This took a tremendous toll on the Lindners' marriage, and they separated in
24  September of 2009.  Mrs. Lindner moved out of the house with her two sons from a previous
25  relationship, leaving Mr. Lindner with their son, who was about three years old at the time.

26  82.   Mr. Lindner continued to write hardship letters to Wells Fargo and to apply for a
27  mortgage modification, but was rejected time and time again, both verbally and in writing.  Eventually,
28  Mr. Lindner realized that his situation was untenable, and he would have to leave the home.  In 2011,

Wells Fargo offered him a "cash for keys" deal and paid him $2,000 to leave his home with his young son.

83.     Mr. Lindner and his son, who was in kindergarten or first grade at the time, were forced to live in a series of uncomfortable situations, renting rooms in other people's houses until Mr. Lindner obtained his contractor's license in 2013, and was finally able to rent a house in 2014.

84.     Mr. Lindner and his son suffered significant depression and anguish as a result of losing their home.  The boy was sad about having to move from the only home he had known, and still fondly remembers it and the friends he left behind.  Mr. Lindner was prescribed anti-depressants but did not have a good reaction to them.  Mr. Lindner is still recovering from the impact of losing his home, having his credit destroyed, and everything else that he endured as a result of being denied a mortgage modification.  His goal now is to be able to buy a home near his ex-wife so that he can be closer to his son and provide him with a secure home.

85.     In late 2018, Mr. Lindner received a letter from Wells Fargo informing him that his mortgage modification should have been approved but was not approved due to an error.  Mr. Lindner was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

86.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Mr. Lindner's life has been irrevocably altered.  His injuries include loss of his family's home and the time and money put into that home; loss of equity in his home; loss of tax benefits; loss of appreciation in his home's value; loss of time and money spent to find replacement housing and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his credit and resulting opportunity costs; and severe emotional distress.

### 3.     Emma White (Florida)

87.     Plaintiff Emma White purchased her home, located in Callahan, Florida, in 2006.  She was a single mother who moved into the house with her four children.  The property was purchased through a mortgage loan that Wells Fargo later acquired.

88.     Around 2009, Ms. White began experiencing financial hardship. She had accumulated debt supporting her children and applied for a mortgage loan modification so that the family could keep

their home.  The loan modification process was long and complicated. Ms. White kept having to send in the same paperwork over and over again, only to ultimately receive a letter from Wells Fargo in 2013 saying that she did not qualify for a modification.

89.     Wells Fargo had already initiated foreclosure proceedings, so after it denied her request for a mortgage modification, Ms. White was forced to leave her house.  She found a rental apartment in Jacksonville, Florida, for her and three of her children, while Wells Fargo completed its foreclosure of their old home.

90.     Wells Fargo's actions caused Ms. White significant emotional distress.  The foreclosure devastated her, especially because she had to support her children and work to make sure the family had a place to live.  Ms. White had been suffering from the stress of supporting her children and other recent events in her life, and the foreclosure multiplied that stress.  As a result of everything that was going on in her life, including the foreclosure, Ms. White was diagnosed with depression and began taking antidepressants.  Ms. White's children were also affected by the foreclosure.  She had to explain to them that she tried her best to keep the house, but ultimately could not do so.

91.     In late 2018, Ms. White received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error.  Ms. White was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

92.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. White's life has been irrevocably altered.  Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

**4.     Troy Frye (Georgia)**

93.     In 2009, Mr. Frye bought a home in Hephzibah, GA for himself and his partner, their two young sons (who were about five and seven years old at the time), and his partner's daughter.

94.     Around the beginning of 2013, Mr. Frye was laid off from his job at a local

manufacturing plant where he had been employed for about eight to ten years.  He applied for and received unemployment assistance, but still was not able to make the monthly mortgage payments on his home.  He reached out to Wells Fargo (his mortgage servicer), to see if they would grant him a mortgage modification, which they did in late February 2013.

95.    Unfortunately, Mr. Frye's new monthly mortgage payment was not significantly lower, and Mr. Frye continued to have difficulty making his payments.  He attempted to get a second modification from Wells Fargo, but this time he was denied—both verbally and in writing.  Wells Fargo then initiated foreclosure proceedings.

96.    The strain of Mr. Frye's financial hardship, coupled with the uncertainty and stress of the impending foreclosure, had a big impact on Mr. Frye and his family.  The relationship between Mr. Frye and the mother of his children became very strained, and in 2014, she moved out with their two boys and her daughter, leaving Mr. Frye alone in the home.

97.    Mr. Frye was able to delay foreclosure proceedings for a while, but Wells Fargo persisted in their efforts to remove him from his home.  Around the beginning of 2015, Wells Fargo asked him how much they would need to pay him to leave.  Confused and frustrated by the situation, Mr. Frye said he would accept $2,000.  The house had recently been damaged by a kitchen fire that broke out while Mr. Frye was sleeping, and from which he was fortunate to escape with his life.  He accepted the $2,000 from Wells Fargo and moved out, as the house was no longer habitable.

98.    Mr. Frye and his children suffered emotional trauma and depression as a result of the foreclosure and the effects that it had on their lives.  They all tried to move on as best they could.

99.    In late 2018, Mr. Frye received a letter from Wells Fargo informing him that his second mortgage modification request should have been approved but was not approved due to an error.  Mr. Frye was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

100.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Mr. Frye's life has been irrevocably altered.  His injuries include loss of his family's home and the time and money put into that home; loss of equity in his home; loss of tax benefits; loss of appreciation in his home's value; loss of time and money spent to find replacement housing and move

1   his family; loss of time and money spent in an effort to avoid foreclosure; damage to his credit and

2   resulting opportunity costs; and severe emotional distress.

3              **5.    Coszetta Teague (Illinois)**

4              101.    Plaintiff Coszetta Teague purchased a home in Calumet City, Illinois, for herself and her

5   daughter, Iesha Brown, in June 2010.  Ms. Teague's two young grandchildren moved in shortly

6   thereafter.  The property was purchased through a mortgage loan with Wells Fargo.

7              102.    In 2010, Ms. Teague was laid off from her job at Chase Bank.  In 2011, Ms. Teague lost

8   her mother and her property taxes went up.  As a result, Ms. Teague could no longer afford to make her

9   monthly payments, and reached out to Wells Fargo to see if they could help.

10             103.    Wells Fargo told Ms. Teague to fill out paperwork.  Ms. Teague did as she was told, but

11  when she later inquired about the status of her modification request, she was told that it had been lost

12  and that she would have to redo it.  It took a long time for Wells Fargo to process Ms. Teague's

13  application, and Wells Fargo's representatives were often impolite during the process, but eventually

14  Wells Fargo told Ms. Teague that she did not qualify for a mortgage modification and it was going to

15  initiate foreclosure proceedings.

16             104.    Afraid that the sheriff was going to remove her from her home, Ms. Teague asked her

17  brother to help move her belongings to storage.  She hired a foreclosure defense attorney, who charged

18  her $4,000 but was unable to help.  Ms. Teague and her family vacated the home in the latter part of

19  2014 and Wells Fargo foreclosed shortly thereafter.

