Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile:  (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs*
*and the Proposed Classes*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Alicia Hernandez et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Wells Fargo & Company and Wells Fargo Bank, N.A.,<br><br>Defendants. | Case No. 3:18-cv-07354-WHA<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:   October 17, 2019<br>Time:  8 a.m.<br>Dept:  Courtroom 12<br>Judge: Hon. William H. Alsup |

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Am. Airlines v. Wolens*,
  513 U.S. 219 (1995)................................................................................................................20

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................................16

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)................................................................................................................11

*Backus v. Gen. Mills, Inc.*,
  122 F. Supp. 3d 909 (N.D. Cal. 2015) ....................................................................................21

*Boundas v. Abercrombie & Fitch Stores, Inc.*,
  280 F.R.D. 408 (N.D. Ill. 2012) .............................................................................................12

*Boyko v. Am. Int'l Grp. Inc.*,
  2012 WL 1495372 (D.N.J. Apr. 26, 2012) .............................................................................12

*Brice Yingling v. eBay, Inc.*,
  2010 WL 11575128 (N.D. Cal. July 16, 2010)........................................................................22

*Bridge v. Phoenix Bond & Indemnity Co.*,
  553 U.S. 639 (2008)................................................................................................................10

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) ..................................................................................................25

*Cervantez v. J.C. Penney Co.*,
  595 P.2d 975 (Cal. 1979) ........................................................................................................23

*Clark v. Arras*,
  443 S.E.2d 277 (Ga. Ct. App. 1994).......................................................................................23

*Clarkson v. Coughlin*,
  145 F.R.D. 339 (S.D.N.Y. 1993) ............................................................................................11

*Cypress v. Newport News General and Nonsectarian Hospital Ass'n*,
  375 F.2d 648 (4th Cir. 1967) ..................................................................................................11

*Deposit Guaranty Nat. Bank v. Roper*,
  445 U.S. 326 (1980)................................................................................................................10

*Dupler v. Costco Wholesale Corp.*,
  249 F.R.D. 29 (E.D.N.Y. 2008) ..............................................................................................17

*Egge v. Healthspan Servs. Co.*,
  208 F.R.D. 265 (D. Minn. 2002).............................................................................................17

*Ehret v. Uber Techs., Inc.*,
  148 F. Supp. 3d 884 (N.D. Cal. 2015) ....................................................................................11

*Feller v. Transamerica Life Ins. Co.*,
  2017 WL 6496803 (C.D. Cal. Dec. 11, 2017) ........................................................................18

*Flanagan v. Allstate Ins. Co.*,
  242 F.R.D. 421 (N.D. Ill. 2007)..............................................................................................17

*Galvan v. KDI Distribution, Inc.*,
  2011 WL 5116585 (C.D. Cal. Oct. 25, 2011)..........................................................................17

*Gaudin v. Saxon Mortg. Servs.*,
  2013 WL 4029043 (N.D. Cal. Aug.5, 2013) ...........................................................13, 18, 20, 21

*Gen. Tel. Co. of Sw. v. Falcon*,

457 U.S. 147 (1982) ............................................................................................... 10

*Grace v. Apple, Inc.*,
2018 WL 4468825 (N.D. Cal. Sept. 18, 2018) ..................................................... 22

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981) ................................................................................................. 10

*Haggart v. U.S.*,
104 Fed. Cl. 484 (2012) ......................................................................................... 11

HAMP.,
2013 WL 4759649 (D. Mass. Sept. 4, 2013) ................................................ 19, 20

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................................... 17

*In re Allstate Ins. Co.*,
400 F.3d 505 (7th Cir. 2005) ................................................................................. 22

*In re Cablevision Consumer Litig.*,
2014 WL 1330546 (E.D.N.Y. Mar. 31) ................................................................. 17

*In re Conseco Life Ins*,
270 F.R.D. 521 (N.D. Cal. 2010) ............................................................... 12, 18, 19

*In re Live Concert Antitrust Litig.*,
247 F.R.D. 98 (C.D. Cal. 2007) ............................................................................. 16

*In re Med. Capital Secs. Litig.*,
2011 WL 5067208 (C.D. Cal. July 26, 2011) ....................................................... 19

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ........................................................................................... 21

*In re Wells Fargo Home Loan Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) ................................................................................. 16

*In Re Yahoo Mail Litig.*,
308 F.R.D. 577 (N.D. Cal. 2015) ............................................................... 11, 15

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ............................................................................... 25

*Kamakahi v. Am. Soc'y for Reprod.*,
*Med.*, 305 F.R.D. 164 (N.D. Cal. 2015) ................................................................. 23

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ............................................................................. 18

*Krueger v. Wyeth, Inc.*,
310 F.R.D. 468 (S.D. Cal. 2015) ........................................................................... 21

*Leszczynski v. Allianz Ins.*,
176 F.R.D. 659 (S.D. Fla. 1997) ........................................................................... 18

*Lozano v. AT & T Wireless Servs., Inc.*,
504 F.3d 718 (9th Cir. 2007) .......................................................................... 21, 24

*Manning v. Princeton Consumer Discount Co., Inc.*,
390 F. Supp. 320 (E.D. Pa. 1975) ......................................................................... 11

*Mazza v. American Honda Motor Co., Inc.*,
666 F.3d 581 ................................................................................................... 12, 17

*McGrath v. Fahey*,
533 N.E. 2d 806 (Ill. 1988) ............................................................................. 23, 24

*McKeage v. TMBC, LLC*,
847 F.3d 992 (8th Cir. 2017) ................................................................................. 17

*McKell v. Wash. Mut., Inc.*,
142 Cal. App. 4th 1457 (2006) .............................................................................. 21

*McLaughlin v. American Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008)...............................................................................................10
*Mejdrech v. Met-Coil Sys. Corp.*,
   319 F.3d 910 (7th Cir. 2003) ..............................................................................................10
*Oasis W. Realty, LLC v. Goldman*,
   51 Cal.4th 811, 250 P.3d 1115 (2011) ...............................................................................12
*Rahman v. Mott's LLP*,
   693 F. App'x 578 (9th Cir. 2017) .......................................................................................10
*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ............................................................................................15
*Ryan-Beedy v. Bank of New York Mellon*,
   293 F. Supp. 3d 1101 (E.D. Cal. 2018)..........................................................................14, 21
*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
   601 F.3d 1159 (11th Cir. 2010) ..........................................................................................17
*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) ..............................................................................................10
*Simpson v. Fireman's Fund Ins. Co.*,
   231 F.R.D. 391 (N.D. Cal.2005)..........................................................................................24
*Skold v Intel Corp.*,
   2012 WL 1375929 (Cal. Super. Ct. Apr. 19, 2012).............................................................22
*Staton v. Boeing*,
   327 F.3d 938 (9th Cir. 2003) ..............................................................................................14
*Steinberg v. Nationwide Mut. Ins. Co.*,
   224 F.R.D. 67 (E.D.N.Y. 2004) ..........................................................................................17
*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S.Ct. 1036 (2016)..........................................................................................................16
*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) .........................................................................................10, 23
*Valenzuela v. Union Pac. R.R. Co.*,
   2017 WL 1398593 (D. Ariz. Apr. 19, 2017) ......................................................................23
*Vaquero v. Ashley Furniture Indus., Inc.*,
   824 F.3d 1150 (9th Cir. 2016).............................................................................................24
*Vedachalam v. Tata Consultancy Servs., Ltd.*,
   2012 WL 1110004 (N.D. Cal. Apr. 2, 2012) .................................................................18, 19
*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..............................................................................................................12
*Wang v. Chinese Daily News, Inc.*,
   737 F.3d 538 (9th Cir. 2013)...............................................................................................12
*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ............................................................................................15

