1   Amanda L. Groves (SBN: 187216)
    agroves@winston.com
2   Morgan E. Stewart (SBN: 321611)
    mstewart@winston.com
3   **WINSTON & STRAWN LLP**
    101 California Street, 35th Floor
4   San Francisco, CA  94111-5840
    Telephone:    (415) 591-1000
5   Facsimile:     (415) 591-1400

6   Kobi K. Brinson (Admitted *pro hac vice*)
    kbrinson@winston.com
7   Stacie C. Knight (Admitted *pro hac vice*)
    sknight@winston.com
8   **WINSTON & STRAWN LLP**
    300 South Tryon Street, 16th Floor
9   Charlotte, NC 28202
    Telephone:    (704) 350-7700
10  Facsimile:     (704) 350-7800

11  Attorneys for Defendant
    WELLS FARGO BANK, N.A.

12

13              **UNITED STATES DISTRICT COURT**

14          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                  **SAN FRANCISCO DIVISION**

16  ALICIA HERNANDEZ, *et al.*,          No. 3:18-cv-07354-WHA
    individually and on behalf of all others
17  similarly situated,

18          Plaintiffs,

19      v.                               **DEFENDANT WELLS FARGO BANK, N.A.'S
                                         ANSWER TO SECOND AMENDED CLASS
20  WELLS FARGO & COMPANY and            ACTION COMPLAINT**
    WELLS FARGO BANK, N.A.,
21
            Defendants.
22

23

24

25

26

27

28

Defendant Wells Fargo Bank, N.A. (the "Bank"), for itself and no other individual or entity, hereby responds to the Second Amended Class Action Complaint in the above-captioned matter as follows:

**INTRODUCTION**

1.     Plaintiffs are among the hundreds of homeowners who lost their homes to foreclosure because Wells Fargo wrongly determined they did not qualify for a mortgage modification.

**ANSWER**:     The Bank denies the allegations in paragraph 1.

2.     This was not an accident, but rather the result of years of a willful and reckless lack of central oversight by Wells Fargo's Board and executive leadership that has led to repeated compliance breakdowns and billions of dollars in government fines.

**ANSWER**:     The Bank denies the allegations in paragraph 2.

3.     For years, Wells Fargo failed to verify or audit its loan modification software to ensure it was properly calculating homeowners' eligibility for government-mandated mortgage modifications.  Material errors remained uncorrected in the software for five to eight years, if not longer.

**ANSWER**:     The Bank denies the allegations in paragraph 3.

4.     The federal government cited Wells Fargo in 2011 for failing to adequately audit its mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive leadership promised to implement ongoing testing to ensure that the Bank complied with government requirements in the future. But they failed to live up to that promise and multiple errors in Wells Fargo's decision-making software remained unaddressed.

**ANSWER**:     The Bank denies the allegations in paragraph 4.

5.     Wells Fargo's leadership failed to implement adequate testing even after the government found that another error in the Bank's software had led the Bank to wrongfully deny mortgage modifications in 2013-2014. Wells Fargo was cited again for failing to properly oversee the Bank's mortgage modification and foreclosure operations, but still did nothing to stop others like Plaintiffs from being wrongfully denied mortgage modifications and foreclosed upon.

**ANSWER**:     The Bank denies the allegations in paragraph 5.

6. Not until August 2013 did Wells Fargo discover one of the errors that led it to wrongfully deny mortgage modifications to Plaintiffs and hundreds of other homeowners. But rather than coming clean, Wells Fargo kept its discovery secret—likely in an effort to avoid additional government penalties. The government had previously imposed restrictions on Wells Fargo's mortgage servicing business and announced fines, with the amount of the fine and the duration of business restrictions dependent on the length and severity of the Bank's continued non-compliance. Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to hundreds of customers, the government likely would not have lifted its business restrictions in 2016 and would have imposed a far more severe penalty than the $70 million fine it ultimately issued.

**ANSWER**: The Bank denies the allegations in paragraph 6.

7. Moreover, despite knowing in 2013 that its mortgage modification software was faulty and had the potential to impact borrowers, Wells Fargo continued to use that faulty software when reviewing borrowers' loans for mortgage modifications. As a result, Wells Fargo wrongfully denied mortgage modifications to Plaintiffs and class members, and in many cases foreclosed on their homes.

**ANSWER:** The Bank denies the allegations in paragraph 7.

8. The Wells Fargo Board's repeated failure to fulfill its oversight responsibilities, despite promising to do so as part of multiple consent decrees, has grown so flagrant—and led to so many scandals and consumer abuses—that the Federal Reserve just last year placed an asset-cap on Wells Fargo that will not be lifted until Wells Fargo convinces the government it has finally reformed its central oversight practices. The Federal Reserve's cease-and-desist order has been described as a "Fear of God Penalty," with one expert opining that the Bank is "lucky it is too big to shut down."

**ANSWER**: The Bank admits that the Federal Reserve placed an asset cap on Wells Fargo & Company in 2018. The Bank denies the remaining allegations in paragraph 8.

9. After the Federal Reserve issued the asset-cap in February 2018, Wells Fargo announced an overhaul of its Board. Wells Fargo has since disclosed to its shareholders what it learned in 2015— that hundreds of its customers were wrongfully and unlawfully denied mortgage

1   modifications, with many of those customers subsequently losing their homes. Following that initial

2   disclosure, Wells Fargo discovered yet another error in its automated decision-making tool, which

3   caused even more homeowners to be wrongfully denied mortgage modifications. Wells Fargo has

4   warned its customers that even more errors and more affected customers may be uncovered as its

5   review continues.

6   **ANSWER**:      The Bank admits that in 2018, it disclosed that a calculation error in its mortgage loan

7   modification underwriting tool led to borrowers being incorrectly denied a trial loan modification,

8   and that for some of those borrowers, a foreclosure was completed.  The Bank denies the remaining

9   allegations in paragraph 9.

10          10.      Although Wells Fargo publicly claims to be turning over a new leaf to make things

11   right for its customers, it is unwilling to fairly compensate the customers whose lives its reckless

12   behavior forever changed. Hundreds lost their homes and yet Wells Fargo told its shareholders it was

13   allocating less than $13,000 per person as remediation. Wells Fargo then moved to dismiss this

14   action with prejudice, so that its customers would receive nothing more than it pre-allocated for

15   them. Wells Fargo wants to be the sole arbiter of how much remediation it should pay—with little

16   regard for the financial and emotional devastation its reckless behavior has wrought on Plaintiffs'

17   and class members' lives.

18   **ANSWER**:      The Bank admits that it moved to dismiss this action with prejudice.  The Bank

19   denies the remaining allegations in paragraph 10.

20          11.      Plaintiffs seek to hold Wells Fargo and its leadership truly responsible for their

21   repeated and deliberate failure to ensure the Bank was complying with legal requirements. They seek

22   certification of a nationwide class of homeowners wrongly denied a mortgage modification and

23   several statewide classes that will allow class members to efficiently pursue additional claims under

24   state consumer protection laws. Plaintiffs also intend to pursue entry of an injunction or other

25   equitable relief sufficient to prevent the continued use of Wells Fargo's unfair practices, and treble

26   and punitive damages pursuant to state law.

27   **ANSWER**:      The Bank admits that Plaintiffs seek certification of several classes, injunctive relief,

28   and treble and punitive damages pursuant to state law.  The Bank denies that this action may

properly be maintained as a class action and denies that Plaintiffs are entitled to any of the relief they

seek.

**JURISDICTION**

12.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §

1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000,

exclusive of interest and costs; in the aggregate, there are more than 100 members in the proposed

classes; and at least one class member is a citizen of a state different from any defendant.

**ANSWER**:    No response is required to the legal conclusions of paragraph 12.  To the extent a

response is required, the Bank does not dispute the subject matter jurisdiction of this Court under 28

U.S.C. § 1332.

13.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant resides in

this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims

occurred in this district.

**ANSWER**:    No response is required to the legal conclusion of paragraph 13.  To the extent a

response is required, the Bank denies the allegations of paragraph 13.

**INTRADISTRICT ASSIGNMENT**

14.    Assignment to the Oakland/San Francisco division is proper because Wells Fargo's

designated principal place of business is in San Francisco, California and a substantial part of the

events or omissions giving rise to Plaintiffs' claims occurred there.

**ANSWER**:    No response is required to the legal conclusion of paragraph 14.  To the extent a

response is required, the Bank denies the allegations in paragraph 14.

**PARTIES**

15.    Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania. Ms.

Hernandez was denied a mortgage modification and her New Jersey condominium was foreclosed

upon as a result of the conduct alleged herein.

**ANSWER**:    The Bank admits that Plaintiff Alicia Hernandez is a resident and citizen of Easton,

Pennsylvania, upon information and belief.  The Bank also admits that Plaintiff Alicia Hernandez

1   was denied a trial mortgage modification and that the property securing her loan ultimately was

2   foreclosed upon.  The Bank denies the remaining allegations in paragraph 15.

3          16.    Plaintiff Debora Granja is a resident and citizen of Eugene, Oregon. Ms. Granja was

4   denied a mortgage modification and her home in Brentwood, California, was foreclosed upon as a

5   result of the conduct alleged herein.

6   **ANSWER**:    The Bank admits that Plaintiff Debora Granja is a resident and citizen of Eugene,

7   Oregon, upon information and belief.  The Bank also admits that Plaintiff Debora Granja was denied

8   a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.

9   The Bank denies the remaining allegations in paragraph 16.

10         17.    Plaintiff Keith Lindner is a resident and citizen of California. Mr. Lindner was denied

11  a mortgage modification and lost his home in Visalia, California, as a result of the conduct alleged

12  herein.

13  **ANSWER**:    The Bank admits that Plaintiff Keith Lindner is a resident and citizen of California,

14  upon information and belief.  The Bank also admits that Plaintiff Keith Lindner was denied a trial

15  mortgage modification and that the property securing his loan ultimately was foreclosed upon.  The

16  Bank denies the remaining allegations in paragraph 17.

17         18.    Plaintiff Emma White is a resident and citizen of Jacksonville, Florida. Ms. White

18  was denied a mortgage modification and her home in Callahan, Florida, was foreclosed upon as a

19  result of the conduct alleged herein.

20  **ANSWER**:    The Bank admits that Plaintiff Emma White is a resident and citizen Jacksonville,

21  Florida, upon information and belief.  The Bank also admits that Plaintiff Emma White was denied

22  a trial mortgage modification and that the property securing her loan ultimately was foreclosed

23  upon.  The Bank denies the remaining allegations in paragraph 18.

24         19.    Plaintiff Coszetta Teague is a resident and citizen of Homewood, Illinois. Ms.

25  Teague was denied a mortgage modification and her home in Calumet City, Illinois, was

26  foreclosed upon as a result of the conduct alleged herein.

27  **ANSWER**:    The Bank admits that Plaintiff Coszetta Teague is a resident and citizen of

28  Homewood, Illinois, upon information and belief.  The Bank also admits that Plaintiff Coszetta

Teague was denied a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 19.

20.     Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana. Mr. and Mrs. Simoneaux were denied a modification of the mortgage on their Louisiana home as a result of the conduct alleged herein.

**ANSWER**:     The Bank admits that Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana, upon information and belief.  The Bank also admits that Plaintiffs Russell and Brenda Simoneaux were denied a trial mortgage modification.  The Bank denies the remaining allegations in paragraph 20.

21.     Plaintiffs John and Yvonne DeMartino are residents and citizens of Baltimore, Maryland. The DeMartinos were denied a mortgage modification and their house in Baltimore, Maryland, was foreclosed upon as a result of the conduct alleged herein.

**ANSWER**:     The Bank admits that Plaintiffs John and Yvonne DeMartino are residents and citizens of Baltimore, Maryland, upon information and belief.  The Bank also admits that Plaintiffs John and Yvonne DeMartino were denied a trial mortgage modification and that the property securing their loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 21.

22.     Plaintiff Rose Wilson is a resident and citizen of New York. Ms. Wilson was denied a mortgage modification and her New York home was foreclosed upon as a result of the conduct alleged herein.

**ANSWER**:     The Bank admits that Plaintiff Rose Wilson is a resident and citizen of New York, upon information and belief.  The Bank also admits that Plaintiff Rose Wilson was denied a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 22.

23.     Plaintiff Tiffanie Hood is a resident and citizen of Ohio. Ms. Hood was denied a mortgage modification and her Ohio home was foreclosed upon as a result of the conduct alleged herein.

1   **ANSWER**:   The Bank admits that Plaintiff Tiffanie Hood is a resident and citizen of Ohio, upon

2   information and belief.  The Bank also admits that Plaintiff Tiffanie Hood was denied a trial

3   mortgage modification and that the property securing her loan ultimately was foreclosed upon.  The

4   Bank denies the remaining allegations in paragraph 23.

5           24.     Plaintiffs George and Cyndi Floyd are residents and citizens of Philadelphia,

6   Pennsylvania. The Floyds were denied a mortgage modification and their house in Lancaster,

7   Pennsylvania, was foreclosed upon as a result of the conduct alleged herein.

8   **ANSWER**:   The Bank admits that Plaintiffs George and Cyndi Floyd are residents and citizens of

9   Philadelphia, Pennsylvania, upon information and belief.  The Bank also admits that Plaintiffs

10   George and Cyndi Floyd were denied a trial mortgage modification and that the property securing

11   their loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph

12   24.

13           25.     Plaintiff Troy Frye is a resident and citizen of Georgia. Mr. Frye was denied a

14   mortgage modification and lost his home in Hephzibah, Georgia, as a result of the conduct alleged

15   herein.

16   **ANSWER**:   The Bank admits that Plaintiff Troy Frye is a resident and citizen of Georgia, upon

17   information and belief.  The Bank also admits that Plaintiff Troy Frye was denied a trial mortgage

18   modification and that the property securing his loan ultimately was foreclosed upon.  The Bank

19   denies the remaining allegations in paragraph 25.

20           26.     Plaintiff Diana Trevino is a resident and citizen of Richardson, Texas. Ms. Trevino

21   was denied a mortgage modification and her Texas home was foreclosed upon as a result of the

22   conduct alleged herein.

23   **ANSWER**:   The Bank admits that Plaintiff Diana Trevino is a resident and citizen of Richardson,

24   Texas, upon information and belief.  The Bank also admits that Plaintiff Diana Trevino was denied a

25   trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.

26   The Bank denies the remaining allegations in paragraph 26.

27

28

27.    Wells Fargo & Company (WFC), is a Delaware corporation headquartered in San Francisco, California, and a registered bank holding company that owns and controls Defendant Wells Fargo Bank, N.A.

**ANSWER**:    The Bank admits that Wells Fargo & Company is a registered bank holding company and a Delaware corporation headquartered in San Francisco, California.  The Bank denies the remaining allegations in paragraph 27.

28.    Defendant Wells Fargo Bank, N.A., is a national banking association with its main office in Sioux Falls, South Dakota, and designated principal place of business in San Francisco, California.

**ANSWER**:    The Bank admits that it is a national banking association with its main office in Sioux Falls, South Dakota.  The Bank denies the remaining allegations in paragraph 28.

29.    Defendant, along with Wells Fargo & Company, shared responsibility for ensuring that the Bank's operations were properly tested to ensure compliance with HAMP and other government requirements, with ultimate responsibility lying with WFC's Board of Directors, and its Audit & Examination Committee in particular. There also exists a high-degree of built-in overlap between Wells Fargo and WFC due to the fact that WFC owns and controls the Bank, and that the Bank directors responsible for ensuring compliance with HAMP and other government requirements were also WFC executives and/or directors.

**ANSWER**:    The Bank admits that Plaintiffs use "WFC" to refer to Wells Fargo & Company and "Bank" to refer to Wells Fargo Bank, N.A.  The Bank denies the remaining allegations in paragraph 29.

## FACTUAL ALLEGATIONS

### A.    Wells Fargo Wrongfully Forecloses on Its Customers' Homes

30.    Plaintiffs are among the millions of homeowners who had trouble making ends meet during the Great Recession. They fell behind on their mortgage payments and needed help to avoid losing their homes.

**ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 30 and, on that basis, denies the allegations of paragraph 30.

31.     The Home Affordable Modification Program (HAMP) was designed to provide the very help that Plaintiffs and class members needed. Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

**ANSWER**:     The Bank admits that the Home Affordable Modification Program ("HAMP") was introduced pursuant to the Emergency Economic Stabilization Act of 2008.  The Bank denies the remaining allegations in paragraph 31.

32.     Similar threshold requirements were incorporated into the mortgage modification requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac, and the Federal Housing Administration (FHA).

**ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 32 and, on that basis, denies the allegations of paragraph 32.

33.     Plaintiffs and class members met the threshold requirements for a mortgage modification and as their mortgage servicer, Wells Fargo, was required to offer them a loan modification.  Wells Fargo failed to do so, however, and instead foreclosed on Plaintiffs and more than five hundred other class members who could not make their monthly payments without a modification.

**ANSWER**:     The Bank denies the allegations in paragraph 33.

34.     Another three hundred class members were just able to stave off foreclosure, but not without overcoming numerous financial and emotional difficulties that could have been avoided if Wells Fargo had lowered their mortgage payments as HAMP and other GSEs required.

**ANSWER**:     The Bank denies the allegations in paragraph 34.

**B.     Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a Period of at Least 8 Years**

35.     Wells Fargo has only recently acknowledged that it wrongfully denied Plaintiffs and class members mortgage loan modifications to which they were entitled under HAMP and other government requirements.

**ANSWER**:     The Bank denies the allegations in paragraph 35.

36.     In form letters sent to Plaintiffs and class members in late 2018, Wells Fargo claimed that its decision was based on a "faulty calculation." The problem goes much deeper than a single miscalculation, however, and reflects the same type of extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.

**ANSWER**:     The Bank admits that letters to Plaintiffs in 2018 stated that the Bank based its decision on a faulty calculation.  The Bank denies the remaining allegations in paragraph 36.

37.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet Wells Fargo not only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years on end.

**ANSWER**:     The Bank denies the allegations in paragraph 37.

38.     Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether homeowners met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

**ANSWER**:     The Bank denies the allegations in paragraph 38.

39.     As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other government requirements over a period of at least eight years

and denied Plaintiffs and class members mortgage modifications that the Bank was legally required to offer.

**ANSWER**:     The Bank denies the allegations in paragraph 39.

> **C.     Wells Fargo's Leadership Fails to Implement Adequate Testing Even After Promising to Do So as Part of 2011 Consent Decrees**

40.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in the Bank's mortgage modification and foreclosure practices.

**ANSWER**:     The Bank denies the allegations in paragraph 40.

41.     The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

**ANSWER**:     To the extent paragraph 41 purports to describe specific findings by the OCC, the Bank refers to those findings for a complete statement of their terms.  The Bank denies the allegations of paragraph 41 to the extent they are inconsistent therewith.

42.     Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

**ANSWER**:     The Bank admits that its Board of Directors signed a document entitled "Consent Order" with the OCC on March 31, 2011 in the matter of *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-11-19 (the "Bank's 2011 OCC Consent Order").  To the extent paragraph 42 purports to describe the specific contents of the Bank's 2011 OCC Consent Order, the Bank refers to that document for a complete statement of its terms.  The Bank denies the allegations of paragraph 42 to the extent they are inconsistent with the terms of the Bank's 2011 OCC Consent Order.

43.     Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with

1  HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were

2  regularly reviewed and any deficiencies promptly detected and remedied. The Bank also promised to

3  maintain a Compliance Committee of board members to monitor its ongoing compliance with the

4  Consent Order.

5  **ANSWER**:     To the extent paragraph 43 purports to describe the specific contents of the Bank's

6  2011 OCC Consent Order, the Bank refers to that document for a complete statement of its terms.

7  The Bank denies the allegations of paragraph 43 to the extent they are inconsistent with the terms of

8  the Bank's 2011 OCC Consent Order.

9        44.     In one of the consent orders, the Federal Reserve specifically ordered the WFC's

10  Board of Directors to take steps to ensure the Bank complied with its obligations under the consent

11  orders, including by strengthening the Board's oversight of compliance with HAMP and other

12  government requirements; to ensure that audit and compliance programs were adequately staffed;

13  and to improve the information and reports that would be regularly reviewed by WFC's Board of

14  Directors.

15  **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

16  or falsity of the allegations of paragraph 44, and, on that basis, denies the allegations of paragraph

17  44.

18        45.     Wells Fargo subsequently reported to the Federal Reserve that the Bank's

19  Compliance Committee was meeting as required, that the Audit & Examination Committee of

20  WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance

21  based on improved reporting, and that WFC's Chief Operational Risk Officer (CORO) was

22  providing both the Compliance Committee and the Audit & Examination Committee with the

23  necessary information and testing results for them to effectively oversee the Bank's mortgage

24  modification and foreclosure practices and ensure compliance with HAMP and other government

25  requirements.

26  **ANSWER**:     To the extent paragraph 45 purports to describe the specific contents of the Bank's

27  reports to the Federal Reserve, the Bank refers to those reports for a complete statement of their

28

1   contents.  The Bank denies the allegations of paragraph 45 to the extent they are inconsistent with

2   the Bank's reports to the Federal Reserve.

3          46.     Together, Wells Fargo's executives and board members—in particular, Wells Fargo's

4   Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—

5   were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any

6   violations of HAMP and other government requirements. They repeatedly failed to fulfill these

7   obligations over the course of several years, however—in violation of the promises they made in the

8   2011 Consent Order and in callous disregard of the well-being of their customers.

9   **ANSWER**:     The Bank denies the allegations in paragraph 46.

10         47.     Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June

11  2015, the OCC found that the Bank was still in continuing noncompliance. Among other things, the

12  OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and

13  other government requirements; had not ensured that the Bank's audit and compliance programs had

14  the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage

15  modification and foreclosure practices would be identified and promptly remedied; and had not

16  ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other

17  government requirements, to modify delinquent mortgage loans and prevent foreclosures of its

18  customers' homes.

19  **ANSWER**:     The Bank admits that its Board of Directors signed a document entitled "Consent

20  Order Amending the 2011 Consent Order and 2013 Amendment to the 2011 Consent Order" with

21  the OCC on June 9, 2015 in the matter of *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, which

22  amended AA-EC-11-19 and #2013-132 (the "Bank's 2015 OCC Consent Order").  To the extent

23  paragraph 47 purports to describe the specific contents of the Bank's 2015 OCC Consent Order, the

24  Bank refers to that document for a complete statement of its terms.  The Bank denies the allegations

25  of paragraph 47 to the extent they are inconsistent with the terms of the Bank's 2015 OCC Consent

26  Order.

27

28

**D.     Wells Fargo Conceals Its Discovery of One of the Systematic Errors from Regulators and Consumers**

48.     In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

**ANSWER**:     To the extent paragraph 48 purports to describe the specific contents of the Bank's 2015 OCC Consent Order, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations of paragraph 48 to the extent they are inconsistent with the terms of the Bank's 2015 OCC Consent Order.

49.     As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

**ANSWER**:     The Bank denies the allegations in paragraph 49, except it admits that it executed a document entitled "Consent Order for a Civil Monetary Penalty" on May 17, 2016 in the matter of *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-2016-30 (the "Bank's 2016 Consent Order").

50.     Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in August 2013—*one of the errors at issue in this case*—which caused the Bank to wrongly deny mortgage modifications to 625 customers. Well Fargo decided not to tell anybody it had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the business restrictions it had imposed in 2015.

**ANSWER**:     The Bank denies the allegations in paragraph 50.

1    51.    The Bank's seven-member Board of Directors, each of whom also served on WFC's

2    Board of Directors, signed the stipulation under which the Bank accepted the $70 million penalty

3    and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184

4    customers in 2013-2014. These directors did not disclose that the Bank had discovered another

5    error—either because their oversight was so non-existent that they did not know, or because they

6    chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC

7    lifted the business restrictions it had imposed on the Bank.

8    **ANSWER**:    The Bank denies the allegations in paragraph 51.

9    52.    To make matters worse, even after discovering the 2013 error, Wells Fargo still did

10    not reform its auditing and verification practices.  Related errors that would affect an additional 145

11    customers were not discovered until five years later.

12    **ANSWER**:    The Bank denies the allegations in paragraph 52.

13
14
       **E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the
       Company's Chronic and Intentional Lack of Central Oversight**

15    53.    The failure of Wells Fargo's executives and board members to implement adequate

16    auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it

17    has become all too clear that Wells Fargo's leaders intentionally abandoned their oversight

18    responsibilities—and did so to a shocking degree.

19    **ANSWER**:    The Bank denies the allegations in paragraph 53.

20    54.    The most notorious example is the fraudulent account scandal uncovered in 2016,

21    when it was revealed that Wells Fargo employees were encouraged to sign up customers for some

22    3.5 million checking and credit card accounts without their knowledge. Wells Fargo was fined $185

23    million by federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce)

24    were fired for their involvement in the scandal.

25    **ANSWER**:    The Bank admits that it was fined $185 million by various entities, including some of

26    its federal regulators.  The Bank denies the remaining allegations in paragraph 54.

27
28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO SECOND AMENDED CLASS ACTION COMPLAINT
No. 3:18-cv-07354-WHA**

55.     The fraudulent account scandal also involved the Audit & Examination Committee, which ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an institutional investor's request that the Board address its lack of comprehensive audit procedures and adjust compensation policies to discourage abusive sales practices. The two executives most associated with the fraudulent account scandal—John G. Stumpf and Carrie L. Tolstedt—were signatories to one of the 2011 consent orders discussed above and among those responsible for Wells Fargo's failure to comply with the orders by implementing adequate auditing and compliance procedures.

**ANSWER**:     The Bank admits that John G. Stumpf and Carrie L. Tolstedt signed the Bank's 2011 OCC Consent Order.  The Bank denies the remaining allegations in paragraph 55.

56.     This case and the fraudulent account scandal are far from the only examples of Wells Fargo's Board and executive leadership abdicating their oversight responsibilities. Wells Fargo's Board and executive leadership have consistently ignored unlawful practices throughout the Bank's lending divisions, leading to an unprecedented series of government fines. To give just a few more examples:

1. In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage lending practices discriminated against African-American and Hispanic borrowers

2. In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses

3. In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had misrepresented the quality of mortgage loans it sold to Freddie Mac

4. In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for falsely certifying that mortgage loans were eligible for FHA insurance

5. In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations that it engaged in illegal student loan servicing practices

6. In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing insurance on its auto-loan customers (often leading to wrongful vehicle repossessions) and charging its mortgage-loan customers excessive rate-lock fees

7. In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it engaged in a variety of improper practices, including selling customers renters' and life insurance they did not ask for and overcharging for GAP auto insurance

1   **ANSWER**:      To the extent paragraph 56 purports to describe the terms of various settlements, the

2   Bank refers to those settlements for a complete statement of their terms.  The Bank denies the

3   allegations of paragraph 56 to the extent they are inconsistent with those settlements.  The Bank also

4   denies the allegations made in the matters underlying those settlements.

5          57.      Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its

6   central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and

7   executives failed to live up to those promises and continued to abdicate their oversight

8   responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to

9   implement and maintain a compliance risk management program commensurate with the Bank's

10  size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or

11  unsound practices and violations of law."

12  **ANSWER**:      The Bank denies the allegations in paragraph 57.

13         58.      Wells Fargo's persistent failure to implement adequate auditing and compliance

14  procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018,

15  the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its

16  business until it sufficiently improves its governance and controls.

17  **ANSWER**:      The Bank denies the allegations in paragraph 58.

18         59.      In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that

19  Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that

20  senior management had maintained an adequate risk management framework, which resulted in

21  weak compliance practices.

22  **ANSWER**:      To the extent paragraph 59 purports to describe the contents of the "Order to Cease

23  and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended" in the

24  matter of *Wells Fargo & Company, San Francisco, California*, Docket No. 18-007-B-HC (the "2018

25  Order"), the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies

26  the allegations of paragraph 59 to the extent they are inconsistent with the terms of the 2018 Order.

27         60.      Wells Fargo was ordered to submit a plan for reforming Board oversight and

28  governance, including steps that it will take to hold senior management accountable, maintain a

management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

**ANSWER**:     To the extent paragraph 60 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations of paragraph 60 to the extent they are inconsistent with the terms of the 2018 Order.

61.     Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

**ANSWER**:     To the extent paragraph 61 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations of paragraph 61 to the extent they are inconsistent with the terms of the 2018 Order.

62.     Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger.

**ANSWER**:     To the extent paragraph 62 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations of paragraph 62 to the extent they are inconsistent with the terms of the 2018 Order.

63.     As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

**ANSWER**:     To the extent paragraph 63 purports to describe the contents of specific articles or writings, the Bank refers to those writings for a complete statement of their contents.

**F.     Wells Fargo's Disclosure of the 2015 Error and Discovery of More Errors**

64.     A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error. Wells Fargo wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12,

2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. Wells Fargo also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

**ANSWER**:     To the extent paragraph 64 purports to describe the contents of Wells Fargo & Company's Form 10-Q for the quarterly period ended June 30, 2018 (the "Q2 2018 10-Q"), the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations of paragraph 64 to the extent they are inconsistent with the contents of the Q2 2018 10-Q.

65.     Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

**ANSWER**:     To the extent paragraph 65 purports to describe the contents of Wells Fargo & Company's Form 10-Q for the quarterly period ended September 30, 2018 (the "Q3 2018 10-Q"), the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations of paragraph 65 to the extent they are inconsistent with the contents of the Q3 2018 10-Q.

66.     Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its recently filed 10-K Annual Report, Wells Fargo disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

**ANSWER**:     To the extent paragraph 66 purports to describe the contents of Wells Fargo & Company's 2018 Form 10-K, the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations of paragraph 66 to the extent they are inconsistent with the contents of Wells Fargo & Company's 2018 Form 10-K.  The bank denies Plaintiffs' allegation of a "long-overdue review of its mortgage modification software."

67.     In late 2018, Wells Fargo began sending form letters to the customers affected by the errors in its automated decision-making tools. The letters typically included a check for around

1   $15,000, and informed customers that if they were not satisfied with that amount, they could

2   consider mediation through a third-party mediator that Wells Fargo has retained.

3   **ANSWER**:   The Bank admits that it began a voluntary remediation program in the fall of 2018,

4   and that the remediation program included payments to borrowers and invited them to participate in

5   cost-free, voluntary, and non-binding mediation if they believed their concerns had not been

6   sufficiently addressed.  The Bank denies the remaining allegations in paragraph 67.

7   68.   The amounts that Wells Fargo is offering its customers is nowhere near enough to

8   compensate them for the damage that Wells Fargo's conduct caused them, and indicates that while

9   Wells Fargo wants the Federal Reserve to believe it has changed its ways, the company is unwilling

10  to accept full responsibility for the life-altering consequences its behavior has wrought.

11  **ANSWER**:   The Bank denies the allegations in paragraph 68.

12  69.   As a result of Wells Fargo's conduct, the lives of Plaintiffs and class members have

13  been irrevocably altered. Their damages include loss of their homes; loss of equity in their homes;

14  loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and

15  money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of

16  time and money to find new housing and move their families; loss of favorable interest rates or other

17  favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage

18  payments; stress-related illnesses; broken marriages; children coping with the financial and

19  emotional consequences of their parents losing the family home; and severe emotional distress.

20  **ANSWER**:   The Bank denies the allegations in paragraph 69.

21  **PLAINTIFFS' EXPERIENCES**

22  **1.   Debora Granja (California)**

23  70.   Plaintiff Debora Granja purchased her home, located in Brentwood, California, with

24  her then-husband in 2004. The couple eventually had three daughters living with them and put

25  substantial time and money into making the house their own. Wells Fargo became Ms. Granja's

26  mortgage lender following a refinance in 2006.

27  **ANSWER**:   The Bank admits that it became Plaintiff Debora Granja's mortgage lender in 2006,

28  after she refinanced her existing mortgage loan.  The Bank lacks knowledge and information

1  sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 70, and,

2  on that basis, denies the remaining allegations of paragraph 70.

3       71.    Around 2009, Ms. Granja's husband lost his job as a landscaping manager. Ms.

4  Granja, who had been working only part-time, returned to full-time work to support her family.

5  **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

6  or falsity of the allegations of paragraph 71, and, on that basis, denies the allegations of paragraph

7  71.

8       72.    Ms. Granja began seeking a loan modification from Wells Fargo in 2010. Each time

9  she called Wells Fargo, she spoke to a different representative. Initially, the representatives told her

10  that she would easily qualify for a modification based on her circumstances. Ms. Granja tried

11  submitting her loan modification application numerous times. Each time, Wells Fargo would claim it

12  lost her paperwork and would ask her to resend it.

13  **ANSWER**:    The Bank admits that Ms. Granja began seeking a trial loan modification from the

14  Bank in 2010.  The Bank denies the remaining allegations in paragraph 72.

15       73.    Eventually, around 2012, Wells Fargo representatives falsely told Ms. Granja that she

16  did not qualify for a modification. The Bank foreclosed on her house in 2014 and Ms. Granja was

17  forced to find a rental home for her family. Her daughters had to change schools and leave the only

18  environment they knew.

