Amanda L. Groves (SBN: 187216)
agroves@winston.com
Morgan E. Stewart (SBN: 321611)
mstewart@winston.com
**WINSTON & STRAWN LLP**
101 California Street, 35th Floor
San Francisco, CA  94111-5802
Telephone:     (415) 591-1000
Facsimile:     (415) 591-1400

Kobi K. Brinson (Admitted *pro hac vice*)
kbrinson@winston.com
Stacie C. Knight (Admitted *pro hac vice*)
sknight@winston.com
**WINSTON & STRAWN LLP**
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Telephone:     (704) 350-7700
Facsimile:     (704) 350-7800

Attorneys for Defendant
WELLS FARGO BANK, N.A.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ALICIA HERNANDEZ, *et al*., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,<br><br>Defendants. | No. 3:18-cv-07354 WHA<br><br>**DEFENDANT WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: October 19, 2019<br>Time: 8:00 a.m.<br>Courtroom: 12<br>Judge: Hon. William H. Alsup |

# TABLE OF CONTENTS

I.      INTRODUCTION......................................................................................................... 1

II.     FACTUAL BACKGROUND......................................................................................... 1

III.    PLAINTIFFS' MOTION ............................................................................................. 4

IV.     LEGAL STANDARD ................................................................................................... 5

V.      ARGUMENT ................................................................................................................ 5

       A.      Plaintiffs Cannot Establish Predominance. .................................................... 5

            1.      Individual Issues Predominate for the Breach of Contract
                  Claim. ........................................................................................... 5

                  (a)     Plaintiffs Ignore Material State Law Differences
                          Regarding Extrinsic Evidence. ......................................... 6

                  (b)     Plaintiffs Ignore Material State Law Differences
                          Regarding the Effect of Their Own Contractual
                          Breaches. ........................................................................... 9

                  (c)     Plaintiffs' "Incorporated HUD Regulations" Theory
                          Varies Across the States, With Many Courts Rejecting
                          It. .................................................................................... 9

            2.      Plaintiffs Improperly Assume Causation, Which Cannot Be
                  Determined On a Class-Wide Basis. ........................................... 10

            3.      Plaintiffs Have No Valid Class-Wide Damages Model. .............. 12

       B.      Plaintiffs Lack Standing to Represent a Nationwide Breach of
           Contract Class. .................................................................................... 14

       C.      The Court Should Decline to Certify Plaintiffs' UCL Class. .................. 14

            1.      Plaintiffs Have Not Shown That the UCL Can Be Applied to
                  Putative Class Members Outside California. .............................. 14

            2.      No Moving Plaintiff Has Standing to Assert a UCL Claim. ....... 16

            3.      A 31-Member California UCL Subclass Does Not Satisfy
                  Numerosity. ................................................................................ 17

       D.      Plaintiffs' Motion is Woefully Deficient Regarding Their Five State
           Subclasses. ........................................................................................... 19

       E.      Plaintiffs Have Not Met Their Burden On Their Wrongful
           Foreclosure Claims. ............................................................................ 20

| | F. | A Class Action Is Not Superior. | 20 |
| | G. | The Court Should Not Certify the Issue of "Extreme and Outrageous Conduct." | 23 |
| | H. | Plaintiffs Have Not Demonstrated Adequacy | 24 |
| V. | | CONCLUSION | 25 |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABN AMRO Mortg. Grp. v. Tullar*,
770 N.W.2d 851 (Iowa Ct. App. 2009)........................................................................10

*Adams v. Bank of Am., N.A.*,
237 F. Supp. 3d 1189 (N.D. Ala. 2017)......................................................................10

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...............................................................................................5, 21

*Ballard v. Bank of Am., N.A.*,
2013 WL 4807193, at *4 (C.D. Cal. Sept. 6, 2013)................................................24, 25

*In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*,
2013 WL 4759649 (D. Mass. Sept. 4, 2013) ...............................................................21

*Barton v. RCI, LLC*,
2013 WL 1338235 (D.N.J. Apr. 1, 2013) ...................................................................12

*Bates v. JPMorgan Chase Bank, NA*,
768 F.3d 1126 (11th Cir. 2014) ................................................................................9

*Boundas v. Abercrombie & Fitch Stores, Inc.*,
280 F.R.D. 408 (E.D. Ill. 2012) ................................................................................8

*Bowers v. Jefferson Pilot Fin. Ins.*
 219 F.R.D. 578 (E.D. Mich. 2004) ...........................................................................7

*Boyko v. Am. Int'l Grp., Inc.*,
2012 WL 1495372 (D.N.J. Apr. 26, 2012) .................................................................8

*Burton v. Nationstar Mortg., LLC*,
2014 WL 5035163 (E.D. Cal. Oct. 8, 2014)................................................................6

*In re Cablevision Consumer Litig.*,
2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014)...............................................................8

*Campusano v. BAC Home Loans Servicing LP*,
2013 WL 2302676 (C.D. Cal. Apr. 23, 2013) .............................................................12

*Carnegie v. Household, Inc.*,
376 F.3d 656 (7th Cir. 2004) ...................................................................................18

*Christenson v. Citimortgage, Inc.*,
2013 WL 5291947 (D. Colo. Sept. 18, 2013)...............................................................10

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ................................................................................5, 12

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*,
  270 F.R.D. 521 (N.D. Cal. 2010) ............................................................................8

*Corvello v. Wells Fargo Bank, N.A.*,
  2016 WL 3995909 (N.D. Cal. Jan. 29, 2016) ..........................................................19

*Culley v. Lincare Inc.*,
  2017 WL 3284800 (E.D. Cal. Aug. 2, 2017) ....................................................18, 20

*In re Ditropan XL Antitrust Litig.*,
  529 F. Supp. 2d 1098 (N.D. Cal. 2007) ..................................................................14

*Donlon v. Evolve Bank & Trust*,
  2014 WL 1330522 (W.D. Tenn. Mar. 31, 2014) .......................................................9

*Dorado v. Bank of Am., N.A.*,
  2016 WL 3924115 (S.D. Fla. July 21, 2016) ..........................................................10

*Dupler v. Costco Wholesale Corp.*,
  249 F.R.D. 29 (E.D.N.Y. 2008) ................................................................................7

*Egge v. Healthspan Servs. Co.*,
  208 F.R.D. 265 (D. Minn. 2002) ..............................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011) ..............................................................................................5

*Feller v. Transamerica Life Ins. Co.*,
  2017 WL 6496803 (C.D. Cal. Dec. 11, 2017) ..........................................................8

*In re: First Am. Home Buyers Prot. Corp. Class Action Litig.*,
  313 F.R.D. 578 (S.D. Cal. 2016) ............................................................................16

*Flanagan v. Allstate Ins. Co.*,
  242 F.R.D. 421 (N.D. Ill. 2007) ................................................................................8

*Fuhrman v. California Satellite Sys.*,
  179 Cal. App. 3d 408 (1986) ....................................................................................4

*Galvan v. KDI Dist. Inc.*,
  2011 WL 5116585 (E.D. Cal. Oct. 25, 2011) ...........................................................7

*Gaudin v. Saxon Mortg. Servs., Inc.*,
  297 F.R.D. 417 (N.D. Cal. 2013) ..............................................................................7

*Gelfound v. Metlife Ins. Co. of Connecticut*,
  313 F.R.D. 674 (S.D. Fla. 2016) ..............................................................................6

*Glover v. Udren*,
   2013 WL 6237990 (W.D. Pa. Dec. 3, 2013).................................................................19

*Gonzales v. Comcast Corp.*,
   2012 WL 10621 (E.D. Cal. Jan. 3, 2012) ..............................................................11, 12

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) (Alsup, J.) ....................................................14

*Gustafson v. BAC Home Loans Servicing, LP*,
   294 F.R.D. 529 (C.D. Cal. 2013)..................................................................7, 15, 16

*Haley v. Medtronic, Inc.*,
   169 F.R.D. 643 (N.D. Cal. 1996)..............................................................................22

*Hawkins v. Comparet–Cassani*,
   251 F.3d 1230 (9th Cir. 2001) ...................................................................................14

*Hayes v. M&T Mortg. Corp.*,
   906 N.E.2d 638 (Ill. App. 2009) ................................................................................10

*Howerton v. Harbin Clinic, LLC*,
   333 Ga. App. 191, 776 S.E.2d 288 (2015)..................................................................23

*HSBC Bank USA, Nat'l Tr. Co. v. Teagarden*,
   6 N.E.3d 678 (Ohio Ct. App. 2013)............................................................................10

*Johnson v. Nissan N. Am., Inc.*,
   272 F. Supp. 3d 1168 (N.D. Cal. 2017) .....................................................................14

*Kamakahi v. Am. Society for Reproductive Medicine*,
   305 F.R.D. 164 (N.D. Cal. 2015)................................................................................23

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) .............................................................................................17

*Lane v. Wells Fargo Bank, N.A.*,
   2013 WL 269133 (N.D. Cal. Jan. 24, 2013) (Alsup, J.) ...................................... *passim*

*Leszczynski v. Allianz Ins.*,
   176 F.R.D. 659 (S.D. Fla. 1997)..................................................................................8

*Lil' Man in the Boat, Inc. v. City & Cty. of San Francisco*,
   2019 WL 125905 (N.D. Cal. Jan. 8, 2019)....................................................17, 18, 21

*Marshall v. H&R Block Tax Servs., Inc.*,
   270 F.R.D. 400 (S.D. Ill. 2010) .................................................................................19

*Mathews v. PHH Mortg. Corp.*,
   283 Va. 723, 724 S.E.2d 196 (Va. 2012)....................................................................10

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) .................................................................................15, 16

