1    Amanda L. Groves (SBN: 187216)
     agroves@winston.com
2    Morgan E. Stewart (SBN: 321611)
     mstewart@winston.com
3    **WINSTON & STRAWN LLP**
     101 California Street, 35th Floor
4    San Francisco, CA  94111-5802
     Telephone:    (415) 591-1000
5    Facsimile:    (415) 591-1400

6    Kobi K. Brinson (Admitted *pro hac vice*)
     kbrinson@winston.com
7    Stacie C. Knight (Admitted *pro hac vice*)
     sknight@winston.com
8    **WINSTON & STRAWN LLP**
     300 South Tryon Street, 16th Floor
9    Charlotte, NC 28202
     Telephone:    (704) 350-7700
10   Facsimile:    (704) 350-7800

11   Attorneys for Defendant
     WELLS FARGO BANK, N.A.
12

13              **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15                **SAN FRANCISCO DIVISION**

16

17                                          No. 3:18-cv-07354 WHA

18   ALICIA HERNANDEZ, *et al*., individually
     and on behalf of all others similarly situated,    **DEFENDANT WELLS FARGO BANK, N.A.'S**
                                                         **NOTICE OF MOTION AND MOTION TO**
19                  Plaintiffs,                          **EXCLUDE DR. JOHN A. KILPATRICK'S**
                                                         **OPINIONS; MEMORANDUM OF POINTS**
20           v.                                          **AND AUTHORITIES IN SUPPORT THEREOF**

21   WELLS FARGO BANK, N.A.,
                                                         Date: October 17, 2019
22                  Defendant.                           Time: 8:00 a.m.
                                                         Courtroom: 12
23                                                       Judge: Hon. William H. Alsup

24

25

26

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on October 17, 2019 at 8:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 12 of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California, Defendant Wells Fargo Bank, N.A. ("Wells Fargo") will and hereby does move the Court to exclude Dr. John A. Kilpatrick's opinions on the grounds that his methodology and opinions are neither reliable nor relevant under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Specifically, Wells Fargo seeks to exclude Kilpatrick's opinions because: (1) he fails to consider critical facts; (2) he fails to provide a method for determining the variables to use in his proposed model; (3) he ignores individualized facts and bases his opinions on inaccurate assumptions unsupported by the facts and circumstances of the case; and (4) his methodology does not align with Plaintiffs' case theories. This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Amanda L. Groves, the record in this action, and any other written or oral submission that may be presented at or before the hearing on this motion.

Dated: September 19, 2019

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: /s/ *Amanda L. Groves*

Amanda L. Groves (SBN: 187216)
agroves@winston.com
Morgan E. Stewart (SBN: 321611)
mstewart@winston.com
101 California Street, 35th Floor
San Francisco, CA 94111-5802
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

Kobi K. Brinson (Admitted *pro hac vice*)
kbrinson@winston.com
Stacie C. Knight (Admitted *pro hac vice*)
sknight@winston.com
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Telephone: (704) 350-7700
Facsimile: (704) 350-7800

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................ 1

II.    RELEVANT PROCEDURAL BACKGROUND AND FACTS ................................ 1

III.   LEGAL STANDARD.................................................................................... 5

IV.   ARGUMENT ............................................................................................. 5

    A.    Kilpatrick's Methodology and Opinions Are Not Reliable. .......................... 5

        1.    Kilpatrick's Failure to Consider Critical Facts Renders His Report Unreliable. .............................................................................. 7

        2.    Kilpatrick Fails to Provide a Method for Determining the Variables to Use for the AVM. .................................................... 9

        3.    Kilpatrick Ignores Individualized Facts and Wrongly Assumes Every Putative Class Members' Facts and Circumstances Are the Same. ........................................................................... 10

    B.    Kilpatrick's Methodology Does Not Align with Plaintiffs' Theories – None of Which Permit Lost Equity Awards Beyond the Date of Foreclosure/Sale. ....................................................................... 12

V.     CONCLUSION........................................................................................ 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkinson v. Hannah*,
  475 S.W.2d 39 (Mo. 1972) ....................................................................................13

*Aetna Finance Co. v. Culpeper*,
  171 Ga. App. 315 (1984) .....................................................................................13

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*,
  22 N.Y.3d 799 (2014).........................................................................................13

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
  923 F. Supp. 2d 1245 (S.D. Cal. 2013).................................................................10

*Britton v. Servicelink Field Services, LLC*,
  2019 WL 3400683 (E.D. Wash. July 26, 2019)............................................... *passim*

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..............................................................................................13

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
  32 A.3d 456 (2011), *aff'd*, 56 A.3d 170 (2012)......................................................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...............................................................................1, 5, 10, 12

*Durkay v. Madco Oil Co.*,
  862 S.W.2d 14 (Tex. App. 1993).........................................................................14

*Eisenbise v. Crown Equip. Corp.*,
  260 F. Supp. 3d 1250 (S.D. Cal. 2017)...................................................................9

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir.2011) ..................................................................................5

*First Tracks Invs., LLC v. Sunrise SchoolHouse, LLC*,
  BCD-CV-11-31 (Bus. & Consumer Ct. Apr. 13, 2012, *Horton, J.*) ............................13

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ......................................................................................14

*Kumho Tire Co. Ltd. v. Carmichael*,
  526 U.S. 137 (1999).............................................................................................5

