# EXHIBIT 12

```
 1               UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4                       ---oOo---
 5
 6   ALICIA HERNANDEZ, et al.,
     individually and on
 7   behalf of all others
     similarly situated,
 8
                   Plaintiffs,
 9
     vs.                                No. 3:18-cv-07354-WHA
10
     WELLS FARGO & COMPANY, and
11   WELLS FARGO BANK, N.A.,
12             Defendants.
     _____/
13
14
15
16       30(b)(6) VIDEOTAPED DEPOSITION OF CARMEN BELL
17              SAN FRANCISCO, CALIFORNIA
18                FRIDAY, AUGUST 2, 2019
19
20
21   Stenographically reported by:
22   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR
23   California CSR No. 9830
24   Job No. 3476159
25   Pages 1- 266
```

Page 1

| | | |
|---|---|---|
| 1 | second error occurred prior to 2015? | 10:18 |
| 2 |     MS. KNIGHT:  Object to form. | 10:18 |
| 3 |     THE WITNESS:  Yes.  And that's where it's | 10:18 |
| 4 | referenced April 2010 in the -- one, two, three -- | 10:19 |
| 5 | fourth bullet down, in which it states that we're | 10:19 |
| 6 | going to go back to 2010 of April. | 10:19 |
| 7 |     MR. PAUL:  Q.  Did -- so let me go at it this | 10:19 |
| 8 | way:  Was there anything about the change of setting | 10:19 |
| 9 | the fee matrix to 0 in October of 2015 that caused or | 10:19 |
| 10 | contributed to the second error? | 10:19 |
| 11 |     MS. KNIGHT:  Object to the form. | 10:19 |
| 12 |     THE WITNESS:  No. | 10:19 |
| 13 |     MR. PAUL:  Okay. | 10:19 |
| 14 |   Q  How would it come about where the -- the HPA | 10:20 |
| 15 | tool wouldn't be adding those two together, so that | 10:20 |
| 16 | the second error could occur without the first error | 10:20 |
| 17 | occurring? | 10:20 |
| 18 |     MS. KNIGHT:  Object to form. | 10:20 |
| 19 |     THE WITNESS:  Can you ask the question again, | 10:20 |
| 20 | please? | 10:20 |
| 21 |     MR. PAUL:  Sure. | 10:20 |
| 22 |   Q  So what I'm trying to figure out is, before | 10:20 |
| 23 | that table is set to 0, if it -- if the HPA tool is | 10:20 |
| 24 | pulling the fee matrix number in and adding it into | 10:20 |
| 25 | whatever fees are there, how does the second error | 10:20 |

| | | |
|---|---|---|
| 1 | occur, because that's not pulling in the fee matrix? | 10:20 |
| 2 |     MS. KNIGHT:  Object to form. | 10:20 |
| 3 |     Go ahead. | 10:20 |
| 4 |     THE WITNESS:  The HPA tool has various | 10:20 |
| 5 | investors and programs built into it.  Only in certain | 10:20 |
| 6 | circumstances, GSEs, Fannie and Freddie, and owned, | 10:20 |
| 7 | bank and private, HAMP treasury, had the calculation | 10:21 |
| 8 | error present. | 10:21 |
| 9 |     In the other instances within the HPA tool, | 10:21 |
| 10 | that automation was not built in.  And hence, we had a | 10:21 |
| 11 | different practice in which we would get the pending | 10:21 |
| 12 | quote from the attorney.  And that wasn't checked per | 10:21 |
| 13 | having a control in place. | 10:21 |
| 14 |     MR. PAUL:  Okay. | 10:21 |
| 15 | Q   And so which -- which types of loans would | 10:21 |
| 16 | those be? | 10:21 |
| 17 |     Which government programs or non-GSE | 10:21 |
| 18 | programs? | 10:21 |
| 19 | A   Can you clarify, when you say "which type," | 10:21 |
| 20 | are you -- what you're referring to? | 10:21 |
| 21 | Q   The investor or insurer. | 10:21 |
| 22 | A   I'm sorry.  For the second error? | 10:21 |
| 23 | Q   For the second error, yes. | 10:21 |
| 24 | A   Thank you. | 10:21 |
| 25 |     The second error would have been for GSE | 10:21 |

