Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HERNANDEZ et al., individually and on behalf of all others similarly situated, | Case No. 3:18-cv-07354-WHA |
| Plaintiffs, | ~~SECOND~~ **THIRD AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| WELLS FARGO BANK, N.A., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

**INTRODUCTION**

1.      Plaintiffs are among the hundreds of homeowners who lost their homes to foreclosure because Wells Fargo wrongly determined they did not qualify for a mortgage modification.

2.      This was not an accident, but rather the result of years of a willful and reckless lack of central oversight by Wells Fargo's Board and executive leadership that has led to repeated compliance breakdowns and billions of dollars in government fines.

3.      For years, Wells Fargo failed to verify or audit its loan modification software to ensure it was properly calculating homeowners' eligibility for government-mandated mortgage modifications. Material errors remained uncorrected in the software for five to eight years, if not longer.

4.      The federal government cited Wells Fargo in 2011 for failing to adequately audit its mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive leadership promised to implement ongoing testing to ensure that the Bank complied with government requirements in the future.  But they failed to live up to that promise and multiple errors in Wells Fargo's decision-making software remained unaddressed.

5.      Wells Fargo's leadership failed to implement adequate testing even after the government found that another error in the Bank's software had led the Bank to wrongfully deny mortgage modifications in 2013-2014.  Wells Fargo was cited again for failing to properly oversee the Bank's mortgage modification and foreclosure operations, but still did nothing to stop others like Plaintiffs from being wrongfully denied mortgage modifications and foreclosed upon.

6.      Not until August 2013 did Wells Fargo discover one of the errors that led it to wrongfully deny mortgage modifications to Plaintiffs and hundreds of other homeowners.  But rather than coming clean, Wells Fargo kept its discovery secret—likely in an effort to avoid additional government penalties.  The government had previously imposed restrictions on Wells Fargo's mortgage servicing business and announced fines, with the amount of the fine and the duration of business restrictions dependent on the length and severity of the Bank's continued non-compliance.  Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to hundreds of customers, the government likely would not have lifted its business restrictions in 2016 and would have imposed a far more severe penalty than the $70 million fine it ultimately issued.

7.      Moreover, despite knowing in 2013 that its mortgage modification software was faulty and had the potential to impact borrowers, Wells Fargo continued to use that faulty software when reviewing borrowers' loans for mortgage modifications.  As a result, Wells Fargo wrongfully denied mortgage modifications to Plaintiffs and class members, and in many cases foreclosed on their homes.

8.      The Wells Fargo Board's repeated failure to fulfill its oversight responsibilities, despite promising to do so as part of multiple consent decrees, has grown so flagrant—and led to so many scandals and consumer abuses—that the Federal Reserve just last year placed an asset-cap on Wells Fargo that will not be lifted until Wells Fargo convinces the government it has finally reformed its central oversight practices.  The Federal Reserve's cease-and-desist order has been described as a "Fear of God Penalty," with one expert opining that the Bank is "lucky it is too big to shut down."

9.      After the Federal Reserve issued the asset-cap in February 2018, Wells Fargo announced an overhaul of its Board.  Wells Fargo has since disclosed to its shareholders what it learned in 2015— that hundreds of its customers were wrongfully and unlawfully denied mortgage modifications, with many of those customers subsequently losing their homes.  Following that initial disclosure, Wells Fargo discovered yet another error in its automated decision-making tool, which caused even more homeowners to be wrongfully denied mortgage modifications.  Wells Fargo has warned its customers that even more errors and more affected customers may be uncovered as its review continues.

10.     Although Wells Fargo publicly claims to be turning over a new leaf to make things right for its customers, it is unwilling to fairly compensate the customers whose lives its reckless behavior forever changed.  Hundreds lost their homes and yet Wells Fargo told its shareholders it was allocating less than $13,000 per person as remediation.  Wells Fargo then moved to dismiss this action with prejudice, so that its customers would receive nothing more than it pre-allocated for them.  Wells Fargo wants to be the sole arbiter of how much remediation it should pay—with little regard for the financial and emotional devastation its reckless behavior has wrought on Plaintiffs' and class members' lives.

11.     Plaintiffs seek to hold Wells Fargo and its leadership truly responsible for their repeated and deliberate failure to ensure the Bank was complying with legal requirements.  They seek certification of a nationwide class of homeowners wrongly denied a mortgage modification; a larger emotional distress class; and several statewide classes that will allow class members to efficiently

1  pursue additional claims under state consumer protection laws.  Plaintiffs also intend to pursue entry of

2  an injunction or other equitable relief sufficient to prevent the continued use of Wells Fargo's unfair

3  practices, and treble and punitive damages pursuant to state law.

**JURISDICTION**

4

5      12.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2)

6  because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of

7  interest and costs; in the aggregate, there are more than 100 members in the proposed classes; and at

8  least one class member is a citizen of a state different from any defendant.

9      13.    Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendant resides in

10  this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims

11  occurred in this district.

**INTRADISTRICT ASSIGNMENT**

12

13      14.    Assignment to the Oakland/San Francisco division is proper because Wells Fargo's

14  designated principal place of business is in San Francisco, California and a substantial part of the events

15  or omissions giving rise to Plaintiffs' claims occurred there.

**PARTIES**

16

17      15.    Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania.  Ms.

18  Hernandez was denied a mortgage modification and her New Jersey condominium was foreclosed upon

19  as a result of the conduct alleged herein.

20      16.    Plaintiff Debora Granja is a resident and citizen of Eugene, Oregon.  Ms. Granja was

21  denied a mortgage modification and her home in Brentwood, California, was foreclosed upon as a

22  result of the conduct alleged herein.

23      16.17.  Plaintiff Sandra Campos is a resident and citizen of Paramount, California.  Ms. Campos

24  was denied a mortgage modification and her home in Paramount, California, was foreclosed upon as a

25  result of the conduct alleged herein.

26      17.18.  Plaintiff Keith Lindner is a resident and citizen of California.  Mr. Lindner was denied a

27  mortgage modification and lost his home in Visalia, California, as a result of the conduct alleged

28  herein.

18.19.  Plaintiff Emma White is a resident and citizen of Jacksonville, Florida.  Ms. White was denied a mortgage modification and her home in Callahan, Florida, was foreclosed upon as a result of the conduct alleged herein.

19.20.  Plaintiff Coszetta Teague is a resident and citizen of Homewood, Illinois.  Ms. Teague was denied a mortgage modification and her home in Calumet City, Illinois, was foreclosed upon as a result of the conduct alleged herein.

20.21.  Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana.  Mr. and Mrs. Simoneaux were denied a modification of the mortgage on their Louisiana home as a result of the conduct alleged herein.

21.22.  Plaintiffs John and Yvonne DeMartino are residents and citizens of Baltimore, Maryland.  The DeMartinos were denied a mortgage modification and their house in Baltimore, Maryland, was foreclosed upon as a result of the conduct alleged herein.

22.23.  Plaintiff Rose Wilson is a resident and citizen of New York.  Ms. Wilson was denied a mortgage modification and her New York home was foreclosed upon as a result of the conduct alleged herein.

23.24.  Plaintiff Tiffanie Hood is a resident and citizen of Ohio.  Ms. Hood was denied a mortgage modification and her Ohio home was foreclosed upon as a result of the conduct alleged herein.

24.25.  Plaintiffs George and Cyndi Floyd are residents and citizens of Philadelphia, Pennsylvania.  The Floyds were denied a mortgage modification and their house in Lancaster, Pennsylvania, was foreclosed upon as a result of the conduct alleged herein.

25.26.  Plaintiff Troy Frye is a resident and citizen of Georgia.  Mr. Frye was denied a mortgage modification and lost his home in Hephzibah, Georgia, as a result of the conduct alleged herein.

26.27.  Plaintiff Diana Trevino is a resident and citizen of Richardson, Texas.  Ms. Trevino was denied a mortgage modification and her Texas home was foreclosed upon as a result of the conduct alleged herein.

27.28.  Wells Fargo & Company (WFC), is a Delaware corporation headquartered in San Francisco, California, and a registered bank holding company that owns and controls Defendant Wells

1   Fargo Bank, N.A.

2       28.29.   Defendant Wells Fargo Bank, N.A., is a national banking association with its main

3   office in Sioux Falls, South Dakota, and designated principal place of business in San Francisco,

4   California.

5       29.30.   Defendant, along with Wells Fargo & Company, shared responsibility for ensuring that

6   the Bank's operations were properly tested to ensure compliance with HAMP and other government

7   requirements, with ultimate responsibility lying with WFC's Board of Directors, and its Audit &

8   Examination Committee in particular.  There also exists a high-degree of built-in overlap between

9   Wells Fargo and WFC due to the fact that WFC owns and controls the Bank, and that the Bank

10  directors responsible for ensuring compliance with HAMP and other government requirements were

11  also WFC executives and/or directors.

12                          **FACTUAL ALLEGATIONS**

13  **A.      Wells Fargo Wrongfully Forecloses on Its Customers' Homes**

14      30.31.   Plaintiffs are among the millions of homeowners who had trouble making ends meet

15  during the Great Recession.  They fell behind on their mortgage payments and needed help to avoid

16  losing their homes.

17      31.32.   The Home Affordable Modification Program (HAMP) was designed to provide the very

18  help that Plaintiffs and class members needed.  Introduced pursuant to the Emergency Economic

19  Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers

20  who met certain threshold requirements.  These modifications would lower a borrower's mortgage

21  payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the

22  borrower to avoid foreclosure.

23      32.33.   Similar threshold requirements were incorporated into the mortgage modification

24  requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac,

25  and the Federal Housing Administration (FHA).

26      33.34.   Plaintiffs and class members met the threshold requirements for a mortgage modification

27  and as their mortgage servicer, Wells Fargo, was required to offer them a loan modification.  Wells

28  Fargo failed to do so, however, and instead foreclosed on Plaintiffs and more than five hundred other

1   class members who could not make their monthly payments without a modification.

2       34.35.  Another three hundred class members were just able to stave off foreclosure, but not

3   without overcoming numerous financial and emotional difficulties that could have been avoided if

4   Wells Fargo had lowered their mortgage payments as HAMP and other GSEs required.

5       **B.      Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a**

6           **Period of at Least 8 Years**

7       35.36.  Wells Fargo has only recently acknowledged that it wrongfully denied Plaintiffs and

8   class members mortgage loan modifications to which they were entitled under HAMP and other

9   government requirements.

10      36.37.  In form letters sent to Plaintiffs and class members in late 2018, Wells Fargo claimed

11  that its decision was based on a "faulty calculation."  The problem goes much deeper than a single

12  miscalculation, however, and reflects the same type of extreme and outrageous conduct that has

13  embroiled Wells Fargo in a string of public scandals.

14      37.38.  Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its

15  automated decision-making tool.  This software determined customers' eligibility for a government-

16  mandated mortgage modification during a time of extreme financial distress.  Its importance to these

17  customers' lives cannot be overstated.  Yet Wells Fargo not only failed to verify that its software was

18  correctly calculating whether customers met threshold requirements for a mortgage modification, it

19  failed to regularly and properly audit the software for compliance with government requirements—

20  allowing life-changing errors to remain uncorrected for years on end.

21      38.39.  Wells Fargo was not required to develop its own tool to calculate whether its customers

22  were eligible for government-mandated mortgage modifications.  The government provided a free

23  software tool for mortgage servicers to use in determining whether homeowners met threshold

24  requirements.  If Wells Fargo was not going to properly verify and audit its own software, it could

25  have—and should have—used the free software instead.

26      39.40.  As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank

27  repeatedly violated HAMP and other government requirements over a period of at least eight years and

28  denied Plaintiffs and class members mortgage modifications that the Bank was legally required to offer.

**C.     Wells Fargo's Leadership Fails to Implement Adequate Testing Even After Promising to Do So as Part of 2011 Consent Decrees**

40.41.  Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in the Bank's mortgage modification and foreclosure practices.

41.42.  The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

42.43.  Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

43.44.  Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied.  The Bank also promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

44.45.  In one of the consent orders, the Federal Reserve specifically ordered WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

45.46.  Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance based on improved reporting, and that WFC's Chief Operational Risk Officer (CORO) was providing both the Compliance Committee and the Audit & Examination Committee with the necessary information and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure compliance with HAMP and other government requirements.

46.47.  Together, Wells Fargo's executives and board members—in particular, Wells Fargo's Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements.  They repeatedly failed to fulfill these obligations over the course of several years, however—in violation of the promises they made in the 2011 Consent Order and in callous disregard of the well-being of their customers.

47.48.  Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that the Bank was still in continuing noncompliance.  Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements; had not ensured that the Bank's audit and compliance programs had the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage modification and foreclosure practices would be identified and promptly remedied; and had not ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' homes.

**D.    Wells Fargo Conceals Its Discovery of One of the Systematic Errors from Regulators and Consumers**

48.49.  In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order.  The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

49.50.  As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014.  The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

50.51.  Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in August 2013—*one of the errors at issue in this case*—which caused the Bank

1   to wrongly deny mortgage modifications to 625 customers.  Well Fargo decided not to tell anybody it

2   had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure

3   that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the

4   business restrictions it had imposed in 2015.

5       51. 52.  The Bank's seven-member Board of Directors, each of whom also served on WFC's

6   Board of Directors, signed the stipulation under which the Bank accepted the $70 million penalty and

7   acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in

8   2013-2014.  These directors did not disclose that the Bank had discovered another error—either

9   because their oversight was so non-existent that they did not know, or because they chose to

10  deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the

11  business restrictions it had imposed on the Bank.

12      52. 53.  To make matters worse, even after discovering the 2013 error, Wells Fargo still did not

13  reform its auditing and verification practices.  Related errors that would affect an additional 145

14  customers were not discovered until five years later.

