# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4                      ---oOo---
 5
 6   ALICIA HERNANDEZ, et al.,
     individually and on
 7   behalf of all others
     similarly situated,
 8
                    Plaintiffs,
 9
     vs.                              No. 3:18-cv-07354-WHA
10
     WELLS FARGO & COMPANY, and
11   WELLS FARGO BANK, N.A.,
12              Defendants.
     _____/
13
14             .
15
16        30(b)(6) VIDEOTAPED DEPOSITION OF CARMEN BELL
17              SAN FRANCISCO, CALIFORNIA
18                FRIDAY, AUGUST 2, 2019
19
20
21   Stenographically reported by:
22   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR
23   California CSR No. 9830
24   Job No. 3476159
25   Pages 1- 266
```

Page 1

Page 22

```
1    Q   All right.                                09:48
2        And the mortgage loan modification        09:48
3    underwriting tool that's being referred to there is   09:48
4    what is known as the HPA; is that true?       09:48
5    A   That's correct.                           09:48
6    Q   Okay. And that's -- what does HPA stand for?   09:48
7    A   Home Preservation Application.            09:49
8    Q   All right.                                09:49
9        I'm going to skip a sentence there. But   09:49
10   there's a reference there to approximately    09:49
11   625 customers were incorrectly denied a loan  09:49
12   modification, or were not offered a modification in   09:49
13   cases where they would have otherwise qualified.   09:49
14       That number has -- has since changed;     09:49
15   correct?                                      09:49
16   A   Yes.                                      09:49
17   Q   All right.                                09:49
18       And the -- the second number there, in    09:49
19   approximately 400 of these instances, there was a   09:49
20   foreclosure completed, where the modification should   09:49
21   have been granted; correct?                   09:49
22       MS. KNIGHT: Object to form.               09:49
23       MR. PAUL: Let me withdraw that question.  09:49
24   Q   My -- my -- I guess what I'm going to get at,   09:49
25   and we're going to look at it -- but that number has   09:49
```

Page 23

```
1    changed as well, correct, the 400?            09:49
2    A   The 400, yes.                             09:50
3        And the modification granted, I would state   09:50
4    that to say a trial modification was where we had the   09:50
5    inaccurate decision.                          09:50
6    Q   Sure.                                     09:50
7        And you -- the process -- we'll get into this   09:50
8    a little later. But a borrower has to go through the   09:50
9    trial modification to get a final modification;   09:50
10   correct?                                      09:50
11   A   Yes.                                      09:50
12   Q   Okay. Now, the -- the disclosure goes on to   09:50
13   say that the company has substantially completed its   09:50
14   internal review.                              09:50
15       Has that review been completed as of today?   09:50
16   A   It's still under review.                  09:50
17   Q   Okay. All right.                          09:50
18       If you'll turn to Exhibit 391.            09:50
19   A   (Witness complies.)                       09:50
20   Q   The -- the first change is, it changes the   09:50
21   date -- well, let me back down. That's not the first   09:51
22   change.                                       09:51
23       The first change I want to point out is, the   09:51
24   date of October 20, 2015, changed to October 2nd, that   09:51
25   was just a typo error on the first one?       09:51
```

Page 24

```
1    A   I believe so, yes.                        09:51
2        MS. KNIGHT: Object to form.               09:51
3        MR. PAUL: Q. And then, after the -- that  09:51
4    first sentence with the date, it says:        09:51
5        "A subsequent expanded review identified  09:51
6    related errors."                              09:51
7        What -- what are the related errors that the   09:51
8    subsequent expanded review identified?        09:51
9    A   We took the broadest approach after we    09:51
10   identified that the automated tool calculation error   09:51
11   impacted borrowers to review all attorneys' fees   09:51
12   practices in loan modifications.              09:52
13       And that subsequent, more broad review    09:52
14   identified that in other instances, we did not have a   09:52
15   control in place. The calculation error was not   09:52
16   present.                                      09:52
17       We did not have an appropriate control in   09:52
18   place when we would receive a pending quote from the   09:52
19   attorney for fees that haven't -- been incurred, but   09:52
20   not yet billed. That's what it revealed.      09:52
21   Q   Okay. And it says "related errors," plural.   09:52
22       Was it just one additional error that was  09:52
23   added, or were there -- was there more than one?   09:52
24       MS. KNIGHT: I'm going to object to the form.   09:52
25       THE WITNESS: Related to attorneys' fees,  09:52
```

Page 25

```
1    just the one.                                 09:52
2        MR. PAUL: Okay.                           09:52
3    Q   So as of the September 30 disclosure, there   09:52
4    were two errors that were being disclosed; correct?   09:52
5    A   That we identified, yes. Related to       09:52
6    attorneys' fees, yes.                         09:53
7    Q   Yes. Okay.                                09:53
8        The other addition that I noted in -- was  09:53
9    that in addition to -- well, let me just point you to   09:53
10   the sentence. So it says -- the sentence that says   09:53
11   "similar to the initial calculation error."   09:53
12   A   Yeah.                                     09:53
13   Q   Do you see that?                          09:53
14       It says:                                  09:53
15       "These errors caused an overstatement of the   09:53
16   attorneys' fees that were included for purposes of   09:53
17   determining a customer qualified for a mortgage loan   09:53
18   modification."                                09:53
19       And then it says:                         09:53
20       "Or repayment plan, which didn't occur in the   09:53
21   first disclosure."                            09:53
22       So what was it about repayment plans that was   09:53
23   learned in -- in that -- in that period?      09:53
24   A   It was specific to the second error that we   09:53
25   identified, that the pending fee quote that we   09:53
```

7 (Pages 22 - 25)

### Page 26

