# EXHIBIT 8

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5   ALICIA HERNANDEZ, et al.,        )
 6   individually and on behalf of    )
 7   all others similarly situated,   ) 18-cv-07354-WHA
 8              Plaintiffs,           )
 9        vs.                         )
10   WELLS FARGO & COMPANY and        )
11   WELLS FARGO BANK, N.A.,          )
12              Defendants.           )
13
14        The videotaped deposition of COSZETTA TEAGUE,
15   called for examination, taken pursuant to the
16   Federal Rules of Civil Procedure for the United
17   States District Courts, taken before
18   KAREN L. PILEGGI, CSR No. 84-3404, a Notary Public,
19   within and for the County of DuPage, State of
20   Illinois, Certified Shorthand Reporter within and
21   for the State of Illinois, Registered Merit
22   Reporter, at 35 West Wacker Drive, Chicago,
23   Illinois, June 27, 2019, at the approximate hour of
24   9:09 a.m.
```

Page 2

```
 1   PRESENT:
 2        GIBBS LAW GROUP, LLP,
          505 14th Street, Suite 1110,
 3        Oakland, California  94612,
          510-350-9703, by:
 4        MR. JOSHUA BLOOMFIELD,
          jjb@classlawgroup.com,
 5             appeared on behalf of the Plaintiffs;
 6        WINSTON & STRAWN, LLP,
          101 California Street, 35th Floor,
 7        San Francisco, California  94111,
          415-591-1000, by:
 8        MS. AMANDA L. GROVES,
          agroves@winston.com,
 9             -and-
          WINSTON & STRAWN, LLP,
10        1700 K Street, NW,
          Washington, DC  20006,
11        202-282-5322, by:
          MR. LAWRENCE E. SLUSKY,
12        lslusky@winston.com,
               appeared on behalf of the Defendants;
13
     ALSO PRESENT:  Stephanie Turner;
14                  Chennell Coleman;
15   VIDEOGRAPHER:  David Lehman,
                    Esquire Deposition Solutions;
16
17
18
19
20
21
22
23        REPORTED BY:  Karen Pileggi, CSR, RPR, RMR, CRR.
24                CSR License No. 84-3404
```

Page 3

```
 1          THE VIDEOGRAPHER:  My name is David Lehman,
 2   certified legal video specialist with Esquire
 3   Solutions located at 20 North Clark Street, Chicago,
 4   Illinois 60602.
 5          I'm the videographer on June 27, 2019,
 6   for the recording of the deposition of
 7   Coszetta Teague being taken at 35 West Wacker Drive,
 8   Chicago, Illinois 60601, at the time of 9:09 a.m. in
 9   the matter of Alicia Hernandez, et al., versus Wells
10   Fargo & Company, Case No. 18-cv-07354-WHA.
11          Will counsel please identify themselves
12   for the record, beginning with the plaintiffs'
13   counsel.
14       MR. BLOOMFIELD:  Josh Bloomfield on behalf of
15   plaintiffs.
16       MS. GROVES:  Amanda Groves and Lawrence Slusky
17   on behalf of defendants.
18       THE VIDEOGRAPHER:  Will the reporter please
19   swear in the witness.
20             (WHEREUPON, the witness was
21              duly sworn.)
22                COSZETTA TEAGUE,
23   called as the witness herein, having been first duly
24   sworn, was examined and testified as follows:
```

Page 4

```
 1                    EXAMINATION
 2   BY MS. GROVES:
 3       Q.   Good morning, Ms. Teague.
 4       A.   Good morning.
 5       Q.   We met a few minimums going, but for the
 6   record, my name is Amanda Groves.  I'm an attorney
 7   at Winston & Strawn and we are representing Wells
 8   Fargo in the lawsuit, and we are here today to take
 9   your deposition.
10            Have you ever had your deposition taken
11   before?
12       A.   No.
13       Q.   So I'll kind of go over a few of what we
14   call the ground rules that help the deposition
15   proceed a little bit more smoothly and help us get a
16   clean record.
17            The first and most important part of the
18   ground rules for a deposition is that you are under
19   oath.  You are testifying today under penalty of
20   perjury and the oath that you gave a moment ago has
21   the same force and effect as if we were sitting in a
22   court of law.  Do you understand that?
