# EXHIBIT 15

Delacruz.txt
25   automatic final copy order.

1

 1                 DEPOSITION OF JERRY DELA CRUZ

 2                    DECEMBER 10, 2019

 3                    ROUGH DRAFT ONLY

 4

 5          THE VIDEOGRAPHER:  Good morning.  We are

 6   now on the video record on December 10th, 2019.  The

 7   time is 9:31 a.m.  My name is Kevin McMahon.  The

 8   court reporter today is Mona Russo.  We're both here

 9   representing Esquire Deposition Solutions in San

10   Francisco, California.

11          This is the beginning of disk 1 for the

12   deposition of Jerry Dela Cruz in the matter of

13   Hernandez, et al., versus Wells Fargo Bank, N.A.

14   The case number is 18 CV 0735 WHA.  We are located

15   at Winston Strawn, 101 California Street, 35th

16   Floor, San Francisco, California, 94111.

17          Counsel, would you please identify

18   yourselves for the record?

19          MS. ROSS:  Sure.  Joelle Ross from

20   Winston & Strawn on behalf of the defendants.

21          MR. FLINT:  Ariel Flint from Winston &

22   Strawn on behalf of the defendants.

23          MS. LAM:  Linda Lam of Gibbs Law Group for

                            Delacruz.txt
24   plaintiffs.

25          MR. KOSBIE:  Jeffrey Kosbie of Gibbs Law
                                                          2
 1   Group for plaintiffs.

 2          THE VIDEOGRAPHER:  The court reporter may

 3   swear in the witness.

 4          (The witness was sworn by the reporter.)

 5          THE VIDEOGRAPHER:  Please proceed.

 6   BY MS. ROSS:

 7      Q   Mr. Dela Cruz, can you please state your

 8   name for the record?

 9      A   My name is Jerry Dela Cruz.

10      Q   And I know we met a moment ago.  I'm

11   Joelle Ross.  I'm one of the attorneys for the

12   defendant, Wells Fargo, and I'm going to be asking

13   you a series of questions related to this lawsuit

14   today.

15          Are you prepared to testify today?

16      A   Yes.

17      Q   Is there any reason why you cannot testify

18   fully and truthfully today?

19      A   No, I don't think so.

20      Q   Do you understand that you are under oath

21   today?

22      A   Yes.

Delacruz.txt

23      Q    Have you ever been a witness in a

24   deposition before?

25      A    Not at all.

                                                    3

1        Q    How about have you ever given sworn

2    testimony in a trial?

3        A    No.

4        Q    To make sure that we have a clean record,

5    I'm just going to ask that you answer my questions

6    verbally, which you have been doing, so just make

7    sure to not shake your head yes or no?

8        A    Okay.

9        Q    Please don't use unclear answers like

10   uh-huh or mh-hm.  And I'm going to do the same

11   myself.  Does that sound good?

12      A    I'm going to try not to move my head.

13   Yes.

14      Q    And if you don't understand a question for

15   any reason, just ask me to rephrase the question.

16   Is that okay?

17      A    Yes.

18      Q    Okay.  We're going to try to take a break

19   every hour or so, and if you need to take a break at

20   any time, just let us know and we can pause, but I

21   will ask that if a question is pending, that you

Delacruz.txt

22    answer the question before we take our break.  Is

23    that okay?

24         A    Okay.

25         Q    Okay.  Are you being represented by

                                                    4

 1    counsel today?

 2         A    Yes.

 3         Q    And who is your counsel?

 4         A    These guys right here, I think.

 5         Q    Do you know their names?

 6         A    Jeff and Linda.

 7         Q    Okay.  And they're from Gibbs Law Group?

 8         A    Yes.

 9         Q    Okay.  When did you retain them as your

10    counsel?

11         A    Today, I believe.  I met them today.

12         Q    What time?

13         A    About 8:30.

14         Q    And where did you meet them?

15         A    In the lobby downstairs.

16         Q    Downstairs of this building?

17         A    Yes.

18         Q    Okay.  And did you meet with them?

19         A    Yes, prior to this deposition.

20         Q    So it's about 9:30 now.  So you've met

                        Delacruz.txt
21   with them for about an hour?

22        A    I believe so, yes.

23        Q    Okay.  Did you review any documents with

24   counsel?

25        A    No.
                                                      5
1         Q    Did you -- so you didn't review any

2    documents to refresh your recollection of what

3    happened?

4         A    No.

5         Q    Okay.  So I'm going to show you what we're

6    going to mark as Exhibit 601.

7              THE REPORTER:  601.

8              MS. ROSS:  Thank you.  601.

9              (Defendant's Exhibit    was marked for

10             identification.)

11   BY MS. ROSS:

12        Q    It's a copy of the federal court subpoena

13   that you received.

14        A    Yes.

15        Q    Do you recognize this document?

16        A    Yes, I do.  I'm sorry.

17        Q    And you were served with this document on

18   November 30th; is that right?  On or about

19   November 30th?

                        Page 6

Delacruz.txt

20      A    Yeah, I think so.

21      Q    Okay.  Did you read through this document

22   when you received it?

23      A    A little bit, yes.

24      Q    Okay.  And if you look at the first page,

25   it says you are commanded to appear at the time,

                                                         6

 1    date and place set forth below to testify at a

 2   deposition to be taken in this civil action.  And

 3   then it provides the address for this office, and it

 4   says December 10th at 9:00 a.m.; is that right?

 5      A    Yes.

 6      Q    And so that's why you are here today?

 7      A    Yes.

 8      Q    Is that right?

 9      A    Yes.

10      Q    Okay.  Also on the first page, it says

11   production, and it says that you must bring to the

12   deposition the following documents:  Electronically

13   stored information or objects, see attached

14   Exhibit A.  Do you see that?

15      A    Yes.

16      Q    Okay.  Turning to Exhibit A, which is

17   about the fourth page of the document, did you

18   review Exhibit A when you received this subpoena?

Delacruz.txt

19      A    Yes, just a little bit.

20      Q    And did you bring any documents with you

21   today that were in response to these requests?

22      A    No, I don't think so.

23      Q    Did you bring any documents with you

24   today?

25      A    Yes.

7

1      Q    And you provided those documents to

2   counsel?

3      A    Yes.

4      Q    All of the documents you brought with you

5   today?

6      A    Yes.

7      Q    Okay.  What did you do to prepare for your

8   deposition today?

9      A    I just collected all the documents that I

10   had, and that was pretty much it.

11      Q    And what were the documents that you

12   collected?

13      A    It was receipts from checks that Wells

14   Fargo has given me.

15      Q    Do you remember what the dates of those

16   checks were offhand?

17      A    One was, I believe, September 2018, and

Delacruz.txt

18   then one was, I think, last month.

19        Q    Were there any other documents that you

20   collected besides the checks?

21        A    No.

22        Q    Did you do anything else to prepare for

23   your deposition?

24        A    Not at all.  I didn't know it was going to

25   happen.

                                                          8

 1        Q    You met with counsel?

 2        A    I met with them, yes.

 3        Q    Okay.  Have you spoken with anyone else

 4   besides your counsel about your deposition today?

 5        A    No.

 6        Q    Have you spoken with anyone besides

 7   counsel about this lawsuit?

 8        A    No.

 9        Q    Have you ever been a party to another

10   lawsuit?

11        A    No.

12        Q    Have you ever gone by any other names?

13        A    No.

14        Q    No nicknames?

15        A    No nicknames.

16        Q    Okay.  Are you currently married?

Delacruz.txt

```
17      A    No.

18      Q    Have you previously been married?

19      A    No.

20      Q    Do you have any children?

21      A    No.

22      Q    You currently reside in Daly City?

23      A    Yes.

24      Q    Is that how you say it?

25      A    Yes.
                                                    9
 1       Q    Okay, great.  Daly City, California.  Is

 2  that a suburb of San Francisco?

 3      A    Yes, it is.

 4      Q    And how far away is it from this office

 5  here?

 6      A    Well, when I Googled it, Google mapped, it

 7  was 40 minutes.  That's because of traffic.

 8      Q    40 minutes because of traffic?

 9      A    Yeah, but if not, probably 20 minutes.

10      Q    Did you drive here today?

11      A    Yes, I did.

12      Q    Did you pay for your own gas and expenses

13  to get here today?

14      A    Yes, I did.

15      Q    How long have you lived in Daly City,
```

Delacruz.txt

16    California?

17          A    2012, seven years.

18          Q    Do you own the home you currently reside

19    in?

20          A    No, I don't.

21          Q    Do you rent?

22          A    Yes, I do.

23          Q    Do you live by yourself?

24          A    No, I don't.

25          Q    Who do you live with?

                                                            10

1          A    I live with my cousin.

2          Q    Who is your cousin?

3          A    Oscar.

4          Q    What's Oscar's last name?

5          A    Galay.

6          Q    And how old is Oscar?

7          A    44.

8          Q    Do you live with anyone else?

9          A    His wife.

10          Q    And what's her name?

11          A    Erica.

12          Q    Is her last name Galay as well?

13          A    Yes, it is.

14          Q    And how old is she, about?

Delacruz.txt

15      A    34.

16      Q    Okay.  Do you live with anyone besides

17   Oscar and Erica?

18      A    No, just us three.

19      Q    And have you lived with Oscar and Erica

20   the whole seven years you've lived in Daly City?

21      A    No.

22      Q    When did you move in with Oscar and Erica?

23      A    Maybe a year after.

24      Q    Okay.

25      A    2013, '14, something like that.  She came
                                                          11
 1   later.

 2      Q    When did she move in?

 3      A    '14, I think, 2014.

 4      Q    And did you live with anyone the first

 5   year you lived in Daly City?

 6      A    No.

 7      Q    Have you lived with anyone else besides

 8   Oscar and Erica during that seven-year period you've

 9   lived in Daly City?

10      A    No.

11      Q    The property that we're going to be

12   discussing today is located in Stockton, California;

13   is that right?

Delacruz.txt

14      A    Yes.

15      Q    How far is Stockton, California, from

16  here?

17      A    I believe two hours, a two-hour drive.

18      Q    Two hour driving?

19      A    Yes.

20      Q    I want to now turn to a bit about your

21  background.  Can you please tell me about your

22  educational background, beginning with high school?

23      A    Yes.  I went to South San Francisco high

24  school, all four years.

25      Q    Did you attend college?

                                                    12

1       A    I went to CSM, community college

2   San Mateo, for, I think, a year and a half.

3       Q    Did you receive a degree from there?

4       A    No, I didn't.

5       Q    Did you do any other postgraduate classes?

6       A    I took machining courses, welding course

7   at City College, and I believe that's it.

8       Q    Did you receive any type of certificate

9   from those courses, the machining course and welding

10  course?

11      A    No, not at all.

12      Q    What did you study when you were at

Delacruz.txt

13    San Mateo college?

14         A    I was just doing general, general

15    education.

16         Q    What about your professional background?

17    Well, let me back up.

18              When did you take these classes at

19    San Mateo college?

20         A    I don't remember.  It was such a long time

21    ago.

22         Q    Okay.  Okay.  Then let's switch, I guess,

23    to your professional background.  Are you currently

24    working?

25         A    Yes, I do, I am.

                                                    13

 1         Q    And what do you do?

 2         A    I work for a surgical company.  We

 3    manufacture surgical instruments for spinal and

 4    orthopedic surgery.

 5         Q    How long have you worked at this company?

 6         A    12 years.

 7         Q    So since about 2007?

 8         A    I think so, yes.

 9         Q    And what was the company's name?

10         A    West Coast surgical.

11         Q    West Coast surgical?

Delacruz.txt

12      A    Mh-hm.

13      Q    Have you had the same role at West Coast

14  surgical the whole 12 years you've worked there?

15      A    Yes.

16      Q    What's your job title?

17      A    Supervisor, production supervisor.

18      Q    So you've been a production supervisor the

19  whole 12 years?

20      A    Yes.

21      Q    Okay.  What are your general

22  responsibilities as a production supervisor?

23      A    Making sure we stay on schedule, send out

24  the instruments at the end of the month, our quota,

25  hit our quota.

                                                    14

 1      Q    Anything else?

 2      A    That's it, I believe, yeah, and work hard,

 3  of course.

 4      Q    Yes.  Us, too.  Where is West Coast

 5  surgical located?

 6      A    It is in Half Moon Bay, California.

 7      Q    Where is that?

 8      A    Off the coast.  It's by Pacifica, further

 9  down, Highway 1.

10      Q    Yeah.

Delacruz.txt

11      A    Going towards Santa Cruz.

12      Q    Okay.

13      A    Yeah.  It's a small little town out there.

14      Q    And how far -- is it driving distance?

15      A    Yes.

16      Q    How far?

17      A    From my place, it's 14 and a half miles, I

18  believe.

19      Q    Okay.

20      A    Mh-hm.

21      Q    When you started at West Coast surgical in

22  2007, what was your salary?

