# EXHIBIT 20

121019EScampos

1

1   Tuesday, December 10th, 2019, for Esquire Deposition

2   Solutions.  Taken at 333 South Grand, 37th floor.  At

3   Winston & Strawn.  Case No. 3:18-cv-07354-WHA)

4   videographer is Jonathan manual.  /SKPWR-FPLT on J o-n-a

5   t-h-a-n.  Man well.  M-a-n u-e-l.  John ^ <Answer>No

6   ^ January ^ John ^ <Answer>No Jonathan Manuel)

7           MR. PAUL:  Mr. Paul.

8           MS. FELLOWS:  Ms. Ashlea G Schwartz

9   ^ <Answer>No /SWARSZ.  A s-h-l-e-a.  G.  S c-h-w-a r-z

10  SCH.  CHW.  HWA.  WAR.  ARD.  ARZ.  ASH.  SHL.  HLE.

11  LEA.

12          THE VIDEOGRAPHER:  Everyone is ready to

13  proceed?

14          THE REPORTER:  It looks like Ms. Suarez is

15  going to be doing the objecting).

16          THE VIDEOGRAPHER:  Everybody ready to

17  proceed?

18          MS. BRINSON:  Yes.

19          THE VIDEOGRAPHER:  Okay.

20          Good morning.  This is the tape No. 1 to the

21  videotaped deposition of Sandra Campos in the matter of

22  Alicia Hernandez et al. versus Wells Fargo Bank.  This

121019EScampos

23    is case No. 3:18-cv-07354-WHA.

24                    This deposition is being held at 333

25    South Grand Avenue, Los Angeles beings California,

                                                          2

1    90071, on December 10th, 2019.

2                    The time is approximately 9:11 -- sorry,

3    912 a.m.  My name is Jonathan Manuel and I am the

4    videographer.

5                    The court reporter is Marceline Noble.

6                    Counsel, will you please introduce

7    yourselves and affiliation and witness will be sworn in.

8                    MS. BRINSON:  Kobe prince son from

9    Winston & Strawn representing Wells Fargo.  Here alock

10   with Peyton Miller from Winston restaurant.

11                   MS. FELLOWS:  Laura ^ fellows representing

12   Ms. Campos.  Also here with Mr. Paul also with.^^^

13                   Witness sworn.

14   BY MS. BRINSON:

15     Q.  Okay.  Good morning, Ms. Campos.

16     A.  Good morning.

17     Q.  I'm Kobe written son, I'm an attorney for

18   Wells Fargo and today I'll be running this deposition

19   and can you go ^ <Answer>No asking you questions.

121019EScampos

20      A.  Uh-huh.

21      Q.  What I'm going to start with is just to run

22   through -- ^ <Answer>No the run of the day, what the

23   deposition will entail and some of the /TKPWHRAOUPB

24   ^ <Answer>No ground rules for what I'll be doing and

25   what we'll need for you to do as well.

^

                                                    3


1           Is that fair?

2       A.  (No audible response.)

3       Q.  Have you ever been deposed before?

4       A.  No.

5       Q.  So let's start with this.  First I'm going to

6    have you say your name and spell you are ^ <Answer>No

7    your name for the record.

8       A.  Sandra Campos.  S-a-n d-r-a.  C-a m-p-o.

9       Q.  Okay.  So you say you've never testified before?

10      A.  No.

11      Q.  Have you ever testified in court before?

12      A.  No.

13          THE REPORTER:  Check name).

14      Q.  So the most important thing today is to remember

15   to speak clearly and to speak audibly because although

16   we do have the video, the court reporter needs to take

121019EScampos

17   down everything you say and that is difficult for her if

18   you're nod ^ <Answer>Noing or shaking your head.

19        So if you could respond yes or no or just make

20   sure that your responses are verbal, that will help the

21   court reporter.

22   A.   Yes.

23   Q.   Second piece, ^ <Answer>No, we'll go through,

24   you know, maybe an hour or so, we'll take breaks, but if

25   you need to take a break, please let your counsel know

                                                              4

1    or let us know and we're happy to take a break.

2         The only thing that I ask you to do is you not

3    request a break in the middle of the either me asking a

4    question or you respond to go a question.

5    A.   That's fine.

6    Q.   The ^ <Answer>No the next order of business is

7    that under the rules of the judge that is overseeing

8    this case, you may not discuss your testimony during

9    breaks or during lunch.

10        Is that clear?

11   A.   I understand.

12   Q.   So -- next thing, if I ask a question that you

13   don't understand, please feel ^ <Answer>No feel free

121019EScampos

14    to ask me to rephrase it.  I may or may not rephrase it,

15    depending on my perception of the question.  But you're

16    certainly free to ask me to rephrase if you need for me

17    to do so.

18        A.  Yes.

19        Q.  Is there anything else?  I think that's it.  All

20    right.  Do you understand that you're under oath today?

21        A.  Yes.  I do.

22        Q.  Do you understand that being under in the

23    deposition has the same force of law as if you were

24    sitting in the courtroom testifying?

25        A.  Yes.

                                                            5

1        Q.  Are you prepared to testify truthfully and

2    honestly today in response to my questions?

3        A.  Yes.

4        Q.  Are you under the influence of any --

5    ^ <Answer>No drugs or alcohol or anything else that

6    may I ^ <Answer>No impair your ability to answer

7    questions today?

8        A.  No.

9        Q.  The other logistic for today is if you will

10    please make sure that I have answered -- that I'm done

121019EScampos

11   asking the question and then answer.  That will also

12   help the court reporter capture everything we're saying

13   that's going to be apparent as we're talking because

14   sometimes I'll be asking ^ <Answer>No speaking and

15   then you'll want to answer before I finish because

16   you're going to know what I'm -- where I'm going with

17   it.  But if you'll just give me the chance to answer

18   completely -- sorry, to finish my question completely

19   and then you answer, that will help the transcript to be

20   clear for everyone.

21        All right?

22   A.  That's fine.

23   Q.  All right.  Okay.  Is there any reason that you

24   cannot testify truthfully today?

25   A.  No.

6

1   Q.  What did you do to prepare for this deposition?

2        MS. FELLOWS:  Object to the extent that that

3   calls for ^ attorney, to the extent that there are

4   communications you can answer.  /AE /AE.

5   BY MS. BRINSON:

6   Q.  You can answer.

7   A.  Oh.  We met with my lawyer.

Page 6

121019EScampos

8     Q.  How many times did you meet with your lawyer?

9     A.  Once.

10    Q.  And who is your lawyer?

11    A.  Laura.

12    Q.  Laura fellows?

13    A.  Yes.

14    Q.  Who is here today?

15    A.  Yes.

16    Q.  Did you just meet with Laura?

17    A.  Yes.

18    Q.  Have you met with any other lawyers regarding

19  this matter?

20    A.  No.

21    Q.  Have you met with any other lawyers other than

22  Laura or members of her firm?

23    A.  No.

24    Q.  Have you spoken with any lawyers other than Laura

25  and her firm?

⬆                                                           7


1     A.  No.

2             THE REPORTER:  ^ <Answer>No.

3     Q.  Did you provide any documents to -- and I'm going

4   to refer to her as Ms. Fellows for the record but I

121019EScampos

5    appreciate that you're referring to her as Laura.

6         Did you provide any documents to Ms. Fellows or

7    her firm in preparation for this deposition?

8    A.  Yes, I did.

9    Q.  Are those documents documents that you reviewed

10   in preparation for the deposition?

11   A.  Yes.

12   Q.

13   A.  No?

14         MS. BRINSON:  Counsel, have we received

15   those documents?

16         MS. FELLOWS:  You have.  And I have a list

17   of documents that she reviewed as well.

18         MS. BRINSON:  Thank you.  All right.

19   Q.  When you met with Ms. Fellows, was there anybody

20   else with you?

21   A.  My husband, Alphonso Campos.

22   Q.  Can you please spell Alphonso's name?

23   A.  A l-f-o-n s-o, C-a m-p-o-s.

24   Q.  And was there anyone else besides Mr. Campos with

25   you?

                                                    8

1    A.  No.

                   Page 8

121019EScampos

2     Q.  When did you meet with Ms. Fellows?

3     A.  Yes.

4     A.  No.

5     A.  Yesterday.

6     Q.  Was it for an hour?  I'm sorry.  I can't remember

7  if that's what you said.

8         How long did you meet with her?

9     A.  It was about two hours.

10    Q.  Was seen that here in Los Angeles?

11    A.  Yes.

12    Q.  The documents that you provided to Ms. Fellows,

13  were those documents that you had in your possession?

14    A.  Yes.

15    Q.  What did you do to find documents?

16    A.  I have a box where I put all my documents I had

17  to do with the loan with Wells Fargo.  I just put

18  everything in the same place.  So --

19    Q.  Did you provide the entire box --

20    A.  Yes.

21    Q.  -- to Ms. Fellows?

22    A.  I did.

23    Q.  Are there any documents that you have related to

24  the loan that you did not provide to Ms. Fellows?

25    A.  No.

121019EScampos

1     Q.  Did you look for any electronic documents?

2   E-mails?  That type of thing?

3     A.  Yes.  I did.

4     Q.  Did you find any?

5     A.  No.

6     Q.  What did you do to look for electronic documents

7   ^ <Answer>No documents?

8     A.  I have separate folders and I looked through the

9   folder where I thought I would have something but there

10  wasn't anything regarding that.

11    Q.  Was there a point in time where you did have an

12  electronic folder that had information about the loan?

13    A.  No.

14    Q.  Other than looking enthusiasm ^ <Answer>No

15  through -- by electronic documents, are you referring to

16  specifically to e-mails?

17    A.  Yes.  E-mails.

18    Q.  Do you have any other type of electronic files,

19  documents related to this loan?

20    A.  No.

21          MS. FELLOWS:  Object to form.

22  BY MS. BRINSON:

121019EScampos

23      Q.  Do you have any social media accounts?  Such as

24  Facebook or Instagram?

25      A.  Yes, I do.

                                                              10


1       Q.  Which ones?

2       A.  I have Facebook and Instagram.

3       Q.  What about Twitter?

4       A.  No.

5       Q.  Did you ^ <Answer>No did you review your social

6   media accounts to determine whether or not there were

7   any comments or information about this loan or this

8   matter?

9       A.  No.  I didn't have that -- those accounts back

10  when I had that loan.

11      Q.  Did you review those accounts to determine if

12  there were any comments or information about this

13  lawsuit?

14      A.  No.

15      Q.  Have you made any comments or posted any

16  information about this lawsuit on either Facebook or

17  Instagram?

18      A.  No.

19      Q.  Do you know whether or not Mr. Campos has

121019EScampos

20  documents regarding this lawsuit?

21      A.  No.

22      Q.  No, you don't know or no, he doesn't have any?

23      A.  No, he doesn't.

24      Q.  Who have you spoken with about this case besides

25  counsel and Mr. Campos?

⌃

                                                          11


1       A.  Nobody.

2       Q.  Have you ever been a party to another lawsuit?

3       A.  No.

4       Q.  Have you ever been involved in any type of

5   criminal prosecution?

6       A.  No.

7       Q.  Have you ever been a defendant in a criminal

8   action?

9       A.  No.

10      Q.  Have you ever brought bankruptcy action or any

11  other type of legal proceedings ^ <Answer>No

12  proceeding?

13      A.  Yes.  I filed for bankruptcy.

14      Q.  When was that?

15      A.  I believe it was in February 20 ^ <Answer>No

16  ^ 2014.

121019EScampos

17     Q.  Was that the only time you filed --

18     A.  Yes.

19     Q.  -- for bankruptcy?

20        ^ Ms. Campos have you ever gone by any other

21   name, maiden name or last name?

22     A.  My maiden name.

23     Q.  What is your maiden name?

24     A.  Castillo?

25     Q.  Cast tea I don't?

                                                        12

1      A.  Yes.

2      Q.  C-a-s-t-i-l-l-o?

3      A.  Yes.

4      Q.  And you're currently married to Alphonso Campos?

5      A.  Yes.

6      Q.  How long have you been married?

7      A.  25 years.

8      Q.  Have you been previously married?

9      A.  No.

10     Q.  What about Mr. Campos?

11     A.  No.

12     Q.  Where do you currently live?

13     A.  Paramount, California.

                        Page 13

121019EScampos

14   Q.  What is the address?

15   A.  15327 me men take avenue.

16   Q.  How do you spell me men take?

17   A.  P-i-m-e-n-t-a.

18   Q.  Because I'm not from California or the west

19   coast, is Paramount near Los Angeles or is it in a

20   different part of California?

21       Where is Paramount?

22   A.  It is near.  It's about 30 minutes away from L.A.

23   Q.  Do you understand that this matter is pending in

24   San Francisco; correct?

25   A.  Yes.

                                              13

1    Q.  Will you be able toss transfer -- travel to

2    San Francisco related to this lawsuit?

3    A.  Yes.

4    Q.  All right.  Before we get into the substance of

5    the deposition, do you have any questions about the

6    logistics or anything else?

7    A.  No.

8    Q.  All right.  What is your educational background.

9    A.  No?

10   A.  I graduated high school.

                          Page 14

121019EScampos

11    Q.  Where did you go to high school?

12    A.  Gardena High, in car ^ <Answer>No Gardena,

13  California.

14    Q.  Did you attend any education -- do you have any

15  education post high school?

16    A.  No.

17    Q.  What is your professional background, starting

18  with when you graduated from high school, what was your

19  first job after high school?

20    A.  Office assistant.

21    Q.  /KPWHR* ^ <Answer>No?

22    Q.  Let me go back.  When did you graduate?

23    A.  '95.  1995.

24    Q.  Office assistant.  Do you remember with whom?

25    A.  Yes.  It was in -- the place was called

                                                        14


1  ^ orange ^ Orange avenue mobile home park.

2    Q.  How long did you work for ^ orange ^ Orange

3  avenue mobile home park?

4    A.  About five years.

5    Q.  And then where did you live?

6    A.  From there I worked part time at elementary

7  school, 135th street elementary school in Gardena,

121019EScampos

8    California.

9         Q.   What type of work did you do?

10        A.   Teacher's assistant.

11        Q.   How long were you at the elementary school?

12        A.   There I was about a year.

13        Q.   Then where did you go next?

14        A.   From there I went to Sardo Donaldo bus and coach

15   upholstery, also a ^ <Answer>No office assistant.

16        Q.   How do you spell, is it Sardo Donaldo?

17        A.   S-a r /TK*R ^ <Answer>No d-o.

18        Q.   When

19        A.   No can you say the whole name of the company

20   again?

21        A.   Sardo Donaldo bus and couch upholstery.

22        Q.   That word -- it started with a bus and ended with

23   up /HOLS three ^ <Answer>No ^ Century ^ century?

24        A.   Yes.  It's a long name.

25        Q.   What did you do for Sardo Donaldo bus and coach

^

15

1    upholstery?

2         A.   Office assistant too.

3         Q.   How long did you work there?

4         A.   It was five years.

Page 16

121019EScampos

5    Q.  So ^ <Answer>No about 2006?

6    A.  No.  That was -- there was time between jobs.

7    Q.  Okay.  So --

8    A.  So there at Sardo, I started in 2005.  September

9  I believe 2005.

10    A.  No up until August 2010.

11    Q.  So Sardo bus and coach upholstery, office

12  assistant from 2005 to 2010.

13    A.  Yes.

14    Q.  Got it.  So from 2001 to 2005, what did you do?

15    A.  From 2001 --

16    Q.  So after -- ^ <Answer>No you left the

17  elementary school but before Sardo, were you working?

18    A.  After the elementary before Sardo?

19    Q.  Yes.

20    A.  I stopped elementary in 2003.

21    Q.  Oh.  I'm sorry.  I thought you said you were

22  there about a year.

23    A.  Like I said this was times I wasn't working

24  between jobs.  I didn't go straight from one to another.

25        So at the elementary school I was -- I would say

                                                          16

↑

1   from 2002 to 2003.  And then from 2003 to 2005, I wasn't
                        Page 17

121019EScampos

2    working.

3        Q.  And 2005 to 2010 you were at Sardo?

4        A.  Yes.

5        Q.  All right.  What did you do after Sardo?

6        A.  I stayed at home.  I didn't work anymore.

7        Q.  Have you worked since then?

8        A.  No.

9        Q.  All right.  So let's start with the Sardo --

10   well, what was your starting salary when you went to

11   Sardo in 2005?

12           Do you recall?

13       A.  Starting, I would like to say probably $13 an

14   hour.

15       Q.  Did you stay on an hourly basis?

16       A.  Yes.

17       Q.  Did your hourly salary increase at some point

18   while you were at Sardo?

19       A.  Yes.

20       Q.  Did you get a promotion?  Or did the salary

21   increase -- let me -- strike that.

22           Let me ask you a better question.

23           When you started as an office assistant in

24   /STHAOEF, so between 2005 and 2010, did you receive any

25   promotions?

Page 18

121019EScampos

1      A.  I had raises during my time there.

2      Q.  Did ^ <Answer>No you had raises but you

3   maintained the same position?

4      A.  It was -- I would vary.  This were different

5   positions I had to cover.  So I wasn't exactly assigned

6   a position.  I did several -- several roles while I

7   worked there.

8      Q.  Did your salary change based on the role or did

9   you have the same salary but then do different roles

10  regardless of how much your salary was?

11     A.  I would say it changed because of the amount of

12  work I had to do.

13     Q.  So from -- ^ <Answer>No the $13 an amount, how

14  long did you stay at that salary

15  ^ range ^ rank ^ raining ^ <Answer>No /RA*EURPBG

16  ^ <Answer>No rank ^ <Answer>No range?

17     A.  I don't remember.

18     Q.  Do you remember what first pay raise was --

19     A.  No.

20     Q.  -- where you went from $13 to something else?

21     A.  No, I don't remember.

22     Q.  What was the highest hourly amount you had made

121019EScampos

23    at Sardo?

24        A.  $16 an hour.

25        Q.  How many hours did you work a week?

18

1        A.  40 hours.

2        Q.  Did you ever work overtime?

3        A.  No.

4        Q.  How many weeks per year did you work?

5        A.  The whole year.  52 weeks.

6        Q.  No vacation?

7        A.  I think I would take a week off.

8        Q.  Did you have paid vacation?

9        A.  Yes.

10        Q.  Prior to Sardo, were you also working at jobs

11   that paid you an hourly wages?

12        A.  Yes.

13        Q.  What was your hourly wage at the job you had

14   before you went to Sardo?

15        A.  At the elementary school?  It was, I believe,

16   $9.75 an hour.

17        Q.  So based on what you just said, what we just went

18   through, your highest income was $16 per hour?

19        A.  Yes.

Page 20

121019EScampos

20     Q.  Do you have any recollection of how long you were

21  at that level, $16 per hour?

22     A.  I don't remember.

23     Q.  Would you have been at $16 per hour in 2005?

24     A.  No.

25     Q.  2005 you're 13, what about 2004, do you recall

                                                                    19

1  whether or not your salary went up, your hourly amount

2  went up in 2004?

3     A.  In 2004 I wasn't working there.

4     Q.  2006.  I'm going the wrong direction.

5         In 2006, were you still at $13 an hour?

6     A.  I believe I was.

7     Q.  What about 2007?

8     A.  I can't remember the exact amount.  It wasn't --

9  it was several -- it went on through the whole time I

10  was working there, there was several increases, so I

11  can't say a specific year I earned this amount.  I just

12  worked its way up to $16 an hour.

13     Q.  Between 2005 and 2010, did you have any other

14  source of income?

15     A.  Just my husband's income.

16     Q.  Was Mr. Campos working during that entire time?

121019EScampos

17      A.  Yes.

18      Q.  What did he do?

19      A.  He worked as a truck driver.

20      Q.  Do you recall what his salary was?

21      A.  He was also on an hourly bags ^ <Answer>No

22   base.  I believe back in that time it must have been

23   about 23, $24 an hour.

24      Q.  Any recollection of how many hours a week he

25   worked?

♠
                                                          20


1      A.

2      A.  No.

3              MS. FELLOWS:  Object to form.

4              THE WITNESS:  It varied.

5   BY MS. BRINSON:

6      Q.  For 2005, do you recall what your annual salary

7   was?

8      A.  No, I don't.

9      Q.  What about 2006?

10      A.  No, I don't.

11      Q.  2007?

12      A.  No.

13      Q.  2008?

121019EScampos

14      A.  No.

15      Q.  2009?

16      A.  No.

17      Q.  2010?

18      A.  No.

19      Q.  Do you have any recollection of the amount that

20  you claimed on your taxes for any of those years?

21      A.  No, I don't.

22      Q.  Do you recall how much Mr. Campos made in 2005?

23      A.  No, I don't remember.

24      Q.  2006?

25      A.  No, I don't.

                                                        21

1       Q.  Or any of the other years?

2       A.  No.

3       Q.  Was the truck driving -- was the truck -- well,

4   did he work for somebody specific as a truck driver?

5       A.  Yes.  He worked for a company.

6       Q.  Who did he work for?

7       A.  Hertz Rental equipment.

8       Q.  Did he work for Hertz Rental during the entire

9   time frame of 2005 to 2010?

10      A.  Yes.

121019EScampos

11    Q.  Do you recall whether or not his hourly wage

12  changed during that time frame?

13    A.  Yes.  He will got a raise.

14    Q.  Did he have any other source of income during

15  that time frame?

16    A.  No.

17    Q.  /STHAOEUFZ to 2010, was anyone living in your

18  household with the two of you that contributed to your

19  income?

20    A.  My mother.

21    Q.  What's her name?

22    A.  Alicia Morales.

23    Q.  How do you spell Alicia?

24    A.  A l-i-c-i-a, M o-r-a l-e /S*E ^ <Answer>No s.

25    Q.  Was Ms. Morales working at that time?

                                                    22

1    A.  No.  She was retired.

2    Q.  So you said she was contributing to the household

3  income.  What was the source of her income?

4    A.  I believe it must have been about 600 a month.

5    Q.  From what?

6    A.  From social security.

7    Q.  Was $600 a month the amount she contributed to

Page 24

121019EScampos

8   the household?

9      A.  That is the amount she received from social

10  security.

11     Q.  How much did he contribute to the household /AE

12  /AE?

13     A.  There wasn't a specific amount.  Just help with

14  food or whatever was needed.

15     Q.  Did she live in the household during that time,

16  2005 to 2010?

17     A.  Yes.

18     Q.  Your ^ <Answer>No were there any other people

19  living in that house during that time frame that

20  contributed to the household --

21     A.  No.

22     Q.  -- income?

23         All right.  In 2010, you left Sardo; is that

24  correct?

25     A.  Yes.  I was laid off.

♠

                                                        23


1      Q.  Do you remember what month?

2      A.  August of 2010.

3      Q.  Was Mr. Campos still working at that point?

4      A.  Yes.  He was.

121019EScampos

```
 5    Q.  Is he still at Hertz?

 6    A.  No.  He's not.

 7    Q.  When did he leave Hertz?

 8    A.  August 2016.

 9    Q.  When you were laid off in August of 2010, did you

10  have any source of income coming in after that?

11    A.  Yes, I did.

12    Q.  What was the source?

13    A.  Unemployment.

14    Q.  Do you remember how much the unemployment

15  payments were?

16    A.  No, I don't.

17    Q.  How long did you receive unemployment

18  compensation?

19    A.  I believe it was about -- it was less than a

20  year.

21    Q.  Were your unemployment compensation payments

22  more, equal to or less than your salary from Sardo?

23    A.  Less.

24    Q.  Do you remember how much less?

25    A.  No, I don't.
```

                                                                24

```
 1    Q.  Did you get paid unemployment compensation on a
```

Page 26

121019EScampos

2   weekly, monthly basis at that time?  How did you get

3   paid workers' compensation?

4        A.  Every two weeks.

5        Q.  When you were at Sardo, how did you get paid?

6        A.  That was weekly.

7        Q.  So on a weekly basis, how much less were you

8   making on unemployment than at Sardo?

9        A.  I don't remember the amount.

10       Q.  Would you say it was $500 less?

11       A.  I don't remember.

12       Q.  Could it have been as much as a thousand dollars

13   less?

14       A.  This is weekly that you're asking me?

15       Q.  Yes.

16       A.  No.  I believe it -- weekly it must have been

17   about 400.

18       Q.  So --

19       A.  Dollars less.

20       Q.  So roughly $12 a month?  1600?

21           Roughly $1600 a month less in income on

22   unemployment versus at Sardo?

23       A.  Yes.

24       Q.  And that was from August of 2010 until roughly

25   August of 2011?

121019EScampos

1    A.  Yes, I would -- I believe it was.

2    Q.  What about Mr. Campos, did his salary remain the

3  same starting in August of 2010 going forward?

4    A.  I know he got raises, I just don't remember the

5  specific dates of when those happened.

6    Q.  Was there any point in time when his salary went

7  down between 2005 and 2010?

8    A.  Like I said, his hours varied.  So there were

9  weeks that he did work less, so his salary was less.

10    Q.  While you were on unemployment, do you recall

11  whether or not his salary was relatively stable or did

12  it fluctuate?

13    A.  I don't remember.

14    Q.  Once your unemployment payments ended in roughly

15  August of 2011, did you have any other form of income?

16    A.  No.

17    Q.  After -- between -- let's just say, after 2010,

18  going forward, did you have any other source of income?

19    A.  No.

20    Q.  After August 2010, did Mr. Campos have any other

21  form of income other than the Hertz Rental truck

22  driving --

121019EScampos

23     A.  No.

24     Q.  -- job?

25         I'm going to switch to a different topic.

↟
                                                    26


1          Let's talk about the lawsuit that we're here for

2     today.

3          What is your understanding of what the lawsuit

4     for which you're being deposed today is about?

