Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORA GRANJA and SANDRA CAMPOS, individually and on behalf of all others similarly situated, and<br><br>ALICIA HERNANDEZ, EMMA WHITE, COSZETTA TEAGUE, RUSSELL SIMONEAUX, BRENDA SIMONEAUX, ROSE WILSON, TIFFANIE HOOD, GEORGE FLOYD, CYNDI FLOYD, TROY FRYE and DIANA TREVINO, individually,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 3:18-cv-07354-WHA<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

JURISDICTION ................................................................................................................. 3

INTRADISTRICT ASSIGNMENT.................................................................................... 3

PARTIES ........................................................................................................................... 4

FACTUAL ALLEGATIONS ............................................................................................. 5

    A.    Wells Fargo Wrongfully Forecloses on Its Customers' Homes ........................... 5

    B.    Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a Period of at Least 8 Years ................................................................................ 6

    C.    Wells Fargo's Leadership Fails to Implement Adequate Testing Even After Promising to Do So as Part of 2011 Consent Decrees ........................................... 7

    D.    Wells Fargo Conceals Its Discovery of One of the Systematic Errors from Regulators and Consumers ................................................................................... 8

    E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight................................................. 9

    F.    Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors .................. 12

PLAINTIFFS' EXPERIENCES ......................................................................................... 13

    1.    Debora Granja (California) ............................................................................. 13

    2.    Sandra Campos (California) ............................................................................ 14

    3.    Emma White (Florida) .................................................................................... 15

    4.    Troy Frye (Georgia) ....................................................................................... 16

    5.    Coszetta Teague (Illinois) .............................................................................. 18

    6.    Russell and Brenda Simoneaux (Louisiana) ..................................................... 19

    7.    Alicia Hernandez (New Jersey) ...................................................................... 20

    8.    Rose Wilson (New York).................................................................................. 21

i

9.      Tiffanie Hood (Ohio) ........................................................................22

10.     George and Cyndi Floyd (Pennsylvania)........................................23

11.     Diana Trevino (Texas) ...................................................................24

CLASS ALLEGATIONS ...........................................................................................26

TOLLING ALLEGATIONS .......................................................................................27

FIRST CAUSE OF ACTION .....................................................................................28

Breach of Contract Brought on behalf of the Class .................................28

SECOND CAUSE OF ACTION .................................................................................32

Intentional Infliction of Emotional Distress Brought on Behalf of all Plaintiffs.......................32

THIRD CAUSE OF ACTION ....................................................................................33

Wrongful Foreclosure Brought on Behalf of Plaintiffs Granja, Campos and Frye ...................33

California Wrongful Foreclosure .................................................33

Georgia Wrongful Foreclosure .................................................34

FOURTH CAUSE OF ACTION ................................................................................35

Violation of California's Homeowners Bill of Rights Brought on Behalf of Plaintiffs Granja and Campos ..............................35

FIFTH CAUSE OF ACTION .....................................................................................36

Violation of California's Unfair Competition Law Brought on Behalf of Plaintiffs Granja and Campos ..............................36

SIXTH CAUSE OF ACTION .....................................................................................37

Violation of State Consumer Protection Laws Brought on Behalf of Plaintiffs Teague, Hernandez, Wilson and Floyds ..................................37

Illinois Consumer Fraud Act........................................................38

New Jersey Consumer Fraud Act .................................................38

New York General Business Law..................................................39

Pennsylvania Unfair Trade Practices and Consumer Protections Law................40

PRAYER FOR RELIEF ................................................................................................................ 41

DEMAND FOR JURY TRIAL .................................................................................................... 42

# INTRODUCTION

1.     Plaintiffs Granja, Campos, Hernandez, White, Teague, Wilson, Hood, Frye, Floyds, and Trevino are among the hundreds of homeowners who lost their homes to foreclosure because Wells Fargo wrongly determined they did not qualify for a mortgage modification.

2.     This was not an accident, but rather the result of years of a willful and reckless lack of central oversight by Wells Fargo's Board and executive leadership that has led to repeated compliance breakdowns and billions of dollars in government fines.

3.     For years, Wells Fargo failed to verify or audit its loan modification software to ensure it was properly calculating homeowners' eligibility for government-mandated mortgage modifications. Material errors remained uncorrected in the software for five to eight years, if not longer.

4.     The federal government cited Wells Fargo in 2011 for failing to adequately audit its mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive leadership promised to implement ongoing testing to ensure that the Bank complied with government requirements in the future. But they failed to live up to that promise and multiple errors in Wells Fargo's decision-making software remained unaddressed.

5.     Wells Fargo's leadership failed to implement adequate testing even after the government found that another error in the Bank's software had led the Bank to wrongfully deny mortgage modifications in 2013-2014. Wells Fargo was cited again for failing to properly oversee the Bank's mortgage modification and foreclosure operations, but still did nothing to stop others like Plaintiffs from being wrongfully denied mortgage modifications and foreclosed upon.

6.     Not until August 2013 did Wells Fargo discover one of the errors that led it to wrongfully deny mortgage modifications to Plaintiffs and hundreds of other homeowners. But rather than coming clean, Wells Fargo kept its discovery secret—likely in an effort to avoid additional government penalties. The government had previously imposed restrictions on Wells Fargo's mortgage servicing business and announced fines, with the amount of the fine and the duration of business restrictions dependent on the length and severity of the Bank's continued non-compliance. Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to hundreds of customers, the government likely would not have lifted its business restrictions in 2016 and would have

imposed a far more severe penalty than the $70 million fine it ultimately issued.

7. Moreover, despite knowing in 2013 that its mortgage modification software was faulty and had the potential to impact borrowers, Wells Fargo continued to use that faulty software when reviewing borrowers' loans for mortgage modifications. As a result, Wells Fargo wrongfully denied mortgage modifications to Plaintiffs and class members, and in many cases foreclosed on their homes.

8. The Wells Fargo Board's repeated failure to fulfill its oversight responsibilities, despite promising to do so as part of multiple consent decrees, has grown so flagrant—and led to so many scandals and consumer abuses—that in 2018 the Federal Reserve placed an asset-cap on Wells Fargo that will not be lifted until Wells Fargo convinces the government it has finally reformed its central oversight practices. The Federal Reserve's cease-and-desist order has been described as a "Fear of God Penalty," with one expert opining that the Bank is "lucky it is too big to shut down."

9. After the Federal Reserve issued the asset-cap in February 2018, Wells Fargo announced an overhaul of its Board. Wells Fargo has since disclosed to its shareholders what it learned in 2015—that hundreds of its customers were wrongfully and unlawfully denied mortgage modifications, with many of those customers subsequently losing their homes. Following that initial disclosure, Wells Fargo discovered yet another error in its automated decision-making tool, which caused even more homeowners to be wrongfully denied mortgage modifications. Wells Fargo has warned its customers that even more errors and more affected customers may be uncovered as its review continues.

10. Although Wells Fargo publicly claims to be turning over a new leaf to make things right for its customers, it is unwilling to fairly compensate the customers whose lives its reckless behavior forever changed. Hundreds lost their homes and yet Wells Fargo told its shareholders it was allocating less than $13,000 per person as remediation. Wells Fargo then twice moved to dismiss this action with prejudice, so that its customers would receive nothing more than it pre-allocated for them. Wells Fargo wants to be the sole arbiter of how much remediation it should pay—with little regard for the financial and emotional devastation its reckless behavior has wrought on Plaintiffs' and class members' lives.

11. Plaintiffs seek to hold Wells Fargo and its leadership truly responsible for their repeated and deliberate failure to ensure the Bank was complying with legal requirements. They originally sought certification of a nationwide class of homeowners wrongly denied a mortgage modification; a

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

larger emotional distress class; and several statewide classes that will allow class members to efficiently pursue additional claims under state consumer protection laws.

12.    On January 29, 2020, the Court certified the following class limited to the breach of contract claim: "All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), [or] the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure."

13.    The Court appointed Plaintiffs Debora Granja and Sandra Campos as representatives of the Class.

14.    Plaintiffs also intend to pursue entry of an injunction or other equitable relief sufficient to prevent the continued use of Wells Fargo's unfair practices, and treble and punitive damages pursuant to state law.

## JURISDICTION

15.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; in the aggregate, there are more than 100 members in the Class; and at least one class member is a citizen of a state different from any defendant.

16.    Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendant resides in this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

17.    Assignment to the Oakland/San Francisco division is proper because Wells Fargo's designated principal place of business is in San Francisco, California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred there.