20             105.    Ms. Teague, her daughter, and her two grandchildren lived in Ms. Teague's car for

21  several months, until she was able to find an apartment sometime around March 2015.

22             106.    The experience was emotionally devastating for all concerned.  Ms. Brown was very

23  depressed and had suicidal ideations.  She was prescribed antidepressants, including Zoloft.  The

24  grandchildren, who were around four and nine at the time, were sad and confused about losing their

25  home and having to live in a car, change schools, and leave all their friends.  They shut down, stopped

26  interacting with people, and attended therapy.  Ms. Teague also experienced depression following the

27  foreclosure, and was prescribed antidepressants, including Zoloft.  She is currently on Social Security

28  and disability benefits.

107.     In late 2018, Ms. Teague received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error.  Ms. Teague was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

108.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Teague and her family's lives have been irrevocably altered.  Their injuries include loss of their home and the time and money put into that home; loss of equity in the home; loss of tax benefits; loss of appreciation in the home's value following the sale; loss of time and money spent to find replacement shelter and relocate; loss of time and money spent in an effort to avoid foreclosure; damage to Ms. Teague's credit and resulting opportunity costs; and severe emotional distress.

### 6.     Russell and Brenda Simoneaux (Louisiana)

109.     Plaintiffs Russell and Brenda Simoneaux purchased their home in Baton Rouge, Louisiana, in 1992.

110.     Mr. and Mrs. Simoneaux contacted Wells Fargo, their mortgage loan servicer, in 2013 because Mr. Simoneaux had recently retired and the couple was living on a fixed income.  They applied for a mortgage modification, but were denied.

111.     Without a mortgage modification, Mr. and Mrs. Simoneaux had a very difficult time meeting their mortgage obligations.  Mr. and Mrs. Simoneaux were both forced to take side jobs for extra income, the couple avoided eating out, and they watched every penny they spent for several years—until their mortgage was finally paid off in late 2018.  It was an extremely stressful time.

112.     In October 2018, Mr. and Mrs. Simoneaux received a letter from Wells Fargo informing them that their request for a mortgage modification should have been approved but was not approved due to an error.  Mr. and Mrs. Simoneaux were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

113.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Mr. and Mrs. Simoneaux were forced to make numerous sacrifices and endure significant stress as they struggled to meet mortgage payments that should have been lowered.  Their injuries include loss of more beneficial loan terms; loss of time spent avoiding foreclosure; and opportunity

costs resulting from higher mortgage payments.

### 7.    John and Yvonne DeMartino (Maryland)

114.    In 2008, Plaintiffs John and Yvonne DeMartino bought a single-family home for $239,000 in Baltimore, Maryland, with a mortgage loan from Wells Fargo.  The home was located next door to their residence.  The plan was for Yvonne's mother, Margaret, then in her late seventies and suffering from Parkinson's disease, to move in to be cared for by Yvonne when she was no longer able to live by herself.

115.    After the DeMartinos bought the home, their pregnant daughter and son-in-law moved in, with the understanding that they would pay the mortgage and live there until Margaret needed to move in.  They got behind on their mortgage payments, however, and the DeMartinos had to tap into their savings to bring the mortgage current.  In or around 2013, the DeMartinos' daughter and son-in-law fell behind on the mortgage payments again, but this time the DeMartinos couldn't afford to bring the debt current.  The DeMartinos applied for a mortgage modification from Wells Fargo but were denied.  Wells Fargo foreclosed on the home in around 2013 or 2014.

116.    Mr. and Mrs. DeMartino suffered great stress and anxiety as a result of the foreclosure.  They were humiliated and afraid to pick up the phone.  Mr. DeMartino has tried to get the foreclosure removed from his record.  He was told by Wells Fargo that it cannot be erased, however, because even though it was in error, the foreclosure did in fact occur.

117.    Margaret, now 87, lives in a nursing home some distance away, and Mrs. DeMartino has a difficult time getting there to see her.  The DeMartinos feel terrible every time they look at the house next door, where Margaret would be living under Mrs. DeMartino's care had Wells Fargo not foreclosed on the home.

118.    In late 2018, the DeMartinos received a letter from Wells Fargo informing them that their request for a mortgage modification should have been approved but was not approved due to an error.  The DeMartinos were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

119.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, the DeMartinos has suffered life-altering consequences.  Their injuries include loss of

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

their house time and money put into that house; loss of equity in the house; loss of appreciation in the house's value following the sale; loss of time and money spent to find replacement housing for Ms. DeMartino's mother; loss of time and money spent in an effort to avoid foreclosure; damage to their credit and resulting opportunity costs; and severe emotional distress.

### 8.  Alicia Hernandez (New Jersey)

120.  Plaintiff Alicia Hernandez bought her studio condominium, located in North Bergen, New Jersey, in 2006.  The property was purchased through a mortgage loan with Wells Fargo.

121.  Ms. Hernandez already owned another unit in the complex and thought the studio, with a lot of work, could be developed into an attractive rental due to its close proximity to New York City.  It's right across the river from Manhattan, and only a seven-minute drive from Times Square with no traffic.  Ms. Hernandez planned to keep the property in her family forever.  The unit also had a deeded parking spot, and parking is very difficult to come by in that area.

122.  When Ms. Hernandez purchased her studio, it was just a shell—it had no kitchen and there were bullet holes in the door.  But Ms. Hernandez was willing to put in the work, time, and money to create an income-generating property that could provide for her and her family.  She tapped into her retirement account and installed new flooring, new appliances, new bathroom fixtures, recessed lighting, and a new air conditioning unit.  She also had to contribute additional money when the homeowners' association imposed special assessments.

123.  During the Great Recession, Ms. Hernandez lost her job in a mass layoff, and with the property now her only source of income, had difficulty making her monthly mortgage payment.  She applied for a mortgage modification in 2012-13, but Wells Fargo told her that she didn't qualify and instituted foreclosure proceedings in late 2013.

124.  Ms. Hernandez fought foreclosure for several years, but Wells Fargo eventually foreclosed on her property in late 2015.  The stress of the foreclosure process had a devastating effect on Ms. Hernandez and her husband.  As non-lawyers, the anxiety and confusion of dealing with the court system and the legal process took a severe toll on them emotionally.  Ms. Hernandez had a miscarriage during the foreclosure process and was hospitalized for the first time in her life.  She also suffered insomnia, panic attacks, and difficulty breathing.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

125.    Ms. Hernandez's husband is a police officer, and both were very concerned about the effects that the foreclosure might have on him professionally.  This put a lot of strain on their marriage and caused embarrassment when they ran into colleagues of his while attending court to fight foreclosure.  Eventually, Ms. Hernandez and her husband moved to Easton, Pennsylvania, to escape the stress of being in the same community, and her husband now commutes approximately an hour and 15 minutes to work.

126.    In late 2018, Ms. Hernandez received a letter from Wells Fargo informing her that her request for a mortgage modification should have been approved but was not approved due to an error.  Ms. Hernandez was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

127.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Hernandez has suffered life-altering consequences.  Her injuries include loss of her property and the time and money put into that property; loss of equity in her property; loss of appreciation in her property's value following the sale; loss of time and money spent fighting foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

**9.    Rose Wilson (New York)**

128.    Plaintiff Rose Wilson purchased her home, located in Rochester, New York, in or around 1995.  Ms. Wilson lived in the home for many years with her family, and put a lot of time and money into the property—including by renovating the kitchen and bathroom.