## Statutes

12 U.S.C. § 5201 ........................................................................................................................4

## Rules

Federal Rule of Civil Procedure 23(a) .................................................................................10, 11
Rule 23 of the Federal Rules of Civil Procedure ........................................................1, 10, 11, 25
Rule 23(a)(1)...............................................................................................................................11

Rule 23(a)(2) .................................................................................................... 12
Rule 23(b)(3) ............................................................................................... passim
Rule 23(c)(4) ....................................................................................... 10, 23, 25
Rule 23(c)(4)(A) ............................................................................................. 10
Rule 23(g) ....................................................................................................... 25

## **Other Authorities**

2 W. Rubenstein, Newberg on Class Actions § 4:49, pp. 195–96 (5th ed. 2012) ................................. 16
Newberg on Class Actions § 4:54 (5th ed.) ......................................................... 24
Restatement (Second) of Contracts § 211(2) ........................................................ 18

## NOTICE OF MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on October, 17, 2019, at 8:00 a.m. or as soon thereafter as this matter may be heard, Plaintiffs Alicia Hernandez, Emma White, Troy Frye, Coszetta Teague, Russell and Brenda Simoneaux, John and Yvonne Demartino, Rose Wilson, Tiffanie Hood, Cyndi Floyd, and Diana Trevino will appear through counsel before the Honorable William H. Alsup in Courtroom 12, 19th Floor of the United States District Court for the Northern District of California, San Francisco Division, located at the Phillip Burton Federal Building, 450 Golden Gate Avenue, San Francisco, California 94102.

At that time, Plaintiffs will move the Court for an order certifying the class and sub-classes defined herein, to appoint the named plaintiffs as class representatives, and to appoint Michael L. Schrag of Gibbs Law Group LLP and Richard M. Paul III of Paul LLP as co-lead class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## MEMORANDUM IN SUPPORT

### INTRODUCTION

Last year, in the latest of a string of scandals, Wells Fargo admitted it wrongfully denied home loan modifications to approximately 870 borrowers, causing 545 of them to lose their homes to foreclosure and all of them all to incur undue fees and interest charges. After further inquiry, that number has grown to 946 borrowers. Wells Fargo sent a uniform letter to all 946 stating that they qualified for and were wrongfully denied a loan modification or repayment plan. Plaintiffs bring this class action to hold Wells Fargo accountable for taking away their piece of the American dream.

Wells Fargo was obligated to offer modifications to those who qualified based on a federally-mandated formula. It only had to execute the formula correctly, something the fourth largest U.S. bank with nearly two trillion dollars in assets should easily accomplish. But for Plaintiffs and class members, Wells Fargo made a colossal error: it ignored state-specific caps on foreclosure attorneys' fees and thus added more fees than allowed to the equation, which caused the formula to reject class members' loan modifications. Had Wells Fargo included the correct attorneys' fees, the formula would have granted the loan modification for all class members. Wells Fargo hid this error for years.

All class members entered into standardized contracts that required Wells Fargo to notify them that they qualified for a loan modification before it accelerated on their loans. Whether Wells Fargo breached this obligation can be resolved in a single trial—indeed it would be wasteful to force every borrower to re-litigate this issue over and over. Likewise, a single trial can resolve whether Wells Fargo's error constitutes an unfair business practice to five subclasses, given that Wells Fargo's conduct necessarily violates state law as to all or none. Moreover, Plaintiffs have retained a damages expert who can systematically calculate class members' home-related damages. Class members may have additional damages that they wish to prove, requiring individualized follow-on hearings. But even though a single class trial can't address all the harm Wells Fargo inflicted, having liability and perhaps a large portion of economic harm established would materially advance the litigation and preserve judicial and party resources.

In sum, Wells Fargo has admitted its error to Plaintiffs and class members, but denies any legal obligation to make things right. A single class trial, and streamlined individual hearings is the most efficient way for victims of this error to get justice, making class certification warranted.

**PROCEDURAL HISTORY**

On December 5, 2018, Plaintiff Alicia Hernandez filed this case on behalf of herself and all others similarly situated. *See generally* Complaint (ECF No.1). Because Wells Fargo was communicating with absent class members to try to settle their claims while they were unrepresented by counsel, Ms. Hernandez sought a show cause order to stop such communications. (ECF No. 17). The Court issued a show cause order (ECF No. 18), and after full briefing and a hearing, issued an order restricting Wells Fargo's ability to obtain a release of liability from unrepresented parties and requiring Wells Fargo to send corrective letters to all affected borrowers to advise them of their right to be represented by counsel in Wells Fargo's private "remediation" efforts. (ECF No. 28).

Wells Fargo then sought a venue transfer to the Southern District of Iowa, but withdrew that motion after Plaintiffs filed their first amended complaint. (ECF Nos. 25, 51).

On February 28, 2019, Ms. Hernandez, along with Emma White, Troy Frye, Coszetta Teague, Iesha Brown, Russell and Brenda Simoneaux, John and Yvonne Demartino, Rose Wilson, Keith Linder, Tiffanie Hood, Cyndi and George Floyd, and Diana Trevino, filed an amended complaint

against Wells Fargo bank and its parent company. (ECF No. 44). Both defendants moved to dismiss. (ECF Nos. 59, 73). The Court dismissed the parent company, but granted in part, and denied in part, Wells Fargo's motion. Specifically, the Court denied the motion to dismiss with respect to Plaintiffs' intentional infliction of emotional distress, UCL, and Homeowner's Bill of Rights claims. (ECF No. 87). The Court dismissed the breach of contract and negligence claims, while granting Plaintiffs permission to seek leave to amend. (*Id.* at p. 17).

Plaintiffs then moved for leave to amend their complaint. (ECF No. 123). Through discovery, including the production of more than 140,000 pages of documents and 18 depositions, including two important Rule 30(b)(6) depositions of corporate representatives, Plaintiffs developed further support for the dismissed breach of contract claim. The Court granted Plaintiffs' motion for leave to amend in part (ECF No. 136 at p. 7), and on August 26, Plaintiffs filed their second amended complaint, which re-asserted the contract claim. (ECF No. 137 at ¶¶ 180-196).

## SUMMARY OF EVIDENCE

### I.   Wells Fargo Ignores the Government's Warnings of Loan Servicing Deficiencies

Wells Fargo is one of the country's largest servicers of residential mortgages. Rule 30(b)(6) Deposition of Carmen Bell ("Bell Depo."), Exh. 1 to Declaration of Michael Schrag ("Schrag Decl.") at 248:24-249:5.[1] During the Great Recession, thousands of Wells Fargo's residential loans were delinquent and faced foreclosure. 2011 Consent Order, Depo. Exh. 420 (Exh. 2 to Schrag Decl.) at Article I(1). Many of these mortgages were insured by the U.S. government, which investigated Wells Fargo and found numerous unsound banking practices in its residential mortgage servicing. *See generally* 2011 Consent Order. Wells Fargo promised to enact adequate governance and controls to ensure it had "effective mortgage servicing, foreclosure, and loss mitigation activities." *Id.* at Article III(2). It did not. Instead, Wells Fargo's oversight failures and unsafe practices continued, leading to additional consent orders with the government in 2013 and 2015. Depo. Exh. 421 (Exh. 3 to Schrag

---

[1] In 2011, Wells Fargo serviced a portfolio of approximately 8,900,000 residential mortgages. 2011 Consent Order (Exh. 2 to Schrag Decl.) at Article I(1)). In 2018, Wells Fargo was the second largest retail mortgage lender (Wells Fargo Today, 1st Quarter 2019, available at https://www08.wellsfargomedia.com/assets/pdf/about/corporate/wells-fargo-today.pdf).