19  **ANSWER**:    The Bank admits that a foreclosure was completed on the property securing Ms.

20  Granja's loan.  The Bank denies that its representatives "falsely told Ms. Granja that she did not

21  qualify for a loan modification."  The Bank lacks knowledge and information sufficient to form a

22  basis as to the truth or falsity of the remaining allegations of paragraph 73, and, on that basis, denies

23  the remaining allegations of paragraph 73.

24       74.    Wells Fargo's failure to grant Ms. Granja a loan modification caused great strain on

25  her marriage. Ms. Granja and her husband legally separated around the time of the foreclosure. The

26  stress of the foreclosure also severely affected Ms. Granja's health. She was diagnosed with severe

27  depression in 2013. Four years later, Ms. Granja was diagnosed with acute traumatic stress disorder.

28

1  Her breakdown was triggered by a minor car accident but caused by an accumulation of stress over

2  recent years, including from the foreclosure.

3  **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

4  or falsity of the allegations of paragraph 74, and, on that basis, denies the allegations of paragraph

5  74.

6      75.    In September 2018, Ms. Granja's ex-husband received a letter from Wells Fargo

7  informing him and Ms. Granja that their mortgage modification should have been approved but was

8  not approved due to an error. He notified Ms. Granja of the letter and she contacted Wells Fargo to

9  provide it with her contact information. Ms. Granja was one of the customers wrongly denied a

10  mortgage modification because of systematic errors in Wells Fargo's automated decision-making

11  tool.

12  **ANSWER**:    The Bank denies that "Ms. Granja was one of the customers wrongly denied a

13  mortgage modification because of systematic errors in Wells Fargo's automated decision-making

14  tool."  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity

15  of the remaining allegations of paragraph 75, and, on that basis, denies the remaining allegations of

16  paragraph 75.

17      76.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

18  making tool, Ms. Granja's life has been irrevocably altered. Her injuries include loss of her family's

19  home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

20  loss of appreciation in her home's value following the sale; loss of time and money spent to find

21  replacement housing and move her family; loss of time and money spent in an effort to avoid

22  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

23  **ANSWER**:    The Bank denies the allegations in paragraph 76.

24          **2.    Keith Lindner (California)**

25      77.    Mr. Lindner bought a home for his family in Visalia, California in 2003, financing the

26  purchase with a mortgage loan from Wells Fargo. He moved in shortly thereafter with his partner,

27  daughter, and two young stepsons.

28

1    **ANSWER**:      The Bank admits that Mr. Lindner purchased property in Visalia, California in 2003

2    and that he financed the purchase with a loan from Wells Fargo Home Mortgage, Inc., upon

3    information and belief.  The Bank lacks knowledge and information sufficient to form a basis as to

4    the truth or falsity of the remaining allegations of paragraph 77, and, on that basis, denies the

5    remaining allegations of paragraph 77.

6          78.    As a seasoned professional in the construction industry, Mr. Lindner made wholesale

7    improvements to the home. He built a 16-by-24-foot addition, replaced the windows, carpeting,

8    flooring and interior doors, installed new lighting, and rebuilt showers and closets, among other

9    things.

10   **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

11   or falsity of the allegations of paragraph 78, and, on that basis, denies the allegations of paragraph

12   78.

13         79.    In 2006, Mr. Lindner began to experience some medical issues. It took a long time for

14   doctors to arrive at the correct diagnosis, and he eventually had surgery in 2008. Following the

15   surgery, he was unable to work for two months. Around the same time, the construction industry

16   began to suffer from the effects of the Great Recession. Mr. Lindner's partner, who by this time was

17   his wife, had recently obtained a master's degree, but was having a hard time finding work. Mr.

18   Lindner's father also fell ill, and Mr. Lindner missed more time at work to be with his ailing father.

19   **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

20   or falsity of the allegations of paragraph 79, and, on that basis, denies the allegations of paragraph

21   79.

22         80.    In 2009, Mr. Lindner was laid off from his job with the company that had employed

23   him for the previous seven years. This caused the Lindners' already-difficult financial situation to

24   become critical. Mr. Lindner reached out to Wells Fargo to tell them about his financial difficulties

25   and asked them if they could provide any assistance with his mortgage so that his family could stay

26   in their home. Wells Fargo denied his request.

27   **ANSWER**:      The Bank admits that it opened a home preservation review for Mr. Lindner in May

28   2009, and that it entered into a Special Forbearance Plan with Mr. Lindner in June 2009.  The Bank

lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 80, and, on that basis, denies the remaining allegations of paragraph 80.

81.    Mr. Lindner did everything he could to make ends meet, but money became tighter and tighter every month. This took a tremendous toll on the Lindners' marriage, and they separated in September of 2009. Mrs. Lindner moved out of the house with her two sons from a previous relationship, leaving Mr. Lindner with their son, who was about three years old at the time.

**ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 81, and, on that basis, denies the allegations of paragraph 81.

82.    Mr. Lindner continued to write hardship letters to Wells Fargo and to apply for a mortgage modification, but was rejected time and time again, both verbally and in writing. Eventually, Mr. Lindner realized that his situation was untenable, and he would have to leave the home. In 2011, Wells Fargo offered him a "cash for keys" deal and paid him $2,000 to leave his home with his young son.

**ANSWER**:    The Bank admits that it opened several more home preservation reviews for Mr. Lindner.  The Bank denies that Mr. Lindner was "rejected time and time again, both verbally and in writing."  The Bank also denies that "in 2011, [it] offered [Mr. Lindner] a 'cash for keys' deal and paid him $2,000 to leave his home with his young son."  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations in paragraph 82, and, on that basis, denies the remaining allegations of paragraph 82.

83.    Mr. Lindner and his son, who was in kindergarten or first grade at the time, were forced to live in a series of uncomfortable situations, renting rooms in other people's houses until Mr. Lindner obtained his contractor's license in 2013, and was finally able to rent a house in 2014.

**ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 83, and, on that basis, denies the allegations of paragraph 83.

84.    Mr. Lindner and his son suffered significant depression and anguish as a result of losing their home. The boy was sad about having to move from the only home he had known, and

1  still fondly remembers it and the friends he left behind. Mr. Lindner was prescribed anti-depressants

2  but did not have a good reaction to them. Mr. Lindner is still recovering from the impact of losing

3  his home, having his credit destroyed, and everything else that he endured as a result of being denied

4  a mortgage modification. His goal now is to be able to buy a home near his ex-wife so that he can be

5  closer to his son and provide him with a secure home.

6  **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

7  or falsity of the allegations of paragraph 84, and, on that basis, denies the allegations of paragraph

8  84.

9       85.     In late 2018, Mr. Lindner received a letter from Wells Fargo informing him that his

10  mortgage modification should have been approved but was not approved due to an error. Mr.

11  Lindner was one of the customers wrongly denied a mortgage modification because of systematic

12  errors in Wells Fargo's automated decision-making tool.

13  **ANSWER**:     The Bank admits that Mr. Lindner received a letter from the Bank in the fall of 2018,

14  upon information and belief.  To the extent paragraph 85 purports to describe the contents of that

15  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

16  the allegations of paragraph 85 to the extent they are inconsistent with the contents of the letter.  The

17  Bank also denies that "Mr. Lindner was one of the customers wrongly denied a mortgage

18  modification because of systematic errors in Wells Fargo's automated decision-making tool."

19       86.     As a result of Wells Fargo's repeated failure to properly test its automated decision-

20  making tool, Mr. Lindner's life has been irrevocably altered. His injuries include loss of his family's

21  home and the time and money put into that home; loss of equity in his home; loss of tax benefits;

22  loss of appreciation in his home's value; loss of time and money spent to find replacement housing

23  and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his

24  credit and resulting opportunity costs; and severe emotional distress.

25  **ANSWER**:     The Bank denies the allegations in paragraph 86.

26

27

28

### 3.   Emma White (Florida)

87.   Plaintiff Emma White purchased her home, located in Callahan, Florida, in 2006. She was a single mother who moved into the house with her four children. The property was purchased through a mortgage loan that Wells Fargo later acquired.

**ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 87, and, on that basis, denies the allegations of paragraph 87.

88.   Around 2009, Ms. White began experiencing financial hardship. She had accumulated debt supporting her children and applied for a mortgage loan modification so that the family could keep their home. The loan modification process was long and complicated. Ms. White kept having to send in the same paperwork over and over again, only to ultimately receive a letter from Wells Fargo in 2013 saying that she did not qualify for a modification.

**ANSWER**:   The Bank denies that Ms. White received a letter from the Bank in 2013 "saying that she did not qualify for a modification."  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 88, and, on that basis, denies the remaining allegations of paragraph 88.

89.   Wells Fargo had already initiated foreclosure proceedings, so after it denied her request for a mortgage modification, Ms. White was forced to leave her house. She found a rental apartment in Jacksonville, Florida, for her and three of her children, while Wells Fargo completed its foreclosure of their old home.

**ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 89, and, on that basis, denies the allegations of paragraph 89.

90.   Wells Fargo's actions caused Ms. White significant emotional distress. The foreclosure devastated her, especially because she had to support her children and work to make sure the family had a place to live. Ms. White had been suffering from the stress of supporting her children and other recent events in her life, and the foreclosure multiplied that stress. As a result of everything that was going on in her life, including the foreclosure, Ms. White was diagnosed with

1  depression and began taking antidepressants. Ms. White's children were also affected by the

2  foreclosure. She had to explain to them that she tried her best to keep the house, but ultimately could

3  not do so.

4  **ANSWER**:      The Bank denies the allegations in paragraph 90.

5      91.      In late 2018, Ms. White received a letter from Wells Fargo informing her that her

6  mortgage modification should have been approved but was not approved due to an error. Ms. White

7  was one of the customers wrongly denied a mortgage modification because of systematic errors in

8  Wells Fargo's automated decision-making tool.

9  **ANSWER**:      The Bank admits that Ms. White received a letter from the Bank in the fall of 2018,

10 upon information and belief.  To the extent paragraph 91 purports to describe the contents of that

11 letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

12 the allegations of paragraph 91 to the extent they are inconsistent with the contents of the letter.  The

13 Bank denies that "Ms. White was one of the customers wrongly denied a mortgage modification

14 because of systematic errors in Wells Fargo's automated decision-making tool."

15      92.      As a result of Wells Fargo's repeated failure to properly test its automated decision-

16 making tool, Ms. White's life has been irrevocably altered. Her injuries include loss of her family's

17 home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

18 loss of appreciation in her home's value following the sale; loss of time and money spent to find

19 replacement housing and move her family; loss of time and money spent in an effort to avoid

20 foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

21 **ANSWER**:      The Bank denies the allegations in paragraph 92.

22          **4.      Troy Frye (Georgia)**

23      93.      In 2009, Mr. Frye bought a home in Hephzibah, GA for himself and his partner, their

24 two young sons (who were about five and seven years old at the time), and his partner's daughter.

25 **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

26 or falsity of the allegations of paragraph 93, and, on that basis, denies the allegations of paragraph

27 93.

28

94.     Around the beginning of 2013, Mr. Frye was laid off from his job at a local manufacturing plant where he had been employed for about eight to ten years. He applied for and received unemployment assistance, but still was not able to make the monthly mortgage payments on his home. He reached out to Wells Fargo (his mortgage servicer), to see if they would grant him a mortgage modification, which they did in late February 2013.

**ANSWER**:     The Bank admits that it entered into a document entitled "Loan Modification Agreement" with Mr. Frye in February 2013.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 94, and, on that basis, denies the remaining allegations of paragraph 94.

95.     Unfortunately, Mr. Frye's new monthly mortgage payment was not significantly lower, and Mr. Frye continued to have difficulty making his payments. He attempted to get a second modification from Wells Fargo, but this time he was denied—both verbally and in writing. Wells Fargo then initiated foreclosure proceedings.

**ANSWER**:     The Bank admits that Mr. Frye attempted to get a second trial loan modification and that his request for a trial modification was denied.  The Bank also admits that it initiated foreclosure proceedings.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 95, and, on that basis, denies the remaining allegations of paragraph 95.

96.     The strain of Mr. Frye's financial hardship, coupled with the uncertainty and stress of the impending foreclosure, had a big impact on Mr. Frye and his family. The relationship between Mr. Frye and the mother of his children became very strained, and in 2014, she moved out with their two boys and her daughter, leaving Mr. Frye alone in the home.

**ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 96, and, on that basis, denies the allegations of paragraph 96.

97.     Mr. Frye was able to delay foreclosure proceedings for a while, but Wells Fargo persisted in their efforts to remove him from his home. Around the beginning of 2015, Wells Fargo asked him how much they would need to pay him to leave. Confused and frustrated by the situation,

1   Mr. Frye said he would accept $2,000. The house had recently been damaged by a kitchen fire that

2   broke out while Mr. Frye was sleeping, and from which he was fortunate to escape with his life. He

3   accepted the $2,000 from Wells Fargo and moved out, as the house was no longer habitable.

4   **ANSWER**:   The Bank admits that it provided Mr. Frye $2,000 in relocation assistance.  The Bank

5   denies that it "persisted" in "efforts to remove him from his home."  The Bank lacks knowledge and

6   information sufficient to form a basis as to the truth or falsity of the remaining allegations of

7   paragraph 97, and, on that basis, denies the remaining allegations of paragraph 97.

8        98.   Mr. Frye and his children suffered emotional trauma and depression as a result of the

9   foreclosure and the effects that it had on their lives. They all tried to move on as best they could.

10  **ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth

11  or falsity of the allegations of paragraph 98, and, on that basis, denies the allegations of paragraph

12  98.

13       99.   In late 2018, Mr. Frye received a letter from Wells Fargo informing him that his

14  second mortgage modification request should have been approved but was not approved due to an

15  error. Mr. Frye was one of the customers wrongly denied a mortgage modification because of

16  systematic errors in Wells Fargo's automated decision-making tool.

17  **ANSWER**:   The Bank admits that Mr. Frye received a letter from the Bank in the fall of 2018,

18  upon information and belief.  To the extent paragraph 99 purports to describe the contents of that

19  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

20  the allegations of paragraph 99 to the extent they are inconsistent with the contents of the letter.  The

21  Bank denies that "Mr. Frye was one of the customers wrongly denied a mortgage modification

22  because of systematic errors in Wells Fargo's automated decision-making tool."

23       100.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

24  making tool, Mr. Frye's life has been irrevocably altered. His injuries include loss of his family's

25  home and the time and money put into that home; loss of equity in his home; loss of tax benefits;

26  loss of appreciation in his home's value; loss of time and money spent to find replacement housing

27  and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his

28  credit and resulting opportunity costs; and severe emotional distress.

1    **ANSWER**:      The Bank denies the allegations in paragraph 100.

2                      **5.        Coszetta Teague (Illinois)**

3          101.    Plaintiff Coszetta Teague purchased a home in Calumet City, Illinois, for herself and

4    her daughter, Plaintiff Iesha Brown, in June 2010. Ms. Teague's two young grandchildren moved in

5    shortly thereafter. The property was purchased through a mortgage loan with Wells Fargo.

6    **ANSWER**:      The Bank admits that Ms. Teague financed her purchase of the subject property

7    through a mortgage loan with the Bank.  The Bank lacks knowledge and information sufficient to

8    form a basis as to the truth or falsity of the remaining allegations of paragraph 101, and, on that

9    basis, denies the remaining allegations of paragraph 101.

10         102.    In 2010, Ms. Teague was laid off from her job at Chase Bank. In 2011, Ms. Teague

11   lost her mother and her property taxes went up. As a result, Ms. Teague could no longer afford to

12   make her monthly payments, and reached out to Wells Fargo to see if they could help.

13   **ANSWER**:      The Bank admits that Ms. Teague requested assistance from the Bank.  The Bank

14   lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

15   allegations of paragraph 102, and, on that basis, denies the remaining allegations of paragraph 102.

16         103.    Wells Fargo told Ms. Teague to fill out paperwork. Ms. Teague did as she was told,

17   but when she later inquired about the status of her modification request, she was told that it had been

18   lost and that she would have to redo it. It took a long time for Wells Fargo to process Ms. Teague's

19   application, and Wells Fargo's representatives were often impolite during the process, but eventually

20   Wells Fargo told Ms. Teague that she did not qualify for a mortgage modification and it was going

21   to initiate foreclosure proceedings.