*McKeague v. TMBC, LLC*,
    847 F.3d 992 (8th Cir. 2017) .........................................................................................8

*McKinnon v. Dollar Thrifty Automotive Grp., Inc.*,
    2015 WL 4537957 (N.D. Cal. July 27, 2015)................................................................24

*In re Med. Capital Sec. Litig.*,
    201 WL 5067208 (C.D. Cal. July 26, 2011) ...................................................................8

*Miller v. Wells Fargo Bank, N.A.*,
    2017 WL 698520 (S.D. Fla. Feb. 22, 2017) .................................................................10

*Moeller v. Taco Bell Corp.*,
    2012 WL 3070863 (N.D. Cal. July 26, 2012) (Hamilton, J.) .................................23, 25

*Moore v. McCalla Raymer, LLC*,
    916 F. Supp. 2d 1332 (N.D. Ga. 2013)........................................................................20

*Plastic Surgery Assocs., S.C. v. Cynosure, Inc.*,
    2019 WL 3719404 (D. Mass. Aug. 7, 2019) .................................................................21

*Pom Wonderful LLC v. Welch Foods, Inc.*,
    2009 WL 5184422 (C.D. Cal. Dec. 21, 2009) ..............................................................17

*Porcell v. Lincoln Wood Prods., Inc.*,
    713 F. Supp. 2d 1305 (D.N.M. 2010) ..........................................................................19

*Rannis v. Recchia*,
    2010 WL 2124096 (9th Cir. May 27, 2010) ............................................................17, 18

*Rapp v. Green Tree Servicing, LLC*,
    302 F.R.D. 505 (D. Minn. 2014)..................................................................................7, 9

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs. Inc.*,
    601 F.3d 1159 (11th Cir. 2010) .....................................................................................8

*Sandoval Guzman v. Bridgepoint Educ., Inc.*,
    305 F.R.D. 594 (S.D. Cal. 2015) .................................................................................15

*Sandoval v. M1 Auto Collisions Ctrs.*,
    309 F.R.D. 549 (N.D. Cal. 2015)..................................................................................17

*Silberg v. Anderson*,
    50 Cal. 3d 205 (1990) ....................................................................................................4

*Stoudt v. E.F. Hutton & Co., Inc.*,
    121 F.R.D. 36 (S.D.N.Y. 1988) ...................................................................................21

*Suggs v. M & T Bank,*
230 F. Supp. 3d 458 (E.D. Va.), *aff'd sub nom. Suggs v. M&T Bank*, 694 F. App'x
180 (4th Cir. 2017)...............................................................................................................23

*Taylor v. Wells Fargo Bank, N.A.,*
85 F. Supp. 3d 63 (D.D.C. 2015) ........................................................................................23

*Thompson v. Allianz Life Ins. Co. of N. Am.,*
330 F.R.D. 219 (D. Minn. 2019)...........................................................................................8

*Turner v. Seterus, Inc.,*
27 Cal. App. 5th 516 (2018) ................................................................................................20

*Valentino v. Carter-Wallace, Inc.,*
97 F.3d 1227 (9th Cir. 1996) ...............................................................................................23

*Valenzuela v. Union Pacific Railroad Co.,*
2017 WL 1398593 (D. Ariz. April 19, 2017) .................................................................23, 24

*Victorino v. FCA US LLC,*
326 F.R.D. 282 (S.D. Cal. 2018) .........................................................................................15

*Wal–Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011)................................................................................................................5

*Walsh Chiropractic, Ltd. v. StrataCare, Inc.,*
2011 WL 4336727 (S.D. Ill. Sept. 14, 2011) ......................................................................12

*Webb v. Alpha and Omega Servs., Inc.,*
2017 WL3000014 (C.D. Cal. June 1, 2017) ........................................................................20

*Weisberg v. Takeda Pharm. U.S.A., Inc.,*
2018 WL 4043171 (C.D. Cal. Aug. 21, 2018).......................................................................7

*Wells Fargo Home Mortg., Inc. v. Neal,*
398 Md. 705 (2007) .............................................................................................................10

*White v. Empire Exp., Inc.,*
395 S.W.3d 696 (Tenn. Ct. App. 2012) .................................................................................9

*Yingling v. eBay, Inc.,*
2010 WL 11575128 (N.D. Cal. July 16, 2010).....................................................................21

*Zinser v. Accufix Research Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001) ....................................................................................6, 21, 22

**Other Authorities**

F.R.C.P. 23 .................................................................................................................1, 5, 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

F.R.C.P. 23(a) ................................................................................................................5

F.R.C.P. 23(a)(4) .........................................................................................................24

F.R.C.P. 23(b) ...............................................................................................................5

F.R.C.P. 23(b)(2) .........................................................................................................17

F.R.C.P. 23(b)(3) .................................................................................................. *passim*

F.R.C.P. 23(b)(4) ...........................................................................................................4

F.R.C.P. 23(c)(4) ...............................................................................................23, 24, 25

*Schwarzer, et al.*, Cal. Prac. Guide, Fed. Civ. Pro. Before Trial, Ch. 10-C, § 10:412 ........................5

**DEFENDANT WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1    **I.    INTRODUCTION**

2            Plaintiffs' Motion is founded on 11 pages of rhetoric camouflaged as "facts,"

3    mischaracterizations of the evidence, and misapplications of the law.  Indeed, Plaintiffs ask the

4    Court to do something that is rarely done (certify a nationwide breach of contract claim) and

5    something that is never done ("issue" certify an intentional infliction of emotional distress claim).

6    Repeating words like "standardized, "uniform," "same," and "form," Plaintiffs gloss over Rule 23's

7    requirements, ignore significant differences in state law, and improperly assume causation.

8    Plaintiffs have not and cannot meet their burden under Rule 23, particularly as to predominance and

9    superiority.  The Motion should be denied.

10   **II.   FACTUAL BACKGROUND**

11           Plaintiffs devote almost as many pages to describing background "facts" and this litigation's

12   history as they do to analyzing Rule 23.  For all its length, however, much of Plaintiffs' "Summary

13   of Evidence" is simply wrong.  Many misstated facts are without citation or, worse, with citations to

14   evidence that is mischaracterized.  Plaintiffs repeatedly violate this Court's admonition "to avoid

15   half-truths, meaning statements that are true as far as they literally go but which remain misleading

16   due to the part left out."  Supp. Order to Order Setting Initial CMC at 4.  Some of the more egregious

17   examples are highlighted below, along with a more accurate explanation of the background and

18   error.

19           In response to the housing crisis that began in 2007, the U.S. Treasury implemented the

20   Home Affordable Modification Program ("HAMP") to increase loss mitigation options for qualified

21   borrowers.  In the years that followed, Wells Fargo would decision nearly three million loan

22   modification applications, approving some 1.6 million permanent loan modifications for

23   homeowners across the country.  Ferguson Dec. ¶ 3. The error at issue here, described more fully

24   below, impacted 946 of those applications.  *Id*., Ex. B.

25           To carry out the various regulatory and investor requirements for modification decisioning,

26   Wells Fargo implemented a Home Preservation Application ("HPA") Tool, which uses borrower-

27   specific information to apply a series of steps, called a "waterfall," to try and achieve a monthly

28

payment of no more than 31% of the borrower's gross monthly income.  Schrag Dec. Ex. 12.[1]

Plaintiffs wrongly describe the loan modification process as "standardized," but the waterfall steps, and the order in which they are applied, vary by loan modification program.  *See, e.g., id*.  The Motion falsely claims—without evidentiary citation—that "Wells Fargo never audited its [HPA] software tool despite calls internally and from outsiders for regular audits."  Mtn. 21:25-22:1.  The HPA Tool has, in fact, been the subject of regular auditing, as Wells Fargo employee, Carmen Bell, testified.  Brinson Dec. Ex. 17 (Bell Dep. 155:20-156:16).  In fact, auditing was conducted not only by Wells Fargo, but by regulators and by third-party investors (*e.g*., Fannie Mae, Freddie Mac).  Schrag Dec. Ex. 7 at B-2.

To assess an application, the HPA tool compiled various data inputs, including recoverable fees, to be included in the modified payment.  *Id*., Ex. 16.  HAMP included attorney fees as recoverable fees, subject to applicable state maximums.  *Id*., Ex. 12.  The HPA Tool was intended to pull the applicable state maximums from an attorney fee matrix in order to compare those maximums to the total actual (plus estimated) attorney fees.  *Id.*, Ex. 16.  This would ensure that the attorney fees capitalized into the principal balance as "recoverable fees" did not exceed the maximum allowable amount.  *Id.*

However, the HPA Tool contained a calculation error between April 13, 2010 and October 2, 2015 (when the error was corrected).  *Id*.  Instead of comparing the actual fees to the state maximums, the HPA Tool erroneously <u>added</u> the state fee matrix amount to actual fees.  *Id*.  This unintentional calculation error during the modification eligibility determination caused the amount of fees to be overstated in some instances, which led to an inflated housing-to-income ratio for some borrowers.  *Id.*  The inflated ratio resulted in the erroneous denial of trial payment plans or trial modifications for impacted borrowers.[2]  *See id*.

Concerns regarding the use of the state fee matrix arose in late 2013 when Wells Fargo

---

[1] *See also, e.g*., Making Home Affordable Program Handbook for Servicers of Non-GSE loans at 67-69 (https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_53.pdf).