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ....................................................................9

*Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*,
  89 F.3d 594 (9th Cir. 1996) ...................................................................................5

*Miles v. Deutsche Bank Nat'l Tr. Co.*,
   236 Cal. App. 4th 394 (2015) .................................................................................13

*Munger v. Moore*,
   11 Cal. App. 3d 1 (1970) ........................................................................................13

*Obrey v. Johnson*,
   400 F.3d 691 (9th Cir. 2005) ....................................................................................5

*Power Restoration Int'l, Inc. v. PepsiCo, Inc.*,
   2015 WL 1208128 (E.D. Pa. Mar. 17, 2015).........................................................13

*Rutherford v. Palo Verde Health Care Dist.*,
   2015 WL 12864245 (C.D. Cal. Apr. 17, 2015) ........................................................5

*Townsend v. Monster Beverage Corp.*,
   303 F. Supp. 3d 1010 (C.D. Cal. 2018) ....................................................................5

*Zhong v. PNC Bank, N.A.*,
   334 Ga. App. 653 (2015) ........................................................................................13

**Other Authorities**

Fed. R. Evid. 702 .............................................................................................................5

"Home Affordable Modification Program (HAMP) Perforamnce Summary --
   Updated Through June 30, 2019," August 5, 2019, available at
   https://www.treasury.gov/initiatives/financial-stability/reports/Pages/Making-
   Home-Affordable-Program-Performance-Report.aspx ............................................12

HPI Calculator, Federal Housing Finance Agency, available at
   https://www.fhfa.gov/DataTools/Tools/Pages/HPI-Calculator.aspx .......................3

https://finance.zacks.com/home-tax-assessed-value-vs-appraised-value-2241.htm.........8, 9

https://www.zillow.com/zestimate/.....................................................................................3

"The Illinois Property Tax System – A General Guide to the Local Property Tax
   Cycle," Illinois Department of Revenue, pp. 10–11; "Assessments & Millages –
   Property Value and Assessed Valuation," Louisiana East Baton Rouge Parish
   Assessor's Office, https://www.ebrpa.org/assessments-millages ...............................8

"Making Home Affordable – Program Performance Report Through the Second
   Quarter of 2017," U.S. Treasury, September 8, 2017, p. 9......................................12

Maryland Department of Assessments and Taxation,
   https://dat.maryland.gov/realproperty/Pages/Questions-and-Answers-About-Real-
   Property-Assessments.aspx........................................................................................8

Melnik, Steven V. and Cendella, David S., *Real Property Taxation and Assessment
   Process: A Case For a Better Model*,12 N.Y.U. J. Legis. & Pub. Pol'y 259, 267
   (2008-2009)................................................................................................................8

Sumit Agarwal, et al., "Policy Intervention in Debt Renegotiation: Evidence from the Home Affordable Modification Program," *Journal of Political Economy* 125, no. 3 (2017), pp. 654–712, fn.4.............................................................................................................12

24 Williston on Contracts § 64:16 (4th ed.).......................................................................................13

1    I.    **INTRODUCTION**

2          In conducting its rigorous analysis of Plaintiffs' motion for class certification (ECF 138), the

3    Court should exclude, and not consider, the opinions of Dr. John A. Kilpatrick (ECF 140 "Report").

4    His methodology and opinions are neither reliable nor relevant under *Daubert v. Merrell Dow*

5    *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

6          Kilpatrick, a professional appraiser and financial economist, opines that he can provide a class-

7    wide model for one of the fourteen categories of damages claimed by Plaintiffs. Specifically,

8    Kilpatrick opines that he can determine lost equity damages -- or at least the "starting point" for lost

9    equity damages -- on a class-wide mass appraisal basis. Groves Dec. Ex 1(Report ¶ 18). Kilpatrick

10   proposes using a methodology he largely copied-and-pasted from another matter, *Britton v. Servicelink*

11   *Field Services, LLC*, 2019 WL 3400683 (E.D. Wash. July 26, 2019). Groves Dec. ¶ 5, Ex. 3. There,

12   the court rejected Kilpatrick's valuation methodology, finding that its flaws rendered it both unreliable

13   and irrelevant. These flaws are even more apparent here, where Kilpatrick offers only a hypothetical

14   model he has not built. That model cannot be meaningfully assessed by the Court and, in any event,

15   does not align with Plaintiffs' theory of liability.

16         The Report and Kilpatrick's opinions should therefore be excluded.

17   II.   **RELEVANT PROCEDURAL BACKGROUND AND FACTS**

18         Plaintiffs' counsel asked Kilpatrick "whether or not the matters [at] [sic] hand can be analyzed

19   systematically and in a manner consistent with a certified class." Grove Dec. Ex. 1 (Report ¶ 8). After

20   reviewing only the Second Amended Complaint (SAC),[1] and spending less than 12 hours on this

21

22   ─────────────────
     [1] *See* Groves Dec. Ex. 5 (Kilpatrick Dep. 46:20-25, 47:1-12, 48:14-20 ) ("Q.Were you provided with
23   your client's theory of the case as part of your getting information for the assignment? A. I already
     mentioned I was provided a copy of the complaint. We may have discussed that complaint, but
24   beyond that, I can't recall. Q. And what was your understanding as you were preparing your report
     as to your client's theory of the case? … A. Beyond that which I've memorialized in my report, I
25   don't have any, any underlying understanding. … Q. Can you finish your answer without referring to
     your report? A. No. That's why I write things down. It's a -- it's handy way not to cloud my
26   memory and to keep things straight. I highly recommend writing things down. I'd suggest it to you.
     They probably teach it in law school.").
27