|    |    |    |
|---|---|---|
| 1 | repayment plans, as well as the SLOAD tool.  So now, a | 10:22 |
| 2 | different tool in which HUD loans were underwritten | 10:22 |
| 3 | in. | 10:22 |
| 4 |     Q   Okay.  Was there any time period where the | 10:22 |
| 5 | second error related to loans in which the HPA tool | 10:22 |
| 6 | was used? | 10:22 |
| 7 |         MS. KNIGHT:  Object to form. | 10:22 |
| 8 |         THE WITNESS:  Can you ask the question again, | 10:22 |
| 9 | please? | 10:22 |
| 10 |         MR. PAUL:  I can. | 10:22 |
| 11 |     Q   So the -- let me ask it this way: | 10:22 |
| 12 | Post-October 2015, could the second error occur for | 10:22 |
| 13 | loan modifications being reviewed using the HPA tool, | 10:22 |
| 14 | in addition to the SLOAD tool? | 10:23 |
| 15 |         MS. KNIGHT:  Object to form. | 10:23 |
| 16 |         THE WITNESS:  Yes, for phase, the second | 10:23 |
| 17 | issue we're referring to, but not for where we | 10:23 |
| 18 | corrected the matrix automated issue. | 10:23 |
| 19 |         MR. PAUL:  Q.  So let me -- let me just see | 10:23 |
| 20 | if I can boil this down here and keep this straight. | 10:23 |
| 21 |         The -- the first error is always the HPA | 10:23 |
| 22 | tool, not the SLOAD tool? | 10:23 |
| 23 |     A   That's accurate. | 10:23 |
| 24 |     Q   And for the second error, it's always the | 10:23 |
| 25 | SLOAD tool throughout the entire 2010 to 2018 time | 10:23 |

```
 1    period, and in some instances the HPA tool?          10:23
 2            MS. KNIGHT:  Object to form.                 10:23
 3            THE WITNESS:  Yes.                           10:23
 4            MR. PAUL:  Q.  And the HPA tool would be     10:23
 5    post-October 2015?                                   10:23
 6            MS. KNIGHT:  Object to form.                 10:23
 7            THE WITNESS:  Yes, in those instances, where 10:24
 8    the calculation error -- it wasn't the calculation   10:24
 9    error.                                               10:24
10            MR. PAUL:  Right.  Okay.                     10:24
11       Q    The overview third bullet point, May 1, 2018,10:24
12    to the present, based on the review and validation   10:24
13    that has occurred to date, do you believe that the   10:24
14    problem -- that both the first and second errors have 10:24
15    been resolved or are no longer occurring             10:24
16    post-April 31, 2018?                                 10:24
17       A    I do, yes.                                   10:24
18       Q    All right.                                   10:24
19            So the population, you mentioned earlier that 10:24
20    those numbers are not correct.  Let's just go through 10:24
21    each of those.                                       10:24
22            What is the current number of impacted       10:24
23    accounts for Phase 1, as you know it to be today?    10:25
24       A    I don't know the -- the -- the breakout off  10:25
25    the top of my mind by each of the phases.  I know the 10:25
```