15      **E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the**

16  **Company's Chronic and Intentional Lack of Central Oversight**

17      53. 54.  The failure of Wells Fargo's executives and board members to implement adequate

18  auditing and compliance procedures was not an accident.  As scandal after scandal comes to light, it has

19  become all too clear that Wells Fargo's leaders intentionally abandoned their oversight

20  responsibilities—and did so to a shocking degree.

21      54. 55.  The most notorious example is the fraudulent account scandal uncovered in 2016, when

22  it was revealed that Wells Fargo employees were encouraged to sign up customers for some 3.5 million

23  checking and credit card accounts without their knowledge.  Wells Fargo was fined $185 million by

24  federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce) were fired for

25  their involvement in the scandal.

26      55. 56.  The fraudulent account scandal also involved the Audit & Examination Committee,

27  which ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an

28  institutional investor's request that the Board address its lack of comprehensive audit procedures and

1  adjust compensation policies to discourage abusive sales practices.  The two executives most associated

2  with the fraudulent account scandal—John G. Stumpf and Carrie L. Tolstedt—were signatories to one

3  of the 2011 consent orders discussed above and among those responsible for Wells Fargo's failure to

4  comply with the orders by implementing adequate auditing and compliance procedures.

5       56. 57.  This case and the fraudulent account scandal are far from the only examples of Wells

6  Fargo's Board and executive leadership abdicating their oversight responsibilities.  Wells Fargo's

7  Board and executive leadership have consistently ignored unlawful practices throughout the Bank's

8  lending divisions, leading to an unprecedented series of government fines.  To give just a few more

9  examples:

10         1.  In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage
               lending practices discriminated against African-American and Hispanic borrowers
11
           2.  In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of
12             $8.5 billion to resolve claims of foreclosure abuses

13         3.  In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had
               misrepresented the quality of mortgage loans it sold to Freddie Mac
14
           4.  In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for
15             falsely certifying that mortgage loans were eligible for FHA insurance

16         5.  In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations
               that it engaged in illegal student loan servicing practices
17
           6.  In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing
18             insurance on its auto-loan customers (often leading to wrongful vehicle repossessions)
               and charging its mortgage-loan customers excessive rate-lock fees
19
           7.  In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it
20             engaged in a variety of improper practices, including selling customers renters' and life
               insurance they did not ask for and overcharging for GAP auto insurance
21

22       57. 58.  Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its

23  central oversight as part of its settlements with the government.  Each time, Wells Fargo's Board and

24  executives failed to live up to those promises and continued to abdicate their oversight responsibilities.

25  As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a

26  compliance risk management program commensurate with the Bank's size, complexity and risk

27  profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations

28  of law."

58.59.   Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

59.60.   In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

60.61.   Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

61.62.   Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

62.63.   Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger.

63.64.   As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

F.      Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors

64.65.   A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error.  Wells Fargo wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances

1   resulted in a foreclosure.  Wells Fargo also wrote that it had "accrued $8 million to remediate

2   customers," which amounts to an average of only $12,800 per customer.

3          65.66.  Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered

4   related errors that affected approximately 245 more customers who were incorrectly denied a mortgage

5   modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls

6   were implemented."  These related errors raised the number of affected customers to approximately 870

7   and the resulting wrongful foreclosures to approximately 545.

8          66.67.  Wells Fargo's long-overdue review of its automated mortgage modification software is

9   apparently still not complete.  In its recently filed 10-K Annual Report, Wells Fargo disclosed to

10  shareholders that the "effort to identify other instances in which customers may have experienced harm

11  is ongoing, and it is possible that we may identify other areas of potential concern."

12         67.68.  In late 2018, Wells Fargo began sending form letters to the customers affected by the

13  errors in its automated decision-making tools.  The letters typically included a check for around

14  $15,000, and informed customers that if they were not satisfied with that amount, they could consider

15  mediation through a third-party mediator that Wells Fargo has retained.

16         68.69.  The amounts that Wells Fargo is offering its customers is nowhere near enough to

17  compensate them for the damage that Wells Fargo's conduct caused them, and indicates that while

18  Wells Fargo wants the Federal Reserve to believe it has changed its ways, the company is unwilling to

19  accept full responsibility for the life-altering consequences its behavior has wrought.

20         69.70.  As a result of Wells Fargo's conduct, the lives of Plaintiffs and class members have been

21  irrevocably altered.  Their damages include loss of their homes; loss of equity in their homes; loss of

22  tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

23  spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

24  money to find new housing and move their families; loss of favorable interest rates or other favorable

25  loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments;

26  stress-related illnesses; broken marriages; children coping with the financial and emotional

27  consequences of their parents losing the family home; and severe emotional distress.

28  //

1 #

2 #

3 **PLAINTIFFS' EXPERIENCES**

4  **1. Debora Granja (California)**

5  ~~70.~~71. Plaintiff Debora Granja purchased her home, located in Brentwood, California, with her

6 then-husband in 2004.  The couple eventually had three daughters living with them and put substantial

7 time and money into making the house their own.  Wells Fargo became Ms. Granja's mortgage lender

8 following a refinance in 2006.

9  ~~71.~~72. Around 2009, Ms. Granja's husband lost his job as a landscaping manager.  Ms. Granja,

10 who had been working only part-time, returned to full-time work to support her family.

11  ~~72.~~73. Ms. Granja began seeking a loan modification from Wells Fargo in 2010.  Each time she

12 called Wells Fargo, she spoke to a different representative.  Initially, the representatives told her that

13 she would easily qualify for a modification based on her circumstances.  Ms. Granja tried submitting

14 her loan modification application numerous times. Each time, Wells Fargo would claim it lost her

15 paperwork and would ask her to resend it.

16  ~~73.~~74. Eventually, around 2012, Wells Fargo representatives falsely told Ms. Granja that she

17 did not qualify for a modification.  The Bank ultimately foreclosed on her house in 2014 and Ms.

18 Granja was forced to find a rental home for her family.  Her daughters had to change schools and leave

19 the only environment they knew.

20  ~~74.~~75. Wells Fargo's failure to grant Ms. Granja a loan modification caused great strain on her

21 marriage.  Ms. Granja and her husband legally separated around the time of the foreclosure.  The stress

22 of the foreclosure also severely affected Ms. Granja's health.  She was diagnosed with severe

23 depression in 2013.  Four years later, Ms. Granja was diagnosed with acute traumatic stress disorder.

24 Her breakdown was triggered by a minor car accident but caused by an accumulation of stress over

25 recent years, including from the foreclosure.

26  ~~75.~~76. In September 2018, Ms. Granja's ex-husband received a letter from Wells Fargo

27 informing him and Ms. Granja that their mortgage modification should have been approved but was not

28 approved due to an error.  He notified Ms. Granja of the letter and she contacted Wells Fargo to provide

1  it with her contact information. Ms. Granja was one of the customers wrongly denied a mortgage

2  modification because of systematic errors in Wells Fargo's automated decision-making tool.

3      77.     As a result of Wells Fargo's repeated failure to properly test its automated decision-

4  making tool, Ms. Granja's life has been irrevocably altered. Her injuries include loss of her family's

5  home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss

6  of appreciation in her home's value following the sale; loss of time and money spent to find

7  replacement housing and move her family; loss of time and money spent in an effort to avoid

8  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

9          **2.     Sandra Campos (California)**

10      78.     Plaintiff Sandra Campos, with her husband Alfonso, purchased a home for their family

11  in Paramount, California, in 2008. The purchase was financed with a mortgage loan from Wells Fargo.

12  The couple moved into the home with their three children, who ranged in age from about five to 13

13  years old, and Ms. Campos's mother, who was about 67 years old at the time.

14      79.     Mr. Campos is handy, and made many valuable improvements to the home. These

15  included painting the exterior of the home, and installing a new roof and plumbing.

16      80.     In around August of 2010, Ms. Campos lost her job as an office assistant. She looked for

17  other employment, but was unable to find anything. She received unemployment insurance for a few

18  months, but when that was exhausted, she and her husband had difficulty making the mortgage

19  payments on their home.

20      81.     Ms. Campos then approached Wells Fargo to find out what programs were available to

21  help her family avoid foreclosure and remain in their beloved home. The Camposes were offered a

22  forbearance agreement which featured lower mortgage payments, and they made each of the required

23  payments over the course of several months. However, the payments then returned to their previous

24  level, which the Camposes again had difficulty making.

25      82.     For the next several years, the Camposes tried to get a modification of their mortgage

26  that would result in a manageable payment that would allow them to remain in their home. Despite

27  these continued efforts, they were never granted a mortgage modification. The Bank ultimately

28  foreclosed on their house in around February 2014.

~~SECOND~~ THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1      83.    In around April of 2014, sheriffs knocked on the door of the Campos home and told the

2   Camposes that their home had been sold at a foreclosure sale and they had five days to vacate the

3   premises. Ms. Campos was very lucky to find a rental home for her family, as the foreclosure and

4   associated damage to her credit made it very difficult to find a landlord willing to rent to the Camposes.

5      84.    Ms. Campos eventually found a home to rent, but it was much smaller than the home

6   she had lost and in a less desirable part of Paramount. Ms. Campos's daughters went from having their

7   own rooms to sharing a room in the rental home, and Ms. Campos's mother was forced to find her own

8   accommodations because the rental home didn't have room for her. The Campos children lost their

9   neighborhood friends and had to start over in an unfamiliar part of town.

10      85.    In or around September 2018, Ms. Campos received a letter from Wells Fargo informing

11   her and Mr. Campos that their mortgage modification should have been approved but was not approved

12   due to an error.  Ms. Campos was one of the customers wrongly denied a mortgage modification

13   because of systematic errors in Wells Fargo's automated decision-making tool.

14      76.86.  As a result of Wells Fargo's repeated failure to properly test its automated decision-

15   making tool, Ms. Campos's life has been irrevocably altered.  Her injuries include loss of her family's

16   home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss

17   of appreciation in her home's value following the sale; loss of time and money spent to find

18   replacement housing and move her family; loss of time and money spent in an effort to avoid

19   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

20          2.3.    **Keith Lindner (California)**

21      77.87.  Mr. Lindner bought a home for his family in Visalia, California in 2003, financing the

22   purchase with a mortgage loan from Wells Fargo.  He moved in shortly thereafter with his partner,

23   daughter, and two young stepsons.

24      78.88.  As a seasoned professional in the construction industry, Mr. Lindner made wholesale

25   improvements to the home.  He built a 16-by-24-foot addition, replaced the windows, carpeting,

26   flooring and interior doors, installed new lighting, and rebuilt showers and closets, among other things.

27      79.89.  In 2006, Mr. Lindner began to experience some medical issues.  It took a long time for

28   doctors to arrive at the correct diagnosis, and he eventually had surgery in 2008.  Following the

surgery, he was unable to work for two months.  Around the same time, the construction industry began

to suffer from the effects of the Great Recession.  Mr. Lindner's partner, who by this time was his wife,

had recently obtained a master's degree, but was having a hard time finding work.  Mr. Lindner's father

also fell ill, and Mr. Lindner missed more time at work to be with his ailing father.

80.90.  In 2009, Mr. Lindner was laid off from his job with the company that had employed him

for the previous seven years.  This caused the Lindners' already-difficult financial situation to become

critical.  Mr. Lindner reached out to Wells Fargo to tell them about his financial difficulties and asked

them if they could provide any assistance with his mortgage so that his family could stay in their

home.  Wells Fargo denied his request.

81.91.  Mr. Lindner did everything he could to make ends meet, but money became tighter and

tighter every month.  This took a tremendous toll on the Lindners' marriage, and they separated in

September of 2009.  Mrs. Lindner moved out of the house with her two sons from a previous

relationship, leaving Mr. Lindner with their son, who was about three years old at the time.

82.92.  Mr. Lindner continued to write hardship letters to Wells Fargo and to apply for a

mortgage modification, but was rejected time and time again, both verbally and in writing.  Eventually,

Mr. Lindner realized that his situation was untenable, and he would have to leave the home.  In 2011,

Wells Fargo offered him a "cash for keys" deal and paid him $2,000 to leave his home with his young

son.

83.93.  Mr. Lindner and his son, who was in kindergarten or first grade at the time, were forced

to live in a series of uncomfortable situations, renting rooms in other people's houses until Mr. Lindner

obtained his contractor's license in 2013, and was finally able to rent a house in 2014.

84.94.  Mr. Lindner and his son suffered significant depression and anguish as a result of losing

their home.  The boy was sad about having to move from the only home he had known, and still fondly

remembers it and the friends he left behind.  Mr. Lindner was prescribed anti-depressants but did not

have a good reaction to them.  Mr. Lindner is still recovering from the impact of losing his home,

having his credit destroyed, and everything else that he endured as a result of being denied a mortgage

modification.  His goal now is to be able to buy a home near his ex-wife so that he can be closer to his

son and provide him with a secure home.

1    85.95.   In late 2018, Mr. Lindner received a letter from Wells Fargo informing him that his
2  mortgage modification should have been approved but was not approved due to an error.  Mr. Lindner
3  was one of the customers wrongly denied a mortgage modification because of systematic errors in
4  Wells Fargo's automated decision-making tool.
5    86.96.   As a result of Wells Fargo's repeated failure to properly test its automated decision-
6  making tool, Mr. Lindner's life has been irrevocably altered.  His injuries include loss of his family's
7  home and the time and money put into that home; loss of equity in his home; loss of tax benefits; loss
8  of appreciation in his home's value; loss of time and money spent to find replacement housing and
9  move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his credit
10 and resulting opportunity costs; and severe emotional distress.
11           3.4.    **Emma White (Florida)**
12    87.97.   Plaintiff Emma White purchased her home, located in Callahan, Florida, in 2006.  She
13 was a single mother who moved into the house with her four children.  The property was purchased
14 through a mortgage loan that Wells Fargo later acquired.
15    88.98.   Around 2009, Ms. White began experiencing financial hardship. She had accumulated
16 debt supporting her children and applied for a mortgage loan modification so that the family could keep
17 their home.  The loan modification process was long and complicated. Ms. White kept having to send
18 in the same paperwork over and over again, only to ultimately receive a letter from Wells Fargo in 2013
19 saying that she did not qualify for a modification.
20    89.99.   Wells Fargo had already initiated foreclosure proceedings, so after it denied her request
21 for a mortgage modification, Ms. White was forced to leave her house.  She found a rental apartment in
22 Jacksonville, Florida, for her and three of her children, while Wells Fargo completed its foreclosure of
23 their old home.
24    90.100. Wells Fargo's actions caused Ms. White significant emotional distress.  The foreclosure
25 devastated her, especially because she had to support her children and work to make sure the family
26 had a place to live.  Ms. White had been suffering from the stress of supporting her children and other
27 recent events in her life, and the foreclosure multiplied that stress.  As a result of everything that was
28 going on in her life, including the foreclosure, Ms. White was diagnosed with depression and began

SECOND THIRD AMENDED COMPLAINT
                                    Case No. 3:18-cv-07354-WHA

1   taking antidepressants.  Ms. White's children were also affected by the foreclosure.  She had to explain

2   to them that she tried her best to keep the house, but ultimately could not do so.