```
 1  received was not reconciled with actuals. So it was    09:53
 2  related to the second error, and that it impacted the  09:53
 3  repayment plans, which is a short-term program for a   09:54
 4  customer.                                              09:54
 5      Q   Okay. With respect to the -- the different    09:54
 6  investor programs, is there -- did the second error    09:54
 7  reach a broader group of investor loans?              09:54
 8         MS. KNIGHT: Object to form.                    09:54
 9         And also, I believe this is beyond -- getting   09:54
10  beyond the scope of the topic for which the witness   09:54
11  has been designated.                                   09:54
12         I believe she can testify about the           09:54
13  population in her personal capacity, once we finish   09:54
14  the 30(b)(6) under the standing order. I think we're  09:54
15  getting abroad of the -- the topic.                    09:54
16         MR. PAUL: Well, yeah. I think -- so the        09:54
17  issue is the discovery of the error. And so I'm       09:54
18  trying to figure out which -- how broad the error is. 09:54
19         MS. KNIGHT: Okay. I'll -- ask it again, and    09:55
20  maybe we can get it a different way.                   09:55
21         MR. PAUL: Q. Well, let's -- let's just        09:55
22  break it down.                                         09:55
23      A   Sure.                                         09:55
24      Q   We're going to have some documents that we'll 09:55
25  walk through, but I think you probably just know this. 09:55
```

### Page 27

```
 1         So of the trial loan modifications that --    09:55
 2  that you've discovered should have been granted, some  09:55
 3  of those were Fannie Mae loans; correct?              09:55
 4      A   Yes.                                          09:55
 5      Q   And some were Freddie Mac loans?             09:55
 6      A   Yes.                                          09:55
 7      Q   Were any of them VA loans?                   09:55
 8      A   I believe there was one or two. I don't know  09:55
 9  the exact number. I believe there was a VA loan which 09:55
10  referenced HUD here, but that would be under the HUD  09:55
11  program, yes.                                         09:55
12      Q   Okay. And -- and is that in the first error  09:55
13  or the second error, do you know, or both?           09:55
14         MS. KNIGHT: Object to form.                    09:56
15         THE WITNESS: I don't recall which specific,   09:56
16  first error or second error, that was in.             09:56
17         MR. PAUL: Okay. All right.                    09:56
18      Q   When the number of affected customers goes   09:56
19  from 625 to 870, is the difference between those      09:56
20  two numbers just a result of the second error, or were 09:56
21  there additional first error borrowers discovered?   09:56
22         MS. KNIGHT: Object to form.                    09:56
23         THE WITNESS: Both.                            09:56
24         MR. PAUL: Okay.                                09:56
25      Q   And same question with respect to the number 09:56
```

### Page 28

```
 1  of foreclosures that had been completed. It goes from  09:56
 2  400 to 545.                                            09:56
 3         Was that the discovery of additional first    09:56
 4  error, as well as second error?                        09:56
 5      A   Yes, both.                                   09:56
 6      Q   Okay. All right.                             09:57
 7         If you would now pull out Exhibit 392.         09:57
 8      A   (Witness complies.)                          09:57
 9      Q   There is a new section that begins in the    09:57
10  second column on page 5 that says "As Previously      09:57
11  Disclosed."                                            09:57
12         Do you see that?                               09:57
13      A   I do see that.                                09:57
14      Q   Okay. And did you also have a hand in        09:57
15  preparing this new -- or at least reviewing this new  09:57
16  language before it was published?                     09:57
17         MS. KNIGHT: Object to form.                    09:57
18         THE WITNESS: I believe I reviewed it, yes.    09:57
19         MR. PAUL: All right.                           09:57
20      Q   The -- that -- so that's -- there's a long   09:57
21  sentence there. Then the next sentence after that    09:58
22  begins "the number of previously disclosed           09:58
23  customers."                                           09:58
24         Do you see that?                               09:58
25      A   I do see that.                               09:58
```

### Page 29

```
 1      Q   All right.                                   09:58
 2         And it says that:                             09:58
 3         "The number of customers there may change as  09:58
 4  a result of ongoing validation, but is not expected to 09:58
 5  change materially."                                   09:58
 6         I take it that the -- there's a process of   09:58
 7  review, and then there's a process of validation; is  09:58
 8  that correct?                                         09:58
 9         MS. KNIGHT: Object to form.                    09:58
10         THE WITNESS: Can you be more specific?        09:58
11         Do you mean for the actual work to determine  09:58
12  impact?                                               09:58
13         MR. PAUL: I do, yes.                          09:58
14         THE WITNESS: That's correct.                  09:58
15         MR. PAUL: Okay.                                09:58
16      Q   And are -- are both phases of that, the      09:58
17  review and the validation, still ongoing today?      09:58
18      A   The validation is still ongoing.             09:58
19      Q   Okay. But the review has been completed?     09:58
20         MS. KNIGHT: Object to form.                    09:58
21         THE WITNESS: Yes.                             09:58
22         MR. PAUL: Q. And when was it completed?       09:58
23      A   I don't know the exact date. I would say    09:58
24  within the last 30 days.                              09:58
25      Q   All right.                                   09:58
```

## Page 30