23       A.   Yes.
24       Q.   Another important aspect of the
```



Page 53

1  A.   Yes, I was staying in my car.  Yes.
2  Q.   Where did you stay in your car?  Like
3  where was your car?
4  A.   Wherever there was a park and it was safe
5  for me and my family.
6  Q.   Was the -- so the Luella Avenue property
7  was vacant, nobody was living there, correct, during
8  this time?
9  A.   During what time?
10 Q.   The time that you were in your car.
11 A.   Yes.
12 Q.   So rather than -- I'm trying to
13 understand.  Rather than living -- it was you and
14 Iesha, right?
15 A.   And my grandkids.
16 Q.   You had your grandkids at the time you
17 were in -- at the time your house was foreclosed on?
18 A.   Yes.
19 Q.   Makala and Marón?
20 A.   Makala and Marón.
21 Q.   You testified earlier that they had moved
22 out in 2012.
23 A.   Yes.
24 Q.   Does that refresh your recollection that

Page 54

1  you didn't have your grandkids in December of 2014?
2      MR. BLOOMFIELD:  Objection to form.
3  BY THE WITNESS:
4  A.   I had them, yes.
5  BY MS. GROVES:
6  Q.   So your testimony earlier that they moved
7  out in 2012 was wrong?
8  A.   No.  No.  That's right.
9  Q.   Then why did you have them in 2014 if
10 they had moved out in 2012?
11 A.   My daughter had an incident that happened
12 and they had to come back with me.
13 Q.   So it was you, Iesha, Makala and Marón
14 and for how long -- strike that.
15     Was there any reason other than advice
16 from your foreclosure attorney that you moved
17 yourself and your three children -- and three
18 children, not all yours -- but to move yourself and
19 three children out of the vacant home on Luella and
20 into a car?
21 A.   I don't understand.
22 Q.   I guess I'm trying to understand.  If the
23 house on Luella Avenue -- you're living in it,
24 right?  Nobody else is trying to move in, correct?

Page 55

1  A.   No.
2  Q.   The sheriff never showed up, right?
3  A.   No.
4  Q.   Nobody came in and said you have to --
5  nobody knocked on the door and said you need to move
6  out, we bought the house, we're trying to move in,
7  right?
8  A.   My attorney called me and told me that.
9      MR. BLOOMFIELD:  Wait --
10 BY MS. GROVES:
11 Q.   Right.  I think the cat is kind of out of
12 the bag on that.
13     Is there any reason other than your
14 attorney telling you that the sheriff was going to
15 be coming, that you moved yourself and three
16 children into a car in December of 2014?
17 A.   Yes.
18 Q.   What other reasons did you do that?
19 A.   The hot water tank went out.  We didn't
20 have no heat and we didn't have no gas.
21 Q.   In the house?
22 A.   In the house.  And there was mold in the
23 house.
24 Q.   Because I was especially curious about,

Page 56

1  it was probably very cold?
2  A.   It was.
3  Q.   In the car.
4  A.   No.  I had heat in my car.
5  Q.   But the house had no heat?
6  A.   None.
7  Q.   Why not?
8  A.   The hot water tank went out.  And there
9  was water in the basement and it was so cold that
10 mold -- mold was already in the house, but mold had
11 developed on the walls, and I wasn't going to stay
12 in there.  It was unsafe for me to stay in there.
13 Q.   You had asthma, right?
14 A.   Yes.
15 Q.   And so did Iesha?
16 A.   Yes.
17 Q.   So staying in a home with mold in it
18 sounds dangerous.
19 A.   It was.
20 Q.   And staying in a home with no heat in
21 Chicago in December sounds dangerous.
22 A.   It was.
23 Q.   Did you have anywhere else you could have
24 gone besides the car?



Page 57

1  A.  No.  I wish.  No.
2  Q.  Until you found Governors Place, I guess.
3  That was when you were able to move out and get into
4  a place with heat?
5  A.  Yes.
6  Q.  I know this is hard.  We're almost done
7  with this part.
8      How long after you moved out of the
9  Luella Avenue home with the heat problems it was
10  having into your car were you able to get into
11  Governors Place?
12  A.  It was March 2015.
13  MS. GROVES:  Let's take a little break.  I know
14  this part isn't fun.
15  THE VIDEOGRAPHER:  We are off the record.  The
16  time is 10:51 a.m.
17      (WHEREUPON, a recess was had.)