23      A    I don't remember.

24      Q    Can you give me a ballpark?

25      A    17, 18.

15

1       Q    Are you talking 17 --

2       A    Dollars an hour.

3       Q    $17 an hour?

4       A    And 18, yes.

5       Q    Okay.  Are you an hourly employee?

6       A    I'm on the clock still.

7       Q    Okay.  And how many hours per week do you

8   usually work?

9       A    I do a lot of overtime, so maybe ten-hour

Delacruz.txt

10    days.

11         Q    For five days a week?

12         A    Yeah.  Well, not Fridays, just -- I do a

13    regular eight on Fridays.

14         Q    Okay.  So --

15         A    Like Monday to Thursday, it's ten-hour

16    days.

17         Q    Okay.  So between a 40 to 50 hour

18    workweek?

19         A    Yes.

20         Q    Did you receive any promotions in those 12

21    years at West Coast surgical?

22         A    No.

23         Q    Did you receive any pay raises in those 12

24    years?

25         A    Yes.

                                                        16
 1         Q     When was that?

 2         A    Yearly, every year.

 3         Q    And how much did you -- how much does it

 4    go up each year?

 5         A    Depending on my performance that year.

 6         Q    I guess let's go year to year then.  So in

 7    2007, it was around 17 to $18 an hour.

 8              What was it in 2008?

Delacruz.txt

9      A   I think they went 8 percent up.

10     Q   Okay.

11     A   Yeah, something like that.

12     Q   And then what about 2009?

13     A   Probably the same thing.

14     Q   Okay.  Was it the same thing in 2010?

15     A   I believe so.

16     Q   And 2011?

17     A   Yeah.

18     Q   Is it usually 8 percent increase each

19  year?

20     A   Yeah.

21     Q   Is there any year you remember it being

22  much higher or lower than 8 percent?

23     A   No.

24     Q   What are you currently making today?

25     A   Close to $30 an hour.

                                                    17

1      Q   And are you still working that 40 to

2   50-hour workweek?

3      A   Yes.

4      Q   Do you ever work weekends?

5      A   Once in a while.

6      Q   Okay.  But it's not usual?

7      A   Not usual, only for -- to get that quota.

Delacruz.txt

8      Q    Yeah.  What's the overtime rate?

9      A    Time and a half, I believe.

10     Q    Time and a half?

11     A    Yes.

12     Q    And does overtime kick in once you hit 40

13  hours?

14     A    Yes, I believe so.

15     Q    Where did you work before West Coast

16  surgical?

17     A    I've been working -- doing the same thing

18  for about 21 years.  So I worked for -- it was

19  actually a previous owner.  He owned the old

20  company.  So I was working for pacific surgical

21  innovation, and I was doing that for about ten

22  years, also.

23     Q    Oh, wow.

24     A    Yeah, yeah, yeah, a total of 20 years I've

25  been doing the same -- same thing.

                                                18

1      Q    Yeah, that's great.

2      A    Yeah.

3      Q    Is it the same location, even?

4      A    No, not at all.  It's in San Carlos.

5      Q    Has the location for West Coast surgical

6  been the same the whole 12 years?

Delacruz.txt

7      A    No.  That was new.  Oh, yeah, yeah.  I'm

8   sorry.  12 years, yes.

9      Q    Yes.  Okay.

10     A    I'm sorry.

11     Q    No problem.  Okay.

12          So during this 12-year period, did you

13   have any other sources of income besides your job?

14     A    No.

15     Q    Do you have any investments?

16     A    Just my 401(k).

17     Q    What about people who contributed to

18   household expenses, like Oscar or Erica?

19     A    Yeah, we share on stuff for the house, of

20   course.

21     Q    Okay.  And what do you mean by that?

22     A    Like toilet paper, just stuff like garbage

23   bags, you know, food.

24     Q    Groceries?

25     A    Groceries, yes.

                                              19

1      Q    What about utilities?

2      A    Yes, utilities, also.

3      Q    What about cable?

4      A    Yes, cable, the usual.

5      Q    Is it -- do you split it three ways?

Delacruz.txt

```
 6      A    Two ways.

 7      Q    What about rent?

 8      A    Yes.  We split it two ways.

 9      Q    How much is the rent total?

10      A    17.

11      Q    Hundred?

12      A    Yes.

13      Q    1700?

14      A    Yes, yes.

15      Q    So you pay -- oh, my gosh -- 650?

16      A    Yes.

17      Q    Is it a condo you guys live in?

18      A    We stay in an in-law.

19      Q    What's an in-law?

20      A    It's an extension of a house.  We stay at

21   the bottom, downstairs.

22      Q    Oh.

23      A    They fixed it up, added some rooms.

24      Q    Oh, nice.

25      A    Yeah.
                                                  20
 1      Q    Do you have a car?

 2      A    Yes.

 3      Q    Is it your car?

 4      A    Yes.
```

                        Delacruz.txt
5        Q    Do you pay for all expenses on the car?

6        A    Yes.

7        Q    You don't split the car expenses with

8   Oscar or Erica?

9        A    Not at all.

10        Q    Have you ever filed for bankruptcy?

11        A    No.

12        Q    One last question about your household

13   expenses:  Have you and Oscar and Erica been

14   splitting the household expenses two ways the entire

15   time you've lived together?

16        A    Yes.

17        Q    And you've lived together at the same

18   apartment the whole time?

19        A    Yes.

20        Q    Okay.  And what's the address of that

21   apartment?

22        A    It's 583 Gellert Boulevard, Daly City,

23   California.

24        Q    Oh, I did my math wrong.

25             You've been paying 850 a month in rent?
                                                        21
1        A    Yes.

2        Q    I think I misstated and said 650 earlier.

3   Okay.  So you pay 850.  Great.

                        Page 22

Delacruz.txt

```
 4              So turning now to the loan at issue, this

 5    loan concerns property at 2942 Fisher Court,

 6    Stockton, California, 95207; is that right?

 7        A    Mh-hm.

 8        Q    And I believe it's condo Number 1934?

 9        A    I'm not sure.

10        Q    What's -- what's the addresses that you

11    know for the property at issue?

12        A    I remember Fisher court.

13        Q    Okay.  Well, we can look at documents

14    where it has the condo number.

15        A    Okay.

16        Q    It is a condo, though; is that right?

17        A    Yes.

18             MS. ROSS:  Can we mark this as 602,

19    please?

20             (Defendant's Exhibit     was marked for

21              identification.)

22    BY MS. ROSS:

23        Q    I'm now showing what we've marked as

24    Exhibit 602, which is, if you look at the bottom

25    right, these are called Bates numbers, and so when I
                                                         22
 1    refer to a Bates number throughout the day today,

 2    those are the numbers I'm referring to.  It's just
```

Delacruz.txt

3    easy for page numbering purposes.

4         A    Okay.

5         Q    So this document is labeled WFHERNANDEZ

6    00175713 through 175716.

7         A    Okay.

8         Q    Do you recognize this document?

9         A    I don't remember this document.

10        Q    Do you want to take a minute to review it?

11   If you turn to the last page of the document, in the

12   middle of the page, is that your signature?

13        A    Yes.

14        Q    And it's dated May 5th, 2011?

15        A    Yes.

16        Q    So this document is a loan application,

17   and you can see that on the first page; is that

18   right?

19        A    Yes.

20        Q    And also on the first page, it has the

21   subject property address as 2942 Fisher Court,

22   Stockton, California, 95207.

23             Do you see that?

24        A    Mh-hm.

25        Q    So it's a loan application for that

                                                      23
1    property?

Delacruz.txt

2      A    Okay.

3      Q    That you signed; is that right?

4      A    Yes, yes.

5      Q    Okay.  Just making sure.

6      A    Sorry.  Yes, I am.

7      Q    And then also it's a little bit of a bad

8  copy of the document, so I apologize, but it's all

9  we have.  Above the property address, it's the terms

10  of the mortgage and it says amount, 41,400.  Do you

11  see that?

12      A    Yes.

13      Q    Do you recall that the loan application

14  was for a loan of 41,400?

15      A    No, I don't recall.

16      Q    What do you remember the loan to be?

17      A    Actually, I don't remember.  I just filled

18  this out.

19      Q    Do you have any reason to doubt that you

20  requested a loan in the amount of 41,400?

21      A    No.

22      Q    So it's possible that this is what you

23  filled out?

24      A    Yes, yes, of course.

25      Q    In 2011, and that you requested a loan of

                                                  24

Delacruz.txt

↥    1    $41,000?

2         A    Mh-hm.

3         Q    Okay.

4              THE REPORTER:   This is 603.

5              (Defendant's Exhibit     was marked for

6              identification.)

7    BY MS. ROSS:

8         Q    I am now showing you what we've marked as

9    Exhibit 603, which is Bates labeled 175076

10   to 175081.

11             Do you recognize this to be the note for

12   the property at 2942 Fisher Court, Stockton,

13   California?

14        A    No, I don't.  I don't remember this.

15        Q    If you look at the top left, this document

16   is dated May 4th, 2011.

17             Do you see that?

18        A    Yes, yes.

19        Q    And if you turn to the second to last

20   page, is that your signature?

21        A    Yes.

22        Q    So you signed this document; is that

23   right?

24        A    Yes.

Delacruz.txt

25      Q    Did you review this document before you
                                                          25
  1   signed it?

  2       A    I believe I did at that time, yes.

  3       Q    And turning back to the first page, do you

  4   see it says borrower's promise to pay, and then it

  5   says I promise to pay $41,400?  Do you see that?

  6       A    Yes.

  7       Q    Okay.  So this refreshes your recollection

  8   that your loan was in the amount of $41,400?

  9            MR. KOSBIE:  I object to form.

 10   BY MS. ROSS:

 11       Q    Was your loan in the amount of $41,400?

 12       A    Yes.

 13       Q    Okay.  In the middle of the first page,

 14   underneath paragraph 3, payments, subsection B,

 15   amount of monthly payment, my monthly payment will

 16   be in the amount of $235.06.

 17            Do you see that?

 18       A    Yes.

 19       Q    Were your monthly payments under the loan

 20   $235.06?

 21       A    Yes.

 22            MS. ROSS:  604.

 23            (Defendant's Exhibit    was marked for

Page 27

                          Delacruz.txt
24          identification.)

25     BY MS. ROSS:
                                                            26
 1          Q    I'm now showing you what we've marked as

 2     Exhibit 604, which is Bates labeled WFHERNANDEZ

 3     00175156 to 175177, which is the deed of trust for

 4     the Fisher Court property.

 5               Do you recognize this document as the deed

 6     of trust for the property at issue?

 7          A    No, I don't.

 8          Q    Turning to the second page of the

 9     document, do you see that the document underneath

10     the words deed of trust, it is dated May 4th, 2011?

11          A    Mh-hm.

12          Q    And it lists you, Jerry Dela Cruz, as the

13     borrower?

14          A    Yes.

15          Q    And if you turn to the page ending in

16     Bates Number 175169, which is in the middle of the

17     document, do you see your signature there?

18          A    Yes.

19          Q    So you signed this document?

20          A    Yes.

21          Q    Did you read through this document before

22     you signed it?

                          Page 28

Delacruz.txt

23     A    I'm sure I did at that time, but I don't

24  remember now.

25        Q    Turning now to the page ending in 175159,

27

 1   which I think is about the fourth page of the

 2  document, if you look at the section uniform

 3  covenants, and then look at Number 1, payment of

 4  principal, interest, escrow items, prepayment

 5  charges, and late charges, will you please take a

 6  moment to read through this paragraph?

 7        A    Out loud?

 8        Q    Oh, no.

 9        A    Oh, I'm sorry.

10        Q    Just your -- just read what it says.

11             (Document review.)

12             THE WITNESS:   Okay.

13  BY MS. ROSS:

14        Q    In your own words, what does this

15  paragraph mean to you?

16        A    It means I have to pay them because I

17  signed a form.

18        Q    And now turning to the page ending

19  in 175168, which is in the middle of the document,

20  underneath nonuniform covenants, paragraph 22,

21  acceleration remedies, will you take a moment and

Page 29

Delacruz.txt

22   read through this paragraph?

23        A    Okay.

24             (Document review.)

25             THE WITNESS:  Okay.
                                                      28
  1   BY MS. ROSS:

  2        Q    In your own words, what does this

  3   paragraph of the agreement mean to you?

  4        A    That I have to pay them back agreement,

  5   security instruments.

  6        Q    Is it fair to say that this paragraph says

  7   Wells Fargo can require immediate payment of the

  8   mortgage if you fail to pay monthly payments before

  9   the due date?

 10             MR. KOSBIE:  I object as to form.

 11             THE WITNESS:  Yes.

 12   BY MS. ROSS:

 13        Q    And looking at the first paragraph under

 14   paragraph 22, like the first section at the top, the

 15   second to last sentence of that paragraph says, if

 16   the default is not cured on or before the date

 17   specified in the notice, lender at its option may

 18   require immediate payment in full of all sums

 19   secured by this security instrument without further

 20   demand and may invoke the power of sale and any

Delacruz.txt
21    other remedies permitted by applicable law.

22            Do you see that?

23       A    Yes.

24       Q    Did you read this paragraph when you --

25    before you signed the document?
                                                       29
 1       A    No, I didn't.