5     A.  It is about the mistake that happened with

6     Wells Fargo regarding loan modifications.

7     Q.  Can you describe specifically what your

8     understanding of the mistake is?

9     A.  From what I understand, there was a mistake done

10    in their system when it was time to make approved -- to

11    approve loans, loan modifications.

12    Q.  Do you know what the mistake was?

13             MS. FELLOWS:  Objection to form.

14             THE WITNESS:  No.

15    BY MS. BRINSON:

16    Q.  How did you become aware of this lawsuit?

17    A.  I received a letter from Wells Fargo.

18    Q.  As a result of that letter, did you reach out to

19    Ms. Fellow's firm?

121019EScampos

20      A.  Yes.  I did.

21      Q.  When did they start representing you in this

22  matter?

23      A.  I believe it was some time in 2018.  I don't

24  remember the exact date.

25      Q.  But more recently you've been safety device to

&uarr;

27

1  represent the class.  Is that correct?

2          MS. FELLOWS:  I'll object that calls for

3  privileged communications and I'll instruct the witness

4  not to answer.

5  BY MS. BRINSON:

6      Q.  Ms. Campos, do you understand what a named

7  representative is in a class action?

8      A.  Yes, I do.

9      Q.  And do you know who the named representatives are

10  in the lawsuit for which you're being deposed today?

11          Do you know who they are?  What their names are?

12      A.  No.

13      Q.  Are you one of the named representatives of this

14  class action?

15          MS. FELLOWS:  Object to the form.

16          THE WITNESS:  Yes.

121019EScampos

17          MS. BRINSON:  Mark this as 500.

18    BY MS. BRINSON:

19      Q.  Ms. Campos, I'm handing you what's been marked

20    Exhibit 500.  Which is the third amended class action

21    Complaint in Alicia Hernandez and others similarly

22    situated versus Wells Fargo Bank.

23          Have you ever seen this document before?

24      A.  Yes.

25      Q.  What is it?

                                                    28


1       A.  It's regarding the lawsuit that Alicia Hernandez

2     has.

3       Q.  Ms. Campos, did you provide information to be

4     included in this third amended class action Complaint?

5             MS. FELLOWS:  I'll object that calls for

6     privileged communications.

7                 To the extent that you can answer that

8     without revealing your communications with counsel, you

9     may do so.

10            THE WITNESS:  Yes.

11    BY MS. BRINSON:

12      Q.  I'm going to ask you to turn to page 15 of the

13    Third Amended Complaint.

                          Page 31

121019EScampos

14          Do you see on page 15 where it says

15   Sandra Campos?

16      A.  Yes I do.

17      Q.  Are you the Sandra Campos that's referenced on

18   page 15?

19      A.  Yes.

20      Q.  I'll have you take a look at page 15 and 16.

21   Please look at paragraphs 78 through 86.  And I'll ask

22   you about those in a few minutes?

23          MS. BRINSON:  Second amended Complaint has

24   already -- I'm sure in the record?

25          MR. SKWRAO:  It's going to get a new number.

                                                          29


1    I don't have it marked down --

2           MS. BRINSON:  Okay.  Given Judge Alsup's

3    rules about the marking of documents, Counsel I'll

4    suggest that we go ahead and mark it today but we may

5    have to go back and revisit the numbering in case it's

6    in there twice /AE?

7           MR. PAUL:  I think that's fine.  Given the

8    pleading we don't need to mark it but --

9           MS. BRINSON:  Do we even need to?

10          MR. PAUL:  I don't think so.

                          Page 32

121019EScampos

11          MS. BRINSON:  Okay.  Even better.  All

12   right.  All right.

13          MR. PAUL:  I'll just put the docket number

14   in the record.

15          MS. BRINSON:  Okay.  That's great.  For the

16   record, I'm mostly going to be showing Ms. Campos the

17   second amended class action Complaint which is document

18   127-1 in the Hernandez class action.

19          MS. FELLOWS:  Counsel, to avoid any

20   ambiguity, I think the correct document number is 137.

21   I'm not sure what part we didn't get because I don't

22   want to restate.  I think that the document that you're

23   referencing was an attachment as part of a proposed

24   motion including that document.

25          MS. BRINSON:  Okay.  Thank you.

                                                        30


 1     Q.  Ms. Campos, I'm showing you the Second Amended

 2   Complaint.  I'd like for you to take a look at the

 3   second page of the Second Amended Complaint.

 4          Can you please take a look at on Roman numeral,

 5   small I, small 1, under plaintiffs' experiences.

 6          Do you see that section?

 7     A.  Yes.  I do.

                        Page 33

121019EScampos

8      Q.  If you will review the names that are listed in

9   that section, please confirm whether or not you are

10   listed there.

11      A.  No, I am not.

12      Q.  So you were not included in the Second Amended

13   Complaint based on the list of plaintiffs that you just

14   reviewed.  But you are included in the Third Amended

15   Complaint.

16          Is that correct?

17      A.  Yes.  I am.

18      Q.  Ms. Campos, when did you become a named plaintiff

19   in this lawsuit?

20              MS. FELLOWS:  Object to the form.

21              THE WITNESS:  I don't recall the exact date.

22   BY MS. BRINSON:

23      Q.  Was it within the last month?

24              MS. FELLOWS:  Object to the form.

25              THE WITNESS:  It was sometime this year,

                                                            31

1   2019.

2   BY MS. BRINSON:

3      Q.  Early 2019?  Mid-2019?

4          What -- what part of 2019 are you referring to?

121019EScampos

5               MS. FELLOWS:  Object to the form.

6               THE WITNESS:  I don't recall the exact date.

7      BY MS. BRINSON:

8        Q.  501.

9      BY MS. BRINSON:

10       Q.  Ms. Campos, I've handed you what's been marked

11     Exhibit 501, I'll give you a chance to take a look at

12     this document and see if it refreshes your recollection

13     as to your role in this matter?

14               MS. FELLOWS:  Object to the form.

15     BY MS. BRINSON:

16       Q.  Are you ready?

17       A.  Yes.

18       Q.  Ms. Campos, after reviewing Exhibit 501 -- but

19     first Exhibit 501 is a declaration of Sandra Campos in

20     support of plaintiffs' motion for leave to file

21     Third Amended Complaint and renewed class certification,

22     do you see that on the front page?

23       A.  Yes.  I do.

24       Q.  And this document was previously filed in the

25     northern district of California.

                                                    32

1               Ms. Campos, after reviewing this document, does

121019EScampos

2  this refresh your recollection as to what your role is

3  in this lawsuit?

4      A.  Yes.

5      Q.  Does it also refresh your recollection as to the

6  timing of you becoming a class representative in this

7  case?

8      A.  Yes.

9      Q.  And is this your signature on the declaration?

10     A.  Yes, it is.

11     Q.  So according to this declaration states that in

12  paragraph 4 you understand that you're needed as a class

13  representative because you have a home -- you had a home

14  located in Paramount, California, that was secured by

15  F.H.A. Deed of Trust.

16         Is that accurate?

17     A.  Yes.

18     Q.  It also states in paragraph 3 that you spoke with

19  your attorneys, Michael Schrag and Joshua Bloomfield on

20  November 4 and November 16 about serving as a class

21  representative in this case; is that correct?

22     A.  Yes.

23     Q.  And was that the first time you spoke with

24  counsel about serving as a class representative?

25     A.  Yes.

121019EScampos

1      Q.  So it also states in paragraph 6 that your

2  attorneys explained the duties that you're assuming as

3  class representative.

4          Is that correct?

5      A.  Yes.

6      Q.  What duties are you assuming as class

7  representative in this case?

8      A.  From what I understand it is -- I'm representing

9  the State of California.

10     Q.  What does that mean to you?  What does it mean

11 that you're representing the State of California?

12     A.  What I understand is since there are so many

13 residents that have gone through this that they have

14 just picked certain people to represent.

15     Q.  Do you know how many people are in California --

16     A.  I don't know.

17     Q.  -- that you're representing?

18     A.  No, I don't.

19     Q.  Do you know what types of legal claims the other

20 people in California have?

21     A.  No, I don't.

22     Q.  Do you know whether or not their claims are

121019EScampos

23    similar to yours?

24              MS. FELLOWS:  Object to the form.

25              THE WITNESS:  No.

34

1     BY MS. BRINSON:

2        Q.  Have you met any other people in California who

3     are part of this lawsuit?

4        A.  No.

5        Q.  So when you said you represent the

6     State of California for purposes of this lawsuit, what

7     does your representation include in terms of what you

8     have to do?

9              What are you supposed to be doing.

10       A.  From what I know is just provide the documents

11    that are necessary.

12       Q.  Provide which documents?

13       A.  In regards to the loan with Wells Fargo.  Appear

14    at any meeting that is required.

15       Q.  Why did you decide to become a class

16    representative?

17       A.  From speaking with my lawyer --

18              MS. FELLOWS:  I would just object to the

19    extent that you're about to reveal privileged

121019EScampos

20   communications.  To the extent that you can answer

21   without revealing the substantive communication with

22   counsel, you may answer.

23            THE WITNESS:  I'm sorry, can you ask again.

24   BY MS. BRINSON:

25     Q.  Sure.  Why did you decide to become a class

                                                            35

 1   representative?

 2            MS. FELLOWS:  The same objection.

 3            THE WITNESS:  I'm really not sure how to

 4   answer that.

 5   BY MS. BRINSON:

 6     Q.  Prior to November, you had not been asked to be a

 7   class representative; is that correct?

 8     A.  I don't think so.

 9     Q.  So at some point, according to this declaration,

10   Michael Schrag and Joshua Bloomfield discussed with you

11   serving as class representative in this case.  Right?

12     A.  Yes.

13     Q.  Why did you say yes to the extent that you can

14   answer without revealing privileged information.

15     A.  We thought -- I'm saying my husband and myself

16   that it would -- that it would help us in this lawsuit.

121019EScampos

17    Q.  In what way?

18    A.  I'm not sure in what way, but -- yeah, I don't

19 know exactly.

20    Q.  Do you know what your compensation will be for

21 serving as class representative?

22    A.  No.

23    Q.  Will you receive compensation for serving as

24 class representative?

25    A.  I don't know.

                                                      36

1    Q.  What do you hope to get from this lawsuit?

2    A.  What we hope is that there is some kind of better

3 system that is put in place so that this won't happen to

4 other families.

5    Q.  What do you hope to gain for your family?

6    A.  What I hope to gain is just knowing that in some

7 way we helped to change something.

8    Q.  Are you seeking compensation from Wells Fargo?

9    A.  Oh, whatever is decided.

10    Q.  Whatever is decided by whom?

11    A.  Whatever is decided by I would say the judge.

12    Q.  As the -- as a representative of the class, what

13 benefit do you hope to achieve for the class?

121019EScampos

14            MS. FELLOWS:  Object to the form.

15            THE WITNESS:  You're saying for the other

16   people that are included?

17   BY MS. BRINSON:

18       Q.  Right.

19       A.  I really don't know their situation, but if it's

20   needed for them to receive some type of compensation or

21   the same as me, just that something is changed, that

22   would be it.

23       Q.  Are you seeking money on behalf of the class?

24       A.  There is no specific amount.

25       Q.  But the question was are you seeking money?

                                                          37


1        A.  Yes.

2        Q.  So you say there's no specific amount.  Is there

3    a range that you're seeking?

4        A.  No.

5        Q.  Do you believe that each person in the class

6    should get the same amount of money?

7        A.  No.

8        Q.  Why not?

9        A.  I believe each person has a different situation

10   that happened to them.

                         Page 41

121019EScampos

11      Q.  As class representative, do you feel you are able

12   to determine how much money each class member should

13   receive?

14      A.  No.

15      Q.  Do you feel that you're able to determine how

16   much you should receive?

17      A.  No.

18      Q.  Why not?

19      A.  I don't have a specific amount in mind.

20      Q.  Would $10,000 be sufficient?

21          MS. FELLOWS:  Object to the form.

22          THE WITNESS:  I don't have a specific

23   amount.

24   BY MS. BRINSON:

25      Q.  That's not my question.

                                                    38


1          Would $10,000 be sufficient?

2          MS. FELLOWS:  Object to the form.

3          THE WITNESS:  As I said, I don't -- I can't

4   answer that because it's not -- I don't have a specific

5   amount so I wouldn't be able to say yes or no.

6   BY MS. BRINSON:

7      Q.  The question that I'm asking is would it be

121019EScampos

8    sufficient for you, so I understand you don't have a

9    specific amount in mind, but I'm asking you would that

10   specific amount be sufficient to satisfy your needs in

11   this case?

12              MS. FELLOWS:  Object to the form.

13              THE WITNESS:  I don't know.

14   BY MS. BRINSON:

15     Q.  Would it take more than that?

16              MS. FELLOWS:  Object to the form.

17              THE WITNESS:  I don't know.

18   BY MS. BRINSON:

19     Q.  How many times have you met with counsel in

20   person regarding your role as a potential lead

21   plaintiff?

22     A.  In person?  Just once.

23     Q.  How long?  How long did you meet with him.

24     A.  It was just a couple of hours.

25     Q.  Was that with Mr. Schrag and Mr. Bloomfield?

                                                      39


1      A.  No.  It was just with Mrs. Fellows.

2      Q.  Was that the same meeting as your preparation --

3      A.  Yes.

4      Q.  -- for the deposition?

                        Page 43

121019EScampos

5      A.  Yes.

6      Q.  Okay.  So the conversation with Mr. Schrag and

7   Mr. Bloomfield that's referenced in the declaration, was

8   that on the phone?

9      A.  On the phone.

10     Q.  How often do you speak with counsel on the phone?

11          MS. FELLOWS:  Object.  That calls for

12   privileged communications.

13          If you can answer without revealing

14   privileged communications, you may answer.

15          THE WITNESS:  I would say two times a week.

16   BY MS. BRINSON:

17     Q.  Two times since when?

18          MS. FELLOWS:  Counsel, I think that calls

19   for privileged communications how often she's speaking

20   with her lawyers.

21          MS. BRINSON:  Is that privileged how often

22   versus the substance of the conversations?

23          MS. FELLOWS:  I mean I think if you want to

24   tell us how often you speak with your client as well.

25          MS. BRINSON:  That that Bob easy to answer

                                                        40

1   actually.

                        Page 44

121019EScampos

2      Q.  The question I'm asking is how long -- since

3   when, right?  So according to your declaration, you

4   spoke with Mr. Schrag and Mr. Bloomfield -- this is in

5   your declaration -- that you spoke with them on November

6   4th and November 16th.

7          The question is have you been speaking with them

8   twice a week since that point or were you speaking with

9   them prior to then?

10     A.  I have spoken to them prior to that and since

11  then.  It has been probably around the same amount of

12  time.

13     Q.  How much time have you devoted to this case?  How

14  much time per week do you spend on this?

15     A.  It varies depending on what I'm asked to do.

16     Q.  Do you have any idea how much more time you're

17  going to have to spend on it?

18     A.  No, I don't.

19     Q.  Do you know what role you will need to play next

20  year as the case moves forward?

21     A.  No, I don't.

22     Q.  Are you involved with the strategy in this case?

23     A.  No.

24     Q.  Have you spoken with the media at alls?

25  Newspaper, television at all about this matter?

121019EScampos

1    A.  No.

2    Q.  Let's take a break.  It's been about an hour.

3            THE VIDEOGRAPHER:  We're going off the

4    record.

5            The time is 10:13 a.m.

6            THE REPORTER:  S c-h-r-a g.  B

7    l-o-o-m-f-i-e-l-d) Schrag.

8            THE VIDEOGRAPHER:  Ready, Counsel?

9            MS. BRINSON:  Yes.

10           THE VIDEOGRAPHER:  We're now back on the

11   record.

12           The time is ^^ 11:27 a.m.

13   BY MS. BRINSON:

14   Q.  Ms. Campos, we just came back from a break, did

15   you discuss the substance of your testimony with your

16   counsel during the break?

17   A.  No.

18           THE REPORTER:  Check time.

19   Q.  All right.  We discussed this morning the lawsuit

20   in general.  Now I'd like to turn to the specific

21   property at issue here.  The property at issue in this

22   lawsuit for you personally is on clover lawn --

121019EScampos

23     A.  Yes.

24     Q.  -- is that correct?

25     A.  Yes.

42

1      Q.  What is the address?

2      A.  7103 clover lawn drive, Paramount.  /AE.

3      Q.  When did you purchase that property?

4      A.  In 2008.

5      Q.  7103 clover lawn.

6          Do you remember what month?

7      A.  I believe it was June.

8      Q.  And who was the lender for the loan?

9      A.  Wells Fargo.

10     Q.  Was anybody else on the note?

11     A.  My husband, Alphonso Campos.

12     Q.  Was there any other co-borrowers?

13     A.  No.

14     Q.  June of 2008, when purchased the property on

15     clover lawn.  Who lived in the property when you

16     purchased it -- strike that.

17         When you purchased the property in June of 2008,

18     did you all move in immediately?

19     A.  Yes.

121019EScampos

20    Q.  Who lived in the house?

21    A.  Myself, my husband, my three children and my

22  mother.

23    Q.  You already testified that in 2008 you were

24  working at Sardo.  Correct?

25    A.  Yes.

↑

43

1    Q.  And your husband was working at Hertz --

2    A.  Yes.

3    Q.  -- right?

4        And your mother was receiving social security

5  income at that point?

6    A.  Yes.

7    Q.  Was her social security income taken into account

8  for the mortgage loan?

9    A.  No.

10    Q.  Was Mr. Campos' income taken into account for the

11  mortgage loan?

12    A.  Yes.

13    Q.  Do you recall what amount of borrowed to buy the

14  property?

15    A.  I believe the loan was for $365,000.

16    Q.  Do you recall what the monthly mortgage payment

121019EScampos

17    was?

18       A.  I don't remember the amount.  Is it okay if I

19    give you a -- not the exact amount?

20       Q.  Sure.

21       A.  At the beginning of the loan, I believe it was

22    2500.

23       Q.  And we have a lot to go through today, so we'll

24    get into the numbers, so you don't need to feel, you

25    know, locked into that particular number.

                                                          44


1        A.  Okay.

2        Q.  But to the extent that, you know, we get to the

3     exact number, we'll discuss that.  I just want to get a

4     feel for what you remember about the loan.

5        A.  Yes.  Okay.

6        Q.  All right.  So that roughly $2500, that was your

7     recollection of the total monthly payment including

8     interest and taxes?

9        A.  Yes.

10       Q.  Prior to purchasing 7103 clover lawn, did you own

11    a house or property before that?

12       A.  Yes.  We did.

13       Q.  What property did you own?

121019EScampos

```
14    A.  It was in -- you need the address?

15    Q.  Yes.

16    A.  Oh, God.

17    Q.  Do you remember the street?

18    A.  Yes.  I forgot the number.  But it was on the

19  street Mona Boulevard.  In the City of Compton?

20    Q.  Did you live in the Mona Boulevard house?

21    A.  Yes.

22    Q.  When did you purchase the Mona Boulevard

23  property?

24    A.  I don't remember the exact date that we purchased

25  it.
```

⬆                                                              45


```
1     Q.  Is that where you lived prior to 7103 clover

2   lawn?

3     A.  Yes.

4     Q.  Do you have a ballpark recollection of how long

5   you lived on Mona Boulevard?

6     A.  Well, we went in the house renting at first in

7   '96.

8     Q.  So who is "we," you and Mr. Campos?

9     A.  Yes, my husband.

10              THE REPORTER:  Mr. Paul is not in the room
```

121019EScampos

11  after break).

12      Q.  And at some point you purchased it?

13      A.  Yes.

14      Q.  Do you think it was in the '90s --

15      A.  No.

16      Q.  -- or 2000s?

17      A.  I'm sorry.  It wasn't in '96.  I'm thinking of a

18  different date when we moved to a different place.

19          It was in 2003.  December of 2003.  Sorry.

20      Q.  That's when you rented it?

21      A.  Yes.  When we went to rent.

22      Q.  So December of 2003 you rented it, then you moved

23  out in 2008?

24      A.  Yes.

25      Q.  So sometime between December of 2003 and December

                                                    46


1   of 2008 you purchased the Mona Boulevard property,

2   right?

3       A.  Yes, we did.

4       Q.  Do you recall when that was, how long you were

5   living in the house before you purchased it?

6       A.  No, I don't.

7       Q.  Was it maybe two years?  Halfway through?

                        Page 51

121019EScampos

8      A.  I would think it was halfway through.  Around two

9  years.

10      Q.  Who was the mortgage company that -- I assume you

11  got a mortgage to buy the property.

12      A.  Yes.  We did.

13      Q.  Who was the mortgage lender?

14      A.  EMC Mortgage.

15      Q.  Do you remember how much that mortgage was for?

16      A.  We had two different loans.  Combined I believe

17  the payment was about 1800.

18      Q.  Who was the other mortgage lender?

19      A.  The same.

20      Q.  So you had two loans --

21      A.  Yes, with the same company.

22      Q.  So it was a first and second lien on the house,

23  is that what you're describing?

24      A.  Yes.

25      Q.  When you purchased the house, initially were

                                                          47

1  there two mortgages on the house or did you get a second

2  mortgage later?

3      A.  No.  It was at the beginning of the loan.

4      Q.  Any recollection as to why there were -- there

                        Page 52

121019EScampos

5    was a first and a second when you initially bought the

6    house?

7        A.  I don't remember why.

8        Q.  Did EMC, did they service the loan throughout the

9    time you lived there?

10           Do you understand what I mean by that?

11              THE WITNESS:  If it was the same company?

12   BY MS. BRINSON:

13       Q.  That you paid your mortgage payments to?

14       A.  That's who I made my payment -- I'm sorry, made

15   the payments to.

16       Q.  Prior to renting the Mona Boulevard property, you

17   mentioned having lived someplace else?

18       A.  Yes.

19       Q.  Did you rent or own?

20       A.  Rent.

21       Q.  Have you ever owned a house -- did -- did you own

22   any houses prior to your purchase of the Mona Boulevard

23   property?

24       A.  No.

25       Q.  So that was the first house you bought?

                                                          48

1        A.  Yes.

Page 53

121019EScampos

2    Q.  And then the second house was clover lawn?

3    A.  Yes.

4    Q.  What happened to the Mona Boulevard property?

5    A.  That property I believe was a foreclosure.

6    Q.  Do you remember when it was foreclosed?

7    A.  Sometime in 2008.  I don't remember the exact

8    month.

9    Q.  Was it foreclosed prior to you buying clover

10   lawn?

11   A.  No.

12   Q.  When you bought clover lawn, had the foreclosure

13   process begun on the Mona Boulevard property?

14   A.  No.

15   Q.  To your recollection, were you current on your

16   mortgage at the Mona Boulevard property when you bought

17   clover lawn?

18   A.  I believe we were.

19   Q.  When you bought clover lawn and then moved from

20   Mona Boulevard to clover lawn, did you keep the

21   Mona Boulevard house or did you sell it?

22       So what happened with Mona Boulevard in June of

23   2008 when you bought clover lawn?

24   A.  After we purchased the house on clover lawn

25   drive, we just let go of the house on Mona Boulevard.

Page 54

121019EScampos

1   This was no more payments made.

2       Q.  So when you say "let go of the house," what do

3   you mean by that?

4       A.  We didn't pay the mortgage anymore.

5       Q.  Did anybody live there?

6       A.  For I would say a few months after that, this was

7   a family that moved in.

8       Q.  Did they pay you rent?

9       A.  Yes, they did.

10      Q.  So when you say a few months after that, you

11  meant a few months after June 2008?

12      A.  Yes.

13      Q.  How long was the family in the Mona Boulevard

14  property?

15      A.  I would say about six months.

16      Q.  Do you have any recollection of how much rent

17  they paid?

18      A.  I don't remember.

19      Q.  Do you have -- do you recall whether or not the

20  amount of rent they were paying was equal to or greater

21  than the mortgage payment on the Mona Boulevard house?

22      A.  I don't remember.

121019EScampos

23      Q.  Was the family who was renting it living there at

24   the time the foreclosure occurred on Mona Boulevard?

25      A.  Yes, they were.

                                                         50


1      Q.  Did they have to vacate the house?

2      A.  Yes.

3      Q.  Do you recall when the foreclosure sale was on

4   Mona Boulevard?

5      A.  No, I don't.

6      Q.  Why did you stop making payments on

7   Mona Boulevard?

8      A.  We weren't interested in keeping that house after

9   we purchased the one on clover lawn drive.  We -- there

10   was problems with the -- with how the loan was set up.

11      Q.  Okay.  So let's break those two things apart.

12           So you weren't interested in keeping the house

13   and there were also problems with the loan itself?

14      A.  Yes.

15      Q.  All right.  So let's start with the house piece.

16           Why weren't you interested in keeping the house?

17      A.  Because we were told from the realtor that helped

18   us by the clover lawn drive property that the loan on

19   Mona Boulevard home, the loan was set up as a -- it was

                              Page 56

121019EScampos

20    going to go up.  The payment was going to go up.

21         So the payments that we were making the minimum

22    payments, so we were told that they weren't even

23    covering the payment on the house.  It was mostly

24    interest that we were paying, so the payment on the loan

25    amount wasn't going down, so we were -- it was

                                                            51


1     basically -- from what I remember, it was going up.

2         Q.  The payments?

3         A.  The payments were going to go up.

4         Q.  So the payment were going to go up because the

5     initial payments were interest only?

6         A.  Yes.  They -- yes, from what I remember it was a

7     variable -- I'm not sure how you call it, a variable

8     loan.  After a certain amount of time, the payment was

9     going to go up.

10        And I believe it was quite a bit of an amount.

11        Q.  So the payments were going to go up.  I want to

12    make sure I'm understanding.  I don't want to put words

13    in your mouth.

14        So understanding what you're saying payments were

15    going to go up because the principal was going to be

16    added in going forward to the payments?