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

**PARTIES**

18.     Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania. Ms. Hernandez was denied a mortgage modification and her New Jersey condominium was foreclosed upon as a result of the conduct alleged herein.

19.     Plaintiff Debora Granja is a resident and citizen of Eugene, Oregon. Ms. Granja was denied a mortgage modification and her home in Brentwood, California, was foreclosed upon as a result of the conduct alleged herein. The Court appointed Ms. Granja as a class representative.

20.     Plaintiff Sandra Campos is a resident and citizen of Paramount, California. Ms. Campos was denied a mortgage modification and her home in Paramount, California, was foreclosed upon as a result of the conduct alleged herein. The Court appointed Ms. Campos as a class representative.

21.     Plaintiff Emma White is a resident and citizen of Jacksonville, Florida. Ms. White was denied a mortgage modification and her home in Callahan, Florida, was foreclosed upon as a result of the conduct alleged herein.

22.     Plaintiff Coszetta Teague is a resident and citizen of Homewood, Illinois. Ms. Teague was denied a mortgage modification and her home in Calumet City, Illinois, was foreclosed upon as a result of the conduct alleged herein.

23.     Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana. Mr. and Mrs. Simoneaux were denied a modification of the mortgage on their Louisiana home as a result of the conduct alleged herein.

24.     Plaintiff Rose Wilson is a resident and citizen of New York. Ms. Wilson was denied a mortgage modification and her New York home was foreclosed upon as a result of the conduct alleged herein.

25.     Plaintiff Tiffanie Hood is a resident and citizen of Ohio. Ms. Hood was denied a mortgage modification and her Ohio home was foreclosed upon as a result of the conduct alleged herein.

26.     Plaintiffs George and Cyndi Floyd are residents and citizens of Philadelphia, Pennsylvania. The Floyds were denied a mortgage modification and their house in Lancaster, Pennsylvania, was foreclosed upon as a result of the conduct alleged herein.

27.     Plaintiff Troy Frye is a resident and citizen of Georgia. Mr. Frye was denied a mortgage modification and his home in Hephzibah, Georgia was foreclosed upon as a result of the conduct alleged herein.

28.     Plaintiff Diana Trevino is a resident and citizen of Richardson, Texas. Ms. Trevino was denied a mortgage modification and her Texas home was foreclosed upon as a result of the conduct alleged herein.

29.     Wells Fargo & Company (WFC), is a Delaware corporation headquartered in San Francisco, California, and a registered bank holding company that owns and controls Defendant Wells Fargo Bank, N.A.

30.     Defendant Wells Fargo Bank, N.A., is a national banking association with its main office in Sioux Falls, South Dakota, and designated principal place of business in San Francisco, California.

31.     Defendant, along with Wells Fargo & Company, shared responsibility for ensuring that the Bank's operations were properly tested to ensure compliance with HAMP and other government requirements, with ultimate responsibility lying with WFC's Board of Directors, and its Audit & Examination Committee in particular. There also exists a high-degree of built-in overlap between Wells Fargo and WFC due to the fact that WFC owns and controls the Bank, and that the Bank directors responsible for ensuring compliance with HAMP and other government requirements were also WFC executives and/or directors.

## FACTUAL ALLEGATIONS

### A.     Wells Fargo Wrongfully Forecloses on Its Customers' Homes

32.     Plaintiffs are among the millions of homeowners who had trouble making ends meet during the Great Recession. They fell behind on their mortgage payments and needed help to avoid losing their homes.

33.     The Home Affordable Modification Program (HAMP) was designed to provide the very help that Plaintiffs and class members needed. Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1  payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the
2  borrower to avoid foreclosure.

3      34.     Similar threshold requirements were incorporated into the mortgage modification
4  requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac,
5  and the Federal Housing Administration (FHA).

6      35.     Plaintiffs and class members met the threshold requirements for a mortgage modification
7  and as their mortgage servicer, Wells Fargo was required to offer them a loan modification. Wells
8  Fargo failed to do so, however, and instead foreclosed on ten Plaintiffs and more than five hundred
9  other class members who could not make their monthly payments without a modification.

10     36.     Another three hundred borrowers were just able to stave off foreclosure, but not without
11 overcoming numerous financial and emotional difficulties that could have been avoided if Wells Fargo
12 had lowered their mortgage payments as HAMP and other GSEs required.

13 **B.     Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a**
14 **        Period of at Least 8 Years**

15     37.     Wells Fargo has only recently acknowledged that it wrongfully denied Plaintiffs and
16 class members mortgage loan modifications to which they were entitled under HAMP and other
17 government requirements.

18     38.     In form letters sent to Plaintiffs and class members in late 2018, Wells Fargo claimed
19 that its decision was based on a "faulty calculation." The problem goes much deeper than a single
20 miscalculation, however, and reflects the same type of extreme and outrageous conduct that has
21 embroiled Wells Fargo in a string of public scandals.

22     39.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its
23 automated decision-making tool. This software determined customers' eligibility for a government-
24 mandated mortgage modification during a time of extreme financial distress. Its importance to these
25 customers' lives cannot be overstated. Yet Wells Fargo not only failed to verify that its software was
26 correctly calculating whether customers met threshold requirements for a mortgage modification, it
27 failed to regularly and properly audit the software for compliance with government requirements—
28 allowing life-changing errors to remain uncorrected for years on end.

40.     Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether homeowners met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

41.     As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other government requirements over a period of at least eight years and denied Plaintiffs and class members mortgage modifications that the Bank was legally required to offer.

**C.     Wells Fargo's Leadership Fails to Implement Adequate Testing Even After Promising to Do So as Part of 2011 Consent Decrees**

42.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in the Bank's mortgage modification and foreclosure practices.

43.     The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

44.     Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

45.     Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied. The Bank also promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

46.     In one of the consent orders, the Federal Reserve specifically ordered WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government

requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

47.     Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance based on improved reporting, and that WFC's Chief Operational Risk Officer was providing both the Compliance Committee and the Audit & Examination Committee with the necessary information and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure compliance with HAMP and other government requirements.

48.     Together, Wells Fargo's executives and board members—in particular, Wells Fargo's Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. They repeatedly failed to fulfill these obligations over the course of several years, however—in violation of the promises they made in the 2011 Consent Order and in callous disregard of the well-being of their customers.

49.     Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that the Bank was still in continuing noncompliance. Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements; had not ensured that the Bank's audit and compliance programs had the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage modification and foreclosure practices would be identified and promptly remedied; and had not ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' homes.

### D.     Wells Fargo Conceals Its Discovery of One of the Systematic Errors from Regulators and Consumers

50.     In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order. The OCC also stated that it would be

taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

51.     As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

52.     Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in August 2013—*one of the errors at issue in this case*—which caused the Bank to wrongly deny mortgage modifications to 625 customers. Well Fargo decided not to tell anybody it had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the business restrictions it had imposed in 2015.

53.     The Bank's seven-member Board of Directors, each of whom also served on WFC's Board of Directors, signed the stipulation under which the Bank accepted the $70 million penalty and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in 2013-2014. These directors did not disclose that the Bank had discovered another error—either because their oversight was so non-existent that they did not know, or because they chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the business restrictions it had imposed on the Bank.

54.     To make matters worse, even after discovering the 2013 error, Wells Fargo still did not reform its auditing and verification practices. Related errors that would affect an additional 145 customers were not discovered until five years later.

### E.     Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight

55.     The failure of Wells Fargo's executives and board members to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Wells Fargo's leaders intentionally abandoned their oversight

responsibilities—and did so to a shocking degree.

56.     The most notorious example is the fraudulent account scandal uncovered in 2016, when it was revealed that Wells Fargo employees were encouraged to sign up customers for some 3.5 million checking and credit card accounts without their knowledge. Wells Fargo was fined $185 million by federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce) were fired for their involvement in the scandal.

57.     The fraudulent account scandal also involved the Audit & Examination Committee, which ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an institutional investor's request that the Board address its lack of comprehensive audit procedures and adjust compensation policies to discourage abusive sales practices. The two executives most associated with the fraudulent account scandal—John G. Stumpf and Carrie L. Tolstedt—were signatories to one of the 2011 consent orders discussed above and among those responsible for Wells Fargo's failure to comply with the orders by implementing adequate auditing and compliance procedures.