129.    After Ms. Wilson lost her job due to the economic downturn, however, she struggled to make the mortgage payments on her home.

130.    She applied for a mortgage modification from Wells Fargo (her mortgage servicer) multiple times over the course of several years.  Wells Fargo kept stringing her along, requiring her to make monthly payments she could not afford in order to qualify for a mortgage modification, and then telling her the request had been denied and she would need to reapply and start the process all over again.

131.    Ms. Wilson's attempt to obtain a mortgage modification from Wells Fargo and save her home went on for years.  During this time, Ms. Wilson had to make many sacrifices to keep making her

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1    mortgage payments.  She tapped into her retirement account early, incurring tax penalties to do so.

2         132.    Ms. Wilson's efforts to save her home were ultimately unsuccessful, however, and Wells

3    Fargo foreclosed in 2014.  At the time of the foreclosure, Ms. Wilson's daughter, son-in-law, and their

4    two children lived with her. They were all forced to move from their home to a cramped, moldy,

5    rodent-infested rental property.  The aftermath of the foreclosure caused Ms. Wilson significant stress

6    and depression.  She had worked hard to purchase a home and provide for her family, but after the

7    foreclosure, Ms. Wilson felt utterly defeated and left with nothing.  It has taken many years for the pain

8    to subside, but she still feels immense sadness whenever she drives by her former house or thinks about

9    her old life.

10        133.    In late 2018, Ms. Wilson received a letter from Wells Fargo informing her that her

11   request for a mortgage modification should have been approved but was not approved due to an error.

12   Ms. Wilson was one of the customers wrongly denied a mortgage modification because of systematic

13   errors in Wells Fargo's automated decision-making tool.

14        134.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

15   making tool, Ms. Wilson has suffered life-altering consequences.  Her injuries include loss of her home

16   and the time and money put into that property; loss of equity in her property; loss of appreciation in her

17   property's value following the sale; loss of time and money spent fighting foreclosure; damage to her

18   credit and resulting opportunity costs; and severe emotional distress.

19                      **10.    Tiffanie Hood (Ohio)**

20        135.    In May of 2001, Ms. Hood bought a three-bedroom home for her family in Cincinnati,

21   Ohio.  She moved in with her young children—her son was about eight years old at the time, and her

22   daughter was about 11.

23        136.    The home was built in 1926 and needed quite a bit of work.  Ms. Hood invested

24   significant resources putting in a kitchen, repairing the roof, replacing the garage door and front door,

25   and completing various other necessary repairs.

26        137.    In or around 2013, Ms. Hood had difficulty making the monthly payment and reached

27   out to Wells Fargo for help.  Her request for a mortgage modification was denied, and Wells Fargo

28   initiated foreclosure proceedings.  Ms. Hood and her family were forced out of their home in late 2014.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

138.    Ms. Hood and her children suffered emotional trauma and depression as a result of the foreclosure and the effects that it had on their lives.  They all tried to move on as best they could.

139.    In late 2018, Ms. Hood received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error.  Ms. Hood was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

140.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Hood life has been irrevocably altered.  Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following foreclosure; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

### 11.    George and Cyndi Floyd (Pennsylvania)

141.    Plaintiffs George and Cyndi Floyd purchased their home, located in Lancaster, Pennsylvania, in 2004.  The property was purchased through a mortgage loan with Wachovia, which was later transferred to Wells Fargo.

142.    After the financial crisis hit, the Floyds had difficulty making their mortgage payments.  Mr. Floyd lost his job when the company he worked for closed, and Mrs. Floyd later lost her job due to the economic recession as well.

143.    In an effort to save their home, the Floyds went to great lengths: they applied for numerous mortgage modifications over a period of two years; they paid a company to help them avoid foreclosure; and they spent countless hours reaching out to various other companies, government agencies, and even Congressional representatives for help.

144.    The Floyds' efforts were ultimately unsuccessful.  Wells Fargo denied their final request for a mortgage modification in November 2011 and initiated foreclosure proceedings.  The Floyds were forced to move to a new home in Philadelphia.

145.    The foreclosure process was emotionally devastating for the Floyds.  Mr. Floyd is disabled and suffers from degenerative disc disease, arthritis throughout his body, and the aftereffects

1  of failed bilateral knee replacements.  Being forced to move by Wells Fargo was an extreme hardship
2  that caused Mr. Floyd severe depression and emotional distress.  He was hospitalized during the
3  foreclosure process, and though he was eventually able to get through the move to Philadelphia, it took
4  weeks and required the help of Mr. Floyd's nephew and high doses of pain medication.  To this day,
5  Mr. Floyd suffers from deep depression and anxiety because of what Wells Fargo has done to him and
6  his family.

7       146.    In late 2018, the Floyds received a letter from Wells Fargo informing them that their
8  mortgage modification should have been approved but was not approved due to an error.  The Floyds
9  were among the customers wrongly denied a mortgage modification because of systematic errors in
10  Wells Fargo's automated decision-making tool.

11       147.    As a result of Wells Fargo's repeated failure to properly test its automated decision-
12  making tool, the Floyds lives were irrevocably altered.  Their injuries include loss of their home and the
13  time and money put into that home; loss of equity in their home; loss of tax benefits; loss of
14  appreciation in their home's value following the sale; loss of time and money spent to find replacement
15  housing and move their belongings; loss of time and money spent in their efforts to avoid foreclosure;
16  damage to their credit and resulting opportunity costs; and severe emotional distress.

17           **12.    Diana Trevino (Texas)**

18       148.    In 2007, Plaintiff Diana Trevino purchased a three-bedroom home in Garland, Texas,
19  where she lived with her husband and four children.  Close family friend Roder Contreras co-signed the
20  mortgage loan and resided in the home as well.  When Mr. Contreras's grandmother became ill in 2010,
21  he moved to El Salvador to take care of her.  He stopped making his share of the payments on the
22  Trevino home, and quitclaimed his interest in it to the Trevinos.

23       149.    Because the Trevinos were unable to make the entire monthly mortgage payment
24  without Mr. Contreras's contribution, Ms. Trevino applied for a mortgage modification from Wells
25  Fargo and was approved.  After making approximately five to eight payments under the modification
26  plan, Ms. Trevino suffered another setback when her mother became ill with cancer.  Ms. Trevino
27  began missing a significant amount of work because she was taking time off to take care of her
28  mother.  She fell behind on the mortgage payments, and again sought assistance from Wells Fargo.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

150.    Wells Fargo told Ms. Trevino to stop making mortgage payments so that she could qualify for another mortgage modification, which they assured her she was likely to get.  Ms. Trevino stopped making payments as instructed, instead devoting her limited financial resources to her children and ailing mother.

151.    In 2013, Ms. Trevino received a call from Wells Fargo notifying her that she had not been approved for a mortgage modification, and that Wells Fargo planned to initiate foreclosure proceedings.  She was told she had 60 days to vacate the premises; a follow-up letter conveyed the same information.