Decl.); Depo. Exh. 422 (Exh. 4 to Schrag Decl.).

But two years later, the U.S. Government found that Wells Fargo had not complied with the consent orders, as it failed to have "processes to ensure that the risk management, quality control, audit and compliance programs have the requisite authority and status within the organization so that appropriate reviews of the Bank's mortgage servicing, loss mitigation, and foreclosure activities and operations may occur and *deficiencies are identified and promptly remedied.*" Depo Ex. 422 at Article IV(vi) (emphasis added). In 2016, Wells Fargo was fined for incorrectly denying 184 loan modifications in 2013-2014 due to an "error in a proprietary loan decisioning software tool." Depo. Exh. 423 (Exh. 5 to Schrag Decl.) at Articles I(6) and I(7). When it promised the government to be extra vigilant in its loan modification decisions, Wells Fargo knew about the separate loan modification error at issue here, but did not fully fix the problem or inform borrowers about it until 2018.

## II.     Wells Fargo Develops Software to Determine Plaintiffs' Loan Modification Eligibility

Plaintiffs are current and former borrowers who had loans originated and/or serviced by Wells Fargo. Plaintiffs' mortgage loans were insured, guaranteed, or held by a federal government agency and are governed by standardized Security instruments provided by government-issued, form Federal Housing Administration (FHA) and/or Fannie Mae/Freddie Mac Security instruments.[2]

During the Great Recession, Plaintiffs, like millions of other homeowners, had trouble making ends meet. To "help homeowners retain their homes and prevent the destructive impact of foreclosures on families and communities," the federal government launched loss mitigation programs, including HAMP. Mortgagee Letter 2009-23 (Exh. 6 to Schrag Decl.); 12 U.S.C. § 5201, *et seq*. Wells Fargo participated in HAMP, and received billions in government funds. Service Participation Agreement (SPA) (Exh. 7 to Schrag Decl.) at section 4(F). In exchange, Wells Fargo was required to determine whether any delinquent borrowers were eligible for a loan modification under HAMP. Mortgage Letter 2009-35 (Exh. 8 to Schrag Decl.); *see generally* SPA; Deposition of Robert Ferguson ("Ferguson

---

[2] *See* ECF No. 60, Wells Fargo's Request for Judicial Notice, attaching copies of certain Plaintiffs' Security instruments as "exemplars" that were "substantially similar to the security instruments of the remaining named Plaintiffs." The exemplars included Security instruments for Plaintiffs DeMartino (FHA Maryland Deed of Trust), Floyd (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), Hood (FHA Ohio Open-End Mortgage), Hernandez (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), and Wilson (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT).

1    Depo.") (Exh. 9 to Schrag Decl.) at 53:17-24. The government developed a formula to determine

2    whether a borrower had the ability to bring their loan current through a loan modification, which would

3    cure the default and stop the home from being foreclosed. Ferguson Depo. at 27:23-28:1, 30:3-31:4,

4    46:20-47:9, 49:25-51:4, 52:11-53:9; Depo. Exh. 344 (Exh. 10 to Schrag Decl.); Depo. Exh. 345 (Exh.

5    11 to Schrag Decl.).

6          In 2010, Wells Fargo developed two proprietary software tools to evaluate loan modification

7    eligibility depending on the type of loan -- the Home Preservation Application ("HPA") and the SLoaD

8    tool. Bell Depo. at 60:4-61:9; Depo. Exh. 396 (Exh. 12 to Schrag Decl.) at 00071471; Depo. Exh. 411

9    (Exh. 13 to Schrag Decl.) at 00071155. Both software tools used the same net present value calculator

10   to determine eligibility for a loan modification. Bell Depo at 155:12-19. The purpose of its loan

11   modification programs was "to prevent foreclosures." Depo. Exh. 396 (Exh. 12 to Schrag Decl.) at

12   00071415.

13   **III.    Wells Fargo Miscalculates Attorney Fees and Causes Wrongful Loan Modification Denials**

14         The loan modification process is standardized, and all errors at issue here occurred in the same

15   phase of the process. Depo. Exh. 396 at 00071415-16; Bell Depo. at 61:10-62:8. During this phase,

16   Wells Fargo ran a formulaic calculation (the "Waterfall") to determine whether a modified loan

17   payment would allow the borrower to bring the loan current. Depo Exh. 396 at 00071418-00071420.

18   The Waterfall begins with capitalizing the loan to get the borrower current on his payments. *Id.* at

19   00071422. When the loan is capitalized, all unpaid amounts, including attorney's fees Wells Fargo

20   incurred processing the delinquent loan, were added to the loan balance and this sum was re-amortized.

21   *Id.* at 00071422-71423. HUD established the maximum allowable attorneys fee table (by state in which

22   the property was located) and provided banks with this table. Mortgagee Letter 2005-30 (available at

23   https://www.hud.gov/program_offices/administration/hudclips/sfhsuperseded/mltrs_full).

24         Wells Fargo failed to ensure it only attributed the allowable attorney's fees to borrowers as part

25   of the loan modification process. Wells Fargo was supposed to compare the actual attorney's fees billed

26   and paid and incurred but not yet paid with the maximum allowable amount from the state fee matrix.

27   Depo. Exh. 397 (Exh. 14 to Schrag Decl.) at 00010407-08; Depo. Exh. 398 (Exh. 15 to Schrag Decl.) at

28   00066808. If the fees were less than the state fee matrix amount, the actual attorney's fees were to be

used; but if the fees were more than the state fee matrix amount, the amount from the state fee matrix was to be used. Depo. Exh. 399 (Exh. 16 to Schrag Decl.) at 106022. But rather than comparing the two amounts, Wells Fargo erroneously programmed its matrix to *add* the state maximum to the fees that had been actually paid and incurred. *Id*.

## IV.   Wells Fargo Discovered the Error in 2013

Wells Fargo first discovered the attorney fee error in August 2013. Depo. Exh. 393 (Exh. 17 to Schrag Decl.) at 00000311. Senior leaders within Wells Fargo were briefed on the error and a recommendation was made to fix it. *Id.* Later in 2013, Wells Fargo initiated its internal "change control" process to research how the error occurred and how to fix it so the bank would "[p]rovide accurate analysis for a loan modification." Depo. Exh. 371 (Exh. 18 to Schrag Decl.).

Wells Fargo reviewed 7,000 loans to determine whether any customers were wrongfully denied a loan modification because of the error. Bell Depo. at 140:15-141:12; Depo. Exh. 401 (Exh. 19 to Schrag Decl.) at 00000476. Although this review was improperly limited in scope, Wells Fargo identified 50 loans where a loan modification had been wrongly denied. 1/9/14 E-mail from Christie Coffin (Exh. 20 to Schrag Decl.); 1/24/14 E-mail chain (Exh. 21 to Schrag Decl.).

Even though its testing showed that at least 50 borrowers were wrongfully denied a loan modification, Wells Fargo somehow concluded that no modifications were wrongfully denied and that there was no urgency to fix the error or inform borrowers about the problem. Meeting Minutes (Exh. 22 to Schrag Decl.) at 00000476; 5/30/14 E-mail Chain (Exh. 23 to Schrag Decl.) at 00002724. The enormity of this error and decision is perplexing and, in fact, since this scandal has broken, Wells Fargo has been unable to determine any basis for concluding that no customers were wrongly denied a loan modification. Bell Depo. at 95:10-18.