22   **ANSWER**:      The Bank admits that it asked Ms. Teague to fill out paperwork and that it eventually

23   told her it could not offer her a trial mortgage modification.  The Bank denies the remaining

24   allegations in paragraph 103.

25         104.    Afraid that the sheriff was going to remove her from her home, Ms. Teague asked her

26   brother to help move her belongings to storage. She hired a foreclosure defense attorney, who

27   charged her $4,000 but was unable to help. Ms. Teague and her family vacated the home in the latter

28   part of 2014 and Wells Fargo foreclosed shortly thereafter.

1    **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

2    or falsity of the remaining allegations of paragraph 104, and, on that basis, denies the remaining

3    allegations of paragraph 104.

4           105.    Ms. Teague, her daughter, and her two grandchildren lived in Ms. Teague's car for

5    several months, until she was able to find an apartment sometime around March 2015.

6    **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

7    or falsity of the allegations of paragraph 105, and, on that basis, denies the allegations of paragraph

8    105.

9           106.    The experience was emotionally devastating for all concerned. Ms. Brown was very

10   depressed and had suicidal ideations. She was prescribed antidepressants, including Zoloft. The

11   grandchildren, who were around four and nine at the time, were sad and confused about losing their

12   home and having to live in a car, change schools, and leave all their friends. They shut down,

13   stopped interacting with people, and attended therapy. Ms. Teague also experienced depression

14   following the foreclosure, and was prescribed antidepressants, including Zoloft. She is currently on

15   Social Security and disability benefits.

16   **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

17   or falsity of the allegations of paragraph 106, and, on that basis, denies the allegations of paragraph

18   106.

19          107.    In late 2018, Ms. Teague received a letter from Wells Fargo informing her that her

20   mortgage modification should have been approved but was not approved due to an error. Ms. Teague

21   was one of the customers wrongly denied a mortgage modification because of systematic errors in

22   Wells Fargo's automated decision-making tool.

23   **ANSWER**:     The Bank admits that Ms. Teague received a letter from the Bank in the fall of 2018,

24   upon information and belief.  To the extent paragraph 107 purports to describe the contents of that

25   letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

26   the allegations of paragraph 107 to the extent they are inconsistent with the contents of the letter.

27   The Bank denies that "Ms. Teague was one of the customers wrongly denied a mortgage

28   modification because of systematic errors in Wells Fargo's automated decision-making tool."

1   108.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

2   making tool, Ms. Teague and her family's lives have been irrevocably altered. Their injuries include

3   loss of their home and the time and money put into that home; loss of equity in the home; loss of tax

4   benefits; loss of appreciation in the home's value following the sale; loss of time and money spent to

5   find replacement shelter and relocate; loss of time and money spent in an effort to avoid foreclosure;

6   damage to Ms. Teague's credit and resulting opportunity costs; and severe emotional distress.

7   **ANSWER**:   The Bank denies the allegations in paragraph 108.

8                 **6.   Russell and Brenda Simoneaux (Louisiana)**

9   109.   Plaintiffs Russell and Brenda Simoneaux purchased their home in Baton Rouge,

10  Louisiana, in 1992.

11  **ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth

12  or falsity of the allegations of paragraph 109, and, on that basis, denies the allegations of paragraph

13  109.

14  110.   Mr. and Mrs. Simoneaux contacted Wells Fargo, their mortgage loan servicer, in

15  2013 because Mr. Simoneaux had recently retired and the couple was living on a fixed income. They

16  applied for a mortgage modification, but were denied.

17  **ANSWER**:   The Bank admits that Mr. and Mrs. Simoneaux applied for a trial mortgage

18  modification and were denied a trial mortgage modification.  The Bank lacks knowledge and

19  information sufficient to form a basis as to the truth or falsity of the remaining allegations of

20  paragraph 110, and, on that basis, denies the remaining allegations of paragraph 110.

21  111.   Without a mortgage modification, Mr. and Mrs. Simoneaux had a very difficult time

22  meeting their mortgage obligations. Mr. and Mrs. Simoneaux were both forced to take side jobs for

23  extra income, the couple avoided eating out, and they watched every penny they spent for several

24  years—until their mortgage was finally paid off in late 2018. It was an extremely stressful time.

25  **ANSWER**:   The Bank admits that Mr. and Mrs. Simoneaux paid off their mortgage in 2018.  The

26  Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the

27  remaining allegations of paragraph 111, and, on that basis, denies the remaining allegations of

28  paragraph 111.

1      112.   In October 2018, Mr. and Mrs. Simoneaux received a letter from Wells Fargo

2  informing them that their request for a mortgage modification should have been approved but was

3  not approved due to an error. Mr. and Mrs. Simoneaux were among the customers wrongly denied a

4  mortgage modification because of systematic errors in Wells Fargo's automated decision-making

5  tool.

6  **ANSWER**:   The Bank admits that Mr. and Mrs. Simoneaux received a letter from the Bank in the

7  fall of 2018, upon information and belief.  To the extent paragraph 112 purports to describe the

8  contents of that letter, the Bank refers to that document for a complete statement of its contents.  The

9  Bank denies the allegations of paragraph 112 to the extent they are inconsistent with the contents of

10  the letter.  The Bank denies that "Mr. and Mrs. Simoneaux were among the customers wrongly

11  denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-

12  making tool."

13      113.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

14  making tool, Mr. and Mrs. Simoneaux were forced to make numerous sacrifices and endure

15  significant stress as they struggled to meet mortgage payments that should have been lowered. Their

16  injuries include loss of more beneficial loan terms; loss of time spent avoiding foreclosure; and

17  opportunity costs resulting from higher mortgage payments.

18  **ANSWER**:   The Bank denies the allegations in paragraph 113.

19          **7.**    **John and Yvonne DeMartino (Maryland)**

20      114.   In 2008, Plaintiffs John and Yvonne DeMartino bought a single-family home for

21  $239,000 in Baltimore, Maryland, with a mortgage loan from Wells Fargo. The home was located

22  next door to their residence. The plan was for Yvonne's mother, Margaret, then in her late seventies

23  and suffering from Parkinson's disease, to move in to be cared for by Yvonne when she was no

24  longer able to live by herself.

25  **ANSWER**:   The Bank denies that Plaintiffs John and Yvonne Martino financed their purchase of

26  the subject property through a mortgage loan with the Bank.  The Bank lacks knowledge and

27  information sufficient to form a basis as to the truth or falsity of the remaining allegations of

28  paragraph 114, and, on that basis, denies the remaining allegations of paragraph 114.

1    115.    After the DeMartinos bought the home, their pregnant daughter and son-in-law

2    moved in, with the understanding that they would pay the mortgage and live there until Margaret

3    needed to move in. They got behind on their mortgage payments, however, and the DeMartinos had

4    to tap into their savings to bring the mortgage current. In or around 2013, the DeMartinos' daughter

5    and son-in- law fell behind on the mortgage payments again, but this time the DeMartinos couldn't

6    afford to bring the debt current. The DeMartinos applied for a mortgage modification from Wells

7    Fargo but were denied. Wells Fargo foreclosed on the home in around 2013 or 2014.

8    **ANSWER**:    The Bank admits that the DeMartinos applied for a trial mortgage modification in

9    early 2013 and that the application for a trial mortgage modification was denied.  The Bank denies

10   that it foreclosed on the home in around 2013 or 2014.  The Bank lacks knowledge and information

11   sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 115, and,

12   on that basis, denies the remaining allegations of paragraph 115.

13    116.    Mr. and Mrs. DeMartino suffered great stress and anxiety as a result of the

14   foreclosure. They were humiliated and afraid to pick up the phone. Mr. DeMartino has tried to get

15   the foreclosure removed from his record. He was told by Wells Fargo that it cannot be erased,

16   however, because even though it was in error, the foreclosure did in fact occur.

17   **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

18   or falsity of the allegations of paragraph 116, and, on that basis, denies the allegations of paragraph

19   116.

20    117.    Margaret, now 87, lives in a nursing home some distance away, and Mrs. DeMartino

21   has a difficult time getting there to see her. The DeMartinos feel terrible every time they look at the

22   house next door, where Margaret would be living under Mrs. DeMartino's care had Wells Fargo not

23   foreclosed on the home.

24   **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

25   or falsity of the allegations of paragraph 117, and, on that basis, denies the allegations of paragraph

26   117.

27    118.    In late 2018, the DeMartinos received a letter from Wells Fargo informing them that

28   their request for a mortgage modification should have been approved but was not approved due to an

1   error. The DeMartinos were among the customers wrongly denied a mortgage modification because

2   of systematic errors in Wells Fargo's automated decision-making tool.

3   **ANSWER**:   The Bank admits that Mr. and Mrs. DeMartino received a letter from the Bank in the

4   fall of 2018, upon information and belief.  To the extent paragraph 118 purports to describe the

5   contents of that letter, the Bank refers to that document for a complete statement of its contents.  The

6   Bank denies the allegations of paragraph 118 to the extent they are inconsistent with the contents of

7   the letter.  The Bank denies that "Mr. and Mrs. DeMartino were among the customers wrongly

8   denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-

9   making tool."

10      119.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

11   making tool, the DeMartinos has suffered life-altering consequences. Their injuries include loss of

12   their house time and money put into that house; loss of equity in the house; loss of appreciation in

13   the house's value following the sale; loss of time and money spent to find replacement housing for

14   Ms. DeMartino's mother; loss of time and money spent in an effort to avoid foreclosure; damage to

15   their credit and resulting opportunity costs; and severe emotional distress.

16   **ANSWER**:   The Bank denies the allegations in paragraph 119.

17          **8.    Alicia Hernandez (New Jersey)**

18      120.   Plaintiff Alicia Hernandez bought her studio condominium, located in North Bergen,

19   New Jersey, in 2006. The property was purchased through a mortgage loan with Wells Fargo.

20   **ANSWER**:   The Bank admits that Plaintiff Alicia Hernandez purchased the subject property in

21   North Bergen, New Jersey in 2006 and that she financed that purchase through a mortgage loan with

22   the Bank.   The Bank lacks knowledge and information sufficient to form a basis as to the truth or

23   falsity of the remaining allegations of paragraph 120, and, on that basis, denies the remaining

24   allegations of paragraph 120.

25      121.   Ms. Hernandez already owned another unit in the complex and thought the studio,

26   with a lot of work, could be developed into an attractive rental due to its close proximity to New

27   York City. It's right across the river from Manhattan, and only a seven-minute drive from Times

28

1   Square with no traffic. Ms. Hernandez planned to keep the property in her family forever. The unit

2   also had a deeded parking spot, and parking is very difficult to come by in that area.

3   **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

4   or falsity of the allegations of paragraph 121, and, on that basis, denies the allegations of paragraph

5   121.

6          122.    When Ms. Hernandez purchased her studio, it was just a shell—it had no kitchen and

7   there were bullet holes in the door. But Ms. Hernandez was willing to put in the work, time, and

8   money to create an income-generating property that could provide for her and her family. She tapped

9   into her retirement account and installed new flooring, new appliances, new bathroom fixtures,

10  recessed lighting, and a new air conditioning unit. She also had to contribute additional money when

11  the homeowners' association imposed special assessments.

12  **ANSWER**:      The Bank lacks knowledge and information sufficient to form a basis as to the truth

13  or falsity of the allegations of paragraph 122, and, on that basis, denies the allegations of paragraph

14  122.

15         123.    During the Great Recession, Ms. Hernandez lost her job in a mass layoff, and with the

16  property now her only source of income, had difficulty making her monthly mortgage payment. She

17  applied for a mortgage modification in 2012-13, but Wells Fargo told her that she didn't qualify and

18  instituted foreclosure proceedings in late 2013.

19  **ANSWER**:      The Bank denies that "Ms. Hernandez applied for a mortgage modification in 2012-

20  13, but [the Bank] told her that she didn't qualify" and denies that the Bank "instituted foreclosure

21  proceedings in late 2013."  The Bank lacks knowledge and information sufficient to form a basis as

22  to the truth or falsity of the remaining allegations of paragraph 123, and, on that basis, denies the

23  remaining allegations of paragraph 123.

24         124.    Ms. Hernandez fought foreclosure for several years, but Wells Fargo eventually

25  foreclosed on her property in late 2015. The stress of the foreclosure process had a devastating effect

26  on Ms. Hernandez and her husband. As non-lawyers, the anxiety and confusion of dealing with the

27  court system and the legal process took a severe toll on them emotionally. Ms. Hernandez had a

28

1  miscarriage during the foreclosure process and was hospitalized for the first time in her life. She also

2  suffered insomnia, panic attacks, and difficulty breathing.

3  **ANSWER**:     The Bank admits that Ms. Hernandez contested the foreclosure of the subject

4  property.  The Bank denies that it "eventually foreclosed on her property in late 2015."  The Bank

5  lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

6  allegations of paragraph 124, and, on that basis, denies the remaining allegations of paragraph 124.

7         125.    Ms. Hernandez's husband is a police officer, and both were very concerned about the

8  effects that the foreclosure might have on him professionally. This put a lot of strain on their

9  marriage and caused embarrassment when they ran into colleagues of his while attending court to

10  fight foreclosure. Eventually, Ms. Hernandez and her husband moved to Easton, Pennsylvania, to

11  escape the stress of being in the same community, and her husband now commutes approximately an

12  hour and 15 minutes to work.

13  **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

14  or falsity of the allegations of paragraph 125, and, on that basis, denies the allegations of paragraph

15  125.

16         126.    In late 2018, Ms. Hernandez received a letter from Wells Fargo informing her that her

17  request for a mortgage modification should have been approved but was not approved due to an

18  error. Ms. Hernandez was one of the customers wrongly denied a mortgage modification because of

19  systematic errors in Wells Fargo's automated decision-making tool.

20  **ANSWER**:     The Bank admits that Ms. Hernandez received a letter from the Bank in the fall of

21  2018, upon information and belief.  To the extent paragraph 126 purports to describe the contents of

22  that letter, the Bank refers to that document for a complete statement of its contents.  The Bank

23  denies the allegations of paragraph 126 to the extent they are inconsistent with the contents of the

24  letter.  The Bank denies that "Ms. Hernandez was one of the customers wrongly denied a mortgage

25  modification because of systematic errors in Wells Fargo's automated decision-making tool."

26         127.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

27  making tool, Ms. Hernandez has suffered life-altering consequences. Her injuries include loss of her

28  property and the time and money put into that property; loss of equity in her property; loss of

appreciation in her property's value following the sale; loss of time and money spent fighting foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

**ANSWER**:   The Bank denies the allegations in paragraph 127.

### 9. Rose Wilson (New York)

128.   Plaintiff Rose Wilson purchased her home, located in Rochester, New York, in or around 1995. Ms. Wilson lived in the home for many years with her family, and put a lot of time and money into the property—including by renovating the kitchen and bathroom.

**ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 128, and, on that basis, denies the allegations of paragraph 128.

129.   After Ms. Wilson lost her job due to the economic downturn, however, she struggled to make the mortgage payments on her home.

**ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 129, and, on that basis, denies the allegations of paragraph 129.

130.   She applied for a mortgage modification from Wells Fargo (her mortgage servicer) multiple times over the course of several years. Wells Fargo kept stringing her along, requiring her to make monthly payments she could not afford in order to qualify for a mortgage modification, and then telling her the request had been denied and she would need to reapply and start the process all over again.

**ANSWER**:   The Bank denies the allegations in paragraph 130.

131.   Ms. Wilson's attempt to obtain a mortgage modification from Wells Fargo and save her home went on for years. During this time, Ms. Wilson had to make many sacrifices to keep making her mortgage payments. She tapped into her retirement account early, incurring tax penalties to do so.

**ANSWER**:   The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 131, and, on that basis, denies the allegations of paragraph 131.

1    132.    Ms. Wilson's efforts to save her home were ultimately unsuccessful, however, and

2    Wells Fargo foreclosed in 2014. At the time of the foreclosure, Ms. Wilson's daughter, son-in-law,

3    and their two children lived with her. They were all forced to move from their home to a cramped,

4    moldy, rodent-infested rental property. The aftermath of the foreclosure caused Ms. Wilson

5    significant stress and depression. She had worked hard to purchase a home and provide for her

6    family, but after the foreclosure, Ms. Wilson felt utterly defeated and left with nothing. It has taken

7    many years for the pain to subside, but she still feels immense sadness whenever she drives by her

8    former house or thinks about her old life.

9    **ANSWER**:    The Bank admits that a foreclosure was completed on the property securing Ms.

10   Wilson's loan in 2014.  The Bank lacks knowledge and information sufficient to form a basis as to

11   the truth or falsity of the remaining allegations of paragraph 132, and, on that basis, denies the

12   remaining allegations of paragraph 132.