[2] Under HAMP, eligibility for a permanent modification depended upon the successful completion of a trial payment plan (TPP), during which the borrower was required to make timely modified payments.  Failure to comply with the trial plan ended the loss mitigation/foreclosure process.  Schrag Dec. Ex. 12.

employee, Thomas Wayne, now deceased, reported that the HPA Tool appeared to be adding the state maximum to already assessed amounts, and that the matrix was outdated, which may have led to inaccurate calculations.  Schrag Dec. Exs. 21, 29; Brinson Dec. Ex. 17 (Bell Dep. 33:16-20).  At that time, Wells Fargo reviewed decisioning of over 7,000 loans, for which no negative impact was found, although the matrix was determined to be outdated.  Schrag Dec. Exs. 21, 22, 29; Brinson Dec. Ex. 17 (Bell Dep. Ex. 408).  To solve the outdated matrix issue, Wells Fargo reset the attorney fees matrix values to zero, which also had the effect of eliminating the overstatement of fees.  Brinson Dec. Ex. 17 (Bell Dep. 165:4-9).

As the above demonstrates, and contrary to the unsupported assertion in Plaintiffs' Motion, Wells Fargo never "ignored state-specific caps."  Mtn. 1:25.  Nor did testing show, as the Motion also falsely states, that 50 borrowers were wrongfully denied a loan modification and Wells Fargo ignored it.  *Id*., 6:16-18.  No document supports this statement and, in fact, one of the documents Plaintiffs cite shows no harm or disparate treatment was found during the review.  Schrag Dec. Ex. 33.  Nor did Wells Fargo determine that its attorney fee calculations were so defective it called a "5-day summit" with employees to discuss it.  Mtn. 7:4-5.  As the email Plaintiffs purport to cite shows, the so-called "5-day summit" was not focused on the attorney fee calculation, but rather on an omnibus review of all fees within the modification process.  Schrag Dec. Ex. 25.  These are yet further examples of Plaintiffs' presentation of (at best) half-truths by failing to mention critical contextual information attached to their own Motion.

While reviewing an unrelated issue in 2017, Wells Fargo decided that the original "no impact" conclusion in 2014 and 2015 needed to be re-assessed.  *See Form 10-Q*, June 30, 2018 at 5.[3]  During that reassessment, Wells Fargo determined that the prior no-impact finding was incorrect and that the 946 loans referenced herein were eligible for a trial modification or repayment plan.  Ferguson Dec. Ex. B; Brinson Dec. Ex. 17 (Bell Dep. 23:3-5, 25:19-26:4).   Promptly thereafter, Wells Fargo implemented a voluntary remediation program which included the distribution of proactive checks to borrowers as well as the opportunity to engage in a mediation process if

---

[3] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2018/second-quarter-10q.pdf.

1  borrowers felt that the check was not sufficient to make things right.  Brinson Dec. Ex. 17 (Bell Dep.

2  47:24-53:19).  All but four of the named Plaintiffs pursued individual mediations with Wells Fargo

3  to seek additional compensation.  Ferguson Dec. ¶ 4.

4  **III.    PLAINTIFFS' MOTION**

5          Plaintiffs seek certification of a nationwide breach of contract class.  Although difficult to

6  decipher,[4] it appears they also seek nationwide certification of their UCL claim—despite the Court's

7  earlier warning that "I will never, never certify a UCL claim outside the borders of California."  July

8  3, 2019 Hearing Tr. 9:23-24.  Plaintiffs have not moved to certify their IIED claim, apparently

9  conceding, as they must, that "[p]erhaps no cause of action is less susceptible to a class action than

10  one for [IIED]."  *Fuhrman v. California Satellite Sys.*, 179 Cal. App. 3d 408, 425 (1986),

11  *disapproved of on other grounds by Silberg v. Anderson*, 50 Cal. 3d 205 (1990).  Instead, Plaintiffs

12  ask the Court to do what no other court has done: certify, under Rule 23(b)(4), the issue of whether

13  Wells Fargo's conduct was "extreme and outrageous."

14          Plaintiffs also seek certification of several subclasses.  First, and despite having no moving

15  Plaintiffs from California, they seek California and Georgia wrongful foreclosure subclasses.

16  Second, Plaintiffs propose Illinois, Maryland, New Jersey, New York, and Pennsylvania subclasses

17  under those states' respective "consumer protection" statutes.  Plaintiffs have not moved for

18  certification on their California Homeowner Bill of Rights ("HBOR") claim.  This may be because

19  they have no California representative to pursue it, though this did not stop them from seeking a

20  California wrongful foreclosure class.  In any event, Wells Fargo reserves all rights to oppose a tardy

21  attempt to certify the HBOR claim.

22

23

24

---

25  [4] Plaintiffs' Motion is inconsistent.  California is not included as a subclass for the state subclasses

26  (Mtn. 9:17 and 9 n.3), so we assume the putative UCL class is nationwide.  But four pages later, the Motion states that Plaintiffs "also seek to certify a California sub-class for their UCL claim."  *Id.*,

27  13:20.  The Trial Plan does not include a California UCL subclass (Tr. Plan 5-7), Plaintiffs never pled one (SAC, *passim*), and no moving Plaintiff is from California.  Plaintiffs' sloppiness aside,

28  Wells Fargo assumes Plaintiffs seek certification of a nationwide class for their UCL claim.

1   **IV.    LEGAL STANDARD**

2   A party seeking to maintain a class action "must affirmatively demonstrate his [or her]

3   compliance" with Rule 23. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The Rule

4   "does not set forth a mere pleading standard." *Id*.  Rather, the plaintiff must "prove that there are *in*

5   *fact* sufficiently numerous parties, common questions of law or fact," typicality of claims or

6   defenses, and adequacy of representation, as required by Rule 23(a). *Id*.  (emphasis in original).

7   "The party must also satisfy through evidentiary proof at least one of the provisions of Rule

8   23(b)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Plaintiffs move only under Rule

9   23(b)(3), which requires a plaintiff to provide "evidentiary proof that common issues "predominate

10  over" issues that must be individually resolved. *Id*.  The court may also consider the merits,

11  particularly to evaluate whether the requirements for class certification are met. *Dukes*, 564 U.S. at

12  350-51.  Indeed, certification is "proper only if the trial court is satisfied, after a rigorous analysis,"

13  that the prerequisites of Rule 23 have been satisfied. *Comcast Corp*., 133 S. Ct. at 1432

14  **V.    ARGUMENT**

15  **A.    Plaintiffs Cannot Establish Predominance.**

16  Considering predominance "begins, of course, with the elements of the underlying cause of

17  action." *Erica P. John Fund, Inc. v. Halliburton Co*., 131 S. Ct. 2179, 2184 (2011).  Specifically,

18  the court (1) identifies the substantive issues related to the plaintiffs' claims (claims and defenses);

19  (2) considers the proof needed for all elements of the claim or defense; and (3) considers how these

20  issues would be tried. *See Schwarzer, et al*., Cal. Prac. Guide, Fed. Civ. Pro. Before Trial, Ch. 10-C,

21  § 10:412.  The plaintiff must demonstrate that common questions predominate as to each cause of

22  action for which he or she seeks certification. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620

23  (1997).  Plaintiffs have not met their burden.

24  **1.    Individual Issues Predominate for the Breach of Contract Claim.**

25  Plaintiffs ask the Court to certify a single, nationwide class for their breach of contract claim,

26  even though at least two different contracts are implicated, each with very different "notice"

27  provisions allegedly breached.  For one of them (the Fannie/Freddie version), Plaintiffs allege Wells

28  Fargo breached the terms of the notice provision as drafted.  SAC ¶ 184.  For the other (the FHA

1    version), Plaintiffs allege Wells Fargo violated some (unspecified) HUD regulation incorporated into

2    the contract by reference. *Id.* ¶ 187.

3        Even more problematic, each instrument provides: "This Security Instrument shall be

4    governed by federal law and the law of the jurisdiction in which the Property is located. … ."

5    Ferguson Dec. Ex. A.  Those choice-of-law provisions prohibit any Plaintiff from pursuing contract

6    claims under the laws of another state. *See Lane v. Wells Fargo Bank, N.A.*, 2013 WL 269133, at *4

7    (N.D. Cal. Jan. 24, 2013) (Alsup, J.).

8        Plaintiffs acknowledge other states' laws will apply, and thus bear the "burden to conduct an

9    extensive choice of law analysis and show that the requirements of Rule 23(b)(3) are not defeated."

10   *Burton v. Nationstar Mortg., LLC*, 2014 WL 5035163, at *15 (E.D. Cal. Oct. 8, 2014).  In addition,

11   where significant differences in law will arise, plaintiffs also bear "the burden of demonstrating a

12   suitable and realistic plan for trial of the class claims." *Zinser v. Accufix Research Inst., Inc.*, 253

13   F.3d 1180, 1189 (9th Cir. 2001) (quotations and citation omitted).  Plaintiffs' perfunctory

14   discussion—three pages, no state law survey, and no acknowledgement of even a single difference—

15   does not meet that burden. *See, e.g., Gelfound v. Metlife Ins. Co. of Connecticut*, 313 F.R.D. 674,

16   679 (S.D. Fla. 2016) ("Plaintiff's failure to even identify, let alone analyze, the variations among the

17   applicable 46 states' laws is fatal to his motion [for class certification]."); *see also Lane*, 2013 WL

18   2013 WL 3187410, at *4; *Burton*, 2014 WL 5035163, at *14.

19                    **(a)    Plaintiffs Ignore Material State Law Differences Regarding**
                            **Extrinsic Evidence.**[5]

20

21       As alleged, Plaintiffs' breach of contract claim relies on extrinsic evidence.  SAC ¶¶ 192-95.

     However, Plaintiffs' Motion is silent on the legal standards for consideration of such evidence.

22
         As one court has explained when considering whether to certify a nationwide breach of

23   contract claim, "the extrinsic evidence issue is more complicated than a binary question of whether a

24   jurisdiction permits or prohibits consideration of extrinsic evidence to interpret" a contract.