28

matter[2], Kilpatrick opined that in fact they can.  According to Kilpatrick, Ms. Hernandez and similarly situated plaintiffs have been affected in two distinct ways: (1) loss of "all of the increase in value of her home she would have otherwise enjoyed" and (2) "measurable additional out-of-pocket costs, such as increased occupancy costs, increased borrowing costs (resulting from loss of credit), moving expenses, personal legal expenses, and other miscellaneous costs."  Groves Dec. Ex. 1 (Report ¶ 14). According to the Report, "these costs can and should be measured in a systematic fashion across the universe of affected plaintiffs."  *Id*. ¶ 15.

With respect to lost equity, Kilpatrick proposes using a "mass appraisal system," *i.e.,* his own Greenfield automated valuation model (AVM), "to measure the actual value of each plaintiff [sic] residence at the time the mortgage was foreclosed.  We can then also measure the actual value plaintiff [sic] residence as of the time of certification of the class."  *Id*. ¶ 18.  The difference between the two values, according to Kilpatrick, "is the actual loss in equity suffered by a 'typical homeowner.'"  *Id*. ¶ 16.  But Kilpatrick later acknowledges that the "differences between each of these pairs of values would be the ***starting point*** for determination of a loss of homeownership equity for each of these plaintiffs."  *Id*. ¶ 18 (emphasis added).  His Report does not explain further, but at his deposition Kilpatrick testified that equity is not simply the value of the asset itself; instead, it is "the value in that asset in excess of liens."  Groves Dec. Ex. 5 (Kilpatrick Dep. 60:22-23).  Despite acknowledging this (uncontroversial) definition, Kilpatrick's purported lost equity measure ignores the impact of the underlying loan balance on the borrower's home equity.  Kilpatrick also has no explanation for using "the time of certification of the class" (or the date of trial – he went back and forth at his deposition)[3] as a measuring point for lost equity.  Indeed, he admits to having no information about how long borrowers expected to stay in their homes.  *Id.* 162:19-24.

Kilpatrick also admits he did not set up the AVM he would use for this matter, explaining it would take too long (two weeks) and require licenses from iLeads that he would have to pay for.  *Id*.

---

[2] Groves Dec. Ex. 5 (Kilpatrick Dep. 46:10-12) (explaining Kilpatrick did "lion's share" of the work); Groves Dec. Ex. 6 (Greenfield's invoice showing less than 12 hours work by Kilpatrick).

[3] Groves Dec. Ex. 5 (Kilpatrick Dep. 159:15-25-160:1-5 (Kilpatrick explaining he doesn't recall any particular reason why he chose the date he did).

117:19-25–118:1-3. Kilpatrick was thus unable to demonstrate how his AVM would work. Groves Dec. Ex. 5 (Kilpatrick Dep. 114:15-22); *id*. 114:15-22. Instead, Kilpatrick's Report only describes the process he **plans** to use, and that he will include location coordinates for each property and analyze certain "sources of data on property characteristics and values for properties within the proposed class." Groves Dec. Ex. 1 (Report ¶ 28). Without describing the particular sources for this case, he indicates that "[f]or projects such as this one, I typically utilize property data from iLeads … [including] recorder (or deed/sales) data and tax assessor data." *Id*. ¶ 30-31. Based on examination of the data in other contexts, Kilpatrick believes it to be "both comprehensive and representative." *Id*. ¶ 31. However, he also acknowledged that – when he has set up his AVM and measured it – the AVM has had a known error rate (median prediction error) "in the 7 percent range." Groves Dec. Ex. 5 (Kilpatrick Dep. 108:11-20). This is about the same as Zillow.[4]

Unable to run the actual AVM, Kilpatrick's Report runs a hypothetical scenario through a different AVM, the publicly-available Federal Housing Finance Authority online calculator.[5] The Report assumes that if Ms. Hernandez had purchased property in North Bergen, NJ at the beginning of 2006 for $200,000,

> it would have fallen in value to $175,503 by the end of 2010. This was the period in question when homes, such as Ms. Hernandez' and others, were eligible for loan modification to aid them in saving their lost equity, but instead their homes were foreclosed. Had Ms. Hernandez been allowed to keep her home until the first quarter of 2019, again using FHFA's data, her home today would have been worth $216,769. The difference between the value at foreclosure (in this example, $175,503) and the value today ($216,769), or $41,266, is the actual loss in equity suffered by a typical homeowner.

Groves Dec. Ex 1 (Report ¶ 16).

While Kilpatrick describes this hypothetical $41,266 as "actual loss in equity," it nowhere accounts for the balance of any of Ms. Hernandez's (considerable) liens against the property --

---

[4] Zillow, *available at* https://www.zillow.com/zestimate/, last accessed on September 18, 2019 (median error rate of 7.5% for off-market homes).

[5] HPI Calculator, Federal Housing Finance Agency, available at https://www.fhfa.gov/DataTools/Tools/Pages/HPI-Calculator.aspx.