Page 46

```
 1    Preservation Application, decision tool.  It -- based     10:57
 2    on the date, it -- it is one that was after the           10:57
 3    implementation of the tool.                               10:57
 4         Q    Did the tool predate April 2010?                10:57
 5         A    No.                                             10:57
 6              MS. KNIGHT:  Object to form.                    10:57
 7              THE WITNESS:  No.                               10:57
 8              MR. PAUL:  Okay.  All right.                    10:57
 9         Q    So with respect to the -- the time period for   10:57
10    Phase -- the Phase 1 error, that began with the           10:57
11    implementation and use of the HPA?                        10:58
12         A    Yes.                                            10:58
13         Q    Okay.  All right.                               10:58
14              If you would turn to what says page 1 in the    10:58
15    bottom right.  It actually begins with the numbers        10:58
16    '71415.                                                   10:58
17         A    Page '5.                                        10:58
18              (Witness complies.)                             10:58
19              Okay.  I'm there.                               10:58
20         Q    All right.                                      10:58
21              Was the Home Preservation Application put in    10:58
22    place because of the advent of HAMP loans?                10:59
23              MS. KNIGHT:  I'll object to form.               10:59
24              MR. PAUL:  Loan modifications.  I'm sorry.      10:59
25              THE WITNESS:  Not for that sole reason.         10:59
```

Page 60

| | | |
|---|---|---|
| 1 | MR. PAUL: Okay. | 10:59 |
| 2 | Q   Was that part of the purpose? | 10:59 |
| 3 | A   Yes. | 10:59 |
| 4 | Q   All right. | 10:59 |
| 5 | And what -- what other reasons were there for | 10:59 |
| 6 | the HPA tool? | 10:59 |
| 7 | A   To create a more standard underwriting | 10:59 |
| 8 | decision tool, given the number of various programs | 10:59 |
| 9 | over the various investors. | 10:59 |
| 10 | Q   Okay.  There are -- if you -- beginning on | 10:59 |
| 11 | page 1, there's a -- a list of phases:  Preconditions, | 11:00 |
| 12 | eligibility, trial period, and final modification. | 11:00 |
| 13 | Which of these phases did the first error | 11:00 |
| 14 | occur in? | 11:00 |
| 15 | MS. KNIGHT:  Object to form. | 11:00 |
| 16 | THE WITNESS:  Phase 2, I would say, generally | 11:00 |
| 17 | speaking, it would have been in the eligibility | 11:00 |
| 18 | criteria. | 11:00 |
| 19 | MR. PAUL:  Okay. | 11:00 |
| 20 | Q   And would the same be true with respect to | 11:00 |
| 21 | the second error during the time period that the HPA | 11:00 |
| 22 | tool -- H -- the loans that used the HPA tool had the | 11:00 |
| 23 | error two occur? | 11:01 |
| 24 | MS. KNIGHT:  Object to form. | 11:01 |
| 25 | MR. PAUL:  Q.  Do you understand my question? | 11:01 |

| | | |
|---|---|---|
| 1 | CIT 1552 was opened, there was a concern that maybe | 11:52 |
| 2 | customers were impacted, but not a determination at | 11:52 |
| 3 | that point in time that they had been, in fact, | 11:52 |
| 4 | impacted? | 11:52 |
| 5 |       MS. KNIGHT:  Object to form. | 11:52 |
| 6 |       THE WITNESS:  Yeah, I would describe it as | 11:52 |
| 7 | there was a need to check to see if anybody was | 11:52 |
| 8 | impacted, because we would always be concerned if we | 11:52 |
| 9 | inappropriately denied somebody. | 11:52 |
| 10 |       MR. PAUL:  Q.  Do you have an understanding | 11:52 |
| 11 | as to how they got it wrong? | 11:52 |
| 12 |       How did they wrongly determine that no | 11:52 |
| 13 | customers were impacted? | 11:53 |
| 14 |       MS. KNIGHT:  Object to form. | 11:53 |
| 15 |       THE WITNESS:  We have attempted to go back | 11:53 |
| 16 | and recreate and determine the how through the | 11:53 |
| 17 | documentation and the team members that are still | 11:53 |
| 18 | here.  We have not been able to determine the how. | 11:53 |
| 19 |       MR. PAUL:  Okay. | 11:53 |
| 20 |   Q   There were -- so in this bullet point: | 11:53 |
| 21 |       "In January-February 2014, approximately | 11:53 |
| 22 | 50 loans were reviewed." | 11:53 |
| 23 |       Isn't it true that some of those 50, that | 11:53 |
| 24 | were reviewed and determined, did not have a customer | 11:53 |
| 25 | impact, you've subsequently determined were, in fact, | 11:53 |