3       91. 101. In late 2018, Ms. White received a letter from Wells Fargo informing her that her

4   mortgage modification should have been approved but was not approved due to an error.  Ms. White

5   was one of the customers wrongly denied a mortgage modification because of systematic errors in

6   Wells Fargo's automated decision-making tool.

7       92. 102. As a result of Wells Fargo's repeated failure to properly test its automated decision-

8   making tool, Ms. White's life has been irrevocably altered.  Her injuries include loss of her family's

9   home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss

10  of appreciation in her home's value following the sale; loss of time and money spent to find

11  replacement housing and move her family; loss of time and money spent in an effort to avoid

12  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

13          4. 5.    **Troy Frye (Georgia)**

14      93. 103. In 2009, Mr. Frye bought a home in Hephzibah, GA for himself and his partner, their

15  two young sons (who were about five and seven years old at the time), and his partner's daughter.

16      94. 104. Around the beginning of 2013, Mr. Frye was laid off from his job at a local

17  manufacturing plant where he had been employed for about eight to ten years.  He applied for and

18  received unemployment assistance, but still was not able to make the monthly mortgage payments on

19  his home.  He reached out to Wells Fargo (his mortgage servicer), to see if they would grant him a

20  mortgage modification, which they did in late February 2013.

21      95. 105. Unfortunately, Mr. Frye's new monthly mortgage payment was not significantly lower,

22  and Mr. Frye continued to have difficulty making his payments.  He attempted to get a second

23  modification from Wells Fargo, but this time he was denied—both verbally and in writing.  Wells

24  Fargo then initiated foreclosure proceedings.

25      96. 106. The strain of Mr. Frye's financial hardship, coupled with the uncertainty and stress of

26  the impending foreclosure, had a big impact on Mr. Frye and his family.  The relationship between Mr.

27  Frye and the mother of his children became very strained, and in 2014, she moved out with their two

28  boys and her daughter, leaving Mr. Frye alone in the home.

1   ~~97.~~107. Mr. Frye was able to delay foreclosure proceedings for a while, but Wells Fargo

2   persisted in their efforts to remove him from his home.  Around the beginning of 2015, Wells Fargo

3   asked him how much they would need to pay him to leave.  Confused and frustrated by the situation,

4   Mr. Frye said he would accept $2,000.  The house had recently been damaged by a kitchen fire that

5   broke out while Mr. Frye was sleeping, and from which he was fortunate to escape with his life.  He

6   accepted the $2,000 from Wells Fargo and moved out, as the house was no longer habitable.

7   ~~98.~~108. Mr. Frye and his children suffered emotional trauma and depression as a result of the

8   foreclosure and the effects that it had on their lives.  They all tried to move on as best they could.

9   ~~99.~~109. In late 2018, Mr. Frye received a letter from Wells Fargo informing him that his second

10   mortgage modification request should have been approved but was not approved due to an error.  Mr.

11   Frye was one of the customers wrongly denied a mortgage modification because of systematic errors in

12   Wells Fargo's automated decision-making tool.

13   ~~100.~~110.      As a result of Wells Fargo's repeated failure to properly test its automated

14   decision-making tool, Mr. Frye's life has been irrevocably altered.  His injuries include loss of his

15   family's home and the time and money put into that home; loss of equity in his home; loss of tax

16   benefits; loss of appreciation in his home's value; loss of time and money spent to find replacement

17   housing and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to

18   his credit and resulting opportunity costs; and severe emotional distress.

19           ~~5.~~6.    **Coszetta Teague (Illinois)**

20   ~~101.~~111.      Plaintiff Coszetta Teague purchased a home in Calumet City, Illinois, for herself

21   and her daughter, Iesha Brown, in June 2010.  Ms. Teague's two young grandchildren moved in shortly

22   thereafter.  The property was purchased through a mortgage loan with Wells Fargo.

23   ~~102.~~112.      In 2010, Ms. Teague was laid off from her job at Chase Bank.  In 2011, Ms.

24   Teague lost her mother and her property taxes went up.  As a result, Ms. Teague could no longer afford

25   to make her monthly payments, and reached out to Wells Fargo to see if they could help.

26   ~~103.~~113.      Wells Fargo told Ms. Teague to fill out paperwork.  Ms. Teague did as she was

27   told, but when she later inquired about the status of her modification request, she was told that it had

28   been lost and that she would have to redo it.  It took a long time for Wells Fargo to process Ms.

1   Teague's application, and Wells Fargo's representatives were often impolite during the process, but

2   eventually Wells Fargo told Ms. Teague that she did not qualify for a mortgage modification and it was

3   going to initiate foreclosure proceedings.

4        104.114.       Afraid that the sheriff was going to remove her from her home, Ms. Teague

5   asked her brother to help move her belongings to storage.  She hired a foreclosure defense attorney,

6   who charged her $4,000 but was unable to help.  Ms. Teague and her family vacated the home in the

7   latter part of 2014 and Wells Fargo foreclosed shortly thereafter.

8        105.115.       Ms. Teague, her daughter, and her two grandchildren lived in Ms. Teague's car

9   for several months, until she was able to find an apartment sometime around March 2015.

10       106.116.       The experience was emotionally devastating for all concerned.  Ms. Brown was

11  very depressed and had suicidal ideations.  She was prescribed antidepressants, including Zoloft.  The

12  grandchildren, who were around four and nine at the time, were sad and confused about losing their

13  home and having to live in a car, change schools, and leave all their friends.  They shut down, stopped

14  interacting with people, and attended therapy.  Ms. Teague also experienced depression following the

15  foreclosure, and was prescribed antidepressants, including Zoloft.  She is currently on Social Security

16  and disability benefits.

17       107.117.       In late 2018, Ms. Teague received a letter from Wells Fargo informing her that

18  her mortgage modification should have been approved but was not approved due to an error.  Ms.

19  Teague was one of the customers wrongly denied a mortgage modification because of systematic errors

20  in Wells Fargo's automated decision-making tool.

21       108.118.       As a result of Wells Fargo's repeated failure to properly test its automated

22  decision-making tool, Ms. Teague and her family's lives have been irrevocably altered.  Their injuries

23  include loss of their home and the time and money put into that home; loss of equity in the home; loss

24  of tax benefits; loss of appreciation in the home's value following the sale; loss of time and money

25  spent to find replacement shelter and relocate; loss of time and money spent in an effort to avoid

26  foreclosure; damage to Ms. Teague's credit and resulting opportunity costs; and severe emotional

27  distress.

28

1      **6.7.    Russell and Brenda Simoneaux (Louisiana)**

2      109.119.         Plaintiffs Russell and Brenda Simoneaux purchased their home in Baton Rouge,

3  Louisiana, in 1992.

4      110.120.         Mr. and Mrs. Simoneaux contacted Wells Fargo, their mortgage loan servicer, in

5  2013 because Mr. Simoneaux had recently retired and the couple was living on a fixed income.  They

6  applied for a mortgage modification, but were denied.

7      111.121.          Without a mortgage modification, Mr. and Mrs. Simoneaux had a very difficult

8  time meeting their mortgage obligations.  Mr. and Mrs. Simoneaux were both forced to take side jobs

9  for extra income, the couple avoided eating out, and they watched every penny they spent for several

10 years—until their mortgage was finally paid off in late 2018.  It was an extremely stressful time.

11     112.122.          In October 2018, Mr. and Mrs. Simoneaux received a letter from Wells Fargo

12 informing them that their request for a mortgage modification should have been approved but was not

13 approved due to an error.  Mr. and Mrs. Simoneaux were among the customers wrongly denied a

14 mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

15     113.123.          As a result of Wells Fargo's repeated failure to properly test its automated

16 decision-making tool, Mr. and Mrs. Simoneaux were forced to make numerous sacrifices and endure

17 significant stress as they struggled to meet mortgage payments that should have been lowered.  Their

18 injuries include loss of more beneficial loan terms; loss of time spent avoiding foreclosure; and

19 opportunity costs resulting from higher mortgage payments.

20     **7.8.    John and Yvonne DeMartino (Maryland)**

21     114.124.          In 2008, Plaintiffs John and Yvonne DeMartino bought a single-family home for

22 $239,000 in Baltimore, Maryland, with a mortgage loan from Wells Fargo.  The home was located next

23 door to their residence.  The plan was for Yvonne's mother, Margaret, then in her late seventies and

24 suffering from Parkinson's disease, to move in to be cared for by Yvonne when she was no longer able

25 to live by herself.

26     115.125.          After the DeMartinos bought the home, their pregnant daughter and son-in-law

27 moved in, with the understanding that they would pay the mortgage and live there until Margaret

28 needed to move in.  They got behind on their mortgage payments, however, and the DeMartinos had to

1 tap into their savings to bring the mortgage current.  In or around 2013, the DeMartinos' daughter and

2 son-in-law fell behind on the mortgage payments again, but this time the DeMartinos couldn't afford to

3 bring the debt current.  The DeMartinos applied for a mortgage modification from Wells Fargo but

4 were denied.  Wells Fargo foreclosed on the home in around 2013 or 2014.

5      116.126.      Mr. and Mrs. DeMartino suffered great stress and anxiety as a result of the

6 foreclosure.  They were humiliated and afraid to pick up the phone.  Mr. DeMartino has tried to get the

7 foreclosure removed from his record.  He was told by Wells Fargo that it cannot be erased, however,

8 because even though it was in error, the foreclosure did in fact occur.

9      117.127.      Margaret, now 87, lives in a nursing home some distance away, and Mrs.

10 DeMartino has a difficult time getting there to see her.  The DeMartinos feel terrible every time they

11 look at the house next door, where Margaret would be living under Mrs. DeMartino's care had Wells

12 Fargo not foreclosed on the home.

13      118.128.      In late 2018, the DeMartinos received a letter from Wells Fargo informing them

14 that their request for a mortgage modification should have been approved but was not approved due to

15 an error.  The DeMartinos were among the customers wrongly denied a mortgage modification because

16 of systematic errors in Wells Fargo's automated decision-making tool.

17      119.129.      As a result of Wells Fargo's repeated failure to properly test its automated

18 decision-making tool, the DeMartinos has suffered life-altering consequences.  Their injuries include

19 loss of their house time and money put into that house; loss of equity in the house; loss of appreciation

20 in the house's value following the sale; loss of time and money spent to find replacement housing for

21 Ms. DeMartino's mother; loss of time and money spent in an effort to avoid foreclosure; damage to

22 their credit and resulting opportunity costs; and severe emotional distress.

23      **8.9.    Alicia Hernandez (New Jersey)**

24      120.130.      Plaintiff Alicia Hernandez bought her studio condominium, located in North

25 Bergen, New Jersey, in 2006.  The property was purchased through a mortgage loan with Wells Fargo.

26      121.131.      Ms. Hernandez already owned another unit in the complex and thought the

27 studio, with a lot of work, could be developed into an attractive rental due to its close proximity to New

28 York City.  It's right across the river from Manhattan, and only a seven-minute drive from Times

1   Square with no traffic.  Ms. Hernandez planned to keep the property in her family forever.  The unit

2   also had a deeded parking spot, and parking is very difficult to come by in that area.

3          ~~122.~~132.          When Ms. Hernandez purchased her studio, it was just a shell—it had no kitchen

4   and there were bullet holes in the door.  But Ms. Hernandez was willing to put in the work, time, and

5   money to create an income-generating property that could provide for her and her family.  She tapped

6   into her retirement account and installed new flooring, new appliances, new bathroom fixtures, recessed

7   lighting, and a new air conditioning unit.  She also had to contribute additional money when the

8   homeowners' association imposed special assessments.

9          ~~123.~~133.          During the Great Recession, Ms. Hernandez lost her job in a mass layoff, and

10  with the property now her only source of income, had difficulty making her monthly mortgage

11  payment.  She applied for a mortgage modification in 2012-13, but Wells Fargo told her that she didn't

12  qualify and instituted foreclosure proceedings in late 2013.

13         ~~124.~~134.          Ms. Hernandez fought foreclosure for several years, but Wells Fargo eventually

14  foreclosed on her property in late 2015.  The stress of the foreclosure process had a devastating effect

15  on Ms. Hernandez and her husband.  As non-lawyers, the anxiety and confusion of dealing with the

16  court system and the legal process took a severe toll on them emotionally.  Ms. Hernandez had a

17  miscarriage during the foreclosure process and was hospitalized for the first time in her life.  She also

18  suffered insomnia, panic attacks, and difficulty breathing.

19         ~~125.~~135.          Ms. Hernandez's husband is a police officer, and both were very concerned

20  about the effects that the foreclosure might have on him professionally.  This put a lot of strain on their

21  marriage and caused embarrassment when they ran into colleagues of his while attending court to fight

22  foreclosure.  Eventually, Ms. Hernandez and her husband moved to Easton, Pennsylvania, to escape the

23  stress of being in the same community, and her husband now commutes approximately an hour and 15

24  minutes to work.