```
 1      Hold on a second.                         09:58
 2         The -- in the expanded review, there are some  09:59
 3   documents that reference another software tool    09:59
 4   called -- at least what I understood to be a software  09:59
 5   tool called SLOAD.                            09:59
 6         Is that something you're familiar with?   09:59
 7   A   I am.                                     09:59
 8   Q   And did, I guess, either the first or the   09:59
 9   second error involve the SLOAD software tool as well?  09:59
10   A   Yes.                                      09:59
11   Q   And was it the first or the second, or both?  09:59
12   A   The second.                               09:59
13   Q   Okay.  And would you describe how the issue  09:59
14   implicated the SLOAD program?                 09:59
15         MS. KNIGHT:  Object to form.            10:00
16         THE WITNESS:  Within the loss mitigation  10:00
17   process, most investors require us to include any  10:00
18   attorneys' fees that have been incurred, up until the  10:00
19   point of the loss mitigation date, decision date.  10:00
20         In this case -- and -- and that -- in -- at  10:00
21   the final modification point, the process in which we  10:00
22   had in place would use actual fees that had been  10:00
23   billed and paid to the attorney.              10:00
24         And we would get a quote from the attorney  10:00
25   for what was pending, incurred, and not yet paid up  10:00
```

## Page 31

```
 1   until the decision date.                      10:00
 2         The actuals were all reconciled to all State  10:00
 3   allowables.  The control that was missed in the loss  10:01
 4   mitigation process for the decision was, we did not  10:01
 5   confirm that what the attorney gave us did not put a  10:01
 6   particular customer over the State allowable.  10:01
 7         MR. PAUL:  Okay.                        10:01
 8   Q   So let me see if I can simplify that.      10:01
 9         So the first error is, the State maximum from  10:01
10   the table would be added to whatever fees had been  10:01
11   incurred as of that date, which allowed it to be  10:01
12   higher than -- if there were incurred fees, when they  10:01
13   were added to the maximum, that put them over the  10:01
14   maximum; is that right?                       10:01
15         MS. KNIGHT:  Ob- -- object to form.     10:01
16         THE WITNESS:  I would describe that slightly  10:01
17   differently by saying billed -- incurred and paid,  10:01
18   plus the State fee matrix, versus just incurred.  10:01
19         MR. PAUL:  Oh, okay.                    10:01
20         THE WITNESS:  So paid, and then added the  10:01
21   State fee matrix.                             10:02
22         MR. PAUL:  Okay.                        10:02
23   Q   And then the second error was -- that was  10:02
24   used, the fees that were incurred and paid, just there  10:02
25   wasn't a check to see that they didn't exceed the  10:02
```

## Page 32

```
 1   allowable maximum?                            10:02
 2   A   That's correct.                           10:02
 3   Q   All right.                                10:02
 4   A   Can I -- would you mind if I go back to the  10:02
 5   question before, when you asked if the review is  10:02
 6   completed?                                    10:02
 7   Q   Yeah, go ahead.                           10:02
 8   A   I'd like to just clarify.  We're still    10:02
 9   completing under the guidance of -- can I just ask her  10:02
10   a question?                                   10:02
11         MS. KNIGHT:  Yeah, can we go off the record  10:02
12   for privilege -- possible privilege?          10:02
13         MR. PAUL:  Okay.                        10:02
14         THE VIDEOGRAPHER:  Going off the record.  The  10:02
15   time is 10:02.                                10:02
16         (Recess taken.)                         10:02
17         THE VIDEOGRAPHER:  We are back on the record.  10:04
18   The time is 10:03.                            10:04
19         MR. PAUL:  All right.                   10:04
20   Q   And you wanted to supplement your prior    10:04
21   answer?                                       10:04
22   A   Yeah, I would like to.                    10:04
23         You asked earlier if the review and the  10:04
24   validation -- what stages they're in.  And I'd like to  10:04
25   just restate, that the review is still underway.  10:04
```

## Page 33

```
 1   Q   Okay.  And is that review underway on both  10:04
 2   the first and second errors?                  10:04
 3   A   Yes.                                      10:04
 4   Q   All right.                                10:04
 5         And I take it the validation is also still  10:04
 6   going on for both first and second error?     10:04
 7   A   Yes.  I stated that one accurately earlier.  10:04
 8   Q   Okay.  And has the review uncovered any other  10:04
 9   errors related to attorneys' fees?            10:04
10         MS. KNIGHT:  Object to the form.  Also, this  10:04
11   is definitely beyond the scope.               10:04
12         You're free to ask her that question at the  10:04
13   end after we finish the testimony for which she's been  10:04
14   designated.                                   10:05
15         MR. PAUL:  Okay.  All right.            10:05
16   Q   When was the first error first discovered?  10:05
17         MS. KNIGHT:  Object to form.            10:05
18         THE WITNESS:  The calculation error was first  10:05
19   discovered and identified that the tool was -- the  10:05
20   automated tool -- in December of 2013.        10:05
21         (Document marked Exhibit 393            10:05
22         for identification.)                    10:05
23         MR. PAUL:  Ma'am, I've handed you what we've  10:05
24   marked as Exhibit 393, which is -- has an attachment  10:05
25   which is:                                     10:06
```

**Page 46**