18  THE VIDEOGRAPHER:  We are back on the record.
19  The time is 10:59 a.m.
20  BY MS. GROVES:
21  Q.  Ms. Teague, I'm going to show you a
22  document that we had marked at a previous deposition
23  as Exhibit 18.
24      I guess while he's pulling that, what

Page 58

1  caused the hot water heater to break in the Luella
2  Avenue home?
3  A.  It was old.  It rust.
4  Q.  Was replacing it just really expensive?
5  A.  Yes.
6  Q.  And that caused the heat to go out also?
7  A.  Yes.
8  Q.  Is it the same issue that caused the
9  mold -- or the flood?  Or both?  That was not a good
10  question.
11      Did you say there had been some flooding
12  in the basement?
13  A.  Yes.
14  Q.  Was that connected to the water heater
15  issue?
16  A.  The flood was coming through.  Every time
17  it rained water would seep through the walls of the
18  house.
19  Q.  So that was just a function of the way
20  the house was constructed?  It was cracked?
21  A.  Yes.
22  Q.  That's what caused the mold?
23  A.  Yes.
24  Q.  Again, getting that fixed, I assume, was

Page 59

1  expensive?
2  A.  Yes.
3  Q.  Too expensive?
4  A.  Yes.
5  Q.  I'm going to show you what we had marked
6  at a previous deposition as Exhibit 18.  It's a
7  hefty document that I promise you we will not go
8  through the whole thing.
9      It's the first amended complaint in this
10  case.  We had talked earlier about you having
11  reviewed a complaint in this case, and I'm wondering
12  if this is the complaint that you have reviewed?
13      If it's helpful, you were probably
14  reviewing the parts that described your claims, in
15  particular, and those are at paragraphs 101, 102,
16  that area.
17  A.  Yes.
18  Q.  When we were talking about the complaint
19  earlier that you had reviewed at the beginning of
20  the case and then again in connection with your
21  deposition preparation, Exhibit 18 is the complaint
22  you reviewed, right?  It's this document?
23      I'll ask it again.  Do you remember
24  earlier in your deposition we were talking about the

Page 60

1  complaint that you reviewed with Josh when you first
2  started getting involved in the case?
3  A.  Yes.
4  Q.  We talked about the complaint you
5  reviewed, right?
6  A.  Yes.
7  Q.  You reviewed that same complaint
8  yesterday to help prepare for your deposition,
9  correct?
10  A.  Yes.
11  Q.  And the complaint that we were talking
12  about is what you're now looking at, Exhibit 18,
13  right?
14  A.  Yes.
15  Q.  Can you look at paragraph 104 on page 19
16  of the complaint.
17  A.  104?
18  Q.  Yes.
19  A.  Yes.
20  Q.  In paragraph 104 and in paragraph --
21  strike that.
22      Let's look at paragraph 105.  It says
23  that you lived in your car until sometime around
24  March of 2015.  March 2015 is when you moved into



Page 85

1  modification in addition to lowering the payment
2  could change any of the other terms of your
3  mortgage, like the length of the term of the
4  mortgage or the interest rate?
5       Did you have any understanding about what
6  other terms might change as a result of the
7  modification?
8   A.   No.
9   Q.   You were focused on the amount of the
10 monthly payment; is that fair?
11  A.   Yes.
12  Q.   You were trying to get the monthly
13 payment lowered from the $840?
14  A.   Yes.
15  Q.   Could you have still afforded -- go
16 ahead.
17  A.   Excuse me.  From my understanding, I
18 thought it was no longer 837.  I thought it was
19 1267.  That's -- wait a minute.  That was the
20 understanding that --
21  Q.   That's fair.  I should back up.  It was
22 the eight -- strike that.
23       If we start at the beginning it was
24 six --

Page 86

1   A.   Six seventy-two.
2   Q.   And then it went to the 838 and then
3  because you fell behind on the 838 on the escrow, it
4  went up to the 1200, right?
5   A.   Yes.
6   Q.   When you reached out to them in the --
7  when you reached out to them to talk about a
8  modification, were you looking for a lower payment
9  that was closer to the $637 that you had started off
10 with?
11  A.   Yes.
12  Q.   Could you have afforded something more
13 than the $637?
14  A.   No.
15  Q.   So you needed Wells Fargo to lower your
16 monthly payment to something below $637 in order for
17 you to afford it?