 2       Q    So you never read this paragraph before?

 3       A    No.

 4       Q    When you signed this security instrument

 5    here today, that's here in front of you -- let me

 6    start over.

 7            When you signed this deed of trust, did

 8    you understand that you were required to make

 9    monthly payments on time?

10       A    Yes.

11       Q    And did you understand that if you did not

12    make monthly payments on time, Wells Fargo had the

13    right to require immediate payment of the mortgage

14    in full?

15            MR. KOSBIE:  I object as to form.

16            THE WITNESS:  No, I didn't know that.

17    BY MS. ROSS:

18       Q    But it's stated in this paragraph that we

19    just looked at; is that the?

Delacruz.txt

20      A    Yes.

21           MR. KOSBIE:   I object as to form.

22   BY MS. ROSS:

23      Q    So you just did not read the paragraph?

24      A    This one right here?

25      Q    Before you signed?
                                                        30
 1      A    No, I didn't.

 2      Q    Did you read the document before you

 3   signed?

 4      A    Not all of it.

 5      Q    Turning to -- in this document, turning to

 6   the second to last page, which is Bates

 7   numbered 175176, do you see this page is called

 8   second home rider?

 9      A    Mh-hm.

10      Q    And it is dated May 4th, 2011; is that

11   right?

12      A    Yes.

13      Q    And it has the property address 2942

14   Fisher Court in Stockton, California?

15      A    Yes.

16      Q    And if you turn the page to the last page

17   of the document, is that your signature?

18      A    Yes.

```
                          Delacruz.txt
19      Q    So you signed this document?

20      A    Yes.

21      Q    Did you review the document before you

22  signed?

23      A    No.

24      Q    Did you work with an attorney to obtain

25  this mortgage?
                                                        31
 1      A    No.

 2      Q    Did you work with -- or was anyone with

 3  you when you signed all these documents?

 4      A    My uncle.

 5      Q    And who's your uncle?

 6      A    Oscar, Oscar, senior, Galay, senior.

 7      Q    Oscar Galay, senior?

 8      A    Yeah.

 9      Q    Did Oscar review these documents?

10      A    I don't know if he did.

11      Q    Did he see the documents?

12      A    I'm sure he did, yes.

13      Q    Did you guys discuss the contents of the

14  mortgage?

15      A    Yes.

16      Q    Is the property at 2942 Fisher Court the

17  first home that you've owned?
```

Delacruz.txt

18      A    Yes.

19      Q    Was the property at 2942 Fisher Court your

20   primary residence?

21      A    No.

22      Q    What was your primary residence?

23      A    At that time, I was living in Pacifica.

24      Q    In 2011?

25      A    Yes.
                                                        32
 1      Q    What was your address in Pacifica?

 2      A    I thought I saw it on one of these that I

 3   filled out the form.  Right here, 336 Glen court

 4   way, Pacifica, California.

 5      Q    Can you let me know what exhibit you're

 6   looking at?

 7      A    Oh, yeah, sorry.

 8      Q    What's the number at the bottom?  Sorry.

 9      A    602.

10      Q    Okay.  And what is the page number at the

11   bottom right -- I mean, the Bates number?

12      A    713 -- 00175713.

13      Q    Got it.  Thank you.  Okay.  I see what

14   you're looking at.  335 Glen court way, Pacifica,

15   California?

16      A    Yeah.

Page 34

Delacruz.txt

17      Q    And that was your address in 2011?

18      A    Yes.

19      Q    Where is Pacifica, California?

20      A    It is next to Daly City.  It's the city

21 over.  They're very close.  It's pretty much the

22 same city over.

23      Q    So 45 minutes from here?

24      A    Same thing, yeah, with traffic.

25      Q    With traffic?

33

1      A    Yeah, yeah, very close.

2      Q    How long did you live at that address in

3 Pacifica?

4      A    Five -- five years, I believe.  I'm not

5 too sure.  Five years, yeah, so '06, 2006.

6      Q    So 2006 to about 2011?

7      A    '11, yeah.

8      Q    And where did you move after you left the

9 Pacifica address?

10      A    I moved to Daly City.

11      Q    And that was in about 2012?

12      A    Yes.

13      Q    Did you live with anyone at the Pacifica

14 address?

15      A    I lived with my mom at the time, yeah.

Delacruz.txt

16        Q    Anyone else?

17        A    No.

18        Q    Did you own the home at the Pacifica

19   address?

20        A    No.

21        Q    Were you renting?

22        A    Yes.

23        Q    How much were you paying in rent?

24        A    I was renting a room there.  It was, I

25   think, around 7, 700.

34

 1        Q     700 a month?

 2        A    700 a month, yes.

 3        Q    Did you split the cost with your mom?

 4        A    No.

 5        Q    So you paid the whole 700?

 6        A    Yeah.

 7        Q    And was it 700 a month for the entire time

 8   you lived at the Pacifica address?

 9        A    Yes, I believe so.

10        Q    When you moved to the Daly City address in

11   2012, your rent was $850 a month?

12        A    No.  I was -- I moved there first by

13   myself, so --

14        Q    So how much were you paying?

Delacruz.txt

15      A    I was paying full -- I was paying 12,

16   actually, because it was just me.

17      Q    And then Oscar moved in in about 2013?

18      A    Mh-hm.

19      Q    And at that time, did you split the cost

20   of the rent with Oscar?

21      A    Not -- not right away.

22      Q    When did you start splitting the cost with

23   him?

24      A    Maybe a year later.

25      Q    Okay.  And did your rent increase from
                                                          35
 1   2012 to today?

 2      A    Yeah.

 3      Q    How much has it increased?

 4      A    About 400, 400, $500, yeah.

 5      Q    Okay.  So today it's about $1,700 a month?

 6      A    Yeah, close to 17, yeah, 16 or 17, yeah.

 7      Q    And I think that's what you said earlier,

 8   yeah.  Okay.

 9           Do you recall how much your rent was in

10   2012?

11      A    The whole -- the whole year or --

12      Q    Yeah.

13      A    Yeah.  I was paying $1,200 a month.

Delacruz.txt

14      Q    And what about in 2013?

15      A    When I moved in.  And then when my cousin

16   moved in, it went up to 16, 17, and then I was still

17   paying -- helping him out because he was -- he

18   didn't have a job right away.  So I was -- I was

19   doing still the 12 and he was paying the rest.

20      Q    Okay.

21      A    Until he got -- yeah.

22      Q    So did the rent increase from 1200 to 1600

23   between 2012 and 2013?

24      A    Yes.

25      Q    Okay.  So it increased $400 --

                                                    36

 1       A    Yeah, because there was two of us.

 2       Q    Oh, because there was a second person?

 3       A    Yeah, yeah.

 4       Q    Okay.  Got it.  I'm following now.

 5       A    I'm sorry.

 6       Q    No problem.  Getting back to the Fisher

 7   Court address now in Stockton, did anyone else live

 8   there besides you?

 9       A    No.

10       Q    Did anyone else ever stay there for any

11   period of time?

12       A    I don't know.

Delacruz.txt

13      Q    So did you give the keys to people?

14      A    My uncle was -- had it.

15      Q    He had the keys?

16      A    Was taking care -- yeah.

17      Q    To your condo?

18      A    Yeah.

19      Q    So you don't know if other people were

20   staying there when you weren't there?

21      A    Hm-mh.

22      Q    Did you ever rent it out?

23      A    No, I don't think so.

24      Q    So you never had a tenant at that

25   property?

                                                      37

 1         A    I don't know.  I don't think so.

 2         Q    Well, how often would you go visit that

 3   property?

 4         A    I didn't visit it at all.

 5         Q    You never went?

 6         A    Maybe once, once, to see how it got fixed

 7   up, because it was in -- it was in bad shape.  We

 8   just, you know, upgraded things.  That's it.

 9         Q    What did you do to upgrade?

10         A    Just fixed the cabinets and tiles on the

11   sync.

Delacruz.txt

```
12        Q    In the kitchen?

13        A    Yeah.

14        Q    In the bathroom?

15        A    I don't remember the bathroom.

16        Q    Just the kitchen?

17        A    Yeah.

18        Q    And you said you replaced the tile?

19        A    Yeah, just kind of updated it.

20        Q    Did you replace any appliances?

21        A    I don't remember.

22        Q    So you said you only went to the Fisher

23   Court address once?

24        A    Mh-hm.

25        Q    And when was that?
```
                                                              38
```
 1        A    Actually, twice.  When I first saw it and

 2   then the second time when -- to see all the -- all

 3   the stuff being fixed, and that was it.

 4        Q    When you first saw it, that was in 2011?

 5        A    Yes.

 6        Q    Before you signed the mortgage?

 7        A    Yes.

 8        Q    When did you go back to see the updates to

 9   the kitchen?

10        A    Maybe a month later.
```

                        Delacruz.txt
11        Q    And who did the updates to the kitchen?

12        A    My uncle.

13        Q    Did your uncle live at that property?

14        A    I don't know.  I don't think so.

15        Q    Did he have another address?

16        A    Yeah.

17        Q    Was the other address his home?

18        A    Yes.

19        Q    Why did you purchase the Fisher Court
20   property?

21        A    Just to own property, be a property owner.

22        Q    What was your plan for using the property?

23        A    Probably rent it out.

24        Q    But you never ultimately did rent it out?

25        A    I -- I don't know.  I don't -- I was
                                                      39
 1   letting my uncle take care of that.

 2        Q    Did you ever receive rental income?

 3        A    No.

 4        Q    Did you visit your uncle?

 5        A    What do you mean?

 6        Q    Yeah.  Let me clarify.

 7             Before you purchased this property --

 8        A    Okay.

 9        Q    -- would you often visit your uncle?

                        Page 41

Delacruz.txt

```
10        A    Yes, when my mom was alive, I would --

11   that's her brother, so I would take her to visit

12   him, but after she passed, I hardly saw him.  It's

13   so far away.  That's why.  Only holidays is when I

14   would see him.

15        Q    Okay.  Because it's about, you said, two

16   hours?

17        A    Two-hour drive, yeah.

18        Q    How often would you go with your mom?

19   Would you say once a month?  Every other month?

20        A    I would say maybe twice a year, maybe

21   three, for birthdays, stuff like that.  That's it.

22        Q    And when did your mom pass?

23        A    10, 2010.

24        Q    2010?

25        A    July, yes.
                                                    40
1         Q    And you said after that you wouldn't go as

2    frequently?

3         A    Yeah.

4         Q    So maybe once a year?

5         A    Yeah.  And, actually, I didn't go there to

6    visit him in his place at all, just those two times

7    in Stockton.  We would always meet at other family

8    parties.  That's when I would see him, yes.
```

Delacruz.txt

9      Q    Oh, okay, okay.

10     A    But I think just those two times, yes.

11     Q    So what made you then think of Stockton as

12   a place to purchase property?

13          MR. KOSBIE:  I object as to form.

14          THE WITNESS:  It's closer to Stockton, to

15   my uncle.

16   BY MS. ROSS:

17     Q    But if you --

18     A    It's cheaper out there, too.

19     Q    So your plan was to purchase the property

20   and have your uncle manage it; is that right?

21          MR. KOSBIE:  I object as to form.

22   BY MS. ROSS:

23     Q    And you weren't planning on visiting the

24   property often?

25     A    Yeah.  I just never got time to.  It's so
                                                           41
1    far and I was busy.

2      Q    But you wanted to keep the property for a

3    long period of time?

4      A    Sure.

5      Q    Did you furnish the property?

6      A    No.

7      Q    Was there furniture -- strike that.

Delacruz.txt

8          When you went to visit it the one time to

9   see the kitchen updates, was there furniture inside?

10      A    No, not at all.

11      Q    Did you tell your uncle to furnish the

12   property?

13      A    No, not at all.

14      Q    Did your uncle say that he was going to

15   rent it out?

16      A    I think so.

17      Q    Did you follow up with him to find out if

18   he did rent it out?

19      A    No.

20      Q    And I think you already said this, but you

21   never received rental income?

22      A    No.

23      Q    Okay.  So as far as you know, the property

24   was vacant the whole time that you owned it?

25      A    As far as I know, yes.

                                                      42

1      Q    Did you see the home as an investment

2   opportunity?

3      A    Yes.

4          MR. KOSBIE:  I object as to form.

5   BY MS. ROSS:

6      Q    Did you like the property?

Delacruz.txt

```
 7       A    It was okay.

 8       Q    What makes it okay?

 9       A    It was a place.  It was property, but just

10   the resident it was in, I didn't like it too much,

11   too much work.

12       Q    So why did you purchase it?

13       A    I thought it would be nice just to be a

14   homeowner, too, property owner.

15       Q    And this was the only property that you

16   owned at this time in 2011?

17       A    Yes.

18       Q    Is it the only property that you've ever

19   owned?

20       A    Yes.

21       Q    And the property was purchased by you

22   alone; is that right?

23       A    Mh-hm.

24       Q    Did your uncle help with the down payment

25   on the property?
                                                          43
 1       A    No.

 2       Q    How much did you purchase the home for in

 3   2011?

 4       A    I believe -- from the loan approval,

 5   right?  14 -- 40, 40,400.
```

                            Delacruz.txt
    6       Q    Looking at -- do you have Exhibit 603, the

    7    loan application, in front of you?