Page 57

121019EScampos

17        You said -- and I don't have the live thing to

18   see exactly what you said, but you said the realtor said

19   there was a problem because the payments were just

20   covering interest.

21        Right?

22   A.   Yes.

23   Q.   And your principal wasn't going down --

24   A.   Yes.

25   Q.   -- is that correct?

                                                        52

1    A.   Yes.

2    Q.   But then the payments were going to start going

3    up --

4    A.   Yes.

5    Q.   -- right?

6    A.   (No audible response.)

7    Q.   Why were the payments going to start going up?

8    A.   I'm not sure -- I'm not sure if it had to do with

9    the interest that was going to go up.  I'm not really

10   sure what happened.  Like I said that was the first home

11   we purchased, so we didn't know anything about loans or

12   what to look for, so we just signed and didn't realize

13   that the -- that we had agreed to that, that the payment

                        Page 58

121019EScampos

14    were going to go -- that they were going to change at a

15    certain time.

16        Q.  So for the Mona Boulevard property, you signed a

17    note; correct?

18        A.  Yes.

19        Q.  And the Deed of Trust along with the note.  Do

20    you recall that?

21        A.  Yes.

22        Q.  The terms of the note included a variable

23    interest payment, is that now what you understand?

24        A.  Yes.

25        Q.  So because the payments on the property were

                                                          53

1     going to change, you decided that you weren't interested

2     in keeping the house, is that your testimony?

3         A.  Yes.

4         Q.  Was there anything wrong with the house itself?

5         A.  Not with the house.

6         Q.  Did you consider refinancing the loan on

7     Mona Boulevard?

8         A.  No.

9         Q.  Did you know about the issues with the loan on

10    Mona Boulevard before you bought clover lawn?

121019EScampos

11    A.  Yes.  When the realtor for that house on clover

12  lawn told us, explained to us what was happening.

13  That's when we realized the problem.

14    Q.  When you bought clover lawn, was your intention

15  to sell Mona Boulevard?

16    A.  Not at the time.

17    Q.  So was your intention to keep Mona Boulevard and

18  rent it out?

19    A.  That's what we thought we could do.

20    Q.  So the plan was you were going to buy clover

21  lawn, move your family into clover lawn, right?

22    A.  Yes.

23    Q.  And then maintain Mona Boulevard, right?

24    A.  Yes.

25    Q.  And was the plan to charge enough rent on

54

1  Mona Boulevard to cover the mortgage?

2    A.  I think that's when the plan changed, when we

3  found out that it wasn't going to be able to cover the

4  amounts that we were -- that we planned on charging for

5  the rent, it wasn't going to cover the payment on the

6  house.

7    Q.  Did you consider raising the rent to cover the

121019EScampos

8    mortgage?

9        A.  No.

10       Q.  Why not?

11       A.  Because, like I said, from what I remember, the

12   realtor told us that it was in our best interest was to

13   just let the house go because we were never going to be

14   able to make -- we weren't able to -- we weren't able --

15   we weren't going to be able to make the payments, the

16   new payments for the new amount, for the new amount.

17       Q.  Did you speak with a lawyer about that?

18       A.  No.

19       Q.  Did you speak with anybody other than this

20   realtor who was trying to sell you clover lawn about

21   walking away from the Mona Boulevard --

22       A.  No.

23       Q.  -- mortgage?

24       A.  No, we didn't.

25       Q.  Did you inform Wells Fargo at the time that you

                                                        55

1    got the loan for clover lawn that you intended to let

2    the Mona Boulevard loan go into default?

3                MS. FELLOWS:  Object to the form.

4                THE WITNESS:  No.

                    Page 61

121019EScampos

5    BY MS. BRINSON:

6        Q.  So at the time you bought clover lawn, to your

7    recollection, the EMC loan -- I think you already said

8    this -- was current, right?

9        A.  I believe it was.

10       Q.  Did you understand what the consequences were

11   going to be of walking away from the EMC Mortgage?

12       A.  No.

13       Q.  Did you understand that not paying the mortgage

14   would likely lead to foreclosure?

15       A.  Yes.

16       Q.  Did you consider what the impact of the

17   foreclosure would be on your credit?

18       A.  Yes.

19       Q.  And making that consideration, then you they

20   sided that it's still worth it to walk away from that

21   mortgage?

22       A.  Yes.

23       Q.  What was the impact on your credit of the EMC

24   foreclosure?

25       A.  I believe my credit score, both, because my

                                                    56

1    husband and myself were on that, that loan, went down.

                        Page 62

121019EScampos

2    Q.  Do you remember how much?

3    A.  No, I don't.

4    Q.  Did you have difficulty getting credit after the

5  EMC Mortgage -- EMC foreclosure?

6    A.  Yes.  I don't recall if we actually needed to

7  apply for any kind of credit after that.  But, yeah, I'm

8  sure it's -- when we did, it did take a while to get

9  better.

10    Q.  Do you remember how long?

11    A.  No, I don't.

12    Q.  Do you remember -- I think you said the

13  foreclosure was in 2008.

14        Is that correct?

15    A.  Yes.  I believe it was sometime in 2008.

16    Q.  Did you stop paying the mortgage on

17  Mona Boulevard immediately after you bought clover lawn?

18    A.  Yes.

19    Q.  Did you inform the renters that you had stopped

20  making payments on the property?

21    A.  Yes.

22    Q.  When did you tell them?

23    A.  I believe it must have been a couple of months

24  after they moved in.

25    Q.  When they moved into the property, was the loan

121019EScampos

1   already in default?

2       A.  I don't remember.

3       Q.  Is it possible that you had already stopped

4   paying the mortgage when the renters moved in?

5       A.  Yes.

6       Q.  What did you do with the rent money that they

7   paid if you weren't paying the mortgage on

8   Mona Boulevard?

9       A.  It went toward other expenses.  And the house.

10      Q.  What about taxes on the Mona Boulevard property,

11  did you pay those?

12      A.  From what he remember, they were separate from

13  the loan.  I can't remember when we paid those.

14      Q.  All right.  Going -- one more question.

15          Did your mother also live in the Mona Boulevard

16  property?

17      A.  Yes.

18      Q.  All right.  Any -- so -- those are the only two

19  properties you owned, clover lawn, Mona Boulevard.  So

20  let's go back to clover lawn.

21          In June of 2008 when you bought clover lawn, any

22  recollection as to what your monthly income was?

121019EScampos

23    A.  No, I don't.

24    Q.  Do you recall at some point missing a payment on

25  the clover lawn property -- strike that.

↑                                                                58

1        Do you recall the first time you missed a payment

2  on the clover lawn mortgage?

3    A.  No, I don't.

4    Q.  Do you have any recollection what year it was?

5    A.  I don't remember.

6    Q.  Do you have any recollection as to how many

7  months you lived in the property before you missed your

8  first payment?

9    A.  No, I don't.

10    Q.  Do you recall when the loan went into default?

11    A.  No.

12    Q.  In August of 2010 when you lost your job, did

13  that impact your ability to pay your mortgage on time?

14    A.  Yes.

15    Q.  Prior to August of 2010, while you were still

16  working, did you miss any monthly payments?

17    A.  I don't remember.

18    Q.  Do you recall when your loan first went into

19  foreclosure?  Do you remember when it was?

121019EScampos

20    A.  No, I don't.

21          MS. BRINSON:  Mark this as Exhibit 502.

22   Include File Not Found.

23   BY MS. BRINSON:

24    Q.  Ms. Campos, you've been handed what's been marked

25   Exhibit 502.  I'll give you a moment to take a look at

⌃                                                         59

1    this and let me know when you're ready to discuss it.

2    BY MS. BRINSON:

3     Q.  Ready?

4     A.  Yes.

5     Q.  Ms. Campos, do you recognize Exhibit 502?

6     A.  Yes.

7     Q.  What is it?

8     A.  It is a note for the house on clover lawn drive.

9     Q.  And at the bottom of the first page, which is

10   Bates labeled WF  HERNANDEZ 00171225, and the document

11   ends at 1129.

12          Are those your initials there, S.C.?

13    A.  Yes.

14    Q.  And then looking at page 171128, is that your

15   signature?

16    A.  Yes.

121019EScampos

17      Q.  So this appears to be a copy of the June 13th,

18   2008, note for clover lawn drive; is that correct?

19      A.  Yes.

20      Q.  So in the note, the amount borrowed is $349,515.

21   Correct?

22          Do you see that?

23      A.  Yes, I see.

24      Q.  And what is the interest rate?

25      A.  6 percent.

                                                        60


1      Q.  And this was a fixed loan?  The interest rate was

2   fixed.

3      A.  Yes, I believe it was.

4      Q.  And you also see the monthly payment of interest

5   and principal amount?

6      A.  Yes.  I do.

7      Q.  And what was that amount?

8      A.  $2095.52.

9      Q.  And your first payment was due on August 1st,

10   2008; correct?

11      A.  Yes.

12      Q.  With the America court date of July -- first day

13   of July 2038, so a 30-year mortgage, right?

121019EScampos

14      A.  Yes.

15      Q.  So looking at the second which is 726, 11726, do

16  you see the first thing on the page where it says

17  borrower's failure to pay?

18      A.  Yes.

19      Q.  Take a look at the section entitled B, default.

20  Can you read the first sentence of that paragraph.

21      A.  If borrower defaults by failing to pay in full

22  any monthly payment then lender may accept as limited by

23  regulations of the secretary in the case of payment

24  defaults require immediate payment in full of the

25  principal, balance remaining due and all accrued

                                                    61

1   interest.

2       Q.  So you understood when you borrowed this money

3   that you were obligated to pay it back; correct?

4            MS. FELLOWS:  Object to form.

5            THE WITNESS:  Yes.

6   BY MS. BRINSON:

7       Q.  And that if you failed to make your monthly

8   payments, the lender could require immediate payment in

9   full except as limited by regulations of the secretary;

10  correct?

                    Page 68

121019EScampos

11          MS. FELLOWS:  Objection to form.

12          THE WITNESS:  Yes.

13    BY MS. BRINSON:

14      Q.  As of June of 2008, is it fair to say your

15    intention was to make monthly payments in the amount

16    required on this loan?

17      A.  Yes.

18      Q.  Going back to Exhibit 501, you can take a look at

19    the third page of that exhibit.  Attached to your

20    declaration is a copy of the Deed of Trust dated June

21    13th, 2008.

22          Do you recognize this document?

23      A.  Yes.

24      Q.  And this document does not appear to be signed.

25    Is that correct?

                                                        62

1       A.  Yes.

2       Q.  But this was attached to the declaration you

3     signed in support of the plaintiffs' motion for leave to

4     file Third Amended Complaint and class recertification;

5     correct?

6       A.  Yes.  /AE /AE.

7       Q.  And in paragraph 4 of Exhibit 501, you noted that

121019EScampos

8    a true and correct copy of your F.H.A. Deed of Trust is

9    attached hereto as Exhibit A, right?

10       A.  Yes.

11       Q.  So even though it was not signed, this is a copy

12   of your Deed of Trust?

13       A.  Yes.

14       Q.  In that Deed of Trust, I'll have you look at --

15   one moment --

16           My apologies, Ms. Campos, give me one moment.

17           Sorry about that, too much paperwork.  Okay.  All

18   right.  So looking at your deed of trust, did you sign

19   the deed of trust at the time you purchased the house?

20       A.  I'm sure I did.

21       Q.  Did you agree to comply with the terms of the

22   Deed of Trust in order to obtain the loan from

23   Wells Fargo?

24           MS. FELLOWS:  Objection to form.

25           THE WITNESS:  Yes.

                                                          63

1    BY MS. BRINSON:

2        Q.  Did you make your first payment in August of

3    2008?  To your recollection.

4        A.  Yes.

121019EScampos

```
 5    Q.  Ms. Campos, you've been handed what's general

 6   marked Exhibit 3 -- sorry, 503.  I'll give you a moment

 7   to take a look at this document and let me know if you

 8   recognize it.

 9        Do you recognize this letter?

10    A.  I don't remember seeing this before.

11    Q.  The date of this document is February 19th, 2009.

12        Do you see that?

13    A.  Yes.  I do.

14    Q.  Do you also see at the bottom where it says

15   PL CAMPOS , ten?

16    A.  Yes.

17    Q.  And we'll state to you that those numbers at the

18   bottom of the page refer to documents that were provided

19   to Wells Fargo by your counsel.

20    A.  Yes.

21    Q.  Is this one of the documents that you provided to

22   your counsel?

23    A.  There were several of these letters and I didn't

24   look through each one of the them.  So I wouldn't --

25   can't tell you that this exactly -- that I went through
```

                                                                 64


```
 1   and saw this exact letter.
```

121019EScampos

2       Q.  But based on the Bates label PL CAMPOS 10 at the

3   bottom, do you have any reason to believe that this

4   document was not provided by you?

5       A.  No.

6       Q.  So this document is something that at least at

7   some point you had in your possession, right?

8       A.  Yes.

9       Q.  So looking at this document, what is it?

10      A.  It is, from what I see, it was some sort of

11  payment plan.

12      Q.  And according to the first paragraph, first

13  sentence, it says pursuant to your recent conversation

14  with us, you have promised to pay the amount shown below

15  by the date indicated.

16          Do you see that?

17      A.  Yes.  I do.

18      Q.  Do you have any recollection as to which recent

19  conversation this letter is referring to?

20      A.  No, I don't.

21      Q.  Do you recall speaking with representatives of

22  Wells Fargo regarding your payments in February of 2009?

23      A.  I don't remember.

24      Q.  Do you recall why you would have a need to speak

25  to them in February of 2009 about your payments?

Page 72

121019EScampos

1      A.  No, I don't.

2      Q.  This letter indicates based on the information

3   regarding payments that your payment had not been made

4   in a timely manner.

5          Is that fair?

6      A.  Yes.

7      Q.  In February of 2009 you were still working at

8   Sardo; correct?

9      A.  Yes I was.

10      Q.  And Mr. Campos was working at Hertz; correct?

11      A.  Yes.

12      Q.  Why was your payment late in January or February

13   of 2009?

14      A.  The only reason I can think of is, like I said,

15   my husband's work was not always the same amount of

16   hours that he put in.  So I know there were times -- I'm

17   not sure of that date -- but there were times that his

18   hours went down, so that meant that the salary was less.

19      Q.  When his hours went down and his salary was less,

20   did you adjust your mortgage payment because of that?

21      A.  I don't remember.

22      Q.  Are there other times that you can think of when

Page 73

121019EScampos

23   you weren't able to make the full mortgage payment

24   because his hours fluctuated?

25       A.  No, I can't.

66

1        Q.  Were you able to make these payments on February

2    24th and 27th?

3        A.  I don't remember.

4        Q.  Sticking with 503, before we get to 504, do you

5    see where it says failure to adhere to the date and

6    dates and amounts indicated may result in further

7    collection activity on your loan and affect our ability

8    to make future arrangements?

9        A.  Yes.  I do.

10       Q.  What do you understand that to mean?

11       A.  That if the payments that were listed here were

12   not made, that it would affect future arrangements that

13   were needed.

14       Q.  Now, looking at Exhibit 504, take a look another

15   that.  At the beginning you'll note at the bottom it

16   says PL CAMPOS 146.  This is a document that was

17   provided to Wells Fargo by your counsel.

18           Let me know when you're ready to discuss.

19       A.  Yes.

Page 74

121019EScampos

20    Q.  Do you recognize this letter?

21    A.  Yes.

22    Q.  What is it?

23    A.  It is in response to us asking, requesting for a

24  loan modification.

25    Q.  So in March of 2009, Wells Fargo's responding to

67

1  your request for loan modification; correct?

2    A.  Yes.

3    Q.  Do you remember whether or not you made that

4  request in February or -- or March of 2009?  Do you

5  recall when the request was made?

6    A.  No, I don't.

7    Q.  Your first payment on this loan was due on

8  August 1st, 2008, according to Exhibit 502; correct?

9    A.  Yes.

10    Q.  So why were you looking for a loan modification

11  as early as March 2009?

12    A.  I don't remember.  But I see an amount here that

13  I wrote in, and I don't remember why.

14    Q.  Do you remember if this amount that you wrote in,

15  and can you state for the record what that amount is.

16    A.  2644.32.

121019EScampos

17    Q.  Was that the amount of your monthly mortgage

18  payment at the time?

19    A.  Sounds about correct.

20    Q.  Did your employment change between August of 2008

21  and March of 2009?

22    A.  Mine didn't.

23    Q.  So your income remained the same?

24    A.  Yes.

25    Q.  But as you testified before it's possible that

                                                        68


1  Mr. Campos' income had changed?

2    A.  Yes.

3    Q.  Do you recall whether or not in March of 2009

4  Mr. Campos' income was the reason that you would have

5  needed a loan modification?

6    A.  I don't remember.

7    Q.  Prior to June of 2008 when you acquired clover

8  lawn, did his hours fluctuate?

9    A.  They were always changing.

10    Q.  So when you bought the property in June of 2008,

11  were you already aware that his hours could possibly go

12  down such that it may impact your ability to pay your

13  mortgage?

121019EScampos

14      A.  No.

15      Q.  Why not?

16      A.  I don't -- I don't think during that time they

17  changed too much to affect the amount that he was get --

18  receiving.

19      Q.  Do you recall at some point that his hours

20  started to fluctuate more than you all were

21  anticipating?

22      A.  No, I don't remember.

23      Q.  So in March of 2009, you asked for a loan

24  modification, were you able to make payments of

25  $2,644.32?

                                                    69

1      A.  I don't remember if we did.

2      Q.  What were you trying to get Wells Fargo to do

3  when you asked for a loan modification?

4      A.  Lower the payments.

5      Q.  Why were you trying to get the payment lowered?

6      A.  I don't remember the reason.

7      Q.  Do you remember how much you were trying to get

8  it lowered?

9      A.  No.

10      Q.  Taking a look at the second page, which is

121019EScampos

11    PL CAMPOS 8 -- these two things got stapled together,

12    they were not sequential when you gave them to us based

13    on the number, but based on the date of PL CAMPOS 8,

14    which is April 21st, 2009 --

15        A.  Yes.

16        Q.  -- does the April 21st, 2009, letter appear to be

17    in response to the March effort to get a loan

18    modification?

19        A.  Yes.

20        Q.  Do you recall -- looking at this letter, do you

21    recall what the result of your loan modification request

22    was?

23        A.  That I see was denied.

24        Q.  Right.  6789 do you see the reason for --

25        A.  Yes.

                                                        70


1         Q.  -- that?

2             And can you state for the record what reason was

3     given to you by Wells Fargo?

4         A.  This request would be outside of your investor

5     guidelines.

6         Q.  So when it says "This request," do you have any

7     recollection as to what your specific request was?

121019EScampos

8      A.  No.

9      Q.  Do you recall whether or not you had to

10     provide -- well, let me ask the question.  Sorry.

11          On the first page of 504, it states that you'll

12     be asked to provide certain information for the online

13     mortgage payment workout tool.

14          Do you see that?

15     A.  Yes.

16     Q.  Do you recall using the online mortgage payment

17     workout tool?

18     A.  I don't remember.

19     Q.  Do you have any recollection of doing any online

20     process to try to get a loan modification?  Not just in

21     March of 2009, but any time?

22     A.  I don't remember.

23     Q.  It also states on this letter, please note all

24     normal collection foreclosure bankruptcy processes will

25     continues uninterrupted during this time period.

                                                          71

1           Do you see that?

2      A.  Yes.  I do.

3      Q.  At this time do you recall there being collection

4      efforts to get you to pay your mortgage?

                        Page 79

121019EScampos

```
 5      A.  No, I don't.

 6      Q.  And at that point there was no foreclosure

 7  process in place as far as you know, right?

 8      A.  I don't think so.

 9          MS. FELLOWS:  Thank you.

10  BY MS. BRINSON:

11      Q.  Ms. Campos, you've been handed Exhibit 505, which

12  again are documents provided to Wells Fargo by your

13  counsel.

14          Give you a chance to take a look at it and let me

15  know when you're ready.

16      A.  Yes.

17      Q.  All right.  Can you let me know if you recognize

18  PL CAMPOS 5?

19      A.  Yes.

20      Q.  What is PL CAMPOS 5?

21      A.  It is a letter from Wells Fargo stating that

22  we -- my husband and I have requested the help of

23  someone else for the loan modification.

24      Q.  The date of this letter is what?

25      A.  June 5th, 2009.
```

72

```
 1      Q.  Do you recall requesting assistance from
```

121019EScampos

2    Debt Settlers of America and agents?

3        A.  Yes.

4        Q.  Do you recall working with them?

5        A.  Yes.

6        Q.  Are you the person that contacted Debt Settlers?

7        A.  Yes.

8        Q.  What is Debt Settlers?

9        A.  It is a company that helps people get loan

10   modifications.

11       Q.  How did you become aware of Debt Settlers?

12       A.  The person living next to us had actually worked

13   with them.

14       Q.  Why did you need to contact Debt Settlers?

15       A.  I believe it was because talking to Wells Fargo

16   they had denied us a modification.  So we went to them,

17   to Debt Settlers.

18       Q.  Why did you need a modification in June of 2009?

19       A.  I don't remember the reason.

20       Q.  Were you still working at Sardo?

21       A.  Yes, I was.

22       Q.  And your husband was still working at Hertz?

23       A.  Yes.

24       Q.  And your mother was still helping out with her

25   social security?

121019EScampos

1     A.  Yes.

2     Q.  So in June of, did you anticipate needing long

3  term assistance to pay your mortgage?

4     A.  I don't remember.

5     Q.  Because you testified that your husband's income

6  fluctuated.  In June of 2009, had his income gone down

7  such that you didn't think it would go back up?

8     A.  I don't remember.

9     Q.  Who did you speak with at Debt Settlers?

10     A.  I can't remember his name.  This was two

11  different people.  I know at the beginning I spoke to

12  one person but I can't remember his name and he no

13  longer worked for the company while they were still in

14  the process of helping us and after he left, I was sent

15  to someone else, I believe his name was Carlos.

16        I can't remember his last name but it was just

17  those two people that I spoke to.

18     Q.  Did you pay Debt Settlers?

19     A.  I don't remember. I'm pretty sure we did.  I just

20  don't remember how much.

21     Q.  Do you have a ballpark amount?  A thousand

22  dollars?  Hundreds?

121019EScampos

23          Do you have any recollection?

24     A.  No, I don't.

25     Q.  What were they supposed to do for the money you

                                                              74

1  paid them?

2     A.  They were supposed to gather all of our paperwork

3  and turn it into the bank, speak to the bank for us.

4     Q.  Did they do that?

5     A.  Yes.

6     Q.  Were they able to get some type of modification

7  for you?

8     A.  I think they did.

9     Q.  Do you have documents from your communications

10  with Debt Settlers?

11     A.  Yes.

12     Q.  Did you turn those over to your attorney?

13     A.  I don't remember if they were included in the --

14  in the box.

15     Q.  But the Debt Settlers documents, would they be

16  related to this loan?

17     A.  From what I remember what they had asked us for

18  is a list of our expenses and the check stubs.

19     Q.  Let me reask my question.

Page 83

121019EScampos

20    A.  Okay.

21    Q.  I'm going to ask you a better question than I

22  just asked, because the last question that I asked you

23  was not that great.

24        Was Debt Settlers helping you with other debts

25  besides your Wells Fargo mortgage?

                                                        75


1    A.  No.

2    Q.  So any documents you had related to Debt Settlers

3  would be regarding this loan; is that correct?

4    A.  Yes.

5        MS. BRINSON:  Counsel, we're going to ask

6  that those documents be provided to us in conjunction

7  with our request for documents related to this loan.

8    Q.  Ms. Campos, for the modification that you believe

9  Debt Settlers got for you, do you have any recollection

10  as to what the modification was, what the terms were?

11    A.  The amounts?

12    Q.  Uh-huh.

13    A.  I don't remember the exam ^ <Answer>No exact

14  amounts?

15    Q.  Do you recall whether or not were aim to afford

16  the modified payments?

121019EScampos

17     A.  Yes.

18     Q.  You think you were?

19     A.  Yes.

20     Q.  I'll ask you to take a look at the second page,

21  which is PL CAMPOS 6.  Take a look at this?

22     A.  Yes.

23     Q.  This is a letter dated July 23rd, 0

24  ^ <Answer>No 2009; correct?

25     A.  Yes.

                                                          76


1      Q.  And what is this letter?

2      A.  This letter is saying that we have -- that our

3   repayment agreement has been denied.

4      Q.  For what reason?

5      A.  You have failed to agree with the /TPORPBS plan,

6   borrower did not repay the payment plan payment.  /AE

7   /AE.

8      Q.  Do you have any recollection of failing to make

9   scheduled repayment plan payments that led to this July

10  23rd, 2009, letter?

11     A.  No, I don't.

12     Q.  Do you recall Wells Fargo granting you a Barnes

13  forbearance plan around this time frame?

121019EScampos

14      A.  Besides the one that was in February of 2009?

15      Q.  Yes.  Besides that?

16      A.  I don't remember /TW ^ <Answer>No if there was

17  another one.

18      Q.  So based on your reading of this letter, do you

19  believe that the terms of the forbearance plan that

20  they're talking about are the February 2009, that's a

21  reference to February of 2009?

22      A.  It could be.

23      Q.  Do you recall whether or not there was any other

24  type of plan between February of 2009 and July of 2009?

25      A.  I don't remember.

                                                        77


1      Q.  So the modification that you believe

2  Debt Settlers obtained for you would not be what they're

3  referring to in the July 23rd, 2009, letter?

4          Is that correct?

5      A.  Yes.

6  BY MS. BRINSON:

7      Q.  Ms. Campos, you've been handed Exhibit 506, which

8  is PL CAMPOS 134.  I'll give you a chance to look at

9  that and let me know when you're ready?