58.     This case and the fraudulent account scandal are far from the only examples of Wells Fargo's Board and executive leadership abdicating their oversight responsibilities. Wells Fargo's Board and executive leadership have consistently ignored unlawful practices throughout the Bank's lending divisions, leading to an unprecedented series of government fines. To give just a few more examples:

1.  In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage lending practices discriminated against African-American and Hispanic borrowers

2.  In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses

3.  In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had misrepresented the quality of mortgage loans it sold to Freddie Mac

4.  In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for falsely certifying that mortgage loans were eligible for FHA insurance

5.  In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations that it engaged in illegal student loan servicing practices

6.  In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing insurance on its auto-loan customers (often leading to wrongful vehicle repossessions) and charging its mortgage-loan customers excessive rate-lock fees

7.  In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it engaged in a variety of improper practices, including selling customers renters' and life

insurance they did not ask for and overcharging for GAP auto insurance

59.     Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law."

60.     Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

61.     In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

62.     Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

63.      Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

64.     Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger.

65.     As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to

shut down." "A smaller bank might have lost its banking licenses."

**F.    Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors**

66.    A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error. Wells Fargo wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. Wells Fargo also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

67.    Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

68.    Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its recently filed 10-K Annual Report, Wells Fargo disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

69.    In late 2018, Wells Fargo began sending form letters to the customers affected by the errors in its automated decision-making tools. The letters typically included a check for around $15,000, and informed customers that if they were not satisfied with that amount, they could consider mediation through a third-party mediator that Wells Fargo has retained.

70.    The amounts that Wells Fargo is offering its customers is nowhere near enough to compensate them for the damage that Wells Fargo's conduct caused them, and indicates that while Wells Fargo wants the Federal Reserve to believe it has changed its ways, the company is unwilling to accept full responsibility for the life-altering consequences its behavior has wrought.

71.    As a result of Wells Fargo's conduct, the lives of Plaintiffs and class members have been

irrevocably altered. Their damages include loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments; stress-related illnesses; broken marriages; children coping with the financial and emotional consequences of their parents losing the family home; and severe emotional distress.

## PLAINTIFFS' EXPERIENCES

### 1.   Debora Granja (California)

72.     Plaintiff and class representative Debora Granja purchased her home, located in Brentwood, California, with her then-husband in 2004. The couple eventually had three daughters living with them and put substantial time and money into making the house their own. Wells Fargo became Ms. Granja's mortgage lender following a refinance in 2006.

73.     Around 2009, Ms. Granja's husband lost his job as a landscaping manager. Ms. Granja, who had been working only part-time, returned to full-time work to support her family.

74.     Ms. Granja began seeking a loan modification from Wells Fargo in 2010. Each time she called Wells Fargo, she spoke to a different representative. Initially, the representatives told her that she would easily qualify for a modification based on her circumstances. Ms. Granja tried submitting her loan modification application numerous times. Each time, Wells Fargo would claim it lost her paperwork and would ask her to resend it.

75.     Eventually, around 2012, Wells Fargo representatives falsely told Ms. Granja that she did not qualify for a modification. The Bank ultimately foreclosed on her house in 2014 and Ms. Granja was forced to find a rental home for her family. Her daughters had to change schools and leave the only environment they knew.

76.     Wells Fargo's failure to grant Ms. Granja a loan modification caused great strain on her marriage. Ms. Granja and her husband legally separated around the time of the foreclosure. The stress of the foreclosure also severely affected Ms. Granja's health. She was diagnosed with severe depression in 2013. Four years later, Ms. Granja was diagnosed with acute traumatic stress disorder. Her

breakdown was triggered by a minor car accident but caused by an accumulation of stress over recent years, including from the foreclosure.

77.    In September 2018, Ms. Granja's ex-husband received a letter from Wells Fargo informing him and Ms. Granja that their mortgage modification should have been approved but was not approved due to an error. He notified Ms. Granja of the letter and she contacted Wells Fargo to provide it with her contact information. Ms. Granja was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

78.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Granja's life has been irrevocably altered. Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

### 2.    Sandra Campos (California)

79.    Plaintiff and class representative Sandra Campos, with her husband Alfonso, purchased a home for their family in Paramount, California, in 2008. The purchase was financed with a mortgage loan from Wells Fargo. The couple moved into the home with their three children, who ranged in age from about four to 12 years old, and Ms. Campos's mother, who was about 67 years old at the time.

80.    Mr. Campos is handy and made many valuable improvements to the home. These included painting the exterior of the home and installing a new roof and plumbing.

81.    In around August of 2010, Ms. Campos lost her job as an office assistant. She received unemployment insurance for a few months, but when that was exhausted, she and her husband had difficulty making the mortgage payments on their home.

82.    Ms. Campos approached Wells Fargo to find out what programs were available to help her family avoid foreclosure and remain in their beloved home. The Camposes were offered a forbearance agreement which featured temporarily lower mortgage payments, and the Camposes did their best to make the required payments over the course of several months. However, the payments then returned to their previous level, which the Camposes again had difficulty making.

83.     For the next several years, the Camposes tried to get a modification of their mortgage that would result in a manageable payment that would allow them to remain in their home. Despite these continued efforts, they were never granted a mortgage modification that provided them affordable payments. The Bank ultimately foreclosed on their house in or around February 2014.

84.     In around April of 2014, sheriffs knocked on the door of the Campos home and told the Camposes that their home had been sold at a foreclosure sale and they had five days to vacate the premises. Ms. Campos was very lucky to find a rental home for her family, as the foreclosure and associated damage to her credit made it very difficult to find a landlord willing to rent to her and her husband.

85.      Ms. Campos eventually found a home to rent, but it was much smaller than the home she had lost and in a less desirable part of Paramount. Ms. Campos's daughters went from having their own rooms to sharing a room in the rental home, and Ms. Campos's mother was forced to find her own accommodations because the rental home didn't have room for her. The Campos children lost their neighborhood friends and had to start over in an unfamiliar part of town.

86.     In or around September 2018, Ms. Campos received a letter from Wells Fargo informing her and Mr. Campos that their mortgage modification should have been approved but was not approved due to an error. Ms. Campos was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

87.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Campos's life has been irrevocably altered. Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

**3.     Emma White (Florida)**

88.     Plaintiff Emma White purchased her home, located in Callahan, Florida, in 2006. She was a single mother who moved into the house with her four children. The property was purchased through a mortgage loan that Wells Fargo later acquired.

89.     Around 2009, Ms. White began experiencing financial hardship. She had accumulated debt supporting her children and applied for a mortgage loan modification so that the family could keep their home. The loan modification process was long and complicated. Ms. White kept having to send in the same paperwork over and over again, only to ultimately receive a letter from Wells Fargo in 2013 saying that she did not qualify for a modification.

90.     Wells Fargo had already initiated foreclosure proceedings, so after it denied her request for a mortgage modification, Ms. White was forced to leave her house. She found a rental apartment in Jacksonville, Florida, for her and three of her children, while Wells Fargo completed its foreclosure of their old home.

91.     Wells Fargo's actions caused Ms. White significant emotional distress. The foreclosure devastated her, especially because she had to support her children and work to make sure the family had a place to live. Ms. White had been suffering from the stress of supporting her children and other recent events in her life, and the foreclosure multiplied that stress. As a result of everything that was going on in her life, including the foreclosure, Ms. White was diagnosed with depression and began taking antidepressants. Ms. White's children were also affected by the foreclosure. She had to explain to them that she tried her best to keep the house, but ultimately could not do so.

92.     In late 2018, Ms. White received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error. Ms. White was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

93.     As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. White's life has been irrevocably altered. Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

### 4.     Troy Frye (Georgia)

94.     In 2009, Mr. Frye bought a home in Hephzibah, GA for himself and his partner, their

1   two young sons (who were about five and seven years old at the time), and his partner's daughter.

2   95.   Around the beginning of 2013, Mr. Frye was laid off from his job at a local

3   manufacturing plant where he had been employed for about eight to ten years. He applied for and

4   received unemployment assistance, but still was not able to make the monthly mortgage payments on

5   his home. He reached out to Wells Fargo (his mortgage servicer), to see if they would grant him a

6   mortgage modification, which they did in late February 2013.

7   96.   Unfortunately, Mr. Frye's new monthly mortgage payment was not significantly lower,

8   and Mr. Frye continued to have difficulty making his payments. He attempted to get a second

9   modification from Wells Fargo, but this time he was denied—both verbally and in writing. Wells Fargo

10   then initiated foreclosure proceedings.

11   97.   The strain of Mr. Frye's financial hardship, coupled with the uncertainty and stress of

12   the impending foreclosure, had a big impact on Mr. Frye and his family. The relationship between Mr.