152.    Ms. Trevino had great difficulty finding a new place for her family to live, but eventually found a three-bedroom apartment in an undesirable neighborhood in Richardson, Texas.  The lease was solely in her husband's name, because the foreclosure had ruined Ms. Trevino's credit.

153.    In April of 2013, the Trevinos moved into the apartment.  Ms. Trevino tried to keep her children in the same school in Garland, but the travel proved very difficult for the family.  At times, some of the children were forced to live with their aunt so they could be nearer to their school.  This was hard on the children, who couldn't understand why they had lost their home, or why their mother was so sad all of the time.  Some of the children lost friends and started acting out at school.  Uncharacteristically, her son and daughter were both suspended from school for misbehavior during this time period.

154.    The stress of the foreclosure, among other factors, strained the Trevinos' marriage, and in 2013 they separated.  Eventually they divorced.  When the lease on their apartment expired, Ms. Trevino was unable to renew it because she had not been on the original lease, and her poor credit prevented her from getting a lease on her own.  The Trevinos were evicted from the apartment and had a very hard time finding a new place to live.

155.    Around the same time, Ms. Trevino's stress and depression got to the point that she wasn't eating or sleeping, and she had to be hospitalized with a bacterial infection.  She lost her job and was unemployed for around ten months.  She and her children survived on her unemployment benefits and the financial assistance of her sister.  Two of Ms. Trevino's sons left college so that they could

work and help support the family.  Ms. Trevino and her family have worked hard to try to rebuild their lives in the wake of the foreclosure in 2013, and continue to do so to this day.

156.    In late 2018, Ms. Trevino received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error.  Ms. Trevino was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

157.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Trevino's life has been irrevocably altered.  Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

## CLASS ALLEGATIONS

158.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to pursue their claims on behalf of a class of similarly situated persons.  The parameters of the class may be refined through discovery and will be subject to Court approval and modification, but for purposes of this Complaint, Plaintiffs propose the following class definition:

<u>Nationwide Class</u>

All persons who (i) qualified for a mortgage loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP), or any other governmental entity or program; and (ii) were not offered a mortgage loan modification by Wells Fargo due to a systematic error in Wells Fargo's automated mortgage loan modification underwriting tool.

159.    For purposes of this proposed class definition, "mortgage loan" refers to any loan secured by real property.

160.    The Nationwide Class will pursue contract claims and UCL claims. Plaintiffs also propose that the Court consider several subclasses so that class members may pursue unique state law claims available to them.

161.    The first group of subclasses would only be necessary if the Court determines that the UCL should not be applied to all class members.  These subclasses would be defined as follows and cover the following states: California, Florida, Georgia, Illinois, Louisiana, Maryland, New Jersey, New York, Ohio, Pennsylvania, and Texas.

[State] Subclass

All members of the Nationwide Class whose mortgage loan was secured by real property located in [State].

162.    The second group of subclasses would be defined as follows, and permit Plaintiffs to pursue wrongful foreclosure claims that exist under California and Georgia law.

[California / Georgia] Foreclosure Subclass

All members of the Nationwide Class whose mortgage loan was secured by real property located in [California / Georgia] who subsequently lost that property through a foreclosure.

163.    Plaintiffs anticipate that they will be able to identify all class and subclass members from Wells Fargo's records and that they can be notified of the pendency of this class action by mail.

164.    The proposed class and subclasses meet each of the requirements for class certification pursuant to Rule 23(a) and Rule 23(b)(3).

165.    Numerosity.  The classes and subclasses are sufficiently numerous such that individual joinders are impracticable and less advantageous than proceeding through the class device.  Based on Wells Fargo's public disclosures to date, the Nationwide Class consists of at least 870 persons.  And based on information Wells Fargo has provided to Plaintiffs in this case, Plaintiffs estimate that each proposed Subclass consists of at least 20 persons, with the possible exception of the Georgia Foreclosure Subclass.

166.    Commonality & Predominance.  Common questions of law and fact exist as to the proposed classes and subclasses, and those common questions predominate over questions affecting only individual class members.  These common questions include:

1.    Whether Wells Fargo breached a standard notice requirement in mortgage contracts by failing to notify class members they qualified for a mortgage modification;

2.    Whether Wells Fargo's conduct, as alleged herein, was extreme and outrageous;

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

3.   Whether Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to its customers;

4.   Wells Fargo owed Plaintiffs and class members a duty to exercise reasonable care when determining their eligibility for a mortgage modification; and

5.   Whether Wells Fargo's failure to properly verify or audit its automated decision-making software constitutes an unfair practice.

167.   <u>Typicality</u>.  Plaintiffs' claims are typical of those asserted by the proposed classes and subclasses.  Both Plaintiffs and class members seek to recover for injuries caused by Wells Fargo's failure to properly verify or audit its automated decision-making tool, which caused both Plaintiffs and class members to be denied mortgage modifications and/or to suffer emotional distress.

168.   <u>Adequacy</u>. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class, as their interests do not conflict with the interest of the class members they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation and intend to prosecute this action vigorously.

169.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Successfully prosecuting class members' claims will require an in-depth knowledge of HAMP-related jurisprudence; intensive discovery of a banking giant defended by a large, global law firm; and depositions of several sophisticated banking executives and board members.  These are matters that can only realistically be handled through unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings.  A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

170.   In the alternative to class certification under Rule 23(b)(3), the proposed class and subclasses may also be certified under Rule 23(b)(2) or Rule 23(c)(4).  Wells Fargo has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory appropriate with respect to the class as a whole.  And Plaintiffs' claims present a number of discrete but complex factual and legal issues that could be resolved for all class members in a single proceeding.

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

**TOLLING ALLEGATIONS**

171.    The causes of actions alleged herein did not accrue or were tolled until Plaintiffs and class members discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims.

172.    Plaintiffs and class members were not aware that they qualified for a mortgage modification, and that Wells Fargo's automated decision-making tool had miscalculated their eligibility, until Wells Fargo informed them through letters mailed the second half of 2018.

173.    Plaintiffs and class members had no realistic ability to discover these facts on their own. Wells Fargo's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for a mortgage modification depended on variables within Wells Fargo's exclusive control.

174.    Any applicable statues of limitations are also tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts alleged herein.  Wells Fargo discovered one of the software errors in August 2013 but deliberately concealed its discovery from Plaintiffs and from class members until the second half of 2018.  Wells Fargo was under a continuous duty to disclose the truth to Plaintiffs and class members, and Plaintiffs and class members reasonably relied on Wells Fargo's ongoing concealment.

**CHOICE OF LAW ALLEGATIONS**

175.    The State of California has sufficient contacts to the claims of nonresident Plaintiffs and class members such that application of California's Unfair Competition Law (UCL) is appropriate.

176.    Wells Fargo does substantial business in California; WFC is headquartered in California; the Bank's principal place of business is in California; and a significant portion of the proposed Nationwide Class is located in California.

177.    In addition, the practices that form the basis of Plaintiffs' and class members' UCL claims against Wells Fargo are centered in California, where WFC is headquartered.  WFC owns and controlled the Bank, and is responsible for testing and auditing its mortgage modification operations for compliance with HAMP and other government regulations.