Wells Fargo then analyzed whether it needed to temporarily change its loan modification practices to ensure borrowers were not incorrectly denied loan modifications. Both the employee who found the error in August 2013 (and escalated the issue to senior leaders) and a Wells Fargo risk manager recommended a temporary fix while Wells Fargo worked on a permanent solution. 1/9/14 E-mail from Christie Coffin (Exh. 24 to Schrag Decl.). In fact, Wells Fargo's risk consultant warned that Wells Fargo knew there was a risk of ongoing harm to customers, *i.e.*, wrongful denials of loan

1   modifications. *Id.* Yet, Wells Fargo decided to ignored this advice and did not execute the temporary

2   fix.

3          A year later, in July 2014, Wells Fargo determined that its calculation of attorneys' fees to

4   determine loan modification eligibility was so defective that it decided to call a 5-day summit with its

5   employees to discuss the issue. July 2014 E-mail Chain (Exh. 25 to Schrag Decl.). At this summit, from

6   July 26-August 2014, Wells Fargo had clear knowledge of its errors regarding the way it added

7   attorney's fees to its loan modification decisioning process and again acknowledged that it could be

8   incorrectly denying loan modifications to customers. Depo. Exh. 405 (Exh. 26 to Schrag Decl.) at

9   00001325-00001326 (noting problems in the software, "…may allow Wells Fargo **to incorrectly pass**

10   **Fee amounts onto customers** that should not be included….These same gaps … may lead to **incorrect**

11   **mod program participation decisions by HPU**.") Despite again noting that it could be denying an

12   "unknown" number of loan modifications because of "overstated fees," Wells Fargo still did nothing to

13   fix the problem. WF_HERNANDEZ_00001339 (Exh. 27 to Schrag Decl.).

14          In October 2014, a new project manager was brought in to "kick-off" a proposed solution. Depo

15   Ex. 362 (Exh. 28 to Schrag Decl.); Depo Ex. 363 (Exh. 29 to Schrag Decl.). The proposed solution,

16   though, required funding of $61,950, and Wells Fargo refused to fund it. Deposition of Diane Young

17   ("Young Depo.") (Exh. 30 to Schrag Decl.) at 67:15-69:5, 91:24-92:4; Depo Ex. 369 (Exh. 31 to

18   Schrag Decl.); Depo. Exh. 376 (Exh. 32 to Schrag Decl.). The funding request specifically noted it

19   would impact more than 250,000 loans and that the consequences of not implementing the change was

20   that "[i]naccurate fees will continue to be quoted…." Depo Exh. 376 (Exh. 32 to Schrag Decl.). Even

21   though the amount requested was relatively small compared to funding sought for other projects, the

22   request for funding was denied because "Strategic priorities changed." Young Depo. at 118:4-21; Depo

23   Exh. 374 (Exh. 33 to Schrag Decl.); WF_HERNANDEZ_00001713 (Exh. 34 to Schrag Decl.) at 1715.

24   Even assuming only 250,000 loans were potentially impacted, the cost per loan to implement the

25   project would have been less than a quarter. *See generally id.*

26          After the funding request was denied, Susan Crawford, Operational Risk Consultant, advised on

27   May 4, 2015 that continuing to use the fee matrix was "risky," so she asked whether they should "[t]ry

28   for a different fix or accept the risk and close this issue?" WF_HERNANDEZ_00001713 (Exh. 34 to

Schrag Decl.). Wells Fargo chose the latter. WF_HERNANDEZ_00107881 (Exh. 35 to Schrag Decl.) at 00107884. But Ms. Crawford continued to voice her concerns, stating that the business is "not looking at why they thought there might be a problem or why there was no harm (was it just luck?). Depo Exh. 406 (Exh. 36 to Schrag Decl.). She suggested a small change that she said was "very small…to prevent a much larger risk." *Id*.

The fee matrix was removed from the HPA tool in October 2015 but this fix did not ensure that fees did not exceed the maximum allowable amount. Bell Depo. at 43:21-46:9, 193:15-25. As a result, errors in adding excessive attorney fees for loans decisioned with the SLoaD tool continued. Bell Depo at 43:21-46:9. Borrowers thus continued to lose their homes to foreclosure.

Even if Wells Fargo's astonishingly incorrect conclusion that there was no borrower harm in 2013 was not intentional, it certainly knew there was potential for wrongful denials because of the excessive attorney fees issue. Bell Depo. at 179:8-17. Yet, Wells Fargo failed to even test the "fix" to ensure it was effective so that borrowers were not denied a loan modification improperly. Moreover, Wells Fargo did not even contemplate disclosing the error in 2014 or 2015. Bell Depo. at 243:20-23.

## V.    As Predicted, the Error Surfaced Again in 2018

Just as Ms. Crawford predicted in 2015, while Wells Fargo was reviewing yet another error, it discovered loans that were potentially denied a loan modification because of how attorney fees were calculated. Depo Exh. 409 (Exh. 37 to Schrag Decl.) at 00011932. As a result, in March 2018, Wells Fargo again started the process of determining how the error occurred, how many borrowers were wrongfully denied a loan modification, and how they could fix the problem. Depo Exh. 412 (Exh. 38 to Schrag Decl.). Wells Fargo finally figured out—nearly five years after first discovering the problem— that in fact borrowers were harmed by the attorney fee matrix in the HPA tool from the time the tool was implemented until the time the fee matrix was removed, i.e.  from April 13, 2010 until October 20, 2015. Depo. Exh. 409 (Exh. 37 to Schrag Decl.) at 00011932. Wells Fargo also finally analyzed the full scope of borrowers that could have been wrongfully denied a mortgage modification, something it failed to do in 2013 when it only reviewed specific investors' loans. Through this review, Wells Fargo further found that it wrongfully denied mortgage loan modifications for HUD loans as well because it failed to use any method to ensure it was only attributing the amount of attorney fees permitted. In

addition to using an out of date and faulty State Fee Matrix, Wells Fargo also denied mortgage modifications for loans decisioned in SLoaD from 2010 until 2018. Bell Depo. at 44:25-46:3; Depo. Exh. 410 (Exh. 39 to Schrag Decl.).

Through this process, which continues to day, Wells Fargo identified 946 loans where the borrowers qualified for a loan modification or repayment plan but Wells Fargo incorrectly concluded otherwise. To date, Wells Fargo has identified over 500 of these borrowers whose homes Wells Fargo foreclosed due to a default that could have been cured had Wells Fargo properly notified them they qualified for a loan modification or repayment plan. Bell Depo. at 203:14-18.

### THE PROPOSED CLASS DEFINITIONS

Plaintiffs seek to certify a nationwide class and several subclasses, which they define as follows:

#### Nationwide Class

*All persons who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); and (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorneys fees being included in the loan modification decisioning process.*

#### [State] Unfair Practices Sub-class

*All members of the Nationwide Class whose home loan was secured by real property located in [State].[3]*

#### [California / Georgia] Wrongful Foreclosure Sub-class

*All members of the Nationwide Class whose home loan was secured by real property located in [California / Georgia] whose home Wells Fargo sold in foreclosure.*

### LEGAL ARGUMENT

"Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981). "The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government." *Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 339 (1980). The class action device

---

[3] Plaintiffs propose state subclasses for the following states: Illinois, Maryland, New Jersey, New York, and Pennsylvania.

conserves the resources of the court and the parties by allowing issues affecting a class of people to be litigated in an economical fashion. *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 155 (1982).

"A representative plaintiff may sue on behalf of a class when the plaintiff affirmatively demonstrates the proposed class meets the four threshold requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1651 (2019). "Additionally, a plaintiff seeking certification under Rule 23(b)(3) must demonstrate that 'questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* (citations omitted).

"Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008) (a court "may employ Rule 23(c)(4) to certify a class as to common issues . . . regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement") (internal quotation marks and citation omitted), *abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008). "[C]ertification of a liability-only class" is appropriate when it "would materially advance the litigation." *Rahman v. Mott's LLP*, 693 F. App'x 578, 580 (9th Cir. 2017) (unpublished); *see also Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) (where "there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense … to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.").

The Court must conduct a "rigorous" analysis under Rule 23, but that does not authorize "free-ranging merits inquiries at the certification stage." *In Re Yahoo Mail Litig.*, 308 F.R.D. 577, 586 (N.D. Cal. 2015) (citation omitted). "Merits questions may be considered to the extent—but only to the

extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## I.   Plaintiffs Satisfy All Four Requirements of Rule 23(a)

### A.  Numerosity

Under Rule 23(a)(1), a proposed class must be "so numerous that joinder of all members is impracticable." Plaintiffs need not set forth a precise number of class members to satisfy this element and the Court may draw reasonable inferences from the facts before it. *In Re Yahoo Mail Litig.*, 308 F.R.D. at 589-90. There is "no fixed number that satisfies the numerosity requirement." *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 890 (N.D. Cal. 2015) (internal quotation marks and citation omitted).

Many courts have recognized that even small sub-classes promote efficiency and economy of judicial resources, and are therefore appropriate for certification. *See, e.g.*: *Clarkson v. Coughlin*, 145 F.R.D. 339, 348 (S.D.N.Y. 1993) (certifying sub-class with only seven identified members); *Cypress v. Newport News General and Nonsectarian Hospital Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding "eighteen a sufficiently large number to constitute a class"); *Haggart v. U.S.*, 104 Fed. Cl. 484, 489 (2012) (certifying six sub-classes, including one with 18 members); and *Manning v. Princeton Consumer Discount Co., Inc.*, 390 F. Supp. 320, 324 (E.D. Pa. 1975) (finding numerosity satisfied and certifying a class of 15 members).

Plaintiffs' proposed Nationwide Class consists of 946 members, and thus easily satisfies numerosity. Bell Depo. at 203:14-18. The state sub-classes are smaller, but are also sufficiently numerous to make joinder impracticable. Specifically, based on information provided by Wells Fargo, the state sub-classes consist of the following number of putative class members:

| | |
|---|---|
| California:  31 (18 foreclosures) | New Jersey:  70 |
| Georgia:  28 (21 foreclosures) | New York:  69 |
| Illinois:  45 | Pennsylvania:  93 |
| Maryland:  40 | |

E-mail from Wells Fargo (Exh. 40 to Schrag Decl.) Notably, these numbers increased since the filing of this case because Wells Fargo is still investigating the scope of its wrongful denials of mortgage modifications. ECF No. 85-4 at p. 5.

### B. Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." Plaintiffs' claims must depend on a common contention such that determining its truth or falsity "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*. (internal citation omitted). This burden is a "limited" one. *Mazza*, 666 F.3d at 585. Plaintiffs need not show that "every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (quoting *Dukes*, 564 U.S. at 359).

Whether Wells Fargo is liable to Plaintiffs and the class on their breach of contract claim can be resolved in a single class trial. The elements of a cause of action for breach of contract under each state's law are generally the same and require proof of (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages to the plaintiff. *Oasis W. Realty, LLC v. Goldman*, 51 Cal.4th 811, 821, 250 P.3d 1115 (2011); *see also In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010) (rejecting argument that there are significant "variations in state contract law, including as to the definition of breach, the existence of causation and damages requirements, and the admissibility of extrinsic evidence"); *see also Boyko v. Am. Int'l Grp. Inc.*, 2012 WL 1495372, *9 (D.N.J. Apr. 26, 2012) ("The Court agrees with Plaintiff that the legal elements of a breach of contract claim are substantially similar in all fifty states, such that certification of the AIG class as to the breach of contract claim is proper."); *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 416 (N.D. Ill. 2012) ("the parties' dispute over the contract's meaning would be resolved the same way under any State's laws").

Proof of Wells Fargo's liability depends on two common contentions. First, Plaintiffs contend that the security instruments Wells Fargo had with each class member contained a provision requiring Wells Fargo to provide notice of how the borrower could cure his default and bring his loan current.

While the relevant secured loan instruments under Fannie/Freddie and the FHA differ slightly in language, the notice requirement is essentially the same. Whether this notice provision required notice that class members were eligible for a loan modification or repayment plan is a common question.

Second, Plaintiffs contend that Wells Fargo breached these security instruments by failing to notify them that they could cure the default by accepting a loan modification or repayment plan. Whether Wells Fargo breached this notice requirement by incorrectly concluding that class members were not eligibile for a loan modification or repayment plan is again necessarily common to the class. Because the security instruments are uniform documents, they must have a common meaning and a single jury can interpret these common terms for all class members.

If Wells Fargo is correct that the notice of right to cure requirement did not include notice of class members' eligibility for a loan modification or that its failure to offer a loan modification as a cure does not constitute a breach, then all such contract claims fail. A class-wide ruling along these lines would surely advance the resolution of the litigation. The correct interpretation of these security intruments, then, is central to the validity of each class member's contract claims, and can be resolved for each class member in a single decision. These common questions suffice to establish commonality. *See Gaudin v. Saxon Mortg. Servs.*, 2013 WL 4029043, at *5 (N.D. Cal. Aug.5, 2013) ("By determining whether the TPP is an enforceable contract and whether the parties' performance obligations are fully contained within it, the Court can resolve an issue central to the viability of the Proposed Class Members' claims.").

Plaintiffs also seek to certify a California sub-class for their UCL claim and five sub-classes for their consumer protection claims in Illinois, Maryland, New Jersey, New York, and Pennsylvania. Plaintiffs allege that Wells Fargo violated each of these statutes when it engaged in unlawful practices by denying mortgage modifications to Plaintiffs and class members in violation of HAMP and other governmental requirements, as well as in violation of class members' security instruments.

Plaintiffs will use evidence common to all class members to show that Wells Fargo time and again failed to audit and test its loan application tool. Plaintiffs will also use common evidence to demonstrate that Wells Fargo's Board and executive leadership engaged in unlawful practices by failing to oversee Wells Fargo's duty to notify class members that they were eligible for loan

modifications that could cure their default. Common evidence will likewise be used to show that Wells Fargo's practice of using systematically-flawed software to calculate class members' eligibility for mortgage loan modifications was unfair. Finally, common evidence will show that if Wells Fargo would have tested its loan application tool and if the tool were accurate, sub-class members would have opted for the mortgage modification for which they qualified.

Use of various state sub-classes involving differing state laws that are materially identical to each other is common. For instance, in *In re Checking Account Overdraft Litigation¸* the court approved of class certification for an action that included several sub-classes with minor variations in state law. 307 F.R.D. 630, 652 (S.D. Fla. 2015). The trial court found that a trial plan and the use of sub-classes showed that the action was manageable and suitable for class treatment. *Id.* Similarly, the sub-classes here facilitate management for this class action. In addition, the variations in state consumer law are minor and are materially identical. Therefore, the state sub-classes present no issue as to manageability.