13   133.    In late 2018, Ms. Wilson received a letter from Wells Fargo informing her that her

14   request for a mortgage modification should have been approved but was not approved due to an

15   error. Ms. Wilson was one of the customers wrongly denied a mortgage modification because of

16   systematic errors in Wells Fargo's automated decision-making tool.

17   **ANSWER**:    The Bank admits that Ms. Wilson received a letter from the Bank in the fall of 2018,

18   upon information and belief.  To the extent paragraph 133 purports to describe the contents of that

19   letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

20   the allegations of paragraph 133 to the extent they are inconsistent with the contents of the letter.

21   The Bank denies that "Ms. Wilson was one of the customers wrongly denied a mortgage

22   modification because of systematic errors in Wells Fargo's automated decision-making tool."

23   134.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

24   making tool, Ms. Wilson has suffered life-altering consequences. Her injuries include loss of her

25   home and the time and money put into that property; loss of equity in her property; loss of

26   appreciation in her property's value following the sale; loss of time and money spent fighting

27   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

28   **ANSWER**:    The Bank denies the allegations in paragraph 134.

1     **10.     Tiffanie Hood (Ohio)**

2          135.    In May of 2001, Ms. Hood bought a three-bedroom home for her family in

3    Cincinnati, Ohio. She moved in with her young children—her son was about eight years old at the

4    time, and her daughter was about 11.

5    **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

6    or falsity of the allegations of paragraph 135, and, on that basis, denies the allegations of

7    paragraph 135.

8          136.    The home was built in 1926 and needed quite a bit of work. Ms. Hood invested

9    significant resources putting in a kitchen, repairing the roof, replacing the garage door and front

10   door, and completing various other necessary repairs.

11   **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

12   or falsity of the allegations of paragraph 136, and, on that basis, denies the allegations of

13   paragraph 136.

14         137.    In or around 2013, Ms. Hood had difficulty making the monthly payment and reached

15   out to Wells Fargo for help. Her request for a mortgage modification was denied, and Wells Fargo

16   initiated foreclosure proceedings. Ms. Hood and her family were forced out of their home in late

17   2014.

18   **ANSWER**:  The Bank admits that it opened several home preservation reviews for Ms. Hood.  The

19   Bank denies that it never provided Ms. Hood with home preservation assistance.  The Bank lacks

20   knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

21   allegations of paragraph 137, and, on that basis, denies the remaining allegations of paragraph 137.

22         138.    Ms. Hood and her children suffered emotional trauma and depression as a result of

23   the foreclosure and the effects that it had on their lives. They all tried to move on as best they

24   could.

25   **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

26   or falsity of the allegations of paragraph 138, and, on that basis, denies the allegations of

27   paragraph 138.

28

1   139.    In late 2018, Ms. Hood received a letter from Wells Fargo informing her that her

2   mortgage modification should have been approved but was not approved due to an error. Ms. Hood

3   was one of the customers wrongly denied a mortgage modification because of systematic errors in

4   Wells Fargo's automated decision-making tool.

5   **ANSWER**:    The Bank admits that Ms. Hood received a letter from the Bank in the fall of 2018,

6   upon information and belief.  To the extent paragraph 139 purports to describe the contents of that

7   letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

8   the allegations of paragraph 139 to the extent they are inconsistent with the contents of the letter.

9   The Bank denies that "Ms. Hood was one of the customers wrongly denied a mortgage modification

10   because of systematic errors in Wells Fargo's automated decision-making tool."

11   140.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

12   making tool, Ms. Hood life has been irrevocably altered. Her injuries include loss of her family's

13   home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

14   loss of appreciation in her home's value following foreclosure; loss of time and money spent to find

15   replacement housing and move her family; loss of time and money spent in an effort to avoid

16   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

17   **ANSWER**:    The Bank denies the allegations in paragraph 140.

18          **11.    George and Cyndi Floyd (Pennsylvania)**

19   141.    Plaintiffs George and Cyndi Floyd purchased their home, located in Lancaster,

20   Pennsylvania, in 2004. The property was purchased through a mortgage loan with Wachovia, which

21   was later transferred to Wells Fargo.

22   **ANSWER**:    The Bank admits the allegations in paragraph 141.

23   142.    After the financial crisis hit, the Floyds had difficulty making their mortgage

24   payments. Mr. Floyd lost his job when the company he worked for closed, and Mrs. Floyd later lost

25   her job due to the economic recession as well.

26   **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

27   or falsity of the allegations of paragraph 142, and, on that basis, denies the allegations of paragraph

28   142.

143.    In an effort to save their home, the Floyds went to great lengths: they applied for numerous mortgage modifications over a period of two years; they paid a company to help them avoid foreclosure; and they spent countless hours reaching out to various other companies, government agencies, and even Congressional representatives for help.

**ANSWER**:    The Bank admits that the Floyds requested home preservation assistance from the Bank.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 143, and, on that basis, denies the remaining allegations of paragraph 143.

144.    The Floyds' efforts were ultimately unsuccessful. Wells Fargo denied their final request for a mortgage modification in November 2011 and initiated foreclosure proceedings. The Floyds were forced to move to a new home in Philadelphia.

**ANSWER**:    The Bank admits that it denied the Floyds a trial mortgage modification in November 2011 but denies that it initiated foreclosure proceedings in November 2011.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 144, and, on that basis, denies the remaining allegations of paragraph 144.

145.    The foreclosure process was emotionally devastating for the Floyds. Mr. Floyd is disabled and suffers from degenerative disc disease, arthritis throughout his body, and the aftereffects of failed bilateral knee replacements. Being forced to move by Wells Fargo was an extreme hardship that caused Mr. Floyd severe depression and emotional distress. He was hospitalized during the foreclosure process, and though he was eventually able to get through the move to Philadelphia, it took weeks and required the help of Mr. Floyd's nephew and high doses of pain medication. To this day, Mr. Floyd suffers from deep depression and anxiety because of what Wells Fargo has done to him and his family.

**ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 145, and, on that basis, denies the allegations of paragraph 145.

146.    In late 2018, the Floyds received a letter from Wells Fargo informing them that their mortgage modification should have been approved but was not approved due to an error. The Floyds

1    were among the customers wrongly denied a mortgage modification because of systematic errors in

2    Wells Fargo's automated decision-making tool.

3    **ANSWER**:    The Bank admits that the Floyds received a letter from the Bank in the fall of 2018,

4    upon information and belief.  To the extent paragraph 146 purports to describe the contents of that

5    letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

6    the allegations of paragraph 146 to the extent they are inconsistent with the contents of the letter.

7    The Bank denies that "the Floyds were among the customers wrongly denied a mortgage

8    modification because of systematic errors in Wells Fargo's automated decision-making tool."

9        147.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

10    making tool, the Floyds lives were irrevocably altered. Their injuries include loss of their home and

11    the time and money put into that home; loss of equity in their home; loss of tax benefits; loss of

12    appreciation in their home's value following the sale; loss of time and money spent to find

13    replacement housing and move their belongings; loss of time and money spent in their efforts to

14    avoid foreclosure; damage to their credit and resulting opportunity costs; and severe emotional

15    distress.

16    **ANSWER**:    The Bank denies the allegations in paragraph 147.

17                    **12.    Diana Trevino (Texas)**

18        148.    In 2007, Plaintiff Diana Trevino purchased a three-bedroom home in Garland, Texas,

19    where she lived with her husband and four children. Close family friend Roder Contreras co-signed

20    the mortgage loan and resided in the home as well. When Mr. Contreras's grandmother became ill in

21    2010, he moved to El Salvador to take care of her. He stopped making his share of the payments on

22    the Trevino home, and quitclaimed his interest in it to the Trevinos.

23    **ANSWER**:    The Bank lacks knowledge and information sufficient to form a basis as to the truth

24    or falsity of the allegations of paragraph 148, and, on that basis, denies the allegations of paragraph

25    148.

26        149.    Because the Trevinos were unable to make the entire monthly mortgage payment

27    without Mr. Contreras's contribution, Ms. Trevino applied for a mortgage modification from Wells

28    Fargo and was approved. After making approximately five to eight payments under the modification

plan, Ms. Trevino suffered another setback when her mother became ill with cancer. Ms. Trevino began missing a significant amount of work because she was taking time off to take care of her mother. She fell behind on the mortgage payments, and again sought assistance from Wells Fargo.

**ANSWER**:      The Bank admits that it entered into a document entitled "Loan Modification Agreement" with Ms. Trevino on or about October 13, 2009.  The Bank also admits that it entered into a document entitled "Loan Modification Agreement" with Ms. Trevino on or about May 18, 2011.  The Bank also admits that Ms. Trevino fell behind on her modified mortgage payments and that she contacted the Bank to request assistance.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 149, and, on that basis, denies the remaining allegations of paragraph 149.

150.    Wells Fargo told Ms. Trevino to stop making mortgage payments so that she could qualify for another mortgage modification, which they assured her she was likely to get. Ms. Trevino stopped making payments as instructed, instead devoting her limited financial resources to her children and ailing mother.

**ANSWER**:      The Bank denies the allegations in paragraph 150.

151.    In 2013, Ms. Trevino received a call from Wells Fargo notifying her that she had not been approved for a mortgage modification, and that Wells Fargo planned to initiate foreclosure proceedings. She was told she had 60 days to vacate the premises; a follow-up letter conveyed the same information.

**ANSWER**:      The Bank admits that in 2013, Ms. Trevino received a call notifying her that she had not been approved for a trial mortgage modification.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 151, and, on that basis, denies the allegations of paragraph 151.

152.    Ms. Trevino had great difficulty finding a new place for her family to live, but eventually found a three-bedroom apartment in an undesirable neighborhood in Richardson, Texas. The lease was solely in her husband's name, because the foreclosure had ruined Ms. Trevino's credit.

1  **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

2  or falsity of the allegations of paragraph 152, and, on that basis, denies the allegations of paragraph

3  152.

4          153.    In April of 2013, the Trevinos moved into the apartment. Ms. Trevino tried to keep

5  her children in the same school in Garland, but the travel proved very difficult for the family. At

6  times, some of the children were forced to live with their aunt so they could be nearer to their school.

7  This was hard on the children, who couldn't understand why they had lost their home, or why their

8  mother was so sad all of the time. Some of the children lost friends and started acting out at school.

9  Uncharacteristically, her son and daughter were both suspended from school for misbehavior during

10 this time period.

11 **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

12 or falsity of the allegations of paragraph 153, and, on that basis, denies the allegations of paragraph

13 153.

14         154.    The stress of the foreclosure, among other factors, strained the Trevinos' marriage,

15 and in 2013 they separated. Eventually they divorced. When the lease on their apartment expired,

16 Ms. Trevino was unable to renew it because she had not been on the original lease, and her poor

17 credit prevented her from getting a lease on her own. The Trevinos were evicted from the apartment

18 and had a very hard time finding a new place to live.

19 **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

20 or falsity of the allegations of paragraph 154, and, on that basis, denies the allegations of paragraph

21 154.

22         155.    Around the same time, Ms. Trevino's stress and depression got to the point that she

23 wasn't eating or sleeping, and she had to be hospitalized with a bacterial infection. She lost her job

24 and was unemployed for around ten months. She and her children survived on her unemployment

25 benefits and the financial assistance of her sister. Two of Ms. Trevino's sons left college so that they

26 could work and help support the family. Ms. Trevino and her family have worked hard to try to

27 rebuild their lives in the wake of the foreclosure in 2013, and continue to do so to this day.

28

1  **ANSWER**:     The Bank lacks knowledge and information sufficient to form a basis as to the truth

2  or falsity of the allegations of paragraph 155, and, on that basis, denies the allegations of paragraph

3  155.

4       156.   In late 2018, Ms. Trevino received a letter from Wells Fargo informing her that her

5  mortgage modification should have been approved but was not approved due to an error. Ms.

6  Trevino was one of the customers wrongly denied a mortgage modification because of systematic

7  errors in Wells Fargo's automated decision-making tool.

8  **ANSWER**:     The Bank admits that Ms. Trevino received a letter from the Bank in the fall of 2018,

9  upon information and belief.  To the extent paragraph 156 purports to describe the contents of that

10  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

11  the allegations of paragraph 156 to the extent they are inconsistent with the contents of the letter.

12  The Bank denies that "Ms. Trevino was one of the customers wrongly denied a mortgage

13  modification because of systematic errors in Wells Fargo's automated decision-making tool."

14       157.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

15  making tool, Ms. Trevino's life has been irrevocably altered. Her injuries include loss of her family's

16  home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

17  loss of appreciation in her home's value following the sale; loss of time and money spent to find

18  replacement housing and move her family; loss of time and money spent in an effort to avoid

19  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

20  **ANSWER**:     The Bank denies the allegations in paragraph 157.

21                                    **CLASS ALLEGATIONS**

22       158.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to pursue

23  their claims on behalf of a class of similarly situated persons. The parameters of the class may be

24  refined through discovery and will be subject to Court approval and modification, but for purposes of

25  this Complaint, Plaintiffs propose the following class definition:

26                                    Nationwide Class

27       All persons who (i) qualified for a mortgage loan modification or repayment plan
         pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae

28

and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP), or any other governmental entity or program; and (ii) were not offered a mortgage loan modification by Wells Fargo due to a systematic error in Wells Fargo's automated mortgage loan modification underwriting tool.

**ANSWER**:   The allegations of paragraph 158 constitute characterizations of Plaintiffs' Second Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 158.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

159.   For purposes of this proposed class definition, "mortgage loan" refers to any loan secured by real property.

**ANSWER**:   The Bank admits that Plaintiffs have defined "mortgage loan" to refer to any loan secured by real property.  The Bank denies that the proposed class definition is proper or that this action is appropriate for class treatment.

160.   The Nationwide Class will pursue contract claims and UCL claims. Plaintiffs also propose that the Court consider several subclasses so that class members may pursue unique state law claims available to them.

**ANSWER**:   The allegations of paragraph 160 constitute characterizations of Plaintiffs' Second Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 160.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

161.   The first group of subclasses would only be necessary if the Court determines that the UCL should not be applied to all class members. These subclasses would be defined as followed and cover the following states: California, Florida, Georgia, Illinois, Louisiana, Maryland, New Jersey, New York, Ohio, Pennsylvania, and Texas.

<div align="center">[State] Subclass</div>

All members of the Nationwide Class whose mortgage loan was secured by real property located in [State],

**ANSWER**:   The allegations of paragraph 161 constitute characterizations of Plaintiffs' Second

Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 161.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

162.   The second group of subclasses would be defined as follows, and permit Plaintiffs to pursue wrongful foreclosure claims that exist under California and Georgia law.

### [California/Georgia] Foreclosure Subclass

All members of the Nationwide Class whose mortgage loan was secured by real property located in [California / Georgia] who subsequently lost that property through a foreclosure.

**ANSWER**:   The allegations of paragraph 162 constitute characterizations of Plaintiffs' Second Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 162.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

163.   Plaintiffs anticipate that they will be able to identify all class and subclass members from Wells Fargo's records and that they can be notified of the pendency of this class action by mail.

**ANSWER:**   The allegations of paragraph 163 constitute characterizations of Plaintiffs' Second Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 163.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

164.   The proposed class and subclasses meet each of the requirements for class certification pursuant to Rule 23(a) and Rule 23(b)(3).

**ANSWER**:   The Bank denies the allegations in paragraph 164.

165.   Numerosity. The classes and subclasses are sufficiently numerous such that individual joinders are impracticable and less advantageous than proceeding through the class device. Based on Wells Fargo's public disclosures to date, the Nationwide Class consists of at least 870 persons. And based on information Wells Fargo has provided to Plaintiffs in this case, Plaintiffs estimate that each proposed Subclass consists of at least 20 persons, with the possible exception of the Georgia Foreclosure Subclass.

1    **ANSWER**:    The Bank denies the allegations in paragraph 165.

2         166.    <u>Commonality & Predominance</u>. Common questions of law and fact exist as to the

3    proposed classes and subclasses, and those common questions predominate over questions affecting

4    only individual class members. These common questions include:

5              1.    Whether Wells Fargo breached a standard notice requirement in mortgage contracts

6                   by failing to notify class members they qualified for a mortgage modification;

7              2.    Whether Wells Fargo's conduct, as alleged herein, was extreme and outrageous;

8              3.    Whether Wells Fargo acted with reckless disregard for the probability that its

9                   conduct would cause emotional distress to its customers;

10             4.    Wells Fargo owed Plaintiffs and class members a duty to exercise reasonable care

11                  when determining their eligibility for a mortgage modification; and

12             5.    Whether Wells Fargo's failure to properly verify or audit its automated decision-

13                  making software constitutes an unfair practice.