25   *Gelfound*, 313 F.R.D. at 678.  For example, in contrast to many other states, California has a liberal

26   parol evidence rule.  It permits consideration of extrinsic evidence to explain the meaning of the

27

28   ---
     [5] Other differences are included in the (non-exhaustive) state law surveys.  Brinson Dec. Exs. 20, 21.
     While this Opposition focuses on three significant differences, Plaintiffs overlooked all of them.

1    terms of a contract even when the meaning appears unambiguous.  Brinson Dec. Ex. 21.  Other

2    states, such as Arkansas and Mississippi, allow extrinsic evidence only where there is a contractual

3    ambiguity.  *Id.*  Still other states, like Michigan, allow parties to use extrinsic evidence to *create* a

4    contractual ambiguity.  *Id.*

5         Because the states' laws regarding the use of extrinsic evidence are far from uniform,

6    multiple courts have refused to certify nationwide breach of contract claims on that basis.  *See, e.g.,*

7    *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529 (C.D. Cal. 2013); *Rapp v. Green Tree*

8    *Servicing, LLC*, 302 F.R.D. 505 (D. Minn. 2014); *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D.

9    578, 583 (E.D. Mich. 2004); *Weisberg v. Takeda Pharm. U.S.A., Inc.*, 2018 WL 4043171, at *10

10   (C.D. Cal. Aug. 21, 2018).

11        The same is true here.  Plaintiffs' contract claim depends on extrinsic evidence, but neither

12   their Motion nor their Trial Plan mentions the state law differences or proposes any plan to deal with

13   them.  And, as the attached state law survey shows,[6] the differences are many.  For example (setting

14   aside the obvious question of whether the evidence is admissible in the first place), among those

15   states that allow extrinsic evidence to demonstrate an ambiguity, they differ regarding the <u>type</u> of

16   evidence the court may consider.  Brinson Dec. Ex. 21.  Relatedly, states differ markedly regarding

17   the <u>process</u> for resolving an ambiguity.  For example, in Colorado and various other states (Florida,

18   Maine, Missouri), resolution of an ambiguity in a contract is an issue of fact to be determined in the

19   same manner as other factual issues.  *Id.*  In other states, such as Texas and Georgia, common law or

20   statutory rules of contract construction first may be employed to resolve the ambiguity, and if the

21   trial court does not resolve the ambiguity employing these rules, the meaning of the contract then

22   becomes an issue for the fact finder.  *Id.*  In contrast, in Wyoming, the interpretation of an

23   ambiguous contract is a mixed question of law and fact.  *Id.*  All of these nuanced rules could lead to

24   different results in different states.

25        Plaintiffs' cases also do not help them, and they have not identified a single case in which the

26   court certified a nationwide breach of contract class under circumstances like those here.  *Gaudin v.*

27   *Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 426-27 (N.D. Cal. 2013), *Galvan v. KDI Dist. Inc.*, 2011

28

---

[6] Brinson Dec. Ex. 21.

1  WL 5116585, at *2 (E.D. Cal. Oct. 25, 2011), and *Dupler v. Costco Wholesale Corp.*, 249 F.R.D.

2  29, 35 (E.D.N.Y. 2008) and *McKeague v. TMBC, LLC*, 847 F.3d 992, 997-1000 (8th Cir. 2017), all

3  involved in only one state's law.  And extrinsic evidence was not at issue in *In re Cablevision*

4  *Consumer Litig.*, 2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014), *Leszczynski v. Allianz Ins.*, 176

5  F.R.D. 659 (S.D. Fla. 1997), *In re Med. Capital Sec. Litig.*, 201 WL 5067208 (C.D. Cal. July 26,

6  2011), *Feller v. Transamerica Life Ins. Co.*, 2017 WL 6496803, at *12 (C.D. Cal. Dec. 11, 2017), or

7  *In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal.

8  2010).

9         Finally, Plaintiffs' reliance on *Sacred Heart Health Sys., Inc.*, *v. Humana Military*

10  *Healthcare Servs. Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010), is quite curious, given that the

11  Eleventh Circuit reversed the district court's multistate class certification order based, in part, on its

12  finding that "there may be considerable variation in the state law under which extrinsic evidence

13  would have to be scrutinized."  The Eleventh Circuit also remarked that "[u]ndeniably, it falls to the

14  plaintiff to demonstrate the homogeneity of different states' laws," and that "more than a perfunctory

15  analysis is required."  *Id.*[7]

16         In light of the pervasive differences in state law regarding extrinsic evidence, which will

17  overwhelm any common issues, the Court should deny the Motion on this basis alone.  As one court

18  aptly summarized: "The class raises breach-of-contract claims under the laws of multiple states, and

19  each state's laws regarding extrinsic evidence … are different.  These individual differences simply

20  overwhelm any common questions, and [plaintiff] has failed to satisfy predominance."  *Thompson v.*

21  *Allianz Life Ins. Co. of N. Am.*, 330 F.R.D. 219, 226 (D. Minn. 2019).

22

23

24  [7] Plaintiffs' remaining cases are similarly unhelpful to them.  In *Boyko v. Am. Int'l Grp., Inc.*, 2012
    WL 1495372, at *9 (D.N.J. Apr. 26, 2012), and *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 431

25  (N.D. Ill. 2007), the courts certified nationwide breach of contract claims after finding no relevant
    state law differences.  In *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408 (E.D. Ill.

26  2012), the court erroneously shifted the burden to the defendant and found that it "made no effort to
    show that variations in state contract law would require that the claims of [class members] in

27  different states be resolved differently."  Finally, *Egge v. Healthspan Servs. Co.*, 208 F.R.D. 265 (D.
    Minn. 2002), did not even involve a breach of contract claim, but rather a claim under the federal

28  Fair Debt Collection Practices Act.

1

           **(b)**      **Plaintiffs Ignore Material State Law Differences Regarding the Effect of Their Own Contractual Breaches.**

2

3

       Plaintiffs admit they defaulted on their loans.  Accordingly, their breach of contract claim

4

necessarily requires an inquiry into the legal effect of those contractual breaches.  But Plaintiffs

5

ignore material state law differences here too, blithely arguing that "Plaintiffs' performance does not

6

enter the picture at this stage of the contractual breach, and therefore does not introduce

7

individualized issues that could defeat predominance."  Mtn. 19:17.  The Court should reject this

8

dismissive approach.

9

       Some states require plaintiffs to prove, as part of a *prima facie* breach of contract claim, that

10

they performed as required by the contract.  *See* Brinson Dec. Ex. 20.  Other states require no such

11

proof as part of the *prima facie* case.  *See id*.  Still others have adopted the "first-to-breach" rule as

12

an affirmative defense, which provides that "[a] party who has materially breached a contract is not

13

entitled to damages stemming from the other party's later material breach of the same contract."

14

*White v. Empire Exp., Inc*., 395 S.W.3d 696, 715 (Tenn. Ct. App. 2012).  As one court recently

15

recognized in declining to certify a nationwide contract class, whether these various rules apply, and

16

how, "would require an analysis of the facts of each case and the law of each of the 50 states,"

17

thereby causing "individual questions [to] overwhelm common questions."  *Rapp*, 302 F.R.D. at

512-13.

18

           **(c)**      **Plaintiffs' "Incorporated HUD Regulations" Theory Varies Across the States, With Many Courts Rejecting It.**

19

20

       The "FHA" Plaintiffs (whomever they are – the Motion does not say) argue that Wells Fargo

21

breached their security instruments by violating yet-to-be identified "regulations issued by the

22

Secretary in the case of payment defaults" that purportedly were incorporated by reference.  SAC ¶

23

187.  But Plaintiffs overlook the substantial inconsistency among states as to whether a plaintiff can

24

even bring a breach of contract claim based on alleged violations of HUD regulations incorporated

into the contract.

25

       Some state courts, and federal courts interpreting state law, allow borrowers to bring such

26

claims.  *See, e.g.*, *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1130 (11th Cir. 2014)

27

(applying Georgia law); *Donlon v. Evolve Bank & Trust*, 2014 WL 1330522, at *5 (W.D. Tenn. Mar.

28

1    31, 2014); *Mathews v. PHH Mortg. Corp.*, 283 Va. 723, 724 S.E.2d 196, 202–03 (Va. 2012).  Other

2    courts reject the claim, finding that "the failure to comply with HUD regulations, when incorporated

3    into the mortgage contract," does not provide "a basis for a breach of contract claim."  *HSBC Bank*

4    *USA, Nat'l Tr. Co. v. Teagarden*, 6 N.E.3d 678, 686 (Ohio Ct. App. 2013); *see also Adams v. Bank*

5    *of Am., N.A.*, 237 F. Supp. 3d 1189, 1197-1201 (N.D. Ala. 2017); *Hayes v. M&T Mortg. Corp.*, 906

6    N.E.2d 638, 641-42 (Ill. App. 2009); *Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 711

7    (2007).  Still others hold that while a breach of incorporated HUD regulations cannot sustain a

8    breach of contract claim, it can be an affirmative defense to foreclosure.  *See, e.g., Christenson v.*

9    *Citimortgage, Inc.*, 2013 WL 5291947, at *7 (D. Colo. Sept. 18, 2013); *ABN AMRO Mortg. Grp. v.*

10   *Tullar*, 770 N.W.2d 851, at *3 (Iowa Ct. App. 2009).