1   ignoring his own definition of equity and apparently leaving the court to determine the extent to which

2   those liens impact the lost equity.   Moreover, since lost equity is only one of the 14 categories of

3   damages Plaintiff seeks, this methodology also leaves the Court to determine the claimed "loss of tax

4   benefits; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put

5   into their homes; loss of time and money to find new housing and move their families; loss of favorable

6   interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit

7   or higher mortgage payments; stress-related illnesses; broken marriages; children coping with the

8   financial and emotional consequences of their parents losing the family home; and severe emotional

9   distress." SAC (ECF 137) ¶ 69.

10          Despite insisting "out-of-pocket costs" (or "opportunity costs", as Plaintiffs call them) can also

11   be measured on a classwide basis, the Report offers a single conclusion on this score and zero

12   methodology or analysis: "Quite obviously, the median homeowner would have received a reduction

13   in housing costs of $530 per month as a direct result of participation in HAMP.  That, unfortunately,

14   was only the beginning of direct economic losses suffered by each of these homeowners."  Groves

15   Dec. Ex 1 (Report ¶ 19).   Perhaps acknowledging a mere couple sentences would not suffice,

16   Kilpatrick back-tracked at his deposition, stating that he had not been asked to provide a methodology

17   for anything other than lost equity.[6]  Apparently, he had not alerted Plaintiffs to this before they filed

18   their Motion. *See* Motion 24:18-20 (explaining that Plaintiffs engaged Kilpatrick to calculate for all

19   class members in a class trial "the lost equity in the home as a result of the foreclosure ***and the lost***

20   ***opportunity costs*** of not having a reduced mortgage payment") (emphasis added).

21

22   [6] *See* Groves Dec. Ex 5 (Kilpatrick Dep. at 65:8-22) ("Q. So you're not offering an opinion today that
     each of the homeowners in the putative class are entitled to a $530-per-month award or out-of-pocket
23   loss award?  A. No. I'm offering that up as an example of what the typical or median property owner,
     at a minimum, would have been denied in just that one category. And, quite obviously, as is shown in
24   paragraph 69 of the complaint, there are many other categories. But that is illustrative of the fact that
     outside of the loss of equity in their homes, there are a host of other losses. And measuring that loss
25   of equity is, in my mind, as a financial economist, a starting point."); *id*. 58:4-15 ("Q. So just to make
     sure I'm understanding this.  You are here today to offer an opinion about a methodology for
26   determining lost equity, but you have not been asked to provide a methodology for determining any
     of the other damages that the plaintiffs have suffered as outlined in your report?  A. I'm not.  But that
27   paragraph alludes to the fact that, if asked, I certainly could.  And that would certainly be within the
     expertise of a financial economist.  But I have not yet been asked to do that.")

28

1    **III.   LEGAL STANDARD**

2          Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal courts.

3    Under that Rule, expert testimony is only admissible if: (a) the expert's scientific, technical, or other

4    specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in

5    issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

6    principles and methods; and (d) the expert has reliably applied the principles and methods to the facts

7    of the case.  Fed. R. Evid. 702.

8          Courts apply the *Daubert* standard to evaluate challenged evidence at the class certification

9    stage.  *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir.2011).  The Supreme Court in

10   *Daubert v. Merrell Dow Pharmaceuticals, Inc.* established the trial court's gatekeeping role and duty

11   to ensure that proffered expert testimony based on scientific knowledge is sufficiently relevant and

12   reliable.  *See* 509 U.S. 579, 597 (1993).  In *Kumho Tire Co. Ltd. v. Carmichael*, the Supreme Court

13   extended the trial judge's gatekeeping function to include expert testimony based on "technical" and

14   "other specialized" knowledge.  526 U.S. 137, 141 (1999).  Expert testimony that suffers from "serious

15   methodological flaws" should be excluded as unreliable.  *Obrey v. Johnson*, 400 F.3d 691, 696 (9th

16   Cir. 2005).  To be relevant, expert testimony must fit the issues to be decided.  *Daubert*, 509 U.S. at

17   591.

18   **IV.   ARGUMENT**

19         **A.   Kilpatrick's Methodology and Opinions Are Not Reliable.**

20         "In determining reliability of a proffered expert, courts scrutinize not only the principles and

21   methods used by the expert, but also whether those principles and methods have been properly applied

22   to the facts of the case."  Fed. R. Evid. 702, Advisory Committee's Note (2000 Amendment);

23   *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1018–19 (C.D. Cal. 2018); *Rutherford*

24   *v. Palo Verde Health Care Dist*., 2015 WL 12864245, at *1 (C.D. Cal. Apr. 17, 2015).  Accordingly,

25   a court "'can exclude an expert's opinion if the expert fails to identify and defend the reasons' for his

26   conclusions."  *Townsend*, 303 F. Supp. 3d at 1018-19 (quoting *Lust ex rel. Lust v. Merrell Dow*

27   *Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

28

1      A case excluding a substantially similar Kilpatrick Report (Groves Dec. Exs. 2 and 3) two

2   months ago is illustrative.  *See Britton v. Servicelink Field Services, LLC*, 2019 WL 3400683 (E.D.