Page 95

```
 1   CIT 1552 was opened, there was a concern that maybe        11:52
 2   customers were impacted, but not a determination at        11:52
 3   that point in time that they had been, in fact,            11:52
 4   impacted?                                                  11:52
 5           MS. KNIGHT:  Object to form.                       11:52
 6           THE WITNESS:  Yeah, I would describe it as         11:52
 7   there was a need to check to see if anybody was            11:52
 8   impacted, because we would always be concerned if we       11:52
 9   inappropriately denied somebody.                           11:52
10           MR. PAUL:  Q.  Do you have an understanding        11:52
11   as to how they got it wrong?                               11:52
12           How did they wrongly determine that no             11:52
13   customers were impacted?                                   11:53
14           MS. KNIGHT:  Object to form.                       11:53
15           THE WITNESS:  We have attempted to go back         11:53
16   and recreate and determine the how through the             11:53
17   documentation and the team members that are still          11:53
18   here.  We have not been able to determine the how.         11:53
19           MR. PAUL:  Okay.                                   11:53
20       Q   There were -- so in this bullet point:             11:53
21           "In January-February 2014, approximately           11:53
22   50 loans were reviewed."                                   11:53
23           Isn't it true that some of those 50, that          11:53
24   were reviewed and determined, did not have a customer      11:53
25   impact, you've subsequently determined were, in fact,      11:53
```

```
 1    stating we estimated outstanding fees and costs, which    15:36
 2    caused the loan to be denied."                             15:36
 3          Do you know what that's a reference to?              15:36
 4       A  We have went back and tried to research that,        15:36
 5    and we have not been able to identify what that is.        15:36
 6          (Document marked Exhibit 408                         15:37
 7           for identification.)                                15:37
 8          MR. PAUL:  All right.                                15:37
 9       Q  Ma'am, I've handed you what we've marked as          15:37
10    Exhibit 408.                                               15:37
11          Is this an e-mail that you've reviewed               15:37
12    before?                                                    15:37
13       A  I don't recall seeing this one, but it --            15:37
14    I -- but I can speak to it.                                15:38
15       Q  Okay.  So the -- the date of the e-mail chain        15:38
16    here is November of 2015.  So that would be, for           15:38
17    context, after the fee matrix is set to 0; right?          15:38
18       A  That would be correct.                               15:38
19       Q  All right.                                           15:38
20          And then -- well, in fact, that's what it            15:38
21    says:                                                      15:38
22          "HPA attorney fee matrix was turned off              15:38
23    October 2, 2015."                                          15:38
24          Right?                                               15:38
25       A  Yes.                                                 15:38
```

```
 1                CERTIFICATE OF REPORTER
 2           I, ANDREA M. IGNACIO, hereby certify that the
 3   witness in the foregoing deposition was by me duly
 4   sworn to tell the truth, the whole truth, and nothing
 5   but the truth in the within-entitled cause;
 6           That said deposition was taken in shorthand
 7   by me, a disinterested person, at the time and place
 8   therein stated, and that the testimony of the said
 9   witness was thereafter reduced to typewriting, by
10   computer, under my direction and supervision;
11           That before completion of the deposition,
12   review of the transcript [ ] was [x] was not
13   requested.  If requested, any changes made by the
14   deponent (and provided to the reporter) during the
15   period allowed are appended hereto.
16           I further certify that I am not of counsel or
17   attorney for either or any of the parties to the said
18   deposition, nor in any way interested in the event of
19   this cause, and that I am not related to any of the
20   parties thereto.
21   Dated: August 6, 2019
22
23
24   _____
25   ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830
```