25         ~~126.~~136.          In late 2018, Ms. Hernandez received a letter from Wells Fargo informing her

26  that her request for a mortgage modification should have been approved but was not approved due to an

27  error.  Ms. Hernandez was one of the customers wrongly denied a mortgage modification because of

28  systematic errors in Wells Fargo's automated decision-making tool.

1    ~~127.~~137.    As a result of Wells Fargo's repeated failure to properly test its automated

2    decision-making tool, Ms. Hernandez has suffered life-altering consequences.  Her injuries include loss

3    of her property and the time and money put into that property; loss of equity in her property; loss of

4    appreciation in her property's value following the sale; loss of time and money spent fighting

5    foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

6        ~~9.~~10.    **Rose Wilson (New York)**

7        ~~128.~~138.    Plaintiff Rose Wilson purchased her home, located in Rochester, New York, in

8    or around 1995.  Ms. Wilson lived in the home for many years with her family, and put a lot of time

9    and money into the property—including by renovating the kitchen and bathroom.

10       ~~129.~~139.    After Ms. Wilson lost her job due to the economic downturn, however, she

11   struggled to make the mortgage payments on her home.

12       ~~130.~~140.    She applied for a mortgage modification from Wells Fargo (her mortgage

13   servicer) multiple times over the course of several years.  Wells Fargo kept stringing her along,

14   requiring her to make monthly payments she could not afford in order to qualify for a mortgage

15   modification, and then telling her the request had been denied and she would need to reapply and start

16   the process all over again.

17       ~~131.~~141.    Ms. Wilson's attempt to obtain a mortgage modification from Wells Fargo and

18   save her home went on for years.  During this time, Ms. Wilson had to make many sacrifices to keep

19   making her mortgage payments.  She tapped into her retirement account early, incurring tax penalties to

20   do so.

21       ~~132.~~142.    Ms. Wilson's efforts to save her home were ultimately unsuccessful, however,

22   and Wells Fargo foreclosed in 2014.  At the time of the foreclosure, Ms. Wilson's daughter, son-in-law,

23   and their two children lived with her. They were all forced to move from their home to a cramped,

24   moldy, rodent-infested rental property.  The aftermath of the foreclosure caused Ms. Wilson significant

25   stress and depression.  She had worked hard to purchase a home and provide for her family, but after

26   the foreclosure, Ms. Wilson felt utterly defeated and left with nothing.  It has taken many years for the

27   pain to subside, but she still feels immense sadness whenever she drives by her former house or thinks

28   about her old life.

1    133.143.      In late 2018, Ms. Wilson received a letter from Wells Fargo informing her that

2    her request for a mortgage modification should have been approved but was not approved due to an

3    error.  Ms. Wilson was one of the customers wrongly denied a mortgage modification because of

4    systematic errors in Wells Fargo's automated decision-making tool.

5    134.144.      As a result of Wells Fargo's repeated failure to properly test its automated

6    decision-making tool, Ms. Wilson has suffered life-altering consequences.  Her injuries include loss of

7    her home and the time and money put into that property; loss of equity in her property; loss of

8    appreciation in her property's value following the sale; loss of time and money spent fighting

9    foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

10                **10.11.  Tiffanie Hood (Ohio)**

11    135.145.      In May of 2001, Ms. Hood bought a three-bedroom home for her family in

12    Cincinnati, Ohio.  She moved in with her young children—her son was about eight years old at the

13    time, and her daughter was about 11.

14    136.146.      The home was built in 1926 and needed quite a bit of work.  Ms. Hood invested

15    significant resources putting in a kitchen, repairing the roof, replacing the garage door and front door,

16    and completing various other necessary repairs.

17    137.147.      In or around 2013, Ms. Hood had difficulty making the monthly payment and

18    reached out to Wells Fargo for help.  Her request for a mortgage modification was denied, and Wells

19    Fargo initiated foreclosure proceedings.  Ms. Hood and her family were forced out of their home in late

20    2014.

21    138.148.      Ms. Hood and her children suffered emotional trauma and depression as a result

22    of the foreclosure and the effects that it had on their lives.  They all tried to move on as best they could.

23    139.149.      In late 2018, Ms. Hood received a letter from Wells Fargo informing her that her

24    mortgage modification should have been approved but was not approved due to an error.  Ms. Hood

25    was one of the customers wrongly denied a mortgage modification because of systematic errors in

26    Wells Fargo's automated decision-making tool.

27    140.150.      As a result of Wells Fargo's repeated failure to properly test its automated

28    decision-making tool, Ms. Hood life has been irrevocably altered.  Her injuries include loss of her

1 family's home and the time and money put into that home; loss of equity in her home; loss of tax

2 benefits; loss of appreciation in her home's value following foreclosure; loss of time and money spent

3 to find replacement housing and move her family; loss of time and money spent in an effort to avoid

4 foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

5              11.12.  **George and Cyndi Floyd (Pennsylvania)**

6     141.151.       Plaintiffs George and Cyndi Floyd purchased their home, located in Lancaster,

7 Pennsylvania, in 2004.  The property was purchased through a mortgage loan with Wachovia, which

8 was later transferred to Wells Fargo.

9     142.152.      After the financial crisis hit, the Floyds had difficulty making their mortgage

10 payments.  Mr. Floyd lost his job when the company he worked for closed, and Mrs. Floyd later lost her

11 job due to the economic recession as well.

12     143.153.      In an effort to save their home, the Floyds went to great lengths: they applied for

13 numerous mortgage modifications over a period of two years; they paid a company to help them avoid

14 foreclosure; and they spent countless hours reaching out to various other companies, government

15 agencies, and even Congressional representatives for help.

16     144.154.      The Floyds' efforts were ultimately unsuccessful.  Wells Fargo denied their final

17 request for a mortgage modification in November 2011 and initiated foreclosure proceedings.  The

18 Floyds were forced to move to a new home in Philadelphia.

19     145.155.      The foreclosure process was emotionally devastating for the Floyds.  Mr. Floyd

20 is disabled and suffers from degenerative disc disease, arthritis throughout his body, and the aftereffects

21 of failed bilateral knee replacements.  Being forced to move by Wells Fargo was an extreme hardship

22 that caused Mr. Floyd severe depression and emotional distress.  He was hospitalized during the

23 foreclosure process, and though he was eventually able to get through the move to Philadelphia, it took

24 weeks and required the help of Mr. Floyd's nephew and high doses of pain medication.  To this day,

25 Mr. Floyd suffers from deep depression and anxiety because of what Wells Fargo has done to him and

26 his family.

27     146.156.      In late 2018, the Floyds received a letter from Wells Fargo informing them that

28 their mortgage modification should have been approved but was not approved due to an error.  The

1 Floyds were among the customers wrongly denied a mortgage modification because of systematic

2 errors in Wells Fargo's automated decision-making tool.

3 ~~147.~~157.     As a result of Wells Fargo's repeated failure to properly test its automated

4 decision-making tool, the Floyds lives were irrevocably altered.  Their injuries include loss of their

5 home and the time and money put into that home; loss of equity in their home; loss of tax benefits; loss

6 of appreciation in their home's value following the sale; loss of time and money spent to find

7 replacement housing and move their belongings; loss of time and money spent in their efforts to avoid

8 foreclosure; damage to their credit and resulting opportunity costs; and severe emotional distress.

9          ~~12.~~13.  **Diana Trevino (Texas)**

10 ~~148.~~158.     In 2007, Plaintiff Diana Trevino purchased a three-bedroom home in Garland,

11 Texas, where she lived with her husband and four children.  Close family friend Roder Contreras co-

12 signed the mortgage loan and resided in the home as well.  When Mr. Contreras's grandmother became

13 ill in 2010, he moved to El Salvador to take care of her.  He stopped making his share of the payments

14 on the Trevino home, and quitclaimed his interest in it to the Trevinos.

15 ~~149.~~159.     Because the Trevinos were unable to make the entire monthly mortgage payment

16 without Mr. Contreras's contribution, Ms. Trevino applied for a mortgage modification from Wells

17 Fargo and was approved.  After making approximately five to eight payments under the modification

18 plan, Ms. Trevino suffered another setback when her mother became ill with cancer.  Ms. Trevino

19 began missing a significant amount of work because she was taking time off to take care of her

20 mother.  She fell behind on the mortgage payments, and again sought assistance from Wells Fargo.

21 ~~150.~~160.     Wells Fargo told Ms. Trevino to stop making mortgage payments so that she

22 could qualify for another mortgage modification, which they assured her she was likely to get.  Ms.

23 Trevino stopped making payments as instructed, instead devoting her limited financial resources to her

24 children and ailing mother.

25 ~~151.~~161.     In 2013, Ms. Trevino received a call from Wells Fargo notifying her that she had

26 not been approved for a mortgage modification, and that Wells Fargo planned to initiate foreclosure

27 proceedings.  She was told she had 60 days to vacate the premises; a follow-up letter conveyed the

28 same information.

152.162.    Ms. Trevino had great difficulty finding a new place for her family to live, but eventually found a three-bedroom apartment in an undesirable neighborhood in Richardson, Texas.  The lease was solely in her husband's name, because the foreclosure had ruined Ms. Trevino's credit.

153.163.    In April of 2013, the Trevinos moved into the apartment.  Ms. Trevino tried to keep her children in the same school in Garland, but the travel proved very difficult for the family.  At times, some of the children were forced to live with their aunt so they could be nearer to their school.  This was hard on the children, who couldn't understand why they had lost their home, or why their mother was so sad all of the time.  Some of the children lost friends and started acting out at school.  Uncharacteristically, her son and daughter were both suspended from school for misbehavior during this time period.

154.164.    The stress of the foreclosure, among other factors, strained the Trevinos' marriage, and in 2013 they separated.  Eventually they divorced.  When the lease on their apartment expired, Ms. Trevino was unable to renew it because she had not been on the original lease, and her poor credit prevented her from getting a lease on her own.  The Trevinos were evicted from the apartment and had a very hard time finding a new place to live.

155.165.    Around the same time, Ms. Trevino's stress and depression got to the point that she wasn't eating or sleeping, and she had to be hospitalized with a bacterial infection.  She lost her job and was unemployed for around ten months.  She and her children survived on her unemployment benefits and the financial assistance of her sister.  Two of Ms. Trevino's sons left college so that they could work and help support the family.  Ms. Trevino and her family have worked hard to try to rebuild their lives in the wake of the foreclosure in 2013, and continue to do so to this day.

156.166.    In late 2018, Ms. Trevino received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error.  Ms. Trevino was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

157.167.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Trevino's life has been irrevocably altered.  Her injuries include loss of her

1   family's home and the time and money put into that home; loss of equity in her home; loss of tax

2   benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to

3   find replacement housing and move her family; loss of time and money spent in an effort to avoid

4   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

5                                   **CLASS ALLEGATIONS**

6          158.168.        Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to

7   pursue their claims on behalf of a class of similarly situated persons.  The parameters of the class may

8   be refined through discovery and will be subject to Court approval and modification, but for purposes

9   of this Complaint, Plaintiffs propose the following class definition:

10                                   Nationwide Class

11         All persons who (i) qualified for a mortgage loan modification or repayment plan
           pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae
12         and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of
           Treasury's Home Affordable Modification Program (HAMP), or any other governmental
13         entity or program; and (ii) were not offered a mortgage loan modification by Wells Fargo
           due to a systematic error in Wells Fargo's automated mortgage loan modification
14         underwriting tool.

15

16         159.169.        For purposes of this proposed class definition, "mortgage loan" refers to any loan

17   secured by real property.

18         160.170.        The Nationwide Class will pursue contract claims and UCL claims. Plaintiffs

19   also propose that the Court consider several subclasses so that class members may pursue unique state

20   law claims available to them.

21         161.171.        The first group of subclasses would only be necessary if the Court determines

22   that the UCL should not be applied to all class members.  These subclasses would be defined as

23   followed and cover the following states: California, Florida, Georgia, Illinois, Louisiana, Maryland,

24   New Jersey, New York, Ohio, Pennsylvania, and Texas.

25                                   [State] Subclass

26         All members of the Nationwide Class whose mortgage loan was secured by real property
           located in [State].
27

28         162.172.        The second group of subclasses would be defined as follows, and permit

---

1   Plaintiffs to pursue wrongful foreclosure claims that exist under California and Georgia law.

2                          [California / Georgia] Foreclosure Subclass

3           All members of the Nationwide Class whose mortgage loan was secured by real property
            located in [California / Georgia] who subsequently lost that property through a
4           foreclosure.

5           163. 173.        The third subclass would be defined as follows, and permit Plaintiffs to pursue

6   fraudulent omission claims.

7                                      Fraud Subclass

8
            All members of the Nationwide Class to whom Wells Fargo sent a letter in or after
9           August 2013 stating that his or her request for a modification had been denied and made
            no mention of the fact that Wells Fargo used software with inaccurate attorneys' fees
10          inputs and/or other errors to calculate eligibility for modifications.

11

12          164. 174.        The fourth subclass would be defined as follows, and permit Plaintiffs to pursue

13  negligent misrepresentation claims.

14                                 Misrepresentation Subclass

15
            All members of the Nationwide Class to whom Wells Fargo sent a letter between 2010
16          and August 2013 stating that his or her request for a modification had been denied based
            on any reason, and made no mention of the actual cause of the denial: inaccurate
17          attorneys' fees inputs and/or other errors in the software Wells Fargo was using to
            calculate eligibility for modifications.
18
            165. 175.        Plaintiffs also propose that the Court certify a larger class for purposes of
19
    advancing Plaintiffs' claims for intentional infliction of emotional distress.  This class would be defined
20
    as follows:
21
                                        IIED Class
22
            All members of the Nationwide Class.
23
            166. 176.        Plaintiffs anticipate that they will be able to identify all class and subclass
24
    members from Wells Fargo's records and that they can be notified of the pendency of this class action
25
    by mail.
26
            167. 177.        The proposed class and subclasses meet each of the requirements for class
27
    certification pursuant to Rule 23(a) and Rule 23(b)(3).
28

                                        -31-        SECOND THIRD AMENDED COMPLAINT
                                                    Case No. 3:18-cv-07354-WHA

1    168.178.    Numerosity.  The classes and subclasses are sufficiently numerous such that

2  individual joinders are impracticable and less advantageous than proceeding through the class device.