```
 1  period, and in some instances the HPA tool?         10:23
 2       MS. KNIGHT: Object to form.                    10:23
 3       THE WITNESS: Yes.                              10:23
 4       MR. PAUL: Q. And the HPA tool would be         10:23
 5  post-October 2015?                                  10:23
 6       MS. KNIGHT: Object to form.                    10:23
 7       THE WITNESS: Yes, in those instances, where    10:24
 8  the calculation error -- it wasn't the calculation  10:24
 9  error.                                              10:24
10       MR. PAUL: Right. Okay.                         10:24
11    Q  The overview third bullet point, May 1, 2018,  10:24
12  to the present, based on the review and validation  10:24
13  that has occurred to date, do you believe that the  10:24
14  problem -- that both the first and second errors have 10:24
15  been resolved or are no longer occurring            10:24
16  post-April 31, 2018?                                10:24
17    A  I do, yes.                                     10:24
18    Q  All right.                                     10:24
19       So the population, you mentioned earlier that  10:24
20  those numbers are not correct. Let's just go through 10:24
21  each of those.                                      10:24
22       What is the current number of impacted        10:24
23  accounts for Phase 1, as you know it to be today?   10:25
24    A  I don't know the -- the -- the breakout off    10:25
25  the top of my mind by each of the phases. I know the 10:25
```

**Page 47**

```
 1  total combined.                                     10:25
 2    Q  What is the total combined?                    10:25
 3    A  946.                                           10:25
 4    Q  Okay. And what caused it to go down?           10:25
 5       Is it that there -- there were some accounts   10:25
 6  that had previously been determined to be impacted  10:25
 7  that are no longer impacted?                        10:25
 8       Why did that happen?                           10:25
 9    A  With this document being from September of     10:25
10  2018, we've continued to refine and -- and complete 10:25
11  our line of business remediation work, as well as then 10:25
12  throughout validation. It's -- it's fluctuated as   10:25
13  those efforts have been -- worked -- worked on.     10:26
14    Q  At what point in the process did letters to    10:26
15  the borrowers first go out, telling them, You've been 10:26
16  impacted by one of these errors?                    10:26
17    A  I believe it was the second week of            10:26
18  September 2018.                                     10:26
19    Q  Okay. And on how many occasions since then     10:26
20  have letters gone out to borrowers, describing that 10:26
21  they've been impacted by one of these errors?       10:26
22       MS. KNIGHT: Object to the form.                10:26
23       THE WITNESS: I need you to be more specific,   10:26
24  if you could, on the question, please.              10:26
25       MR. PAUL: Sure.                                10:26
```

**Page 48**

```
 1    Q  So I'm just trying to differentiate. I know    10:26
 2  there have been follow-up communications after a    10:26
 3  borrower gets a first letter.                       10:26
 4    A  Right.                                         10:27
 5    Q  On how many occasions, since that first        10:27
 6  mailing in September 2018, have there been first    10:27
 7  notifications to a borrower that they may have been 10:27
 8  impacted by one of these errors?                    10:27
 9       MS. KNIGHT: Object to form.                    10:27
10       THE WITNESS: I don't know the exact number     10:27
11  off the top of mind.                                10:27
12       MR. PAUL: All right.                           10:27
13    Q  Have there been occasions where Wells Fargo    10:27
14  sent a borrower a notice, a letter, saying you've   10:27
15  been -- we should have granted you a trial          10:27
16  modification and didn't, or should have granted you a 10:27
17  repayment plan and didn't, and which you've later   10:27
18  determined that they should not have received that  10:27
19  letter?                                             10:27
20    A  Yes.                                           10:27
21    Q  And do you know about how many times that's    10:27
22  happened?                                           10:27
23    A  12.                                            10:27
24    Q  And on those 12 occasions, has the bank        10:27
25  communicated back to those customers, Sorry, our first 10:27
```

**Page 49**

```
 1  letter saying we were in error was in error?        10:28
 2       MS. KNIGHT: Object to form.                    10:28
 3       THE WITNESS: No, we have not.                  10:28
 4       MR. PAUL: Okay.                                10:28
 5    Q  I know you've brought some documents with you  10:28
 6  today, and you have a notebook.                     10:28
 7       Do you have something in front of you that     10:28
 8  would give you the breakdown today between the number 10:28
 9  of Phase 1 borrowers and the number of Phase 2      10:28
10  borrowers?                                          10:28
11       MS. KNIGHT: If we can go off the record,       10:28
12  we'll --                                            10:28
13       MR. PAUL: Sure.                                10:28
14       MS. KNIGHT: Yeah.                              10:28
15       THE WITNESS: I didn't --                       10:28
16       THE VIDEOGRAPHER: Going off the record. The    10:28
17  time is 10:28.                                      10:28
18       (Recess taken.)                                10:28
19       THE VIDEOGRAPHER: We are back on the record.   10:41
20  The time is 10:41.                                  10:41
21       (Document marked Exhibit 395                   10:40
22       for identification.)                           10:41
23       MR. PAUL: All right.                           10:41
24    Q  Ma'am, I've handed you what we've marked as    10:41
25  Exhibit 395, which is a document that your counsel  10:41
```

13 (Pages 46 - 49)