18  A.   Or if it could have stayed at the 637.
19 When I bought the house, that was my understanding
20 that it was going to be the 637.
21  Q.   Right.  So you were surprised when six
22 months later the property taxes went up, right?
23  A.   Yes.
24  Q.   If Wells Fargo could have taken your

Page 87

1  payment that had gone up due to the property taxes
2  and made the payment 637 or less, you would have
3  been able to afford it and stay in the house?
4   A.   Yes.
5   Q.   And that's why you approached them for a
6  modification?
7   A.   Yes.
8        (WHEREUPON, certain documents were
9        marked Deposition Exhibit Nos.
10       298-299 for identification, as of
11       06-27-2019.)
12 BY MS. GROVES:
13  Q.   Ms. Teague, we've put in front of you a
14 couple of documents.  Exhibit 298, which appears to
15 be a handwritten note from you dated March 7, 2012,
16 and it's WF Hernandez 61146.  Is this a letter that
17 you sent to Wells Fargo requesting the modification
18 we just talked about?
19  A.   Yes.
20  Q.   And then Exhibit 299 is also dated March
21 of 2012.  It's Bates labeled WF Hernandez 50359
22 through 61.  Is this also communication that you
23 sent to Wells Fargo in connection with your request
24 for the modification?

Page 88

1   A.   Yes.
2   Q.   You filled out the information and
3  handwriting here on Exhibit 299?
4   A.   Yes.
5   Q.   Let's look at Exhibit 298 first.  You
6  note that you're having a hard time right now --
7  hardest time, even paying your mortgage?
8   A.   Yes.
9   Q.   You note that in the past you were able
10 to pay the mortgage, but with it being $1,267 you
11 couldn't pay that amount, correct?
12  A.   Yes.
13  Q.   That was a result of the taxes we talked
14 about, right?
15  A.   Yes.
16  Q.   It was also true at this time that the
17 $838 amount was also an amount you couldn't pay,
18 right?
19  A.   Yes.
20  Q.   You didn't put in the letter that you
21 were asking for the $637 lower payment, did you?
22 You didn't include that in the letter?
23  A.   No.
24  Q.   Did you ever talk with anybody at Wells



Page 89

1 Fargo about that number, specifically?
2  A.  What?
3  Q.  I'll ask that again.
4      Did you ever have any phone conversations
5 with anybody at Wells Fargo about the fact that the
6 amount of the mortgage payment that you could afford
7 was the original 637 or less?
8  A.  Yes.
9  Q.  You told them that over the phone?
10  A.  Yes.
11  Q.  What was the response to that, if they
12 had any?
13  A.  I remember -- I recall them saying
14 regardless it was going to be the 1267.
15  Q.  Even if it was modified?
16  A.  Yes.
17  Q.  Look at Exhibit 299. You filled out, it
18 looks like, your income and your expenses. You
19 don't reference in here the child support under the
20 income.
21      Were you receiving child support in March
22 of 2012? This might have been around the time you
23 said it stopped. Do you recall?
24  A.  I don't remember.

Page 90

1  Q.  If you were receiving it, would you have
2 put it in the income?
3  A.  Yes.
4  Q.  So the fact that it's not listed as part
5 of your income in March of 2012, that leads you to
6 believe that you weren't receiving it at that time?
7  A.  Yes.
8  Q.  Did you include the income you were
9 receiving through Iesha's disability?
10  A.  No, it don't look like I did.
11  Q.  Were you receiving income from her
12 disability at that time?
13  A.  Yes.
14  Q.  Why didn't you list it?
15  A.  I don't know.
16  Q.  And then you have some expenses listed.
17 Who are the three people who were living in your
18 household in March of 2012? Does that look right to
19 you?
20  A.  No.
21  Q.  It would either be two or four, correct?
22  A.  Right. Exactly.
23  Q.  And then you have some estimates of your
24 monthly spending. Do those look about right for

Page 91

1 that time period?
2  A.  Yes.
3  Q.  So is it fair to say that even if you had
4 included Iesha's disability checks in here, your
5 expenses exceeded your income even if the mortgage
6 payment was $838?
7  A.  Yes.
8  Q.  On the first page of Exhibit 299 it says
9 select -- on the right where you provide the --
10 select the option that best matches the reason you
11 need assistance, the first box is checked, death or
12 illness of the borrower, co-borrower or a family
13 member.