    8       A    Yes.

    9       Q    Okay.  If you look at the page ending

   10    in 175715, it's the third page of the document.

   11       A    What was it again?  I'm sorry.

   12       Q    175715.

   13       A    715.  175 --

   14            MR. KOSBIE:  Counsel, which exhibit was

   15    that?

   16            MS. ROSS:  603.

   17            MR. FLINT:  602.

   18            MS. ROSS:  602.  Sorry about that.

   19            THE WITNESS:  17515.  Okay.

   20    BY MS. ROSS:

   21       Q    If you look at the bottom of the page, it

   22    has details of the transaction.

   23       A    Mh-hm.

   24       Q    And the first row says purchase price.  It

   25    says 51750.
                                                    44
    1             Do you see that?  In the bottom section.

    2       A    Okay.

    3       Q    Details of the transaction.

    4       A    Mh-hm.

Delacruz.txt

5      Q    The first row says purchase price.

6      A    Purchase price.  I got it, yeah.

7      Q    51750.

8      A    Yeah.

9      Q    Did you purchase the home for 51750?

10     A    I guess, yeah.

11     Q    You have no reason to doubt that this is

12   incorrect, right?

13     A    Yeah, yeah, of course.  I just don't

14   remember.

15     Q    And then if you turn the page to the last

16   page, it has the loan amount, which is the second to

17   last row, 41,400.

18     A    Yeah.

19     Q    And that is the loan that you took out

20   from the bank; is that right?

21     A    Yes.

22     Q    And then the last column is cash from to

23   borrower, and it says $12,150.50.

24     A    Mh-hm.

25     Q    Do you see that?
                                                        45
1      A    Mh-hm.

2      Q    Was that the down payment that you made to

3    purchase the home?

Page 47

Delacruz.txt

4     A    Yes.

5          Q    And how did you get the money for the down

6    payment?

7     A    I think my uncle used that, yeah.

8          Q    So your uncle gave you the $12,000?

9     A    Yeah.

10          Q    Why did your uncle do that?

11     A    Because he wanted to, you know -- because

12    he was closer to the property, and he was going to

13    maintain it for me.

14          Q    Was your uncle going to pay the monthly

15    payments?

16     A    I think so.

17          Q    Did your uncle pay the monthly payments?

18     A    I'm not sure.

19          Q    So you never monitored the payments?

20     A    I trusted him.

21          Q    In 2011, at the time you purchased the

22    property, what was your annual household income?

23     A    Repeat that again.  I'm sorry.

24          Q    Sure.  In 2011, so the year that you

25    purchased the home, what was your household income?

                                                        46

 1          A    How much I was getting an hour or my

2    paychecks?

                        Page 48

Delacruz.txt

3      Q    For the year, if you can guess.

4      A    I don't remember.

5      Q    Okay.  So we can calculate it.  You said

6    it was about 17 or -- do you remember how much you

7    were making an hour in 2011?

8      A    Oh, let's see.  About a little over 20.

9      Q    Okay.

10      A    20 an hour.

11      Q    So it would be 20 an hour times 40 to 50

12    hours a week?

13         MR. KOSBIE:  I object as to form.

14    BY MS. ROSS:

15      Q    And that would be what your household

16    income was for the year?

17      A    I believe so.

18      Q    So you worked -- you had no other sources

19    of income in 2011?

20      A    No, no.

21      Q    Other than your job?

22      A    Yes.

23      Q    Okay.  Did your uncle give you any other

24    money besides the $12,000 for the down payment?

25      A    No.

                                           47

↥      1      Q    Okay.  Let's -- is now an okay time for a

Delacruz.txt

2   break?  It's been about an hour?

3              MR. KOSBIE:  Yeah, sure.

4              MS. ROSS:  Okay.  We're going on to the

5   next topic.

6              THE VIDEOGRAPHER:  We're going off the

7   record.  The time is 10:28 a.m.

8              (Recess taken.)

9              THE VIDEOGRAPHER:  We are back on the

10  record.  The time is 10:44 a.m.  Please proceed.

11  BY MS. ROSS:

12      Q    Mr. Dela Cruz, I'm now going to hand you

13  what we're marking as 605.

14              (Defendant's Exhibit    was marked for

15              identification.)

16  BY MS. ROSS:

17      Q    This document is Bates labeled WFHERNANDEZ

18  00174580.

19              Do you recognize this document?

20      A    No, I don't.

21      Q    It is a letter to W.J. Bradley mortgage,

22  and it was written by you.

23              Do you see that?

24      A    I don't remember writing this.

25      Q    Is that your signature at the bottom?

48

Delacruz.txt

⬆   1        A      Yeah.

    2        Q      Do you have any reason to doubt that you

    3   wrote this in 2011?

    4        A      I don't -- I don't remember writing this.

    5        Q      But it's possible that you did write it?

    6               MR. KOSBIE:  I object as to form.

    7               THE WITNESS:  I don't know.  I don't know.

    8   BY MS. ROSS:

    9        Q      You just don't remember writing it; is

   10   that right?

   11               MR. KOSBIE:  I object as to form.

   12               THE WITNESS:  I don't think I wrote this.

   13   BY MS. ROSS:

   14        Q      Who wrote it then?

   15        A      I don't know who wrote it.

   16        Q      But you did sign the document at the

   17   bottom; is that right?

   18        A      I don't remember writing it.

   19        Q      Is that your signature, though?

   20        A      That's my signature.

   21        Q      Okay.  If you look at the last paragraph

   22   of this letter, the middle of the paragraph, it

   23   says, this is the first chance for me to own a

   24   property.  I believe that it will appreciate in a

Page 51

Delacruz.txt
```
25    few years so it's a good use of my money.
                                                      49
  1        A    Hm.  I don't remember.

  2        Q    And that's consistent with what you

  3    testified earlier, that you wanted to be a property

  4    owner; is that right?

  5        A    Yes.

  6             MR. KOSBIE:  I object as to form.

  7    BY MS. ROSS:

  8        Q    Is it correct that purchasing the 2942

  9    Fisher Court property was the first chance for you

 10    to own property?

 11        A    Yes.

 12        Q    And is it also true that you believed that

 13    the property was a good investment?

 14        A    At that time.

 15        Q    And you testified earlier that your uncle

 16    gave you the money for the down payment on the home;

 17    is that right?

 18        A    Yeah.

 19        Q    And that was about $12,000?

 20        A    Mh-hm.

 21        Q    Did your uncle say why he gave you the

 22    money?

 23        A    To help get the -- get the property.
```

Delacruz.txt

24      Q   Did you ask him for it?

25      A   No, no.

                                                50

1       Q   He offered it to you?

2      A   Yes.

3      Q   Why didn't your uncle buy the home

4  himself?

5        MR. KOSBIE:  I object as to form.

6        THE WITNESS:  I don't know.

7  BY MS. ROSS:

8      Q   So the plan was for your uncle to help you

9  with the down payment?

10      A   Mh-hm.

11      Q   And for you to purchase the home and then

12  for your uncle to kind of oversee the property; is

13  that right?

14      A   Yes.

15      Q   After you purchased the property, did you

16  give the keys to your uncle?

17      A   Yeah.

18      Q   Did you maintain a set of the keys

19  yourself?

20      A   No, not at all.

21      Q   And you asked your uncle to look over the

22  property?

Delacruz.txt

23       A    Mh-hm.

24       Q    And to do the upgrades to the kitchen?

25       A    Mh-hm.  No.  He did that himself.

                                                          51

 1       Q    One thing, if you could just watch out for

 2  the mh-hms and the huhs.

 3       A    I'm sorry.

 4       Q    I didn't really notice that either, but

 5  just so we're clear on the record.

 6       A    Got it.

 7       Q    Yes.  Okay.  I'm just going to ask my

 8  question again so that we get a clear answer.  So

 9  you asked your uncle to look over the property; is

10  that right?

11       A    Yes.

12       Q    And you said that your uncle's plan was

13  maybe to rent out the property; is that right?

14       A    Yes.

15       Q    But as far as you know, he never did rent

16  the property?

17       A    As far as I know.

18       Q    Because you never received rental income?

19       A    Yes.

20       Q    How often did you speak to your uncle

21  about the property?

Delacruz.txt

```
22        A    Not too often.

23        Q    Like once a month or --

24        A    Maybe more than that.  Mostly maybe two

25   months, every two months.
                                                      52
 1        Q    Once every other month?

 2        A    Yeah, and it wasn't nothing too important,

 3   you know.

 4        Q    What would you say?

 5        A    I would just say how's everything going

 6   with place?  Is it doing well?  That's it.

 7        Q    And he never told you about renting the

 8   property out.

 9        A    I had an idea he might.

10        Q    Why did you have that idea?

11        A    Because he was fixing it up and he had his

12   own place.

13        Q    Okay.

14        A    Or he was staying with someone, with his

15   wife.

16        Q    He lived somewhere else?

17        A    Yes.

18        Q    Got it.  And you said he lived with his

19   wife?

20        A    Yes.
```

Delacruz.txt

21    Q    Did he -- how far was his home from the

22  Fisher Court property?

23    A    Not far.  It's also in the same -- it's

24  also in Stockton.

25    Q    Okay.

                                                        53

 1       A    But I don't know how --

 2       Q    Close it was?

 3       A    Yeah, yeah.

 4       Q    Do you know if your uncle owned his home

 5  with his wife?

 6       A    I don't know.

 7       Q    So you never lived at the property?

 8       A    The Fisher Court?

 9       Q    Sorry.  Yes.  Thank you.

10       A    No.

11       Q    You never lived at the Fisher Court

12  property?

13       A    No.

14       Q    Did you ever stay overnight at the Fisher

15  Court property?

16       A    No.

17       Q    And as far as you know, your uncle never

18  lived at the Fisher Court property?

19       A    I don't know if he did, as far as I know.

Delacruz.txt

```
20       Q    As far as you know?

21       A    Yes.

22       Q    And you also testified that you didn't see

23   any furniture at the property when you were there.

24       A    Not at all.

25       Q    Okay.  Just making sure.
```
                                                     54
```
 1            Who paid for the kitchen upgrades?

 2       A    I believe my uncle did.

 3       Q    You didn't pay for them?

 4       A    No.

 5       Q    Is that right?

 6       A    No, no.

 7       Q    Okay.  Did you pay for any of the upgrades

 8   that were done on the property?

 9       A    As far as I know, it was only the -- that

10   I saw, was the kitchen, and, no.

11       Q    Did you make any other -- outside of the

12   kitchen, do you remember making any other payments

13   for any of the general maintenance on the property?

14       A    No.

15       Q    And as far as you know, you said the

16   property was essentially vacant the whole time that

17   you owned it?

18       A    As far as I know, yeah.
```

Delacruz.txt

19        Q     Okay.  Okay.  Let's go back to

20   Exhibit 603, which is the note.

21        A     Oh, yeah.

22        Q     The --

23        A     Exhibit 605?

24        Q     603.

25        A     Sorry.
                                                         55
 1        Q     One we looked at earlier today.

 2        A     Okay.  The note?

 3        Q     Yes, that one.

 4        A     Okay.

 5        Q     If you look on the first page, at the

 6   third section called payments, do you see where I'm

 7   looking?

 8        A     Yes.

 9        Q     It says, I will make my monthly payment on

10   the first day of each month, beginning on July 1st.

11              Do you see that?

12        A     Yes.

13        Q     And so you understood that the first

14   payment on your mortgage was due July?

15        A     Yes.

16        Q     2011?

17        A     Yes.

Delacruz.txt

```
18       Q    And underneath that paragraph, subsection

19   B says my monthly payment will be in the amount

20   of $235.06.  Do you see that?

21       A    Yes.

22       Q    And was that the monthly payments that

23   were due on the mortgage?

24       A    Yes.

25       Q    Was there an additional payment due each
```
                                                     56
```
 1    month for property taxes?

 2       A    I don't know.

 3       Q    Was there an additional payment due each

 4   month for home insurance?

 5       A    I don't know.

 6       Q    What about was there an additional payment

 7   due each month for condo fees?

 8       A    I don't know.

 9       Q    Do you recall any condo fees that were

10   owed to the condo association?

11       A    No.

12       Q    So you never paid any condo fees if there

13   was any?

14       A    None.

15       Q    Who made the payment of $235.06 on

16   July 1st, 2011?
```

Delacruz.txt

17      A    My uncle.

18      Q    And how do you know your uncle made the

19  payment?

20      A    I trust him.

21      Q    Did your uncle provide you with the money

22  that you then sent to Wells Fargo?

23      A    No.

24      Q    How did the payment happen?

25      A    I think he was getting the checks -- I
                                                            57
 1   mean, the statements, and I think he was paying it.

 2   I don't know, actually.

 3      Q    So as far as you know, your uncle paid the

 4   bank directly?