10      A.  Yes.

121019EScampos

11    Q.  Do you recognize this letter /#23RE6789S

12    A.  No?

13    A.  Yes.

14    Q.  And what is this letter?

15    A.  This letter is letting us know that our loan is

16    in default.  That they would like -- Wells Fargo would

17    like us to contact them to speak -- to talk about our

18    situation.

19    Q.  So one year after you initially purchased the

20    house, your mortgage loan is in default; is that

21    correct?

22              MS. FELLOWS:  Objection to form.

23              THE WITNESS:  From this letter, it seemed

24    like it was.

25    BY MS. BRINSON:

                                                        78


1     Q.  Do you have any doubt about that?

2     A.  No.

3     Q.  In June of 2009, why were you unable to pay your

4     mortgage in a timely fashion?

5     A.  I don't remember.

6     Q.  What efforts did you make to bring your loan

7     current in June of 2009?

121019EScampos

8    A.  I don't remember.  Besides requesting the help

9   from Debt Settlers, I don't know anything else that we

10  did.

11    Q.  Did you and Mr. Campos try to do anything to

12  increase your income at that time?

13    A.  No.

14    Q.  Did you do anything to try to decrease your

15  expenses?

16    A.  I don't remember.

17    Q.

18    A.  Yes.

19    Q.  All right.  Ms. Campos, you've been handed

20  Exhibit 507 which is PL CAMPOS 131 through 133.

21        Do you recognize this document?

22    A.  Yes.

23    Q.  What is it?

24    A.  It's a letter from Wells Fargo saying that they

25  have come to -- they're sending us a

                                              79

1   Forbearance Agreement of five payments starting May 1st,

2   2009, to September 1st, 2009.

3    Q.  And to be clear, the dates you just read are the

4   dates that your loan was due, right?

121019EScampos

5      A.  Yes.

6      Q.  So this plan, according to the third page would

7  have you making a payment on November 1st of 2009;

8  correct?

9      A.  Yes.

10      Q.  So you did not make payments May through

11  September of 2009, right?

12      A.  I don't remember.

13      Q.  Well, the letter states currently your loan is

14  due for five ^ installments from May 1st, 2009, through

15  September 1th, 2009?

16      A.  Yes.

17      Q.  Do you have any reason to dispute that statement?

18      A.  No.  The only thing I'm not sure about is if we

19  made partial payments.  So --

20      Q.  So you could have made partial payments that

21  applied to the months prior to May 2009?

22      A.  Yes.

23      Q.  Is this special Forbearance Agreement that's

24  dated September 4th, 2009, is this the modification or

25  repayment plan that debt set ^ Letters<Sticky Space>of

                                                    80

1  Intent ^ letters helped you with?

Page 89

121019EScampos

2      A.  Yes.  They were the only people we were working

3   with.

4      Q.  To your knowledge, do you have any documentation

5   or communications between you and Debt Settlers about

6   this Forbearance Agreement?

7      A.  About this one in particular?

8      Q.  Yes.

9      A.  I don't remember.

10     Q.  How did you communicate where Debt Settlers about

11  what they were trying to do for you?

12     A.  By phone.  And by fax, that's how I tendered the

13  documents they required.

14     Q.  Did they fax you back?  Did they send you

15  documents by fax?

16     A.  I don't remember.

17     Q.  Did they e-mail you?

18     A.  I don't remember.  What we e-mailed.

19     Q.  But you do think you have some documents from

20  Debt Settlers?

21     A.  I have -- what I remember seeing was the faxes

22  that I sent them.

23     Q.  Do you recall discussing with Debt Settlers what

24  the terms ^ <Answer>No terms of the

25  Forbearance Agreement would be?

121019EScampos

1    A.  No, I don't remember.

2    Q.  Did you work with them to get affordable payments

3  ^ .  or 4 ^ <Answer>No did they just -- ^ I

4  guess ^ ick ^ ic what I'm asking is were they acting as

5  an intermediary between you and Wells Fargo such that he

6  this were communicating what you wanted or did -- what

7  did they do exactly?

8    A.  Yes.  They were the ones that were communicating

9  with Wells Fargo for us.  Once they took over, we didn't

10  speak to Wells Fargo.  It was between them,

11  Debt Settlers and Wells Fargo and then debt set

12  ^ literatures will let us know what happened and the

13  letters that we will receive from Wells Fargo /TPARG

14  that would come to us that's correct ^ <Answer>No

15  that's Howe we would know what was happening.

16    Q.  All right.  So in September of 20 '09, they grant

17  a Forbearance Agreement, right?

18    A.  Yes.

19    Q.  Did you accept this Forbearance Agreement?

20    A.  I don't remember.

21    Q.  Do you recall whether or not the payment schedule

22  was affordable?

121019EScampos

23     A.  I don't remember.

24     Q.  Do you recall whether or not you were able to

25   make 9 ^ <Answer>No it ^ <Answer>No the payments

                                                        82

1   that are ^ list ^ lit ^ hits ^ lessed on the third page

2   of Exhibit 507?

3     A.  I don't remember if we did those payments or not.

4     Q.  Do you also see where the fourth payment is

5   $19,175.45?

6     A.  Yes.  I do.

7     Q.  Do you recall what your reaction was to seeing

8   that amount?

9     A.  I don't remember, but I'm pretty sure it was not

10   something we could afford.

11     Q.  So in this special Forbearance Agreement take a

12   look on Campos 133 where it says paragraph 2 --

13     A.  Yes.

14     Q.  Do you see where it says the installments may be

15   less than the total amount due you may still have

16   outstanding payments and fees?

17     A.  Yes, I do.

18     Q.  Did you understand that a loan fore ^ by any

19   chance plan might provide you with ear ^ <Answer>No

Page 92

121019EScampos

20    lower monthly payments but you would still have to pay

21    the arrearage?

22        A.  That means whatever was behind?

23        Q.  Right.

24        A.  Yes.

25        Q.  And then further in paragraph 3, can you read

^

83

1    that paragraph, please.

2        A.  The lender is under no obligation to enter into

3    any further agreements and this agreement shall not

4    ^ cannot say stout other waiver of a lender's right to

5    strict performance in the future /AE /AE.

6        Q.  So do you understand that that paragraph means

7    that they're not, even though they're providing this

8    Forbearance Agreement, that doesn't mean they're

9    obligated to provide similar agreements in the future?

10       A.  Yes.

11           MS. FELLOWS:  Object as to form.

12   BY MS. BRINSON:

13       Q.  In paragraph 6, where it states there is no grace

14   period allowance in this agreement, all installments

15   must be received on or before the agreed due date and

16   remain strictly in accordance with Section 5 above.

121019EScampos

17          Do you see that?

18     A.  Yes.

19     Q.  So did you understand that the payment due on

20   November 1st, 2009, was required for this nor Barnes

21   plan to continue?

22          MS. FELLOWS:  Object to the form.

23          THE WITNESS:  Yes.

24   BY MS. BRINSON:

25     Q.  Ms. Campos, I'm showing you what's been marked as

84

1    Exhibit 508.

2          Do you recognize this letter?

3     A.  No, I don't.

4     Q.  Do you recall your husband sending a hardship

5    letter to Wells Fargo on December 31st, 2009?

6     A.  No.

7     Q.  Look at the second paragraph.

8     A.  Yes.

9     Q.  Do you see in the middle where it says we asked

10   you to please freeze the interest rate, that part?

11    A.  Yes.

12    Q.  Do you recall having a discussion in December of

13   2009 about asking Wells Fargo to freeze your interest

121019EScampos

14    rate at 2.5?

15        A.  No, I don't.

16        Q.  Is this, if you ^ <Answer>No -- do you recall

17    whether or not you had anything to do with this letter?

18        A.  I didn't do it.  I don't remember if I was -- I

19    don't remember if I saw this before I it was sent.

20        A.  Do you know where that amount comes from, where

21    the 2.5 percent suggestion came from.

22        A.  No.

23        Q.  Do you recall whether or not that is consistent

24    with something Debt Settlers would have suggested?

25        A.  Yes.  It must have been something they did.  I

                                                        85


1     just don't remember speaking to them about this.

2         Q.  When you spoke with Debt Settlers, were you and

3     your husband talking to them at the same time?

4         A.  No.  It was just myself.

5         Q.  Did he ever speak with them?

6         A.  I don't remember.

7         Q.  And I'll ask this question on other information

8     that we have received, is your husband's /HR*EURB

9     sufficient that he would have written this letter?

10        A.  No.

                        Page 95

121019EScampos

11    Q.  So could he have written this letter in English?

12    A.  No.

13    Q.  If he could not have written this letter in

14   English, who wrote it?

15       Do you know?

16    A.  It ^ miss ^ mits ^ mis<Delete Space>

17   ^ <Answer>No must have been somebody from

18   Debt Settlers.

19    A.

20    A.  No.

21    Q.  And you are certain that you did not write this

22   letter?

23    A.  I didn't.

24    Q.  And you don't recall authorizing this letter?; is

25   that correct.

88                                                    86


1    A.  I don't remember.

2    Q.  Is your husband's English good enough for him

3   having been able to read this letter in English?

4       MS. FELLOWS:  Object to the form.

5       THE WITNESS:  No.

6   BY MS. BRINSON:

7    Q.  But you don't know who would have affixed his --

Page 96

121019EScampos

8    their electronic signature?

9        A.  No, I don't.

10       Q.  Were you all working with anybody other than

11   Debt Settlers?

12       A.  During that time, I don't think so.

13       Q.  In the first paragraph of this letter, it states

14   that ^ Alfonso Campos, is the author of the letter, his

15   financial hardship started in March of 2009.

16           Is that consistent with your recollection of his

17   financial situation.

18       A.  I don't remember the exact time.

19       Q.  Do you disglee with this statement?

20       A.  No, I wouldn't ^ dress ^ Chris ^ <Answer>No

21   disglee.

22       Q.  It also states that income has decreased

23   drastically due to the downfall of the economy.

24           Would you agree that his income decreased

25   drastically in 2009?

♠
                                                        87

1        A.  I don't remember exactly how much.

2        Q.  Would you agree that his income decreased in

3    2009?

4        A.  Yes.

Page 97

121019EScampos

5     Q.  Diver ^ <Answer>No do you have any reason to

6   disDre ^ <Answer>No agree that it may have reduce

7   ^ <Answer>No decreased drastically?

8     A.  No.

9     Q.  The letter states that it has been very difficult

10  for him to keep up with the payment barely, struggling

11  to eat and putting food on the table for my three

12  children.

13    A.  Yes.

14    Q.  Is that an accurate statement of what the

15  situation was in 2009?

16    A.  Yes.

17    Q.  Then the letter says the situation has been

18  stressing me out and has not been easy and so I started

19  to default on the loan.

20        Do you see that?

21    A.  Yes, I do.

22    Q.  In your household, who made mortgage payments?

23    A.  I did.

24    Q.  When it says the situation's been stressing me

25  out, do you recall your husband being under stress in

                                                    88

1   2009 at the time this letter was written?

121019EScampos

2      A.  Yes. ?  How did you know he was under industries

3  ^ <Answer>No stress.

4      A.  He would speak about it.  Even though I wasn't

5  the one making the payments, in charge of making the

6  payments, I would have to let him know, this one we

7  can't.

8      Q.  Did you say this one or this month?

9      A.  This month.

10      Q.  What was his reaction to that?

11          MS. FELLOWS:  Coin, I think we're getting

12  far afield of communications by spouses which is

13  objected to on the spousal privilege.

14  BY MS. BRINSON:

15      Q.  I'm not asking you to tell me what he said.  But

16  in this letter, which was sent to Wells Fargo, it says

17  stressing me out, how did that manifest?

18          How did you know he was under stress?

19      A.  Well, by him communicating to me and also just by

20  seeing the way he was.

21      Q.  How was he?

22      A.  For him it's easy to tell when he's -- when his

23  mood is different.  So for me to see that he's stressed

24  out, it's nervous and -- yeah.  That will be --

25      Q.  Did he seek any medical attention?

121019EScampos

1     A.  No.

2     Q.  Was he on any kind of medications for she is

3  /STR-FRPBLGTS ^ <Answer>No?

4     A.  No.

5     Q.  For stress related medical issues?

6     A.  No.

7     Q.  Did he have any kind of medical issues during the

8  time frame?

9     A.  No.  Not that I can remember, no.

10    Q.  And were you under stress at this time?

11    A.  Yes.

12    Q.  And how did you -- how did the stress impact you?

13    A.  Well, also the -- not having the money to make

14  the payments and by this time it was accumulating, so it

15  caused stress on me also 6789 ^ <Answer>No,

16  ^ <Answer>No.

17    Q.  Did you seek any medical attention --

18    A.  No.

19    Q.  -- for stress?

20    A.  No.

21    Q.  Did you have any medical issues that were

22  stress-related?

121019EScampos

23     A.  No.

24     Q.  Is ^ <Answer>No so by the situation's been

25  stressing me out, you believe that this is -- the stress

90

1   of not being able to make the payments, is that fair?

2      A.  Yes.

3      Q.  Were there other debts that you couldn't pay

4   during this time frame in 2009?

5      A.  I don't remember.

6      Q.  Did you have other payments that you needed to

7   make?  Car payments, mortgage payments, that type of

8   thing?

9      A.  There were other payments.  I believe back then

10  there were some correct, cell phone.  I've -- that's

11  about it.  Besides -- besides the food and the -- and

12  the, like the gas and all that.

13     Q.  Did you have any other mortgages on clover lawn

14  other than the Wells Fargo mortgage?

15     A.  No.

16     Q.  Do you recall having a loan with Chase?

17     A.  For a loan?

18     Q.  Mortgage loan.

19     A.  For a mortgage loan?

121019EScampos

20          I think that that changed, I mean for the company

21     for the Mona Boulevard changed to Chase, if I'm not

22     mistaken?

23     Q.  Okay.  So you think the EMC --

24     A.  Yes.

25     Q.  Do you remember loan ended up being a Chase --

91

1      A.  Yes.

2      Q.  -- loan?

3          So the only loan on this property was

4      Wells Fargo?

5      A.  Yes.  Wells Fargo.

6      Q.  This letter also ^ gross on to say we would

7      appreciate the opportunity to get a loan modification.

8      By we, I am taking it to mean you and Alphonso is who

9      the "we" represents?

10     A.  Yes.

11     Q.  Going back to who might have written this letter,

12     who do you think wrote it?  If he couldn't

13     ^ in ^ have ^ approximate ^ <Answer>No have done this

14     by himself because of his English skills?

15              MS. FELLOWS:  Who would have done this for

16     him.

121019EScampos

17          THE WITNESS:  The person that we were

18   speaking to at Debt Settlers, was -- and at this time I

19   don't remember if it was still the first person, like I

20   said, I'm sorry , I don't remember his name, or the

21   second one was just Carlos.

22   BY MS. BRINSON:

23     Q.  So you mentioned getting a loan modification

24   based on the new California Civil Code that went this to

25   effect in July of 2008.

                                                        92


1          Do you know which civil code he's referring to in

2   this letter?

3     A.

4     A.  No?

5          Did you have a discussion with Debt Settlers

6   about the homeowner affordability and stability plan

7   signed by President Obama.

8     A.  I don't remember that.

9     Q.  In addition to the 2.5 percent interest request,

10   the letter also states that we also ask that you apply

11   all late payment to the principal balance of the loan.

12          Do you recall speaking with Debt Settlers about

13   making that type of request?

121019EScampos

14     A.  That would mean ^ <Answer>No mean -- from what

15  I understand, that would mean putting in the late

16  payments, adding those to the new payments.

17         Would that be --

18     Q.  I'll ask you to read that line and see what you

19  think it means versus we also ask that was

20  ^ <Answer>No apply all late payments to the principal

21  balance on the loan.

22     A.  That's what I understand.

23     Q.  Did you discuss that with Debt Settlers?

24     A.  I remember -- yes, I do remember.

25     Q.

                                                             93


1     A.  No that this ^ <Answer>No that would be an

2  option.

3     Q.  So your recollection is that ^ debt settlers

4  suggested that that would be an option under the note

5  and Deed of Trust that you already had with Wells Fargo,

6  that that was a possibility?

7              MS. FELLOWS:  Object to the form.

8              THE WITNESS:  From what I remember what I

9  understood was that they could add whatever was late to

10  the loan.

121019EScampos

11    BY MS. BRINSON:

12        Q.  Okay.  And then it says lastly we'd like

13    Wells Fargo to impound or taxes and insurance along with

14    our monthly payment.

15            Do you know what that means?

16        A.  No, I don't.

17        Q.  Looking at the language in this particular

18    paragraph, does it sound to you like something your

19    husband would have said?

20        A.  No.

21        Q.  Now, further down, the letter also states in part

22    we would appreciate it if you will consider giving us a

23    principal reduction according to the current market

24    value of our home.

25            Do you see that line?

                                                          94


1         A.  Yes.

2         Q.  Do you know what this particular sentence means

3     in terms of current value of your home?

4         A.  No.

5         Q.  Do you recall whether or not the market value of

6     the house went down during this time frame?

7         A.  I don't remember.

121019EScampos

8    Q.  Do you recall what the current market value would

9    have been in 2009?

10   A.  No, I don't.

11   Q.  Exhibit 12.

12            THE REPORTER:  Could we take a break.

13            MS. BRINSON:  Absolutely.

14            THE REPORTER:  Please.

15            MS. BRINSON:  Say we'll take a break after

16   12 but we can take a break right now,

17   Ma'am Court Reporter.

18            THE VIDEOGRAPHER:  We're now going off the

19   record.

20            The time is 12:10 p.m.

21            (Short recess.)

22            THE VIDEOGRAPHER:  Everyone ready?

23            We're now back on the record.

24            The time is 12:22 p.m.

25   BY MS. BRINSON:

                                                    95

1    Q.  Ms. Campos, we're coming back from a break.

2         Did you discuss the substance of your testimony

3    with your counsel?

4    A.  No.

121019EScampos

5      Q.  You were discussing this 12/31/2009 letter, which

6  is Exhibit 508, I wanted to ask whether or not you

7  recall if foreclosure proceedings were initiated toward

8  the end of 2009?

9      A.  I don't remember.

10     Q.  Do you have any recollection of foreclosure

11  proceedings happening in 2009 or 2010?

12     A.  I don't remember.

13  BY MS. BRINSON:

14     Q.  Ms. Campos, you've been handed what's been marked

15  Exhibit 509.

16         Do you recognize this letter -- well, document?

17  Excuse me.

18     A.  Yes, I do.

19     Q.  What is Exhibit 509?

20     A.  It is a letter from Wells Fargo saying that they

21  have come to a Forbearance Agreement.

22     Q.  What is the date of the letter?

23     A.  January 5th, 2010.

24     Q.  So January 5th, 2010, Wells Fargo offers you a

25  special Forbearance Agreement; correct?

                                                          96

1      A.  Yes.

121019EScampos

2   Q.  Going back to Exhibit 507, that was also an offer

3   of a special Forbearance Agreement, is that also

4   correct?

5   A.  Yes.

6   Q.  And that document was dated September 4th, 2009;

7   right?

8   A.  Yes.

9   Q.  And in the September 4th, 2009, offer, it states

10  that currently your loan is due for five installments

11  from May 1st, 2009, through September 1st, 2009;

12  correct?

13  A.  Yes.

14  Q.  And when you look at Exhibit 508 -- sorry, 509,

15  it states that your loan is due for nine installments

16  from May 1st, 2009, through January 1st, 2010; correct?

17  A.  Yes.

18  Q.  So based on these documents, specifically

19  Exhibit 507 and Exhibit 509, does this -- excuse me --

20  refresh your recollection as to whether or not you made

21  any payments under the September 4th, 2009,

22  Forbearance Agreement?

23  A.  I don't remember if we made those payments.

24  Q.  Looking at Exhibit 509, it states that your loan

25  is due for May 1st, 2009, through January 1st, 2010, as

Page 108

121019EScampos

1    we've just said, right?

2        A.  Yes.

3        Q.  And then Exhibit 507, it also states that your

4    loan was due for five installments from May 1st of 2009

5    as well; correct?

6        A.  Yes.

7        Q.  So the May 1st, 2009, installment didn't change

8    from September 4th, 2009, to January 5th, 2010, based on

9    these documents, is that fair?

10       A.  Yes.

11       Q.  So is it also fair to take from Exhibit 509 that

12   the May 1st, 2009, payment was still outstanding in

13   January of 2010, even though you had a

14   Forbearance Agreement in September of 2009 that

15   references that same payment?

16       A.  Yes.

17       Q.  So based on that, is it also fair to say that if

18   you had made a payment under the September 4, 2009,

19   Forbearance Agreement, it would have been applied to

20   May 1st of 2009, because that's the time frame that was

21   referenced in the September 2009 Forbearance Agreement?

22          Do you understand my question?

121019EScampos

23      A.  Yes.

24      Q.  All right.  So based on that, it appears that you

25  did not make any payments under the September 2009

98

1   forbearance agreement because they were still

2   outstanding as of the January 2010 agreement?

3       A.  Yes.

4       Q.  Right?

5       A.  (No audible response.)

6       Q.  Do you have any recollection as to why no

7   payments were made under the September 2009

8   Forbearance Agreement?

9       A.  No, I don't.

10      Q.  Do you think -- well, do you have any reason to

11  believe that this statement, specifically currently your

12  loan is due for nine installments from May 1st, 2009,

13  through January 1st, 2010, do you have any reason to

14  believe is that that statement is incorrect?

15      A.  No.

16      Q.  So based on this document, it would appear that

17  you did not make any payments between -- well, any

18  payments that were applied to the May 1st, 2009, through

19  January 1st, 2010 --

Page 110

121019EScampos

20      A.  Yes.  That's what it seems.

21      Q.  Okay.  So even though you didn't make any

22  payments under the September 2009 Forbearance Agreement,

23  Wells Fargo provided you with a special

24  Forbearance Agreement in January of 2010; correct?

25      A.  Yes.

↑

                                                        99


1      Q.  And this Forbearance Agreement appears to have

2  been signed by you on January 29th, 2010; is that right,

3  on the third page of the document?

4      A.  Yes.

5      Q.  And just for the record, Exhibit 509 is

6  WF Hernandez 175721 through 723.

7      Q.  Looking at the second page of Exhibit 509, the

8  payment amounts are -- three payments of $2,543.99;

9  correct?

10      A.  Yes.

11      Q.  And those payments should have been made

12  February, March and April of 2010, right?

13      A.  Yes.

14      Q.  Do you have any recollection as to whether or not

15  you and Mr. Campos made any of those payments?

16      A.  I don't remember.

121019EScampos

17    Q.  In January of 2010, were you still working at

18    Sardo?

19    A.  Yes, I was.

20    Q.  And Mr. Campos was still at Hertz?

21    A.  Yes.

22    Q.  Do you recall whether his income had returned to

23    the higher level by that point?

24    A.  I don't remember.

25    Q.  Do you recall whether or not you all were able to

                                                        100


1    make this payment?  Was this affordable for you?

2    A.  I don't remember if we made those payments.

3    Q.  Do you recall whether or not in January of 2010

4    you were still working with Debt Settlers?

5    A.  I don't remember.

6    Q.  So looking at the first page of Exhibit 509,

7    that's the paragraph that starts with currently your

8    loan --

9    A.  Uh-huh, yes.

10    Q.  Do you see the sentence that starts with this is

11    not a waiver, kind of in the middle of that paragraph?

12    A.  Yes.

13    Q.  Could you read that particular sentence.

                            Page 112

121019EScampos

14      A.  This is not a waiver of a cured or future

15   payments that come due but a trial period showing you

16   can make regular monthly payments.  Please note investor

17   approval is still pending.

18      Q.  Looking back at Exhibit 507, do you see that same

19   language on the first page of Exhibit 507 which is

20   PL CAMPOS 131?

21      A.  Yes.

22      Q.  So in September of 2009, Wells Fargo explained in

23   this letter to you that this payment plan was not a

24   waiver of all your future payments but rather a trial

25   period to show that you could make regular payments.

                                                          101


1   Right?

2      A.  Yes.

3      Q.  But in fact you did not make the trial period

4   payments under the September 4th, 2009, forbearance

5   claim, did you?

6      A.  It seems like we didn't.

7      Q.  Looking at January 5th, 2010, forbearance plan,

8   as we sit here today, you don't recall whether or not

9   you made those payments, is that accurate?

10      A.  Yes.

121019EScampos

11      Q.  All right.

12          Let's go ahead and take a break.

13              THE VIDEOGRAPHER:  We're now going off the

14  record.

15              The time is 12:34 p.m.

16              (Off record.)

17              THE VIDEOGRAPHER:  Ready?

18              MS. BRINSON:  Okay.  Ready.

19              THE VIDEOGRAPHER:  We're now back on the

20  record.

21              The time is 12:39 p.m.

22  BY MS. BRINSON:

23      Q.  All right, Ms. Campos -- back on the record --

24  after a fake lunch break, you've been handed

25  Exhibit 510.  Take a look at this document and let me

                                                    102

1   know if you recognize it.

2   BY MS. BRINSON:

3       Q.  You've also been handed Exhibit 511, take a look

4   at these two documents together.

5           Let me know when you're ready.

6       A.  Yes.

7       Q.  All right.  Do you recognize Exhibit 510?

                        Page 114

121019EScampos

8      A.  I don't remember this document?

9      Q.  You will see from the bottom it says

10  PL CAMPOS 226 through 228 document?

11      A.  Yes.

12      Q.  So this is a document that was produced to us by

13  your counsel.

14          Is this one of the documents that you provided

15  them for this deposition?

16      A.  I don't remember seeing this one, but like I

17  said, I didn't go through each page individually.  If it

18  was in the rest of the documents, I just sent everything

19  in.

20      Q.  So this is not one of the documents you looked at

21  specifically to prepare for today?