13   Frye and the mother of his children became very strained, and in 2014, she moved out with their two

14   boys and her daughter, leaving Mr. Frye alone in the home.

15   98.   Mr. Frye was able to delay foreclosure proceedings for a while, but Wells Fargo

16   persisted in their efforts to remove him from his home. Around the beginning of 2015, Wells Fargo

17   asked him how much they would need to pay him to leave. Confused and frustrated by the situation,

18   Mr. Frye said he would accept $2,000. The house had recently been damaged by a kitchen fire that

19   broke out while Mr. Frye was sleeping, and from which he was fortunate to escape with his life. He

20   accepted the $2,000 from Wells Fargo and moved out, as the house was no longer habitable.

21   99.   Mr. Frye and his children suffered emotional trauma and depression as a result of the

22   foreclosure and the effects that it had on their lives. They all tried to move on as best they could.

23   100.   In late 2018, Mr. Frye received a letter from Wells Fargo informing him that his second

24   mortgage modification request should have been approved but was not approved due to an error. Mr.

25   Frye was one of the customers wrongly denied a mortgage modification because of systematic errors in

26   Wells Fargo's automated decision-making tool.

27   101.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

28   making tool, Mr. Frye's life has been irrevocably altered. His injuries include loss of his family's home

1   and the time and money put into that home; loss of equity in his home; loss of tax benefits; loss of

2   appreciation in his home's value; loss of time and money spent to find replacement housing and move

3   his family; loss of time and money spent in an effort to avoid foreclosure; damage to his credit and

4   resulting opportunity costs; and severe emotional distress.

5           **5.      Coszetta Teague (Illinois)**

6           102.    Plaintiff Coszetta Teague purchased a home in Calumet City, Illinois, for herself and her

7   daughter, Iesha Brown, in June 2010. Ms. Teague's two young grandchildren moved in shortly

8   thereafter. The property was purchased through a mortgage loan with Wells Fargo.

9           103.    In 2010, Ms. Teague was laid off from her job at Chase Bank. In 2011, Ms. Teague lost

10   her mother and her property taxes went up. As a result, Ms. Teague could no longer afford to make her

11   monthly payments, and reached out to Wells Fargo to see if they could help.

12           104.    Wells Fargo told Ms. Teague to fill out paperwork. Ms. Teague did as she was told, but

13   when she later inquired about the status of her modification request, she was told that it had been lost

14   and that she would have to redo it. It took a long time for Wells Fargo to process Ms. Teague's

15   application, and Wells Fargo's representatives were often impolite during the process, but eventually

16   Wells Fargo told Ms. Teague that she did not qualify for a mortgage modification and it was going to

17   initiate foreclosure proceedings.

18           105.    Afraid that the sheriff was going to remove her from her home, Ms. Teague asked her

19   brother to help move her belongings to storage. She hired a foreclosure defense attorney, who charged

20   her $4,000 but was unable to help. Ms. Teague and her family vacated the home in the latter part of

21   2014 and Wells Fargo foreclosed shortly thereafter.

22           106.    Ms. Teague, her daughter, and her two grandchildren lived in Ms. Teague's car for

23   several months, until she was able to find an apartment sometime around March 2015.

24           107.    The experience was emotionally devastating for all concerned. Ms. Brown was very

25   depressed and had suicidal ideations. She was prescribed antidepressants, including Zoloft. The

26   grandchildren, who were around four and nine at the time, were sad and confused about losing their

27   home and having to live in a car, change schools, and leave all their friends. They shut down, stopped

28   interacting with people, and attended therapy. Ms. Teague also experienced depression following the

foreclosure, and was prescribed antidepressants, including Zoloft. She is currently on Social Security and disability benefits.

108.    In late 2018, Ms. Teague received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error. Ms. Teague was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

109.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Teague and her family's lives have been irrevocably altered. Their injuries include loss of their home and the time and money put into that home; loss of equity in the home; loss of tax benefits; loss of appreciation in the home's value following the sale; loss of time and money spent to find replacement shelter and relocate; loss of time and money spent in an effort to avoid foreclosure; damage to Ms. Teague's credit and resulting opportunity costs; and severe emotional distress.

### 6.    Russell and Brenda Simoneaux (Louisiana)

110.    Plaintiffs Russell and Brenda Simoneaux purchased their home in Baton Rouge, Louisiana, in 1992.

111.    Mr. and Mrs. Simoneaux contacted Wells Fargo, their mortgage loan servicer, in 2013 because Mr. Simoneaux had recently retired and the couple was living on a fixed income. They applied for a mortgage modification but were denied.

112.    Without a mortgage modification, Mr. and Mrs. Simoneaux had a very difficult time meeting their mortgage obligations. Mr. and Mrs. Simoneaux were both forced to take side jobs for extra income, the couple avoided eating out, and they watched every penny they spent for several years—until their mortgage was finally paid off in late 2018. It was an extremely stressful time.

113.    In October 2018, Mr. and Mrs. Simoneaux received a letter from Wells Fargo informing them that their request for a mortgage modification should have been approved but was not approved due to an error. Mr. and Mrs. Simoneaux were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

114.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Mr. and Mrs. Simoneaux were forced to make numerous sacrifices and endure significant

stress as they struggled to meet mortgage payments that should have been lowered. Their injuries include loss of more beneficial loan terms; loss of time spent avoiding foreclosure; and opportunity costs resulting from higher mortgage payments.

### 7.   Alicia Hernandez (New Jersey)

115.   Plaintiff Alicia Hernandez bought her studio condominium, located in North Bergen, New Jersey, in 2006. The property was purchased through a mortgage loan with Wells Fargo.

116.   Ms. Hernandez already owned another unit in the complex and thought the studio, with a lot of work, could be developed into an attractive rental due to its close proximity to New York City. It's right across the river from Manhattan, and only a seven-minute drive from Times Square with no traffic. Ms. Hernandez planned to keep the property in her family forever. The unit also had a deeded parking spot, and parking is very difficult to come by in that area.

117.   When Ms. Hernandez purchased her studio, it was just a shell—it had no kitchen and there were bullet holes in the door. But Ms. Hernandez was willing to put in the work, time, and money to create an income-generating property that could provide for her and her family. She tapped into her retirement account and installed new flooring, new appliances, new bathroom fixtures, recessed lighting, and a new air conditioning unit. She also had to contribute additional money when the homeowners' association imposed special assessments.

118.   During the Great Recession, Ms. Hernandez lost her job in a mass layoff, and with the property now her only source of income, had difficulty making her monthly mortgage payment. She applied for a mortgage modification in 2012-13, but Wells Fargo told her that she didn't qualify and instituted foreclosure proceedings in late 2013.

119.   Ms. Hernandez fought foreclosure for several years, but Wells Fargo eventually foreclosed on her property in late 2015. The stress of the foreclosure process had a devastating effect on Ms. Hernandez and her husband. As non-lawyers, the anxiety and confusion of dealing with the court system and the legal process took a severe toll on them emotionally. Ms. Hernandez had a miscarriage during the foreclosure process and was hospitalized for the first time in her life. She also suffered insomnia, panic attacks, and difficulty breathing.

120.   Ms. Hernandez's husband is a police officer, and both were very concerned about the

effects that the foreclosure might have on him professionally. This put a lot of strain on their marriage and caused embarrassment when they ran into colleagues of his while attending court to fight foreclosure. Eventually, Ms. Hernandez and her husband moved to Easton, Pennsylvania, to escape the stress of being in the same community, and her husband now commutes approximately an hour and 15 minutes to work.

121.    In late 2018, Ms. Hernandez received a letter from Wells Fargo informing her that her request for a mortgage modification should have been approved but was not approved due to an error. Ms. Hernandez was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

122.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Hernandez has suffered life-altering consequences. Her injuries include loss of her property and the time and money put into that property; loss of equity in her property; loss of appreciation in her property's value following the sale; loss of time and money spent fighting foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

**8.    Rose Wilson (New York)**

123.    Plaintiff Rose Wilson purchased her home, located in Rochester, New York, in or around 1995. Ms. Wilson lived in the home for many years with her family and put a lot of time and money into the property—including by renovating the kitchen and bathroom.

124.    After Ms. Wilson lost her job due to the economic downturn, however, she struggled to make the mortgage payments on her home.

125.    She applied for a mortgage modification from Wells Fargo (her mortgage servicer) multiple times over the course of several years. Wells Fargo kept stringing her along, requiring her to make monthly payments she could not afford in order to qualify for a mortgage modification, and then telling her the request had been denied and she would need to reapply and start the process all over again.