178.    Several of the executives and board members who failed to ensure that Wells Fargo

properly tested and audited its mortgage modification operations were based in California.  For example, public records indicate that at least four of the ten members who served on the Audit & Examination Committee between 2010 and 2017 were based in California—far more than any other state.  In addition, at least one—and likely both—of the executives who served as WFC's Chief Operational Risk Officer between 2010 and 2017, and thus were responsible for the compliance and audit reporting provided to the Compliance Committee and the Audit & Examination Committee, were based in WFC's San Francisco office.

179.    The State of California also has the strong regulatory interest in applying the UCL to all class members' claims.  The UCL is designed to preserve a business climate in California free of unfair and deceptive practices.  If California were only able to address unfair business conduct when the injured consumer resides in California, the UCL would be largely ineffective at regulating companies who do business in all fifty states.  Violators would be able to keep the vast majority of their ill-gotten gains (all those obtained from non-California consumers), leaving California-based companies like Wells Fargo undeterred from engaging in similar conduct in the future.

**FIRST CAUSE OF ACTION**
**Breach of Contract**
**Brought on behalf of the Nationwide Class**

180.    Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague, John and Yvonne DeMartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of themselves and the State Subclasses.

181.    When Plaintiffs and class members financed their homes, they entered into Security Instruments (typically referred to as a mortgage, deed of trust, or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and foreclose on the property.

182.    Plaintiffs' and class members' mortgage loans were insured, guaranteed, or held by a federal government agency and their Security Instruments were typically government-issued, form

Federal Housing Administration (FHA) and/or Fannie Mae/Freddie Mac Security Instruments.[1] Twelve of the fifteen Plaintiffs had their homes secured by Fannie/Freddie Security Instruments, while the remaining three had their homes secured by FHA Security Instruments. Wells Fargo breached the terms of both types of Security Instruments. Plaintiffs Hood and DeMartino entered into FHA Security Instruments, while the remaining Plaintiffs' Security Instruments are Fannie Mae/Freddie Mac documents. References to "Security Instruments" in this complaint refer to all Plaintiffs' mortgage contracts. Reference to "FHA Security Instruments" is to Plaintiffs Hood and DeMartino's mortgage contracts, while reference to "Fannie/Freddie Security Instruments" is to the remaining Plaintiffs' mortgage contracts.

183.    Wells Fargo Bank was subject to the terms of these Security Instruments, either as the original lender, an assignee, or as the mortgage servicer authorized to act on behalf of the lender.

184.    Under the Fannie/Freddie Security Instruments, the Bank was required to give notice to Plaintiffs and class members before it was permitted to accelerate the remaining balance on their loans and initiate the foreclosure process.  That notice was required to specify the borrower's default, the action required by the borrower to cure the default, and the date by which the borrower must cure the default to avoid acceleration and foreclosure proceedings.

185.    The Bank also agreed that "[i]f the Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued…" prior to the sale of the property. Those conditions included, among other things, that the Borrower "(a) pays Lender all sums which then would be due under this Security Instrument…" and "(b) cures any defaults of any other covenants or agreements."[2]

186.    The Fannie/Freddie Security Instruments specifically contemplated the possibility of both a forbearance and modification of the sums secured by the Security Instruments. The

---

[1] *See* Wells Fargo's Request for Judicial Notice, Dkt. 60, attaching copies of certain Plaintiffs' Security Instruments as "exemplars" that were "substantially similar to the security instruments of the remaining named Plaintiffs." The exemplars included Security Instruments for Plaintiffs DeMartino (FHA Maryland Deed of Trust), Floyd (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), Hood (FHA Ohio Open-End Mortgage), Hernandez (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), and Wilson (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT).

[2] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at pg. 24, ¶ 19; *see also* Plaintiff Hernandez at p. 56, ¶ 19; Plaintiff Wilson at p. 76, ¶ 21(B).

1   Fannie/Freddie Security Instruments provided, "Extension of the time for payment *or modification* of

2   amortization of the sums secured by this Security Instrument … shall not operate to release the liability

3   of Borrower…"[3] (emphasis added).

4        187.   Similarly, under the FHA Security Instruments, the Bank agreed it was not able to

5   require full payment and its rights were otherwise limited "by regulations issued by the Secretary in the

6   case of payment defaults…"[4] The Bank also agreed that, "In many circumstances regulations issued by

7   the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment

8   in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure

9   if not permitted by regulations of the Secretary."[5]

10       188.   Consistent with the Security Instruments, once a borrower missed a mortgage payment,

11  Wells Fargo sent correspondence advising of the amount owed and invited borrowers to call Wells

12  Fargo's "trained professionals" who are "available to assist you in bringing your loan current … [and]

13  will work with you to determine the best option available to you." These letters show Wells Fargo's

14  understanding that there is more than one way to bring a loan current under the Security Instruments.

15       189.   One of the ways a loan could be brought current was a loan modification. In a recent

16  Rule 30(b)(6) deposition, Wells Fargo's corporate representative testified that a mortgage modification

17  could cure a default and bring a loan current.

18       190.   This testimony is consistent with other correspondence Wells Fargo sent in response to a

19  request for mortgage assistance. In one letter, Wells Fargo told Plaintiff Troy Frye it was "considering a

20  program that may assist you in bringing your loan current … This program, known as a loan

21  modification, would provide you with the opportunity for a fresh start by adjusting the current terms of

22  your loan."

23       191.   In a different letter, Wells Fargo advised Plaintiffs and class members that a loan

24  modification is "an agreement that changes the terms of your existing mortgage. It brings your account

25

26  [3] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at p. 23, ¶ 12; *see also* Plaintiff Hernandez at p. 52, ¶ 12.

27  [4] *See, e.g.*, Plaintiff DeMartino FHA Security Instrument (Dkt. 60-3) at p. 6, ¶ 9(a); *see also* Plaintiff Hood FHA Security Instrument (Doc. 60-3) at p. 33, ¶ 9(a).

28  [5] *See id.* at ¶ 9(d).

SECOND AMENDED COMPLAINT
                                                             Case No. 3:18-cv-07354-WHA

up-to-date and may result in a lower monthly payment."

192.    Once borrowers, such as Plaintiffs, requested mortgage assistance from Wells Fargo, the Bank would tell borrowers: "We'll continue to work with you to help avoid a foreclosure sale. If your loan has not previously been referred to foreclosure and you have submitted all of the required documentation needed to evaluate for an alternative, this loan will not be referred to foreclosure while the application is evaluated. If your loan has been referred to foreclosure, we will not conduct a foreclosure sale on this loan while your documents are being reviewed and if allowed by state law and/or investor guidelines." This message from Wells Fargo shows its understanding that a modification would bring an account current, and allow the borrower to avoid foreclosure.

193.    The Bank breached its contractual obligations to Plaintiffs and class members by failing to give Plaintiffs and class members adequate notice prior to accelerating their loan payments, commencing the foreclosure process, and, in many instances, foreclosing on Plaintiffs' and class members' homes.