Plaintiffs' wrongful foreclosure claim is based on Wells Fargo's illegal foreclosure of Plaintiffs' properties by failing to comply with the terms of Plaintiffs' secured-loan instruments, and so Plaintiffs will prove this claim with the same common evidence discussed in connection with the contract claim. The California wrongful foreclosure claim may also be established, independently, by the same common proof discussed above in connection with Plaintiffs' UCL claim, because California also permits wrongful foreclosure claims to be premised on "unfair business practices" *See Ryan-Beedy v. Bank of New York Mellon*, 293 F. Supp. 3d 1101, 1115 (E.D. Cal. 2018)).

### C. Typicality

Typicality exists if the plaintiffs' claims are "reasonably coextensive" with those of absent class members. *Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003). To be typical, the class representatives must be part of the class, possess the same interest, and have been injured by the same course of conduct. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). Typicality is thus considered a "permissive" standard—one deemed satisfied when class members' claims arise from the same course of events and each class member will make similar legal arguments to prove the defendant's liability. *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010).

Plaintiffs are typical of the classes they seek to represent because they received identical letters in which Wells Fargo admitted wrongfully denying them loan modifications, and Plaintiffs have been harmed by the same course of conduct as the classes: Wells Fargo entered into uniform contracts with class members, which the bank then breached by failing to notify class members that they could cure a default by accepting a mortgage modification. *See* Letter to Class Members (Exh. 41 to Schrag Decl.). Further, Plaintiffs' legal and remedial theories are the same as the legal and remedial theories of those they seek to represent. For these reasons, Plaintiffs claims are typical of the class.

### D. Adequacy

The adequacy requirement is two inquiries: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Yahoo Mail Litig.*, 308 F.R.D. at 595.

There are no conflicts among or between Plaintiffs and the proposed classes. Plaintiffs have diligently pursued this litigation to uncover the details behind Wells Fargo's dilatory disclosure that they had been wrongfully denied a loan modification, and are committed to holding Wells Fargo responsible to all class members. The fact that Plaintiffs and the class were harmed in the same way, as reflected by the fact that Wells Fargo sent them the same apology letter (Exh. 41 to Schrag Decl.), means that Plaintiffs have every incentive to vigorously pursue the monetary and equitable relief that they all deserve.

Plaintiffs and their counsel have demonstrated their commitment to the class over the last nine months. Since filing suit in late 2018, counsel have spent over 4,402 hours prosecuting this case and have incurred $87,123.97 in litigation expenses. *See* Schrag Decl. at ¶ 10; Paul Decl. at ¶ 15. The case has been hard fought, including two motions to dismiss all or part of the case, 18 depositions, and over 140,000 pages of documents produced. To prepare class members' claims for certification, Plaintiffs' counsel reviewed tens of thousands of Wells Fargo documents; reviewed Plaintiffs' voluminous loan files, preparded for and defended 14 Plaintiff depositions, deposed four Wells Fargo employees; and hired an expert to assess the ability to systematically calculate class members' damages. Schrag Decl. at ¶ 9; Paul Decl. at ¶ 14. Plaintiffs' counsel are well-versed in complex class litigation and will continue to devote their time and expertise for the benefit of the classes as the case advances towards trial. Firm

Resumes, Exh. A to Schrag Decl.; Exh. A to Paul Decl.

The proposed class representatives have all produced documents and answered Wells Fargo's interrogatories. Each has also kept in touch with class counsel on developments in the litigation and been deposed by defense counsel. Schrag Decl. at ¶ 11. And each understands the essence of the claims: that Wells Fargo wrongfully denied them a mortgage modification for which they qualified,thus satisfying the requirement that a class representative need only possess "an understanding for the basic theory of the case." *In re Live Concert Antitrust Litig*., 247 F.R.D. 98, 120-21 (C.D. Cal. 2007).

## II.   Plaintiffs Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3)

Rule 23(b)(3) has two components. Plaintiffs must establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Plaintiffs must also show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

### A.  Wells Fargo's Common Conduct Predominates Over Any Individual Issues

The predominance inquiry—whether "questions of law or fact common to class members predominate," Fed. R. Civ. P. 23(b)(3)—"tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:49, pp. 195–96 (5th ed. 2012)). The essential question is whether "adjudication of common issues will help achieve judicial economy." *In re Wells Fargo Home Loan Mortg. Overtime Pay Litig*., 571 F.3d 953, 958 (9th Cir. 2009) (citations and quotations omitted). If "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication . . ." then "there is clear justification for handling the dispute on a representative rather than an individual basis." *Mazza*, 666 F.3d at 589 (quoting *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1022 (9th Cir. 1998)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses

peculiar to some individual class members.'" *Bouaphakeo*, 136 S.Ct. at 145 (citations omitted).

Here, there is clear justification for class adjudication because the substantive issues raised by Plaintiffs, and the evidence relevant to each of those issues, demonstrates that common issues predominate. *See Galvan v. KDI Distribution, Inc.*, 2011 WL 5116585, at *8 (C.D. Cal. Oct. 25, 2011).

### 1. Common liability issues predominate on Plaintiffs' breach of contract claim.

The nationwide breach of contract claim is particularly amenable to class certification because the contracts at issue are form contracts with common terms. Whether those terms require notice of eligibility for a loan modification that would cure their default, and whether Wells Fargo breached that notice requirement -- the key questions in the case – can be decided in one stroke for all class members.

Suits involving form contracts are "the classic case for treatment as a class action." *McKeage v. TMBC, LLC*, 847 F.3d 992, 999 (8th Cir. 2017) (quoting *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such") (internal quotation omitted); *Egge v. Healthspan Servs. Co.*, 208 F.R.D. 265, 269 (D. Minn. 2002) ("Claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action."); *see also Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 46 (E.DN.Y. 2008) ("the alleged breach of standard-form contracts are particularly appropriate for class action"); *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 428 (N.D. Ill. 2007) ("Claims arising out of form contracts are particularly appropriate for class action treatment."); *In re Cablevision Consumer Litig.*, 2014 WL 1330546, *6 (E.D.N.Y. Mar. 31) ("numerous courts have held that claims arising out of form contracts are particularly appropriate for class certification"); *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment.").

Consider first the existence of a contract. Plaintiffs have already obtained common proof that the security instruments establish an enforceable contractual obligation on Wells Fargo. There is no dispute that the contracts here are uniform among class members. *See* ECF No. 60. Beyond this testimony, the uniform contractual language is also common proof that can establish this element of the claim for all class members nationwide.

Consider next whether Wells Fargo breached the contract by failing to offer a loan modification. "[S]everal courts have recognized that the law relating to the element of breach does not vary greatly from state to state." *In re Conseco*, 270 F.R.D. at 529 (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262–63 (11th Cir. 2004)); *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 672 (S.D. Fla. 1997). Courts thus have certified contract claims nationwide where, as here, the element of breach can be resolved classwide. *See id.*; *see also Gaudin*, 297 F.R.D. at 428.

Here, Plaintiffs' classwide theory is that the form security instruments required Wells Fargo to notify class members that they could cure a default and avoid acceleration and foreclosure by accepting the government-mandated mortgage modification for which they qualified. For each class member, the language states either that Wells Fargo must send notice of "the action required to cure the default" before accelerating, or that Wells Fargo may not accelerate or foreclose "if not permitted by regulations of the [HUD] Secretary." ECF No. 60-3 at pp. 7, 26. Whether Wells Fargo breached that requirement can be decided classwide because the answer turns on the interpretation of documents that apply to all class members. *See Feller v. Transamerica Life Ins. Co.*, 2017 WL 6496803, at *11 (C.D. Cal. Dec. 11, 2017) ("courts have long found that 'claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action'") (collecting cases).