14   **ANSWER**:    The Bank denies the allegations in paragraph 166.

15        167.    <u>Typicality</u>. Plaintiffs' claims are typical of those asserted by the proposed classes and

16   subclasses. Both Plaintiffs and class members seek to recover for injuries caused by Wells Fargo's

17   failure to properly verify or audit its automated decision-making tool, which caused both Plaintiffs

18   and class members to be denied mortgage modifications and/or to suffer emotional distress.

19   **ANSWER**:    The Bank denies the allegations in paragraph 167.

20        168.    <u>Adequacy</u>. Plaintiffs will fairly and adequately represent and protect the interests of

21   the members of the Class, as their interests do not conflict with the interest of the class members

22   they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class

23   action litigation and intend to prosecute this action vigorously.

24   **ANSWER**:    The Bank denies the allegations in paragraph 168.

25        169.    <u>Superiority</u>. A class action is superior to other available methods for the fair and

26   efficient adjudication of this controversy. Successfully prosecuting class members' claims will

27   require an in-depth knowledge of HAMP-related jurisprudence; intensive discovery of a banking

28   giant defended by a large, global law firm; and depositions of several sophisticated banking

executives and board members. These are matters that can only realistically be handled through unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

**ANSWER**:     The Bank denies the allegations in paragraph 169.

170.     In the alternative to class certification under Rule 23(b)(3), the proposed class and subclasses may also be certified under Rule 23(b)(2) or Rule 23(c)(4). Wells Fargo has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory appropriate with respect to the class as a whole. And Plaintiffs' claims present a number of discrete but complex factual and legal issues that could be resolved for all class members in a single proceeding.

**ANSWER**:     The Bank denies the allegations in paragraph 170.

## TOLLING ALLEGATIONS

171.     The causes of actions alleged herein did not accrue or were tolled until Plaintiffs and class members discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims.

**ANSWER**:     The Bank denies the allegations in paragraph 171.

172.     Plaintiffs and class members were not aware that they qualified for a mortgage modification, and that Wells Fargo's automated decision-making tool had miscalculated their eligibility, until Wells Fargo informed them through letters mailed the second half of 2018.

**ANSWER**:     The Bank denies the allegations in paragraph 172.

173.     Plaintiffs and class members had no realistic ability to discover these facts on their own. Wells Fargo's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for a mortgage modification depended on variables within Wells Fargo's exclusive control.

**ANSWER**:     The Bank denies the allegations in paragraph 173.

174.     Any applicable statues of limitations are also tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts alleged herein. Wells Fargo discovered one of the

software errors in August 2013 but deliberately concealed its discovery from Plaintiffs and from class members until the second half of 2018. Wells Fargo was under a continuous duty to disclose the truth to Plaintiffs and class members, and Plaintiffs and class members reasonably relied on Wells Fargo's ongoing concealment.

**ANSWER**:      The Bank denies the allegations in paragraph 174.

### CHOICE OF LAW ALLEGATIONS

175.    The State of California has sufficient contacts to the claims of nonresident Plaintiffs and class members such that application of California's Unfair Competition Law (UCL) is appropriate.

**ANSWER**:      The Bank denies the allegations in paragraph 175.

176.    Wells Fargo does substantial business in California; WFC is headquartered in California; the Bank's principal place of business is in California; and a significant portion of the proposed Nationwide Class is located in California.

**ANSWER**:      The Bank admits that Wells Fargo & Company is headquartered in California.  The Bank denies the remaining allegations in paragraph 176.

177.    In addition, the practices that form the basis of Plaintiffs' and class members' UCL claims against Wells Fargo are centered in California, where WFC is headquartered. WFC owns and controlled the Bank, and is responsible for testing and auditing its mortgage modification operations for compliance with HAMP and other government regulations.

**ANSWER**:      The Bank denies the allegations in paragraph 177.

178.    Several of the executives and board members who failed to ensure that Wells Fargo properly tested and audited its mortgage modification operations were based in California. For example, public records indicate that at least four of the ten members who served on the Audit & Examination Committee between 2010 and 2017 were based in California—far more than any other state. In addition, at least one—and likely both—of the executives who served as WFC's Chief Operational Risk Officer between 2010 and 2017, and thus were responsible for the compliance and audit reporting provided to the Compliance Committee and the Audit & Examination Committee, were based in WFC's San Francisco office.

1    **ANSWER**:     The Bank denies the allegations in paragraph 178.

2           179.     The State of California also has the strong regulatory interest in applying the UCL to

3    all class members' claims. The UCL is designed to preserve a business climate in California free of

4    unfair and deceptive practices. If California were only able to address unfair business conduct when

5    the injured consumer resides in California, the UCL would be largely ineffective at regulating

6    companies who do business in all fifty states. Violators would be able to keep the vast majority of

7    their ill-gotten gains (all those obtained from non-California consumers), leaving California-based

8    companies like Wells Fargo undeterred from engaging in similar conduct in the future.

9    **ANSWER**:     The Bank denies the allegations in paragraph 179.

10                            **FIRST CAUSE OF ACTION**
                                   **Breach Of Contract**
11                      **Brought On Behalf Of The Nationwide Class**

12          180.     Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague,

13   John and Yvonne DeMartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson,

14   Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as

15   if fully set forth herein. They bring this claim on behalf of themselves and the Nationwide Class or,

16   in the alternative, on behalf of themselves and the State Subclasses.

17   **ANSWER**:     The Bank incorporates by reference its responses to each and every allegation

18   contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action

19   is appropriate for class treatment.

20          181.     When Plaintiffs and class members financed their homes, they entered into Security

21   Instruments (typically referred to as a mortgage, deed of trust, or security deed) that set forth the

22   conditions under which the lender could accelerate the borrower's payments and foreclose on the

23   property.

24   **ANSWER**:     To the extent paragraph 181 purports to describe specific documents, the Bank refers

25   to those document for complete statements of their terms. The Bank denies the allegations of

26   paragraph 181 to the extent they are inconsistent with the terms of Plaintiffs' and class members'

27   loan documents.

28

182.    Plaintiffs' and class members' mortgage loans were insured, guaranteed, or held by a federal government agency and their Security Instruments were typically government-issued, form Federal Housing Administration (FHA) and/or Fannie Mae/Freddie Mac Security Instruments.[1] Twelve of the fifteen Plaintiffs had their homes secured by Fannie/Freddie Security Instruments, while the remaining three had their homes secured by FHA Security Instruments. Wells Fargo breached the terms of both types of Security Instruments. Plaintiffs Hood and DeMartino entered into FHA Security Instruments, while the remaining Plaintiffs' Security Instruments are Fannie Mae/Freddie Mac documents. References to "Security Instruments" in this complaint refer to all Plaintiffs' mortgage contracts. Reference to "FHA Security Instruments" is to Plaintiffs Hood and DeMartino's mortgage contracts, while reference to "Fannie/Freddie Security Instruments" is to the remaining Plaintiffs' mortgage contracts.

**ANSWER**:    The Bank admits Plaintiffs use "Security Instruments," "FHA Security Instruments," and "Fannie/Freddie Security Instruments" to reference certain documents.  To the extent paragraph 182 purports to describe specific documents, the Bank refers to those documents for complete statements of their terms. The Bank denies the allegations of paragraph 182 to the extent they are inconsistent with the terms of Plaintiffs' and class members' loan documents. The Bank denies that it breached the Security Instruments or other loan documents, and denies all other allegations in paragraph 182.

183.    Wells Fargo Bank was subject to the terms of these Security Instruments, either as the original lender, an assignee, or as the mortgage servicer authorized to act on behalf of the lender.

**ANSWER**:    To the extent paragraph 183 states a legal conclusion, no response is required.  To the extent a response is required, the Bank denies the allegations in paragraph 183.

184.    Under the Fannie/Freddie Security Instruments, the Bank was required to give notice to Plaintiffs and class members before it was permitted to accelerate the remaining balance on their loans and initiate the foreclosure process. That notice was required to specify the borrower's default,

---

[1] *See* Wells Fargo's Request for Judicial Notice, Dkt. 60, attaching copies of certain Plaintiffs' Security Instruments as "exemplars" that were "substantially similar to the security instruments of the remaining named Plaintiffs." The exemplars included Security Instruments for Plaintiffs DeMartino (FHA Maryland Deed of Trust), Floyd (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), Hood (FHA Ohio Open-End Mortgage), Hernandez (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), and Wilson (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT).

1   the action required by the borrower to cure the default, and the date by which the borrower must cure

2   the default to avoid acceleration and foreclosure proceedings.

3   **ANSWER**:       To the extent paragraph 184 purports to describe the "Fannie/Freddie Security

4   Instruments," the Bank refers to those documents for complete statements of their terms. The Bank

5   denies the allegations of paragraph 184 to the extent they are inconsistent with the terms of the

6   "Fannie/Freddie Security Instruments" or other loan documents.

7            185.    The Bank also agreed that "[i]f the Borrower meets certain conditions, Borrower shall

8   have the right to have enforcement of this Security Instrument discontinued…" prior to the sale of

9   the property. Those conditions included, among other things, that the Borrower "(a) pays Lender all

10  sums which then would be due under this Security Instrument…" and "(b) cures any defaults of any

11  other covenants or agreements."[2]

12  **ANSWER**:       To the extent paragraph 184 purports to describe the "Fannie/Freddie Security

13  Instruments," the Bank refers to those documents for complete statements of their terms. The Bank

14  denies the allegations of paragraph 185 to the extent they are inconsistent with the terms of the

15  "Fannie/Freddie Security Instruments" or other loan documents.

16           186.    The Fannie/Freddie Security Instruments specifically contemplated the possibility of

17  both a forbearance and modification of the sums secured by the Security Instruments. The

18  Fannie/Freddie Security Instruments provided, "Extension of the time for payment or modification

19  of amortization of the sums secured by this Security Instrument … shall not operate to release the

20  liability of Borrower…"[3] (emphasis added).

21  **ANSWER**:       The Bank denies the allegations in paragraph 186.

22           187.    Similarly, under the FHA Security Instruments, the Bank agreed it was not able to

23  require full payment and its rights were otherwise limited "by regulations issued by the Secretary in

24  the case of payment defaults…"[4] The Bank also agreed that, "In many circumstances regulations

---

25  [2] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at pg. 24, ¶ 19; *see also* Plaintiff Hernandez at
26  p. 56, ¶ 19; Plaintiff Wilson at p. 76, ¶ 21(B).

27  [3] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at p. 23, ¶ 12; *see also* Plaintiff Hernandez at p.
    52, ¶ 12.

28  [4] *See, e.g.*, Plaintiff DeMartino FHA Security Instrument (Dkt. 60-3) at p. 6, ¶ 9(a); *see also* Plaintiff Hood FHA Security

1    issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require

2    immediate payment in full and foreclose if not paid. This Security Instrument does not authorize

3    acceleration or foreclosure if not permitted by regulations of the Secretary."[5]

4    **ANSWER**:    To the extent paragraph 187 purports to describe the "FHA Security Instruments," the

5    Bank refers to those documents for complete statements of their terms. The Bank denies the

6    allegations of paragraph 187 to the extent they are inconsistent with the terms of the "FHA Security

7    Instruments" or other loan documents.

8        188.    Consistent with the Security Instruments, once a borrower missed a mortgage

9    payment, Wells Fargo sent correspondence advising of the amount owed and invited borrowers to

10   call Wells Fargo's "trained professionals" who are "available to assist you in bringing your loan

11   current … [and] will work with you to determine the best option available to you." These letters

12   show Wells Fargo's understanding that there is more than one way to bring a loan current under the

13   Security Instruments.

14   **ANSWER**:    The Bank denies the allegations in paragraph 188.

15       189.    One of the ways a loan could be brought current was a loan modification. In a recent

16   Rule 30(b)(6) deposition, Wells Fargo's corporate representative testified that a mortgage

17   modification could cure a default and bring a loan current.

18   **ANSWER**:    The Bank denies the allegations in paragraph 189.  The Bank also denies that the

19   referenced testimony relates to the "Security Instruments."

20       190.    This testimony is consistent with other correspondence Wells Fargo sent in response

21   to a request for mortgage assistance. In one letter, Wells Fargo told Plaintiff Troy Frye it was

22   "considering a program that may assist you in bringing your loan current … This program, known as

23   a loan modification, would provide you with the opportunity for a fresh start by adjusting the current

24   terms of your loan."

25   **ANSWER**:    To the extent paragraph 190 purports to describe a specific document, the Bank refers

26   to that document for a complete statement of its terms. The Bank denies the allegations of paragraph

27

28
Instrument (Doc. 60-3) at p. 33, ¶ 9(a).
[5] *See id.* at ¶ 9(d).

190 to the extent they are inconsistent with the terms of the referenced document. The Bank denies all other allegations in paragraph 190, including that the "Security Instruments" required it to offer borrowers loan modifications.

191.    In a different letter, Wells Fargo advised Plaintiffs and class members that a loan modification is "an agreement that changes the terms of your existing mortgage. It brings your account up-to-date and may result in a lower monthly payment."

**ANSWER**:    To the extent paragraph 191 purports to describe a specific document, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations of paragraph 191 to the extent they are inconsistent with the terms of the referenced document.  The Bank denies all other allegations in paragraph 191, including that the "Security Instruments" required it to offer borrowers loan modifications.

192.    Once borrowers, such as Plaintiffs, requested mortgage assistance from Wells Fargo, the Bank would tell borrowers: "We'll continue to work with you to help avoid a foreclosure sale. If your loan has not previously been referred to foreclosure and you have submitted all of the required documentation needed to evaluate for an alternative, this loan will not be referred to foreclosure while the application is evaluated. If your loan has been referred to foreclosure, we will not conduct a foreclosure sale on this loan while your documents are being reviewed and if allowed by state law and/or investor guidelines." This message from Wells Fargo shows its understanding that a modification would bring an account current, and allow the borrower to avoid foreclosure.

**ANSWER**:    To the extent paragraph 192 purports to describe a specific document, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations of paragraph 192 to the extent they are inconsistent with the terms of the referenced document. The Bank denies all other allegations in paragraph 192, including that the referenced document "shows its understanding that a modification would bring an account current, and allow the borrower to avoid foreclosure," and that the "Security Instruments" required it to offer borrowers loan modifications.

193.    The Bank breached its contractual obligations to Plaintiffs and class members by failing to give Plaintiffs and class members adequate notice prior to accelerating their loan

1   payments, commencing the foreclosure process, and, in many instances, foreclosing on Plaintiffs'

2   and class members' homes.

3   **ANSWER**:      The Bank denies the allegations in paragraph 193.

4          194.    In particular, the Bank did not notify Plaintiffs and class members that they could

5   cure their default and avoid acceleration and foreclosure by accepting a mortgage modification.

6   Plaintiffs and class members qualified for a government-mandated mortgage modification, and the

7   Bank was required to offer them a mortgage modification but failed to do so. While HAMP and

8   other types of government-mandated mortgage modifications might have come into effect after

9   Plaintiffs and class members signed their Security Instruments, a reasonable interpretation of these

10   contracts required Wells Fargo to inform Plaintiffs of actions available to cure their default *at the*

11   *time of the default* – not just any action available at the time the parties executed the contract. And at

12   the time of Plaintiffs' defaults, a mortgage modification was an option that should have been

13   available to them.

14   **ANSWER**:      The Bank denies the allegations in paragraph 194.

15          195.    Plaintiffs Hood and DeMartinos' FHA Security Instruments specifically contemplated

16   HUD Secretary regulations placing a limitation on Wells Fargo's right to foreclose in the event of a

17   default. These contracts stated, "In many circumstances regulations issued by the [HUD] Secretary

18   will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and

19   foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not

20   permitted by regulations of the Secretary."[6] Indeed, as a part of the financial crisis, the HUD

21   Secretary stated in a report to Congress that "During this time of elevated financial stress on

22   households, FHA maintained a robust set of policies…to provide assistance in *curing* mortgage

23   delinquencies." Those tools included, among other things, loan modifications.[7] The FHA (Federal

24   Housing Administration) is a part of HUD. And HUD was one of the administering offices for

25

26   ――――――――――――――――
    [6] *See id.* at ¶ 9(d).

27   [7] *See* U.S. Department of Housing and Urban Development November 15, 2011 Annual Report to Congress Fiscal Year
    2011 Financial Status FHA Mutual Mortgage Insurance Fund at p. 23-24, available at
28   https://www.hud.gov/sites/documents/FHAMMIFANNRPTFY2011.PDF (last accessed July 10, 2019).