11           Based on these "divergences in authority," one court recently refused to certify a nationwide

12   class based upon a breach of HUD regulations purportedly incorporated into the plaintiffs' security

13   instruments:

14           If the Court were to certify Plaintiff's proposed nationwide class, the Court would be
         required to determine—on a case-by-case basis—with nuanced analysis and without
15       any guidance from Plaintiff—whether *each state's law* permits an affirmative breach
         of contract claim based on incorporated HUD regulations.  Because Plaintiff failed to
16       provide any summary of authority concerning different states' laws as to whether a
         breach of contract claim based on incorporated HUD regulations is viable, and, in any
17       event, because Defendant has shown that there are obviously differences in state law
         that would need to be analyzed by the Court on a case-by-case basis in adjudicating the
18       putative class members' claims, Plaintiff fails to satisfy Rule 23(b)(3). …

19   *Miller v. Wells Fargo Bank, N.A.*, 2017 WL 698520, at *13 (S.D. Fla. Feb. 22, 2017) (emphasis in

20   original).  This Court should find the same here.[8]

21                      **2.      Plaintiffs Improperly Assume Causation, Which Cannot Be
                            Determined On a Class-Wide Basis.**

22           Causation is pivotal to each of Plaintiffs' claims.  Plaintiffs propose trying causation class-

23   wide (Tr. Plan 2:26; 5:11; 6:4; 7:3), but are entirely silent on how that could be accomplished.

24   Instead, Plaintiffs apparently want the jury to presume (among other things) that, had they been

25   granted the subject trial modifications, then they, along with all of the other 934 putative class

26   members, would have (1) accepted the trial modifications and timely made all required trial

27   

28   [8] *Dorado v. Bank of Am., N.A.*, 2016 WL 3924115 (S.D. Fla. July 21, 2016), is a prime example of
     the extensive, state-by-state analysis the Court would be required to undertake regarding this claim.

payments; and (2) qualified for and accepted permanent loan modifications.  Also, because Plaintiffs seek lost equity based on current values, they assume all class members would have timely made all required payments on the modified loans and remained in the homes to this day.  But critical evidence—in the form of Plaintiffs' own testimony, which they conveniently ignore—illustrates that those assumptions cannot be made, and that individualized causation issues preclude a finding of predominance here.  *See, e.g., Gonzales v. Comcast Corp.*, 2012 WL 10621, at *19 (E.D. Cal. Jan. 3, 2012) (denying class certification because, *inter alia*, individualized causation determinations predominated over any common issues regarding the defendant's business practices).

First, several named Plaintiffs had previously been granted repayment plans and permanent loan modifications, with some benefiting from several loss mitigation opportunities, yet, unfortunately, all of them defaulted on the modified terms.  For example, prior to the decision at issue here, Wells Fargo approved Plaintiff Hood for 13 forbearance agreements and six permanent loan modifications, but she did not make the required payments under any of them.  Brinson Dec. Ex. 2 (Hood Dep. 149:14-17; 163:19-22).  Plaintiff Wilson similarly was offered several forbearance agreements and loan modifications.  *Id.*, Exs. 3-7.  She, too, re-defaulted.  While Plaintiffs claim that they would have accepted and performed the trial modification offers at issue here, that claim will have to be tested on an individualized basis.

Second, putative class members' incomes varied widely, as did their ability to pay.  For example, Plaintiff Frye (who received a prior permanent loan modification in 2013) testified that he could only have afforded a $400 mortgage payment at the time of the decision at issue.  *Id.*, Exs. 8 (Frye Dep. 90:3-7; 90:25-91:15) and 9.  However, had Mr. Frye been approved for the subject trial modification the modified payment would have been much higher than that.  *Id.*, Ex. 1 at 3-4.  Plaintiff Teague's testimony (who moved out of her house because of pervasive mold issues and a lack of heat and hot water, and admitted that she never would have been able to afford the necessary repairs) revealed that she could not have afforded the proposed modified trial payment.  *Id.*, Exs. 14 (Teague Dep. 56:9-12; 57:24-59:4; 86:12-87:7; 92:15-93:2; 98:24-100:4) and 1 at 4.  It is wrong to presume all putative class members would have accepted the modification offer at all, let alone have made the payments for the next several years.

1     Third, the evidence suggests that, due to reasons personal to them, some putative class

2   members decided to "walk away" from the properties and their loan obligations and had no intention

3   of repaying the loan, whether modified or not.  For example, Wells Fargo approved Plaintiff

4   Hernandez for two trial modifications just a few months before the modification decision at issue

5   here.  *Id.*, Exs. 11 and 12.  Ms. Hernandez, who was renting the unit out, did not respond to either

6   offer.  *Id.*, Ex. 10 (Hernandez Dep. 64:13-65:5).

7     Plaintiffs ignore this evidence, wrongly assuming that the individual circumstances bear only

8   on the **amount** of damages.  Wells Fargo is entitled to present evidence relevant to whether, had

9   Plaintiffs had been granted the trial modifications at issue, the end result would have been the same –

10  because, for example, they would have abandoned the property for reasons unrelated to Wells Fargo,

11  they would not have accepted the modification, or they would have re-defaulted.  That

12  individualized, person-by-person analysis will yield varying answers across the class and thus

13  defeats a finding of predominance.  *See Campusano v. BAC Home Loans Servicing LP*, 2013 WL

14  2302676, at *7 (C.D. Cal. Apr. 23, 2013); *Gonzales*, 2012 WL 10621, at *19; *Barton v. RCI, LLC*,

15  2013 WL 1338235, at *8 (D.N.J. Apr. 1, 2013); *Walsh Chiropractic, Ltd. v. StrataCare, Inc*., 2011

16  WL 4336727, at *9 (S.D. Ill. Sept. 14, 2011).

17           **3.      Plaintiffs Have No Valid Class-Wide Damages Model.**

18    Without a methodology capable of measuring damages on a class-wide basis, "individual

19  damage calculations will inevitably overwhelm [common] questions."  *Comcast Corp.*, 569 U.S. at

20  34.  Plaintiffs attempt to overcome the pervasive individualized damages issues here by proposing a

21  damages methodology from their expert, Dr. Kilpatrick.  Specifically, Kilpatrick proposes using his

22  mass appraisal software to compare the value of each plaintiff's home at the time of foreclosure to

23  its value at the time of certification – then use the difference as "the starting point for determination

24  of a loss of homeownership equity for each of these plaintiffs."  Doc. No. 138-47 ¶ 18.  This

25  methodology does not meet the standards announced in *Comcast*, nor does it overcome the

26  predominance of individualized issues.

27    *Comcast* requires Kilpatrick's model to (1) match Plaintiffs' theory of liability; and (2)

28  measure only those damages attributable to Wells Fargo's conduct.  *Comcast Corp.*, 569 U.S. at 35

1   (while "[c]alculations need not be exact," the model must measure *only* those damages attributable

2   to Plaintiffs' theory of liability).  As the Supreme Court explained, "[i]f the model does not even

3   attempt to do that, it cannot possibly establish that damages are susceptible of measurement across

4   the entire class for purposes of Rule 23(b)(3)." *Id*.  Plaintiffs' method fails on both fronts.

5          First, as explained more fully in the accompanying Motion to Exclude, damages for "lost

6   equity" are measured by netting the subject property's value at the time of foreclosure against any

7   mortgages and liens against the property.[9]  But Kilpatrick's model ignores the mortgages and liens

8   altogether.  And he measures property value not at the time of foreclosure but, with no support, at

9   the time of certification.  Because this calculation is contrary to law,[10] Kilpatrick's proposed model

10  does not align with Plaintiffs' theories of liability.

11         Second, Kilpatrick's proposed model is not capable of isolating the damages attributable to

12  Wells Fargo's alleged wrongdoing.  Without considering a single individualized fact (and there are

13  many), Kilpatrick assumes (as do Plaintiffs) that all 946 putative class members would have (1)

14  accepted and successfully completed the trial modifications at issue by timely making all required

15  payments and complying with all other trial plan requirements; (2) qualified for and accepted

16  permanent loan modifications; (3) never re-defaulted on their loans; and (4) continued to own their

17  homes until class certification.[11]  But Kilpatrick's methodology ignores Plaintiffs' individual

18  circumstances—none of which were caused by Wells Fargo—that would have made it difficult, if

19  not impossible, for many of them to make even a modified mortgage payment, such as loss of

20  income, unstable employment, increased medical expenses, increased property tax assessments, and

21  the like.  Thus, Kilpatrick's proposed model does not measure only those damages attributable to

22  Wells Fargo's conduct.

23         In any event, even if Plaintiffs' methodology were to be used, it would leave the jury with a

24  dozen additional categories of claimed damages, for which Plaintiffs have no model, and which they

25  admit are not capable of class-wide resolution.  SAC ¶ 69.  Obviously, 946 "mini" trials on a dozen

26

27  [9] Motion to Exclude at 7.
    [10] Motion to Exclude at 12-13.
28  [11] *See also* Expert Report of Professor Christopher M. James ¶¶ 27, 31-37.

1  types of individualized damages would overwhelm the single category (or, rather the "starting point"

2  of a single category)[12] Kilpatrick purports to address.

3  **B.  Plaintiffs Lack Standing to Represent a Nationwide Breach of Contract Class.**

4  The Court should also refuse to certify a nationwide breach of contract class because the

5  moving Plaintiffs do not have standing to assert that claim under the laws of the states in which they

6  do not reside.

7  A named plaintiff cannot represent a class alleging claims he does not have standing to raise.

8  *See Hawkins v. Comparet–Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001).  Moreover, as this Court

9  has recognized, "[e]ach claim under each state [law] must be analyzed separately.  A class cannot

10  assert a claim on behalf of an individual that they cannot represent." *In re Graphics Processing*

11  *Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026–27 (N.D. Cal. 2007) (Alsup, J.).  Accordingly, a

12  plaintiff cannot bring claims under the laws of a state in which he or she does not reside. *Id.*; *see*

13  *also Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1174-76 (N.D. Cal. 2017); *In re Ditropan*

14  *XL Antitrust Litig.,* 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007).