3   Wash. July 26, 2019).   There, a putative class action was filed against Servicelink, an asset

4   preservation servicer, for its role in "drill[ing] out and replac[ing] the locks on homes…" prior to

5   lenders' foreclosures.   *Id*. at *1.   Based on a Washington Supreme Court decision that found

6   agreements purporting to allow lenders to take possession of homes after default and before

7   foreclosure invalid, plaintiffs sued Servicelink for trespass.   *Id*. at *1.   In support of their class

8   certification motion, plaintiffs submitted a report by Kilpatrick, substantially similar to the one

9   submitted in this matter (*see* Groves Dec. Ex. 3), purportedly showing that the damages claimed could

10   be calculated on a class-wide basis.  In *Britton*, as here, Kilpatrick proposed determining the property

11   value using his Greenfield AVM to "assign[] a value to a home based on the average value of

12   properties with certain characteristics and within a certain geographical area." *Britton*, 2019 WL

13   3400683, at *7.  To determine the daily rental value damages for *Britton's* putative class members,

14   Kilpatrick determined the rent-to-price ratio to the proposed value of the house and multiplied it by

15   the number of days the putative class member was locked out.  *Id*.

16      The court granted Servicelink's motion to exclude Kilpatrick's opinions, concluding that

17   plaintiffs "failed to present a viable methodology for calculating damages[.]"  *Id*.  ("[T]he matter is

18   not one of weight, but of admissibility as a matter of relevance.  Moreover, the time to present a valid

19   methodology is now, at the certification stage, not later.").  In excluding Kilpatrick's opinion, the court

20   found that "[t]he proposed method ha[d] several problems."  *Id*.  First, Kilpatrick offered no "real

21   method" for determining which variables would be used in the AVM.  *Id*.  Second, Kilpatrick failed

22   to consider critical facts, including the actual condition of the home in determining its fair rental value.

23   *Britton*, 2019 WL 3400683, at *8.  This failure resulted in a method proposing to award rental value

24   based on the average house condition, which "would result in a windfall to [plaintiffs] (and others

25   similarly situated) and violate [Servicelink's] Seventh Amendment right to a jury trial and due

26   process."  *Id*.  Finally, the court determined that Kilpatrick's method for determining damages by

27   assuming every class member was actually locked out completely from the beginning of the time of

28   the service until foreclosure, and ignoring the facts that many members were never completely locked

out, while others were able to gain access to the home prior to foreclosure, was "wholly insufficient."

*Id.*  Thus, the court held that Kilpatrick's opinion was unreliable and irrelevant.

1.         **Kilpatrick's Failure to Consider Critical Facts Renders His Report Unreliable.**

Kilpatrick's Report does not account for the fact that the properties here were each subject to at least one lien – the mortgage Wells Fargo was servicing.  Kilpatrick admits that equity, by definition, must take the amount of such liens into account.  Groves Dec. Ex. 5 (Kilpatrick Dep. 60:20-23).  But his Report is conspicuously silent on this point and Plaintiffs propose simply taking the amount of the homes' value – regardless of how much was owed against it – and awarding that as "lost equity." Motion, 24:18-25.

The impact this silence has on the Report's reliability can easily be seen with the hypothetical $41,266 in "actual lost equity" the Report identifies for Plaintiff Hernandez.  Groves Dec. Ex. 1 (Report ¶ 16).  For example, suppose Plaintiff Hernandez's outstanding mortgage at the time of foreclosure was $200,000 but her property was worth only $100,000. At that point, Ms. Hernandez has negative equity in her property (*i.e.*, it is "underwater").  Then, assuming arguendo as Kilpatrick does, that she had been granted the modification and had not re-defaulted or moved, five years later if the property value had increased to $125,000 and her outstanding mortgage had been paid down to $180,000, she would still be underwater.  But, according to Kilpatrick, in this hypothetical scenario Ms. Hernandez's actual lost equity is $25,000 -- or the hypothetical increase in value of the property, despite her hypothetical mortgage being $55,000 more than the property's value.  The fact that Kilpatrick's method would so wildly misstate lost equity demonstrates that it is unreliable.

Another critical fact the Kilpatrick Report ignores is the actual condition of the class members' homes.  In the Ms. Hernandez example, Kilpatrick apparently assumed (without so stating) that her home was in average condition.  The facts here are wildly different even among the named Plaintiffs – a fact Kilpatrick ignores.  Plaintiff Hood, for instance, put a kitchen in the house, repaired the roof, replaced the garage and front door, and "complet[ed] various other necessary repairs."  SAC ¶ 136. Plaintiff Hood expects those investments to be recovered as part of her claim for lost equity.  Groves Dec. Ex. 7 (Hood Dep. 201:15-25).   And on the other end of the spectrum, Plaintiff Teague moved

1   out of her home after the hot water tank broke and because "mold had developed on the walls." Groves

2   Dec. Ex. 27 (Teague Dep. 56:10-11; *id.* 56:11-12)("I wasn't going to stay in there.  It was unsafe for

3   me to stay in there.").  Her modified payment, had the modification been offered, would have been

4   $873.88[7] -- an amount Plaintiff Teague admits she could not have paid.  Groves Dec. Ex. 27 (Teague

5   Dep. 86:6-14); *id*. 99:3-7.  But the Kilpatrick Report treats both Plaintiffs the same, resulting in an

6   overstatement of "lost equity" for Plaintiff Teague and an understatement for Plaintiff Hood.  As the

7   court in *Britton* explained, failing to account for the actual condition of the home in determining its

8   value threatens to violate a defendant's due process rights by providing class members with overstated

9   awards.  *Britton*, 2019 WL 3400683, at *8.