3  Based on Wells Fargo's public disclosures to date, the Nationwide Class consists of at least 870

4  persons.  And based on information Wells Fargo has provided to Plaintiffs in this case, Plaintiffs

5  estimate that each proposed Subclass consists of at least 20 persons, with the possible exception of the

6  Georgia Foreclosure Subclass.

7    169.179.    Commonality & Predominance.  Common questions of law and fact exist as to

8  the proposed classes and subclasses, and those common questions predominate over questions affecting

9  only individual class members.  These common questions include:

10        1.  Whether Wells Fargo breached a standard notice requirement in mortgage contracts by

11            failing to notify class members they qualified for a mortgage modification;

12        2.  Whether Wells Fargo's conduct, as alleged herein, was extreme and outrageous;

13        3.  Whether Wells Fargo acted with reckless disregard for the probability that its conduct

14            would cause emotional distress to its customers;

15        4.  Wells Fargo owed Plaintiffs and class members a duty to exercise reasonable care when

16            determining their eligibility for a mortgage modification; and

17        5.  Whether Wells Fargo's failure to properly verify or audit its automated decision-making

18            software constitutes an unfair practice.

19    170.180.    Typicality.  Plaintiffs' claims are typical of those asserted by the proposed

20  classes and subclasses.  Both Plaintiffs and class members seek to recover for injuries caused by Wells

21  Fargo's failure to properly verify or audit its automated decision-making tool, which caused both

22  Plaintiffs and class members to be denied mortgage modifications and/or to suffer emotional distress.

23    171.181.    Adequacy.  Plaintiffs will fairly and adequately represent and protect the interests

24  of the members of the Class, as their interests do not conflict with the interest of the class members they

25  seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action

26  litigation and intend to prosecute this action vigorously.

27    172.182.    Superiority.  A class action is superior to other available methods for the fair and

28  efficient adjudication of this controversy.  Successfully prosecuting class members' claims will require

1   an in-depth knowledge of HAMP-related jurisprudence; intensive discovery of a banking giant

2   defended by a large, global law firm; and depositions of several sophisticated banking executives and

3   board members.  These are matters that can only realistically be handled through unified class-wide

4   representation, which can be conducted on a contingency basis and offers class members economies of

5   scale unavailable in individual proceedings.  A class action also has the benefit of comprehensive

6   supervision by a single court and will avoid the risk of inconsistent results.

7       173.183.    In the alternative to class certification under Rule 23(b)(3), the proposed class

8   and subclasses may also be certified under Rule 23(b)(2) or Rule 23(c)(4).  Wells Fargo has acted or

9   refused to act on grounds generally applicable to the class, thereby making final injunctive relief or

10   corresponding declaratory appropriate with respect to the class as a whole.  And Plaintiffs' claims

11   present a number of discrete but complex factual and legal issues that could be resolved for all class

12   members in a single proceeding.

13                   **TOLLING ALLEGATIONS**

14       174.184.    The causes of actions alleged herein did not accrue or were tolled until Plaintiffs

15   and class members discovered, or could have discovered with the exercise of reasonable diligence, the

16   facts giving rise to their legal claims.

17       175.185.    Plaintiffs and class members were not aware that they qualified for a mortgage

18   modification, and that Wells Fargo's automated decision-making tool had miscalculated their

19   eligibility, until Wells Fargo informed them through letters mailed the second half of 2018.

20       176.186.    Plaintiffs and class members had no realistic ability to discover these facts on

21   their own.  Wells Fargo's automated decision-making tool is not public, and the mathematical

22   calculations used to determine eligibility for a mortgage modification depended on variables within

23   Wells Fargo's exclusive control.

24       177.187.    Any applicable statues of limitations are also tolled by Wells Fargo's knowing,

25   active, and ongoing concealment of the facts alleged herein.  Wells Fargo discovered one of the

26   software errors in August 2013 but deliberately concealed its discovery from Plaintiffs and from class

27   members until the second half of 2018.  Wells Fargo was under a continuous duty to disclose the truth

28   to Plaintiffs and class members, and Plaintiffs and class members reasonably relied on Wells Fargo's

1  ongoing concealment.

2  **CHOICE OF LAW ALLEGATIONS**

3  ~~178.~~ 188.      The State of California has sufficient contacts to the claims of nonresident

4  Plaintiffs and class members such that application of California's Unfair Competition Law (UCL) is

5  appropriate.

6  ~~179.~~ 189.      Wells Fargo does substantial business in California; WFC is headquartered in

7  California; the Bank's principal place of business is in California; and a significant portion of the

8  proposed Nationwide Class is located in California.

9  ~~180.~~ 190.      In addition, the practices that form the basis of Plaintiffs' and class members'

10  UCL claims against Wells Fargo are centered in California, where WFC is headquartered.  WFC owns

11  and controlled the Bank, and is responsible for testing and auditing its mortgage modification

12  operations for compliance with HAMP and other government regulations.

13  ~~181.~~ 191.      Several of the executives and board members who failed to ensure that Wells

14  Fargo properly tested and audited its mortgage modification operations were based in California.  For

15  example, public records indicate that at least four of the ten members who served on the Audit &

16  Examination Committee between 2010 and 2017 were based in California—far more than any other

17  state.  In addition, at least one—and likely both—of the executives who served as WFC's Chief

18  Operational Risk Officer between 2010 and 2017, and thus were responsible for the compliance and

19  audit reporting provided to the Compliance Committee and the Audit & Examination Committee, were

20  based in WFC's San Francisco office.

21  ~~182.~~ 192.      The State of California also has the strong regulatory interest in applying the

22  UCL to all class members' claims.  The UCL is designed to preserve a business climate in California

23  free of unfair and deceptive practices.  If California were only able to address unfair business conduct

24  when the injured consumer resides in California, the UCL would be largely ineffective at regulating

25  companies who do business in all fifty states.  Violators would be able to keep the vast majority of their

26  ill-gotten gains (all those obtained from non-California consumers), leaving California-based

27  companies like Wells Fargo undeterred from engaging in similar conduct in the future.

28

**~~FIRST~~FIRST CAUSE OF ACTION**
**Breach of Contract**
**Brought on behalf of the Nationwide Class**

Formatted: All caps

~~183.~~193.        Plaintiffs Debora Granja, Sandra Campos, Keith Lindner, Emma White, Troy Frye, Coszetta Teague, John and Yvonne DeMartino, Russell and Brenda Simoneaux, Alicia Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of themselves and the State Subclasses.

~~184.~~194.        When Plaintiffs and class members financed their homes, they entered into Security Instruments (typically referred to as a mortgage, deed of trust, or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and foreclose on the property.

~~185.~~195.        Plaintiffs' and class members' mortgage loans were insured, guaranteed, or held by a federal government agency and their Security Instruments were typically government-issued, form Federal Housing Administration (FHA) and/or Fannie Mae/Freddie Mac Security Instruments.[1]Twelve of the ~~fifteen~~sixteen Plaintiffs had their homes secured by Fannie/Freddie Security Instruments, while the remaining ~~three~~four had their homes secured by FHA Security Instruments. Wells Fargo breached the terms of both types of Security Instruments. Plaintiffs Campos, Hood and DeMartino entered into FHA Security Instruments, while the remaining Plaintiffs' Security Instruments are Fannie Mae/Freddie Mac documents. References to "Security Instruments" in this complaint refer to all Plaintiffs' mortgage contracts. Reference to "FHA Security Instruments" is to Plaintiffs Campos, Hood and DeMartino's mortgage contracts, while reference to "Fannie/Freddie Security Instruments" is to the remaining Plaintiffs' mortgage contracts.

~~186.~~196.        Wells Fargo Bank was subject to the terms of these Security Instruments, either as the original lender, an assignee, or as the mortgage servicer authorized to act on behalf of the lender.

---

[1] *See* Wells Fargo's Request for Judicial Notice, Dkt. 60, attaching copies of certain Plaintiffs' Security Instruments as "exemplars" that were "substantially similar to the security instruments of the remaining named Plaintiffs." The exemplars included Security Instruments for Plaintiffs DeMartino (FHA Maryland Deed of Trust), Floyd (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), Hood (FHA Ohio Open-End Mortgage), Hernandez (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), and Wilson (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT).

1    187.197.        Under the Fannie/Freddie Security Instruments, the Bank was required to give

2    notice to Plaintiffs and class members before it was permitted to accelerate the remaining balance on

3    their loans and initiate the foreclosure process.  That notice was required to specify the borrower's

4    default, the action required by the borrower to cure the default, and the date by which the borrower

5    must cure the default to avoid acceleration and foreclosure proceedings.

6    188.198.        The Bank also agreed that "[i]f the Borrower meets certain conditions, Borrower

7    shall have the right to have enforcement of this Security Instrument discontinued…" prior to the sale of

8    the property. Those conditions included, among other things, that the Borrower "(a) pays Lender all

9    sums which then would be due under this Security Instrument…" and "(b) cures any defaults of any

10   other covenants or agreements."[2]

11   189.199.        The Fannie/Freddie Security Instruments specifically contemplated the

12   possibility of both a forbearance and modification of the sums secured by the Security Instruments. The

13   Fannie/Freddie Security Instruments provided, "Extension of the time for payment *or modification* of

14   amortization of the sums secured by this Security Instrument … shall not operate to release the liability

15   of Borrower…"[3] (emphasis added).

16   190.200.        Similarly, under the FHA Security Instruments, the Bank agreed it was not able

17   to require full payment and its rights were otherwise limited "by regulations issued by the Secretary in

18   the case of payment defaults…"[4] The Bank also agreed that, "In many circumstances regulations issued

19   by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate

20   payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or

21   foreclosure if not permitted by regulations of the Secretary."[5]

22   191.201.        Consistent with the Security Instruments, once a borrower missed a mortgage

23

24   [2] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at pg. 24, ¶ 19; *see also* Plaintiff Hernandez at p. 56, ¶ 19; Plaintiff Wilson at p. 76, ¶ 21(B).

25
26   [3] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at p. 23, ¶ 12; *see also* Plaintiff Hernandez at p. 52, ¶ 12.

27   [4] *See, e.g.*, Plaintiff DeMartino FHA Security Instrument (Dkt. 60-3) at p. 6, ¶ 9(a); *see also* Plaintiff Hood FHA Security Instrument (Doc. 60-3) at p. 33, ¶ 9(a).

28   [5] *See id.* at ¶ 9(d).

1  payment, Wells Fargo sent correspondence advising of the amount owed and invited borrowers to call

2  Wells Fargo's "trained professionals" who are "available to assist you in bringing your loan current …

3  [and] will work with you to determine the best option available to you." These letters show Wells

4  Fargo's understanding that there is more than one way to bring a loan current under the Security

5  Instruments.

6      192.202.      One of the ways a loan could be brought current was a loan modification. In a

7  recent Rule 30(b)(6) deposition, Wells Fargo's corporate representative testified that a mortgage

8  modification could cure a default and bring a loan current.

9      193.203.      This testimony is consistent with other correspondence Wells Fargo sent in

10 response to a request for mortgage assistance. In one letter, Wells Fargo told Plaintiff Troy Frye it was

11 "considering a program that may assist you in bringing your loan current … This program, known as a

12 loan modification, would provide you with the opportunity for a fresh start by adjusting the current

13 terms of your loan."

14     194.204.      In a different letter, Wells Fargo advised Plaintiffs and class members that a loan

15 modification is "an agreement that changes the terms of your existing mortgage. It brings your account

16 up-to-date and may result in a lower monthly payment."

17     195.205.      Once borrowers, such as Plaintiffs, requested mortgage assistance from Wells

18 Fargo, the Bank would tell borrowers: "We'll continue to work with you to help avoid a foreclosure

19 sale. If your loan has not previously been referred to foreclosure and you have submitted all of the

20 required documentation needed to evaluate for an alternative, this loan will not be referred to

21 foreclosure while the application is evaluated. If your loan has been referred to foreclosure, we will not

22 conduct a foreclosure sale on this loan while your documents are being reviewed and if allowed by state

23 law and/or investor guidelines." This message from Wells Fargo shows its understanding that a

24 modification would bring an account current, and allow the borrower to avoid foreclosure.

25     196.206.      The Bank breached its contractual obligations to Plaintiffs and class members by

26 failing to give Plaintiffs and class members adequate notice prior to accelerating their loan payments,

27 commencing the foreclosure process, and, in many instances, foreclosing on Plaintiffs' and class

28 members' homes.

1   197.207.     In particular, the Bank did not notify Plaintiffs and class members that they could

2   cure their default and avoid acceleration and foreclosure by accepting a mortgage modification.

3   Plaintiffs and class members qualified for a government-mandated mortgage modification, and the

4   Bank was required to offer them a mortgage modification but failed to do so. While HAMP and other

5   types of government-mandated mortgage modifications might have come into effect after Plaintiffs and

6   class members signed their Security Instruments, a reasonable interpretation of these contracts required

7   Wells Fargo to inform Plaintiffs of actions available to cure their default *at the time of the default* – not

8   just any action available at the time the parties executed the contract. And at the time of Plaintiffs'

9   defaults, a mortgage modification was an option that should have been available to them.