```
 1  gave to me this morning.                          10:41
 2        Can you describe for me what this is, please?  10:41
 3     A  This would be all the loans that we've      10:41
 4  currently identified as either impacted, or in the  10:41
 5  12 cases, you'll note on here where they were later  10:41
 6  determined to be not impacted.                    10:41
 7        And it has various columns, including the   10:41
 8  product type and remediation amount and the status of  10:41
 9  the loan that -- the incorrect decision date.     10:41
10     Q  All right.                                  10:42
11        Let me walk through the -- some of the --   10:42
12  some of the columns --                            10:42
13     A  Okay.                                       10:42
14     Q  -- just to be sure I know what we're looking  10:42
15  at.                                               10:42
16        So the -- the loan number is going to be    10:42
17  there on their mortgage loan documents.  So that's  10:42
18  unique to a borrower; correct?                    10:42
19     A  That's correct.                             10:42
20     Q  All right.                                  10:42
21        And so I -- I understand where that was     10:42
22  removed.                                          10:42
23        But you could tie each of these to a name --  10:42
24     A  Yes.                                        10:42
25     Q  -- or names?                                10:42
                                                     Page 50
```

```
 1     Q  All right.                                  10:42
 2        And then -- let's see.  The category of     10:42
 3  "Remediation" column, would you describe that for us,  10:42
 4  please.                                           10:42
 5     A  At the time, when we identified the impact  10:42
 6  and -- we classified the -- each loan into        10:42
 7  five categories in order to determine which       10:43
 8  remediation category they were -- would be remediated  10:43
 9  under.                                            10:43
10        And that status is as of the date that we   10:43
11  identified and started the remediation for that   10:43
12  customer.                                         10:43
13     Q  All right.                                  10:43
14        Would you walk me through what each of the  10:43
15  categories are, please.                           10:43
16     A  Sure.                                       10:43
17        In order would probably be the easiest,     10:43
18  No. 1 --                                          10:43
19     Q  Yes.                                        10:43
20     A  -- even though they're not in order on the  10:43
21  spreadsheet.                                      10:43
22        The ones numbered No. 1 would be active.  And  10:43
23  active would mean they still have a Wells Fargo   10:43
24  mortgage -- that Wells Fargo mortgage with Wells Fargo  10:43
25  as the servicer.                                  10:43
                                                     Page 51
```

```
 1        The second category is foreclosure.  It's   10:43
 2  labeled FCL.  That means that the customer completed  10:43
 3  foreclosure.                                      10:43
 4        3 is labeled PIF.  That means that the      10:44
 5  customer satisfied the full mortgage, paid in full.  10:44
 6        The fourth category is short sale.  And I   10:44
 7  believe that can either mean a short sale, as it  10:44
 8  specifically said.  Our category was Liquidations  10:44
 9  there, so I don't know if on this spreadsheet, it's  10:44
10  broken out as short sale and deed in lieu.  But it's  10:44
11  liquidations, basically.  It had another exit.    10:44
12        And then the fifth category is Service TXFR.  10:44
13  That's where Wells Fargo transferred the servicing  10:44
14  rights to another servicer.                       10:44
15        And those are the five categories.          10:44
16     Q  All right.                                  10:44
17        So I assume that the Category 5 -- that could  10:45
18  be, like, they -- they refinanced with another bank,  10:45
19  and so somebody else is servicing it?             10:45
20        Or is that, you sold a batch of loans?      10:45
21     A  Service transfer would be very specific to  10:45
22  selling loans to another servicer, whether it be, you  10:45
23  know, the -- the GSE has requested a service transfer.  10:45
24  It -- it would not be a situation where a customer  10:45
25  refinanced.  If it was a refinance, that would be a  10:45
                                                     Page 52
```

```
 1  paid in full category.                            10:45
 2     Q  All right.                                  10:45
 3        So the -- the loan would not have been      10:45
 4  foreclosed on before that transfer occurred?      10:45
 5     A  Correct.                                    10:45
 6     Q  Could it have been in the foreclosure process  10:45
 7  when the transfer occurred?                       10:46
 8     A  Yes.                                        10:46
 9     Q  Okay.  All right.                           10:46
10        The next column, "Initial Remediation Amount  10:46
11  to Customer," is blank.  But that would have been the  10:46
12  amount that the customer received with -- as a check  10:46
13  with the letter that was sent out?                10:46
14     A  Yes.                                        10:46
15     Q  All right.                                  10:46
16        And then "Total Amount Received" would be, I  10:46
17  presume, any amounts from mediation or subsequent  10:46
18  discussions added to that initial check?          10:46
19     A  That's correct.                             10:46
20     Q  All right.                                  10:46
21        And then the next column, "Product Type     10:46
22  Incorrectly Decisioned," would you explain that   10:46
23  column, please.                                   10:46
24     A  Based on the investor, as well as the       10:46
25  Treasury program, depending upon who the customer's  10:46
                                                     Page 53
```

## Page 154