14      What are you referring to there? Is that
15 your disability? I should just ask you. What was
16 that referring to?
17  A.  Repeat that.
18  Q.  What did you mean when you checked the
19 box for death or illness of the borrower,
20 co-borrower or a family member was the reason for
21 needing assistance?
22  A.  That was when I lost my mother.
23  Q.  You had burial expenses?
24  A.  Yeah.

Page 92

1  Q.  And then a box is checked for problems
2 with the property. What problems were you having
3 with the property in March of 2012?
4  A.  That was the mold.
5  Q.  That had already started in 2012?
6  A.  It was in 2011. It started in 2011.
7      I need some time.
8  Q.  That's okay. We can take a break.
9      THE VIDEOGRAPHER:  We are off the record. The
10 time is 12:07 p.m.
11      (WHEREUPON, a recess was had.)
12      THE VIDEOGRAPHER:  We are back on the record.
13 The time is 12:16 p.m.
14 BY MS. GROVES:
15  Q.  Ms. Teague, we were talking a little bit
16 before the break about the modification that you
17 requested from Wells Fargo in 2012, and specifically
18 right before the break we were talking about the
19 problems with the house. I just have one question
20 on the mold issue with the house.
21      Could you afford to have that issue fixed
22 in 2012?
23  A.  No.
24  Q.  Were you ever able to afford to have that



COSZETTA TEAGUE  
HERNANDEZ vs WELLS FARGO

June 27, 2019  
93–96

Page 93
1  issue fixed?
2     A.   No.
3     Q.   What happened with the modification
4  request that you made in 2012?  Was it granted,
5  denied?
6     A.   It was denied.
7     Q.   What did you understand the reason for
8  the denial to be in 2012?  Do you know why they
9  denied it in 2012?
10    A.   At the time I didn't know why they denied
11 it, but I got a letter recently telling me that --
12    Q.   I think that letter might be for a later
13 modification.
14    A.   Yes.
15    Q.   For the one in 2012, you were told at
16 some point that it was denied?
17    A.   Yes.
18    Q.   You don't know, as you sit here today,
19 what the reason for that was?  Do you remember?
20    A.   No.
21    Q.   Do you know if you were ever told?
22    A.   No, I can't recall.
23    Q.   At what point in time -- strike that.
24         Did the mold issue in the house, did it

Page 94
1  ever get so bad that it made the house uninhabitable
2  on its own?
3     A.   Yes.
4     Q.   When did that happen?
5     A.   Around that time, like September.  I'd
6  say between August of 2011 up until I left.  The
7  mold was -- it was really, really bad.
8     Q.   But you stayed there during that time
9  period?
10    A.   No, I couldn't, because I couldn't
11 breathe.
12    Q.   Where were you staying?
13    A.   I'm sorry.
14    Q.   Did you live in the house between
15 August 2011 and the time --
16    A.   Yes.
17    Q.   Even though the mold was really bad, you
18 stayed there?
19    A.   Right.  But you said -- you said
20 something about it getting bad.
21    Q.   Right.
22    A.   Right.  That's when I left, when it got
23 real bad.
24    Q.   Was that in August of 2011?

Page 95
1     A.   No.  It was --
2     Q.   Later when the water heater --
3     A.   Right.
4         MR. BLOOMFIELD:  Try to make sure to let her
5  finish the question.
6         THE WITNESS:  Okay.
7         MS. GROVES:  Sorry.  We're kind of doing the
8  conversation thing.  That was my fault as much as
9  anything.
10        We'll mark this one next, please.
11        (WHEREUPON, a certain document was
12        marked Deposition Exhibit No. 300,
13        for identification, as of
14        06-27-2019.)
15 BY MS. GROVES:
16    Q.   We're showing you a document that we've
17 marked as Exhibit 300.  It's Bates labeled WF
18 Hernandez 50189 to 204.
19        Did you understand that after the
20 modification was denied in 2012 that the foreclosure
21 process was going to begin?
22    A.   Yes.
23    Q.   Is Exhibit 300 a September 25, 2012
24 complaint to foreclose the mortgage on the property

Page 96
1  at issue here?
2     A.   Say that again.
3     Q.   Is Exhibit 300 a copy of the foreclosure
4  complaint for the property at issue in this case?
5     A.   Yes.
6     Q.   You had described earlier today that you
7  had hired a lawyer in connection with the
8  foreclosure?