 5      A    I -- I'm hoping.

 6      Q    I'm just trying to figure out what your

 7   involvement with the payments was.

 8      A    I don't know.

 9      Q    So you didn't have any involvement in the

10   monthly payments?

11      A    Yes.

12      Q    As far as you know, your uncle was sending

13   money directly to the bank?

14      A    Yes.

15      Q    Was this an arrangement that you made with

Delacruz.txt

16    your uncle prior to signing the mortgage?

17         A    Yes.

18         Q    And what was the arrangement?

19         A    That he would -- he just needed my

20    signature for -- to get a loan and he would take

21    care of the rest.

22         Q    Okay.  So your uncle agreed to make the

23    monthly payments on the mortgage?

24         A    Yes.

25         Q    Every month?
                                                        58
 1         A    Yes.

 2         Q    Looking at the note that you have in front

 3    of you, if you see in the first section under

 4    borrower's promise to pay, it says, in the second

 5    line, the lender is W.J. Bradley mortgage capital

 6    corporation, an Oregon corporation.

 7              Do you see that?

 8         A    What was it again?  I'm sorry.

 9         Q    Under the first section at the top --

10         A    Oh, yes, yes.  I'm sorry.

11         Q    It lists the lender as W.J. Bradley

12    mortgage capital corporation, an Oregon corporation.

13         A    Mh-hm.

14         Q    And as far as you know, was this the

Delacruz.txt

15   original mortgage lender?

16        A    I don't remember.  Sorry.

17        Q    Do you recall that at some point, though,

18   Wells Fargo became the mortgage servicer of your

19   loan?

20        A    I think so.

21        Q    Because you eventually received

22   communications from Wells Fargo?

23        A    Yes.

24        Q    Is that right?

25        A    Yes.

                                                      59

 1        Q    And do you recall around when that was?

 2        A    No, I don't.

 3        Q    If I were to say it was around July 2013,

 4   does that sound about right?

 5        A    I can't say.

 6        Q    Okay.

 7        A    I don't remember.

 8        Q    I'm now handing you what we're marking as

 9   Exhibit 606.

10             (Defendant's Exhibit    was marked for

11             identification.)

12   BY MS. ROSS:

13        Q    Have you seen this document before?

Delacruz.txt

14      A    I don't remember.

15      Q    This document, if you look at the top

16 right section, it's dated July 8th, 2013.

17      A    July 8th.  Yes.

18      Q    Yes.  And if you look at the second

19 paragraph of this document, it lists your name; is

20 that right?

21      A    Second paragraph.  Yes.

22      Q    Okay.  And this is -- it's called an

23 assignment of deed of trust.

24           Do you see that?

25      A    Mh-hm.

                                                    60

1      Q    And it says that essentially -- or I'll

2 just read it.  It says, for good and valuable

3 consideration this efficiency of which is hereby

4 acknowledged mortgage electronic registration

5 systems, Inc. as nominee for W.J. Bradley mortgage

6 capital corporation and successors and assigns, the

7 address, for value received the undersigned hereby

8 grants assigns and transfers to Wells Fargo Bank

9 assignee all beneficial interests under certain deed

10 of trust, and it continues.

11           Do you see where I'm reading?

12      A    Yes.

Delacruz.txt

13      Q    Okay.  So this document shows that your

14   mortgage was transferred from that W.J. Bradley

15   mortgage to Wells Fargo; is that right?

16      A    Yeah.

17          MR. KOSBIE:  I object as to form.

18   BY MS. ROSS:

19      Q    Okay.  And then eventually you received

20   communications from Wells Fargo; is that right?

21      A    I think so, yes.

22      Q    Okay, great.  Was the mortgage that you

23   had that we've looked at at 2942 Fisher Court the

24   only mortgage that you had on that property?

25      A    Yes.

61

 1      Q    So you had one mortgage?

 2      A    I believe so, yes.

 3      Q    Do you recall that the monthly payments

 4   of $235.06 increased slightly in early 2013?

 5      A    No, I didn't.

 6      Q    And why don't you recall that?

 7      A    Because I had no idea.  I had no forms to

 8   read or anything.

 9      Q    Did your uncle tell you?

10      A    No.

11      Q    Did you have any contact with the bank

Delacruz.txt

12   during that time?

13        A    The Wells Fargo Bank?

14        Q    Yes.

15        A    No.

16        Q    I'm now going to hand you what we're going

17   to mark as Exhibit 607.

18             (Defendant's Exhibit     was marked for

19             identification.)

20   BY MS. ROSS:

21        Q    Which is Bates labeled WFHERNANDEZ

22   00174468 to 174470.  And this is a letter from Wells

23   Fargo to you; is that right?

24        A    Mh-hm.

25        Q    And it was sent to the property address

                                                     62

 1    2942 Fisher Court, Stockton, California; is that

 2   right?

 3        A    Yes.

 4        Q    And the letter is dated August 15th, 2012;

 5   is that right?

 6        A    Yes.

 7        Q    Did you receive this document?

 8        A    No.

 9        Q    Have you ever seen this document before?

10        A    No.

Delacruz.txt

11     Q     Who was checking the mail at the Fisher

12   Court property?

13        A     My uncle, I suppose.

14     Q     Yeah, because as you said, he was

15   maintaining the property.

16        A     (Nods head).

17     Q     And that would have included -- is that a

18   yes?  Sorry.

19        A     Yes, yes.  I'm sorry again.  Sorry again.

20     Q     And your uncle was maintaining the

21   property; is that right?

22        A     Yes.

23     Q     And that would include checking the mail;

24   is that right?

25        A     Yes.

                                                         63

 1     Q     And your uncle was in charge of making the

 2   monthly payments; is that right?

 3        A     Yes.

 4     Q     So he would have likely opened a letter

 5   from Wells Fargo; is that right?

 6        A     Yes.

 7          MR. KOSBIE:  I object as to form.

 8   BY MS. ROSS:

 9     Q     On the first -- the first line of the

Delacruz.txt

10   letter says during a review of your account we

11   learned your property taxes payable to your taxing

12   authority are past due.

13            Do you see that?

14      A    Yes.

15      Q    And then the next sentence says, if you

16   paid your taxes, please send us proof of your

17   payment by September 14th, 2012.

18            Do you see that?

19      A    Yes.

20      Q    Did you pay property taxes in 2012 for

21   this property?

22      A    No.

23      Q    Was your uncle supposed to be paying the

24   property taxes at the 2942 Fisher Court property?

25      A    I believe so, yes.
                                                      64
 1      Q    And so you were never made aware that your

 2   property taxes were past due?

 3      A    No.

 4      Q    Your uncle never told you?

 5      A    Hm-mh.

 6      Q    And you didn't hear directly from the

 7   bank; is that right?

 8      A    No.

Page 67

Delacruz.txt

9      Q    Because your uncle was receiving your

10   mail?

11      A    I think so, yes.

12      Q    Okay.  We're now handing you what we're

13   going to mark as Exhibit 608.

14          (Defendant's Exhibit    was marked for

15          identification.)

16   BY MS. ROSS:

17      Q    Which is Bates labeled WFHERNANDEZ

18   00174462 to 174464.  And this is a letter from Wells

19   Fargo addressed to you; is that correct?

20      A    Yes.

21      Q    And it was sent to the property address

22   2942 Fisher Court, Stockton, California; is that

23   right?

24      A    Yes.

25      Q    And the date of the letter is

                                                    65
1   September 14th, 2012; is that right?

2      A    Yes.

3      Q    And then the first sentence of the -- or

4   the first paragraph of the letter says, we are

5   writing to follow up on a letter we sent notifying

6   you that your taxes are past due.  In our letter we

7   asked you to send us proof you paid these taxes.  We

Delacruz.txt

8    have not received your proof of payment document.

9              Do you see that?

10      A    Yes.

11      Q    Did you receive this letter?

12      A    No.

13      Q    And that is because you were not receiving

14   your mail at the Fisher Court property; is that

15   right?

16      A    Yes, I wasn't.

17      Q    Your uncle was receiving the mail at the

18   Fisher Court property; is that right?

19      A    Mh-hm.

20      Q    And you have no reason to doubt that your

21   uncle received this letter?

22      A    Mh-hm.

23      Q    Is that yes?

24      A    Yes.

25      Q    Did your uncle ever tell you that you
                                                          66
♠    1   received a letter about past due taxes?

2       A    No.

3       Q    I'm now handing you what we're going to

4    mark as Exhibit 609.

5              (Defendant's Exhibit     was marked for

6              identification.)

Delacruz.txt
```
 7   BY MS. ROSS:

 8        Q    This document is Bates labeled WFHERNANDEZ

 9   00174458 to 00174459.  And this is a letter from

10   Wells Fargo directed to you; is that right?

11        A    Yes.

12        Q    And it was sent to the address 2942 Fisher

13   Court, Number 1934, Stockton, California; is that

14   right?

15        A    Yes.

16        Q    And the letter was dated November 1st,

17   2012; is that right?

18        A    Yes.

19        Q    Looking at the first paragraph of the

20   letter, Wells Fargo wrote we're writing to let you

21   know that you will soon see an increase in your

22   mortgage payment amount.  Your mortgage payment will

23   increase because we advanced funds on your behalf to

24   pay the balance due on your property taxes and/or

25   purchase lender placed insurance for your property.
```
                                                      67
```
 1              Do you see that?

 2        A    Yes.

 3        Q    Did you receive this letter?

 4        A    No, I didn't.

 5        Q    So your uncle never sent this letter to
```

                        Delacruz.txt
 6   you?

 7       A    No.

 8       Q    But it is likely that your uncle received

 9   this letter?

10            MR. KOSBIE:  I object as to form.

11            THE WITNESS:  I'm not sure.

12   BY MS. ROSS:

13       Q    Was your uncle checking the mail at Fisher

14   Court?

15       A    I'm sure he was, yeah.

16       Q    And you personally never paid property

17   taxes on the Fisher Court property; is that right?

18       A    Not at all.

19       Q    Were you ever made aware that the mortgage

20   payments -- the monthly -- let me start over.

21            Were you ever made aware that the monthly

22   mortgage payments increased as a result of Wells

23   Fargo paying your property taxes?

24            MR. KOSBIE:  I object as to form.

25            THE WITNESS:  No.
                                                    68
 1   BY MS. ROSS:

 2       Q    Did your uncle ever tell that you the

 3   monthly mortgage payments increased?

 4       A    No.

                        Page 71

Delacruz.txt

```
5       Q     Do you know what the monthly mortgage

6    payments increased to?

7       A     Not at all.

8       Q     And you don't know this because you

9    weren't paying the monthly mortgage payments?

10      A     Yes.

11      Q     Is that right?

12      A     Yes.

13      Q     At some point, did your uncle stop making

14   the monthly mortgage payments?

15      A     I don't know.  I don't know that.

16      Q     Did you ever become aware of your uncle no

17   longer making monthly mortgage payments?

18      A     I don't know.  I don't think so.  He never

19   told me.

20      Q     Did the bank ever contact you directly to

21   discuss?

22      A     I think so, yeah.

23      Q     When was that?

24      A     I don't remember.  It was a while back.

25      Q     Maybe 2013?
                                              69
1        A     Maybe.

2        Q     Does your uncle still live in Stockton?

3        A     I think so, yes.
```

Delacruz.txt

4      Q    When was the last time you talked to him?

5      A    This summer.

6      Q    So as far as you know, he still lives in

7   the house with his wife?

8      A    Yes.

9      Q    In Stockton?  I'm now handing you what

10   we're going to mark as 610, which is Bates labeled

11   WFHERNANDEZ 00174457.

12           (Defendant's Exhibit    was marked for

13           identification.)

14   BY MS. ROSS:

15      Q    This is a letter from Wells Fargo directed

16   to you; is that right?

17      A    Yes.

18      Q    And it was sent to the address 2942 Fisher

19   Court, Number 1934, Stockton, California; is that

20   right?

21      A    Yes.

22      Q    Did you ever read this letter?

23      A    No.

24      Q    Did your uncle ever tell you that he

25   received a letter that the mortgage loan is

                                                    70

1   delinquent?

2      A    No.

Delacruz.txt

3       Q    Is it -- or strike that.

4            Did Wells Fargo start contacting you

5    directly about the mortgage after June 2013?

6       A    I don't remember.

7       Q    At this point in time, June 2013, had you

8    ever talked to Wells Fargo directly about your

9    mortgage?

10      A    No.

11      Q    Did you ever tell Wells Fargo that your

12   uncle was making the monthly payments?

13      A    No.

14      Q    And did you ever provide Wells Fargo with

15   your uncle's contact information?

16      A    No.

17      Q    Did you ever provide Wells Fargo with your

18   uncle's phone number?

19      A    No.

20      Q    Do you know what phone number Wells Fargo

21   used to contact you?

22      A    My cell phone or --

23      Q    What's your cell phone number?

24      A    (415)632-6443.

25      Q    Did your uncle ever tell you that he had

                                                        71

♠    1    difficulty making the monthly payments?