22      A.  No.

23      Q.  Do you recall receiving a loan modification from

24  Wells Fargo in April of 2010?

25      A.  I don't.

                                                        103

1      Q.  Looking at PL CAMPOS 228, which is the third page

2  of the document, is that your signature?

3      A.  Yes.  It is.

4      Q.  And the date of your signature is May 10, 2010,

121019EScampos

5    is that accurate?

6        A.  Yes.

7        Q.  And your husband's signature is there as well,

8    right?

9        A.  Yes.

10       Q.  Having looked at this document, does this refresh

11   your recollection that Wells Fargo granted you a loan

12   modification that you signed on May 10th of 2010?

13       A.  Yes.

14       Q.  Looking -- starting at the top of the document,

15   this document is titled loan modification agreement;

16   correct?

17       A.  Yes.

18       Q.  Does not say it's a special forbearance plan,

19   right?

20       A.  No.

21       Q.  And the first paragraph states that whereas

22   borrower has ^ go ahead and lender has agreed subject to

23   the following terms and conditions to a loan

24   modification as follows, then it goes onto provide the

25   terms of the loan modification, right?

                                                        104

1        A.  Yes.

121019EScampos

2      Q.  The first term under the No. 1 which is the

3   balance, what does it say under No. 1?

4      A.  Balance as of April 30th, 2010, the amount

5   payable under the note and security instrument, in

6   paragraphs, the unpaid principal balance, is U.S. $345

7   /SKWRAERBG ^ <Answer>No.'09 ^ <Answer>No 590 with 48

8   cents.

9      Q.  And as we discussed previously looking at the

10   note that's consistent with the -- sorry, with the

11   principal balance that you borrowed in the original note

12   on -- is that correct?

13        That's Exhibit 502.  I have it in front of me.

14      A.  It's different.

15      Q.  Slightly different.  So the balance in the note

16   on 502 was $349.515, right?

17      A.  Yes.

18      Q.  But then it's a little less by April 30th, 2010,

19   now the unpaid principal balance is /#3W45.

20      A.  No,590.48, right?

21      A.  Yes.

22      Q.  It's about $4,000 less? Is that correct.

23      A.  Yes.

24      Q.  So the original note was from August 1st, 2008,

25   to July 1st of 2038; correct?

Page 117

121019EScampos

1    A.  Yes.

2    Q.  Under this loan modification agreement under 2 B,

3    the maturity date was extended from July 2038 to June of

4    2040, right?

5    A.  Yes.

6    Q.  So is it fair to say that Wells Fargo added

7    roughly two years to your maturity date?

8    A.  Yes.

9    Q.  It also -- and under 2-C, it notes that the

10   amount of interest to be capitalized were included will

11   be $20,000700 -- 20,730.45 cents, right?

12   A.  Yes.

13   Q.  Do you understand what that means when it says

14   the amount of interest to be included in parenthesis

15   capitalized will be 20,735.40?

16   A.  Yes.

17   Q.  What does that mean?

18   A.  From what I understand the amount of interest

19   that wasn't paid will be added.

20   Q.  Right.  Added to what?

21   A.  To the -- to the new note.  To the modified loan.

22   Q.  And then there's also 7 /SKWROURPBGS

121019EScampos

23    A.  No,430 dollars 42 cents in escrow advances that

24  will be /KAOEUPT ^ <Answer>No capitalized under 2-C as

25  well, right?

106

1    A.  Yes.

2    Q.  Plus $20 in recoverable expenses?

3    A.  Yes.

4    Q.  And then the loan modification agreement states

5  that your new unpaid principal balance is 371.the

6  ^ <Answer>No 908.72, right?

7    A.  Yes.

8    Q.  Your original interest rate was 6 percent

9  according to the note at Exhibit 502.  Right?

10    A.  Yes.

11    Q.  And under the loan modification agreement,

12  Wells Fargo reduced your interest rate to 5.25 in

13  paragraph D, is that right?

14    A.  Yes.

15    Q.  In the original note, the principal and interest

16  payment was 2 ebbs ^ <Answer>No,095 and 52 cents,

17  right, in Exhibit 502 /KPWREFRPBLTS?

18    Q.  Under the loan modification, the principal and

19  interest payment is 2,053.289 ^ <Answer>No 29, right?

121019EScampos

20      A.  Yes.

21      Q.  So this loan modification dated April 30th, 2010,

22  extends the maturity date, right?

23      A.  Yes.

24      Q.  Allows you to pay accrued interest and

25  recoverable expenses and escrow advances as a part of

↑

                                                    107


1   the modified principal balance, correct?

2       A.  Yes.

3       Q.  Reduces your interest rate?

4       A.  Yes.

5       Q.  And reduces your monthly payment amount?

6       A.  Yes.

7       Q.  And given the maturity date being extended to

8   2040, did you understand that this was a permanent loan

9   modification?

10      A.  Yes.

11      Q.  This is not a Temporary Forbearance Agreement

12  like the two forbearance agreements we discussed

13  previously in September of 2009 and January 2010, right?

14      A.  Yes.

15      Q.  This loan modification was an agreement to

16  permanently modify your loan?

121019EScampos

17      A.  Yes.

18      Q.  And as we discussed you signed it on May l0th,

19  2010, yes?

20      A.  Yes.

21      Q.  Ms. Campos, do you recall when you provided this

22  document to counsel?

23      A.  No, I don't.

24      Q.  Did you provide it just for this deposition or

25  before?

108

1      A.  No.  It was for this deposition.

2      Q.  So to your recollection, prior to your

3  preparation for this deposition, you didn't provide this

4  information?

5      A.  No.

6      Q.  Taking a look at Exhibit 511, which goes with

7  510, which we'll do and then break, do you recognize

8  Exhibit 511?

9      A.  No, I don't.

10      Q.  Take a look at this document.  So my first

11  question for you is on the first page, which is

12  WF Hernandez, 170980, do these amounts appear to be the

13  same as the amounts in the loan modification agreement

121019EScampos

14    that we just discussed as Exhibit 510?

15        A.   Yes.

16        Q.   And to clarify, what is Exhibit 511?

17        A.   A loan modification settlement statement.

18        Q.   On the second page, excuse me, on the second page

19    of Exhibit 511, technically the third, which is

20    PL HERNANDEZ 170982, it provides the premodification

21    payment and the modified payment, right?

22        A.   Yes.

23        Q.   And the modified payment is how much?

24        A.   $2,053 with 59 cents.

25        Q.   So it's 2,053 and 59 cents was the monthly

                                                          109

1     principal and interest payment, but then there's an

2     additional $500 added to that; correct?

3         A.   Yes.

4         Q.   $499.92 -- just a little bit less than 500 it

5     would appear.  Were you able to make that payment

6     amount?  Sorry.

7         A.   I don't remember.

8         Q.   You don't remember whether or not this was

9     affordable?

10        A.   I don't remember.

                        Page 122

121019EScampos

11    Q.  In January -- sorry.  April of 2010, you were

12  still working for Sardo; correct?

13    A.  Yes.

14    Q.  Your husband was still working for Hertz?

15    A.  Yes.

16    Q.  Do you recall what your monthly income was in

17  April of 2010?

18    A.  No, I don't.

19    Q.  Do you recall what your monthly income was when

20  you got laid off from Sardo?

21    A.  By then I was earning the $16 an hour and working

22  40 hours a week.

23    Q.  And that was August of 2010 that you got laid

24  off?

25    A.  Yes.

                                                        110


1    Q.  So in April of 2010, just four months prior to

2  you getting laid off, had you already started making $16

3  per hour?

4    A.  Yes.

5    Q.  Okay.  So as of the time of this loan

6  modification, your recollection is that you were making

7  $16 an hour for 40 hours a week?

Page 123

121019EScampos

```
 8      A.  Yes.

 9      Q.  Do you have a recollection of how much your

10   husband was making on a monthly basis as of April of

11   2010?

12      A.  No, I don't.

13      Q.  All right.

14          Take a lunch break.

15              THE VIDEOGRAPHER:  Okay.

16              We're now going off the record.

17              The time is 12:56 p.m.  Include File Not

18   Found).

19              THE VIDEOGRAPHER:  Ready?

20              MS. BRINSON:  Yes.

21              THE VIDEOGRAPHER:  Okay.  We are now back on

22   the record.

23              The time is 1 /KWHR-FRPB

24   ^ <Answer>No:44 p.m.

25              Counsel.
```

                                                         111

```
 1   BY MS. BRINSON:

 2      Q.  Ms. Campos, we're back on the record after a

 3   hutch break.

 4          During the break did you discuss any substantive
```

Page 124

121019EScampos

5    testimony with your counsel?

6        A.  No.

7        Q.  When we were speaking prior to the break, we were

8    looking at loan modification from April 30th of 2010,

9    which was Exhibits 510 and 511.

10           Do you recall that?

11       A.  Yes.

12       Q.  So in April of 2010, four months before you got

13   laid off, your loan had already been permanently

14   modified.  Is that correct?

15       A.  Yes.

16       Q.

17   BY MS. BRINSON:

18       Q.  Showing you what's been marked as probably 512,

19   do you recognize -- recognize this document?

20       A.  Yes.

21       Q.  Is this a letter written in your handwriting?

22       A.  Yes.

23       Q.  Okay.  And could you please tell us what

24   Exhibit 512 is.

25       A.  From what I can see, it's the hardship letter

                                                        112

1    that I wrote to Wells Fargo.

                        Page 125

121019EScampos

2      Q.  Why did you write -- and what's the date of the

3   letter?

4      A.  October 8th, 2010.

5      Q.  Why did you write Wells Fargo a hardship letter

6   on October 8th, 2010?

7      A.  I believe it was requesting help with our loan

8   payments.

9      Q.  Why did you need help with your loan payment?

10      A.  I had been laid off from my job in August of

11   2010.

12      Q.  From April 2010 to October 2010, do you remember

13   whether or not you were able to make payments under the

14   modification?

15      A.  I don't remember.

16      Q.  Do you remember making any payments in 2010?

17      A.  I don't remember.

18      Q.  So in your October 8th, 2010, letter, you note

19   that you were receiving unemployment benefits but much

20   less than what you were earning before.  Right?

21      A.  Yes.

22      Q.  When we were talking earlier about your

23   unemployment benefits, you couldn't remember how much

24   less they were than your -- your salary --

25      A.  Yes.

121019EScampos

1     Q.  -- right?

2         Does this letter help refresh your recollection

3     as to what the difference was between your Sardo income

4     and your unemployment benefits?

5     A.  No.  I still can't remember the exact amount.

6     Q.  You also noted in this letter that we have other

7     expenses which I am listing separately and I don't

8     believe I have that list.

9         Do you recall what you listed?

10    A.  From what I remember, my other expenses were the

11    utilities in the house, the gas used for our vehicles,

12    the insurance, cell phone bills.  I believe we had

13    credit card bills also.  And from there I don't remember

14    anything else I put.

15    Q.  Were you able to make the credit card payments?

16    A.  I don't remember.

17    Q.  What about your car, were you able to make car

18    payments?

19    A.  They weren't car payments, they were just the --

20    the gas, not car payments, no.

21    Q.  What about cell phone bills?

22    A.  I believe we did.  Yes.

121019EScampos

23     Q.  You noted that this recent change of our income

24   is ^ <Answer>No has really put a lot of stress in not

25   having enough money for our expenses including the

                                                            114


1   mortgage payment.

2           Do you remember writing that?

3     A.  Yes.

4     Q.  What did you mean by that?

5     A.  That's in service -- that's money coming into the

6   home and this was a lot of bills including the house

7   payment, it was putting stress on myself, not having the

8   money -- enough money to cover all of it.

9     Q.  How was this different in terms of stress than

10   the prior months when you couldn't pay the mortgage?

11    A.  I don't think this was a difference.

12    Q.  You noted that this recent change has really put

13   a lot of stress.  Wouldn't it be fair to say that you

14   hadn't really been able to make regular monthly payments

15   since fairly early on in the mortgage, as we discussed

16   earlier today?

17    A.  That we were not able to make the full payment.

18    Q.  Right.

19    A.  Yes.

121019EScampos

20     Q.  You also say we would like to get some kind of

21  assistance so we don't lose our house.  Right?

22     A.  Yes.

23     Q.  But by that point, you had already had at least

24  two forbearance agreements and a permanent loan

25  modification; correct?

&uarr;

                                                          115


1      A.  Yes.

2      Q.  And , in fact, in October of 2010, your loan had

3   already been modified, right?

4      A.  Yes.

5      Q.  What type of assistance were you looking for in

6   October of 2010?

7      A.  Anything the bank could to to help us.  Lower the

8   payment.

9      Q.  How much lower did you need the payment to be?

10     A.  This wasn't an exact amount I was giving them,

11  just something that it would fit into our -- I don't

12  know how much that would have been.

13     Q.  They had already lowered the payment and you

14  weren't able to make the lowered payment, right?

15     A.  Yes.

16     Q.  You've been handed what's marked Exhibit 513.

121019EScampos

17          Do you recognize this letter?

18      A.  Yes.

19      Q.  And this letter is dated January 31st, 2011, and

20  it's notifying you that your loan has been referred for

21  foreclosure proceedings, correct?

22      A.  Yes.

23      Q.  Do you recall receiving a letter prior to this

24  letting you know that your loan had been referred for

25  foreclosure?

116

1       A.  I don't remember.

2       Q.  Do you recall whether or not January 2011 was the

3   first time you -- that the bank had notified you

4   regarding foreclosure?

5       A.  I don't remember.

6       Q.  When you received this letter, what was your

7   response?

8       A.  My response to them or my -- my reaction to

9   the --

10      Q.  Reaction.

11      A.  Okay.  I was starting to get nervous thinking

12  about foreclosure.

13      Q.  This letter is dated January 31st, 2011.

121019EScampos

14          Do you recall how many payments you missed

15     leading up to January of 2011?

16          A.  No, I don't.

17          Q.  Between the 2009 letter that we discussed at the

18     beginning of the deposition informing you repayment of

19     some missed payments, and January 31st, 2011, when your

20     loan was referred for foreclosure proceedings, is it

21     fair to say that from February 2009 to January 2011

22     there was no time in which you could afford the full

23     monthly payment?

24          A.  Yeah, I guess you could -- yeah, you could say

25     that.

                                                        117


1          Q.  Because if you had been able to make your

2      payments, would you have made them?

3          A.  Yes.

4          Q.  So it was your intention to keep this house;

5      correct?

6          A.  Yes.

7          Q.  So if you had been able to make the payments,

8      that's what you would have done, right?

9          A.  Yes.

10     BY MS. BRINSON:

121019EScampos

11      Q.  Ms. Campos, take a look at Exhibit 514 and let me

12  know when you're ready to discuss.

13      A.  Yes.

14      Q.  All right.  You recognize Exhibit 514?

15      A.  I don't remember seeing this with those amounts.

16      Q.  Do you recall Wells Fargo providing you with

17  modified payments of this amount?

18      A.  I don't.

19      Q.  All right.  So what is Exhibit 514?

20      A.  That is another Forbearance Agreement from

21  Wells Fargo.

22      Q.  And it's dated February 8th, 2000?

23      A.  Yes.

24      Q.  All right.  So by my account this is the third

25  Forbearance Agreement plus the loan modification --

                                                        118

1       A.  No, is that --

2       A.  Yes.

3       Q.  -- correct?

4       A.  Yes.

5           THE REPORTER:  Check date /AE.

6       Q.  So even though foreclosure proceedings had been

7   initiated, ^ <Answer>No the end of January,

121019EScampos

8    Wells Fargo in February granted you a

9    Forbearance Agreement to deal with your temporary

10   financial hardship according to the letter.  Is that

11   correct?

12        A.  Yes.

13        Q.  They further note that you were at that point

14   five months /TKPHREUPBG when, right?

15        A.  Yes.

16        Q.  And approximately 12.886.150 ^ <Answer>No 10

17   past due?

18        A.  Right ^ <Answer>No.

19        A.  Yes.

20        Q.  Not counting attorney's fees or escrow shortage,

21   right?

22        A.  Yes.  /AE /AE.

23        Q.  So they provided you with a seven-month temporary

24   plan in which the payments were $1.820.26 for six of the

25   months and $1,000 to start the plan, is that fair?

                                                      119

1         A.  Yes.

2         Q.  But you understood that this was a

3    Forbearance Agreement and not a modification, right, so

4    the permanent payments weren't going to go down to

                        Page 133

121019EScampos

5   1820.22, right?

6       A.  Yes.

7       Q.  In fact, in this letter, they note that after

8   making those payments, you would still owe $19,005.32,

9   right?

10      A.  Yes.

11      Q.  And that 19.

12      A.  No thousand dollars -- 19,005.32 was -- would

13  have been the amount of the ^ arrearage, right?

14      A.  Yes.

15      Q.  Ms. Campos when you had the opportunity to pay a

16  lower amount on your mortgage payment -- well, first, do

17  you remember doing that?

18      A.  Making the payments?

19      Q.  Uh-huh.

20      A.  I don't.

21      Q.  Did you recall that this was a time period when

22  Wells Fargo reduced your monthly payment to $1.820.22?

23      A.  I remember them lowering the payment, I don't

24  remember the amount exactly.  But I do remember them

25  lowering the payment for a few months.

                                                    120

1       Q.  And during that time period that you remember

                    Page 134

121019EScampos

2   when your payments were lowered, were you able to make

3   those payments?

4       A.  I want to say yes.

5       Q.  So the lowered amount -- and as far as you can

6   recall, were there other time periods when they lowered

7   your mortgage amount or was there only one time period?

8       A.  I only remember once.

9       Q.  So do you have any reason to believe that that

10  one time that you remember is different than this

11  description in this Forbearance Agreement?

12      A.  No, because I don't remember them lowering it to

13  this amount, this low.

14      Q.  But as recall the amount they lowered it to was

15  affordable?

16      A.  I remember when they did lower it, if I remember

17  correctly, we were able to make those payments.  I'm not

18  sure if it's this exact amount it says here.

19      Q.  So your payment prior to this

20  Forbearance Agreement based on the documents we've

21  looked at before, your modified payment was $2,550.69, I

22  believe?

23      A.  Yes.

24      Q.  So these temporary payments were roughly $700

25  less per month, right?

121019EScampos

1      A.  Yeah.  Yes.

2      Q.  So when they reduced your payments previously,

3  you were not able to make your payments, but this amount

4  was affordable if it was the same amount you recall; is

5  that right?  /AE /AE?

6      A.  I don't remember if this is the amount that we

7  paid.

8      Q.  Okay.

9      A.  I don't.

10     Q.  All right.

11  BY MS. BRINSON:

12     Q.  Ms. Campos, do you recognize Exhibit 515?

13     A.  Yes.

14     Q.  What is Exhibit 515?

15     A.  It is a letter that I wrote to Wells Fargo

16  requesting them to help with our payments.  From what I

17  see, it was coming to -- it was at the end of the -- I

18  think it was the forbearance agreements, so that meant

19  our payment was going to go back to normal.

20     Q.  And you ask for Wells Fargo to do what?

21     A.  To review our loan, if to see it was possible to

22  keep receiving that same modified payment.

Page 136

121019EScampos

23     Q.  Were you asking them to make that your permanent

24  payment?

25     A.  I was asking them to review it and see what they

122

1  could -- what they could do.

2     Q.  Once the modified payment ended, did you go back

3  to making full payments?

4     A.  I don't remember.

5     Q.  In December of 2011 when you made this request,

6  what was your income status?

7     A.  From what I see, I was still receiving

8  unemployment and my husband's income.

9     Q.  How stable was his income in terms of

10  fluctuations in 2011?

11     A.  I don't remember.

12     Q.  Was it still going up and down?

13     A.  It could have been.

14     Q.  Was this some time in which it didn't go up and

15  down and it was pretty stable and specifically, I'm

16  talking about between 2008 and ^ 2014.

17     A.  I don't remember if there was a time.

18     Q.  Note here that $2600 is not affordable in

19  December of 2011; correct?

121019EScampos

20      A.  Yes.

21      Q.  What would have been affordable?

22      A.  I don't remember back then how much we would have

23   been able to do.

24      Q.  But the modified payment -- let me -- let me ask

25   you this.

^

123

1           Your letter said our modified agreement expired

2   in August 2011, I believe.  Right?

3      A.  Yes.

4      Q.  So looking back at Exhibit 514, do these two

5   documents together refresh your recollection as to

6   whether or not the February 2011 Forbearance Agreement

7   is the time frame you're talking about when you say you

8   remember your loan payments being lowered?

9      A.  Yes.

10      Q.  And -- just to make sure we're year on the record

11   as to what you're answering -- the time that you

12   remember where your mortgage payments were lowered and

13   were affordable for you is the same as the time frame

14   described in the February 8th, 2011

15   Forbearance Agreement, which is Exhibit 514; correct?

16           MS. FELLOWS:  Object to the form.

121019EScampos

17          THE WITNESS:  From this

18  Forbearance Agreement to the letter that I wrote in

19  December of 2011, it seems like we were able to make

20  those lower payments, but I don't remember exactly if

21  they were made in that amount.

22          I can't tell you yes, exactly we made those

23  payments but from the documents that I have here, it

24  seems like we did.

25      Q.  Okay.  But I'm asking a slightly different

124

1   question, just to clarify that when you said you

2   remembered making lower payments for a certain period of

3   time, does your letter refresh your recollection that

4   that certain period of time that you're talking about is

5   the same time period that's described in Exhibit 514?

6       A.  Yes.

7       Q.  So when you are asking for the continuation of a

8   modified payment in December of 2011, you're asking for

9   the payments that are described in Exhibit 514,

10  specifically $1820.22?

11      A.  Yes, it seems like I am asking -- I'm not sure --

12  I'm not sure if that's the amount I want to pay.  I'm

13  not sure if that's the amount I wanted them to continue

Page 139

121019EScampos

14    giving us.

15        Q.  Not that I remember enough.  Is it possible that

16    you were hoping for a lawyer amount than 1820.22?

17        A.  I think since the time -- that I wasn't going to

18    get any more income from anywhere myself, I was hoping

19    that it would be lower than that amount in the

20    forbearance.

21        Q.  Okay.  Hold on a second.  Yes, all right.

22    BY MS. BRINSON:

23        Q.  Ms. Campos, we were just discussing the December

24    9, 2011 letter, so I'm handing -- you've been handed

25    what's marked Exhibit 515.  Look at the third page of

                                                          125


1    this document, the document starts at 170910, look at

2    170912, you will see the date on that letter --

3        A.  Yes.

4        Q.  -- is that your signature?

5        A.  Yes.

6        Q.  And just to clarify, did Mr. Campos sign this

7    himself?

8        A.  I believe he did.

9        Q.  Do you recognize Exhibit 515?

10        Yes, I'm sorry about that.

121019EScampos

11          516.  Apologies.

12          Do you recognize this.

13     A.  I don't remember it.

14     Q.  But that's your signature?

15     A.  Yes.

16     Q.  And I just have one question about this document.

17     As you can see this is a little -- it's a little hard to

18     read at the top of it.  But making home affordable,

19     request for modification and affidavit.  RMA.

20          Do you see that at the very top?

21     A.  Yes.

22     Q.  Do you know what this document is?

23     A.  Yes.

24     Q.  What is this document?

25     A.  It's part of a program to help in getting a loan

126

1     modification.

2     Q.  And in this document on the bottom of the first

3     page, do you see under the section where it says

4     hardship affidavit?

5     A.  Yes.

6     Q.  And it says my expenses have increased, that is

7     Xed --

121019EScampos

8      A.  Yes.

9      Q.  -- did you write that "X"?  Is this your

10  handwriting?

11      A.  I don't know.

12      Q.  Where it indicates my expenses have increased,

13  can you explain what that means, what that references?

14      A.  What I think it means is monthly mortgage

15  payments went back to its normal amount.  After the

16  Forbearance Agreement was done.

17      Q.  And looking at the second page, do you see under

18  the acknowledgment and agreement, where it says, making

19  this request for consideration under the making home

20  affordable program, I certify under penalty of perjury

21  and then the first one is that all of the information in

22  this document is truthful and ^ <Answer>No in the

23  event identified on page 1 is/are, reason I need to

24  request a modification of the terms of my mortgage loan,

25  short sale or deed in lieu of foreclosure.

                                                    127

♠

1          Do you see that?

2      A.  Yes.

3      Q.  And was the information that's included in this

4  document truthful?

121019EScampos

5      A.  I'm looking at the amounts listed under the

6   household expenses, yeah, they seem about right.

7      Q.  Under monthly household income, do you see where

8   it says 1455 for unemployment --

9      A.  Yes.

10     Q.  -- income?

11         Does this document refresh your recollection how

12   much you received in unemployment income?

13     A.  No.  I still can't remember the amount of time or

14   the amounts I received.

15     Q.  Did the amount of unemployment income change over

16   time?

17     A.  I don't think so.

18     Q.  So if you have $1455 here as your monthly

19   unemployment income why do you believe that the amount

20   was something other than that?

21     A.  As I said, I don't remember the exact amount.

22     Q.  Do you have any reason to believe that you would

23   have put an amount on this document that you signed

24   under penalty of perjury that wasn't accurate?

25     A.  No.  It should be right.

                                                        128

1      Q.  And under monthly household income, it also says
                          Page 143

121019EScampos

2  $5,650 for monthly gross wages.

3      A.  Uh-huh.

4      Q.  Do you see that?

5      A.  Yes.

6      Q.  And that's for Mr. Campos?

7      A.  That would be the only other income.

8      Q.  So that was his gross wages.  Right?

9      A.  Yes.

10     Q.  Do you remember what his net wages were?

11     A.  No, I don't.

12     Q.  When did your unemployment income end?

13     A.  I don't remember.

14     Q.  This is dated March of 2012.  You noted in --

15 reading this hardship letter, Exhibit 515, which was

16 dated December 19th of 2011, you said your unemployment

17 would soon end.