126.    Ms. Wilson's attempt to obtain a mortgage modification from Wells Fargo and save her home went on for years. During this time, Ms. Wilson had to make many sacrifices to keep making her mortgage payments. She tapped into her retirement account early, incurring tax penalties to do so.

127.    Ms. Wilson's efforts to save her home were ultimately unsuccessful, however, and Wells Fargo foreclosed in 2014. At the time of the foreclosure, Ms. Wilson's daughter, son-in-law, and their two children lived with her. They were all forced to move from their home to a cramped, moldy, rodent-infested rental property. The aftermath of the foreclosure caused Ms. Wilson significant stress and depression. She had worked hard to purchase a home and provide for her family, but after the foreclosure, Ms. Wilson felt utterly defeated and left with nothing. It has taken many years for the pain to subside, but she still feels immense sadness whenever she drives by her former house or thinks about her old life.

128.    In late 2018, Ms. Wilson received a letter from Wells Fargo informing her that her request for a mortgage modification should have been approved but was not approved due to an error. Ms. Wilson was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

129.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Wilson has suffered life-altering consequences. Her injuries include loss of her home and the time and money put into that property; loss of equity in her property; loss of appreciation in her property's value following the sale; loss of time and money spent fighting foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

### 9.    Tiffanie Hood (Ohio)

130.    In May of 2001, Ms. Hood bought a three-bedroom home for her family in Cincinnati, Ohio. She moved in with her young children—her son was about eight years old at the time, and her daughter was about 11.

131.    The home was built in 1926 and needed quite a bit of work. Ms. Hood invested significant resources putting in a kitchen, repairing the roof, replacing the garage door and front door, and completing various other necessary repairs.

132.    In or around 2013, Ms. Hood had difficulty making the monthly payment and reached out to Wells Fargo for help. Her request for a mortgage modification was denied, and Wells Fargo initiated foreclosure proceedings. Ms. Hood and her family were forced out of their home in late 2014.

133.    Ms. Hood and her children suffered emotional trauma and depression as a result of the

1   foreclosure and the effects that it had on their lives. They all tried to move on as best they could.

2   134.   In late 2018, Ms. Hood received a letter from Wells Fargo informing her that her

3   mortgage modification should have been approved but was not approved due to an error. Ms. Hood was

4   one of the customers wrongly denied a mortgage modification because of systematic errors in Wells

5   Fargo's automated decision-making tool.

6   135.   As a result of Wells Fargo's repeated failure to properly test its automated decision-

7   making tool, Ms. Hood life has been irrevocably altered. Her injuries include loss of her family's home

8   and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of

9   appreciation in her home's value following foreclosure; loss of time and money spent to find

10   replacement housing and move her family; loss of time and money spent in an effort to avoid

11   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

12   **10.   George and Cyndi Floyd (Pennsylvania)**

13   136.   Plaintiffs George and Cyndi Floyd purchased their home, located in Lancaster,

14   Pennsylvania, in 2004. The property was purchased through a mortgage loan with Wachovia, which

15   was later transferred to Wells Fargo.

16   137.   After the financial crisis hit, the Floyds had difficulty making their mortgage payments.

17   Mr. Floyd lost his job when the company he worked for closed, and Mrs. Floyd later lost her job due to

18   the economic recession as well.

19   138.   In an effort to save their home, the Floyds went to great lengths: they applied for

20   numerous mortgage modifications over a period of two years; they paid a company to help them avoid

21   foreclosure; and they spent countless hours reaching out to various other companies, government

22   agencies, and even Congressional representatives for help.

23   139.   The Floyds' efforts were ultimately unsuccessful. Wells Fargo denied their final request

24   for a mortgage modification in November 2011 and initiated foreclosure proceedings. The Floyds were

25   forced to move to a new home in Philadelphia.

26   140.   The foreclosure process was emotionally devastating for the Floyds. Mr. Floyd is

27   disabled and suffers from degenerative disc disease, arthritis throughout his body, and the aftereffects

28   of failed bilateral knee replacements. Being forced to move by Wells Fargo was an extreme hardship

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

that caused Mr. Floyd severe depression and emotional distress. He was hospitalized during the foreclosure process, and though he was eventually able to get through the move to Philadelphia, it took weeks and required the help of Mr. Floyd's nephew and high doses of pain medication. To this day, Mr. Floyd suffers from deep depression and anxiety because of what Wells Fargo has done to him and his family.

141.    In late 2018, the Floyds received a letter from Wells Fargo informing them that their mortgage modification should have been approved but was not approved due to an error. The Floyds were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

142.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, the Floyds lives were irrevocably altered. Their injuries include loss of their home and the time and money put into that home; loss of equity in their home; loss of tax benefits; loss of appreciation in their home's value following the sale; loss of time and money spent to find replacement housing and move their belongings; loss of time and money spent in their efforts to avoid foreclosure; damage to their credit and resulting opportunity costs; and severe emotional distress.

**11.    Diana Trevino (Texas)**

143.    In 2007, Plaintiff Diana Trevino purchased a three-bedroom home in Garland, Texas, where she lived with her husband and four children. Close family friend Roder Contreras co-signed the mortgage loan and resided in the home as well. When Mr. Contreras's grandmother became ill in 2010, he moved to El Salvador to take care of her. He stopped making his share of the payments on the Trevino home, and quitclaimed his interest in it to the Trevinos.

144.    Because the Trevinos were unable to make the entire monthly mortgage payment without Mr. Contreras's contribution, Ms. Trevino applied for a mortgage modification from Wells Fargo and was approved. After making approximately five to eight payments under the modification plan, Ms. Trevino suffered another setback when her mother became ill with cancer. Ms. Trevino began missing a significant amount of work because she was taking time off to take care of her mother. She fell behind on the mortgage payments, and again sought assistance from Wells Fargo.

145.    Wells Fargo told Ms. Trevino to stop making mortgage payments so that she could

qualify for another mortgage modification, which they assured her she was likely to get. Ms. Trevino stopped making payments as instructed, instead devoting her limited financial resources to her children and ailing mother.

146.    In 2013, Ms. Trevino received a call from Wells Fargo notifying her that she had not been approved for a mortgage modification, and that Wells Fargo planned to initiate foreclosure proceedings. She was told she had 60 days to vacate the premises; a follow-up letter conveyed the same information.

147.    Ms. Trevino had great difficulty finding a new place for her family to live, but eventually found a three-bedroom apartment in an undesirable neighborhood in Richardson, Texas. The lease was solely in her husband's name, because the foreclosure had ruined Ms. Trevino's credit.

148.    In April of 2013, the Trevinos moved into the apartment. Ms. Trevino tried to keep her children in the same school in Garland, but the travel proved very difficult for the family. At times, some of the children were forced to live with their aunt so they could be nearer to their school. This was hard on the children, who couldn't understand why they had lost their home, or why their mother was so sad all of the time. Some of the children lost friends and started acting out at school. Uncharacteristically, her son and daughter were both suspended from school for misbehavior during this time period.

149.    The stress of the foreclosure, among other factors, strained the Trevinos' marriage, and in 2013 they separated. Eventually they divorced. When the lease on their apartment expired, Ms. Trevino was unable to renew it because she had not been on the original lease, and her poor credit prevented her from getting a lease on her own. The Trevinos were evicted from the apartment and had a very hard time finding a new place to live.

150.    Around the same time, Ms. Trevino's stress and depression got to the point that she wasn't eating or sleeping, and she had to be hospitalized with a bacterial infection. She lost her job and was unemployed for around ten months. She and her children survived on her unemployment benefits and the financial assistance of her sister. Two of Ms. Trevino's sons left college so that they could work and help support the family. Ms. Trevino and her family have worked hard to try to rebuild their lives in the wake of the foreclosure in 2013, and continue to do so to this day.

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

151.    In late 2018, Ms. Trevino received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error. Ms. Trevino was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

152.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Trevino's life has been irrevocably altered. Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

## CLASS ALLEGATIONS

153.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Granja and Campos pursue their contract claims on behalf of the following certified class ("Class"):

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), [or] the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

154.    For purposes of this class definition, "home loan" refers to any loan secured by residential real property.

155.    Plaintiffs Granja and Campos anticipate that they will be able to identify all class members from Wells Fargo's records and that class members can be notified of the pendency of this class action by mail.