194.    In particular, the Bank did not notify Plaintiffs and class members that they could cure their default and avoid acceleration and foreclosure by accepting a mortgage modification.  Plaintiffs and class members qualified for a government-mandated mortgage modification, and the Bank was required to offer them a mortgage modification but failed to do so. While HAMP and other types of government-mandated mortgage modifications might have come into effect after Plaintiffs and class members signed their Security Instruments, a reasonable interpretation of these contracts required Wells Fargo to inform Plaintiffs of actions available to cure their default *at the time of the default* – not just any action available at the time the parties executed the contract. And at the time of Plaintiffs' defaults, a mortgage modification was an option that should have been available to them.

195.    Plaintiffs Hood and DeMartinos' FHA Security Instruments specifically contemplated HUD Secretary regulations placing a limitation on Wells Fargo's right to foreclose in the event of a default. These contracts stated, "In many circumstances regulations issued by the [HUD] Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid.  This Security Instrument does not authorize acceleration or foreclosure if not

permitted by regulations of the Secretary."[6] Indeed, as a part of the financial crisis, the HUD Secretary stated in a report to Congress that "During this time of elevated financial stress on households, FHA maintained a robust set of policies…to provide assistance in *curing* mortgage delinquencies." Those tools included, among other things, loan modifications.[7] The FHA (Federal Housing Administration) is a part of HUD. And HUD was one of the administering offices for HAMP; thus HUD was responsible for issuing regulations on borrower eligibility for a modification under the program.

196.   As a result of the Bank's breach, Plaintiffs and class members suffered damages in an amount subject to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families and belongings; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments.

**SECOND CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**Brought on Behalf of the Nationwide Class**

197.   Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague, John and Yvonne DeMartino, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of themselves and the State Subclasses.

198.   Wells Fargo engaged in extreme and outrageous conduct as alleged herein.  Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its customers' homes and wellbeing depended.  It allowed systemic errors to persist for five to eight years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices; failed to

---

[6] *See id.* at ¶ 9(d).

[7] *See* U.S. Department of Housing and Urban Development November 15, 2011 Annual Report to Congress Fiscal Year 2011 Financial Status FHA Mutual Mortgage Insurance Fund at p. 23-24, available at https://www.hud.gov/sites/documents/FHAMMIFANNRPTFY2011.PDF (last accessed July 10, 2019).

1 reform its verification and auditing practices even after the government found a software error had led
2 the Bank to wrongfully deny mortgage modifications; concealed its discovery of an additional software
3 error from regulators and customers; and failed to identify other related errors for an additional three
4 years.

5     199.    The same extreme and outrageous conduct that caused a series of scandals and consumer
6 abuses within Wells Fargo—leading the government to impose billions of dollars in fines and to forbid
7 Wells Fargo from growing until reforms were implemented—was also responsible for Plaintiffs and
8 class members losing their homes here.  Wells Fargo's Board and executive leadership abandoned their
9 oversight responsibilities to a shocking degree, repeatedly ignoring compliance failures, government
10 fines, and consent decrees requiring leadership to implement appropriate auditing and compliance
11 procedures.

12     200.    With regard to the Bank's mortgage modification and foreclosure processes in
13 particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank
14 conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP or
15 other government requirements.  Wells Fargo's leadership ignored its oversight responsibilities even
16 after the government found it had not adequately overseen the Bank's mortgage modification and
17 foreclosure operations, even after it agreed to implement proper oversight as part of two 2011 consent
18 orders, and even after the government found in 2015 that Wells Fargo had continuously failed to
19 comply with the consent.  Leadership so flagrantly and repeatedly disregarded its oversight
20 responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it
21 will be prohibited from growing unless and until it reforms its oversight and governance.

22     201.    Wells Fargo acted with reckless disregard for the probability that its conduct would
23 cause emotional distress to customers, including Plaintiffs and class members, who were wrongfully
24 denied mortgage modifications and foreclosed upon.

25     202.    As a result of Wells Fargo's conduct, Plaintiffs and class members have suffered severe
26 emotional distress, as alleged herein, which has contributed to diagnoses of anxiety and depression,
27 extended psychological therapy, hospitalizations, high blood pressure, various health problems, marital
28 struggles, social withdrawal, childhood trauma, suicidal ideation, stress disorders, and a number of

other physical, psychological, and social afflictions.

203.    Plaintiffs and class members seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiffs and class members.

### THIRD CAUSE OF ACTION
### Wrongful Foreclosure Brought on Behalf of the California and Georgia Foreclosure Subclasses

204.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

### California Foreclosure Subclass

205.    Plaintiffs Debora Granja and Keith Lindner bring this claim on behalf of themselves and the California Foreclosure Subclass.

206.    Wells Fargo wrongfully foreclosed on Plaintiffs' and the California Foreclosure Subclass's real property pursuant to a power of sale in their Security Instruments.  The foreclosure was unlawful and/or unfair because Wells Fargo did not first notify Plaintiffs and the California Foreclosure Subclass that they could cure their default by accepting a mortgage modification.  Plaintiffs and class members qualified for the mortgage modification and Wells Fargo was required by the Security Agreements to notify Plaintiffs and class members of actions they could take to cure their default before exercising its power of sale.

207.    Plaintiffs and class members were excused from tendering the amount of their secured indebtedness, and no breach of condition or failure of performance existed on the part of Plaintiffs and class members that would have authorized the foreclosure, because Wells Fargo was required to offer Plaintiffs and class members a mortgage modification before it could accelerate their secured indebtedness and initiate foreclosure proceedings.

208.    Plaintiffs and class members were harmed by the wrongful foreclosure and suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit; and emotional distress.

209.    Plaintiffs and the California Foreclosure Subclass seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiffs and class members.

**Georgia Foreclosure Subclass**

210.    Plaintiff Troy Frye brings this claim on behalf of himself and the Georgia subclass

211.    Wells Fargo owed Plaintiff Frye and the Georgia Foreclosure Subclass a duty to exercise the power of sale afforded it by Plaintiff's and class members' Security Instruments in conformance with the terms of the Security Instruments and in good faith.

212.    Wells Fargo breached its duty by foreclosing on Plaintiff's and class members' homes without first giving Plaintiff and class members notice that the could cure their default by accepting a mortgage modification.  Wells Fargo was required to do so under the terms of the Security Instruments. Alternatively, foreclosing on Plaintiff's and class members' homes without first offering them a mortgage modification to which they were entitled constitutes bad faith and unfair execution of the Wells Fargo's power of sale.

213.    As a result of Wells Fargo's conduct, Plaintiff Frye and the Georgia Foreclosure Subclass lost their homes to foreclosure and suffered other damages to be proven at trial, including loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit; and emotional distress.

214.    Plaintiff and the Georgia Foreclosure Subclass seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiffs and class members.

**FOURTH CAUSE OF ACTION**
**Violation of California's Homeowners Bill of Rights**
**Brought on Behalf of the California Subclass**

215.    Plaintiffs Debora Granja and Keith Lindner incorporate all preceding paragraphs as if

1   fully set forth herein.  They bring this claim on behalf of themselves and the California Foreclosure

2   Subclass.

3        216.    Under California's Homeowners Bill of Rights, Wells Fargo had an obligation to ensure

4   that competent and reliable evidence, including the borrower's loan status and information, supported

5   its right to foreclose before it filed a notice of default or notice or sale in connection with the

6   foreclosure of Plaintiffs' and class members' real property.  Cal. Civ. Code § 2924.17.