The security instruments must, as a practical matter, have the same meaning and impose the same obligations for all class members. It would make little sense—and would lead to an unpredictable set of legal obligations for businesses—if the meaning of the same language varied depending on individual circumstances. *See Vedachalam v. Tata Consultancy Servs., Ltd.*, 2012 WL 1110004, at *13 (N.D. Cal. Apr. 2, 2012) (*citing* Restatement (Second) of Contracts § 211(2) & Comment e). Here, for example, when the Court interpreted Wells Fargo's contracts at the pleadings stage, the Court's interpretation did not depend on Plaintiffs' individual circumstances—only on the contractual language and Wells Fargo's course of performance. *See* Order re Motion to Dismiss (ECF No. 87) at 14-15. The same analysis will be extended for all class members at summary judgment and trial. *See In re Med. Capital Secs. Litig.*, 2011 WL 5067208, at *5 (C.D. Cal. July 26, 2011) (certifying contract claims where plaintiffs' interpretation was buttressed by "evidence regarding Defendants' course of performance").

Critical here is the fact that the relevant contractual language is uniform and was imposed on borrowers without individualized negotiations. The language thus does not reflect individualized negotiations or different obligations for different borrowers. *See Vedachalam,* 2012 WL 1110004 at *13. As in *Conseco*, "Plaintiffs' contractual interpretations may ultimately be rejected at the summary judgment stage or disproved at trial, but they are not patently untenable from the face of the documents, and do not demonstrate a lack of common issues of law." *In re Conseco*, 270 F.R.D. at 529.

Whether the contractual language is ambiguous and may require extrinsic evidence does not create individualized issues. The only extrinsic evidence possibly relevant pertains to Wells Fargo's knowledge that the loan modification was an action that could cure default. To date, that evidence includes deposition testimony of Wells Fargo's corporate representative admitting that a loan modification could cure a default, as contemplated in the security instrument. Ferguson Depo. at 50:5-7. Plaintiffs may uncover more evidence before trial, but the critical point is that all such evidence will concern *Wells Fargo's* understanding of the contractual language at issue. That language was standard across contracts and was not negotiated on an individualized basis. *See In re Med. Capital Secs. Litig.*, 2011 WL 5067208, at *5 (C.D. Cal. July 26, 2011) (certifying contract claims where plaintiffs' interpretation was buttressed by "evidence regarding Defendants' course of performance").

Lastly, Plaintiffs' performance does not interject indivudalized issues that defeat predominance. The court in *In re Bank of America* reached a contrary conclusion because plaintiffs there had alleged that they were denied a permanent modification after having fulfilled all obligations imposed on them as part of a trial period plan that operated as a temporary modification of the loan terms under HAMP. 2013 WL 4759649, *10-11 (D. Mass. Sept. 4, 2013). But here, Plaintiffs and class members were never offered a trial period plan, which they allege that Wells Fargo was contractually obligated to provide. Neither HAMP nor the contract imposes on Plaintiffs any performance obligation to obtain such a modification other than meeting the financial requirements per the formula. Wells Fargo admitted in a uniform letter that class members met those requirements and yet were denied a modification due to the uniform calculation error. *See* Exh. 41 to Schrag Decl. While each Class member may present individual damages issues, Plaintiffs' performance does not enter the picture at this stage of the contractual breach, and therefore does not introduce individualized issues that could defeat

predominance.

Classwide resolution of two liability issues—whether the contract requires notice of eligibility for a loan modification and whether it was breached—will materially advance the litigation. *See Gaudin*, 2013 WL 4029043, at *5 (certifying Rule 23(b)(3) class); *see also In re Bank of America*, 2013 WL 4759649 at *5 (concluding that resolution of these two issues would materially advance litigation concerning whether a bank had breached a contractual obligation to offer a permanent modification). The final element of Plaintiffs' contract claim is proof of damages. Wells Fargo's failure to perform prevented class members from curing their defaults through mortgage modifications – in many cases resulting in foreclosures or short sales that cost them their homes, entitling them to recover damages. The amount of those damages will be calculated for all class members using a common methodology.

The proposed nationwide class therefore satisfies predominance. The language of Rule 23(b)(3) clearly defines individual issues as "questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added). While variations in state law exist, they do not constitute individual issues. *See Am. Airlines v. Wolens*, 513 U.S. 219, 233 (1995) ("Because contract law is not at its core 'diverse, nonuniform, and confusing,' we see no large risk of nonuniform adjudication inherent in 'state-court enforcement of the terms of a uniform agreement….'"). In fact, the literal language of Rule 23(b)(3) supports this conclusion—that questions affecting broad groups within the class should instead count toward common questions because they do not affect only individual members and therefore are not individual questions.

### 2.   Whether Wells Fargo Wrongfully Foreclosed Class Members' Homes Can Be Resolved in a Single Trial

Plaintiffs' wrongful foreclosure claim is based on Wells Fargo's illegal foreclosure of Plaintiffs' properties by failing to comply with the terms of Plaintiffs' secured-loan instruments, and so the elements of this claim can be established by the same common proof discussed in connection with Plaintiffs' contract claim above. Plaintiffs' wrongful foreclosure claim under California law, separate and apart from any breach of their secured-loan instruments, may also be established by the same common proof discussed below in connection with Plaintiffs' UCL claim, because California also permits wrongful foreclosure claims to be premised on "unfair business practices" *See Ryan-Beedy v.*

1   *Bank of New York Mellon*, 293 F. Supp. 3d 1101, 1115 (E.D. Cal. 2018)).

2   **3.   Common liability issues predominate Plaintiffs' UCL Claim.**

3   Plaintiffs also seek to certify a claim for Wells Fargo's violation of California's Unfair

4   Competition Law (UCL). (ECF 137, ¶¶ 246-54.) This claim that Wells Fargo acted unfairly poses a

5   prototypically common question: Was "the harm to the public from [Wells Fargo's] business practice . .

6   . greater than the utility of the practice?" *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D.

7   Cal. 2015).)[4]

8   Answering this question will require examination of Wells Fargo's "reasons, justifications and

9   motives" for its conduct, balanced against the impact on the public. *McKell v. Wash. Mut., Inc.*, 142

10  Cal. App. 4th 1457, 1473 (2006). Both the depth with which the Court will need to examine Wells

11  Fargo's practices and the market-wide ramifications of the Court's decision weigh in favor of a

12  classwide adjudication. *See Krueger v. Wyeth, Inc.*, 310 F.R.D. 468, 482 (S.D. Cal. 2015) (issues that

13  turn on complex evidence are particularly well-suited to classwide resolution).

14  This analysis requires no individualized inquiries. The goal of the UCL, after all, is not to

15  protect individual consumers, but instead to "protect[ ] the general public against unscrupulous business

16  practices." *See In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). A given business practice must be

17  lawful or unlawful as a general matter, which is why the balancing test examines the harm to the public

18  at large and not just on the harm suffered by individuals. *See, e.g., Backus*, 122 F. Supp. 3d at 929

19  (balancing test depends on "the harm to the public"). And it is one reason why the courts in this district

20  that have been called on to determine whether a given business practice should be permitted in a fair

21  marketplace have concluded that the claim should proceed on a classwide basis. *See Gaudin v. Saxon

22  Mortg. Servs.*, 297 F.R.D. 417, 430 (N.D. Cal. 2013); *Grace v. Apple, Inc.*, 2018 WL 4468825, at *11

23  (N.D. Cal. Sept. 18, 2018).

24  As in the *Gaudin* and *Grace* cases, Plaintiffs will present generalized evidence in a single trial.

25  Internal documents and deposition testimony establish, for example, that Wells Fargo never audited its

26

27  [4] The Ninth Circuit has approved two tests for gauging UCL unfairness—this "balancing" test as well

28  as a "tethering" test. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) The
    tethering test, like the balancing test, focuses on the defendant's conduct. It evaluates whether the
    defendant contradicted a legislatively declared policy.

21

software tool despite calls internally and from outsiders for regular audits. *See generally* Summary of Evidence at sections I, III-V. These practices contributed directly to Wells Fargo wrongfully denying mortgage modifications to qualified borrowers for a sustained period of time.

While Wells Fargo will have the opportunity to present any countervailing benefits that it contends resulted from its behavior, the determination of whether the practices were ultimately helpful or harmful to the public will be the same classwide. *See Grace*, 328 F.R.D. at 337 (certifying UCL unfair claim where plaintiffs would measure classwide harm in the form of "decreased market value"); *Skold v Intel Corp*., 2012 WL 1375929 (Cal. Super. Ct. Apr. 19, 2012) (certifying unfair claim where plaintiffs would measure classwide harm in the form of inflated prices).

### 4.   A class action is the superior way to proceed

Finally, the Court should conclude that a class action is superior to other methods for adjudicating the controversy. In making that determination, courts consider: (1) class members' interests in individually controlling a separate action; (2) the extent and nature of litigation concerning the controversy already begun; (3) the desirability of concentrating the litigation in the particular forum; and (4) the manageability of a class action. Fed. R. Civ. P. 23(b)(3).

Here, there are 946 class members, each with claims arising from the same core facts. Bell Depo. at 203:14-18. Given the large number of borrowers affected, class members cannot lay claim to a strong interest in individually controlling a separate action. Prosecuting this case as a class action will enable the Court to adjudicate a large number of claims in an efficient manner without risking inconsistent results. The amount at stake for some class members, while significant, may be too small to justify the expense of taking on one of the most powerful banks in the world. There is simply no reason for class members to sue Wells Fargo individually rather than take advantage of the economies and efficiencies offered by class litigation. *See Brice Yingling v. eBay, Inc.*, 2010 WL 11575128, at *6 (N.D. Cal. July 16, 2010); *see also In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005) (resolving common issues on behalf of a class "would be a more effective procedure than litigating the class-wide issue of Allstate's policy anew in more than a thousand separate lawsuits."). The case presents important issues, common facts, and a common method of calculating damages; it can thus be effectively managed to a just resolution. Plaintiffs' Trial Plan, attached as Exhibit B, explains how the case can manageably be

tried as a class trial with follow-on individual damages proceedings.

### III. Rule 23(c)(4) Issue Certification on Wells Fargo's Extreme and Outrageous Conduct Would Advance this Litigation

Rule 23(c)(4) "authorizes the district court in appropriate cases to isolate the common issues … and proceed with class treatment of those particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). In deciding whether to certify an issue class, courts should consider whether adjudicating certified issues would advance the case and promote judicial economy. *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 175-76 (N.D. Cal. 2015). "These considerations are closely related to the significance of the issue to be certified: the more significant the common issue, the more likely class-wide adjudication of that issue will advance the litigation." *Valenzuela v. Union Pac. R.R. Co*., 2017 WL 1398593, *3 (D. Ariz. Apr. 19, 2017).

Plaintiffs seek to certify the issue of whether Wells Fargo engaged in extreme and outrageous conduct for purposes of their intentional infliction of emotional distress claim. Outrageous conduct is an element of every state's intentional infliction of emotional distress cause of action. *See, e.g., Cervantez v. J.C. Penney Co*., 595 P.2d 975, 983 (Cal. 1979) (requiring "extreme and outrageous conduct" by the defendant); *Clark v. Arras*, 443 S.E.2d 277, 278 (Ga. Ct. App. 1994) (requiring that the conduct be "outrageous and extreme"); *McGrath v. Fahey*, 533 N.E. 2d 806, 809 (Ill. 1988) ("First, the conduct involved must be truly extreme and outrageous."). The evidence that Plaintiffs will use to show Wells Fargo's outrageous conduct is common to all class members. For example, Plaintiffs will show that Wells Fargo, which had promised the government to use extraordinary care in compliance and audit procedures because of its previous deficiencies, discovered the attorney fee error in 2013 – but did nothing at that point to fix it or inform borrowers about the problem for years. *See* Summary of Evidence at section IV. A Wells Fargo employee proposed a solution that would cost just $61,950, and Wells Fargo refused to fund it – even though the solution would impact 250,000 loans and the consequences of not implementing the change was that inaccurate attorney fees would continue to be quoted. *Id*. Even worse, Wells Fargo kept the error a secret from regulators and its borrowers until 2018. *See* Summary of Evidence at section I.

All evidence of Wells Fargo's extreme and outrageous conduct is common to the class, and will include proof of Wells Fargo's failure to exercise responsibility and oversight over its loan modification practices – resulting in class members' wrongful modification denials. An issue class on whether Wells Fargo engaged in outrageous conduct will advance the litigation, as it would allow for a single adjudication of the most significant issue of each class member's intentional infliction of emotional distress claim.

## IV.   Plaintiffs can systematically calculate some damages and restitution on a classwide basis.

Because Plaintiffs can establish liability using common evidence, the fact that class members have individualized damages does not preclude class certification. *See, e.g., Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) ("the need for individualized findings as to the amount of damages does not defeat class certification"); *see also Simpson v. Fireman's Fund Ins. Co.,* 231 F.R.D. 391, 396 (N.D.Cal.2005) ("In determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff") (*quoted approvingly in Lozano v. AT & T Wireless Servs., Inc.,* 504 F.3d 718, 734 (9th Cir.2007). "[A] class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings." Newberg on Class Actions § 4:54 (5th ed.).

Here, the lost equity in the home as a result of foreclosure and the lost opportunity costs of not having a reduced mortgage payment, while particularized for each class member, can nevertheless be calculated for all class members and determined in a class trial. To do that, Plaintiffs have engaged John Kilpatrick, an expert in real estate valuation and economics. Mr. Kilpatrick developed a mass appraisal system to measure the loss in home ownership equity for each class member. Declaration of John Kilpatrick at ¶¶ 16-18, 20. As Mr. Kilpatrick put it, "While valuations (loss of equity) will vary from property to property, this will be the function of different dates of foreclosure and location-specific value trends, all of which will be accounted for in the model itself." *Id*. at ¶ 40.

Because this methodology is capable of quantifying an appropriate classwide award of damages and restitution, it too supports a finding that common questions predominate in this litigation. *See, e.g., Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017) ("At this stage, Plaintiffs need only show

that such damages can be determined without excessive difficulty and attributed to their theory of liability, and have proposed as much here.").

## CONCLUSION

This case is somewhat unique in that Wells Fargo has admitted its "mistake" and identified those impacted by its mistake. While Wells Fargo sought to "remediate" on its own terms, it refuses to admit the legal consequences of its mistake. Plaintiffs seek to show that Wells Fargo breached its contractual obligations to each one of these impacted borrowers, and to do so on behalf of all impacted borrowers in a single trial. Wells Fargo may argue that borrowers were impacted by its mistake in different ways—and that is no doubt true. But "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damage issues." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). Plaintiffs thus ask that the Court certify a liability-only class of all impacted borrowers, along with state sub-classes as described herein, under Rule 23(b)(3), certify an issue class under Rule 23(c)(4), appoint class counsel under Rule 23(g), and direct notice to the classes.

Dated: August 29, 2019

Respectfully submitted,

/s/ Michael Schrag
**GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
505 14th Street, Ste. 1110
Oakland, California 94612
Telephone:  510-350-9700
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: 816-984-8100
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com