                                                        58

HAMP; thus HUD was responsible for issuing regulations on borrower eligibility for a modification under the program.

**ANSWER**:     To the extent paragraph 195 purports to describe the "FHA Security Instruments," the Bank refers to those document for complete statements of their terms. The Bank denies the allegations of paragraph 195 to the extent they are inconsistent with the terms of the "FHA Security Instruments."  The Bank denies all other allegations in paragraph 195, including that the "FHA Security Instruments" required it to offer borrowers loan modifications.

196.    As a result of the Bank's breach, Plaintiffs and class members suffered damages in an amount subject to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families and belongings; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments.

**ANSWER**:     The Bank denies the allegations in paragraph 196.

<div align="center">

**SECOND CAUSE OF ACTION**
**Intentional Infliction Of Emotional Distress**
**Brought On Behalf Of The Nationwide Class**

</div>

197.    Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague, John and Yvonne DeMartino, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of themselves and the State Subclasses.

**ANSWER**:     The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action is appropriate for class treatment.

198.    Wells Fargo engaged in extreme and outrageous conduct as alleged herein. Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its

1  customers' homes and wellbeing depended. It allowed systemic errors to persist for five to eight

2  years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure

3  practices; failed to reform its verification and auditing practices even after the government found a

4  software error had led the Bank to wrongfully deny mortgage modifications; concealed its discovery

5  of an additional software error from regulators and customers; and failed to identify other related

6  errors for an additional three years.

7  **ANSWER**:      The Bank denies the allegations in paragraph 198.

8         199.    The same extreme and outrageous conduct that caused a series of scandals and

9  consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines

10  and to forbid Wells Fargo from growing until reforms were implemented—was also responsible for

11  Plaintiffs and class members losing their homes here. Wells Fargo's Board and executive leadership

12  abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance

13  failures, government fines, and consent decrees requiring leadership to implement appropriate

14  auditing and compliance procedures.

15  **ANSWER**:      The Bank denies the allegations in paragraph 199.

16         200.    With regard to the Bank's mortgage modification and foreclosure processes in

17  particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank

18  conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP

19  or other government requirements. Wells Fargo's leadership ignored its oversight responsibilities

20  even after the government found it had not adequately overseen the Bank's mortgage modification

21  and foreclosure operations, even after it agreed to implement proper oversight as part of two 2011

22  consent orders, and even after the government found in 2015 that Wells Fargo had continuously

23  failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight

24  responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it

25  will be prohibited from growing unless and until it reforms its oversight and governance.

26  **ANSWER**:      The Bank denies the allegations in paragraph 200.

27

28

1    201.    Wells Fargo acted with reckless disregard for the probability that its conduct would

2    cause emotional distress to customers, including Plaintiffs and class members, who were wrongfully

3    denied mortgage modifications and foreclosed upon.

4    **ANSWER**:    The Bank denies the allegations in paragraph 201.

5    202.    As a result of Wells Fargo's conduct, Plaintiffs and class members have suffered

6    severe emotional distress, as alleged herein, which has contributed to diagnoses of anxiety and

7    depression, extended psychological therapy, hospitalizations, high blood pressure, various health

8    problems, marital struggles, social withdrawal, childhood trauma, suicidal ideation, stress disorders,

9    and a number of other physical, psychological, and social afflictions.

10   **ANSWER**:    The Bank denies the allegations in paragraph 202.

11   203.    Plaintiffs and class members seek compensatory damages as well as punitive

12   damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for

13   the rights of Plaintiffs and class members.

14   **ANSWER**:    The Bank admits that Plaintiffs seek compensatory and punitive damages, but denies

15   that Plaintiffs or the putative class members are entitled to any such damages.  The Bank denies the

16   remaining allegations in paragraph 203.

17                          **THIRD CAUSE OF ACTION**
     **Wrongful Foreclosure Brought on Behalf of the California and Georgia Foreclosure Subclasses**

18   204.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

19   **ANSWER**:    The Bank incorporates by reference its responses to each and every allegation

20   contained in all the foregoing paragraphs as if fully set forth herein.

21                          **California Foreclosure Subclass**

22   205.    Plaintiffs Debora Granja and Keith Lindner bring this claim on behalf of themselves

23   and the California Foreclosure Subclass.

24   **ANSWER**:    The allegations of paragraph 205 constitute characterizations of Plaintiffs' Second

25   Amended Class Action Complaint to which no response is required.  The Bank specifically denies

26   that the proposed class definition is proper or that this action is appropriate for class treatment.

27

28

1    206.    Wells Fargo wrongfully foreclosed on Plaintiffs' and the California Foreclosure

2    Subclass's real property pursuant to a power of sale in their Security Instruments. The foreclosure

3    was unlawful and/or unfair because Wells Fargo did not first notify Plaintiffs and the California

4    Foreclosure Subclass that they could cure their default by accepting a mortgage modification.

5    Plaintiffs and class members qualified for the mortgage modification and Wells Fargo was required

6    by the Security Agreements to notify Plaintiffs and class members of actions they could take to cure

7    their default before exercising its power of sale.

8    **ANSWER**:    The Bank denies the allegations in paragraph 206.

9    207.    Plaintiffs and class members were excused from tendering the amount of their

10   secured indebtedness, and no breach of condition or failure of performance existed on the part of

11   Plaintiffs and class members that would have authorized the foreclosure, because Wells Fargo was

12   required to offer Plaintiffs and class members a mortgage modification before it could accelerate

13   their secured indebtedness and initiate foreclosure proceedings.

14   **ANSWER**:    The Bank denies the allegations in paragraph 207.

15   208.    Plaintiffs and class members were harmed by the wrongful foreclosure and suffered

16   damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax

17   benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

18   spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

19   money to find new housing and move their families; loss of favorable interest rates or other

20   favorable loan terms; damage to credit; opportunity costs due to damaged credit; and emotional

21   distress.

22   **ANSWER**:    The Bank denies the allegations in paragraph 208.

23   209.    Plaintiffs and the California Foreclosure Subclass seek compensatory damages as

24   well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and

25   reckless disregard for the rights of Plaintiffs and class members.

26   **ANSWER**:    The Bank admits that Plaintiffs seek compensatory and punitive damages, but denies

27   that Plaintiffs or the putative class members are entitled to any such damages.  The Bank denies the

28   remaining allegations in paragraph 209.

1

**Georgia Foreclosure Subclass**

2     210.    Plaintiff Troy Frye brings this claim on behalf of himself and the Georgia subclass.

3 **ANSWER**:    The allegations of paragraph 210 constitute characterizations of Plaintiffs' Second

4 Amended Class Action Complaint to which no response is required. The Bank specifically denies

5 that the proposed class definition is proper or that this action is appropriate for class treatment.

6     211.    Wells Fargo owed Plaintiff Frye and the Georgia Foreclosure Subclass a duty to

7 exercise the power of sale afforded it by Plaintiffs and class members' Security Instruments in

8 conformance with the terms of the Security Instruments and in good faith.

9 **ANSWER**:    The Bank denies the allegations in paragraph 211.

10     212.    Wells Fargo breached its duty by foreclosing on Plaintiffs and class members' homes

11 without first giving Plaintiff and class members notice that they could cure their default by accepting

12 a mortgage modification. Wells Fargo was required to do so under the terms of the Security

13 Instruments. Alternatively, foreclosing on Plaintiffs and class members' homes without first offering

14 them a mortgage modification to which they were entitled constitutes bad faith and unfair execution

15 of the Wells Fargo's power of sale.

16 **ANSWER**:    The Bank denies the allegations in paragraph 212.

17     213.    As a result of Wells Fargo's conduct, Plaintiff Frye and the Georgia Foreclosure

18 Subclass lost their homes to foreclosure and suffered other damages to be proven at trial, including

19 loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value

20 following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time

21 and money put into their homes; loss of time and money to find new housing and move their

22 families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity

23 costs due to damaged credit; and emotional distress.

24 **ANSWER**:    The Bank denies the allegations in paragraph 213.

25     214.    Plaintiff and the Georgia Foreclosure Subclass seek compensatory damages as well as

26 punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless

27 disregard for the rights of Plaintiffs and class members.

28

1   **ANSWER**:   The Bank admits that Plaintiffs seek compensatory and punitive damages, but denies

2   that Plaintiffs or the putative class members are entitled to any such damages.  The Bank denies the

3   remaining allegations in paragraph 214.

4   <center>**FOURTH CAUSE OF ACTION**
**Violation Of California's Homeowners Bill Of Rights**

5   **Brought On Behalf Of The California Subclass**</center>

6         215.   Plaintiffs Debora Granja and Keith Lindner incorporate all preceding paragraphs as if

7   fully set forth herein. They bring this claim on behalf of themselves and the California Foreclosure

8   Subclass.

9   **ANSWER**:   The Bank incorporates by reference its responses to each and every allegation

10   contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action

11   is appropriate for class treatment.

12         216.   Under California's Homeowners Bill of Rights, Wells Fargo had an obligation to

13   ensure that competent and reliable evidence, including the borrower's loan status and information,

14   supported its right to foreclose before it filed a notice of default or notice or sale in connection with

15   the foreclosure of Plaintiffs' and class members' real property. Cal. Civ. Code § 2924.17.

16   **ANSWER**:   To the extent paragraph 216 states a legal conclusion, no response is required.  To the

17   extent a response is required, the Bank denies the allegations in paragraph 216.

18         217.   Wells Fargo materially and recklessly violated its obligation because Plaintiffs' and

19   class members' loan information did not support Wells Fargo's right to foreclose. Plaintiffs' and

20   class members' loan information showed that they qualified for a mortgage modification. Wells

21   Fargo was therefore required to offer Plaintiffs and class members the opportunity to cure their

22   default by accepting a mortgage modification before it could exercise its right to foreclose under

23   Plaintiffs' and class members' Security Instruments.

24   **ANSWER**:   The Bank denies the allegations in paragraph 217.

25         218.   The automated software that Wells Fargo used to wrongly determine that Plaintiffs

26   and class members did not qualify for a mortgage modification was not reliable and Wells Fargo was

27   reckless in using the software and relying upon it to support its right to foreclose. The software's

28

<center>64</center>

results had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER**:     The Bank denies the allegations in paragraph 218.

219.    As a result of Wells Fargo's violation of the Homeowners Bill of Rights, Plaintiffs Granja and the California Foreclosure Subclass suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit.

**ANSWER**:     The Bank denies the allegations in paragraph 219.

220.    Pursuant to California Civil Code section 2924.19(b), Plaintiffs Granja and each member of the California Foreclosure Subclass seek an award of treble actual damages or statutory damages of $50,000, whichever is greater.

**ANSWER**:     The Bank admits that Plaintiffs seek treble actual damages or statutory damages of $50,000, whichever is greater, but denies that Plaintiffs or the putative class members are entitled to any such damages.  The Bank denies the remaining allegations in paragraph 220.

### FIFTH CAUSE OF ACTION
**Violation Of California's Unfair Competition Law**
**Brought On Behalf Of The Nationwide Class**

221.    Plaintiffs Debora Granja, Keith Lindner, Emma White, Troy Frye, Coszetta Teague, John and Yvonne DeMartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on behalf of themselves and the Nationwide Class.

1   **ANSWER**:     The Bank incorporates by reference its responses to each and every allegation

2   contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action

3   is appropriate for class treatment.

4        222.    In the alternative, should the Court decide that out-of-state plaintiffs may not

5   maintain this claim against Wells Fargo, Plaintiffs Debora Granja and Keith Lindner bring this claim

6   on behalf of themselves and the California Subclass.

7   **ANSWER**:     The allegations of paragraph 222 constitute characterizations of Plaintiffs' Second

8   Amended Class Action Complaint to which no response is required.  To the extent a response is

9   required, the Bank denies the allegations of paragraph 222.  The Bank specifically denies that the

10  proposed class definition is proper or that this action is appropriate for class treatment.

11       223.    Wells Fargo has violated and continues to violate California's Unfair Competition

12  Law (UCL), which prohibits unlawful, unfair, or fraudulent practices.

13  **ANSWER**:     The Bank denies the allegations in paragraph 223.

14       224.    Wells Fargo engaged in unlawful practices by denying mortgage modifications to

15  Plaintiffs and class members in violation of HAMP and other governmental requirements.

16  **ANSWER**:     The Bank denies the allegations in paragraph 224.

17       225.    Wells Fargo engaged in unfair practices by failing to properly verify or audit the

18  automated software it used to determine whether Plaintiffs and class members were eligible for a

19  mortgage modification. Wells Fargo's faulty verification and auditing practices allowed multiple

20  systemic errors to remain uncorrected for five to eight years and persisted even after the government

21  cited Wells Fargo for failing to adequately audit its mortgage modification and foreclosure

22  processes; even after the government found a software error had led the Bank to wrongfully deny

23  mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error

24  that caused it to wrongly deny modifications in 2015.

25  **ANSWER**:     The Bank denies the allegations in paragraph 225.

26       226.    Wells Fargo's Board and executive leadership further engaged in unfair practices by

27  failing to properly oversee the Bank's compliance with HAMP and other governmental

28  requirements. Wells Fargo's lack of central oversight has led to series of consumer abuses and

billions of dollars in government fines. Yet despite repeatedly promising to reform its oversight practices, Wells Fargo's Board and executive leadership repeatedly failed to implement or maintain procedures to ensure the Bank was complying with HAMP or other applicable government requirements.

**ANSWER**:   The Bank denies the allegations in paragraph 226.

227.   Both Wells Fargo's verification and auditing practices and its oversight practices are unethical, unscrupulous, or substantially injurious to consumers; any legitimate utility of the practices are outweighed by the harm to consumers; and the practices run afoul of the public policies underlying HAMP and California Homeowners Bill or Rights, which seek to help homeowners avoid foreclosure and promote fair mortgage lending and servicing practices.

**ANSWER**:   The Bank denies the allegations in paragraph 227.

228.   As a result of Wells Fargo's violations of the UCL, Plaintiffs have suffered injury in fact and lost money and property, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit.

**ANSWER**:   The Bank denies the allegations in paragraph 228.

229.   Pursuant to California Business and Professions Code section 17203, Plaintiffs and class members seek such orders or judgments as may be necessary to prevent the Wells Fargo's future use of its unfair and unlawful practices, and to restore to Plaintiffs and class members any money or property that may have been acquired by means of Wells Fargo's unfair competition.

**ANSWER**:   The Bank admits that Plaintiffs seek relief under California Business and Professions Code section 17203, but denies that Plaintiffs or the putative class members are entitled to any such relief.  The Bank denies the remaining allegations in paragraph 229.

1
2

**SIXTH CAUSE OF ACTION**
**Violation Of State Consumer Protection Laws**
**Brought On Behalf Of Five State Subclasses**

3
4
5

230.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein. In the alternative or in addition to the preceding claim for violation of the UCL, Plaintiffs and class members seek recovery under the following state consumer protection statutes as detailed below.

6
7
8

**ANSWER**:    The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action is appropriate for class treatment.

9

### Illinois Subclass

10
11

231.    Plaintiff Coszetta Teague brings this claim on behalf of herself and the Illinois Subclass.

12
13
14
15

**ANSWER**:    The allegations of paragraph 231 constitute characterizations of Plaintiffs' Second Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 231.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

16
17
18

232.    Wells Fargo's conduct as alleged herein violates the Illinois Consumer Fraud Act (ICFA), 815 ILCS 505/2, which prohibits unfair acts or practices in the conduct of any trade or commerce.

19

**ANSWER**:    The Bank denies the allegations in paragraph 232.

20
21
22
23
24

233.    Wells Fargo engaged in unfair practices by denying mortgage modifications to Plaintiffs and class members in violation of HAMP and other governmental requirements; by failing to properly verify or audit the automated software it used to determine whether Plaintiffs and class members were eligible for a mortgage modification; and by failing to implement or maintain procedures to ensure the Bank was complying with HAMP or other government requirements.

25

**ANSWER**:    The Bank denies the allegations in paragraph 233.

26
27

234.    As a result of Wells Fargo's violation of the ICFA, Plaintiff Teague and the Illinois Subclass suffered damages according to proof, including loss of their homes; loss of equity in their

28

homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

**ANSWER**:     The Bank denies the allegations in paragraph 234.

235.    Pursuant to 815 ILCS 505/10a, Plaintiff and the Illinois Subclass seek recovery of their actual economic damages, punitive damages, injunctive relief, and attorneys' fees and costs.