15  Because Plaintiffs have no named representative for any states other than in which they

16  reside, their nationwide breach of contract claim cannot proceed.

17  **C.  The Court Should Decline to Certify Plaintiffs' UCL Class.**

18  Plaintiffs' proposed UCL class should not be certified.  First, the UCL cannot be applied to

19  putative class members outside California.  Second, because Plaintiffs have no moving Plaintiff from

20  California, and are not seeking any recovery permitted by the UCL, they lack standing to pursue the

21  UCL claim.  Finally, to the extent Plaintiffs seek a California UCL subclass, they have not

22  demonstrated numerosity.

23  **1.  Plaintiffs Have Not Shown That the UCL Can Be Applied to Putative Class Members Outside California.**

24  As the Court already rightly commented, certification of a nationwide UCL class is not

25  proper here.  As an initial matter, and as this Court held in *Lane*, the choice-of-law provisions

26  require application of the borrowers' own states' laws to any claims that "arise from the loan

27

28  [12] Expert Report of Professor Christopher M. James ¶ 18.

1    agreement and relationship created thereby," thus preventing application of the UCL to non-

2    California borrowers.  2013 WL 269133, at *4; *see also Gustafson*, 294 F.R.D. at 536-37.

3           Even absent the choice-of-law provisions, the result is the same.  Plaintiffs moving to apply

4    the UCL to class members outside California "bear[] the initial burden [of showing] that California

5    has [a] significant aggregation of contacts to the claims of each class member." *Sandoval Guzman v.*

6    *Bridgepoint Educ., Inc*., 305 F.R.D. 594, 612 (S.D. Cal. 2015).  Only once that showing has been

7    made does the burden shift to the defendant to demonstrate that "foreign law, rather than California

8    law, should apply to class claims," *i.e.,* by (1) identifying differences among the relevant laws; (2)

9    examining each jurisdiction's interest in the application of its own law under the circumstances; and

10   (3) for true conflicts, carefully evaluating the nature and strength of each jurisdiction's interest in the

11   application of its own law—and applying the law of the state whose interest would be more impaired

12   if its law were not applied.  *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 589-590 (9th Cir. 2012).

13   (internal quotations omitted).

14          Here, Plaintiffs made no effort to demonstrate that the UCL should apply to putative class

15   members outside California.  That failure alone is sufficient reason to deny certification of a

16   nationwide UCL class.  *Victorino v. FCA US LLC*, 326 F.R.D. 282, 297–98 (S.D. Cal. 2018).  And

17   even assuming Plaintiffs had made this threshold showing, *Mazza*'s three-part test prevents

18   certification of a nationwide UCL class here.

19          First, the consumer protection laws of the 48 jurisdictions implicated here are "materially

20   different."  *Id.* at 590.  Plaintiffs do not argue that the UCL is similar to the other five state

21   consumer-protection laws upon which they rely.  And they downplay the differences among those

22   states' laws, broadly claiming—without a single statutory or case citation, and without laying out the

23   statutes' required elements—that they are "materially identical to each other" and contain only

24   "minor" variations.  Mtn. 14:6-7.  Plaintiffs ignore the other 42 jurisdictions entirely.  The Court

25   should reject this gross oversimplification.  As demonstrated in the state law surveys,[13] Plaintiffs

26   have ignored numerous differences in the laws, including varying descriptions of "deceptive" or

27   "unfair" conduct; differing legal standards as to scienter, materiality, causation, injury, and reliance;

28   ---
[13] Brinson Dec. Ex. 24.

**DEFENDANT WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
3:18-cv-07354-WHA

1 the need in some states to show public impact or interest and for providing pre-suit notice; and the

2 differences among states in available remedies.  As this Court has concluded, "these differences are

3 not trivial as they go to the putative class members' rights to bring consumer protection-based

4 claims.  Moreover, they determine whether the relief will be generous, modest, or if there is any

5 relief available at all." *Gustafson*, 294 F.R.D. at 539 (quotations and citation omitted).

6        As to *Mazza*'s second and third prong, foreign states' interests in applying their laws to

7 putative class members' claims are squarely implicated, because the claims arise from their

8 respective mortgage loan agreements "that were entered into in foreign states and govern property

9 that is located within these foreign states' borders." *Id*.  Moreover, "[i]n analyzing which state's

10 interest is most impaired . . . it is determinative where the 'last event necessary to make the actor

11 liable occurred.'" *In re: First Am. Home Buyers Prot. Corp. Class Action Litig.*, 313 F.R.D. 578,

12 603 (S.D. Cal. 2016) (citing *Mazza*, 666 F.3d at 593).  Here, there is no connection to California, as

13 no moving Plaintiff resides in California, and Plaintiffs have not identified any conduct that occurred

14 in California.  Accordingly, the "place of the wrong" is where each transaction occurred, and

15 therefore "those jurisdictions have a stronger interest in the application of their laws." *Id*.  No

16 nationwide UCL class should be certified.

##                     2.        No Moving Plaintiff Has Standing to Assert a UCL Claim.

18        The Court also should deny certification of any UCL claim (nationwide *or* California-only)

19 because no moving Plaintiff has standing to assert the claim.

20        First, as shown above, it is well-established that a plaintiff lacks Article III standing to assert

21 claims under the laws of the states in which she does not reside. Here, because no moving Plaintiff

22 resides in California, and because the UCL cannot apply to non-California class members, no class

23 representative has standing to bring a UCL claim.  *See Lane*, 2013 WL 269133, at *4 ("There are no

24 current plaintiffs who have standing to assert a [UCL] claim, as the two plaintiffs are from Arkansas

25 … There is no current representative who himself or herself could assert such a claim under

26 California law.") (citations omitted).

27        Second, Plaintiffs seek no legally cognizable remedy under the UCL.  A plaintiff has

28 standing to pursue a UCL claim if he or she seeks remedies that are equitable in nature—*i.e.*,

1    restitution and/or injunctive relief.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134,

2    1144 (2003) (noting that "damages cannot be recovered" under the UCL).  Plaintiffs do not seek

3    certification under Rule 23(b)(2), thus, their UCL standing turns on whether they seek "restitution."

4    They do not.  Plaintiffs seek "lost equity," which, according to them, includes post-foreclosure

5    property value increases.  Plaintiffs seek other monetary relief – but all damages they themselves

6    allegedly suffered.  SAC ¶ 69.  Because Plaintiffs seek remedies unavailable under the UCL, they do

7    not have standing to pursue that claim.  *See Pom Wonderful LLC v. Welch Foods, Inc.*, 2009 WL

8    5184422, at *1-5 (C.D. Cal. Dec. 21, 2009) (holding plaintiff lacked standing under the UCL

9    because it sought remedies not available to it under the UCL).

10                       **3.     A 31-Member California UCL Subclass Does Not Satisfy**
11                       **Numerosity.**

12             Finally, to the extent Plaintiffs seek certification of a California UCL subclass (and had a

13   representative to represent that subclass) they have not demonstrated numerosity.  As shown in

14   Plaintiffs' Motion, there are 31 putative class members in California, 18 of whom experienced a

15   foreclosure.  Mtn. at 11:22

16             The Ninth Circuit has explained that numerosity generally is satisfied "when a class includes

17   at least 40 members" and has indicated that a class of 15 is too small.  *Rannis v. Recchia*, 2010 WL

18   2124096, at *4 (9th Cir. May 27, 2010).  Where a class falls in the "gray area," *i.e.*, proposed classes

19   numbering between 20 and 40, courts "are guided by a series of impracticability factors beyond

20   numbers alone,"[14] including: (1) the judicial economy that will arise from avoiding multiple actions;

21   (2) the geographic dispersion of putative class members; (3) the putative class members' financial

22   resources; (4) the ability of the members to file individual suits; and (5) requests for prospective

23   relief that may have an effect on future class members.  *Sandoval v. M1 Auto Collisions Ctrs.*, 309

24   F.R.D. 549, 562 (N.D. Cal. 2015).  Plaintiffs do not mention or address these required factors,

25   instead relying exclusively on out-of-circuit cases, some decades old.  Mtn. 11:5-17.  As shown

26

27   [14] *Lil' Man in the Boat, Inc. v. City & Cty. of San Francisco*, 2019 WL 125905, at *4 (N.D. Cal. Jan.
     8, 2019) (quotations and citation omitted).
28

1    below, the applicable factors weigh against them.

2          First, it is logical to assume that of the putative class, those who experienced foreclosure are

3    most likely to file suit.[15]  In California, that is 18 people.  *Id.*, 11:22.  Even if every single one filed

4    suit, that hardly constitutes a strain on the judicial system.  Nor would joinder of such suits be

5    impracticable.  *See Culley v. Lincare Inc.*, 2017 WL 3284800 (E.D. Cal. Aug. 2, 2017) (decertifying

6    class of 19 members because it "now lacks numerosity" and "joinder is practicable").

7          Second, regarding geographic dispersion, over half of the California borrowers (18) are

8    located in the Central District of California, while nine are in the Eastern District.  Ferguson Dec.

9    Ex. B.  That most California borrowers (26 of 31) are located in just two districts makes joinder even

10   less impracticable.

11         Next, Plaintiffs have put forth no evidence that the California putative class members lack

12   the resources to bring suit, and, more importantly, the evidence shows that their "claims are large

13   enough that they have an incentive to bring them individually."  *Lil' Man in the Boat, Inc.*, 2019 WL

14   125905, at *5.  Indeed, as this court has explained, "[c]laim size matters because individual claims of

15   certain class members may be too small to warrant individual actions."  *Id.* (quotation and citation

16   omitted).  That is not an issue here, where borrowers—including some of the named Plaintiffs—have

17   suggested damages from $116,000 to well over a million per borrower.  Brinson Dec. ¶ 4 and Exs.