10          When questioned about this at his deposition, Kilpatrick explained that he believes the tax

11  appraisal data in his AVM will account for any increases or decreases to the value based on its

12  condition.  But assuming tax assessments would have data about Ms. Hood's improvements, or Ms.

13  Teague's mold is unfounded.  Frequency of tax reassessments are generally set by state law and

14  "[t]hroughout the country, intervals between appraisals vary from one to ten years."  Melnik, Steven

15  V. and Cendella, David S., *Real Property Taxation and Assessment Process: A Case For a Better*

16  *Model*,12 N.Y.U. J. Legis. & Pub. Pol'y 259, 267 (2008-2009).   As a result of infrequent

17  reassessments, many tax assessed values are "inaccurate[.]"  *Id*.  Moreover, tax assessed values are

18  typically not based on in-person appraisals of individual properties.  For example, a number of states

19  rely on a comparison of recently sold neighboring properties to the property being assessed to estimate

20  tax-assessed values.[8]   This method clearly cannot account for unique conditions of individual

21  properties.

22  ─────────────────
[7] Concurrently filed Declaration of Kobi Brinson in support of Wells Fargo's Opposition to Plaintiffs
23  Motion for Class Certification ("Brinson Decl.") at Ex. 1.

24  [8] For example, Illinois, Louisiana, and Maryland are among such states.  See "The Illinois Property
    Tax System – A General Guide to the Local Property Tax Cycle," Illinois Department of Revenue,
25  pp. 10–11; "Assessments & Millages – Property Value and Assessed Valuation," Louisiana East
    Baton Rough Parish Assessor's Office, https://www.ebrpa.org/assessments-millages/, last accessed
26  on September 18, 2019; "Questions and Answers About Real Property Assessments," Maryland
    Department of Assessments and Taxation, https://dat.maryland.gov/realproperty/Pages/Questions-
27  and-Answers-About-Real-Property-Assessments.aspx, last accessed on September 18, 2019; see also
28  https://finance.zacks.com/home-tax-assessed-value-vs-appraised-value-2241.htm.

Without a reliable method to account for the actual condition of the properties at issue here, Kilpatrick's proposed methodology should be excluded.

### 2. Kilpatrick Fails to Provide a Method for Determining the Variables to Use for the AVM.

Omission of major variables renders an expert's opinions to be so "incomplete as to be inadmissible as irrelevant." *In re Live Concert Antitrust Litig.,* 863 F. Supp. 2d 966, 973 (C.D. Cal. 2012); *see also Britton,* 2019 WL 3400683, at *7 (court determined it could not "adequately determine the actual methodology or whether the model [wa]s reliable" without the method for determining which variables would be utilized by the AVM.); *Eisenbise v. Crown Equip. Corp.,* 260 F. Supp. 3d 1250, 1263 (S.D. Cal. 2017) ("[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court.").

As in *Britton,* Kilpatrick's Report does not outline what set of variables his methodology will take into account for each class member – whether it be number of bedrooms, number of bathrooms, square footage, improvements, etc.  He insists that the data previously utilized in the AVM can *"probably"* be used in this matter. Groves Dec. Ex. 5 (Kilpatrick Dep. 82:18-25, 83:1-7).[9]  But nowhere does the methodology provide a means for inputting any such variables or even identifying what they might be.  The same problem was a basis for *Britton*'s exclusion of Kilpatrick's methodology as unreliable – despite Kilpatrick's instance that his model has never been rejected by a court.  Groves Dec. Ex. 5 (Kilpatrick Dep 83:7-10); *id*. 99:23-25, Ex. 4.  And in *Britton,* Kilpatrick had at least taken the time to set up the AVM and run it for the named plaintiffs.

Even after doing that work, however, the problem remained:

---

[9] *See id.* ("Q.  And what adjustments would apply to the methodology in this case, if you know?  A. Well, for example, the AVM that we've applied in prior mortgage-backed securities cases which we've done retrospective valuations, we used tax-assessed value; square footage of the living area; number of bathrooms; time lag between the comparables and the effective date of value of the subject property; square footage of the land area.  These are all adjustments that we've used.  Q.  Do you know as you sit here today which adjustments you would use for your methodology in this case?  A. *Probably the same ones*.  I mean, we've -- this model has been accepted by the courts over and over and over again; never been rejected by a court.  So why not use the same model that's been accepted by the federal courts throughout the United States?" (Emphasis added.)  Kilpatrick changed this testimony – and others -- about never being rejected in his errata sheet.  Groves Dec. Ex. 4.

> Notably, Dr. Kilpatrick determined that 'comparable properties' for Britton and Larson are residential single family homes [in the subject property county] where the primary owner is an individual. This seems to suggest that Dr. Kilpatrick did not use other variables for his calculation. If true, every single-family home would be valued the same as others in their neighborhood–a separate problem in and of itself. However, it appears Dr. Kilpatrick may have used additional variables because square feet, acres, year built, and total baths are included as variables for Britton and Larson on Table 1 of Dr. Kilpatrick's declaration, although Dr. Kilpatrick does not mention their application. In any event, this ad-hoc, unexplained approach as to what factors should be considered is anything but methodical.