10   198.208.     Plaintiffs Campos, Hood and DeMartinos' FHA Security Instruments specifically

11   contemplated HUD Secretary regulations placing a limitation on Wells Fargo's right to foreclose in the

12   event of a default. These contracts stated, "In many circumstances regulations issued by the [HUD]

13   Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in

14   full and foreclose if not paid.  This Security Instrument does not authorize acceleration or foreclosure if

15   not permitted by regulations of the Secretary."[6] Indeed, as a part of the financial crisis, the HUD

16   Secretary stated in a report to Congress that "During this time of elevated financial stress on

17   households, FHA maintained a robust set of policies…to provide assistance in *curing* mortgage

18   delinquencies." Those tools included, among other things, loan modifications.[7] The FHA (Federal

19   Housing Administration) is a part of HUD. And HUD was one of the administering offices for HAMP;

20   thus HUD was responsible for issuing regulations on borrower eligibility for a modification under the

21   program.

22   199.209.     As a result of the Bank's breach, Plaintiffs and class members suffered damages

23   in an amount subject to proof, including loss of their homes; loss of equity in their homes; loss of tax

24   benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent

25   in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money

26   _____

27   [6] *See id.* at ¶ 9(d).

28   [7] *See* U.S. Department of Housing and Urban Development November 15, 2011 Annual Report to Congress Fiscal Year
2011 Financial Status FHA Mutual Mortgage Insurance Fund at p. 23-24, available at
https://www.hud.gov/sites/documents/FHAMMIFANNRPTFY2011.PDF (last accessed July 10, 2019).

-38-                 SECOND THIRD AMENDED COMPLAINT
                     Case No. 3:18-cv-07354-WHA

1  to find new housing and move their families and belongings; loss of favorable interest rates or other

2  favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage

3  payments.

4
5                      **SECOND**SECOND **CAUSE OF ACTION**
                     **Intentional Infliction of Emotional Distress**
6                        **Brought on Behalf of the IIED Class**

**Formatted:** All caps

7        200.211.    Plaintiffs Debora Granja, Sandra Campos, Keith Lindner, Emma White, Troy

8  Frye, Coszetta Teague, John and Yvonne DeMartino, Alicia Hernandez, Rose Wilson, Tiffanie Hood,

9  George and Cyndi Floyd, and Diana Trevino incorporate all preceding paragraphs as if fully set forth

10  herein.  They bring this claim on behalf of themselves and the Nationwide Class or, in the alternative,

11  on behalf of themselves and the State Subclasses.

12        201.211.    Wells Fargo engaged in extreme and outrageous conduct as alleged herein.

13  Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its

14  customers' homes and wellbeing depended.  It allowed systemic errors to persist for five to eight years;

15  ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices;

16  failed to reform its verification and auditing practices even after the government found a software error

17  had led the Bank to wrongfully deny mortgage modifications; concealed its discovery of an additional

18  software error from regulators and customers; and failed to identify other related errors for an

19  additional three years.

20        202.212.    The same extreme and outrageous conduct that caused a series of scandals and

21  consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines and

22  to forbid Wells Fargo from growing until reforms were implemented—was also responsible for

23  Plaintiffs and class members losing their homes here.  Wells Fargo's Board and executive leadership

24  abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance

25  failures, government fines, and consent decrees requiring leadership to implement appropriate auditing

26  and compliance procedures.

27        203.213.    With regard to the Bank's mortgage modification and foreclosure processes in

28  particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank

1  conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP or

2  other government requirements.  Wells Fargo's leadership ignored its oversight responsibilities even

3  after the government found it had not adequately overseen the Bank's mortgage modification and

4  foreclosure operations, even after it agreed to implement proper oversight as part of two 2011 consent

5  orders, and even after the government found in 2015 that Wells Fargo had continuously failed to

6  comply with the consent.  Leadership so flagrantly and repeatedly disregarded its oversight

7  responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it

8  will be prohibited from growing unless and until it reforms its oversight and governance.

9      ~~204.~~214.      Wells Fargo acted with reckless disregard for the probability that its conduct

10 would cause emotional distress to customers, including Plaintiffs and class members, who were

11 wrongfully denied mortgage modifications and foreclosed upon.

12     ~~205.~~215.      As a result of Wells Fargo's conduct, Plaintiffs and class members have suffered

13 severe emotional distress, as alleged herein, which has contributed to diagnoses of anxiety and

14 depression, extended psychological therapy, hospitalizations, high blood pressure, various health

15 problems, marital struggles, social withdrawal, childhood trauma, suicidal ideation, stress disorders,

16 and a number of other physical, psychological, and social afflictions.

17     ~~206.~~216.      Plaintiffs and class members seek compensatory damages as well as punitive

18 damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for

19 the rights of Plaintiffs and class members.

20
21              **~~THIRD~~THIRD CAUSE OF ACTION**

**Negligence Brought on Behalf of the California Subclass**

22     ~~207.~~217.      Plaintiffs Debora Granja, Sandra Campos and Keith Lindner incorporate all

23 preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the

24 California Subclass.

25     ~~208.~~218.      Wells Fargo owes a duty of care to Plaintiffs and class members because Wells

26 Fargo's conduct is not that of an ordinary lender. Instead, Wells Fargo relied on information that it

27 knew was false to deny Plaintiffs and class members a mortgage modification.  Wells Fargo told half-

28 truths to Plaintiffs and class members: it told these individuals that they did not qualify for a

Formatted: All caps

1   modification, while hiding the fact that these determinations were based on faulty software – and likely

2   inaccurate. Wells Fargo knew in 2013 that the software tool was pulling incorrect inputs in its

3   calculations, yet continued to use the tool without fixing it, and without telling Plaintiffs and class

4   members about the problem.

5   ~~209.~~219.       Under California law, courts consider the *Biakanja* factors in assessing whether

6   to recognize a duty of care, which include: (1) the extent to which the transaction was intended to affect

7   the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff

8   suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury

9   suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing

10  future harm. *See Biakanja v. Irving*, 49 Cal.2d 647 (1958). These factors weigh in favor of finding that

11  Wells Fargo owed Plaintiffs and class members a duty of care with respect to the mortgage

12  modification process.

13  ~~210.~~220.       First, the transactions at issue here, Plaintiffs' and class members' application for

14  a mortgage modification, were intended to affect Plaintiffs' and class members as they directly related

15  to their mortgages, including the amount they would pay each month for their mortgages during a time

16  of financial stress, and ultimately whether Plaintiffs and class members would be able to keep their

17  homes.

18  ~~211.~~221.       Second, the harm to Plaintiffs and class members resulting from Wells Fargo's

19  mishandling of their mortgage modification applications was readily foreseeable. Wells Fargo knew

20  that its software tool was using incorrect inputs in calculating whether borrowers were eligible for a

21  modification, but proceeded to use the tool anyway.

22  ~~212.~~222.       Although Wells Fargo previously indicated it initially discovered the error in

23  2015, internal documents reveal that the error was found much earlier, in August 2013. After the error

24  was discovered in August 2013, the issue was "escalated to senior leadership." Senior leadership

25  received presentations about the error, including a "recommendation on how to correct [the error] as

26  well an interim process …"

27  ~~213.~~223.       As early as 2014, Wells Fargo recognized that the alleged error in this case "does

28  have the potential to impact customers "who are on the edge."' Through 2014 and 2015, Wells Fargo

1    acknowledged potential customer harm in discussing how to fix the error, questioning "will we know

2    there is an issue before there is customer harm?" These facts speak to the third factor, which is the

3    degree of certainty that the plaintiff suffered harm. Wells Fargo has already admitted that this error

4    caused it to deny mortgage modifications to Plaintiffs and class members in a time of need, and for

5    many, resulted in the loss of their homes through foreclosure. In its second quarter 2018 Form 10-Q,

6    when Wells Fargo first publicly disclosed the error, Wells Fargo acknowledged that "as a result of this

7    error…" Plaintiffs and class members were "incorrectly denied a loan modification or were not offered

8    a modification in cases where they could have otherwise qualified."

9         214.224.      Moreover, in the late 2018 letters from Wells Fargo to Plaintiffs and class

10    members where Wells Fargo disclosed the error to them, Wells Fargo apologized and typically

11    provided payment to "help make up for your financial loss." Wells Fargo also acknowledged that in the

12    absence of the error, Plaintiffs and class members would have been approved for a trial modification.

13        215.225.      Fourth, there is a close connection between Wells Fargo's knowledge of an issue

14    in its mortgage modification software and failure to fix it, and the harm that Plaintiffs suffered. In its

15    second quarter 2018 Form 10-Q, when Wells Fargo first publicly disclosed the error, it acknowledged

16    that "after the loan modification was denied or the customer was deemed ineligible to be offered a loan

17    modification, a foreclosure was completed."

18        216.226.      Plaintiffs and class members were injured as a result of the loan modification

19    denial, including, but not limited to, loss of their homes; loss of equity in their homes; loss of tax

20    benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent

21    in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money

22    to find new housing and move their families; loss of favorable interest rates or other favorable loan

23    terms; damage to credit; and opportunity costs due to damage credit or higher mortgage payments; and

24    emotional distress.

25        217.227.      Fifth, Wells Fargo's conduct is worthy of blame. Wells Fargo had knowledge of

26    this particular error and failed fix it and disclose it to Plaintiffs and class members until 2018 – well

27    after most Plaintiffs lost their homes after being unable to receive a mortgage modification. Even more

28    egregious, for some class members, Wells Fargo continued to accept applications for mortgage

1  modifications even after acknowledging that customers who were "on the edge" were most likely to be

2  impacted by the error in early 2014.

3  218.228.    Even before the error was discovered, Wells Fargo permitted multiple, systemic

4  errors in its automated mortgage software because the software was not properly audited to ensure for

5  accuracy. This conduct persisted even though Wells Fargo was on notice and promised to correct

6  deficiencies in its mortgage modification and foreclosure practices after a 2010 investigation by the

7  Office of the Comptroller of the Currency, which led to a 2011 Consent Order in which Wells Fargo

8  promised to improve oversight on its mortgage modification practices.

9  219.229.    Finally, for the sixth factor, there is a strong policy interest in recognizing a duty

10 of care here. If Wells Fargo is not held accountable for knowingly denying government-mandated

11 modifications to Plaintiffs and class members, while accepting stimulus money for participating in

12 government mortgage assistance programs, then banks will have little incentive to abide by government

13 regulations that directly affect homeowners. Unless Wells Fargo is held accountable for its actions,

14 Wells Fargo will not have an incentive to properly audit its mortgage modification software, promptly

15 disclose errors, or notify borrowers of errors.

16 220.230.    Wells Fargo undertook to review Plaintiffs' and class members' mortgage loans

17 for potential modification.  In doing so, Wells Fargo owed Plaintiffs and class members a duty to

18 exercise reasonable care when determining whether Plaintiffs and class members were eligible for a

19 mortgage modification.

20 221.231.    Wells Fargo breached its duty by evaluating Plaintiffs' and class members'

21 eligibility using automated software that had not been properly verified or audited to ensure its

22 accuracy.  Wells Fargo permitted multiple systemic errors in its automated software to remain

23 uncorrected for five to eight years.  It failed to properly verify or audit its software even after the

24 government required it to reform its mortgage modification and foreclosure process in 2011; even after

25 the government found a software error had led the Bank to wrongfully deny mortgage modifications in

26 2013-2014; and even after it discovered the error at issue in 2013.

27 222.232.    Moreover, Wells Fargo owed Plaintiffs and class members a duty not to make a

28 material misrepresentation about the status of Plaintiffs' and class members' mortgage modifications,

1  as well as a duty not to make negligent misrepresentations of fact. California law imposes a duty not to

2  deceive others, which is defined as "[t]he assertion, as a fact, of that which is not true, by one who has

3  no reasonable ground for believing it to be true" and "[t]he suppression of a fact, by one who is bound

4  to disclose it, or who gives information of other facts which are likely to mislead for want of

5  communication of that fact." Civ. Code § 1710, subd. 2, and 3.

6          223.233.        Wells Fargo breached its duty not to make a material misrepresentation about the

7  status of a loan modification and other facts regarding the mortgage modification process by continuing

8  to offer mortgage modifications using a software tool it knew to provide false information, and failing

9  to advise Plaintiffs and class members that the decision to deny their mortgage modifications was

10  determined by faulty software.

11          224.234.        Wells Fargo provided reasons for the denial of Plaintiffs' and class members'

12  mortgage modifications that were false and that it had reason to know were false.

13          225.235.        Wells Fargo advised Plaintiffs and class members that their mortgage

14  modifications were denied based on reasons that were false, such as:

15          1.  "Your pending mortgage assistance required approval from the investor that ultimately

16              owns your mortgage, and the investor has declined the request."

17          2.  "Unfortunately, after carefully reviewing the information you've provided, we are

18              unable to adjust the terms of your mortgage through the Home Affordable Modification

19              Program because your current monthly housing expense…is less than or equal to 31% of

20              your gross monthly income…"

21          3.  "Based on your documented monthly income, we are unable to create an affordable

22              payment that meets the requirements of the program."

23          226.236.        All those reasons were false. Plaintiffs and class members were denied

24  modifications due to incorrect attorneys' fees inputs in Wells Fargo's software – not for the reasons

25  Wells Fargo provided to Plaintiffs at the time.

26          227.237.        Wells Fargo's negligence caused Plaintiffs and class member to be wrongly

27  denied a mortgage modification, resulting in damages subject to proof, including loss of their homes;

28  loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following

foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put

into their homes; loss of time and money to find new housing and move their families; loss of favorable

interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged

credit or higher mortgage payments; and emotional distress.

228.238.    Plaintiffs and class members seek compensatory damages as well as punitive

damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for

the rights of Plaintiffs and class members.

<div align="center">

**FOURTHFOURTH CAUSE OF ACTION**

**Wrongful Foreclosure Brought on Behalf of the California and Georgia Foreclosure Subclasses**

</div>

229.239.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

<div align="center">

**California Foreclosure Subclass**

</div>

230.240.    Plaintiffs Debora Granja, Sandra Campos and Keith Lindner bring this claim on

behalf of themselves and the California Foreclosure Subclass.