```
 1  programs.                                          14:16
 2      MR. PAUL: Okay.                                14:16
 3   Q  And which programs did Wells Fargo use it      14:16
 4  for?                                               14:16
 5   A  Home equity and a different portfolio that    14:16
 6  didn't have attorneys' fees in the calculation.    14:17
 7  Client 512 was the name of it.                     14:17
 8   Q  And why did Wells Fargo choose to develop its  14:17
 9  own proprietary NPV calculator, instead of using the 14:17
10  Fannie Mae NPV calculator?                         14:17
11   A  From an overall customer standpoint, to get    14:17
12  the decision as quickly as possible to the customer, 14:17
13  having any ease for our team members, having the   14:17
14  calculator built into the tool that you complete the 14:17
15  underwriting in is more timely and efficient.      14:17
16      And that's why, because as you can see in the  14:17
17  document that you're referencing, 403, there is a  14:17
18  tremendous number of additional manual steps you need 14:17
19  to go through.                                     14:17
20   Q  Okay. Do you know whether completing those     14:18
21  manual steps and -- and using the Fannie Mae NPV   14:18
22  calculator would have caught the improperly calcu- -- 14:18
23  capitalized fees?                                  14:18
24   A  I do know that.                                14:18
25   Q  Okay. And do you know that it would have?      14:18
```

## Page 155

```
 1   A  It would not have --                           14:18
 2   Q  Okay.                                          14:18
 3   A  -- caught this error.                          14:18
 4   Q  And is that because they need to be manually   14:18
 5  entered?                                           14:18
 6      MS. KNIGHT: Object to form.                    14:18
 7      THE WITNESS: Fannie's NPV calculator tool      14:18
 8  would have still contained the inaccurate amount   14:18
 9  capitalized because of the tool calculation error, 14:19
10  because those are all inputs that go into an NPV   14:19
11  model.                                             14:19
12      MR. PAUL: Q. Do you know whether -- well,      14:19
13  did the SLOAD software tool at any point in time use 14:20
14  the Fannie Mae NPV calculator?                     14:20
15   A  Fannie Mae, it did not. It used our            14:20
16  proprietary.                                       14:20
17   Q  Was it the same NPV calculator for both HPA    14:20
18  that was built into the SLOAD?                     14:20
19   A  Yes.                                           14:20
20   Q  Okay. In 2010, after the HPA tool was rolled   14:20
21  out, what processes were in place to test or audit the 14:21
22  functionality of the software?                     14:21
23   A  I'll break it down into those two separately,  14:21
24  if I -- if I could.                                14:21
25      So testing related to the rollout. When it     14:21
```

## Page 156

```
 1  was initially rolled out, there was user acceptance 14:21
 2  testing, which is just as it sounds.               14:21
 3      And then there was also a comparison to the    14:21
 4  previous various Excel tools that were used.       14:21
 5      And for auditing, I'll -- I'll put that into   14:21
 6  audits and exams kind of a category because those  14:22
 7  sometimes can be used interchangeably.             14:22
 8      We would do reviews within the line of         14:22
 9  business of underwriting decisions. It wasn't an   14:22
10  audit or exam of the tool itself, but it was the   14:22
11  output of the decision.                            14:22
12      Our credit risk team, at the corporate level,  14:22
13  would review decisions.                            14:22
14      As well, virtually all of the investors,       14:22
15  Fannie, Freddie, Treasury, FHA, all completed reviews 14:22
16  on our decisions.                                  14:22
17   Q  The -- the -- the first error that pulled the  14:22
18  max fees in, and added it to the actual fees, that was 14:23
19  a hard -- hard-coded software coding issue; right? 14:23
20      MS. KNIGHT: Object to form.                    14:23
21      THE WITNESS: It was coded into the system,    14:23
22  yes.                                               14:23
23      MR. PAUL: Okay.                                14:23
24   Q  And have you been able to determine            14:23
25  whether -- where that error occurred, in terms of  14:23
```

## Page 157