9     A.   Yes.
10    Q.   What led you to do that?  Why did you
11 hire a foreclosure lawyer?
12    A.   For one, I was afraid that I was about to
13 lose my house.  And people were telling me that
14 that's what I should do.  And I didn't know my
15 rights.  I didn't know.  I didn't understand it and
16 didn't know what was going on.
17    Q.   How did you find the lawyer?
18    A.   Through an ad on the radio.
19    Q.   It was Matthew Wildermuth?
20    A.   Yes.
21    Q.   Did you ever meet Mr. Wildermuth in
22 person?
23    A.   No.
24    Q.   Did you ever -- I think you said



Page 97
1  somewhere he charged $4,000.  Does that sound right?
2      A.   Yes.
3      Q.   Did you ever pay him the $4,000?
4      A.   Yes.
5      Q.   Were you satisfied with his services?
6      A.   No.
7           (WHEREUPON, a certain document was
8            marked Deposition Exhibit No. 301,
9            for identification, as of
10           06-27-2019.)
11 BY MS. GROVES:
12     Q.   Showing you Exhibit 301, which is labeled
13 WF Hernandez 49565 through 867.  Did you understand
14 in August 2013 that your lawyer was submitting an
15 application for you for a modification, a mortgage
16 modification?
17     A.   Yes.
18     Q.   Did you know that?
19     A.   Yes.
20     Q.   There's -- did you give his office a
21 power of attorney to provide paperwork to the bank
22 for your mortgage modification?
23     A.   What do you mean by that, power of
24 attorney?

Page 98
1      Q.   Did you authorize Mr. Wildermuth's office
2  to submit an application for a mortgage modification
3  for you?
4      A.   Yes.
5      Q.   Have you ever seen the application that's
6  included in Exhibit 301?  It looks like it's at
7  page -- if you look in the lower right-hand corner,
8  there's numbers.  The page ending in 49570.
9      A.   Okay.
10     Q.   Do you see this is a making home
11 affordable program request for mortgage assistance?
12          Do you see that reference there on the
13 top of the left page -- the left top of the page?
14     A.   Uh-huh.
15     Q.   Yes?
16     A.   Yes.
17     Q.   Have you ever seen this before, this
18 application?
19     A.   I don't remember this.  No, I do not.  I
20 don't remember seeing this.
21     Q.   We walked through earlier, I think, what
22 your income was at the time of -- in August of 2013?
23     A.   Yes.
24     Q.   Had anything in your situation improved

Page 99
1  by 2013 such that you could afford to make -- strike
2  that.
3           As of the modification request in 2013,
4  were you still seeking to have the reinstatement of
5  the payment of 638 or less for a modification?
6  That's still the amount you were looking for?
7      A.   Yes.
8      Q.   In connection with this modification
9  application, did you have any conversations with
10 anybody at Wells Fargo about the fact that you were
11 looking for a modification in that amount?
12     A.   Repeat that.  I didn't get it.
13     Q.   No problem.
14          So we talked earlier in connection with
15 the 2012 mortgage modification application that you
16 had wanted to have a payment of $637 or less in
17 connection with the 2012 modification request,
18 right?  Do you remember that?
19     A.   Yes.
20     Q.   You had said you did have a conversation
21 with somebody at Wells Fargo about that and that
22 they told you the payment was 1200, right?
23     A.   Yes.
24     Q.   And then we're fast-forwarding.  Now

Page 100
1  we're in 2013 and you are still looking for a
2  mortgage modification with a payment in that amount,
3  right?
4      A.   Yes.
5      Q.   Did you have any conversations with
6  anyone at Wells Fargo in connection with this 2013
7  modification about that?
8      A.   No.  I just wanted to make sure I
9  understood it.
10     Q.   That is an excellent thing to do.
11     A.   It got confusing.  Okay.
12     Q.   It worked out just fine.  I understand
13 the answer.
14     A.   Thank you.
15     Q.   What happened with your lawyer?  What did
16 he accomplish with you?
17     A.   Thank you for asking me that.  Nothing.
18 You know, I don't even know what this is.  I never
19 saw this.  I didn't have -- they really didn't
20 communicate with me.  I was just stuck.
21     Q.   You never -- did you even ever talk with
22 Mr. Wildermuth?
23     A.   Never.  I never met that man.  Never.  He
24 never even spoke -- I didn't even know who he was.