Delacruz.txt

2      A    No, not at all.

3      Q    Did your uncle ever ask you to pay --

4   make -- let me start over.

5           Did your uncle ever ask you to make the

6   monthly payments?

7      A    No.

8      Q    Would you have made the monthly payments

9   if your uncle asked?

10          MR. KOSBIE:  Objection as to form.

11          THE WITNESS:  I don't know.

12          MS. ROSS:  I'm now handing you what we're

13   going to mark as Exhibit 611.

14          (Defendant's Exhibit     was marked for

15           identification.)

16   BY MS. ROSS:

17      Q    This exhibit is Bates labeled WFHERNANDEZ

18   00178506 to 178507.  And it is a letter from Wells

19   Fargo directed to you; is that right?

20      A    Yes.

21      Q    And it was sent to the property address

22   2942 Fisher Court, Number 1934, Stockton,

23   California; is that right?

24      A    Yes.

25      Q    And the letter is dated June 17th, 2013;

72

Delacruz.txt

1    is that right?

2        A    Yes.

3        Q    And have you ever read this letter before?

4        A    No.

5        Q    And why not?

6        A    I've never seen it.

7        Q    Did your uncle ever forward you mail that

8    you received at the Fisher Court address?

9        A    No.

10       Q    So any mail that was sent to the Fisher

11   Court address addressed to you you would never have

12   seen?

13       A    No.

14       Q    This letter says our records indicate that

15   your loan is in default for failure to make payments

16   due.  Unless the payments on your loan can be

17   brought current by July 22nd, 2013, it will become

18   necessary to require immediate payment in full of

19   your mortgage note and pursue the remedies provided

20   for in your mortgage or deed of trust, which include

21   foreclosure.

22            Do you see that?

23       A    Yes.

24       Q    And then it says to cure the default you

Delacruz.txt

25     must pay the total delinquency against your account,

                                                              73

 1     which as of today's date is, and then it has the

 2     total delinquency as of June 17th, 2013, and that

 3     amount is $685.33.

 4              Do you see that?

 5        A    Yes.

 6        Q    Were you aware that your loan was in

 7     default in June 2013?

 8        A    No.

 9        Q    Do you have any reason to doubt that your

10     loan was in default in June 2013?

11        A    I don't remember.  No.

12        Q    Do you know why your loan was in default

13     in June 2013?

14              MR. KOSBIE:  Objection as to form.

15              THE WITNESS:  Not making payments, I

16     guess.

17     BY MS. ROSS:

18        Q    Who wasn't making payments?

19        A    I guess my uncle.

20        Q    Were you in contact with your uncle in

21     June 2013?

22        A    Not very much.

23        Q    And he never mentioned to you that he was

Delacruz.txt

24    no longer making payments on the property?

25            MR. KOSBIE:  I object as to form.
                                                        74
 1            THE WITNESS:  I don't remember.

 2    BY MS. ROSS:

 3        Q    Was there anything going on in your

 4    uncle's life that you were aware of that would have

 5    made it difficult for him to make payments?

 6        A    I don't know.  I don't know that.

 7        Q    I'm now handing you what we're going to

 8    mark as Exhibit 612.

 9            (Defendant's Exhibit     was marked for

10            identification.)

11    BY MS. ROSS:

12        Q    612 is Bates labeled WFHERNANDEZ 00174471

13    to 00174474.

14            Have you ever seen this document before?

15        A    I don't remember, no, I don't think so.

16        Q    And it is a letter from Wells Fargo

17    directed to you; is that right?

18        A    Yes.

19        Q    And it was sent to the address 2942 Fisher

20    Court, Number 1934, Stockton, California; is that

21    right?

22        A    Yes.

Delacruz.txt

23       Q    And it is dated July 9th, 2013; is that

24   right?

25       A    Yes.
                                                      75
 1        Q    And during this time, you were not located

 2   at 2942 Fisher Court; is that right?

 3       A    Yes.

 4       Q    And your uncle was overseeing that

 5   property at 2942 Fisher Court?

 6       A    Yes.

 7       Q    And would have been checking the mail,

 8   yes?

 9       A    Yes.

10       Q    Yes.  Okay.

11       A    Sorry.

12       Q    This letter is regarding the delinquent

13   status of the mortgage.

14            Do you see that?

15       A    Yes.

16       Q    And looking down at the bottom of the

17   first page, it says, mortgage account status.

18            Do you see it says the total amount, the

19   first bullet point, it says the total amount needed

20   to reinstate or bring your account current is $1,033

21   and 46 cents?  Do you see that?

Delacruz.txt

22        A    Yes.

23        Q    And then looking down to the fourth bullet

24   point, it says the date of the last full payment was

25   April 15th, 2013.

                                                              76

 1                  Do you see that?

 2        A    Yes.

 3        Q    Is it correct that the last payment made

 4   on the mortgage was April 15th, 2013?

 5        A    I don't know.

 6        Q    Why don't you know?

 7             MR. KOSBIE:  I object as to form.

 8             THE WITNESS:  Because I don't pay the

 9   mortgage.  I didn't pay the mortgage.  I don't pay

10   the mortgage.

11   BY MS. ROSS:

12        Q    And you weren't paying attention to

13   whether or not your uncle was paying the mortgage?

14        A    Mh-hm.

15        Q    So you weren't aware in July 2013 that

16   your mortgage was past due?

17        A    Yes.

18        Q    And you weren't aware in July 2013 that

19   the last payment made on the mortgage was

20   April 15th, 2013; is that right?

Delacruz.txt

21      A     Yes.

22      Q     But you said earlier that at some point

23   Wells Fargo started contacting you directly,

24   correct?

25      A     Yes.
                                                        77
 1      Q     And do you recall when that was?

 2      A     No, I don't.

 3      Q     Do you recall what they were telling you?

 4      A     No.  I don't remember.

 5      Q     Was it regarding the mortgage loan at --

 6      A     Yeah.

 7      Q     Was it letting you know that the loan was

 8   past due?

 9      A     I think so, yes.

10      Q     Okay.  I'm now going to show you what

11   we're going to mark as Exhibit 613.

12            (Defendant's Exhibit    was marked for

13            identification.)

14   BY MS. ROSS:

15      Q     This document is Bates labeled WFHERNANDEZ

16   001-7448 to 00174450.  This is a letter from Wells

17   Fargo directed to you; is that right?

18      A     Yes.

19      Q     And if you look on the first page of the

Page 81

Delacruz.txt
20    document, it was sent to the address 583 Gellert

21    Boulevard, Daly City, California; is that right?

22         A    Yes.

23         Q    And that's the address where you live?

24         A    Yes.

25         Q    That's the address where you lived in
                                                        78
 1    2013; is that right?

 2         A    Yes.

 3         Q    And the letter is dated August 6th, 2013;

 4    is that right?

 5         A    Yes.

 6         Q    Okay.  Did you receive this letter?

 7         A    I don't remember.

 8         Q    Do you have any reason to doubt that you

 9    received this letter?

10         A    No.

11         Q    Because this is where you lived at the

12    time?

13         A    Yes.

14         Q    So it is likely that you received it?

15         A    Mh-hm.

16         Q    Did you read the letter?

17         A    No.

18         Q    Looking at the first paragraph of the

Delacruz.txt

19   letter, it says, we want to help you and see if

20   you're eligible for a federal government's home

21   affordable modification program, and if not we'll

22   discuss other loan modification options that may

23   help you.

24        Do you see that?

25     A   Yes.

                                                    79

1      Q   And then it provides in the middle of the

2   letter an 800 number that you could call to discuss

3   loan modification options.

4        Do you see that?

5      A   Yes.

6      Q   What did you do when you received this

7   letter?

8      A   I didn't -- I didn't pay attention to it.

9   Probably threw it away, thought it was junk mail.

10     Q   So you never called the 800 number?

11     A   No, I didn't.

12     Q   And you never reached out to Wells Fargo

13   about loan modification options?

14     A   Not at all.

15     Q   Did you speak to your uncle about the

16   property after receiving this letter?

17     A   I don't remember.

Delacruz.txt

18      Q    So when did you become aware that your

19  home was going to go into foreclosure?

20      A    When they were garnishing my wages.

21      Q    When was that?

22      A    I don't remember either, but it was

23  maybe -- I think '13.  No, maybe '12.  I'm not sure.

24  I'm not sure.

25      Q    How much were they taking out of your
                                                        80
 1  wages?

 2      A    I don't remember either.  All I know is

 3  they talked to my boss.

 4      Q    Okay.  And by they, you're referring to

 5  Wells Fargo?

 6      A    I believe so.

 7      Q    I'm now handing you what we're going to

 8  mark as Exhibit 614.

 9          (Defendant's Exhibit    was marked for

10          identification.)

11  BY MS. ROSS:

12      Q    Exhibit 614 is Bates labeled WFHERNANDEZ

13  00174500 to 00174501.

14          And this is a letter from Wells Fargo

15  directed to you; is that right?

16      A    Yes.

Page 84

Delacruz.txt

17      Q      And it was sent to the address 583 Gellert

18   Boulevard, Daly City, California; is that right?

19      A      Yes.

20      Q      And the letter is dated September 12th,

21   2013; is that right?

22      A      Yes.

23      Q      And you were living at the Gellert

24   Boulevard address in September 2013; is that right?

25      A      Yes.

                                                                    81

 1      Q      Did you receive this document?

 2      A      I don't remember.

 3      Q      But it's possible that you received this

 4   document?

 5      A      It's possible, yes.

 6      Q      Do you remember reviewing this document?

 7      A      No, I don't.

 8      Q      Do you remember generally being aware that

 9   your home was going to be entering foreclosure?

10      A      Not at all.

11      Q      Looking at the first paragraph, it says we

12   understand you may be facing challenges in keeping

13   up with your mortgage payments.  If you're feeling

14   overwhelmed and wondering where to get help now a

15   Wells Fargo representative is ready to meet with you

Page 85

Delacruz.txt

16   right in your own community.

17          Do you see that?

18      A   Yes.

19      Q   And then underneath it says, come to our

20   free mortgage assistance event in San Francisco.

21          Do you see that?

22      A   Yes.

23      Q   Did you attend the free mortgage

24   assistance event?

25      A   No.

                                              82

 1      Q   And why not?

 2      A   I don't remember reading this document.

 3      Q   So you were not aware at this time that

 4   your Fisher Court property was delinquent?

 5      A   Huh-uh, no.

 6      Q   As far as you knew at this time, your

 7   uncle was still making the monthly payments?

 8      A   I believe so.

 9      Q   I'm now handing to you what we have marked

10   as Exhibit 615, which is Bates labeled WFHERNANDEZ

11   00174446 to 00174447.

12          (Defendant's Exhibit    was marked for

13          identification.)

14   BY MS. ROSS:

Page 86

Delacruz.txt

15      Q     And this is a letter from Wells Fargo

16   directed to you; is that right?

17      A     Yes.

18      Q     And it was sent to the address 583 Gellert

19   Boulevard, Daly City, California; is that right?

20      A     Yes, yes.

21      Q     And the letter is dated September 13th,

22   2013; is that right?

23      A     Yes.

24      Q     Did you receive this document?

25      A     I believe so.

                                                          83

1       Q     And reading the first paragraph, it says,

2    we are writing to let you know we have referred your

3    mortgage to our foreclosure attorney and the

4    foreclosure process has begun.  However, you may

5    still have an opportunity to keep your home or

6    prevent foreclosure even if you previously indicated

7    that you did not wish to stay in your home.

8             Do you see that?

9       A     Mh-hm, yes.  I'm sorry.

10      Q     So is this around when you were first made

11   aware that your home was going to be entering the

12   foreclosure process?

13      A     Yes.

Delacruz.txt

14    Q    The letter says you still may have time if

15    you act immediately and asks for you to contact

16    Wells Fargo.

17            Do you see that?

18    A    Yes.

19    Q    Did you contact Wells Fargo?

20    A    No.

21    Q    And why not?

22            MR. KOSBIE:  I object as to form.

23            THE WITNESS:  I don't know.

24    BY MS. ROSS:

25    Q    Were you concerned that your home was

                                                          84
1    going to be foreclosed?

2    A    I wasn't.

3    Q    Why weren't you concerned?

4    A    Because I thought -- because I thought I

5    could take care of it.  I mean, not take care of it,

6    but I thought it was going to -- my uncle would take

7    care of it, you know.

8    Q    Did you talk to your uncle at this time?

9    A    Yeah, I think so.  I had an idea he wasn't

10    going to be able to take care of this, but I thought

11    he was.

12    Q    And what did you say in this conversation

Delacruz.txt

13   with your uncle?

14       A    I just asked him what's going on and he

15   said I think it went south, and I'm like okay.

16       Q    So he notified you that he was no longer

17   going to be making payments?

18       A    Yeah.

19       Q    And did you decide that you were no longer

20   going to make payments either?

21       A    Yes.

22       Q    And that you were going to let the home go

23   through the foreclosure process; is that right?