18         Right?

19     A.  Yes.

20     Q.  So is knowing that in December of 2011 it was

21 going to soon end, which you noted that you were still

22 getting in March 2012, does that help you recall how

23 soon after March of 2012 it ended?

24     A.  No, I don't.

25     Q.  Do you know whether or not you got unemployment

Page 144

121019EScampos

1    income throughout 2012?

2        A.  I don't remember.

3        Q.  Did you get unemployment income in 2013?

4        A.  I don't remember.

5        Q.  What about 2014?

6        A.  Oh, for sure in 2014, no.

7        Q.  Sometime before 2014 it ended?

8        A.  Yes.

9        Q.  But as far as you recall, it never increased, the

10    amount didn't increase?

11        A.  No.  My amount didn't change.

12        Q.  Do you recall whether or not Mr. Campos' income

13    increased after March of 2012?

14        A.  I don't remember.

15        Q.  Is it possible it did?

16        A.  It's possible that it could have gone up for a

17    bit.  I don't remember how much.  It could have.

18        Q.  If it had gone up a bit, would that have helped

19    you -- would you have applied that to your mortgage

20    payment?

21        A.  I don't think it changed that much to make a

22    difference.

121019EScampos

23     Q.  So the amount that you have here, would that have

24  been a pretty stable amount, it could have gone down a

25  little bit, maybe gone up a little bit, but this is

                                                            130

 1  about the right number, is that fair?

 2          I'm just trying to make sure I understand the

 3  5,000 --

 4     A.  Yes.

 5     Q.  -- 650.

 6     A.  I think so.

 7     Q.  Okay.  518.

 8             THE REPORTER:  This is 5178.

 9             MS. BRINSON:  Yes.

10             MS. BRINSON:

11     Q.  Ms. Campos, you've been handed 517.  Is this your

12  signature?

13     A.  I don't recognize that as my signature.

14     Q.  Do you recognize this letter?

15     A.  No.

16     Q.  So you did not write this letter?

17     A.  No.

18     Q.  You did not sign this letter?

19     A.  It doesn't -- it doesn't -- that's not my

Page 146

121019EScampos

20   signature.

21      Q.  Is it possible that your husband sent this?

22      A.  No.

23      Q.  Were you working with another company like

24   Debt Settlers, excuse me, or somebody like that and

25   ^ <Answer>No who may have written out your behalf?

^

131

1      A.  Yes.

2      Q.  Who were you working with in December of 2012?

3      A.  I don't remember the one we started with this

4   particular person, but he was from

5   911 Mortgage Solutions.  His name was Juan Macias.

6      Q.  911 mortgage solutions?

7      A.  Yes.

8      Q.  Do you have any documents from

9   911 Mortgage Solutions?

10      A.  What I have I believe is the payments we made to

11   him for his services and I think copies I might have

12   sent him of check stubs.

13      Q.  What was his name again?

14      A.  Juan Macias.  M-a c-i-a s.

15      Q.  Un^ <Answer>No M-a c --

16      A.  I-a s.

121019EScampos

17    Q.  When did you start working with

18  911 Mortgage Solutions?

19    A.  I don't remember the exact date.

20    Q.  So you're working with Debt Settlers initially?

21    A.  Yes.

22    Q.  Was 911 Mortgage Solutions the next company you

23  worked with or was there somebody else in between?

24    A.  No.  That was the next company.

25    Q.  Okay.  How did you find 911 Mortgage Solutions?

                                                          132

1    A.  He was recommended by an acquaintance of my

2  husband's that he had helped them get a loan

3  modification.

4    Q.  How much did you pay Mr. Macias?

5    A.  I can't remember the exact amount.

6    Q.  Ballpark -- I'm sorry.

7    A.  There were several payments I made to him

8  throughout the time we were with him.  I would like to

9  say maybe -- maybe it was 1500.

10    Q.  And what was he supposed to do for this $1500?

11    A.  He was supposed to help us obtain a loan

12  modification with Wells Fargo.

13    Q.  And how was he proposing to do that?

121019EScampos

14      A.  He would just send in our -- our check stubs, my

15  husband's check stubs and he would be the one in charge

16  of representing us so we no longer spoke to Wells Fargo.

17  It was just him and Wells Fargo.

18      Q.  Was he a lawyer?

19      A.  No.

20      Q.  Did you authorize Wells Fargo to speak with him?

21      A.  Yes.

22      Q.  Is it possible then that he sent this letter?

23      A.  It could be.

24      Q.  Did he discuss with you that he was going to

25  communicate with Wells Fargo on your behalf?

                                                            133

1      A.  Yes.

2      Q.  Did you authorize him to sign your name?

3      A.  No.  I don't remember ever telling him that I

4  was -- that I gave him permission to do that.

5      Q.  Do you still have his contact information?

6      A.  Yes, I do.

7      Q.  Do you know how we could reach him?

8      A.  The only thing I have is the phone number, I

9  believe.  I'm not sure if I have the address.  But I

10  know I have the phone number.

121019EScampos

11     Q.  All right.  So taking a look at this letter --

12     understanding you didn't write it -- want to look at the

13     substance of it --

14     A.  Uh-huh, yes.

15     Q.  -- it says that on August 2010, I was laid off

16     from my employer and was in a position in which my

17     family and I lost an average of $3,000 of gross income a

18     month.

19          Is that accurate?

20     A.  I can't remember if that's the amount.

21     Q.  Did you tell him, Mr. Macias, that you had lost

22     over $3,000 of gross income a month?

23     A.  I don't remember giving him an amount.

24     Q.  Then it says, the only income we have for over 14

25     months was my husband's, which fortunately had stable

                                                            134

1      income for a number of years now.

2           Is that statement accurate?

3      A.  No.

4      Q.  Why is it inaccurate?

5      A.  Well, the last 14 months -- because for those 14

6      months I believe I was still receiving unemployment and

7      it says his income was stable, which wasn't.

121019EScampos

8    Q.  Then it goes on to say as of January 2012, I

9    started up my own business in which I've been able to

10   pick up -- in which I have been able to pick up my

11   income and now start to be able to contribute and afford

12   my mortgage payment.

13        Is that accurate?

14   A.  No.

15   Q.  Did you start your own business in January of

16   2012?

17   A.  No.

18   Q.  Did you have any additional income in January of

19   2012 to be able to contribute and afford your mortgage

20   payment?

21   A.  No.

22   Q.  Other than your unemployment compensation?

23   A.  Well, I don't even know if I was still receiving

24   unemployment in January of 2012.  But if -- if the

25   unemployment had ended by then, there wasn't any other

↑

135

1    income coming from me.

2    Q.  Wait.  Wait.  Wait.  Hold on.  Include File Not

3    Found?

4        MS. BRINSON:  Well, yeah.

Page 151

121019EScampos

5  BY MS. BRINSON:

6      Q.  Real quick, Ms. Campos.  Handing you what's been

7  marked Exhibit 518, this -- is this your signature?

8      A.  Yes.

9      Q.  This letter is dated March 21, 2012.  Right?

10     A.  Yes.

11     Q.  It appears to be exactly the same letter as the

12  December 19, 2011, letter which is Exhibit 515 but with

13  a different date.

14         Is that right?

15     A.  Yes.

16     Q.  Do you recall resubmitting the same hardship

17  letter?

18     A.  I don't remember.  And the date that's written in

19  there is not my handwriting.

20     Q.  Were you working with 911 Mortgage Solutions in

21  March of 2012?

22     A.  I believe so.

23     Q.  Is it possible that Mr. Macias sent this on your

24  behalf?

25         MS. FELLOWS:  Objection to form.

                                                    136

1         THE WITNESS:  Yes.

                    Page 152

121019EScampos

2    BY MS. BRINSON:

3        Q.  All right.  Ms. Campos, you've been handed

4    Exhibit 519.

5            Do you recognize this letter?

6        A.  Yes.

7        Q.  What is this letter?

8        A.  This letter is from Wells Fargo in regards to our

9    loan.  It says that we have -- that we started working

10   with Wells Fargo home preservation collection department

11   and they send me the information for the preservation

12   specialist.

13       Q.  And in this letter, it also provides you with a

14   foreclosure sale date of April 15th, 2013, right?

15       A.  Yes.

16       Q.  Was that the first time that you were made aware

17   of the setting of the foreclosure sale?

18       A.  I don't remember.

19       Q.  The foreclosure was initiated in January of 2011,

20   right?  According to Exhibit 513.

21       A.  Yes.

22       Q.  In response to -- in response to this letter with

23   the April 15th, 2013, foreclosure sale date, what did

24   you do?

25       A.  I believe I spoke to Mr. Macias to let him know

121019EScampos

1    what I had received.

2        Q.  And what did he do?

3        A.  I don't know. Include File Not Found?

4    BY MS. BRINSON:

5        Q.  Ms. Campos, you have been handed what's marked

6    Exhibit 520.

7        A.  Yes.

8        Q.  Do you recognize this document?

9        A.  I don't remember seeing this one.

10       Q.  So you don't recall Forbearance Agreement offer

11   from April 9th of 2013?

12       A.  No.

13       Q.  Okay.  Include File Not Found?

14           MS. BRINSON:  26.

15       Q.  Ms. Campos, you've been handed Exhibit 521.

16       A.  Yes.

17       Q.  Do you recognize this document?

18       A.  No, I don't.

19       Q.  Ms. Campos, who is James Wahlberg junior?

20       A.  I do not know him.

21       Q.  You don't know him?

22       A.  No.

121019EScampos

23    Q.  Flip to page 2.  PL HERNANDEZ 17464.

24    A.  Yes.

25    Q.  Is this your signature?

138

1    A.  It looks different than my normal signature.

2    Q.  According to this document, a notary public has

3    indicated that you personally appeared before this

4    person and signed this document on June 15th, 2013.

5        Do you have any recollection of signing a grant

6    deed to James Walker junior on June 15th, 2013?

7    A.  No.

8    Q.  Do you know who ^ Jimmy ^ Jimmie walker is?

9    A.  No.

10    Q.  Have you ever heard his name before?

11    A.  No.

12    Q.  Did you transfer interest in your property /AE to

13    Mr. Walker?

14    A.  No.

15    Q.  Were you was ^ <Answer>No working with this

16    911 Mortgage Solutions --

17    A.  Yes.

18    Q.  -- is the name of it?

19    A.  No -- in 2013

121019EScampos

20    A.   ^ <Answer>No?

21    A.  I believe we were.

22    Q.  You testified a few moments ago that when you

23  were made aware of the foreclosure sale on your property

24  you let Mr. Macias know.  Correct?

25    A.  Yes.

139

1    Q.  What did he tell he was going to do, if anything,

2  in response to that information?

3    A.  What he would always let us know -- from what he

4  told us, he would always stop the sale date.

5    Q.  Did he tell how he was going to stop the sale

6  date?

7    A.  No.

8    Q.  Did you authorize him to deed your property over

9  to Mr. James Walker?

10    A.  No.  I don't recall ever talking to him about

11  this.

12    Q.  Did you notify Wells Fargo that James Walker had

13  an interest in your property and had filed bankruptcy?

14    A.  No.

15    Q.  Did you notify Wells Fargo that because of

16  Mr. Walker's bankruptcy, your foreclosure sale had to be

121019EScampos

17    set aside?

18        A.  No.

19        Q.  Did you authorize someone to do that on your

20    behalf?

21        A.  No.

22        Q.  As you sit here today looking at Exhibit 521,

23    page 174164 specifically, is it your testimony today

24    that this is not your signature?

25        A.  It kind of looks like my signature.  There is a

                                                        140


1    few differences.  But I don't remember signing this

2    document.

3        Q.  As we discussed at the beginning of this

4    deposition, your testimony here is under oath, again

5    under penalty of perjury just as if you were sitting in

6    a courtroom.

7            Is it possible that you transferred interest in

8    your property to James Walker or authorized someone else

9    to do so.

10        A.  No.

11            MS. FELLOWS:  Object to the form.

12    BY MS. BRINSON:

13        Q.  Did Mr. Macias tell you what he did to stop the

121019EScampos

14   foreclosure sale?

15        A.   No.

16        Q.   Did he tell you that he was able to stop the

17   foreclosure sale?

18        A.   Yes.

19        Q.   What did he say?

20        A.   From what I remember he would just let me know it

21   had been postponed.

22        Q.   Mr. Macias was an acquaintance of -- I believe

23   you said --

24        A.   He helped an acquaintance of my husband.

25        Q.   Of your husband.

                                                            141


1         A.   Obtain a loan modification.

2         Q.   Did your husband speak with Mr. Macias directly?

3         A.   I want to say maybe the -- at the beginning he

4    met him but from then on it was just strictly me talking

5    to Mr. Macias.

6         Q.   Do you think it's possible that your husband

7    authorized Mr. Macias to transfer interest in your

8    property to James Walker?

9         A.   No.

10             MS. BRINSON:  Ms. Fellows, we would like any

121019EScampos

11   and all documentation Ms. Campos or Mr. Campos has

12   related to Juan Macias, 911 Mortgage Solutions and

13   James Walker.

14       Q.  Were you aware that a document granting

15   Mr. Walker an interest in your property existed?

16       A.  No.

17               MS. FELLOWS:  Object to the form.

18               THE WITNESS:  No.

19   BY MS. BRINSON:

20       Q.  27.

21           Ms. Campos, you testified previously that you

22   filed bankruptcy.  When was that?

23       A.  In 2014.  I believe it was April.

24       Q.  I've been handed what's been marked Exhibit 522.

25           Do you recognize this letter?

142

1        A.  I don't remember this.

2        Q.  So you don't recall receiving a letter from

3    Wells Fargo referencing bankruptcy filing as early as

4    August 19, 2013, which was the date of this letter?

5        A.  No, I don't.

6        Q.  But a Chapter 13 bankruptcy filing that this

7    letter refers to could not be yours; correct, because

121019EScampos

8    you didn't file until 2014?

9      A.  Yes.

10     Q.  This letter has a PL CAMPOS 13 Bates label, which

11   means, again, that this document came to Wells Fargo

12   from your counsel.

13        Is it your testimony here today that you do not

14   recognize this letter even though you produced it?

15            MS. FELLOWS:  Object to the form.

16            THE WITNESS:  As I -- as I said before there

17   were several letters, that I didn't look through them

18   when I sent them to my lawyer, and I do not remember

19   receiving this back in August of 2013.

20   BY MS. BRINSON:

21     Q.  Going back to April of 2013, which was the notice

22   of foreclosure sale date, what was your income in

23   April of 2013?

24     A.  I don't remember the exact amount.

25     Q.  Did you have sufficient income to bring your loan

                                                             143


1    current in April of 2013?

2      A.  I don't remember.

3      Q.  If you had had sufficient income to bring your

4    loan current, would you have made the mortgage payments?

121019EScampos

5     A.  I believe we would have.

6     Q.  According to Exhibit 520, in April of 2013, your

7  loan was 28 months delinquent.

8        Do you see that?

9     A.  Yes.  I do.

10     Q.  So in April of 2013, your loan was already over

11  two years delinquent.  Correct?

12     A.  Yes.

13     Q.  Do you have any reason to dispute that statement?

14           MS. FELLOWS:  Object to the form.

15           THE WITNESS:  The amount of time?

16  BY MS. BRINSON:

17     Q.  Yes.

18     A.  No.

19     Q.  So would you agree then on April 15, 2013, which

20  was supposed to be the foreclosure sale date on the

21  property at 7103 clover lawn drive, your loan was over

22  two years delinquent?

23           MS. FELLOWS:  Object to the form.

24           THE WITNESS:  Agree.

25  BY MS. BRINSON:

                                                    144


1     Q.  And on that date, April 15th of 2013, would you
                        Page 161

121019EScampos

2    also agree that you did not have sufficient funds to

3    repay the entire arrearage to bring the loan current?

4        A.  Is it also your testimony that you paid

5    Juan Macias approximately $1500 to assist you with your

6    loan.

7        A.  Yes.

8        Q.  And as part of his services, he assured you that

9    he would get the foreclosure sale date postponed; is

10   that correct?

11            MS. FELLOWS:  Object to the form.

12            THE WITNESS:  Yes.

13   BY MS. BRINSON:

14       Q.  It was also your testimony that you did not nor

15   did you authorize anyone else to transfer an interest in

16   your property to a Mr. James Walker in 2013; is that

17   right?

18       A.  Yes, this is right.

19       Q.  And you've also testified that Mr. Macias called

20   you to let you know that he had in fact gotten your

21   phone company sale date postponed; is that right?

22            MS. FELLOWS:  Object to the form.

23            THE WITNESS:  From what I remember, there

24   was communication that there was a sale date.  This were

25   several sale dates while we were working with him that

Page 162

121019EScampos

1    he postponed.

2    BY MS. BRINSON:

3        Q.  So he was able to get all of them postponed?

4        A.  There was one, and I don't know if it has to do

5    with this -- what happened with the James Walker.

6            There was one, and I don't remember the exact

7    date of the sale date, but there was one that did go

8    through and the house sold.  And from what I remember,

9    if I remember correctly, someone came to my house and

10   told me that they had purchased the home.  Or that the

11   home had been sold.

12           So I called him and then he said that, I guess

13   they were not aware of that sale date but that he would

14   find a way to reverse it, but I never -- I don't recall

15   talking to him about what was done to reverse the sale

16   date.

17       Q.  So your understanding --

18       A.  Sale of the house, I'm sorry.

19       Q.  Right.  So your understanding is that a

20   foreclosure sale did occur but Mr. Macias was able to

21   get it reversed?

22       A.  Yes.

121019EScampos

23    Q.  But he did not tell you how he was able to get it

24  reversed?

25    A.  No.

                                                          146


1    Q.  Did you ask?

2    A.  No.  I don't remember --

3    Q.  Do you --

4    A.  -- asking him.

5    Q.  Did he ask you to sign anything?

6          MS. FELLOWS:  Objection to form.

7          MS. BRINSON:  That's a fair objection.

8    Q.  Did he ask you to sign anything related to the

9  reversal of the foreclosure date specifically?

10    A.  No.

11    Q.  Ms. Campos, do you know date that the foreclosure

12  sale went through?

13    A.  No, I don't remember.

14    Q.  Ms. Campos, you've been handed Exhibit 523 --

15    A.  Yes.

16    Q.  -- do you recognize this letter?

17    A.  Yes.

18    Q.  What is Exhibit 523?

19    A.  It is a letter from Wells Fargo telling us that

121019EScampos

20   they reviewed our loan and found that there were funds

21   that had not been applied and that they were being

22   returned.

23       Q.  It notes that since those funds are less than the

24   total amount to bring your loan current, we are unable

25   to apply these found your loan, right?

147

1       A.  Yes.

2       Q.  And then it goes onto state, if your loan is 34

3   payments past due with a total amount 86,489.01; is that

4   correct?

5       A.  Yes.

6       Q.  Do you have any reason to dispute the amount that

7   Wells Fargo stated was due on October 22nd, 2013?

8       A.  No.

9       Q.  So as of October of 2013, your loan was almost

10   three years past due; is that correct?

11       A.  Yes.

12       Q.  Ms. Campos, do you know what effect being 34

13   payments past due had on your credit score?

14       A.  I don't know.

15       Q.  Do you know what your credit score was in October

16   of 2013?

121019EScampos

17 A. No.

18 Q. Do you know what it is today?

19 A. No.

20 Q. Do you know what it was prior to the loan going

21 into default in 2009?

22 A. No, I don't.

23 Q. Do you know what the value of the house was in

24 October of 2013?

25 A. No.

148

1 Q. Do you know what the value of the house was in

2 April of 2013?

3 A. No.

4 Q. What about in 2008 when you initially bought the

5 house?

6 A. Yes.  It was the amount that we asked for a loan

7 for.

8 Q. The amount of money that you borrowed from

9 Wells Fargo to purchase the house, as far as you can

10 recall, was commensurate with how much the house was

11 worth.  Is that fair?

12 In other words, the amount that you borrowed was

13 equal to what the house was worth?

121019EScampos

14      A.  I think so.

15      Q.  Do you know whether or not the value of the house

16 decreased after you bought it?

17      A.  I don't know.

18      Q.  Do you know if it increased?

19      A.  No, I don't.

20      Q.  Ms. Campos, take a look at Exhibit 524.  It

21 starts with Wells Fargo 170858.

22          Will you take a look at page 170895.

23      A.  Yes.

24      Q.  Is this your signature?

25              THE REPORTER:  Check 858 up there).

                                                      149


1      A.   I think it is.

2      Q.  And is that your husband's signature next to your

3 signature?

4      A.  Yes, it looks like his signature.

5      Q.  Let's go back to the first page.

6          On the first page -- well, do you recognize what

7 this is?

8      A.  Yes.

9      Q.  What is it?

10      A.  It's a form from making home affordable program

121019EScampos

11  to make a request to mortgage assistance.

12     Q.  Jumping down to blow the borrower information

13  section, which says have you contacted a credit

14  counseling agency for help?  And then no is checked.

15     A.  Yes.

16     Q.  Is that accurate?

17     A.  A credit counseling company is -- would that be

18  besides Mr. Macias's company?

19     Q.  I'm asking you.  I don't know.  Truly just asking

20  whether that's an accurate answer?

21     A.  I don't know.  I don't remember filling this out.

22  It doesn't look like my handwriting.

23     Q.  Do you know who Roy rober son is?  Or robber son?

24     A.  Roy?

25     Q.  Yes.

                                                        150


 1     A.  Yes.

 2     Q.  Who is he?

 3     A.  He is from another company that also helps with a

 4  loan modification.  I can't remember the name of the

 5  company.

 6     Q.  Were you working with that company as well?

 7     A.  After we stopped working with Mr. Macias, we went

121019EScampos

8    to this person.

9       Q.  Why did you stop working with Mr. Macias?

10      A.  Because when the whole problem of the sale of the

11   house and with the reversal that he did, he came to us

12   and asked for more money to cover the expenses that they

13   had in court or all the expenses they had in reversing

14   the sale of the house and it was quite a bit a month --

15   amount of money that he was requesting from us.

16          So he ^ <Answer>No we just ^ <Answer>No

17   desueded not to work with him anymore.

18      Q.  Did you pay him?

19      A.  No.

20      Q.  Did he try to pursue you all for the money?

21      A.  Yes.  He called us.

22      Q.  Do you remember how many he was trying to get you

23   to pay in addition to the 1500 that you had already paid

24   him?

25      A.  I don't remember the exact amount.

                                                      151


1       Q.  Was it another 1500?  Or was it more than that?

2    Less?

3       A.  I believe it was more than 1500.

4       Q.  Did he tell you what the 15 -- what the

                          Page 169

121019EScampos

5    additional money was for specifically?

6       A.  No.  He didn't go into specifics.  He just said

7    it was money to cover -- to like repay him for the money

8    that they had had to pay in expenses for the reversal of

9    the sale of the house.

10      Q.  Expenses they had to pay to?

11      A.  Courts I believe he told me.  But other than

12   that, he didn't tell me specifically what they had to do

13   or what -- yeah, they didn't give specifics of what that

14   money was exactly for.

15      Q.  So you worked with Debt Settlers, Juan Macias,

16   Roy rober son and -- is that how -- how do you say it?

17   What's his last name?

18      A.  It's -- I don't think it was -- it had a --

19   Louisiana ^ by.

20      Q.  Leroy, Leroy with an apostrophe.

21      A.  Yes.  But I don't remember his exact full name.

22      Q.  What about HRS?

23      A.  That was a different company.

24      Q.  When did you start working with HRS?

25      A.  In 2014.  I don't remember the exact month, but

                                                        152

1    it was in 2014.

121019EScampos

2      Q.  And all of these companies are debt settlement

3   companies?

4      A.  From what I understood they were companies that

5   would help with loan modifications.  I don't know if

6   they did other stuff beside that but from what we

7   understood, it was -- they help with loan modifications.

8      Q.  So on the pages 170891 of that exhibit,

9   Exhibit 24, it says monthly gross wages, 6,000658

10  dollars 58 cents.

11         Do you see that?

12     A.  Yes.

13     Q.  Was -- is that accurate based on your

14  recollection of your monthly gross wages in November of

15  2013?

16     A.  I don't remember.

17     Q.  In November of 2013, what were your -- what was

18  your income?

19     A.  I didn't have an income.

20     Q.  Refresh my memory, what did you say your income

21  was in April of 2013?

22     A.  I don't think I had an income -- I don't think my

23  unemployment was -- didn't go up until 2013.

24         MS. BRINSON:  33.

25         THE REPORTER:  And then a break.

121019EScampos

1    BY MS. BRINSON:

2        Q.  Let me know when you're ready?

3        A.  Yes.

4        Q.  Okay.  Ms. Campos, we've handed you what starts

5    with PL CAMPOS 30, ^ <Answer>No.

6            Do you recognize this document?

7        A.  Yes.

8        Q.  What is this document?

9        A.  It is a letter from Wells Fargo in regards to the

10   payment assist /STHAPBS we were requesting and it was

11   letting us know at this time we do not meet the

12   requirements of the program.

13       Q.  And it provides what reason for the decline of

14   mortgage assistance?

15       A.  ^^based on our documented monthly income we were

16   unable to afford a monthly payment that meets the

17   requirements of the program.  /AE /AE.

18       Q.  And in December of 2013 when you received this

19   letter, you had no income; correct?

20       A.  Yes.

21       Q.  Your husband's income was varying amounts

22   depending on whether or not he had a certain amount of

Page 172

121019EScampos

23    hours.  Is that fair?

24         A.  Yes.

25         Q.  Do you know what his income was in December of

154

1    2013?

2         A.  I don't remember.

3         Q.  Do you know what it was in October of 2013?

4         A.  No, I don't.

5         Q.  Or November of 2013?

6         A.  No.

7         Q.  Was there a minimum amount that he always made

8    that you could count on?