156.    The Class meets each of the requirements for class certification pursuant to Rule 23(a) and Rule 23(b)(3).

157.    <u>Numerosity</u>. The Class is sufficiently numerous such that individual joinders are impracticable and less advantageous than proceeding through the class device. Based on Wells Fargo's public disclosures to date, the Class consists of approximately 505 persons.

158.   <u>Commonality & Predominance</u>. Common questions of law and fact exist as to the Class, and those common questions predominate over questions affecting only individual class members. The central common question is: Whether Wells Fargo breached a standard notice requirement in mortgage contracts by failing to notify class members they qualified for a mortgage modification.

159.   <u>Typicality</u>. Plaintiffs' claims are typical of those asserted by the Class. Both Plaintiffs and class members seek to recover for injuries caused by Wells Fargo's failure to properly verify or audit its automated decision-making tool, which caused both Plaintiffs and class members to be denied mortgage modifications.

160.   <u>Adequacy</u>. Plaintiffs will continue to fairly and adequately represent and protect the interests of the members of the Class, as their interests do not conflict with the interest of the class members they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation who will continue to prosecute this action diligently and vigorously.

161.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims will require an in-depth knowledge of HAMP-related jurisprudence; intensive discovery of a banking giant defended by a large, global law firm; and depositions of several sophisticated banking executives and board members. These are matters that can only realistically be handled through unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

## TOLLING ALLEGATIONS

162.   The causes of actions alleged herein did not accrue or were tolled until Plaintiffs and Class members discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims.

163.   Plaintiffs and Class members were not aware that they qualified for a mortgage modification, and that Wells Fargo's automated decision-making tool had miscalculated their eligibility, until Wells Fargo informed them through letters mailed the second half of 2018.

164.   Plaintiffs and Class members had no realistic ability to discover these facts on their own.

Wells Fargo's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for a mortgage modification depended on variables within Wells Fargo's exclusive control.

165.    Any applicable statues of limitations are also tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts alleged herein. Wells Fargo discovered one of the software errors in August 2013 but deliberately concealed its discovery from Plaintiffs and from class members until the second half of 2018. Wells Fargo was under a continuous duty to disclose the truth to Plaintiffs and class members, and Plaintiffs and class members reasonably relied on Wells Fargo's ongoing concealment.

### FIRST CAUSE OF ACTION
**Breach of Contract**
**Brought on behalf of the Class**

166.    Plaintiffs Debora Granja and Sandra Campos incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on behalf of themselves and the Class.

167.    When Plaintiffs and class members financed their homes, they entered into Security Instruments (typically referred to as a mortgage, deed of trust, or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and foreclose on the property.

168.    Plaintiffs' and class members' mortgage loans were insured, guaranteed, or held by a federal government agency and their Security Instruments were typically government-issued, form Federal Housing Administration (FHA) and/or Fannie Mae/Freddie Mac Security Instruments.[1] Plaintiff Granja's home was secured by a Fannie/Freddie Security Instrument, while Plaintiff Campos's home was secured by an FHA Security Instrument. Wells Fargo breached the terms of both types of Security Instruments. References to "Security Instruments" in this complaint refer to all Plaintiffs' mortgage contracts. Reference to "FHA Security Instruments" is to the type of mortgage contract that

---

[1] *See* Wells Fargo's Request for Judicial Notice, Dkt. 60, attaching copies of certain Plaintiffs' Security Instruments as "exemplars" that were "substantially similar to the security instruments of the remaining named Plaintiffs." The exemplars included Security Instruments for Plaintiffs Floyd (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), Hood (FHA Ohio Open-End Mortgage), Hernandez (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), and Wilson (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT).

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

Plaintiff Campos had, while reference to "Fannie/Freddie Security Instruments" is to the type of mortgage contract that Plaintiff Granja had.

169.    Wells Fargo Bank was subject to the terms of these Security Instruments, either as the original lender, an assignee, or as the mortgage servicer authorized to act on behalf of the lender.

170.    Under the Fannie/Freddie Security Instruments, the Bank was required to give notice to Plaintiffs and class members before it was permitted to accelerate the remaining balance on their loans and initiate the foreclosure process. That notice was required to specify the borrower's default, the action required by the borrower to cure the default, and the date by which the borrower must cure the default to avoid acceleration and foreclosure proceedings.

171.    The Bank also agreed that "[i]f the Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued…" prior to the sale of the property. Those conditions included, among other things, that the Borrower "(a) pays Lender all sums which then would be due under this Security Instrument…" and "(b) cures any defaults of any other covenants or agreements."[2]

172.    The Fannie/Freddie Security Instruments specifically contemplated the possibility of both a forbearance and modification of the sums secured by the Security Instruments. The Fannie/Freddie Security Instruments provided, "Extension of the time for payment *or modification* of amortization of the sums secured by this Security Instrument … shall not operate to release the liability of Borrower…"[3] (emphasis added).

173.    Similarly, under the FHA Security Instruments, the Bank agreed it was not able to require full payment and its rights were otherwise limited "by regulations issued by the Secretary in the case of payment defaults…"[4] The Bank also agreed that, "In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure

---

[2] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at pg. 24, ¶ 19; *see also* Plaintiff Hernandez at p. 56, ¶ 19; Plaintiff Wilson at p. 76, ¶ 21(B).

[3] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at pg. 23, ¶ 12; *see also* Plaintiff Hernandez at p. 52, ¶ 12.

[4] *See, e.g.*, Plaintiff Hood FHA Security Instrument (Doc. 60-3) at p. 33, ¶ 9(a).

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

1   if not permitted by regulations of the Secretary."[5]

2       174.    Consistent with the Security Instruments, once a borrower missed a mortgage payment,

3   Wells Fargo sent correspondence advising of the amount owed and invited borrowers to call Wells

4   Fargo's "trained professionals" who are "available to assist you in bringing your loan current … [and]

5   will work with you to determine the best option available to you." These letters show Wells Fargo's

6   understanding that there is more than one way to bring a loan current under the Security Instruments.

7       175.    One of the ways a loan could be brought current was a loan modification. In a recent

8   Rule 30(b)(6) deposition, Wells Fargo's corporate representative testified that a mortgage modification

9   could cure a default and bring a loan current.

10      176.    This testimony is consistent with other correspondence Wells Fargo sent in response to a

11  request for mortgage assistance. In one letter, Wells Fargo told Plaintiff Troy Frye it was "considering a

12  program that may assist you in bringing your loan current … This program, known as a loan

13  modification, would provide you with the opportunity for a fresh start by adjusting the current terms of

14  your loan."

15      177.    In a different letter, Wells Fargo advised Plaintiffs and class members that a loan

16  modification is "an agreement that changes the terms of your existing mortgage. It brings your account

17  up-to-date and may result in a lower monthly payment."

18      178.    Once borrowers, such as Plaintiffs, requested mortgage assistance from Wells Fargo, the

19  Bank would tell borrowers: "We'll continue to work with you to help avoid a foreclosure sale. If your

20  loan has not previously been referred to foreclosure and you have submitted all of the required

21  documentation needed to evaluate for an alternative, this loan will not be referred to foreclosure while

22  the application is evaluated. If your loan has been referred to foreclosure, we will not conduct a

23  foreclosure sale on this loan while your documents are being reviewed and if allowed by state law

24  and/or investor guidelines." This message from Wells Fargo shows its understanding that a

25  modification would bring an account current and allow the borrower to avoid foreclosure.

26      179.    The Bank breached its contractual obligations to Plaintiffs and class members by failing

27  to give Plaintiffs and class members adequate notice prior to accelerating their loan payments,

28  ───────────────
[5] *See id.* at ¶ 9(d).

commencing the foreclosure process, and, in many instances, foreclosing on Plaintiffs' and class members' homes.

180.    In particular, the Bank did not notify Plaintiffs and class members that they could cure their default and avoid acceleration and foreclosure by accepting a mortgage modification. Plaintiffs and class members qualified for a government-mandated mortgage modification, and the Bank was required to offer them a mortgage modification but failed to do so. While HAMP and other types of government-mandated mortgage modifications might have come into effect after Plaintiffs and class members signed their Security Instruments, a reasonable interpretation of these contracts required Wells Fargo to inform Plaintiffs of actions available to cure their default *at the time of the default* – not just any action available at the time the parties executed the contract. And at the time of Plaintiffs' defaults, a mortgage modification was an option that should have been available to them.