7        217.    Wells Fargo materially and recklessly violated its obligation because Plaintiffs' and

8   class members' loan information did not support Wells Fargo's right to foreclose.  Plaintiffs' and class

9   members' loan information showed that they qualified for a mortgage modification.  Wells Fargo was

10  therefore required to offer Plaintiffs and class members the opportunity to cure their default by

11  accepting a mortgage modification before it could exercise its right to foreclose under Plaintiffs' and

12  class members' Security Instruments.

13       218.    The automated software that Wells Fargo used to wrongly determine that Plaintiffs and

14  class members did not qualify for a mortgage modification was not reliable and Wells Fargo was

15  reckless in using the software and relying upon it to support its right to foreclose.  The software's

16  results had not been properly verified or audited, and as a result, multiple material errors remained

17  uncorrected in the software for five to eight years.  Wells Fargo willfully and recklessly continued to

18  rely on its software even after the government cited it for failing to adequately audit its mortgage

19  modification and foreclosure procedures; even after the government found a software error had led the

20  Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered

21  another software error that caused it to wrongly deny modifications in 2015.

22       219.    As a result of Wells Fargo's violation of the Homeowners Bill of Rights, Plaintiffs

23  Granja and the California Foreclosure Subclass suffered damages according to proof, including loss of

24  their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes'

25  value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time

26  and money put into their homes; loss of time and money to find new housing and move their families;

27  loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs

28  due to damaged credit.

220.     Pursuant to California Civil Code section 2924.19(b), Plaintiffs Granja and each member of the California Foreclosure Subclass seek an award of treble actual damages or statutory damages of $50,000, whichever is greater.

**FIFTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law**
**Brought on Behalf of the Nationwide Class**

221.     Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague, John and Yvonne DeMartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the Nationwide Class.

222.     In the alternative, should the Court decide that out-of-state plaintiffs may not maintain this claim against Wells Fargo, Plaintiffs Debora Granja and Keith Lindner bring this claim on behalf of themselves and the California Subclass.

223.     Wells Fargo has violated and continues to violate California's Unfair Competition Law (UCL), which prohibits unlawful, unfair, or fraudulent practices.

224.     Wells Fargo engaged in unlawful practices by denying mortgage modifications to Plaintiffs and class members in violation of HAMP and other governmental requirements.

225.     Wells Fargo engaged in unfair practices by failing to properly verify or audit the automated software it used to determine whether Plaintiffs and class members were eligible for a mortgage modification.  Wells Fargo's faulty verification and auditing practices allowed multiple systemic errors to remain uncorrected for five to eight years and persisted even after the government cited Wells Fargo for failing to adequately audit its mortgage modification and foreclosure processes; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

226.     Wells Fargo's Board and executive leadership further engaged in unfair practices by failing to properly oversee the Bank's compliance with HAMP and other governmental requirements. Wells Fargo's lack of central oversight has led to series of consumer abuses and billions of dollars in

government fines.  Yet despite repeatedly promising to reform its oversight practices, Wells Fargo's Board and executive leadership repeatedly failed to implement or maintain procedures to ensure the Bank was complying with HAMP or other applicable government requirements.

227.    Both Wells Fargo's verification and auditing practices and its oversight practices are unethical, unscrupulous, or substantially injurious to consumers; any legitimate utility of the practices are outweighed by the harm to consumers; and the practices run afoul of the public policies underlying HAMP and California Homeowners Bill or Rights, which seek to help homeowners avoid foreclosure and promote fair mortgage lending and servicing practices.

228.    As a result of Wells Fargo's violations of the UCL, Plaintiffs have suffered injury in fact and lost money and property, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit.

229.    Pursuant to California Business and Professions Code section 17203, Plaintiffs and class members seek such orders or judgments as may be necessary to prevent the Wells Fargo's future use of its unfair and unlawful practices, and to restore to Plaintiffs and class members any money or property that may have been acquired by means of Wells Fargo's unfair competition.

## SIXTH CAUSE OF ACTION
### Violation of State Consumer Protection Laws
### Brought on Behalf of Five State Subclasses

230.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.  In the alternative or in addition to the preceding claim for violation of the UCL, Plaintiffs and class members seek recovery under the following state consumer protection statutes as detailed below.

### Illinois Subclass

231.    Plaintiff Coszetta Teague brings this claim on behalf of herself and the Illinois Subclass.

232.    Wells Fargo's conduct as alleged herein violates the Illinois Consumer Fraud Act (ICFA), 815 ILCS 505/2, which prohibits unfair acts or practices in the conduct of any trade or

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1    commerce.

2    233.    Wells Fargo engaged in unfair practices by denying mortgage modifications to Plaintiffs

3    and class members in violation of HAMP and other governmental requirements; by failing to properly

4    verify or audit the automated software it used to determine whether Plaintiffs and class members were

5    eligible for a mortgage modification; and by failing to implement or maintain procedures to ensure the

6    Bank was complying with HAMP or other government requirements.

7    234.    As a result of Wells Fargo's violation of the ICFA, Plaintiff Teague and the Illinois

8    Subclass suffered damages according to proof, including loss of their homes; loss of equity in their

9    homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of

10   time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes;

11   loss of time and money to find new housing and move their families; loss of favorable interest rates or

12   other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher

13   mortgage payments.

14   235.    Pursuant to 815 ILCS 505/10a, Plaintiff and the Illinois Subclass seek recovery of their

15   actual economic damages, punitive damages, injunctive relief, and attorneys' fees and costs.

16                                   **Maryland Subclass**

17   236.    Plaintiffs John and Yvonne DeMartino bring this claim on behalf of themselves and the

18   Maryland Subclass.

19   237.    Wells Fargo's conduct as alleged herein violates the Maryland Consumer Protection Act

20   (MCPA), Md. Code Ann., Com. Law. §13-303, which prohibits unfair, abusive or deceptive practices.

21   238.    Wells Fargo engaged in unfair practices by denying mortgage modifications to Plaintiffs

22   and class members in violation of HAMP and other governmental requirements; by failing to properly

23   verify or audit the automated software it used to determine whether Plaintiffs and class members were

24   eligible for a mortgage modification; and by failing to implement or maintain procedures to ensure the

25   Bank was complying with HAMP or other applicable government requirements.

26   239.    Wells Fargo also violated both the MCPA and the Maryland Consumer Debt Collection

27   Act (MDCA), Md. Code Ann. Com. Law § 14-202(8), by attempting to enforce a right to foreclose on

28   Plaintiffs and class member's property with reckless disregard as to the falsity of the existence of the

1    right.