**ANSWER**:     The Bank admits that Plaintiff Teague seeks recovery of actual damages, punitive damages, injunctive relief, and attorneys' fees and costs, but denies that Plaintiff Teague or the putative class members are entitled to any such relief.

### **Maryland Subclass**

236.    Plaintiffs John and Yvonne DeMartino bring this claim on behalf of themselves and the Maryland Subclass.

**ANSWER**:     The allegations of paragraph 236 constitute characterizations of Plaintiffs' Second Amended Class Action Complaint to which no response is required.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

237.    Wells Fargo's conduct as alleged herein violates the Maryland Consumer Protection Act (MCPA), Md. Code Ann., Com. Law. § 13-303, which prohibits unfair, abusive or deceptive practices.

**ANSWER**:     The Bank denies the allegations in paragraph 237.

238.    Wells Fargo engaged in unfair practices by denying mortgage modifications to Plaintiffs and class members in violation of HAMP and other governmental requirements; by failing to properly verify or audit the automated software it used to determine whether Plaintiffs and class members were eligible for a mortgage modification; and by failing to implement or maintain

procedures to ensure the Bank was complying with HAMP or other applicable government requirements.

**ANSWER**:    The Bank denies the allegations in paragraph 238.

239.    Wells Fargo also violated both the MCPA and the Maryland Consumer Debt Collection Act (MDCA), Md. Code Ann. Com. Law § 14-202(8), by attempting to enforce a right to foreclose on Plaintiffs and class member's property with reckless disregard as to the falsity of the existence of the right.

**ANSWER**:    The Bank denies the allegations in paragraph 239.

240.    The automated software that Wells Fargo used to wrongly determine that Plaintiffs and class members did not qualify for a mortgage modification was not reliable and Wells Fargo was reckless in using the software and relying upon it to support its right to foreclose. The software's results had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER**:    The Bank denies the allegations in paragraph 240.

241.    As a result of Wells Fargo's violations of the MCPA and MDCA, Plaintiffs and the Maryland Subclass suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments; and emotional distress.

1    **ANSWER**:     The Bank denies the allegations in paragraph 241.

2         242.     Pursuant to Maryland Code Annotated, Commercial Law sections 13-408 and 14-

3    203, Plaintiffs and the Maryland Subclass seek to recover damages, including damages for emotional

4    distress and mental anguish, and an award of attorneys' fees and costs.

5    **ANSWER**:     The Bank admits that Plaintiffs DeMartino seek recovery of damages, including

6    damages for emotional distress and mental anguish, and an award of attorney's fees and costs, but

7    denies that Plaintiffs DeMartino or the putative class members are entitled to any such relief.

8                              **New Jersey Subclass**

9         243.     Plaintiff Alicia Hernandez brings this claim on behalf of herself and the New Jersey

10   Subclass.

11   **ANSWER**:     The allegations of paragraph 243 constitute characterizations of Plaintiffs' Second

12   Amended Class Action Complaint to which no response is required.  To the extent a response is

13   required, the Bank denies the allegations of paragraph 243.  The Bank specifically denies that the

14   proposed class definition is proper or that this action is appropriate for class treatment.

15        244.     Wells Fargo's conduct as alleged herein violates the New Jersey Consumer Fraud Act

16   (NJCFA), N.J.S.A. 56:8-2, which prohibits the use of any misrepresentation or deception in

17   connection with the extension of credit or subsequent servicing of that credit.

18   **ANSWER**:     The Bank denies the allegations in paragraph 244.

19        245.     Wells Fargo represented to Plaintiff and class members that they did not qualify for a

20   mortgage modification. That representation was false and caused Plaintiff and class members

21   ascertainable loss, including loss of their homes; loss of equity in their homes; loss of tax benefits;

22   loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an

23   effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to

24   find new housing and move their families; loss of favorable interest rates or other favorable loan

25   terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

26   **ANSWER**:     The Bank denies the allegations in paragraph 245.

27        246.     Had Wells Fargo presented accurate information to Plaintiff and class members, they

28   would have opted for the mortgage modification for which the qualified. If Wells Fargo still refused

1   to provide Plaintiff and class members with a mortgage modification, they could and would have

2   used the knowledge that they qualified for a mortgage modification to fight foreclosure.

3   **ANSWER**:    The Bank denies the allegations in paragraph 246.

4         247.    Pursuant to N.J.S.A 56:8-19, Plaintiff and the New Jersey Subclass request seek an

5   award of treble damages, injunctive relief, and attorneys' fees and costs.

6   **ANSWER**:    The Bank admits that Plaintiff Hernandez seeks an award of treble damages,

7   injunctive relief, and attorneys' fees and costs, but denies that Plaintiff Hernandez or the putative

8   class members are entitled to any such relief.

9                       **New York Subclass**

10        248.    Plaintiff Rose Wilson brings this claim on behalf of herself and the New York

11   Subclass.

12   **ANSWER**:    The allegations of paragraph 248 constitute characterizations of Plaintiffs' Second

13   Amended Class Action Complaint to which no response is required.  To the extent a response is

14   required, the Bank denies the allegations of paragraph 248.  The Bank specifically denies that the

15   proposed class definition is proper or that this action is appropriate for class treatment.

16        249.    Wells Fargo's conduct as alleged herein violates Section 349(a) of New York's

17   General Business Law (GBL), which prohibits deceptive acts or practices.

18   **ANSWER**:    The Bank denies the allegations in paragraph 249.

19        250.    Wells Fargo's acts and practices were consumer-oriented, as they affected not only

20   Plaintiff but similarly-situated consumers as well, and they had the potential to affect even more

21   consumers.  The automated software that used to determine Plaintiffs and other consumers'

22   eligibility for mortgage modifications was systematically flawed and generated inaccurate

23   calculations.

24   **ANSWER**:    The Bank denies the allegations in paragraph 250.

25        251.    The automated software's calculations had not been properly verified or audited, and

26   as a result, multiple material errors remained uncorrected in the software for five to eight years.

27   Wells Fargo willfully and recklessly continued to rely on its software even after the government

28   cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even

after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER**:      The Bank denies the allegations in paragraph 251.

252.      Wells Fargo's practice of using systematically-flawed software was deceptive or misleading in a material respect, as it led Plaintiff and class members to believe that they did not qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

**ANSWER**:      The Bank denies the allegations in paragraph 252.

253.      Had Wells Fargo presented accurate information to Plaintiff and class members, they would have opted for the mortgage modification for which the qualified. If Wells Fargo still refused to provide Plaintiff and class members with a mortgage modification, they could and would have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

**ANSWER**:      The Bank denies the allegations in paragraph 253.

254.      As a result of Wells Fargo's violation of the GBL, Plaintiff and class members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

**ANSWER**:      The Bank denies the allegations in paragraph 254.

255.      Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the New York Subclass seek an award of damages, injunctive relief, and attorneys' fees.

**ANSWER**:      The Bank admits that Plaintiff Wilson seeks an award of damages, injunctive relief, and attorneys' fees, but denies that Plaintiff Wilson or the putative class members are entitled to any such relief.

### Pennsylvania Subclass

256.      Plaintiffs Cyndi and George Floyd bring this claim on behalf of themselves and the Pennsylvania Subclass.

**ANSWER**:    The allegations of paragraph 256 constitute characterizations of Plaintiffs' Second Amended Class Action Complaint to which no response is required.  To the extent a response is required, the Bank denies the allegations of paragraph 256.  The Bank specifically denies that the proposed class definition is proper or that this action is appropriate for class treatment.

257.    Wells Fargo's conduct as alleged herein constitutes a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Stat. Ann. § 201-3, which prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.

**ANSWER**:    The Bank denies the allegations in paragraph 257.

258.    Wells Fargo's practice of using systematically-flawed software to calculate Plaintiffs' and class members' eligibility for mortgage loan modifications was unfair and deceptive, as it led Plaintiffs and class members to believe that they did not qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

**ANSWER**:    The Bank denies the allegations in paragraph 258.

259.    The automated software's calculations had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER**:    The Bank denies the allegations in paragraph 259.

260.    Plaintiffs and class members justifiably relied on Wells Fargo's determination that they did not qualify for a mortgage modification. Had Wells Fargo presented accurate information to Plaintiffs and class members, they would have opted for the mortgage modification for which the qualified. If Wells Fargo still refused to provide Plaintiffs and class members with a mortgage modification, they could and would have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

**ANSWER**:    The Bank denies the allegations in paragraph 260.

1    261.   As a result of Wells Fargo's violation of the UTPCPL, Plaintiffs and class members

2  suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits;

3  loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an

4  effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to

5  find new housing and move their families; loss of favorable interest rates or other favorable loan

6  terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

7  **ANSWER**:   The Bank denies the allegations in paragraph 261.

8    262.   Pursuant to 73 Pa. Stat. Ann. § 201-9.2, Plaintiffs and the Pennsylvania Subclass seek

9  an award of treble damages, equitable relief, and attorneys' fees and costs.

10  **ANSWER**:   The Bank admits that Plaintiffs Floyd seek an award of treble damages, injunctive

11  relief, equitable relief, and attorneys' fees and costs, but denies that Plaintiffs Floyd or the putative

12  class members are entitled to any such relief.

13  <div align="center">**PRAYER FOR RELIEF**</div>

14    The Bank denies that Plaintiffs have any valid claim and denies that Plaintiffs are entitled to

15  any of the relief requested in their Prayer for Relief.

16  <div align="center">**AFFIRMATIVE DEFENSES**</div>

17    Without conceding that it bears the burden of proof or persuasion as to any of the issues

18  raised in these defenses (whether denominated as affirmative defenses or otherwise), as separate and

19  distinct affirmative defenses to Plaintiffs' Second Amended Class Action Complaint, the Bank

20  alleges as follows:

21  <div align="center">**FIRST DEFENSE**</div>

22  <div align="center">(Failure to State a Claim for Relief)</div>

23    Neither the Second Amended Class Action Complaint nor any claim for relief asserted

24  therein states facts sufficient to constitute a claim for relief against the Bank.

25

26

27

28

1

2

## SECOND DEFENSE

(Lack of Standing)

3       Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing to sue,

4   including because Plaintiffs lack standing to assert claims under the laws of states in which they do

5   not reside.

6

## THIRD DEFENSE

7

(Statute of Limitations)

8       Some or all of Plaintiffs' and the putative class members' claims are barred by the applicable

9   statutes of limitation and repose.

10

## FOURTH DEFENSE

11

(Actual and Proximate Injury)

12      The relief sought by Plaintiffs is barred, in whole or in part, because Plaintiffs were not

13  actually and proximately injured by reason of any action(s) or omission(s) of the Bank.

14

## FIFTH DEFENSE

15

(Failure to Satisfy Rule 23)

16      This action cannot be maintained as a class action because the named Plaintiffs and the

17  putative class cannot satisfy requirements of Fed. R. Civ. P. 23.

18

## SIXTH DEFENSE

19

(Preemption)

20      Plaintiffs' claims are barred because they are preempted by applicable federal law and

21  regulations, including the National Bank Act and the Home Owners' Loan Act.

22

## SEVENTH DEFENSE

23

(Unjust Enrichment)

24      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and members of the

25  putative class would be unjustly enriched if allowed to recover any portion of the damages alleged in

26  the Second Amended Class Action Complaint.

27

28

1

**EIGHTH DEFENSE**

2

(Waiver and Estoppel)

3

Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

4

**NINTH DEFENSE**

5

(Failure to Mitigate)

6

The Bank alleges Plaintiffs' claims for relief are barred, in whole or in part, because

7

Plaintiffs failed to mitigate, reduce, or otherwise avoid the damages that they allegedly suffered.

8

**TENTH DEFENSE**

9

(Unclean Hands)

10

The Bank alleges some or all of Plaintiffs' claims are barred, in whole or in part, by the

11

doctrine of unclean hands.

12

**ELEVENTH DEFENSE**

13

(Homeowner Bill of Rights Not Retroactive)

14

The California Homeowner Bill of Rights does not apply to conduct that occurred before

15

January 1, 2013.

16

**TWELFTH DEFENSE**

17

(Compliance with the National Mortgage Settlement)

18

Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank complied

19

with the terms of the National Mortgage Settlement.

20

**THIRTEENTH DEFENSE**

21

(Non Owner-Occupied Properties)

22

Some or all of Plaintiffs' claims are barred, in whole or in part, because their loans were

23

secured by non-owner occupied properties.

24

**FOURTEENTH DEFENSE**

25

(Voluntary Payment Doctrine)

26

Some or all of Plaintiffs' claims are barred, in whole or in part, by the voluntary payment

27

doctrine.

28

1

## FIFTEENTH DEFENSE

2

(Compliance with Federal Rules and Regulations)

3        Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank complied

4    with applicable federal rules and regulations.

5

## SIXTEENTH DEFENSE

6

(HAMP Does Not Have the Force of Law)

7        Some or all of Plaintiffs' claims are barred, in whole or in part, because HAMP does not

8    have the force of law.

9

## SEVENTEENTH DEFENSE

10

(No Intent)

11        Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank's alleged

12    actions were not intentional or reckless.

13

## EIGHTEENTH DEFENSE

14

(Contributory and/or Comparative Negligence)

15        Plaintiffs' damages or injuries, if any, were the direct and proximate result of Plaintiffs' own

16    negligence.

17

## NINETEENTH DEFENSE

18

(No Duty)

19        Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank had no duty

20    to modify their loans as a matter of law.

21

## TWENTIETH DEFENSE

22

(Claims Barred by Contract)

23        The Bank's relationship with Plaintiffs was governed by the contract documents entered into

24    by and between the parties.  The contract documents set forth the various terms concerning duties

25    and limitations of liability; and those terms are incorporated herein by reference.  Because the

26    Second Amended Class Action Complaint seeks relief contrary to the terms of those contract

27

28

documents, it fails to state facts sufficient to constitute causes of action upon which relief can be granted and is, accordingly, barred.

**TWENTY-FIRST DEFENSE**

(Lack of Deception or Misrepresentation)

Plaintiffs' claims are barred, in whole or in part, because there was no deceptive act or practice, and no misrepresentation or omission.

**TWENTY-SECOND DEFENSE**

(Unjustified Reliance)

Plaintiffs' claims are barred, in whole or in part, because the challenged actions are not material enough to justify reliance on them.

**TWENTY-THIRD DEFENSE**

(Lack of Detrimental Reliance)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs did not detrimentally rely upon any conduct alleged in the Second Amended Class Action Complaint.

**TWENTY-FOURTH DEFENSE**

(Good Faith)

This action is barred, in whole or in part, because Wells Fargo always acted in good faith and honesty in fact, and always observed reasonable commercial standards of fair dealing in the trade, when dealing with Plaintiffs.

**TWENTY-FIFTH DEFENSE**

(Plaintiffs' Breaches of Contract)

Plaintiffs' claims are barred, in whole or in part, as a result of Plaintiffs' breaches of their mortgage contracts.

**TWENTY-SIXTH DEFENSE**

(Set-Off/Recoupment)

Plaintiffs' claims are barred, in whole or in part, by the doctrines of set-off and recoupment

to the extent that Plaintiffs have already received payment, or that Plaintiffs have unpaid debt.

**TWENTY-SEVENTH DEFENSE**

(Improper Venue)

Plaintiffs' claims are barred, in whole or in part, because venue is not proper in this District.

**RESERVATION OF DEFENSES**

(Additional Defenses)

The Bank presently has insufficient knowledge or information on which to form a belief as to whether it may have available additional, as yet unstated, defenses. The Bank hereby reserves the right to assert other defenses and affirmative defenses as this action proceeds, the right to file an amended answer asserting additional defenses or affirmative defenses, and/or file a cross-complaint, in the event that discovery indicates that such pleadings are appropriate.


Dated:  September 9, 2019                      **WINSTON & STRAWN LLP**


                                    By:   /s/ *Amanda L. Groves*
                                          Amanda L. Groves (SBN: 187216)
                                          Morgan E. Stewart (SBN: 321611)
                                          101 California Street, 34th Floor
                                          San Francisco, CA 94111
                                          Telephone: (415) 591-1000
                                          Facsimile: (415) 591-1400
                                          agroves@winston.com
                                          mstewart@winston.com

                                          Kobi K. Brinson*
                                          Stacie C. Knight*
                                          300 South Tryon Street, 16th Floor
                                          Charlotte, NC 28202
                                          Telephone: (704) 350-7700
                                          Facsimile: (704) 350-7800
                                          kbrinson@winston.com
                                          sknight@winston.com
                                          *Admitted pro hac vice*

                                          Attorneys for Defendant
                                          WELLS FARGO BANK, N.A.