18   15 (J. Demartino Dep. 168:12-14) and 16 (Y. Demartino Dep. 91:15-92:2).  Plainly, "this is not a

19   case where a class action is necessary because 'only a lunatic or fanatic sues for $20.'"  *Lil' Man in*

20   *the Boat, Inc.*, 2019 WL 125905, at *5 (quoting *Carnegie v. Household, Inc.*, 376 F.3d 656, 661 (7th

21   Cir. 2004)).

22         Finally, because Plaintiffs do not seek prospective relief, there is no risk that any such relief

23   will effect "future class members who have not yet been identified."  *Id.*

24

25   ───────────────

26   [15] This is confirmed by the SAC, in which Russell and Brenda Simoneaux are the only named
     Plaintiffs who did not experience a completed foreclosure but instead paid off their loan (and
     admitted they were not harmed).  SAC ¶¶ 109-113; Brinson Dec. Ex. (Simoneaux Dep. 117:16-
27   118:13).  It also is confirmed by the putative class members who filed their own lawsuits, all of
     whom experienced a completed foreclosure, except one, who sold the subject property via a short
28   sale.  Brinson Dec. ¶ 4.

1   Because neither the class size nor the numerosity factors favor certification, the Court should

2   deny certification of any California UCL class.

3   **D.    Plaintiffs' Motion is Woefully Deficient Regarding Their Five State Subclasses.**

4   The Court also should deny certification of five state subclasses for Plaintiffs' "consumer

5   protection" claims.

6   First, Plaintiffs' Motion is silent on the elements of those state claims.  Indeed, Plaintiffs do

7   not even cite the statutory provisions under which they seek to proceed.  And they evade the key

8   differences among those claims by blithely describing them as "materially identical" and boiling

9   them down into three elements: whether a prohibited act occurred, whether Plaintiffs suffered

10  damage, and causation.  Tr. Plan 6:24-7:3.  As shown above, however, these statutes are not

11  "materially identical," and Plaintiffs' "perfunctory analysis of the consumer protection statutes" is

12  precisely what courts have warned against in the class certification context.  *Porcell v. Lincoln Wood*

13  *Prods., Inc*., 713 F. Supp. 2d 1305, 1324 (D.N.M. 2010).  For purposes of class certification, "[a]ll

14  elements of each state's consumer protection statute must be considered" and Plaintiffs cannot focus

15  only a few elements "to the exclusion of others."  *Marshall v. H&R Block Tax Servs., Inc*., 270

16  F.R.D. 400, 408 (S.D. Ill. 2010); *see also Corvello v. Wells Fargo Bank, N.A.*, 2016 WL 3995909, at

17  *7 (N.D. Cal. Jan. 29, 2016) (denying certification of state-law claims when plaintiffs "barely

18  provide[d] any discussion in support of their motion to certify a California class for these claims,

19  simply contending they are based on the same breach-of-contract theory they described above").

20  Second, Plaintiffs do not argue—and cannot seriously suggest—that common issues

21  predominate on these claims.  Mtn. 16:8-22:9.  As shown above, for example, causation cannot be

22  determined on a class-wide basis.  Along those same lines, violations of the Pennsylvania catch-all

23  provision are "not appropriate for class certification under Rule 23(b)(3) because the element of

24  justifiable reliance is dependent upon predominantly individual issues."  *Glover v. Udren*, 2013 WL

25  6237990, at *21 (W.D. Pa. Dec. 3, 2013) (collecting cases).

26  Finally, as shown in Section V.F. below, "Plaintiffs have failed to meet their burden of

27  establishing that concentration of the litigation here is desirable."  *Lane*, 2013 WL 3187410, at *12.

28  Requiring those out-of-state borrowers (most of whom are located on the East Coast) to travel

-19-

1    thousands of miles across the country to pursue their claims benefits no one (except their counsel).

2           The Court should deny certification of the state "consumer protection" subclasses.

3           **E.     Plaintiffs Have Not Met Their Burden On Their Wrongful Foreclosure Claims.**

4           Just like the state consumer protection claims, Plaintiffs' Motion does not mention or address

5    the elements of their California and Georgia wrongful foreclosure claims.  Mtn. 20:21-21:1; *see also*

6    Tr. Plan 4:12-5:3.  Perhaps intentionally so, as the elements demonstrate the claims are not suitable

7    for class treatment.  This conclusion is echoed in the case law: we have not located a single case in

8    which a court certified a California or Georgia wrongful foreclosure class.

9           Wrongful foreclosure plaintiffs in California and Georgia must allege and prove that they

10   tendered the amount of the secured debt or that tendering was excused.  *Turner v. Seterus, Inc*., 27

11   Cal. App. 5th 516, 536 (2018); *Moore v. McCalla Raymer, LLC*, 916 F. Supp. 2d 1332, 1343 (N.D.

12   Ga. 2013).  Wells Fargo is, of course, entitled to show that for any particular California or Georgia

13   borrower, tender was required and cannot be excused.  In addition, as shown at pages 10-12 above,

14   Plaintiffs cannot prove causation on a class-wide basis.

15          That is not all.  Because no moving Plaintiff resides in California, no class representative has

16   standing to bring a California wrongful foreclosure claim.  *See, e.g., Lane*, 2013 WL 269133, at *4.

17          Finally, neither wrongful foreclosure subclass—18 putative members in California and 21

18   putative members in Georgia[16]—satisfies numerosity.  *See* pages 17-19 above; *see also Culley*, 2017

19   WL 3284800 (decertifying class of 19 members); *Webb v. Alpha and Omega Servs., Inc*., 2017

20   WL3000014, at *2 (C.D. Cal. June 1, 2017) (decertifying class of 18 members).

21          For all these reasons, the Court should deny certification of the wrongful foreclosure

22   subclasses.

23          **F.     A Class Action Is Not Superior.**

24          Regarding superiority, Plaintiffs at least cite the relevant factors.  Mtn. 22:11-15.

25   Unfortunately, their perfunctory discussion withholds relevant information, which demonstrates that

26   these claims are supremely suited for individual, not class, treatment.

27

28   _____

[16] Mtn. 11:22-23.

1    In analyzing the first superiority factor (the interests of individual class members in pursuing

2    their claims separately) the court looks to the damages suffered by each putative class member.

3    *Zinser*, 253 F.3d at 1190-91.  Where damages are not large, the factor weighs in favor of

4    certification.  *Id*.  In *Zinser*, the Ninth Circuit explained that a $50,000 damages claim is not a claim

5    with a relatively small value.  *Id*.  And, as shown above, the damages claims here are not small—

6    ranging from $100,000+ to "millions."  Thus, this factor weighs heavily against superiority.  *See,*

7    *e.g.*, *Lil' Man in the Boat, Inc.*, 2019 WL 125905, at *5; *Amchem*, 521 U.S. at 617 ("The policy at

8    the very core of the class action mechanism is to overcome the problem that small recoveries do not

9    provide the incentive for any individual to bring a solo action prosecuting his or her rights."); *Plastic*

10   *Surgery Assocs., S.C. v. Cynosure, Inc.*, 2019 WL 3719404, at *11 (D. Mass. Aug. 7, 2019) (class

11   action was not superior where alleged injury to each plaintiff exceeded $100,000); *Stoudt v. E.F.*

12   *Hutton & Co., Inc.*, 121 F.R.D. 36, 38 (S.D.N.Y. 1988) (finding that $60,000 claims provided each

13   class member with "the ability to assert an individual claim").[17]

14   The second superiority factor, the extent of any existing litigation concerning the same

15   subject-matter,[18] also weighs against superiority here.  Plaintiffs' Motion never mentions it, but six

16   putative class members have filed their own individual cases in Florida, New Jersey, New York,

17   Kentucky, and Rhode Island, and others have filed putative class actions of their own in Washington

18   and Ohio.[19]  Brinson Decl. ¶ 4; Doc. Nos. 58, 109, 134.  Notably, all of those cases were filed after

19   Wells Fargo sent the Court-ordered letters to the putative class notifying them of this action.  "[T]he

20   fact that individual class members have sued separately in related cases … supports the proposition

21   that class certification is not necessary to ensure the vindication of plaintiffs' claims."  *Pediatric*

22   *Surgery Assocs.*, 2019 WL 3719404, at *11; *see also In re Bank of Am. Home Affordable*

23   *Modification Program (HAMP) Contract Litig.*, 2013 WL 4759649, at *14 (D. Mass. Sept. 4, 2013)

24

---

25   [17] *Yingling v. eBay, Inc.*, 2010 WL 11575128 (N.D. Cal. July 16, 2010), is not to the contrary.
     There, the average overcharge amount at issue was "very small," and only a few class members

26   claimed significant damages.  *Id*. at *6.  That is not the case here; the Motion itself describes the
     amount at stake as "significant."  Mtn. 22:20.

27   [18] *Zinser*, 253 F.3d at 1190-91.

28   [19] The Rhode Island matter was dismissed without prejudice for lack of personal jurisdiction.
     Brinson Decl. ¶ 4 n.1.

1   (refusing to certify class action arising out of allegedly botched loan modifications, finding that, "as

2   the many mortgage-related cases in the federal courts attest, individual plaintiffs are normally well-

3   motivated to bring any claims they might have in order to save their homes").

4          Regarding the third factor, Plaintiffs have not offered an "adequate justification for the

5   concentration of the litigation in this particular forum." *Zinser*, 253 F.3d at 1191.  In *Zinser*, the

6   Ninth Circuit approved the approach taken by the district court in *Haley v. Medtronic, Inc.*, 169

7   F.R.D. 643, 653 (N.D. Cal. 1996), where the court considered where potential plaintiffs, witnesses,

8   and evidence were located. *Zinser*, 253 F.3d at 1191-93.  No moving Plaintiff resides here, and the

9   putative class members are located across the country (with 63% of them being on or near the East

10  Coast, thousands of miles away from this Court). *See* Doc. No. 138-43 and Ferguson Dec. Ex. B.

11  Two of the moving Plaintiffs, Ms. Hood and Ms. Teague, refused to come here for their depositions

12  because they are afraid to fly.  Brinson Dec. Ex. 13.  Moreover, during the settlement conference

13  planning call with the Court on September 9, 2019, Plaintiffs' counsel asked that Plaintiffs be

14  excused from in-person attendance at the December 6, 2019 settlement conference because it would

15  be "difficult" for them to come. *Id.*, ¶ 3.  Plaintiffs also do not point to any witness located in this

16  district, or to any particular evidence located in this district—because there isn't any. *See* Doc. No.

17  25-1.  As this Court recognized in *Lane*:

18          For absent class members in Arkansas, certifying a class in this Court would make it
            considerably more difficult for those individuals to follow, participate in, and possibly
19          intervene in this action.  Rather than locating the action in a more convenient district,
            the class members' claims would be litigated more than 1800 miles away.  While it is
20          true that defendant is a national bank that is located in California, the subject properties
            and the alleged victims are in Arkansas … .  Those Arkansas homeowners will be better
21          off litigating in Arkansas.

22  2013 WL 3187410, at *12.  The same reasoning applies here, both (1) to the putative class as a

23  whole, only 3.2% of whom in California; and (2) to Plaintiffs' Illinois, Maryland, New Jersey, New

24  York, and Pennsylvania subclasses.  Everyone (except Plaintiffs' lawyers) will be better off

25  litigating their claims in their home states.

26          As for the fourth factor, the Ninth Circuit has explained that where "each class member has

27  to litigate numerous and substantial separate issues to establish his or her right to recover

28  individually, a class action is not 'superior.'" *Zinser*, 253 F.3d at 1192.  As shown herein and in

Wells Fargo's Response to Plaintiffs' Class Action Trial Plan, individual issues predominate, and Plaintiffs have no plan for trying their claims to judgment on a class-wide basis.  The myriad individual issues undercut any claim that a class action is "superior" here.

### G. The Court Should Not Certify the Issue of "Extreme and Outrageous Conduct."

Finally, the Court should reject Plaintiffs' request that it take the unprecedented step of certifying, under Rule 23(c)(4), the issue of "extreme and outrageous" conduct.[20]  As this Court has recognized, "issue certification should never be undertaken lightly, or used to 'fix' manifest Rule 23(b)(3) predominance problems presented where key issues going to liability require individualized proof."  *Moeller v. Taco Bell Corp.*, 2012 WL 3070863, at *6 (N.D. Cal. July 26, 2012) (Hamilton, J.).  As shown below, that is exactly what Plaintiffs ask the Court to do.

First, Plaintiffs do not argue—because they cannot—that their IIED claims will be governed by the law of any state but the state in which they reside.  Accordingly, as Plaintiffs seem to acknowledge, even if the Court certifies the "extreme and outrageous" conduct issue, 946 individual trials still will be required, with each plaintiff being required to prove the remaining state-specific IIED elements, including causation and damages.  And, even more so than the "extreme and outrageous" element, the states take wildly different approaches to the remaining elements of the claim.  Brinson Dec. Ex. 22.  A Georgia plaintiff, for example, must prove that he sought medical or psychological treatment to recover.  *Howerton v. Harbin Clinic, LLC*, 333 Ga. App. 191, 207–08, 776 S.E.2d 288, 301 (2015).  Virginia does not recognize the tort in the context of foreclosure, nor does the District of Columbia.  *Suggs v. M & T Bank*, 230 F. Supp. 3d 458, 464 (E.D. Va.), *aff'd sub nom. Suggs v. M&T Bank*, 694 F. App'x 180 (4th Cir. 2017); *Taylor v. Wells Fargo Bank, N.A.*, 85 F. Supp. 3d 63, 73 (D.D.C. 2015).  Again, 946 trials, applying the laws of 48 different jurisdictions—which Plaintiffs have no plan for—would not promote judicial economy or efficiency,

---

[20] Tellingly, Plaintiffs do not cite a single case in which a court approved issue certification under Rule 23(c)(4).  In *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996), and *Kamakahi v. Am. Society for Reproductive Medicine*, 305 F.R.D. 164 (N.D. Cal. 2015), the courts merely observed that issue certification can be appropriate under circumstances.  In *Valenzuela v. Union Pacific Railroad Co.*, 2017 WL 1398593 (D. Ariz. April 19, 2017), the court denied issue certification because the plaintiffs did not meet their burden of showing it was appropriate.

1  and it certainly would not significantly advance the resolution of the litigation.  *McKinnon v. Dollar*

2  *Thrifty Automotive Grp., Inc.*, 2015 WL 4537957, at *12 (N.D. Cal. July 27, 2015) (denying issue

3  certification because "individualized damage and liability issues pervade this matter" and "no

4  efficiency will be achieved in light of those issues").

5       *Valenzuela*, 2017 WL 1398593, which Plaintiffs cite in support of their Rule 23(c)(4)

6  request, demonstrates precisely why issue certification is not appropriate here.  There, the plaintiffs

7  sued operators of a gas pipeline for trespass.  After the court denied Rule 23(b)(3) certification, the

8  plaintiffs asked it to certify three common issues, including whether the railroad defendant "knew or

9  should have known" that it did not have title to their properties.  *Id*. at *5.  After examining the

10 purposes behind Rule 23(c)(4) certification, including that it should "sav[e] money, time, and

11 judicial resources in the process," the court denied issue certification, noting that, even if it certified

12 the issues and they were resolved in the plaintiffs' favor, then

13        [a]t best, individual class members would have in hand an issue-class judgment they
         could try to use to their advantage in individual lawsuits they may file against
14       Defendants … [T]he parties would still need to litigate the rest of the case, an
         undertaking that the Court finds would not be made materially easier by the issue class.
15       Resolution of the three common issues would not establish Defendants' liability to any
         Plaintiff.
16
17 *Id*. at *4.

18      The same is true here.  Resolution of "extreme and outrageous" conduct would not establish

19 Wells Fargo's liability to any Plaintiff on the IIED claim, and would not obviate the need for 946

20 individual inquiries.  "Practically speaking, full-blown litigation would continue between each class

21 member and [Wells Fargo]," thus, Plaintiffs have not shown that class-wide adjudication of

22 "extreme and outrageous" conduct "would make this litigation significantly more efficient or less

23 complicated."  *Id*. at *5.

24      **H.      Plaintiffs Have Not Demonstrated Adequacy.**

25      Plaintiffs, of course, bear the evidentiary burden on a motion for class certification.  But they

26 failed here, as with other Rule 23 requirements, "to provide relevant evidence" demonstrating that

27 they meet the adequacy requirements of Rule 23(a)(4).  *Ballard v. Bank of Am., N.A.*, 2013 WL

28 4807193, at *4 (C.D. Cal. Sept. 6, 2013).

1    We do not make this suggestion lightly, but the myriad issues with Plaintiffs' Motion provide

2    reasons to doubt the adequacy of Plaintiffs' counsel.  The Motion contains egregious (and perhaps,

3    purposeful) misstatements of the evidence.  It does not identify which classes and/or subclasses each

4    moving Plaintiff seeks to represent, and does not consistently define the scope of the claims -- nor is

5    there even a moving Plaintiff to represent any of their proposed California subclasses.  The Motion

6    does not provide any choice-of-law analysis, much less the "extensive" analysis that is required.

7    Plaintiffs lack standing as to several claims.  And finally, although this Court has advised that "issue

8    certification should never be undertaken lightly," Plaintiffs make only one page of conclusory

9    argument in support of their Rule 23(c)(4) request, do not acknowledge any state law differences for

10   the IIED claim, do not provide the Court with any comparable cases, and their Trial Plan is generic

11   at best.  *Moeller*, 2012 WL 3070863, at *6.

12   For all these reasons, counsel's adequacy should not be presumed.  *See Lane*, 2013

13   WL3187410, at *14-15 (noting counsel's inaccurate statements in motion for class certification and

14   "failure … to provide the proper evidence in support of class certification" raised adequacy

15   concerns); *Ballard*, 2013 WL 4807193, at *6 (holding "the myriad issues with Plaintiff's motion

16   give the Court strong reason to doubt the adequacy of Plaintiff's counsel," including Plaintiff's lack

17   of standing to pursue two of the three claims and counsel's "fail[ure] to provide anything

18   approximating evidence sufficient to meet Plaintiff's burden of proof on a motion for class

19   certification").

20   **VI.    CONCLUSION**

21   For the foregoing reasons, Wells Fargo Bank, N.A. respectfully requests that the Court deny

22   Plaintiffs' Motion for Class Certification.

23   Dated: September 19, 2019                    WINSTON & STRAWN LLP

24                                               By:  */s/ Amanda L. Groves*

25                                                    Amanda L. Groves
                                                     Morgan E. Stewart
26                                                   Kobi K. Brinson (Admitted *pro hac vice*)
                                                     Stacie C. Knight (Admitted *pro hac vice*)

27                                                   Attorneys for Defendant
28                                                   WELLS FARGO BANK, N.A.

-25-