*Britton*, 2019 WL 3400683, at \*7 n.5 (internal citations omitted).

Here, Kilpatrick has done even less work and the problem is even more glaring. The only work he did do – his hypothetical for Ms. Hernandez – used just the variables of purchase price, "beginning of 2006" and a town. And he didn't even run his hypothetical through the Greenfield AVM, but a different calculator altogether. Moreover, if he had run his AVM – and the approximate 7% error rate held true – the error in his hypothetical would be quite large compared to the asserted award. (His estimated values could be off by about $13,210 for the 2010 purported estimate and by about $16,318 for the 2019 purported estimate.[10] This is significantly larger than the error rate's impact in *Britton*, where the issue was being locked out for a few days and being awarded a foregone "daily rental value."

Kilpatrick's declaration is woefully lacking and incomplete, and should be excluded.

3. **Kilpatrick Ignores Individualized Facts and Wrongly Assumes Every Putative Class Members' Facts and Circumstances Are the Same.**

Kilpatrick's proposed methodology ignores individualized facts and assumes every putative class member suffered damages during his entire proposed time frame – from the date of foreclosure to the date of certification. However, as in *Britton*, his assumptions are in direct contradiction with individualized facts render his proposed model "wholly insufficient." *See also Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1255 (S.D. Cal. 2013) (excluding expert testimony under *Daubert* as unsound and unsupported by underlying facts where expert's assumption not grounded with facts of the case).

---

[10] Dollar prediction errors are calculated as 7% / (100% – 7%) times the purported price estimate.

First, Kilpatrick's model provides every class member the increase in their homes' value not as of the foreclosure date but, inexplicably, through the date of certification.  Groves Dec. Ex. 1 (Report ¶ 18).  Kilpatrick has thus obviously assumed that if Wells Fargo had offered the class member a modification, the class member would still own the home today.  But it is not reasonably foreseeable to determine how long someone will stay in their property.  For example, putative class members may have decided to sell their properties for any number of reasons, including: moving to a different state to find a better job or to be closer to family, moving to a different sized home to accommodate a growing or shrinking family, or selling to access cash equity to deal with emergency health issues or other personal circumstances.  For example, Plaintiff Cyndi Floyd testified that she and her husband moved to a new city—Philadelphia—to be closer to their pregnant daughter.  Groves Dec. Ex. 28 (Floyd Dep. 190:24–192:13).  Thus, Plaintiff Floyd may well have sold her house not long after the modification decision.  In fact, Kilpatrick acknowledges that he had no information about the borrowers' expectations as to how long they would have held onto the properties.  Groves Dec. Ex. 5 (Kilpatrick Dep. 162:19-24).

Kilpatrick also was wrong to assume that all class members would have accepted the modification had it been offered.  The modification would have involved a three-month trial period, which a number of named Plaintiffs had tried before unsuccessfully.  For example, named Plaintiff Tiffanie Hood had been offered six prior modifications and thirteen temporary forbearance agreements and defaulted on each.  Groves Dec. Ex. 7 (Hood Dep. 151:18-21); Groves Dec. Exs. 8-26.  Plaintiffs Hernandez and Granja were both offered and both failed to pay on two temporary payment plans within seven months prior to the modification decisions at issue.  Groves Dec. Exs. 31-37. Other named plaintiffs were considered for trial payment plans *after* the modification decisions at issue and never responded to such offers.  *See e.g.,* Groves Dec. Ex. 29 (Wilson Dep. 162:17-25).  This is consistent with peer-reviewed literature that Kilpatrick apparently ignored: only 53% of HAMP trial modifications were converted into permanent modifications as of June 2012.[11]   And for those

---

[11] The percentage of HAMP trial modifications that became permanent increased after June 2012 to 68% by the end of 2017 (based on a total of 2,537,629 trials and 801,225 cancelled trials).  *See* Treasury 4Q17 HAMP Report, p. 4.

1   borrowers who completed the trial plan, government statistics show 24% to 29% re-defaulted on their

2   permanent modification within two years and 36% to 42% re-defaulted within four years.  Sumit

3   Agarwal, et al., "Policy Intervention in Debt Renegotiation:  Evidence from the Home Affordable

4   Modification Program," *Journal of Political Economy* 125, no. 3 (2017), pp. 654–712, fn.4.[12]

5        Similarly, data from the Treasury Department does not support Kilpatrick's blind assumption

6   that every class member would own the same property today had the modification at issue been

7   offered.  According to HAMP's performance report, borrowers whose delinquency was over 210 days

8   prior to a HAMP modification (which was above average) experienced an over 30% re-default rate in

9   the subsequent two years following a permanent HAMP modification.[13]  And the facts in this case

10  show that 80% of putative class members were 210 days' delinquent or more.  In fact, putative class

11  members were, on average, 503 days' delinquent at the time of the erroneous decision.  For example,

12  Plaintiffs Cyndi and George Floyd were 747 days' delinquent at the time of the modification decision.

13  Concurrently filed Declaration of Robert Ferguson in support of Wells Fargo's Opposition to Plaintiffs

14  Motion for Class Certification ("Ferguson Decl.") at Ex. B.  And Plaintiff Alicia Hernandez was 517

15  days' delinquent at the time of the modification decision.  *Id*.  Thus, Kilpatrick's assumption that every

16  putative class member would not have re-defaulted on the modified mortgage (assuming they accepted

17  it) is totally unfounded.  *See* "Making Home Affordable – Program Performance Report Through the

18  Second Quarter of 2017," U.S. Treasury, September 8, 2017, p. 5 (Even as late as the second quarter

19  of 2017, the percentage of HAMP trial modifications that became permanent was only 68%.).

20       In short, Kilpatrick's failure to account for critical, individualized information renders his

21  opinion unreliable and irrelevant.  Thus, the Court should exclude his opinions.

22       **B.    Kilpatrick's Methodology Does Not Align with Plaintiffs' Theories – None of**
             **Which Permit Lost Equity Awards Beyond the Date of Foreclosure/Sale.**

23       To be relevant, expert testimony must fit the issue to be decided.  *Daubert*, 509 U.S. at 591.

24  And when expert testimony purports to present a model "to serve as evidence of damages in [a] class

25

26  [12] "Home Affordable Modification Program (HAMP) Performance Summary – Updated Through
    June 30, 2019," August 5, 2019, available at https://www.treasury.gov/initiatives/financial-

27  stability/reports/Pages/Making-Home-Affordable-Program-Performance-Report.aspx.
    [13] *See* "Making Home Affordable – Program Performance Report Through the Second Quarter of

28  2017," U.S. Treasury, September 8, 2017, p. 9.

action [it] must measure only those damages attributable to that theory." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Stated differently, where an expert offers a damages model, it must align with the damages available pursuant to the causes of action pled and plaintiffs' theories for how a defendant caused them harm.

However, no claims based on a theory of wrongful foreclosure permit lost equity damages to include post-foreclosure property value increases. This is unsurprising, as permitting such damages would contravene the requirements of foreseeability and certainty that American jurisdictions generally impose on consequential damages. *See, e.g., Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, 2015 WL 1208128, at *4 (E.D. Pa. Mar. 17, 2015) (applying Pennsylvania law); *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 806, 812 (2014); *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 32 A.3d 456, 471, 478 (2011), *aff'd*, 56 A.3d 170 (2012); 24 Williston on Contracts § 64:16 (4th ed.) (breach of contract damages only recoverable if "they are the proximate result of the breach and [] they were foreseeable.").

Thus, for instance, California courts consistently have held that "where a mortgagee or trustee makes an unauthorized sale under a power of sale[,] he and his principal are liable to the mortgagor for the value of the property *at the time of the sale* in excess of the mortgages and liens against said property." *Miles v. Deutsche Bank Nat'l Tr. Co.*, 236 Cal. App. 4th 394, 409 (2015) (citing *Munger v. Moore*, 11 Cal. App. 3d 1, 11 (1970))(emphasis added). Georgia courts too have decided that "the measure of damages where a wrongful foreclosure has occurred is the full difference between the fair market value of the property *at the time of the sale* and the indebtedness to the seller if the fair market value exceeded the amount of the indebtedness." *Aetna Finance Co. v. Culpeper*, 171 Ga. App. 315, 319 (1984); *see also Zhong v. PNC Bank, N.A.,* 334 Ga. App. 653, 655 (2015) (emphasis added); *see also First Tracks Invs., LLC v. Sunrise SchoolHouse, LLC*, BCD-CV-11-31 at *17 (Bus. & Consumer Ct. Apr. 13, 2012, *Horton, J.*) ("[L]ost equity … is measured by the difference between the bid price that would have been realized in the foreclosure sale without the irregularities and the bid price actually submitted [by the winning bidder]."); *Durkay v. Madco Oil Co.*, 862 S.W.2d 14, 21 (Tex. App. 1993) ("[T]he measure of damages [for] wrongful foreclosure is the difference between the value of the property *at the time of the wrongful foreclosure* and the amount of the debt owed on that date.")

1   (emphasis added); *Adkinson v. Hannah*, 475 S.W.2d 39, 43 (Mo. 1972) ("the measure of damages for

2   wrongful foreclosure of a deed of trust is the difference between the reasonable market value of the

3   property and the aggregate amount of the liens thereon *at the date of the foreclosure sale*.") (emphasis

4   added); *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1144 (2003) ("While the scope

5   of conduct covered by the UCL is broad, its remedies are limited. A UCL action is equitable in nature;

6   *damages cannot be recovered*.") (emphasis added).

7          Neither Kilpatrick nor the Motion identify any support for the Report's conclusion that class

8   members are entitled to equity measured as of a date sometimes *years* after foreclosure.  For this

9   additional reason, the Report and opinions should be excluded.

10  **V.    CONCLUSION**

11         For the foregoing reasons, Wells Fargo Bank, N.A. respectfully requests that the Court

12  exclude and disregard Kilpatrick's opinions.

13

14  Dated: September 19, 2019                    WINSTON & STRAWN LLP

15                                               By:   */s/ Amanda L. Groves*
                                                       Amanda L. Groves
16                                                     Morgan E. Stewart
                                                       Kobi K. Brinson (Admitted *pro hac vice*)
17                                                     Stacie C. Knight (Admitted *pro hac vice*)

18                                                     Attorneys for Defendant
                                                       WELLS FARGO BANK, N.A.
19

20

21

22

23

24

25

26

27

28