231.241.    Wells Fargo wrongfully foreclosed on Plaintiffs' and the California Foreclosure

Subclass's real property pursuant to a power of sale in their Security Instruments.  The foreclosure was

unlawful and/or unfair because Wells Fargo did not first notify Plaintiffs and the California Foreclosure

Subclass that they could cure their default by accepting a mortgage modification.  Plaintiffs and class

members qualified for the mortgage modification and Wells Fargo was required by the Security

Agreements to notify Plaintiffs and class members of actions they could take to cure their default

before exercising its power of sale.

232.242.    Plaintiffs and class members were excused from tendering the amount of their

secured indebtedness, and no breach of condition or failure of performance existed on the part of

Plaintiffs and class members that would have authorized the foreclosure, because Wells Fargo was

required to offer Plaintiffs and class members a mortgage modification before it could accelerate their

secured indebtedness and initiate foreclosure proceedings.

233.243.    Plaintiffs and class members were harmed by the wrongful foreclosure and

suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss

of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

<div align="center">

-45-                SECOND THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

</div>

Formatted: All caps

1   spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

2   money to find new housing and move their families; loss of favorable interest rates or other favorable

3   loan terms; damage to credit; opportunity costs due to damaged credit; and emotional distress.

4       ~~234.~~244.     Plaintiffs and the California Foreclosure Subclass seek compensatory damages as

5   well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless

6   disregard for the rights of Plaintiffs and class members.

7                              **Georgia Foreclosure Subclass**

8       ~~235.~~245.     Plaintiff Troy Frye brings this claim on behalf of himself and the Georgia

9   subclass

10      ~~236.~~246.     Wells Fargo owed Plaintiff Frye and the Georgia Foreclosure Subclass a duty to

11  exercise the power of sale afforded it by Plaintiff's and class members' Security Instruments in

12  conformance with the terms of the Security Instruments and in good faith.

13      ~~237.~~247.     Wells Fargo breached its duty by foreclosing on Plaintiff's and class members'

14  homes without first giving Plaintiff and class members notice that the could cure their default by

15  accepting a mortgage modification.  Wells Fargo was required to do so under the terms of the Security

16  Instruments.  Alternatively, foreclosing on Plaintiff's and class members' homes without first offering

17  them a mortgage modification to which they were entitled constitutes bad faith and unfair execution of

18  the Wells Fargo's power of sale.

19      ~~238.~~248.     As a result of Wells Fargo's conduct, Plaintiff Frye and the Georgia Foreclosure

20  Subclass lost their homes to foreclosure and suffered other damages to be proven at trial, including loss

21  of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following

22  foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put

23  into their homes; loss of time and money to find new housing and move their families; loss of favorable

24  interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit;

25  and emotional distress.

26      ~~239.~~249.     Plaintiff and the Georgia Foreclosure Subclass seek compensatory damages as

27  well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless

28  disregard for the rights of Plaintiffs and class members.

Formatted: All caps

### FIFTH~~FIFTH~~ CAUSE OF ACTION
**Violation of California's Homeowners Bill of Rights**
**Brought on Behalf of the California Subclass**

~~240.~~250.    Plaintiffs Debora Granja, Sandra Campos and Keith Lindner incorporate all preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the California Foreclosure Subclass.

~~241.~~251.    Under California's Homeowners Bill of Rights, Wells Fargo had an obligation to ensure that competent and reliable evidence, including the borrower's loan status and information, supported its right to foreclose before it filed a notice of default or notice or sale in connection with the foreclosure of Plaintiffs' and class members' real property.  Cal. Civ. Code § 2924.17.

~~242.~~252.    Wells Fargo materially and recklessly violated its obligation because Plaintiffs' and class members' loan information did not support Wells Fargo's right to foreclose.  Plaintiffs' and class members' loan information showed that they qualified for a mortgage modification.  Wells Fargo was therefore required to offer Plaintiffs and class members the opportunity to cure their default by accepting a mortgage modification before it could exercise its right to foreclose under Plaintiffs' and class members' Security Instruments.

~~243.~~253.    The automated software that Wells Fargo used to wrongly determine that Plaintiffs and class members did not qualify for a mortgage modification was not reliable and Wells Fargo was reckless in using the software and relying upon it to support its right to foreclose.  The software's results had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years.  Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

~~244.~~254.    As a result of Wells Fargo's violation of the Homeowners Bill of Rights, Plaintiffs Granja and the California Foreclosure Subclass suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid

1  foreclosure; loss of time and money put into their homes; loss of time and money to find new housing

2  and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit;

3  and opportunity costs due to damaged credit.

4      245.255.      Pursuant to California Civil Code section 2924.19(b), Plaintiffs Granja and each

5  member of the California Foreclosure Subclass seek an award of treble actual damages or statutory

6  damages of $50,000, whichever is greater.

7
8                    **SIXTHSIXTH CAUSE OF ACTION**
                    **Violation of California's Unfair Competition Law**
9                   **Brought on Behalf of the Nationwide Class**

**Formatted:** All caps

10     246.256.      Plaintiffs Debora Granja, Sandra Campos, Keith Lindner, Emma White, Troy

11  Frye, Coszetta Teague, John and Yvonne DeMartino, Russell and Brenda Simoneaux, Alicia

12  Hernandez, Rose Wilson, Tiffanie Hood, George and Cyndi Floyd, and Diana Trevino incorporate all

13  preceding paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the

14  Nationwide Class.

15     247.257.      In the alternative, should the Court decide that out-of-state plaintiffs may not

16  maintain this claim against Wells Fargo, Plaintiffs Debora Granja, Sandra Campos and Keith Lindner

17  bring this claim on behalf of themselves and the California Subclass.

18     248.258.      Wells Fargo has violated and continues to violate California's Unfair

19  Competition Law (UCL), which prohibits unlawful, unfair, or fraudulent practices.

20     249.259.      Wells Fargo engaged in unlawful practices by denying mortgage modifications

21  to Plaintiffs and class members in violation of HAMP and other governmental requirements.

22     250.260.      Wells Fargo engaged in unfair practices by failing to properly verify or audit the

23  automated software it used to determine whether Plaintiffs and class members were eligible for a

24  mortgage modification.  Wells Fargo's faulty verification and auditing practices allowed multiple

25  systemic errors to remain uncorrected for five to eight years and persisted even after the government

26  cited Wells Fargo for failing to adequately audit its mortgage modification and foreclosure processes;

27  even after the government found a software error had led the Bank to wrongfully deny mortgage

28  modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused

-48-         SECOND THIRD AMENDED COMPLAINT
              Case No. 3:18-cv-07354-WHA

1  it to wrongly deny modifications in 2015.

2       251.261.     Wells Fargo's Board and executive leadership further engaged in unfair practices

3  by failing to properly oversee the Bank's compliance with HAMP and other governmental

4  requirements.  Wells Fargo's lack of central oversight has led to series of consumer abuses and billions

5  of dollars in government fines.  Yet despite repeatedly promising to reform its oversight practices,

6  Wells Fargo's Board and executive leadership repeatedly failed to implement or maintain procedures to

7  ensure the Bank was complying with HAMP or other applicable government requirements.

8       252.262.     Both Wells Fargo's verification and auditing practices and its oversight practices

9  are unethical, unscrupulous, or substantially injurious to consumers; any legitimate utility of the

10  practices are outweighed by the harm to consumers; and the practices run afoul of the public policies

11  underlying HAMP and California Homeowners Bill or Rights, which seek to help homeowners avoid

12  foreclosure and promote fair mortgage lending and servicing practices.

13       253.263.     As a result of Wells Fargo's violations of the UCL, Plaintiffs have suffered

14  injury in fact and lost money and property, including loss of their homes; loss of equity in their homes;

15  loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and

16  money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time

17  and money to find new housing and move their families; loss of favorable interest rates or other

18  favorable loan terms; damage to credit; and opportunity costs due to damaged credit.

19       254.264.     Pursuant to California Business and Professions Code section 17203, Plaintiffs

20  and class members seek such orders or judgments as may be necessary to prevent the Wells Fargo's

21  future use of its unfair and unlawful practices, and to restore to Plaintiffs and class members any money

22  or property that may have been acquired by means of Wells Fargo's unfair competition.

23

24                    **SEVENTHSEVENTH CAUSE OF ACTION**

                      **Violation of State Consumer Protection Laws**

25                    **Brought on Behalf of Five State Subclasses**

26       255.265.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.  In the

27  alternative or in addition to the preceding claim for violation of the UCL, Plaintiffs and class members

28  seek recovery under the following state consumer protection statutes as detailed below.

Formatted: All caps

1                                        **Illinois Subclass**

2          256.266.         Plaintiff Coszetta Teague brings this claim on behalf of herself and the Illinois

3    Subclass.

4          257.267.         Wells Fargo's conduct as alleged herein violates the Illinois Consumer Fraud Act

5    (ICFA), 815 ILCS 505/2, which prohibits unfair acts or practices in the conduct of any trade or

6    commerce. Wells Fargo engaged in unfair practices by denying mortgage modifications to Plaintiffs

7    and class members in violation of HAMP and other governmental requirements; by failing to properly

8    verify or audit the automated software it used to determine whether Plaintiffs and class members were

9    eligible for a mortgage modification; and by failing to implement or maintain procedures to ensure the

10   Bank was complying with HAMP or other government requirements.

11         258.268.         As a result of Wells Fargo's violation of the ICFA, Plaintiff Teague and the

12   Illinois Subclass suffered damages according to proof, including loss of their homes; loss of equity in

13   their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss

14   of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes;

15   loss of time and money to find new housing and move their families; loss of favorable interest rates or

16   other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher

17   mortgage payments.

18         259.269.         Pursuant to 815 ILCS 505/10a, Plaintiff and the Illinois Subclass seek recovery

19   of their actual economic damages, punitive damages, injunctive relief, and attorneys' fees and costs.

20                                        **Maryland Subclass**

21         260.270.         Plaintiffs John and Yvonne DeMartino bring this claim on behalf of themselves

22   and the Maryland Subclass.

23         261.271.         Wells Fargo's conduct as alleged herein violates the Maryland Consumer

24   Protection Act (MCPA), Md. Code Ann., Com. Law. §13-303, which prohibits unfair, abusive or

25   deceptive practices.

26         262.272.         Wells Fargo engaged in unfair practices by denying mortgage modifications to

27   Plaintiffs and class members in violation of HAMP and other governmental requirements; by failing to

28   properly verify or audit the automated software it used to determine whether Plaintiffs and class

1    members were eligible for a mortgage modification; and by failing to implement or maintain

2    procedures to ensure the Bank was complying with HAMP or other applicable government

3    requirements.

4        263. 273.       Wells Fargo also violated both the MCPA and the Maryland Consumer Debt

5    Collection (MDCA), Md. Code Ann. Com. Law § 14-202(8), by attempting to enforce a right to

6    foreclose on Plaintiffs and class member's property with reckless disregard as to the falsity of the

7    existence of the right.

8        264. 274.      The automated software that Wells Fargo used to wrongly determine that

9    Plaintiffs and class members did not qualify for a mortgage modification was not reliable and Wells

10    Fargo was reckless in using the software and relying upon it to support its right to foreclose.  The

11    software's results had not been properly verified or audited, and as a result, multiple material errors

12    remained uncorrected in the software for five to eight years.  Wells Fargo willfully and recklessly

13    continued to rely on its software even after the government cited it for failing to adequately audit its

14    mortgage modification and foreclosure procedures; even after the government found a software error

15    had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo

16    discovered another software error that caused it to wrongly deny modifications in 2015.

17        265. 275.      As a result of Wells Fargo's violations of the MCPA and MDCA, Plaintiffs and

18    the Maryland Subclass suffered damages according to proof, including loss of their homes; loss of

19    equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following

20    foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put

21    into their homes; loss of time and money to find new housing and move their families; loss of favorable

22    interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit

23    or higher mortgage payments; and emotional distress.

24        266. 276.       Pursuant to Maryland Code Annotated, Commercial Law sections 13-408 and

25    14-203, Plaintiffs and the Maryland Subclass seek to recover damages, including damages for

26    emotional distress and mental anguish, and an award of attorneys' fees and costs.

27                                **New Jersey Subclass**

28        267. 277.      Plaintiff Alicia Hernandez brings this claim on behalf of herself and the New

1  Jersey Subclass.

2  268.278.      Wells Fargo's conduct as alleged herein violates the New Jersey Consumer

3  Fraud Act (NJCFA), N.J.S.A. 56:8-2, which prohibits the use of any misrepresentation or deception in

4  connection with the extension of credit or subsequent servicing of that credit.

5  269.279.      Wells Fargo represented to Plaintiff and class members that they did not qualify

6  for a mortgage modification.  That representation was false and caused Plaintiff and class members

7  ascertainable loss, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss

8  of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to

9  avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new

10  housing and move their families; loss of favorable interest rates or other favorable loan terms; damage

11  to credit; and opportunity costs due to damaged credit or higher mortgage payments.

12  270.280.      Had Wells Fargo presented accurate information to Plaintiff and class members,

13  they would have opted for the mortgage modification for which the qualified.  If Wells Fargo still

14  refused to provide Plaintiff and class members with a mortgage modification, they could and would

15  have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

16  271.281.      Pursuant to N.J.S.A 56:8-19, Plaintiff and the New Jersey Subclass request seek

17  an award of treble damages, injunctive relief, and attorneys' fees and costs.

18  **New York Subclass**

19  272.282.      Plaintiff Rose Wilson brings this claim on behalf of herself and the New York

20  Subclass

21  273.283.      Wells Fargo's conduct as alleged herein violates Section 349(a) of New York's

22  General Business Law (GBL), which prohibits deceptive acts or practices

23  274.284.      Wells Fargo's acts and practices were consumer-oriented, as they affected not

24  only Plaintiff but similarly-situated consumers as well, and they had the potential to affect even more

25  consumers.  The automated software that used to determine Plaintiff's and other consumers' eligibility

26  for mortgage modifications was systematically flawed and generated inaccurate calculations.

27  275.285.      The automated software's calculations had not been properly verified or audited,

28  and as a result, multiple material errors remained uncorrected in the software for five to eight years.

1  Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it

2  for failing to adequately audit its mortgage modification and foreclosure procedures; even after the

3  government found a software error had led the Bank to wrongfully deny mortgage modifications in

4  2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly

5  deny modifications in 2015.

6  276.286.      Wells Fargo's practice of using systematically-flawed software was deceptive or

7  misleading in a material respect, as it led Plaintiff and class members to believe that they did not

8  qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

9  277.287.      Had Wells Fargo presented accurate information to Plaintiff and class members,

10  they would have opted for the mortgage modification for which the qualified.  If Wells Fargo still

11  refused to provide Plaintiff and class members with a mortgage modification, they could and would

12  have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

13  278.288.      As a result of Wells Fargo's violation of the GBL, Plaintiff and class members

14  suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss

15  of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to

16  avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new

17  housing and move their families; loss of favorable interest rates or other favorable loan terms; damage

18  to credit; and opportunity costs due to damaged credit or higher mortgage payments.

19  279.289.      Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the New York Subclass

20  seek an award of damages, injunctive relief, and attorneys' fees.

21  **Pennsylvania Subclass**

22  280.290.      Plaintiffs Cyndi and George Floyd bring this claim on behalf of themselves and

23  the Pennsylvania Subclass.

24  281.291.      Wells Fargo's conduct as alleged herein constitutes a violation of the

25  Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Stat. Ann. §

26  201-3, which prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.

27  282.292.      Wells Fargo's practice of using systematically-flawed software to calculate

28  Plaintiffs' and class members' eligibility for mortgage loan modifications was unfair and deceptive, as

-53-                    SECOND THIRD AMENDED COMPLAINT
                                Case No. 3:18-cv-07354-WHA

1   it led Plaintiffs and class members to believe that they did not qualify for a mortgage modification and

2   caused them to be wrongly denied a mortgage modification.

3        283.293.        The automated software's calculations had not been properly verified or audited,

4   and as a result, multiple material errors remained uncorrected in the software for five to eight years.

5   Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it

6   for failing to adequately audit its mortgage modification and foreclosure procedures; even after the

7   government found a software error had led the Bank to wrongfully deny mortgage modifications in

8   2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly

9   deny modifications in 2015.

10       284.294.        Plaintiffs and class members justifiably relied on Wells Fargo's determination

11  that they did not qualify for a mortgage modification.  Had Wells Fargo presented accurate information

12  to Plaintiffs and class members, they would have opted for the mortgage modification for which they

13  qualified.  If Wells Fargo still refused to provide Plaintiffs and class members with a mortgage

14  modification, they could and would have used the knowledge that they qualified for a mortgage

15  modification to fight foreclosure.

16       285.295.        As a result of Wells Fargo's violation of the UTPCPL, Plaintiffs and class

17  members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax

18  benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent

19  in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money

20  to find new housing and move their families; loss of favorable interest rates or other favorable loan

21  terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

22       286.296.        Pursuant to 73 Pa. Stat. Ann. § 201-9.2, Plaintiffs and the Pennsylvania Subclass

23  seek an award of treble damages, equitable relief, and attorneys' fees and costs.

24

25                              **EIGHTH CAUSE OF ACTION**
                                     **Fraud by Concealment**
26                        **Brought on behalf of the Fraud Subclass**

27       287.297.        Plaintiffs Troy Frye, Coszetta Teague, Russell and Brenda Simoneaux, Tiffanie

28  Hood, and Emma White incorporate all preceding paragraphs as if fully set forth herein.  They bring

1   this claim on behalf of themselves and the Fraud Subclass.

2   288.298.      Wells Fargo knew starting in 2013 that its software tool was yielding inaccurate

3   determinations as to whether borrowers qualified for a modification, but hid that fact from borrowers.

4   Instead, Wells Fargo sent each Plaintiff and class member a letter stating that his or her request for a

5   modification had been denied based on a different reason (or without any reason at all), and made no

6   mention of the real cause of the denial: inaccurate attorneys' fees inputs in the software Wells Fargo

7   was using to calculate eligibility for modifications.

8   289.299.      Wells Fargo told Plaintiffs and class members these half-truths by letter. For

9   example, by letter dated March 4, 2014, Wells Fargo told Plaintiff Frye that his mortgage modification

10  application was denied because he "exceeded the number of modifications allowed by the investor."

11  Similarly, Wells Fargo told Plaintiff Teague by letter dated December 16, 2013 that her mortgage

12  modification application was denied because: "[b]ased on your documented monthly income, we are

13  unable to create an affordable payment that meets the requirements of the program." Plaintiff White

14  received a similar letter on October 31, 2013, in which Wells Fargo told her that she did not meet the

15  requirements for a modification because "[b]ased on [her] documented monthly income, [Wells Fargo

16  was] unable to create an affordable payment that meets the requirements of the program." Each denial

17  letter provided an alleged reason for the denial of a mortgage modification, but failed to disclose a

18  material fact: their denials were based on faulty software, and thus were likely erroneous.

19  290.300.      Wells Fargo became aware of deficiencies in its loan modification software no

20  later than August 2013, when it "learned there is a table in HPA which has attorney fees by state

21  programmed and these amounts were being pulled into the trial decision but the tool also pulled in any

22  assessed attorney fees.  In some cases attorney fees could have been double counted therefore

23  impacting the modification decision."

24  291.301.      In October 2014, having known for more than a year that its faulty software

25  could be causing mortgage modifications to be wrongfully denied, Wells Fargo decided to do nothing:

26  "[W]e will continue with the process that is currently in place for obtaining the attorney fees."

27  292.302.      In the second quarter of 2015, more than a year and half after learning of the

28  faulty software issue and having actively studied it for some time, Wells Fargo continued to do nothing

1   to correct it.  It likewise failed to disclose the issue to potentially affected borrowers, despite

2   recognizing that: "Inaccurate fees will continue to be quoted, which causes a negative customer

3   experience in addition to a reconciling discrepancy."

4        293.303.      In April and May of 2015, despite some of its employees expressing concern

5   about the continued use of the faulty software, Wells Fargo made the decision that "No fix is going to

6   take place at this time."  This was apparently based on its assessment that "there is really low risk."

7        294.304.      Wells Fargo had a duty to disclose the software error – a material fact -- to

8   Plaintiffs and class members. By informing Plaintiffs and class members that they were denied

9   mortgage modifications, but not that those denials were based on calculations made by software it knew

10  to be faulty, Wells Fargo stated half-truths. One who undertakes to make a statement must not only

11  state the truth, but may not conceal any facts within his knowledge which materially qualifies his

12  statement. Since Wells Fargo chose to speak in stating that Plaintiffs did not qualify for a modification,

13  it was required to make a full disclosure. This is particularly true because Wells Fargo had superior

14  knowledge as to all material facts surrounding Plaintiffs' eligibility for a modification.

15       295.305.      Wells Fargo knew Plaintiffs and class members would reasonably rely upon its

16  representations and intended that Plaintiffs and class members rely upon its statements that Plaintiffs

17  and class members did not qualify for a mortgage modification.

18       296.306.      Plaintiffs reasonably believed Wells Fargo's representation that they did not

19  qualify for a modification. They had no reason to know Wells Fargo based that determination on a

20  software tool that had a material error in it.

21       297.307.      Had Wells Fargo disclosed the whole truth to Plaintiffs and class members, they

22  would have been able to seek review of the incorrect decisions on their mortgage modifications by a

23  competent third party, such as an attorney, agency, or other organization or individual with knowledge

24  of mortgage modification requirements and processes.  They would then have become aware that the

25  denials of their mortgage modifications were erroneous, and would have been able to prevent the

26  wrongful foreclosures and other harm that flowed from Wells Fargo's error.

27       298.308.      As a result of Wells Fargo's fraudulent omissions and failures to disclose,

28  Plaintiffs and class members have been injured in fact and suffered a loss of money and/or property.

1   Plaintiffs and class members suffered damages, including loss of their homes; loss of equity in their
2   homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of
3   time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes;
4   loss of time and money to find new housing and move their families; loss of favorable interest rates or
5   other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher
6   mortgage payments.

### NINTH CAUSE OF ACTION
**Negligent Misrepresentation**
**Brought on behalf of the Misrepresentation Subclass**

9   ~~299.~~309.       Plaintiffs Keith Lindner and George and Cyndi Floyd incorporate all preceding
10  paragraphs as if fully set forth herein.  They bring this claim on behalf of themselves and the
11  Misrepresentation Subclass.

12  ~~300.~~310.        Wells Fargo made a misrepresentation to Plaintiffs and class members by telling
13  them that they did not qualify for a mortgage modification, while hiding the fact that those
14  determinations were based on faulty software.

15  ~~301.~~311.        Wells Fargo made these negligent misrepresentations to Plaintiffs and class
16  members by letter. For example, by letter dated February 18, 2010, Wells Fargo stated that Mr. Lindner
17  had not been approved for a modification because Wells Fargo was unable to provide "a modified
18  payment amount that [Mr. Lindner] could afford per investor guidelines on [his] mortgage." In a similar
19  letter dated November 18, 2011, Wells Fargo told Mr. and Mrs. Floyd that the investor that owned their
20  mortgage declined their request for a modification. Each denial letter provided an alleged reason for the
21  denial of a mortgage modification that turned out to be false.

22  ~~302.~~312.        Wells Fargo did not have reasonable grounds for believing that the
23  misrepresentations of fact were true because Wells Fargo had notice starting in 2011, when it entered
24  into consent orders with the government, that it had inadequate mortgage modification and foreclosure
25  practices. The OCC's investigation began in 2010, so Wells Fargo had reason at that point to question
26  the accuracy of its modification decisions. Wells Fargo received repeated warnings that it needed to
27  more closely audit and test its mortgage modification procedures, but unreasonably failed to do so.

28  ~~303.~~313.        Wells Fargo had a duty to disclose accurate information to Plaintiffs. By

1 informing Plaintiffs and class members that they were not qualified mortgage modifications based on

2 specific reasons, Wells Fargo chose to speak. One who undertakes to make a statement must not only

3 state the truth, but must not make factual misrepresentations. Since Wells Fargo chose to speak in

4 stating that Plaintiffs did not qualify for a modification, it was required to make an accurate disclosure

5 and not to misrepresent facts. This is particularly true because Wells Fargo had superior knowledge as

6 to all material facts surrounding Plaintiffs' eligibility for a modification.

7         ~~304.~~314.        Wells Fargo knew Plaintiffs and class members would reasonably rely upon its

8 factual representations and intended that Plaintiffs and class members rely upon its statements.

9         ~~305.~~315.        Plaintiffs reasonably believed Wells Fargo's representation that they did not

10 qualify for a modification. They had no reason to know Wells Fargo based that determination on a

11 software tool that had a material error in it.

12        ~~306.~~316.        Had Wells Fargo not misrepresented the reason that Plaintiffs and class members

13 were denied a mortgage modification, they would have been able to seek review of the incorrect

14 decisions on their mortgage modifications by a competent third party, such as an attorney, agency, or

15 other organization or individual with knowledge of mortgage modification requirements and processes.

16 They would then have become aware that the denials of their mortgage modifications were erroneous,

17 and would have been able to prevent the wrongful foreclosures and other harm that flowed from Wells

18 Fargo's error.

19        ~~307.~~317.        As a result of Wells Fargo's negligent misrepresentations, Plaintiffs and class

20 members have been injured in fact and suffered a loss of money and/or property.  Plaintiffs and class

21 members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax

22 benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent

23 in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money

24 to find new housing and move their families; loss of favorable interest rates or other favorable loan

25 terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

26

27                              **PRAYER FOR RELIEF**

28        WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, request the

1  following relief:

2      a. A determination that this action may be maintained as a class action;

3      b. An award of all damages and restitution to be paid according to proof, including

4         statutory damages, treble damages, and punitive damages where appropriate;

5      c. Appropriate injunctive and equitable relief, including an order enjoining Wells Fargo

6         from continuing its unlawful practices;

7      d. Pre-judgment interest and post-judgment interest, as provided by law;

8      e. Attorneys' fees and costs of suit, including expert fees and costs;

9      f. Any and all other legal and equitable relief that the Court may find appropriate.

10                        **DEMAND FOR JURY TRIAL**

11      Plaintiffs demand trial by jury for all issues so triable.

12

13  Dated: November 20, 2019November 20, 2019November         */s/ Michael L. Schrag*
    18, 2019

14                                                **GIBBS LAW GROUP LLP**
                                                  Michael L. Schrag (SBN 185832)
15                                                Joshua J. Bloomfield (SBN 212172)
                                                  Linda Lam (SBN 301461)
16                                                505 14th Street, Suite 1110
                                                  Oakland, California 94612
17                                                Telephone:  510-350-9700
                                                  Facsimile:  510-350-9701
18                                                mls@classlawgroup.com
                                                  jjb@classlawgroup.com
19                                                lpl@classlawgroup.com
20

21                                                Richard M. Paul III
                                                  Ashlea G. Schwarz
22                                                Laura C. Fellows
                                                  **PAUL LLP**
23                                                601 Walnut Street, Suite 300
                                                  Kansas City, Missouri 64106
24                                                Telephone: 816-984-8100
                                                  Facsimile:  816-984-8101
25                                                Rick@PaulLLP.com
                                                  Ashlea@PaulLLP.com
26                                                Laura@PaulLLP.com
                                                                              Formatted: Default Paragraph Font
27

28


1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

~~SECOND~~ THIRD AMENDED
COMPLAINT
Case No. 3:18-cv-07354-WHA