```
 1  developing the software itself?                    14:23
 2      MS. KNIGHT: I think that this was an issue    14:23
 3  earlier. Ms. Bell is not designated to speak on the 14:23
 4  programming or the coding of the tool. It's not one 14:23
 5  of the topics.                                     14:23
 6      But I do think she can speak to this in her    14:23
 7  personal capacity later. I think she can provide some 14:24
 8  information on that. So I think, if we can save that 14:24
 9  'til the end.                                      14:24
10      MR. PAUL: All right.                           14:24
11      I guess for the record, I'm going to say I'm   14:24
12  going to do that. I'm going to do this. By doing   14:24
13  that, I'm not agreeing that these are outside the  14:24
14  scope. And so we may have an issue we can take up  14:24
15  after the fact, whether that's actual corporate rep 14:24
16  testimony or not.                                  14:24
17      MS. KNIGHT: Okay.                              14:24
18      MR. PAUL: But I'll move on for now. Okay.      14:24
19      (Document marked Exhibit 404                   14:25
20      for identification.)                           14:25
21      MR. PAUL: Ma'am, I've handed you what we've    14:25
22  marked as Exhibit 404, which I'll give you a moment to 14:25
23  review. But I saw it was one of the documents that 14:25
24  we --                                              14:25
25   A  Yeah, I've seen -- I've seen this document.    14:25
```

## Page 162

1  A  I do not personally know that.  14:32
2  Q  Okay. And in the e-mail on the top of 1604,  14:32
3  which is in the back and forth again from Thomas  14:32
4  Wayne, he says:  14:32
5     "We are most concerned about the HPA  14:32
6  corporate" --  14:32
7     Let me try that again.  14:32
8     "We are most concerned about the HPA  14:32
9  corporate advances attorney foreclosure fee matrix  14:32
10  CIT 1552, CR 16548, and have an interest in promoting  14:32
11  what we believe to be a simple yet effective  14:32
12  solution."  14:32
13     The discussion that he's having at this point  14:32
14  in time, when he says "we," he's with default  14:33
15  decisioning, which is a department you're over now,  14:33
16  and he's talking to people in what appears to be other  14:33
17  departments; is that right?  14:33
18     MS. KNIGHT: Object to form.  14:33
19     THE WITNESS: Yes.  14:33
20     MR. PAUL: All right.  14:33
21  Q  And do you know whether -- again, in your  14:33
22  research of what happened, and the investigation of  14:33
23  all this, whether different departments came to  14:33
24  different views about what the solution should be, if  14:33
25  -- if -- if any?  14:33

## Page 163

1     MS. KNIGHT: Object to form.  14:33
2     THE WITNESS: From my memory of looking at  14:33
3  the documents, I believe that there were two to  14:33
4  three various solutions put forward during this time  14:33
5  frame, up until it was corrected. I don't remember if  14:34
6  it was two or three, but I know it was more than the  14:34
7  one.  14:34
8     MR. PAUL: All right.  14:34
9  Q  Let's talk about the ones -- so there was a  14:34
10  proposal back then to -- to turn the matrix off. That  14:34
11  was one of them; right?  14:34
12  A  That is correct.  14:34
13  Q  Okay. And then what's the other one that  14:34
14  you're thinking about?  14:34
15  A  The other one that I recall seeing in the  14:34
16  research to prepare was eliminating the matrix, but  14:34
17  going and asking the attorneys for the pending fee  14:34
18  amount so we could take both the billed and paid, plus  14:34
19  the pending fee, into account.  14:34
20  Q  Either of those changes could have still  14:35
21  resulted in the second error; correct?  14:35
22     Not resulted in, but still have allowed the  14:35
23  second error to occur?  14:35
24     MS. KNIGHT: Object to form.  14:35
25     THE WITNESS: I don't agree with that.  14:35

## Page 164

1     MR. PAUL: Okay.  14:35
2  Q  So -- so what about either of those changes  14:35
3  would have precluded the second error from happening?  14:35
4  A  In the first --  14:35
5     MS. KNIGHT: Object to form.  14:35
6     THE WITNESS: -- one, setting the table to 0,  14:35
7  which is what was, in fact, implemented in October --  14:35
8  by setting it to 0, it only used paid, which is  14:35
9  reconciled to the State fee amount.  14:35
10     And so, in that case, because those are  14:35
11  already reconciled, and there's no pending or State  14:35
12  fee additional matrix in, that could not result in the  14:35
13  error that was caused by issue two we've been  14:36
14  discussing.  14:36
15     MR. PAUL: Q. But the -- the error did still  14:36
16  occur with the HPA tool after the table was set to 0  14:36
17  in October of 2015?  14:36
18     MS. KNIGHT: Object to form.  14:36
19     THE WITNESS: Not where the tool was  14:36
20  corrected and set to 0.  14:36
21     MR. PAUL: All right.  14:36
22  Q  So help me with that. How could the tool  14:36
23  have not been set to 0 after October of 2015?  14:36
24  A  This morning, I mentioned that the HPA tool  14:36
25  had multiple investors and multiple programs within  14:36

## Page 165

1  the tool. There was only a certain group of investors  14:37
2  and programs in which the calculation error was  14:37
3  present.  14:37
4     And because of that, when we set those GSE  14:37
5  programs, bank and private, and owned HAMP to 0 for  14:37
6  the State fee matrix, that meant it was only using  14:37
7  what was paid, which is reconciled to the State fee  14:37
8  matrix, State allowables. And there's no error that  14:37
9  was present in those after October 2nd of 2015.  14:37
10  Q  What's the category of loan that is not  14:37
11  within those groups for which the tool was set to 0,  14:38
12  but still used HPA as opposed to SLOAD?  14:38
13  A  If I could reference the spreadsheet.  14:38
14  Q  Sure.  14:38
15  A  I don't know what number that is.  14:38
16  Q  395.  14:38
17     MS. KNIGHT: Yeah, here it is.  14:38
18     THE WITNESS: I think I gave an example  14:38
19  earlier. It was the repayment plan, so not FHA. So  14:38
20  it would have been -- I've got to find one again on  14:38
21  here.  14:38
22     MR. PAUL: Q. Page 14, I think, is the  14:38
23  example --  14:38
24  A  It was 14 that I was talking --  14:38
25  Q  Yeah.  14:39

42 (Pages 162 - 165)

```
 1   Q   All right.                                  15:13
 2       Today, given the process changes that have  15:13
 3   occurred, would it be okay to close the CIT that had  15:13
 4   the potential for customer harm if no customer harm   15:13
 5   had been identified?                            15:13
 6       MS. KNIGHT: Object to form.                 15:13
 7       THE WITNESS: No.                            15:13
 8       MR. PAUL: Q. And you'll agree that's what   15:14
 9   happened here in 2015?                          15:14
10       MS. KNIGHT: Object to form.                 15:14
11       THE WITNESS: Can you restate the question   15:14
12   for me --                                       15:14
13       MR. PAUL: Sure.                             15:14
14       THE WITNESS: -- please?                     15:14
15       MR. PAUL: And I'll -- I'll break it up.     15:14
16       THE WITNESS: Okay.                          15:14
17       MR. PAUL: Q. So as they note, they          15:14
18   hadn't -- they -- they've done a review, and they have  15:14
19   not found any customer harm; right?             15:14
20   A   That's correct.                             15:14
21   Q   And that turned out to be incorrect.        15:14
22       But at least they believed that there was no  15:14
23   customer harm?                                  15:14
24   A   Yes.                                        15:14
25   Q   But they also knew that there was some risk  15:14
                                                  Page 178
```

```
 1   that there could be. They just hadn't found it.  15:14
 2       And that's the reference to there was really  15:14
 3   low risk?                                       15:14
 4       MS. KNIGHT: Object to form.                 15:14
 5       THE WITNESS: Can you ask the -- that last   15:14
 6   question again? Because I'm --                  15:14
 7       MR. PAUL: Sure.                             15:14
 8   Q   From what you've seen here, they had -- they  15:14
 9   had done a review and not found customer harm, but  15:14
10   they couldn't rule it out.                      15:14
11       And so they knew there was still at least   15:14
12   some risk that a loan modification could be improperly  15:14
13   denied because of the excessive capitalized fees?  15:15
14       MS. KNIGHT: Object to form.                 15:15
15       THE WITNESS: Based on how it's written, I   15:15
16   would agree with that statement, not writing the  15:15
17   statement myself.                               15:15
18       MR. PAUL: Okay.                             15:15
19   Q   And it's the -- the potential that harm could  15:15
20   occur, even if they hadn't found any, that today --  15:15
21   under today's processes would require action be taken  15:15
22   before a CIT be closed; correct?                15:15
23       MS. KNIGHT: Object to form.                 15:15
24       THE WITNESS: Not always.                    15:15
25       MR. PAUL: Okay.                             15:15
                                                  Page 179
```

```
 1   Q   So what's the scenario where you could have  15:15
 2   the potential for harm, but no identification of harm,  15:15
 3   and -- and it still be okay to close it down?   15:15
 4       MS. KNIGHT: I'm going to just state that    15:15
 5   this is beyond the scope of the notice.         15:15
 6       And Ms. Bell can answer in her personal     15:15
 7   capacity.                                       15:16
 8       I'm going to give you a little leeway instead  15:16
 9   of waiting 'til the end on this, but, you know --  15:16
10       THE WITNESS: Our -- our acronyms, albeit the  15:16
11   acronym has remained the same, the process around them  15:16
12   I would describe as different.                  15:16
13       To correct the issue that is found in the   15:16
14   corrective action in today's process, so if I open a  15:16
15   CIT in which there is confirmed and validated no  15:16
16   customer impact, but we still need to correct   15:16
17   something, I can close the CIT, but the corrective  15:16
18   action remains open, until that corrective action is  15:16
19   completed.                                      15:16
20       So that's the differentiator there.         15:16
21       MR. PAUL: Q. And so, had I asked the        15:16
22   question with respect to closing the CCR, as opposed  15:16
23   to the CIT, would that have changed your answer then?  15:17
24       MS. KNIGHT: Object to form.                 15:17
25       THE WITNESS: Generally speaking, unless the  15:17
                                                  Page 180
```

```
 1   CCR evolves into a new CCR; but yes.            15:17
 2       MR. PAUL: All right.                        15:17
 3   Q   So let me ask that question without referring  15:17
 4   to earlier questions --                         15:17
 5   A   Yeah.                                       15:17
 6   Q   -- so our record is clear.                  15:17
 7   A   Thank you.                                  15:17
 8   Q   So today, under today's processes, if there  15:17
 9   was an error that had not been identified as impacting  15:17
10   any customers, but there was a known risk that it  15:17
11   could impact a customer, you would not be able to  15:17
12   close down a CCR?                               15:17
13       MS. KNIGHT: Object to form; also beyond the  15:17
14   scope.                                          15:17
15       She can answer in her personal capacity.    15:17
16       THE WITNESS: The CA, which is corrective    15:17
17   action, versus the CCR, is the chain -- a change  15:17
18   control. And so what you would not be able to close  15:17
19   is the CA, which is corrective action.          15:17
20       MR. PAUL: Okay.                             15:18
21   Q   And was that process change put in place    15:18
22   because of what happened in 2015, with respect to  15:18
23   either of these errors?                         15:18
24       MS. KNIGHT: Object to the form.             15:18
25       THE WITNESS: No.                            15:18
                                                  Page 181
```