24       A    Yes.

25       Q    And that's why you never reached out to

                                                          85

 1    Wells Fargo?

 2       A    Yeah.

 3       Q    Okay.  I'm now handing you what we're

 4   going to mark as 616.

 5           (Defendant's Exhibit    was marked for

 6            identification.)

 7   BY MS. ROSS:

 8       Q    And Exhibit 616 is Bates labeled

 9   WFHERNANDEZ 00174494 to 00174495.

10           And this is a letter from Wells Fargo

11   directed to you; is that right?

Delacruz.txt

12      A    Yes.

13           Q    And it was sent to the address on the

14    first page it says 583 Gellert Boulevard, Daly City,

15    California; is that right?

16      A    Yes.

17           Q    And the letter is dated September 18th,

18    2013; is that right?

19      A    Yes.

20           Q    Did you receive this document?

21      A    I don't remember.

22           Q    It's very similar to the document we were

23    just looking at; is that right?

24      A    Yeah, yeah.

25           Q    Yeah.  And you do remember receiving the
                                                            86
♠     1    previous document?

2      A    Yeah, I think I do, yeah.

3           Q    And this is also notifying you that your

4    mortgage is currently in foreclosure; is that right?

5      A    Mh-hm.

6           Q    And it again says that you may still have

7    an opportunity to keep your home or prevent

8    foreclosure and it tells you to contact Wells Fargo?

9      A    Yes.

10           MR. KOSBIE:  I object as to form.

Delacruz.txt

11   BY MS. ROSS:

12        Q    And did you contact Wells Fargo after

13   receiving this letter?

14        A    No.

15        Q    And that's because as we just discussed

16   that you were fine letting the home go through

17   foreclosure?

18             MR. KOSBIE:  I object as to form.

19             THE WITNESS:  (Nods head).

20   BY MS. ROSS:

21        Q    Oh, I realize that you nodded your head.

22        A    Yes, yes.

23        Q    Okay.  I'm going to re-ask the question.

24             Did you contact Wells Fargo after

25   receiving the letter, Exhibit 616?

                                                  87

1         A    No.

2         Q    And that's because you were fine letting

3    the home go through foreclosure; is that right?

4         A    Yes.

5         Q    Okay.  So I'm now going to hand you what

6    we are marking as Exhibit 617.

7              (Defendant's Exhibit    was marked for

8              identification.)

9    BY MS. ROSS:

Page 91

Delacruz.txt

10      Q    Do you recall receiving an official notice

11   of default that your home was in the foreclosure

12   process?

13      A    Yes.

14      Q    Looking at Exhibit 617, which is Bates

15   labeled WFHERNANDEZ 00174650 to 174666, is this the

16   notice of default for the property at 2942 Fisher

17   Court?

18      A    Yes.

19      Q    And this document is dated on the second

20   page, it has a date, September 18th, 2013, at the

21   top; is that right?

22      A    Yes.

23      Q    Okay.  And this notice was sent to you.

24   On the first page it has your -- oh, it has the

25   Fisher Court address; is that right?

                                                    88

 1      A    Yes.

 2      Q    Okay.  Did you receive this document?

 3      A    Yes.

 4      Q    Okay.  Did you do anything in response to

 5   receiving this document?

 6      A    No.

 7      Q    You didn't call Wells Fargo?

 8      A    No, I didn't call Wells Fargo.

Delacruz.txt

9       Q    You didn't send any letters to Wells

10   Fargo?

11       A    No, I didn't.

12       Q    Do you recall that Wells Fargo reached out

13   to you even after the foreclosure process had begun,

14   asking you to call them to discuss options for

15   avoiding foreclosure if you wanted to?

16       A    No, I don't remember.

17       Q    I'm now handing you what we're going to

18   mark as Exhibit 618.

19            (Defendant's Exhibit    was marked for

20            identification.)

21   BY MS. ROSS:

22       Q    Exhibit 618 is Bates labeled WFHERNANDEZ

23   00174492 to 00174493.

24            This is a letter from Wells Fargo directed

25   to you; is that right?

                                                    89
 1       A    Yes.

 2       Q    And it was sent to the address 583 Gellert

 3   Boulevard, Daly City; is that right?

 4       A    Yes.

 5       Q    And that's where you lived at the time?

 6       A    Yes.

 7       Q    And the letter is dated October 10th,

Delacruz.txt

8  2013; is that right?

9      A   Yes.

10     Q   Do you -- did you receive this document?

11     A   I don't remember.

12     Q   But it is likely that you did receive it?

13         MR. KOSBIE:  I object as to form.

14         THE WITNESS:  Probably, yes.

15 BY MS. ROSS:

16     Q   Because you generally check your mail that

17 is sent to the Gellert Boulevard address?

18     A   Of course, yes.

19     Q   The letter says in the first paragraph, we

20 understand you may be facing challenges in keeping

21 up with your mortgage payments.  If you're feeling

22 overwhelmed and wondering where to get help now a

23 Wells Fargo representative is ready to meet with you

24 right in your own community.

25         Do you see that?

                                              90

1      A   Yes.

2      Q   And then it offers for you to come to the

3 mortgage assistance event in San Francisco; is that

4 right?

5      A   Yeah.

6      Q   Did you attend the mortgage assistance

Delacruz.txt

7   event?

8       A    No, I didn't.

9       Q    And why not?

10      A    Because I don't think I read this.

11      Q    Okay.  Oh.  I guess we're going to take a

12  break because they also have to change the media and

13  that will just give us a couple of minutes.

14           THE VIDEOGRAPHER:  We're going off the

15  record.  The time is 11:40 a.m.

16           (Recess taken.)

17           THE VIDEOGRAPHER:  We are back on the

18  record.  The time is 11:55 a.m. and this is the

19  beginning of media Number 2 in the deposition of

20  Jerry Dela Cruz on December 10th, 2019.  Please

21  proceed.

22  BY MS. ROSS:

23      Q    Mr. Dela Cruz, before we took our break,

24  do you recall that we were kind of going through

25  some letters you received from Wells Fargo?

                                                     91

1       A    Yes.

2       Q    Okay.  I'm going to show you one more.

3   619, please.

4            (Defendant's Exhibit     was marked for

5            identification.)

                    Page 95

```
                            Delacruz.txt
 6   BY MS. ROSS:

 7        Q    I'm showing you a document that we are

 8   marking as Exhibit 619, which is Bates labeled

 9   00174425 to 00174427.  And this is a letter that

10   Wells Fargo sent to you; is that right?

11        A    Yes.

12        Q    And they sent it to the address 583

13   Gellert Boulevard, Daly City, California; is that

14   right?

15        A    Mh-hm, yes.

16        Q    And that was the address you were living

17   in at this time?

18        A    Yes.

19        Q    The letter is dated October 21st, 2013; is

20   that right?

21        A    Yes.

22        Q    Okay.  Did you receive this letter?

23        A    I don't remember.

24        Q    Is it likely you received this letter?

25             MR. KOSBIE:  I object as to form.
```

                                                          92
```
 1             THE WITNESS:  (Nods head).

 2   BY MS. ROSS:

 3        Q    Is that yes?

 4        A    Yes.
```

Delacruz.txt

5       Q    Do you see in the first paragraph it says,

6    we understand you've been facing challenges and have

7    fallen behind on your mortgage payments.  Even if

8    you haven't been eligible for assistance in the

9    past, we may be able to help you avoid a foreclosure

10   sale.  Call today to learn about the mortgage

11   assistance and the special incentive opportunity

12   that may be available to you.

13            Do you see that?

14       A    Yes.

15       Q    So Wells Fargo was asking you to call them

16   to learn about mortgage assistance; is that right?

17       A    Yes.

18       Q    And did you call Wells Fargo at this time?

19       A    No, I didn't.

20       Q    And why not?

21       A    I didn't feel -- I just didn't want to.

22       Q    Do you recall ever calling Wells Fargo

23   about your mortgage?

24       A    No.

25       Q    Did you ever write to Wells Fargo about
                                                        93
1    your mortgage?

2        A    No.

3        Q    Did you want to keep the home?

Delacruz.txt

4        A    No.

5        Q    Why not?

6        A    It was out of the way for me.  It was too

7    far.

8        Q    And you -- I believe you mentioned earlier

9    that when you spoke to your uncle about the mortgage

10   and his lack of monthly payments, he said that it

11   went south, or something like that; is that right?

12       A    Yeah.

13       Q    And what did you interpret that to mean?

14       A    That it wasn't going to happen anymore,

15   that the -- I guess we weren't keeping the property

16   anymore.

17       Q    And that's because he wasn't going to make

18   the monthly payments anymore?

19       A    I think so, yes.

20       Q    And you didn't want to make the monthly

21   payments?

22       A    I didn't.  I couldn't.

23       Q    Did you say -- sorry.

24       A    No.

25       Q    You couldn't make the monthly payments?
                                                        94
     1        A    No.

     2        Q    Why not?

                         Delacruz.txt
     3        A     I just had other things I had to take care

     4    of.

     5        Q     Such as?

     6        A     Like my own bills.

     7        Q     What were your own bills?

     8        A     Like, you know, credit cards, stuff like

     9    that, yeah, the normal stuff.

    10        Q     Rent?

    11        A     Rent.

    12        Q     Utilities?

    13        A     Yeah, payments, car payments.

    14        Q     I was going to ask, so you did have car

    15    payments as well?

    16        A     Yes, yes, I did.

    17        Q     Did you have trouble making payments on

    18    these other items you just listed, such as credit

    19    cards, rent, utilities?

    20        A     No.

    21            MR. KOSBIE:   I object as to form.

    22    BY MS. ROSS:

    23        Q     Were you ever late on making payments on

    24    rent?

    25        A     Rent?  No.
                                                           95
     1        Q     Were you ever late on making payments on

Delacruz.txt

2   utilities?

3        A    No.

4        Q    Were you ever late on making payments on

5   your car?

6        A    Sometimes.

7        Q    What about were you ever late on making

8   payments for your credit cards?

9        A    Sometimes, yes.

10        Q    How often would that be?

11        A    I don't remember.

12        Q    Like every other month or --

13        A    Probably every other month.

14        Q    Okay.  Did you ever consider keeping the

15   home, the 2942 Fisher Court property?

16        A    No.

17        Q    Did you think that maybe if the payments

18   were lower, you would be able to keep the home?

19             MR. KOSBIE:  I object as to form.

20             THE WITNESS:  No.

21   BY MS. ROSS:

22        Q    So even if the monthly payments were

23   reduced to, say, $150 a month, you would have chosen

24   to not keep the property?

25        A    Yeah.

                                                    96

Delacruz.txt

1              MR. KOSBIE:  I object as to form.

2              THE WITNESS:  Yes.

3      BY MS. ROSS:

4          Q    Essentially, it didn't matter what the

5      monthly payments were?  You had decided you weren't

6      going to keep the property; is that right?

7              MR. KOSBIE:  I object as to form.

8              THE WITNESS:  Yes.

9      BY MS. ROSS:

10         Q    Because at the time of foreclosure, the

11     monthly payments were around $330 a month.  That was

12     what your uncle had previously been paying.  And so

13     just so I'm clear, even if the payments were reduced

14     by the bank to $200 a month, you would have chosen

15     to continue with foreclosure; is that right?

16             MR. KOSBIE:  I object as to form.

17             THE WITNESS:  Yes.

18     BY MS. ROSS:

19         Q    Even if the payments were reduced to $50 a

20     month, you would have chosen foreclosure?

21         A    I just didn't want any more problems.

22         Q    And it was far away for you.

23         A    Yes, yeah.

24         Q    Yeah.  So you are aware then that the

Delacruz.txt
25   property eventually went into foreclosure?

97

1        A    Yes.

2        Q    And are you aware that the property was

3   sold?

4        A    Not at all.

5        Q    Okay.  Then let's look at Tab 26.  I'm now

6   handing you what we're going to mark as Exhibit 620.

7             (Defendant's Exhibit      was marked for

8             identification.)

9   BY MS. ROSS:

10       Q    Exhibit 620 is Bates labeled

11   WFHERNANDEZ 178604 to 608.

12            Have you seen this document before?

13       A    I don't remember.

14       Q    Looking at the top left corner of the

15   document, it identifies the property address as 2942

16   Fisher Court in Stockton, California.

17            Do you see that?

18       A    Yes.

19       Q    And this is the property address that

20   we've been talking about all day that you previously

21   owned?

22       A    Yes.

23       Q    And if you look on the second page, at the

Delacruz.txt

24   top, it says trustee in compliance with said notice

25   of trustee sale and in exercise of its powers under

98

1    said deed of trust sold the herein described

2    property at public auction on January 23rd, 2014.

3    Grantee being the highest bidder at said sale became

4    the purchaser of said property for the amount bid

5    being $50,000.

6          Do you see that?

7    A    Yes.

8    Q    Were you aware that the property was sold

9    on January 23rd, 2014?

10   A    No.

11   Q    And were you aware the property was sold

12   for $50,000?

13   A    No.

14   Q    When did you become aware that the

15   property was sold?

16   A    I didn't care.  I didn't know and I --

17   Q    Yeah.

18   A    Yeah.

19   Q    Do you know if anyone was living at the

20   property at the time of foreclosure?

21   A    No, I don't.

22   Q    Your uncle wasn't living at the property;

Delacruz.txt

23   is that right?

24        A    I don't think he was.

25        Q    Do you blame Wells Fargo for the
                                                    99
 1   foreclosure of your property?

 2             MR. KOSBIE:  I object as to form.

 3             THE WITNESS:  No.

 4   BY MS. ROSS:

 5        Q    Based off of these letters that we've

 6   looked at today, especially the ones that were sent

 7   to your address at Gellert Boulevard, do you feel

 8   like Wells Fargo was willing to work with you if you

 9   wanted to save your property?

10        A    Yes.

11        Q    And that you decided you weren't going to

12   contact Wells Fargo because you didn't want the

13   property anymore; is that right?

14             MR. KOSBIE:  I object as to form.

15             THE WITNESS:  Yes.

16   BY MS. ROSS:

17        Q    When was the next time that you heard from

18   Wells Fargo after the foreclosure?

19        A    I don't remember.

20        Q    Was it likely when you received a letter

21   in September 2018?

Delacruz.txt

22      A    Yes.

23      Q    Okay.  I'm now handing you what we are

24   going to mark as Exhibit 621.

25           (Defendant's Exhibit    was marked for
                                                      100
 1                identification.)

 2   BY MS. ROSS:

 3      Q    Exhibit 621 is Bates labeled WFHERNANDEZ

 4   00174480 to 174482.  This is a letter from Wells

 5   Fargo directed to you.

 6           Do you see that?

 7      A    Mh-hm.

 8      Q    And it was sent to --

 9      A    Yes.

10      Q    -- the address at -- no problem.  It was

11   sent to the address at 583 Gellert Boulevard, Daly

12   City, California; is that right?

13      A    Yes.

14      Q    And it's dated September 24th, 2018; is

15   that right?

16      A    Yes.

17      Q    And the letter is referring to, if you see

18   in the subject, it is referring to the property 2942

19   Fisher Court, Stockton, California?

20      A    Yes.

Delacruz.txt

21      Q    And it says we have some difficult news to

22   share.  When you were considered for a loan

23   modification you weren't approved and now we realize

24   you should have been.  We based our decision on a

25   faulty calculation and we're sorry.  If it had been
                                                            101
 1   correct you would have been approved for a trial

 2   modification.  And the letter references an enclosed

 3   payment; is that right?

 4      A    Yes.

 5      Q    And it says in the third paragraph you'll

 6   find a payment enclosed to help make up for your

 7   financial loss.

 8           Do you see that?

 9      A    What was it again?

10      Q    In the third -- it's kind of -- it's the

11   paragraph --

12      A    Oh, yes, yes.

13      Q    It's the third paragraph, I guess.  So it

14   says you'll find a payment enclosed to help make up

15   for your financial loss.  Do you see that?

16      A    Yes.

17      Q    And was there an enclosed check with this

18   letter?

19      A    Yes, there was.

Delacruz.txt

20      Q    I'm now handing you what we're going to

21   mark as Exhibit 622.

22           (Defendant's Exhibit     was marked for

23           identification.)

24   BY MS. ROSS:

25      Q    622 is Bates labeled WFHERNANDEZ 00178619.
                                                        102
 1           Is this the check that was enclosed with

 2   the letter we were just looking at?

 3      A    Yes.

 4      Q    What is the amount of the check?

 5      A    15,000.

 6      Q    And you cashed this check; is that right?

 7      A    Yes.

 8      Q    What was your initial reaction to

 9   receiving this letter and this check from Wells

10   Fargo?

11           MR. KOSBIE:  I object as to form.

12           THE WITNESS:  Thank you.

13   BY MS. ROSS:

14      Q    You were happy to receive the check; is

15   that right?

16      A    Yes.

17      Q    Did you talk to anyone about this letter?

18      A    No, not really.

Delacruz.txt

19       Q    Did you talk to your uncle?

20       A    No.

21       Q    Looking back at the letter, which is

22  Exhibit 621, now looking at the last -- the

23  paragraph above the we're here to help paragraph, it

24  says, if you don't feel that we've made things

25  right, you can consider mediation.

                                                   103

 1            Do you see that?

 2       A    Yes.

 3       Q    And then if you see the letter has on the

 4  second page a mediation request form.

 5       A    Mh-hm, yes.  Sorry.

 6       Q    And did you request mediation?

 7       A    No.

 8       Q    Why not?

 9       A    Too much hassle.  I was happy with what I

10  had.

11       Q    You were happy with the amount of money

12  that Wells Fargo had given to you?

13       A    Mh-hm.

14       Q    And you didn't think that you necessarily

15  needed more money; is that right?

16            MR. KOSBIE:  I object as to form.

17            THE WITNESS:  (Nods head).

Delacruz.txt

18   BY MS. ROSS:

19       Q    Sorry.  I'm going to ask it again just

20   because you nodded your head.

21       A    Oh, I'm sorry.

22       Q    No problem.  You were happy with the

23   amount of -- you were happy with the amount of money

24   that Wells Fargo had given to you; is that right?

25       A    Yes.
                                                    104
 1       Q    Okay.  And you didn't necessarily think

 2   that you needed more money; is that right?

 3       A    Yes.

 4            MR. KOSBIE:  I object as to form.

 5            THE WITNESS:  Yes.

 6   BY MS. ROSS:

 7       Q    I'm now handing you a document that we are

 8   going to mark as Exhibit 623.

 9            (Defendant's Exhibit     was marked for

10            identification.)

11   BY MS. ROSS:

12       Q    Exhibit 623 is Bates labeled WFHERNANDEZ

13   00174476 to 00174479.

14            And this is a letter from Wells Fargo to

15   you dated January 11th, 2019; is that right?

16       A    Yes.

Delacruz.txt

17      Q    And it was sent to your home at 583

18   Gellert Boulevard in Daly City; is that right?

19      A    Yes.

20      Q    And it's referring to the property

21   address -- the Fisher Court property?

22      A    Mh-hm, yes.

23      Q    And this letter is following up on the

24   letter we just looked at about the error; is that

25   right?

                                                    105

 1      A    Yes.

 2      Q    And it again attaches a mediation request

 3   form, which is on page 3?

 4      A    Yes.

 5      Q    And it says that you can request mediation

 6   if you do not feel that Wells Fargo has made things

 7   right; is that correct?

 8      A    Yes.

 9      Q    Did you complete the mediation request

10   form?

11      A    No.

12      Q    Because you didn't want to mediate; is

13   that right?

14      A    Yes.

15      Q    Okay.  Okay.  I'm now handing you what

Delacruz.txt

16    we're going to mark as Exhibit 624.

17            (Defendant's Exhibit     was marked for

18            identification.)

19    BY MS. ROSS:

20      Q    624 is Bates labeled WFHERNANDEZ 00174475.

21            And this is a letter from Wells Fargo to

22    you dated November 18th, 2019; is that right?

23      A    Yes.

24      Q    And it was sent to your address on Gellert

25    Boulevard; is that right?

                                                    106

 1        A    Yes.

 2        Q    And this letter again references an

 3    enclosed payment?

 4        A    Yes.

 5        Q    I'm now handing you what we're going to

 6    mark as Exhibit 625.

 7            (Defendant's Exhibit     was marked for

 8            identification.)

 9    BY MS. ROSS:

10        Q    Exhibit 625 is Bates labeled WFHERNANDEZ

11    00178620.

12            Is this the check that was enclosed with

13    the letter we were just looking at, Exhibit 624?

14        A    Yes.

Delacruz.txt

15      Q    What is the amount of the check?

16      A    15,000.

17      Q    And you cashed that check; is that

18   correct?

19      A    Yes, I did.

20      Q    Did you talk to anyone about receiving

21   this letter and check in November 2019?

22      A    No.

23      Q    What was your reaction to receiving this

24   letter?

25      A    Happy again.

                                                    107

1       Q    Did you talk to your uncle about the

2    letter?

3       A    Nope, no.

4       Q    So in total you received $30,000 from

5    Wells Fargo; is that correct?

6       A    Yes.

7       Q    And what did you do with the money?

8       A    I put it in my savings.

9       Q    Did you give any of the money to your

10   uncle?

11      A    No.

12      Q    Why not?

13      A    He doesn't deserve it.

Delacruz.txt

14      Q    Why not?

15      A    He's the one -- they were the ones

16   garnishing my wages.

17      Q    How much did they garnish of your wages?

18      A    I don't remember.

19      Q    Do you know how long they were garnishing

20   your wages?

21      A    Three, four months.

22      Q    So about four months total?

23      A    Yeah.

24      Q    Do you have -- would that be reflected in

25   your pay stubs?
                                                    108

1         A    I believe so.

2         Q    And do you have copies of those at your

3    home?

4         A    I don't know.  I'm not sure.

5         Q    Okay.  Do you think it would have been

6    ballpark a thousand dollars that they garnished?

7         A    I don't remember.  I think so.

8         Q    Okay.  About a thousand?

9         A    Yeah, it might have been, yes.

10        Q    Would it have been above a thousand?

11        A    I don't remember.  It hurt a little.  It

12   hurt me for a while.

Delacruz.txt

13      Q    Yes, no, definitely, definitely.  Would it

14  have been less than 5,000?

15      A    Less than five -- yes.

16      Q    I'm just trying to get a ballpark.  So

17  maybe less than 3,000?

18      A    I think so, yes.

19      Q    So between 1 and 3,000 somewhere, maybe

20  around there?

21      A    Yes.

22      Q    And we can get the exact number if we

23  need.

24           And they were garnishing your wages

25  because of the foreclosure; is that right?

                                                    109

 1      A    Yes.

 2      Q    Do you believe you were harmed by Wells

 3  Fargo's actions?

 4           MR. KOSBIE:  I object as to form.

 5           THE WITNESS:  No.

 6  BY MS. ROSS:

 7      Q    Do you feel that you have been

 8  sufficiently compensated by Wells Fargo for your

 9  injuries?

10           MR. KOSBIE:  I object as to form.

11           THE WITNESS:  Yeah.

Delacruz.txt

12  BY MS. ROSS:

13      Q    And do you feel that Wells Fargo has

14  compensated you for the garnished wages that --

15           MR. KOSBIE:  I object as to form.

16  BY MS. ROSS:

17      Q    -- you had during those four months?

18      A    Yes.

19      Q    Are you seeking additional damages from

20  Wells Fargo other than the $30,000?

21           MR. KOSBIE:  I object as to form.

22           THE WITNESS:  No.

23  BY MS. ROSS:

24      Q    Are you planning to further participate in

25  this lawsuit?
                                              110
 1      A    What do you mean?

 2      Q    If you were asked to go to a courtroom and

 3  testify before a judge, would you be willing to do

 4  that?

 5      A    No.

 6      Q    And that's because you're not seeking any

 7  additional damages; is that right?

 8      A    Yeah.

 9           MR. KOSBIE:  I object as to form.

10           THE WITNESS:  Yes.

                              Delacruz.txt
11   BY MS. ROSS:

12        Q    Are you seeking -- one clarification

13   question.  You're not seeking any damages for

14   emotional distress from Wells Fargo; is that right?

15             MR. KOSBIE:  I object as to form.

16             THE WITNESS:  No.

17             MS. ROSS:  I think -- if we can just take

18   a quick break so I can go through my notes real

19   quick and make sure I don't have any clarification

20   questions, but I think we're almost done.

21             THE VIDEOGRAPHER:  We're going off the

22   record.  The time is 12:19 p.m.

23             (Recess taken.)

24             THE VIDEOGRAPHER:  We are back on the

25   record.  The time is 12:31 p.m.  Please proceed.
                                                     111
 1   BY MS. ROSS:

 2        Q    Mr. Dela Cruz, I only have a few

 3   questions, and this is just to clarify some

 4   testimony that took place earlier today where you

 5   responded with a mh-hm.

 6             So during the 2011 to 2013 time period

 7   when your uncle was making monthly payments, he

 8   never notified you that he was receiving letters

 9   from Wells Fargo about past due payments; is that

                           Page 116

Delacruz.txt

10   right?

11        A    Yes.

12        Q    And he never told you that he was not

13   making payments; is that right?

14        A    Yes.

15        Q    And during this time period before you

16   learned of the foreclosure, you weren't paying

17   attention to whether or not your uncle was making

18   payments; is that right?

19        A    Yes.

20        Q    And so you weren't monitoring the mortgage

21   with Wells Fargo; is that right?

22        A    Yes.

23        Q    You were trusting your uncle to make the

24   payments?

25        A    Yes, I was.
                                                        112
 1        Q    Okay.  No further questions.

 2             MR. KOSBIE:  No questions.

 3             MS. ROSS:  Oh, great.

 4             THE VIDEOGRAPHER:  This concludes today's

 5   deposition of Jerry Dela Cruz on December 10th,

 6   2019.  We're going off the record.  The time is

 7   12:32 p.m.

 8

Delacruz.txt

```
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

113