9         A.  Yes.

10         Q.  What was that amount?

11         A.  I would say a week would be a thousand.

12         Q.  So $4,000 per month gross, you could count on?

13    Is that fair?

14         A.  Yes.  Around that amount.

15         Q.  But it could be higher than that?

16         A.  Yes.

17         Q.  All right.  But generally it wouldn't be lower

18    than that?

19              Is that your recollection?

121019EScampos

20    A.  I -- I'm trying to think back if he was paid

21  weekly or every two weeks.  So I'm not sure if that

22  thousand that I told was the week or every two weeks.

23    Q.  So in November, you said that it was t according

24  to those documents it was 6,665 was monthly for your

25  household income?

155

1    A.  Yes.  For example what that form says.

2    Q.  So based on that it would seem a thousand dollars

3  weekly --

4    A.  It seems like those were the checks that we

5  provided that company for that amount of time.  But if

6  that's what we sent them, I'm sure that's what it was.

7  But it was only his income because by then I didn't have

8  any other kind of income.

9    Q.  Okay.

10        All right.  Let's take a break.

11            THE VIDEOGRAPHER:  We are now going off the

12  record.

13            The time is 3:19 p.m.

14            (Short recess.)

15            MS. BRINSON:  Okay.

16            THE VIDEOGRAPHER:  Everybody ready?

121019EScampos

17          MS. BRINSON:  Yes.

18          THE VIDEOGRAPHER:  We're notice back on the

19    record.

20          The time is 3:35 p.m.

21    BY MS. BRINSON:

22    Q.  Ms. Campos, we are coming back from a break.

23          Did you discuss the substance of your testimony

24    with your counsel during the break?

25    A.  No.

                                                    156


1    Q.  Before we broke we were talking about a couple of

2    things.  So just to be clear, you worked with

3    911 Mortgage Solutions, Debt Settlers, Roy, last name

4    unclear, but we'll figure it out, and HRS, which we will

5    get to.

6          Any other companies?

7    A.  No.

8    Q.  At 911 mortgage solution, you worked with

9    Juan Macias?

10    A.  Yes.

11    Q.  And this were a couple of people at seatbelt

12    settlers?

13    A.  Yes.

121019EScampos

14    Q.  And this Roy person?

15    A.  Yes.

16    Q.  We would like contact information for all of

17    these entities and individuals, as well as any documents

18    Ms. Campos may have related to any of the mortgage

19    modification specialist companies I'll just call them

20    that.

21          MS. FELLOWS:  Just send it to me in writing

22    after the submission, it will be helpful.

23          MS. BRINSON:  Will do.

24    Q.  All right.  Ms. Campos, when with you

25    ^ <Answer>No we were talking right before the break,

157

1    we were trying to figure out what Mr. Campos' reliable

2    income was.  You said you thought it might be a thousand

3    dollars a week and you were trying to figure ^ oil

4    ^ <Answer>No out it ^ <Answer>No if it was a

5    thousand dollars a week or every two weeks.

6        Right?

7    A.  Yes.

8    Q.  Based on the other documentation we've seen today

9    which said his income was $5650 or $6665, those are the

10    two figures we've seen, what I'm trying to drill down on

Page 176

121019EScampos

11   is what amount was a reliable amount for you to base

12   your mortgage payment affordability?

13        Do you understand my question?

14   A.  Like what amount we needed to have to be able to

15   make the payment or --

16   Q.  Let me rephrase.

17   A.  Okay.

18   Q.  If his income was fluctuating and sometimes it

19   was less, sometimes it was more according to your

20   testimony, that impacted your ability to pay your

21   mortgage.  Is that fair?

22   A.  Yes.

23   Q.  So based on your testimony, you couldn't rely on

24   the highest amount he got paid during that time frame

25   because that wasn't necessarily what he was going to get

                                                          158

1   paid the following month.  Right?

2        Lining if he had a lot of hours one month, he

3   wouldn't necessarily get a lot of hours the next

4   month --

5   A.  Yes.

6   Q.  -- right?

7   A.  Yes.

121019EScampos

8    Q.  So you couldn't go based on the highest number of

9  hours, right?

10    A.  Yes.  That would not be the same all the time.

11    Q.  Right.  So what would be the lowest amount of

12  hours that he could rely on so that you at least know

13  that amount of money is coming in for him in a given

14  month?

15    A.  The least amount of hours worked?

16    Q.  Either in hours or money.

17    A.  If he only worked the 40 hours, that was -- it

18  would be much lower than if he had worked, because there

19  times he worked 60 hours, 60, 65 hours.

20    Q.  Okay.  That may answer the question.  So did he

21  ever work less than 40 hours?

22    A.  I don't remember if there was a time that he did

23  under 40 hours.

24    Q.  Okay.  So could you all rely on the fact that he

25  was going to have at least 40 hours, maybe not overtime

                                                      159

1  but he should have at least 40 hours?

2    A.  At least the 40 hours, yes.

3    Q.  Okay.  So at 40 hours, what amount of income was

4  that on a weekly or monthly basis?

121019EScampos

5      A.  Are we talking about 2013?  Or --

6      Q.  Yes.  Do you remember what his hourly wage was in

7   2013?

8      A.  No, I don't.

9      Q.  You said --

10      A.  In that year, I don't remember exactly how much

11   his pay was per hour.

12      Q.  Okay.  You said previously that at some point it

13   was $23 an hour?

14      A.  Yes.

15      Q.  Was that beginning, middle?  End?  Where -- where

16   toss that fall in the range of income?

17      A.  Maybe from the -- well, the middle of -- of what

18   time frame are you talking about?  I'm thinking about

19   from the time he got hired until the time he got --

20   stopped working.

21      Q.  Specifically we're talking about 2013.

22      A.  Okay.  I would say it was towards the middle he

23   was earning that amount.

24      Q.  Towards the middle of 2013?

25      A.  Yeah, during that time.

                                                        160


1      Q.  So $23 times 40 is $920 per week.

                        Page 179

121019EScampos

2          Does that sound about right?

3     A.   Sounds about right.

4     Q.   So the $4,000 per month that you mentioned before

5  is actually just about right?

6     A.   Just about, yeah.  Around there.

7     Q.   Ms. Campos, you understand that in terms of your

8  mortgage payment, there has to be a set amount, you

9  can't vary monthly based on what you can afford.

10          Right?

11          MS. FELLOWS:  Objection to form.

12  BY MS. BRINSON:

13     Q.   Do you understand what I'm saying?

14     A.   Not quite.

15     Q.   You signed a note and then a permanent

16  modification for loan you took out to buy your house,

17  and that note and modification agreement, both of them

18  had a certain monthly payment amount.

19          Correct?

20     A.   Yes.

21     Q.   And the certain monthly payment amount is based

22  in part on the interest rates and maturity date of the

23  loan, right?

24     A.   Yes.

25     Q.   And you mentioned previously that you all were

121019EScampos

1   unhappy with the EMC variable interest rate loan because

2   the payments were escalating; correct?

3       A.  Yes.

4       Q.  This loan is a fixed rate loan, meaning the

5   monthly payment is the same every month.  Right?

6       A.  Yes.

7       Q.  So having a fixed mortgage -- having a fixed

8   monthly mortgage payment means that it's the same every

9   month no matter what your income is that month.  Right?

10      A.  Yes.

11      Q.  So in order for the bank to provide you with a

12  fixed monthly amount, information about your income

13  dictates whether or not that fixed monthly amount is

14  affordable, right?

15              MS. FELLOWS:  Object to form.

16  BY MS. BRINSON:

17      Q.  Do you understand what I'm saying?

18      A.  Yes.

19      Q.  So at $4,000 amount per month, what amount could

20  you have afforded for your monthly payment?

21  Understanding that sometimes he might have made more

22  than $4,000, but you couldn't count on more than $4,000.

121019EScampos

23      A.  Yes.

24      Q.  So if the reliable amount is $4,000, God willing

25  it's more, but we know we got this much, what monthly

162

1   mortgage payment could you have afforded in 2013 based

2   on that salary then?

3       A.  I couldn't give you an amount.  Because I don't

4   remember the other expenses that we had for that year.

5   So I wouldn't be able to give you an exact amount that

6   we could have paid.

7       Q.  Let's look back at Exhibit 524.  And I believe

8   you said have is one of the documents that appears to

9   have been signed by you, right?

10      A.  Appears like it is.

11      Q.  Okay.  So looking at page 170891, where it has

12  your monthly household expenses listed --

13      A.  Yes.

14      Q.  -- do these household expenses look accurate to

15  you?

16      A.  No.

17      Q.  What is inaccurate about them?

18      A.  The property taxes, I don't know how much that

19  was because we didn't pay that directly.  Child care

Page 182

121019EScampos

20  expenses, I don't know where that amount came from,

21  because I didn't have child care expenses.  And the

22  charitable contributions, I don't know what that amount

23  is for either.

24       The other amounts seem about right.

25   Q.  Okay.  So the other amounts being car insurance,

163

1  gas, maintenance, health insurance, groceries, water,

2  sewer, utilities, Internet, cable, satellite.

3   A.  Uh-huh.  Yes.

4   Q.  Adding those up --  I'm going to let Peyton add

5  them up.  I came out with $2,170.  I ^ <Answer>No?

6         MS. FELLOWS:  How did you get that number.

7         MS. BRINSON:  So I added up the categories

8  she said were accurate, so that's car insurance, 450,

9  health insurance 250 ^ <Answer>No, 250, groceries, 7

10  /#50*RBGS water 300, Internet 420.

11         Ms. Campos, you're free to do your own math.

12  I believe the amounts you just said were relatively

13  accurate come up to $2.170.

14         Does that sound about right?

15   A.  Yes.

16   Q.  So if your regular monthly amounts, not counting

Page 183

121019EScampos

17    things like school expenses, vacations, that type of

18    thing, but just basic expenses, $2,170, right?

19        A.  Yes.  That seems about right.

20        Q.  If he brought home $4,000, that then leaves less

21    than $2,000, right?

22        A.  Yes.  Yes.

23        Q.  And is that $4,000 that we're talking about

24    gross?

25        A.  Yes.

                                                        164


 1        Q.  So it would have been $4,000 minus taxes?

 2        A.  Yes.

 3        Q.  So somewhere south of 4,000, then minus the 2170

 4    is how much he would have had left over?

 5        A.  Yes.

 6        Q.  All right.  So hearing those numbers, does that

 7    help you with an estimate of how much you could have

 8    afforded for a mortgage payment?

 9                MS. FELLOWS:  Object to the form.

10                THE WITNESS:  No.

11    BY MS. BRINSON:

12        Q.  Could you have afforded a $2500 mortgage?

13        A.  No.

                        Page 184

121019EScampos

14    Q.  Could you have afforded a $2,000 mortgage?

15        MS. FELLOWS:  Object to the form.

16        THE WITNESS:  No.

17  BY MS. BRINSON:

18    Q.  The total monthly mortgage payment amount of the

19  temporary trial plan that you had previously -- that was

20  a^ stored ^ forwardable was $1820.  Based on your

21  testimony previously.

22        Is that correct?

23    A.  That's what was in the agreement and --

24    Q.  In -- in December of 2013, could you still have

25  afforded $1820?

165

1         MS. FELLOWS:  Object to the form.

2         THE WITNESS:  I don't know.

3  BY MS. BRINSON:

4    Q.  Do you think your mortgage would have needed to

5  be less than that?

6         MS. FELLOWS:  Object to the form.

7         THE WITNESS:  I don't know.

8  BY MS. BRINSON:

9    Q.  We're only going to cover maybe three pages out

10  of this, but because it's one document, we needed to get

121019EScampos

11    it together for the record.

12         Okay.

13         Ms. Campos, I'm handing you what's been marked

14    Exhibit 526, which goes from HERNANDEZ 175316 to 175425.

15    A.  Yes.

16    Q.  But I promise you I will only ask you about a

17    very few number of pages in here.

18         So could you turn to 175325.

19         All right.  You've already testified that you

20    worked with HRS Lawson, right?

21    A.  Yes.

22    Q.  Are you familiar with ^ Jimmy ^ Jimmie Castaneda?

23    A.  Yes.

24    Q.  Is Mr. Castaneda a lawyer?

25    A.

166

1    A.  No?  Do you know.

2    A.  I don't know.

3    Q.  Are you familiar with the letter that is 175325?

4    A.  I don't remember seeing this.

5    Q.  Okay.  But Mr. Castaneda was acting on your

6    behalf?

7    A.  Yes.

Page 186

121019EScampos

```
 8    Q.  Did you pay HRS law center?

 9    A.  Yes.

10    Q.  How much did you pay them?  /AE?

11    A.  I can't remember the exact amount.

12    Q.  Was it more than a thousand dollars?

13    A.  Yes.

14    Q.  More than 2,000?

15    A.  I would think it was between a thousand and

16  3,000.

17    Q.  And what did you hire HRS to do?

18    A.  To help us with the loan modification.

19    Q.  When did you hire HRS?

20    A.  I thought it was in 2014, but this goes back to

21  October of 2013.  So it must have been towards the end

22  of 2013.

23    Q.  How did you find HRS?

24    A.  He had helped --

25            MS. FELLOWS:  I'll object to the extent that
```

                                                            167

```
 1  that calls for privileged communication.

 2            Mr. Castaneda is not an attorney.

 3            MS. BRINSON:  He is not.

 4            MS. FELLOWS:  He's not an attorney.  Is that
```
                        Page 187

121019EScampos

5    your understanding as well, Ms. Campos?

6                   THE WITNESS:  Yes.  Yes.

7                   No.

8                   MS. FELLOWS:  All right.  So I want to make

9    sure that there is a privilege concern that I need to be

10   concerned with.

11                  MS. BRINSON:  He works for a law center, so

12   that's based on bankruptcy documents he indicated he is

13   not.  So he's not.

14                  MS. FELLOWS:  Okay.  So I apologize, I

15   certainly don't mean to steer you the wrong way, but

16   based on my understanding he is not an attorney --

17                  THE WITNESS:  From what I remember --

18                  MS. FELLOWS:  /TPREURBGS what you remember,

19   Ms. Campos and trusting her representations from

20   opposing counsel that he's not an attorney.

21                  Then you may answer, I'm sorry.  You may

22   need to reread the question to her, please.

23   BY MS. BRINSON:

24   Q.  Sure.  Sure.  That would rear ^ <Answer>No

25   require me to remember what the question was.

                                                        168

1                   Okay.  What did you hire Mr. Castaneda to do?

                          Page 188

121019EScampos

2    A.  No.  You asked me who -- about how I -- who

3   recommended him.

4    Q.  How did you meet him?

5    A.  Yes.

6    Q.  Thank you.

7    A.  My husband's sister had -- he had helped them

8   with the loan modification.

9    Q.  What is your husband's sister's name?

10   A.  Jacqueline.  U r-i-a s.  And her husband, I

11   believe her husband was the one that -- do you need his

12   name ^ too, ^ , too?

13   Q.  What is his name?

14   A.  Ernesto, E r-n e-s-t-o, same last name, ^ Yuri

15   ^ Yurie  ^ Uri /KWRAS.

16   Q.  Mr. Castaneda, did you pay him ahead of time, did

17   you have to give him a retainer to assist you or did you

18   pay him hourly?  What was the ^ financial ^

19   arrangement?

20   A.  From what I remember, there was an amount.  I

21   don't remember what amount that was, but we did give him

22   before.

23   Q.  So in this letter, Mr. Castaneda wrote on October

24   22nd, 2013, he states at the bottom of this letter, the

25   homeowner has reason to believe that either the loan

Page 189

121019EScampos

1    terms were misrepresented, changed, in caps, at the time

2    of closing or payments made to the servicer on this note

3    were inaccurately charged and/or posted, causing

4    unnecessary financial and emotional stress.

5         If the servicer did charge and applied payments

6    properly then there is reasonable suspicion that the

7    loan terms may have been modified after signing.

8         Do you see that section?

9    A.  Yes, I do.

10   Q.  Did you have reason to believe in October of 2013

11   that the loan terms were misrepresented?

12   A.  Oh, I don't remember.

13   Q.  What loan terms could have been misrepresented

14   that he's referring to here?

15   A.  I don't know.

16   Q.  Did you tell him that you thought the loan terms

17   had been misrepresented?

18   A.  I -- first of all, I don't understand what that

19   means, so I don't know if we talked about this.

20   Q.  Did you tell Mr. Castaneda that you had reason to

21   believe that the loan terms had been changed at the time

22   of closing?

121019EScampos

23      A.  I don't remember.

24      Q.  Do you believe that any of the terms were changed

25  at the closing of your loan?

                                                            170


1       A.  At the time of closing, does that mean when we

2   purchased the house?

3       Q.  Yes.

4       A.  No.

5       Q.  Is did you believe -- did you tell Mr. Castaneda

6   that you had reason to believe that payments made to the

7   servicer were inaccurately charged?

8       A.  I don't remember.

9       Q.  In 2013, at that point you weren't making

10  payments, right?

11      A.  No.

12      Q.  So this statement here about what the homeowner

13  has reason to believe, did you authorize him to say

14  anything in this statement?

15      A.  We gave him authorization to speak on our behalf

16  to Wells Fargo.  From that I do not remember if we gave

17  him permission to say this, I don't remember.

18      Q.  And finally, he satisfies if the servicer did

19  charge and apply payments properly then it's reasonable

121019EScampos

20   suspicion that the loan terms may have been modified

21   after signing.   /AE /AE.

22        Did you believe that this was reasonable

23   suspicion the loan terms were modified after you signed

24   the loan?

25        A.   I don't understand what that is.

171

1         Q.   On page 175327, what is this document?

2         A.   This -- I believe this is -- because we had

3    worked with that person, Leroy, and I believe that we

4    are letting Wells Fargo know that we were no longer

5    working with him.

6         Q.   So the letter says that you're canceling --

7    Mr. Campos was withdrawing authorization for Wells Fargo

8    to provide information to Mr. Rober son because of

9    services not being fully rendered and for unethical

10   business practices.

11        Do you see that?

12        A.   Yes, I do.

13        Q.   And on a continual basis he made false

14   accusations about the status on that case, right?

15        A.   Yes.

16        Q.   What does that refer to?

121019EScampos

17    A.  I -- I don't remember.

18    Q.  Was Mr. Roy rober son working on your behalf with

19  Wells Fargo?

20    A.  We never met that person.  We spoke with someone

21  else that worked in that firm, in that office.  So I

22  don't know if he was the one talking directly to

23  Wells Fargo?

24    Q.  Why did you feel the need to withdraw his

25  authority if he never had it in the first place?

                                                    172


 1    A.  Because he was the one that was -- he was a

 2  representative, I guess, of the company.

 3    Q.  And what is Mr. Campos' referring to when he says

 4  that services were not fully rendered?

 5    A.  I don't understand, because from what I remember

 6  when we were working with them, they started

 7  ^ <Answer>No asked for paperwork from us which was

 8  like the check stubs and that, they turned it into

 9  Wells Fargo, Wells Fargo then denied the modification,

10  and from there they said they couldn't help us anymore.

11        So I don't understand what that means.

12    Q.  All right.  So anything else that speaks to

13  unethical business practices, do you know what

                         Page 193

121019EScampos

14   Mr. Campos is referring to?

15      A.  I remember speaking to Mr. Castaneda and telling

16   him we had worked before, which was Leroy and I think he

17   pulled up some kind of information on him, but I can't

18   remember exactly what that was.

19      Q.  Okay.  So this isn't necessarily referring to

20   unethical business practices relating to to you

21   specifically or your account?

22            MS. FELLOWS:  Object to the form.

23            THE WITNESS:  From what I remember, yes.

24            I'm sorry.

25   BY MS. BRINSON:

                                                      173


1      Q.  Yes, it's not --

2      A.  Yes.

3      Q.  Got it.  Okay.  Look at 175328, which is the next

4   page.

5            Are you familiar with this document?

6      A.  I'm not sure if I saw this.

7      Q.  175328 is a letter dated February 24th, 2014.

8             is that correct?

9      A.  Yes.

10     Q.  And it's to Mr. /TKAS NADA from Wells Fargo?

121019EScampos

11      A.  Yes.

12      Q.  Right?

13          In this letter, in the middle, second bullet

14  point in the middle of the letter, where it says current

15  status of the loan --

16      A.  Yes.

17      Q.  -- do you see where it says the loan was reviewed

18  for loss mitigation options nine times from March 26th,

19  2009, through January 27, 2014?

20      A.  Yes.

21      Q.  Were you aware that your loan had been reviewed

22  for loss mitigation nine times?

23      A.  Does that mean the amount of times we asked for a

24  modification?

25      Q.  I guess what I'm asking is did -- is this

                                                        174


1   consistent with your understanding of Wells Fargo's

2   review of your loan loss mitigation?

3       A.  Yes.

4       Q.  And further the loan was approved for a

5   modification, which settled on May 19th, 2010 /AE /AE

6   and the loan was brought current.

7           Do you see that?

121019EScampos

8      A.  Yes.

9      Q.  And that refers to that April 30th, 2010, loan

10   modification, that we discussed earlier?

11     A.  Yes.

12     Q.  And then the last denial was on January 27, 2014,

13   it says the financial information provided did not show

14   affordability and no appeal to the denial was received

15   from the customer.

16          Do you see that?

17     A.  Yes.

18     Q.  Is all of this consistent with your understanding

19   of Wells Fargo's handling of your loss mitigation

20   efforts?

21     A.  Yes.

22     Q.  Take a look at page 175381.  Ms. Campos,

23   Exhibit 526, pages 175381 through 175383, appears to be

24   a customer account activity statement from Wells Fargo,

25   would you agree with that characterization of this

                                                        175

1    document?

2      A.  Yes.

3      Q.  And I'll ask you to take a look at the amount

4    received column, which is the fourth column.

121019EScampos

5    A.  Yes.

6    Q.  Do you see the payments starting March 2nd, 2011?

7    A.  Yes.

8    Q.  If you look down the amount received column, you

9  see that there are six payments, five of which are for

10  1820.22 and one for $1,000 even.

11       Is that correct?

12   A.  Yes.

13   Q.  And would you agree with me that that is

14  consistent with that with temporary reduced payments

15  that we discussed earlier, those amounts --

16   A.  Yes.

17   Q.  -- are consistent with that?

18       I ask that you look at the remainder of that

19  column evaluation.

20       Do you see any other mortgage payments under

21  amount received between the last one on July 7th, 2011,

22  and January 3rd, 2014?

23   A.  Yes.  I see.three.

24   Q.  What are those /TPAOEUPLTS?  The amounts?

25   A.  One is for $20, the other is $66 and the other

176

1  one is $59.88.

121019EScampos

2      Q.  All right.  So those are for amounts received.

3   Does it appear to you based on those amounts that those

4   are mortgage payments?

5      A.  I don't know.

6      Q.  I'll ask you to go all the way over to the

7   comments, which is the last column --

8      A.  Uh-huh, yes.

9      Q.  -- if you follow all the way over, do you see

10  where it says corporate advance adjustment?

11     A.  Yes.

12     Q.  And that is what's stated for each of those,

13  right?

14     A.  Yes.

15     Q.  So those amounts appear to be corporate advance

16  fees rather than mortgage fees, is that fair?

17     A.  Yes.  I see here that it's a minus next to the

18  amount.

19     Q.  Do based on on this customer account activity

20  statement, it does not appear that you made any mortgage

21  payments after July of 2011; is that correct?

22     A.  Yes.

23     Q.  So the last payment that you made was for

24  $1,820.22?

25     A.  Yes.

121019EScampos

⬆

 1      Q.  Ms. Campos, you also -- you already testified

 2    that you filed for bankruptcy --

 3      A.  Yes.

 4      Q.  In 2014; correct?

 5      A.  Yes.

 6      Q.  Let's see.  37.

 7    BY MS. BRINSON:

 8      Q.  Ms. Campos, you've been handed Exhibit 527 and

 9    for the record and to teach my good standing with

10    Ms. Fellows, I will direct your attention to the third

11    page of this bankruptcy filing, where Mr. Castaneda

12    signs as a nonattorney petition preparer.

13      A.  Yes.

14      Q.  Woman of my word.

15          MS. FELLOWS:  I had no doubt.

16    BY MS. BRINSON:

17      Q.  Ms. Campos, Exhibit 527, do you recognize this

18    document?

19      A.  Yes.

20      Q.  What is this document?

21      A.  The form I filed for bankruptcy.

22      Q.  Why did you file for bankruptcy?

121019EScampos

23      A.  Because in the month of April 2014, the house had

24   already been sold and we had already received an

25   Eviction Notice, and I was told by Mr. Castaneda that by

178

1   filing for bankruptcy, we could postpone for a bit the

2   eviction.

3      Q.  So did you file bankruptcy intending to go

4   forward with the bankruptcy case or just to delay the

5   eviction?

6      A.  I did because I did have -- I believe by this

7   time I did have credit cards that I was behind on.  So I

8   did intend to finish the bankruptcy, but it wasn't

9   something that I came up with.

10         It was from him telling me that this would help.

11     Q.  How much money did you pay to file bankruptcy?

12     A.  I don't remember.

13     Q.  Ms. Campos, you've been handed Exhibit 528.  What

14   is Exhibit 528?

15     A.  An Order to Comply with bankruptcy, A

16   Notice of Intent to dismiss case.

17     Q.  And it notes that you failed to follow -- failed

18   to file several documents.  Right?

19     A.  Yes.

121019EScampos

20      Q.  Did you file any of the necessary documents to

21   move forward with the bankruptcy case?

22      A.  I took the documents to file that Mr. Castaneda

23   had prepared for me.

24      Q.  Were they in fact filed?

25      A.  Yes.  I went to the office here in Los Angeles

                                                          179


1    myself.  And filed and paid.

2       Q.  Filed and paid --

3       A.  The fee.

4       Q.  Do you have any recollection as to how many

5    documents you filed?

6       A.  No, I don't.

7       Q.  Looking at Exhibit 528, are you familiar with any

8    of the schedules or statements that are referenced on

9    this document?

10      A.  No.

11      Q.  Do you know whether or not you filed any of them?

12      A.  I don't remember.

13      Q.  You're also being handed Exhibit 529.  Do you

14   recognize this document?

15      A.  Yes.

16      Q.  And what is it?

121019EScampos

17      A.  It is a letter notifying that I failed to appear

18  to a scheduled meeting regarding the bankruptcy.

19      Q.  Did you attend any meetings regarding the

20  bankruptcy?

21      A.  No.

22      Q.  And was the bankruptcy ultimately dismissed?

23      A.  I believe it was.

24      Q.  Did the eviction get delayed because of the

25  bankruptcy filing?

                                                          180


1      A.  Yes.

2      Q.  For how long?

3      A.  I don't know for how long it was delayed, but we

4  lived in the house until the end of April of 2014.

5      Q.  You've been handed Exhibit 530.

6          Do you recognize this?

7      A.  Yes.

8      Q.  What is it?

9      A.  It is a notice to vacate.  And what date is on

10  this.

11      A.  The date that it was given to us?

12      Q.  Yes.

13      A.  April 2nd, 2014.

121019EScampos

14    Q.  And you were ordered to vacate the premises by

15  what date?

16    A.  April 7th, 2014.

17    Q.  Did you all vacate the premises?

18    A.

19    A.  No by that date.

20    A.  No.

21    Q.  What happened after April?  What happened?

22    A.  After I received this notice is when I went to

23  Mr. Castaneda and told him and he -- that's when we.

24    Q.

25    A.  No --

                                                      181


1    Q.  That's when you filed the bankruptcy?

2    A.  Yes.  I filed on April 3rd.

3    Q.  When did you ultimately move out of the house?

4    A.  The end of April.  I can't remember the last day

5  of April but it was the end of April.

6    Q.  Ms. Campos, I'm handing you what's been marked

7  Exhibit 531.

8       Do you recognize this letter?

9    A.  Yes.

10    Q.  Okay.  What is this?

121019EScampos

11      A.  This is a letter I received from Wells Fargo

12  letting us know that there is had been a mistake on

13  their part on -- the regarding our loan modification

14  request.

15      Q.  And this is a mistake you already testified about

16  previously, correct?

17      A.  Yes.

18      Q.

19      Q.  When you received this letter what did you do?

20      A.  It also came with a form thatted ask if we

21  thought that a mediation was required, to fill out that

22  letter and sends it back to Wells Fargo.

23      Q.  Was there also a check included?

24      A.  Yes.

25      Q.  How much?

                                                        182

1      A.  /#-6R7B89SDZ it was 14,000, I'm not sure if it

2  was 14,000500, or just the 14,000.

3      Q.  The 14,000500, did you ask you ^ <Answer>No ask

4  for that from Wells Fargo?

5      A.  Yes.

6      A.  No.

7      A.  No.

121019EScampos

8     Q.  Did you have to do anything to get it?

9     A.  No.

10              MS. FELLOWS:  Objection to form.

11    Q.  Did you cash the check?

12    A.  Yes.

13    Q.  So you kept the money?

14    A.  Yes.

15    Q.  After you received the letter, did you indicate

16   to Wells Fargo that you wanted to consider mediation?

17    A.  Yes.

18    Q.  Why did you reach out to Wells Fargo to ask for

19   mediation in your situation?

20    A.  In speaking with my husband when I received this

21   letter, we thought that it would --

22              MS. FELLOWS:  Ms. Campos, caution you

23   conversations you've had with your spouse are protected

24   by a spouse privilege.

25              THE WITNESS:  I thought that there was a

                                                       183

1    chance that we could get -- we wanted was, I guess,

2    is -- okay.  What I wanted was I thought that maybe

3    Wells Fargo would be able to do something -- something

4    more for us.

                    Page 205

121019EScampos

5      Q.  Like what?

6      A.  Well, what I thought is maybe even get the house

7   back.

8      Q.  Get the house back from the person that bought

9   it?

10     A.  Yes.  Somehow in my mind that was a possibility.

11     Q.  Were you also hoping to get money out of

12   Wells Fargo?

13     A.  There wasn't a specific amount.

14     Q.  She's already marked Exhibit 531 -- 2.  532.

15         Ms. Campos, take a look at Exhibit 532 and let me

16   know if it refreshes your memory as to whether or not

17   you had a specific amount in mind that you were seeking

18   from Wells Fargo.

19     A.  Yes.  The amount that we put on the mediation

20   form was the amount we believed the house was valued at

21   at the time.

22     Q.  And you thought the house was valued at what

23   amount?

24     A.  500,000.

25     Q.  After making no payments for three years on the

                                                          184

1   mortgage, where did you think you were entitled to get
                        Page 206

121019EScampos

2    the house back?

3                    MS. FELLOWS:  Object to the form.

4                    THE WITNESS:  From what I understood from

5    the letter stating a mistake that Wells Fargo had made,

6    I thought that if it wouldn't have been for that mistake

7    we would have filed a loan modification, we would have

8    been able to have kept the house.

9    BY MS. BRINSON:

10       Q.  And how did you come up with $500,000?

11       A.  That's just an amount that, like I said, that I

12   thought that's what the house was valued on -- that was

13   the value of the house at that time.

14       Q.  Where did you come up with that number for the

15   house?

16       A.  It's just a number that I assumed.  I'm not

17   saying that that's exact amount, but that's the number I

18   came up with.

19       Q.  So it wasn't based on an appraisal value --

20       A.  Oh, no.

21       Q.  -- or something like that?

22       A.  No.

23       Q.  So you borrowed $345,000 roughly to buy the

24   house, how much do you think you made in payments for

25   while you lived there?

121019EScampos

1       A.  I don't remember.

2       Q.  But it certainly was not $ 345,000, right?

3       A.  No.

4       Q.  So you received $14,500?

5       A.  Yes.

6       Q.  Did you receive any other funds?

7       A.  Yes, after the -- during the mediation.

8       Q.  How much did you receive?

9       A.  20,000.

10      Q.  So you received a total of $34.

11      A.  No,500; correct?

12      A.  Yes.

13      Q.  Was the mediation on the phone or in person?

14      A.  On the phone.

15      Q.  How long did it last?

16      A.  It lasted about an hour.

17      Q.  Was your husband also on the call?

18      A.  Yes.

19      Q.  So the two of you were on the call for one hour;

20   correct?

21      A.  Yes.

22      Q.  And after that call was over, you were -- agreed

121019EScampos

23    to accept $20,000?

24         A.  Yes.

25         Q.  On top of the $14,500 you had already received?

                                                            186


1          A.  Yes.

2          Q.  Were you represented by counsel at the mediation?

3          A.  No.

4          Q.  Why did you agree to accept $20,000 when I went

5     in thinking that you should get the house back?

6               MS. FELLOWS:  Objection to form.

7               THE WITNESS:  I don't remember why.

8     BY MS. BRINSON:

9          Q.  In addition to the remediation check and the

10    mediation check, you also reached out to the begins law

11    firm where you received the letter from September 24th,

12    2018.  Correct?

13         A.  Yes.

14         Q.  So in addition to the $34.500 which you already

15    received, what do you hope to gain in this lawsuit?

16              MS. FELLOWS:  I'll object to the extent that

17    that calls for attorney-client privileged

18    communications.

19                   If you can answer without revealing the

121019EScampos

20   substance of our communications, please do so.

21          THE WITNESS:  We're not looking for --

22   myself, I'm looking to receive anything more if it's is

23   ^ <Answer>No it -- in fact I don't have an amount I'm

24   requesting or I'm hoping.  As I said before it's just --

25   if there's something -- if this help in making a change

                                                        187


1   for the future, that's -- that's it.

2   BY MS. BRINSON:

3      Q.  Understanding that you're looking for a change in

4   the future, are you still seeking to recover the value

5   of the house?

6          MS. FELLOWS:  Object to the form.

7          THE WITNESS:  There is no sets amount that

8   we're seeking.

9   BY MS. BRINSON:

10     Q.  That's not my question.  Are you still seeking to

11   recover the value of the house?

12          MS. FELLOWS:  Object to the form.  Asked and

13   answered.

14          THE WITNESS:  No, there's nothing -- we

15   don't have anything in mind.  No, I don't.

16   BY MS. BRINSON:

121019EScampos

17     Q.  Okay.  Going back to the Third Amended Complaint,

18  which was Exhibit 500, look at page 15 -- actually page

19  16.

20     A.  Yes.

21     Q.  Please take a look at paragraph 86.

22     A.  Yes.

23     Q.  You -- first did you provide information that was

24  used for paragraphs 78 through 86 of this Complaint?

25              MS. FELLOWS:  Object to form.

                                                    188


1              THE WITNESS:  I spoke with my lawyer.

2   BY MS. BRINSON:

3      Q.  Did you review this document before it was filed

4   as a proposed Complaint with the court?

5      A.  When I signed it, I looked over it first.

6      Q.  When you signed this document, were you attesting

7   to the validity of the information that is in this

8   document?

9              MS. FELLOWS:  I'll just object to the extent

10  that take calls for a communication with counsel.

11  BY MS. BRINSON:

12     Q.  I'll ask it more plainly.

13          Is the information in this document accurate?

                          Page 211

121019EScampos

14          MS. FELLOWS:  Object to the form.

15   BY MS. BRINSON:

16     Q.  And specifically the factual information in here

17   related to to you, is it accurate?

18     A.  Yes.

19     Q.  Look at paragraph 82.

20     A.  Yes.

21     Q.  Actually go back to paragraph 81.  Where it says

22   the Camposes were offered a Forbearance Agreement which

23   were offered lower monthly payments, lower mortgage

24   payments and they made each of the required payments

25   over several months.

                                                    189


1          Do you see that?

2     A.  Yes.

3     Q.  As we've discussed today here, how many

4   forbearance agreements did you have?

5     A.  From what I remember seeing, there was about

6   three.

7     Q.  Do you recall making all of the required payments

8   for any of those forbearance agreements?

9     A.  Just for one.

10     Q.  But this doesn't mention the other two?

                            Page 212

121019EScampos

11    A.   ?   Correct.   It mentions a Forbearance Agreement,

12  but there are actually three.

13    A.   Yes.

14    Q.   So there were two other ones for which you did

15  not make a required pavement, ^ <Answer>No payment,

16  right?

17    A.   Yes.

18    Q.   In the next paragraph it states you tried -- the

19  Camposes tried to get a modification but then says

20  despite these continued efforts they were never granted

21  the mortgage modification.

22        Do you see that?

23    A.   Yes.

24    Q.   You've already testified the documents clearly

25  show that you got a mortgage modification on April 30th

                                                         190


1   of 2010, that you signed on May l0th of 2010.  Is that

2   correct?

3     A.   Yes.

4     Q.   So this statement that they were never granted a

5   mortgage modification, that was false, isn't it?

6              MS. FELLOWS:  Object to the form.

7              THE WITNESS:  From what I understand here

                         Page 213

121019EScampos

8    and from what is after that forbearance that we made the

9    payments on, we were not granted a modification.

10   BY MS. BRINSON:

11       Q.  Which forbearance agreement does this refer to,

12   paragraph 81?

13       A.  The one where the payment -- the one were the

14   payments were 1800.

15       Q.  You're talking about document 514?

16       A.  Yes, if that's -- yes.

17       Q.  All right.  So the Forbearance Agreement you're

18   describing was in 2011, right?

19       A.  Yes.

20       Q.  So your testimony is that what this means is that

21   you didn't get a modification after this

22   Forbearance Agreement; correct?

23       A.  Yes.  That's what I understand.

24       Q.  But nowhere in this Complaint does it mention the

25   mortgage modification that you already had in 2010?

⬆

                                                         191


1              MS. FELLOWS:  Object to the form.

2              Is that the question?

3    BY MS. BRINSON:

4        Q.  That's the question.  This Complaint does not

                          Page 214

121019EScampos

```
 5   mention the 2010 modification at all, does it?

 6      A.  No.

 7      Q.  In paragraph 86, you note that your injuries

 8   include loss of equity in the home; correct?

 9      A.  Yes.

10      Q.  But you don't know how much the house was worth

11   before or after the foreclosure, do you?

12      A.  No, I don't.

13      Q.  In fact, you don't know if there was any equity

14   in the house, do you?

15              MS. FELLOWS:  Object to the form.

16              THE WITNESS:  I don't know the exact amount.

17   I don't know.

18   BY MS. BRINSON:

19      Q.  You also claim severe emotional distress.

20   Correct?

21      A.  Yes.

22      Q.  Did you seek any medical attention for severe

23   emotional distress?

24      A.  No.

25      Q.  Were you ever on any medications for severe
```

```
 1   emotional distress?
```

121019EScampos

2      A.  No.

3      Q.  Did you talk to any professionals about having

4  severe emotional distress?

5      A.  No.

6      Q.  Did you talk to any family members about severe

7  emotional distress?

8              MS. FELLOWS:  Objection to form.

9              THE WITNESS:  No.

10  BY MS. BRINSON:

11      Q.  In what -- how was your severe emotional distress

12  manifested?

13      A.  What I remember during that time that we were

14  evicted from the house,  so it was loss of sleep, loss

15  of appetite.  And that's just for me.

16      Q.  And that came from the eviction?

17      A.  Yes.

18      Q.  We talked in the documents previously that

19  foreclosure actually got initiated back in 2011.

20  Correct?

21      A.  Yes.

22      Q.  The sale just didn't happen until 2014, right?

23      A.  Yes.

24      Q.  Because severe emotional distress you're

25  describing here is he ^ vehicles ^ vision related?

Page 216

121019EScampos

1    A.  There was stress all during that time but this

2  severe emotional was during that time of the eviction.

3    Q.  You also note that you had damage to your credit

4  resulting in opportunity costs is that correct?

5    A.  Yes.

6    Q.  But this was , in fact, the second foreclosure;

7  correct?

8    A.  Yes.

9    Q.  And you also filed for bankruptcy, right?

10    A.  Yes.

11    Q.  Do you know what the impact of this foreclosure

12  on your credit was versus the impact of the first

13  foreclosure back in 2008?

14    A.  I don't.

15    Q.  Do you know what the impact of filing bankruptcy

16  was on your credit?

17    A.  Yes.

18    Q.  What was the impact?

19    A.  From what I was told, it was that it would be on

20  my history for a few years.  So during that time I would

21  not be able to have any kind of credit -- new credit

22  opened.

Page 217

121019EScampos

23      Q.  Do you know what the effect of the severe

24  delinquency on your credit report was?  And by severe

25  delinquency I mean the three years of missed mortgage

194

1   payments.

2           Before the foreclosure sale occurred, do you know

3   how those multiple months of delinquency impacted your

4   credit?

5       A.  No, I don't.

6       Q.  Do you know what your credit score was back in

7   2010?

8       A.  No.

9       Q.  Looking at Exhibit 533, Campos 229?

10      A.  Yes.

11      Q.  Do you see where it has the credit score for the

12  co-borrower?

13      A.  Yes.

14      Q.  It appears on this document you are the

15  co-borrower as you're listed second.

16      A.  Yes.

17      Q.  Is that correct?

18          And what is the score?

19      A.  581.

121019EScampos

20      Q.  So prior to the foreclosure, your credit score

21  was below 600.  Correct?

22      A.  Yes.

23      Q.  Do you know what it was after the foreclosure?

24      A.  No.

25      Q.  So you don't know whether or not it went down

↑
                                                        195


1   after the foreclosure on clover lawn?

2              MS. FELLOWS:  Object to the form.

3              THE WITNESS:  I wouldn't know how much lower

4   it got.

5   BY MS. BRINSON:

6       Q.  You don't know if it went down at all, do you?

7       A.  No.

8       Q.  I'm looking at page 234, know of 25th, 2011, it

9   dropped to 575.  Is that right?

10      A.  Yes.

11      Q.  But that was not a result of the foreclosure

12  sale, right?

13      A.  Not the one in 2014, no.

14      Q.  But it possibly could have been affected by the

15  foreclosure in 2008?

16      A.  Yes.

121019EScampos

17      Q.  Ms. Campos, your loan went into default because

18  you could not make the monthly payments.  Isn't that

19  correct?

20              MS. FELLOWS:  Object to form.

21              THE WITNESS:  Yes.

22  BY MS. BRINSON:

23      Q.  You couldn't make the monthly payments because

24  you got laid off from your job and your husband's hours

25  went down.  Is that also accurate?

                                                    196


1      A.  Yes.

2      Q.  Neither of those situations was caused by

3  Wells Fargo, isn't that also correct?

4      A.  No.

5      Q.  "No" is not correct?

6      A.  No, it wasn't caused by Wells Fargo.

7      Q.  Last couple of questions.

8          You testified previously about walking away from

9  theMona Boulevard property.

10         Did you consider selling it?

11              MS. FELLOWS:  Object to form.

12              THE WITNESS:  No.

13  BY MS. BRINSON:

121019EScampos

14    Q.  Why not?

15    A.  I don't remember.

16    Q.  Before the clover lawn property, the amount you

17    borrowed to buy the property to be clear that money that

18    you borrowed from Wells Fargo was used to purchase

19    clover lawn; correct?

20    A.  Yes.

21    Q.  Where you lived from 2008 until 2014 even though

22    you stopped paying the mortgage in 2011; is that

23    correct?

24    A.  Yes.

25    Q.  I don't have any further questions?

                                                    197


1    BY MS. FELLOWS:

2     Q.  Ms. Campos, we've talked here at /HREBTS

3    ^ <Answer>No ^ length ^ lent, so I'll try to keep this

4    brief.

5         I guess first kind of going back to the original

6    payment that you received from Wells Fargo, do you

7    recall recently having that conversation about receiving

8    a check from Wells Fargo?

9         Do you recall that conversation we just had?

10    That Wells Fargo isn't you a payment.

                    Page 221

121019EScampos

11      A.  Yes.

12      Q.  Do you think Wells Fargo sent you that payment

13   out of the goodness of their heart?

14              MS. BRINSON:  Object to form.

15              THE WITNESS:  I don't.

16      Q.  Do you think they sent you that payment just

17   because they wanted to send you a check?

18      A.  I believe they just sent it as some sort of an

19   eye policy gee.

20      Q.  Because -- I'm sorry.

21      A.  Because of a mistake they had made.

22      Q.  We also just discussed a letter that you received

23   from Wells Fargo that the apology letter, which is

24   Exhibit 531.

25              If you'll turn back to that exhibit, in the third

                                                            198


1   paragraph down that begins with we realize that our

2   decision -- do you see that paragraph?

3      A.  Yes.

4      Q.  In the last sentence of that paragraph says,

5   we're also reaching out to the consumer reporting

6   agencies to ask them to remove any negative reporting.

7              Do you see that?

121019EScampos

8      A.  Yes.

9      Q.  Is it your understanding that Wells Fargo reached

10   out to your credit reporting agencies?

11      A.  From what I understand, they did, they were going

12   to do it on my husband's credit report.

13      Q.  Why do you understand that Wells Fargo was going

14   to reach out to your credit reporting agency?

15      A.  To remove the negative, the negative stuff that

16   we had regarding Wells Fargo.

17      Q.  And they would be doing that because it would not

18   have been reported but for their error; is that right?

19             MS. BRINSON:  Object to form.

20             THE WITNESS:  Yes.

21             MS. BRINSON:  Leading.

22   BY MS. FELLOWS:

23      Q.  During your mediation with Wells Fargo, did you

24   have a lawyer represent you?

25      A.  No.

                                                      199


1      Q.  Would you have preferred to have a lawyer

2   represent you during that mediation?

3      A.  I think I would have felt better.

4      Q.  Do you know if Wells Fargo had a lawyer represent

Page 223

121019EScampos

5    them during the mediation?

6        A.  I don't know.

7        Q.  Ms. Campos, why did you decide that you were

8    going to have to leave your home that was in Compton --

9    and by that I mean what was the reason for wanting to

10   leave Compton?

11       A.  It wasn't a neighborhood -- it wasn't a safe

12   neighborhood for my family, myself.

13       Q.  When you say it wasn't safe, what does that mean?

14       A.  There was a lot of gauge ^ <Answer>No gang

15   violence, there was a lot of shootings.  There was a lot

16   of -- just police activity in that area.

17       Q.  How old is your youngest child at the time that

18   you left the home in Compton?

19       A.  When we left, she was about four I believe.

20       Q.  Your child was approximately four years old and

21   your home was in an area where there was gang violence,

22   is that accurate?

23       A.  Yes.

24       Q.  So it was important for you to raise your

25   children in other home that were not surrounded by gang

                                                    200

1    violence, right?

121019EScampos

2      A.  Yes.

3      Q.  And so is that why you purchased the home that

4  was in Pomona --

5      A.  Paramount.

6      Q.  Paramount.  Thank you.

7      A.  Yes.

8      Q.  And did you do everything you could to save your

9  home in Paramount?

10      A.  Yes.

11      Q.  Why was it important for you to do everything you

12  could to save that home?

13      A.  Because for us when we purchased that house, it

14  was going to be our forever home.  It was in a better

15  neighborhood.  The house was bigger and we just -- we

16  wanted to -- we wanted to stay there with our kids.

17      Q.  Now, how many children do you have?

18      A.  Three.

19      Q.  And how old were your children at that time?

20      A.

21      A.  No?  And ^ <Answer>No that's a bad question.

22          At the time that you purchased the home in

23  Paramount, how old were your three children?

24      A.  My youngest must have been about four, I believe

25  she was four.  The middle one must have been around nine

Page 225

121019EScampos

1    and the older, 12.

2        Q.  Is family important to you?

3        A.  Yes.

4        Q.  Is family the driving force in your life?  You do

5    things to protect your family?

6        A.  Yes.

7        Q.  If you will turn with me to Exhibit 521 and 522.

8                  THE REPORTER:  Could we go off the /RO*ERD

9    for a moment please?  Individual situated I guess we'll

10   go off?  We're now going off the record.

11                  The time is 5' clock p.m.  Include File Not

12   Found.

13                  THE REPORTER:  All right 6789 I'm ready to

14   go back on.

15                  THE REPORTER:

16                  THE VIDEOGRAPHER:  We're now back on the

17   record.

18                  The time is 5:03 p.m.

19   BY MS. FELLOWS:

20       Q.  Ms. Campos, if you will turn with me to

21   Exhibit 521 and 522.

22       A.  Yes.

121019EScampos

23    Q.  Exhibit 522 at the top says subject.

24       Do you see the subject line there?

25    A.  Yes.

202

1    Q.  And it says bankruptcy case number and it lists

2  the case number?

3    A.  Yes.

4    Q.  And I believe we discussed earlier that this

5  letter was referencing your bankruptcy and I just want

6  to clarify that in Exhibit 521, that the bankruptcy

7  number Exhibit 5121 matches 522, and that 521 is not

8  your bankruptcy.

9       Can you just review that and see if you agree

10 with my understanding.

11    A.  Yes.  I believe when I was asked about this

12 ^ bankruptcy I said it was a ^ <Answer>Non't mine.

13    Q.  Okay.  And the bankruptcy number from

14 Exhibit 521, does that end in 23522?

15    A.  Yes.

16    Q.  And what bankruptcy case number is on

17 Exhibit 522?

18    A.  1323522.

19    Q.  Does that appear to be the same numbers?

Page 227

121019EScampos

20      A.  Yes.

21      Q.  And just to circumstance the ^ <Answer>No will

22   all the way back.  Exhibit 521, is that your bankruptcy?

23      A.  No.

24      Q.  You are not James Walker, right?

25      A.  No.

^

                                                      203


1       Q.  Okay.  Ms. Campos, if you will turn with me to

2    Exhibit 520.

3       A.  Yes.

4       Q.  Turn with me to the back page which is

5    WF Hernandez 174268 --

6       A.  Yes.

7       Q.  -- is this document signed?

8       A.  No.

9       Q.  Does your signature or Mr. Campos' signature

10   appear on this document?

11      A.  No.

12      Q.  All right.  If you will also turn with me to

13   Exhibit 507.

14      A.  Yes.

15      Q.  September 4th, 2009, document, I believe it was

16   referenced in the special forbearance agreement.  On the

                            Page 228

121019EScampos

17    back page, Campos 133, does your signature appear on

18    this document?

19        A.  No.

20        Q.  Does any signature appear on this document?

21        A.  No.

22        Q.  Relatedly Exhibit 503, if you could turn to that

23    exhibit.

24        A.  Yes.

25        Q.  Is there a signature line on this document?

                                                          204


 1        A.  No.

 2        Q.  Okay.  Ms. Campos, we discussed the facts in the

 3    third amended Complaint.  Did you provide facts in

 4    support of that Complaint based on your best good faith

 5    recollection?

 6        A.  Yes.

 7        Q.  At the time you would have provided those facts,

 8    did you have access to documents from Wells Fargo

 9    regarding your loan?

10        A.  Yes.

11        Q.  All of the documents, you had them?

12        A.  The ones that I'm being shown right now?

13        Q.  Yes.  So the documents, for example, that are

                           Page 229

121019EScampos

14    Bates stamped WF HERNANDEZ?

15       A.   No.

16       Q.   I don't believe I have any further questions.

17               MS. BRINSON:  I have no questions.

18               THE VIDEOGRAPHER:  This concludes the video

19    deposition of Sandra Campos.

20               The time is 5:07 p.m.

21               THE REPORTER:  Ms. Fellows, are you ordering

22    a copy of the deposition?

23               MS. FELLOWS:  Yes.

24               THE REPORTER:  We have exhibits 500 through

25    533.