181.    The FHA Security Instruments specifically contemplated HUD Secretary regulations placing a limitation on Wells Fargo's right to foreclose in the event of a default. These contracts stated, "In many circumstances regulations issued by the [HUD] Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary."[6] Indeed, as a part of the financial crisis, the HUD Secretary stated in a report to Congress that "During this time of elevated financial stress on households, FHA maintained a robust set of policies…to provide assistance in *curing* mortgage delinquencies." Those tools included, among other things, loan modifications.[7] The FHA (Federal Housing Administration) is a part of HUD. And HUD was one of the administering offices for HAMP; thus HUD was responsible for issuing regulations on borrower eligibility for a modification under the program.

182.    As a result of the Bank's breach, Plaintiffs and class members suffered damages in an amount subject to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent

---

[6] *See id.* at ¶ 9(d).

[7] *See* U.S. Department of Housing and Urban Development November 15, 2011 Annual Report to Congress Fiscal Year 2011 Financial Status FHA Mutual Mortgage Insurance Fund at p. 23-24, available at https://www.hud.gov/sites/documents/FHAMMIFANNRPTFY2011.PDF (last accessed July 10, 2019).

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families and belongings; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments.

**SECOND CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**Brought on Behalf of all Plaintiffs**

183.    Plaintiffs Debora Granja, Sandra Campos, Emma White, Troy Frye, Coszetta Teague, Alicia Hernandez, Rose Wilson, Tiffanie Hood, Russell and Brenda Simoneaux, George and Cyndi Floyd, and Diana Trevino (referred to in this Second Cause of Action as "IIED Plaintiffs") incorporate all preceding paragraphs as if fully set forth herein.

184.    Wells Fargo engaged in extreme and outrageous conduct as alleged herein. Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its customers' homes and wellbeing depended. It allowed systemic errors to persist for five to eight years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices; failed to reform its verification and auditing practices even after the government found a software error had led the Bank to wrongfully deny mortgage modifications; concealed its discovery of an additional software error from regulators and customers; and failed to identify other related errors for an additional three years.

185.    The same extreme and outrageous conduct that caused a series of scandals and consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines and to forbid Wells Fargo from growing until reforms were implemented—was also responsible for IIED Plaintiffs losing their homes here. Wells Fargo's Board and executive leadership abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance failures, government fines, and consent decrees requiring leadership to implement appropriate auditing and compliance procedures.

186.    With regard to the Bank's mortgage modification and foreclosure processes in particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP or

other government requirements. Wells Fargo's leadership ignored its oversight responsibilities even after the government found it had not adequately overseen the Bank's mortgage modification and foreclosure operations, even after it agreed to implement proper oversight as part of two 2011 consent orders, and even after the government found in 2015 that Wells Fargo had continuously failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it will be prohibited from growing unless and until it reforms its oversight and governance.

187. Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to customers, including IIED Plaintiffs, who were wrongfully denied mortgage modifications and foreclosed upon.

188. As a result of Wells Fargo's conduct, IIED Plaintiffs have suffered severe emotional distress, as alleged herein, which has contributed to diagnoses of anxiety and depression, extended psychological therapy, hospitalizations, high blood pressure, various health problems, marital struggles, social withdrawal, childhood trauma, suicidal ideation, stress disorders, and a number of other physical, psychological, and social afflictions.

189. IIED Plaintiffs seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of IIED Plaintiffs.

### THIRD CAUSE OF ACTION
### Wrongful Foreclosure Brought on Behalf of Plaintiffs Granja, Campos and Frye

190. Plaintiffs Granja, Campos, and Frye incorporate all preceding paragraphs as if fully set forth herein.

### California Wrongful Foreclosure

191. Plaintiffs Debora Granja and Sandra Campos bring this claim on their own behalves.

192. Wells Fargo wrongfully foreclosed on Plaintiffs Granja and Campos's respective real property pursuant to a power of sale in their Security Instruments. The foreclosure was unlawful and/or unfair because Wells Fargo did not first notify Plaintiffs Granja and Campos that they could cure their default by accepting a mortgage modification. Plaintiffs Granja and Campos qualified for the mortgage

1   modification and Wells Fargo was required by the Security Agreements to notify Plaintiffs of actions

2   they could take to cure their default before exercising its power of sale.

3        193.   Plaintiffs Granja and Campos were excused from tendering the amount of their secured

4   indebtedness, and no breach of condition or failure of performance existed on the part of Plaintiffs

5   Granja and Campos that would have authorized the foreclosure, because Wells Fargo was required to

6   offer Plaintiffs Granja and Campos a mortgage modification before it could accelerate their secured

7   indebtedness and initiate foreclosure proceedings.

8        194.   Plaintiffs Granja and Campos were harmed by the wrongful foreclosure and suffered

9   damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax

10  benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent

11  in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money

12  to find new housing and move their families; loss of favorable interest rates or other favorable loan

13  terms; damage to credit; opportunity costs due to damaged credit; and emotional distress.

14       195.   Plaintiffs Granja and Campos seek compensatory damages as well as punitive damages

15  against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of

16  Plaintiffs Granja and Campos.

17                            **Georgia Wrongful Foreclosure**

18       196.   Plaintiff Troy Frye brings this claim on his own behalf.

19       197.   Wells Fargo owed Plaintiff Frye a duty to exercise the power of sale afforded it by

20  Plaintiff's Security Instrument in conformance with the terms of the Security Instrument and in good

21  faith.

22       198.   Wells Fargo breached its duty by initiating foreclosure proceedings on Plaintiff Frye's

23  home without first giving him notice that he could cure his default by accepting a mortgage

24  modification. Wells Fargo was required to do so under the terms of Plaintiff Frye's Security Instrument.

25  Alternatively, initiating foreclosure proceedings on Plaintiff Frye's home without first offering him a

26  mortgage modification to which he was entitled constitutes bad faith and unfair execution of the Wells

27  Fargo's power of sale.

28       199.   As a result of Wells Fargo's conduct, Plaintiff Frye lost his home and suffered other

1    damages to be proven at trial, including loss of equity in his home; loss of tax benefits; loss of

2    appreciation in his home's value; loss of time and money spent in an effort to avoid foreclosure; loss of

3    time and money put into his home; loss of time and money to find new housing and move his family;

4    loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to

5    damaged credit; and emotional distress.

6        200.    Plaintiff Frye seeks compensatory damages as well as punitive damages against Wells

7    Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiff

8    Frye.

9

**FOURTH CAUSE OF ACTION**
**Violation of California's Homeowners Bill of Rights**
**Brought on Behalf of Plaintiffs Granja and Campos**

12       201.    Plaintiffs Debora Granja and Sandra Campos incorporate all preceding paragraphs as if

13   fully set forth herein. They bring this claim on their own behalves.

14       202.    Under California's Homeowners Bill of Rights, Wells Fargo had an obligation to ensure

15   that competent and reliable evidence, including the borrower's loan status and information, supported

16   its right to foreclose before it filed a notice of default or notice or sale in connection with the

17   foreclosure of Plaintiffs Granja's and Campos's respective real property. Cal. Civ. Code § 2924.17.

18       203.    Wells Fargo materially and recklessly violated its obligation because Plaintiffs Granja's

19   and Campos's respective loan information did not support Wells Fargo's right to foreclose. Plaintiffs

20   Granja's and Campos's loan information showed that they qualified for a mortgage modification. Wells

21   Fargo was therefore required to offer Plaintiffs Granja and Campos the opportunity to cure their default

22   by accepting a mortgage modification before it could exercise its right to foreclose under Plaintiffs

23   Granja's and Campos's Security Instruments.

24       204.    The automated software that Wells Fargo used to wrongly determine that Plaintiffs

25   Granja and Campos did not qualify for a mortgage modification was not reliable and Wells Fargo was

26   reckless in using the software and relying upon it to support its right to foreclose. The software's results

27   had not been properly verified or audited, and as a result, multiple material errors remained uncorrected

28   in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its

software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

205.    As a result of Wells Fargo's violation of the Homeowners Bill of Rights, Plaintiffs Granja and Campos suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit.

206.    Pursuant to California Civil Code section 2924.19(b), Plaintiffs Granjaand Campos seek an award of treble actual damages or statutory damages of $50,000, whichever is greater.

### FIFTH CAUSE OF ACTION
**Violation of California's Unfair Competition Law**
**Brought on Behalf of Plaintiffs Granja and Campos**

207.    Plaintiffs Debora Granja and Sandra Campos incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on their own behalves.

208.    Wells Fargo has violated and continues to violate California's Unfair Competition Law (UCL), which prohibits unlawful, unfair, or fraudulent practices.

209.    Wells Fargo engaged in unlawful practices by denying mortgage modifications to Plaintiffs Granja and Campos in violation of HAMP and other governmental requirements.

210.    Wells Fargo engaged in unfair practices by failing to properly verify or audit the automated software it used to determine whether Plaintiffs Granja and Campos were eligible for a mortgage modification. Wells Fargo's faulty verification and auditing practices allowed multiple systemic errors to remain uncorrected for five to eight years and persisted even after the government cited Wells Fargo for failing to adequately audit its mortgage modification and foreclosure processes; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused

1    it to wrongly deny modifications in 2015.

2        211.    Wells Fargo's Board and executive leadership further engaged in unfair practices by

3    failing to properly oversee the Bank's compliance with HAMP and other governmental requirements.

4    Wells Fargo's lack of central oversight has led to series of consumer abuses and billions of dollars in

5    government fines. Yet despite repeatedly promising to reform its oversight practices, Wells Fargo's

6    Board and executive leadership repeatedly failed to implement or maintain procedures to ensure the

7    Bank was complying with HAMP or other applicable government requirements.

8        212.    Both Wells Fargo's verification and auditing practices and its oversight practices are

9    unethical, unscrupulous, or substantially injurious to consumers; any legitimate utility of the practices

10   are outweighed by the harm to consumers; and the practices run afoul of the public policies underlying

11   HAMP and California Homeowners Bill or Rights, which seek to help homeowners avoid foreclosure

12   and promote fair mortgage lending and servicing practices.

13       213.    As a result of Wells Fargo's violations of the UCL, Plaintiffs Granja and Campos have

14   suffered injury in fact and lost money and property, including loss of their homes; loss of equity in their

15   homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of

16   time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes;

17   loss of time and money to find new housing and move their families; loss of favorable interest rates or

18   other favorable loan terms; damage to credit; and opportunity costs due to damaged credit.

19       214.    Pursuant to California Business and Professions Code section 17203, Plaintiffs Granja

20   and Campos seek such orders or judgments as may be necessary to prevent the Wells Fargo's future use

21   of its unfair and unlawful practices, and to restore to Plaintiffs Granja and Campos any money or

22   property that may have been acquired by means of Wells Fargo's unfair competition.

23

24                          **SIXTH CAUSE OF ACTION**
                     **Violation of State Consumer Protection Laws**
25        **Brought on Behalf of Plaintiffs Teague, Hernandez, Wilson and Floyds**

26       215.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein. Plaintiffs

27   Teague, Hernandez, Wilson and Floyds seek recovery under the following state consumer protection

28   statutes as detailed below.

**Illinois Consumer Fraud Act**

216.    Plaintiff Coszetta Teague brings this claim on her own behalf.

217.    Wells Fargo's conduct as alleged herein violates the Illinois Consumer Fraud Act (ICFA), 815 ILCS 505/2, which prohibits unfair acts or practices in the conduct of any trade or commerce. Wells Fargo engaged in unfair practices by denying a mortgage modification to Plaintiff Teague in violation of HAMP and other governmental requirements; by failing to properly verify or audit the automated software it used to determine whether she were eligible for a mortgage modification; and by failing to implement or maintain procedures to ensure the Bank was complying with HAMP or other government requirements.

218.    As a result of Wells Fargo's violation of the ICFA, Plaintiff Teague suffered damages according to proof, including loss of her home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into her home; loss of time and money to find new housing and move her family; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

219.    Pursuant to 815 ILCS 505/10a, Plaintiff Teague seeks recovery of her actual economic damages, punitive damages, injunctive relief, and attorneys' fees and costs.

**New Jersey Consumer Fraud Act**

220.    Plaintiff Alicia Hernandez brings this claim on her own behalf.

221.    Wells Fargo's conduct as alleged herein violates the New Jersey Consumer Fraud Act (NJCFA), N.J.S.A. 56:8-2, which prohibits the use of any misrepresentation or deception in connection with the extension of credit or subsequent servicing of that credit.

222.    Wells Fargo represented to Plaintiff Hernandez that she did not qualify for a mortgage modification. That representation was false and caused her ascertainable loss, including loss of her home; loss of equity in her home; loss of tax benefits; loss of appreciation in her homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into her home; loss of time and money to find new housing and move her family; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to

damaged credit or higher mortgage payments.

223. Had Wells Fargo presented accurate information to Plaintiff Hernandez, she would have opted for the mortgage modification for which she qualified. If Wells Fargo still refused to provide her with a mortgage modification, she could and would have used the knowledge that she qualified for a mortgage modification to fight foreclosure.

224. Pursuant to N.J.S.A 56:8-19, Plaintiff Hernandez seeks an award of treble damages, injunctive relief, and attorneys' fees and costs.

### New York General Business Law

225. Plaintiff Rose Wilson brings this claim on her own behalf.

226. Wells Fargo's conduct as alleged herein violates Section 349(a) of New York's General Business Law (GBL), which prohibits deceptive acts or practices

227. Wells Fargo's acts and practices were consumer-oriented, as they affected not only Plaintiff Wilson but similarly-situated consumers as well, and they had the potential to affect even more consumers. The automated software that used to determine Plaintiff Wilson's and other consumers' eligibility for mortgage modifications was systematically flawed and generated inaccurate calculations.

228. The automated software's calculations had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

229. Wells Fargo's practice of using systematically-flawed software was deceptive or misleading in a material respect, as it led Plaintiff Wilson to believe that she did not qualify for a mortgage modification and caused her to be wrongly denied a mortgage modification.

230. Had Wells Fargo presented accurate information to Plaintiff Wilson, she would have opted for the mortgage modification for which she qualified. If Wells Fargo still refused to provide her with a mortgage modification, she could and would have used the knowledge that she qualified for a

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA

mortgage modification to fight foreclosure.

231.    As a result of Wells Fargo's violation of the GBL, Plaintiff Wilson suffered damages, including loss of her home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into her home; loss of time and money to find new housing and move her family; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

232.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff Wilson seeks an award of damages, injunctive relief, and attorneys' fees.

**Pennsylvania Unfair Trade Practices and Consumer Protections Law**

233.    Plaintiffs Cyndi and George Floyd bring this claim on their own behalves.

234.    Wells Fargo's conduct as alleged herein constitutes a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Stat. Ann. § 201-3, which prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.

235.    Wells Fargo's practice of using systematically-flawed software to calculate the Floyds' eligibility for mortgage loan modifications was unfair and deceptive, as it led them to believe that they did not qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

236.    The automated software's calculations had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

237.    The Floyds justifiably relied on Wells Fargo's determination that they did not qualify for a mortgage modification. Had Wells Fargo presented accurate information to them, they would have opted for the mortgage modification for which they qualified. If Wells Fargo still refused to provide the

Floyds with a mortgage modification, they could and would have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

238.   As a result of Wells Fargo's violation of the UTPCPL, the Floyds suffered damages, including loss of their home; loss of equity in their home; loss of tax benefits; loss of appreciation in their home's value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their home; loss of time and money to find new housing and move their family; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

239.   Pursuant to 73 Pa. Stat. Ann. § 201-9.2, the Floyds seek an award of treble damages, equitable relief, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Debora Granja and Sandra Campos, on behalf of themselves and those similarly situated, request the following relief:

     a.   A determination that this action may be maintained as a class action;

     b.   An award of all damages to be paid according to proof;

     c.   Pre-judgment interest and post-judgment interest, as provided by law;

     d.   Attorneys' fees and costs of suit, including expert fees and costs;

     e.   Any and all other legal and equitable relief that the Court may find appropriate.

WHEREFORE, Plaintiffs Debora Granja, Sandra Campos, Emma White, Troy Frye, Coszetta Teague, Alicia Hernandez, Rose Wilson, Tiffanie Hood, Russell and Brenda Simoneaux, George and Cyndi Floyd, and Diana Trevino request the following relief:

     a.   An award of all damages and restitution to be paid according to proof, including statutory damages, treble damages, and punitive damages where appropriate;

     b.   Appropriate injunctive and equitable relief, including an order enjoining Wells Fargo from continuing its unlawful practices;

     c.   Pre-judgment interest and post-judgment interest, as provided by law;

     d.   Attorneys' fees and costs of suit, including expert fees and costs;

     e.   Any and all other legal and equitable relief that the Court may find appropriate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury for all issues so triable.

Dated: February 6, 2020

*/s/ Michael L. Schrag*

**GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda Lam (SBN 301461)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:  510-350-9700
Facsimile:  510-350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: 816-984-8100
Facsimile:  816-984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-07354-WHA