2    240.    The automated software that Wells Fargo used to wrongly determine that Plaintiffs and

3    class members did not qualify for a mortgage modification was not reliable and Wells Fargo was

4    reckless in using the software and relying upon it to support its right to foreclose.  The software's

5    results had not been properly verified or audited, and as a result, multiple material errors remained

6    uncorrected in the software for five to eight years.  Wells Fargo willfully and recklessly continued to

7    rely on its software even after the government cited it for failing to adequately audit its mortgage

8    modification and foreclosure procedures; even after the government found a software error had led the

9    Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered

10   another software error that caused it to wrongly deny modifications in 2015.

11   241.    As a result of Wells Fargo's violations of the MCPA and MDCA, Plaintiffs and the

12   Maryland Subclass suffered damages according to proof, including loss of their homes; loss of equity in

13   their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss

14   of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes;

15   loss of time and money to find new housing and move their families; loss of favorable interest rates or

16   other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher

17   mortgage payments; and emotional distress.

18   242.     Pursuant to Maryland Code Annotated, Commercial Law sections 13-408 and 14-203,

19   Plaintiffs and the Maryland Subclass seek to recover damages, including damages for emotional

20   distress and mental anguish, and an award of attorneys' fees and costs.

21                                      **New Jersey Subclass**

22   243.    Plaintiff Alicia Hernandez brings this claim on behalf of herself and the New Jersey

23   Subclass.

24   244.    Wells Fargo's conduct as alleged herein violates the New Jersey Consumer Fraud Act

25   (NJCFA), N.J.S.A. 56:8-2, which prohibits the use of any misrepresentation or deception in connection

26   with the extension of credit or subsequent servicing of that credit.

27   245.    Wells Fargo represented to Plaintiff and class members that they did not qualify for a

28   mortgage modification.  That representation was false and caused Plaintiff and class members

1  ascertainable loss, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss

2  of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to

3  avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new

4  housing and move their families; loss of favorable interest rates or other favorable loan terms; damage

5  to credit; and opportunity costs due to damaged credit or higher mortgage payments.

6        246.    Had Wells Fargo presented accurate information to Plaintiff and class members, they

7  would have opted for the mortgage modification for which the qualified.  If Wells Fargo still refused to

8  provide Plaintiff and class members with a mortgage modification, they could and would have used the

9  knowledge that they qualified for a mortgage modification to fight foreclosure.

10       247.    Pursuant to N.J.S.A 56:8-19, Plaintiff and the New Jersey Subclass request seek an

11  award of treble damages, injunctive relief, and attorneys' fees and costs.

12                                        **New York Subclass**

13       248.    Plaintiff Rose Wilson brings this claim on behalf of herself and the New York Subclass

14       249.    Wells Fargo's conduct as alleged herein violates Section 349(a) of New York's General

15  Business Law (GBL), which prohibits deceptive acts or practices.

16       250.    Wells Fargo's acts and practices were consumer-oriented, as they affected not only

17  Plaintiff but similarly-situated consumers as well, and they had the potential to affect even more

18  consumers.  The automated software that used to determine Plaintiff's and other consumers' eligibility

19  for mortgage modifications was systematically flawed and generated inaccurate calculations.

20       251.    The automated software's calculations had not been properly verified or audited, and as

21  a result, multiple material errors remained uncorrected in the software for five to eight years.  Wells

22  Fargo willfully and recklessly continued to rely on its software even after the government cited it for

23  failing to adequately audit its mortgage modification and foreclosure procedures; even after the

24  government found a software error had led the Bank to wrongfully deny mortgage modifications in

25  2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly

26  deny modifications in 2015.

27       252.    Wells Fargo's practice of using systematically-flawed software was deceptive or

28  misleading in a material respect, as it led Plaintiff and class members to believe that they did not

1   qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

2       253.    Had Wells Fargo presented accurate information to Plaintiff and class members, they

3   would have opted for the mortgage modification for which the qualified.  If Wells Fargo still refused to

4   provide Plaintiff and class members with a mortgage modification, they could and would have used the

5   knowledge that they qualified for a mortgage modification to fight foreclosure.

6       254.    As a result of Wells Fargo's violation of the GBL, Plaintiff and class members suffered

7   damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of

8   appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to

9   avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new

10  housing and move their families; loss of favorable interest rates or other favorable loan terms; damage

11  to credit; and opportunity costs due to damaged credit or higher mortgage payments.

12      255.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the New York Subclass seek an

13  award of damages, injunctive relief, and attorneys' fees.

14                              **Pennsylvania Subclass**

15      256.    Plaintiffs Cyndi and George Floyd bring this claim on behalf of themselves and the

16  Pennsylvania Subclass.

17      257.    Wells Fargo's conduct as alleged herein constitutes a violation of the Pennsylvania

18  Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Stat. Ann. § 201-3, which

19  prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.

20      258.    Wells Fargo's practice of using systematically-flawed software to calculate Plaintiffs'

21  and class members' eligibility for mortgage loan modifications was unfair and deceptive, as it led

22  Plaintiffs and class members to believe that they did not qualify for a mortgage modification and

23  caused them to be wrongly denied a mortgage modification.

24      259.    The automated software's calculations had not been properly verified or audited, and as

25  a result, multiple material errors remained uncorrected in the software for five to eight years.  Wells

26  Fargo willfully and recklessly continued to rely on its software even after the government cited it for

27  failing to adequately audit its mortgage modification and foreclosure procedures; even after the

28  government found a software error had led the Bank to wrongfully deny mortgage modifications in

1 | 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly

2 | deny modifications in 2015.

3 |    260. Plaintiffs and class members justifiably relied on Wells Fargo's determination that they

4 | did not qualify for a mortgage modification.  Had Wells Fargo presented accurate information to

5 | Plaintiffs and class members, they would have opted for the mortgage modification for which the

6 | qualified.  If Wells Fargo still refused to provide Plaintiffs and class members with a mortgage

7 | modification, they could and would have used the knowledge that they qualified for a mortgage

8 | modification to fight foreclosure.

9 |    261. As a result of Wells Fargo's violation of the UTPCPL, Plaintiffs and class members

10 | suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss

11 | of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to

12 | avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new

13 | housing and move their families; loss of favorable interest rates or other favorable loan terms; damage

14 | to credit; and opportunity costs due to damaged credit or higher mortgage payments.

15 |    262. Pursuant to 73 Pa. Stat. Ann. § 201-9.2, Plaintiffs and the Pennsylvania Subclass seek an

16 | award of treble damages, equitable relief, and attorneys' fees and costs.

### PRAYER FOR RELIEF

   WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, request the following relief:

  a. A determination that this action may be maintained as a class action;

  b. An award of all damages and restitution to be paid according to proof, including statutory damages, treble damages, and punitive damages where appropriate;

  c. Appropriate injunctive and equitable relief, including an order enjoining Wells Fargo from continuing its unlawful practices;

  d. Pre-judgment interest and post-judgment interest, as provided by law;

  e. Attorneys' fees and costs of suit, including expert fees and costs;

  f. Any and all other legal and equitable relief that the Court may find appropriate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury for all issues so triable.

Dated: August 26, 2019                                    */s/ Michael L. Schrag*

**GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda Lam (SBN 301461)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:  510-350-9700
Facsimile:  510-350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: 816-984-8100
Facsimile:  816-984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

SECOND AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA