1    Amanda L. Groves (SBN: 187216)
     agroves@winston.com
2    Morgan E. Stewart (SBN: 321611)
     mstewart@winston.com
3    **WINSTON & STRAWN LLP**
     101 California Street, 35th Floor
4    San Francisco, CA  94111-5840
     Telephone:    (415) 591-1000
5    Facsimile:     (415) 591-1400

6    Kobi K. Brinson (Admitted *pro hac vice*)
     kbrinson@winston.com
7    Stacie C. Knight (Admitted *pro hac vice*)
     sknight@winston.com
8    **WINSTON & STRAWN LLP**
     300 South Tryon Street, 16th Floor
9    Charlotte, NC 28202
     Telephone:    (704) 350-7700
10   Facsimile:     (704) 350-7800

11   Attorneys for Defendant
     **WELLS FARGO BANK, N.A.**

12

13              **UNITED STATES DISTRICT COURT FOR THE**

14                 **NORTHERN DISTRICT OF CALIFORNIA**

15

16   DEBORA GRANJA and SANDRA CAMPOS,          Case No.  3:18-cv-07354-WHA
     individually and on behalf of all others similarly
17   situated, and                               **DEFENDANT WELLS FARGO BANK,**
                                                  **N.A.'S ANSWER TO THIRD**
18   ALICIA HERNANDEZ, EMMA WHITE,               **AMENDED CLASS ACTION**
     COSZETTA TEAGUE, RUSSELL SIMONEAUX,         **COMPLAINT**
19   BRENDA SIMONEAUX, ROSE WILSON,
     TIFFANIE HOOD, GEORGE FLOYD, CYNDI
20   FLOYD, TROY FRYE and DIANA TREVINO,
     individually,
21
               Plaintiffs,
22
     v.
23
     WELLS FARGO BANK, N.A.,
24
               Defendant.
25

26

27

28

Defendant Wells Fargo Bank, N.A. (the "Bank"), for itself and no other individual or entity, hereby responds to the Third Amended Class Action Complaint in the above-captioned matter as follows:

## INTRODUCTION

1.       Plaintiffs Granja, Campos, Hernandez, White, Teague, Wilson, Hood, Frye, Floyds, and Trevino are among the hundreds of homeowners who lost their homes to foreclosure because Wells Fargo wrongly determined they did not qualify for a mortgage modification.

**ANSWER:**     The Bank denies the allegations in paragraph 1.

2.       This was not an accident, but rather the result of years of a willful and reckless lack of central oversight by Wells Fargo's Board and executive leadership that has led to repeated compliance breakdowns and billions of dollars in government fines.

**ANSWER:**     The Bank denies the allegations in paragraph 2.

3.       For years, Wells Fargo failed to verify or audit its loan modification software to ensure it was properly calculating homeowners' eligibility for government-mandated mortgage modifications. Material errors remained uncorrected in the software for five to eight years, if not longer.

**ANSWER:**     The Bank denies the allegations in paragraph 3.

4.       The federal government cited Wells Fargo in 2011 for failing to adequately audit its mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive leadership promised to implement ongoing testing to ensure that the Bank complied with government requirements in the future. But they failed to live up to that promise and multiple errors in Wells Fargo's decision-making software remained unaddressed.

**ANSWER:**     The Bank denies the allegations in paragraph 4.

5.       Wells Fargo's leadership failed to implement adequate testing even after the government found that another error in the Bank's software had led the Bank to wrongfully deny mortgage modifications in 2013-2014. Wells Fargo was cited again for failing to properly oversee the Bank's mortgage modification and foreclosure operations, but still did nothing to stop others like Plaintiffs from being wrongfully denied mortgage modifications and foreclosed upon.

1    **ANSWER:**    The Bank denies the allegations in paragraph 5.

2         6.         Not until August 2013 did Wells Fargo discover one of the errors that led it to

3    wrongfully deny mortgage modifications to Plaintiffs and hundreds of other homeowners. But rather

4    than coming clean, Wells Fargo kept its discovery secret—likely in an effort to avoid additional

5    government penalties. The government had previously imposed restrictions on Wells Fargo's

6    mortgage servicing business and announced fines, with the amount of the fine and the duration of

7    business restrictions dependent on the length and severity of the Bank's continued non-compliance.

8    Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to

9    hundreds of customers, the government likely would not have lifted its business restrictions in 2016

10   and would have imposed a far more severe penalty than the $70 million fine it ultimately issued.

11   **ANSWER:**    The Bank denies the allegations in paragraph 6.

12        7.         Moreover, despite knowing in 2013 that its mortgage modification software was

13   faulty and had the potential to impact borrowers, Wells Fargo continued to use that faulty software

14   when reviewing borrowers' loans for mortgage modifications. As a result, Wells Fargo wrongfully

15   denied mortgage modifications to Plaintiffs and class members, and in many cases foreclosed on

16   their homes.

17   **ANSWER:**    The Bank denies the allegations in paragraph 7.

18        8.         The Wells Fargo Board's repeated failure to fulfill its oversight responsibilities,

19   despite promising to do so as part of multiple consent decrees, has grown so flagrant—and led to so

20   many scandals and consumer abuses—that in 2018 the Federal Reserve placed an asset-cap on Wells

21   Fargo that will not be lifted until Wells Fargo convinces the government it has finally reformed its

22   central oversight practices. The Federal Reserve's cease-and-desist order has been described as a

23   "Fear of God Penalty," with one expert opining that the Bank is "lucky it is too big to shut down."

24   **ANSWER:**    The Bank admits that the Federal Reserve placed an asset cap on Wells Fargo &

25   Company in 2018.  The Bank denies the remaining allegations in paragraph 8.

26        9.         After the Federal Reserve issued the asset-cap in February 2018, Wells Fargo

27   announced an overhaul of its Board. Wells Fargo has since disclosed to its shareholders what it

28   learned in 2015— that hundreds of its customers were wrongfully and unlawfully denied mortgage

1   modifications, with many of those customers subsequently losing their homes. Following that initial

2   disclosure, Wells Fargo discovered yet another error in its automated decision-making tool, which

3   caused even more homeowners to be wrongfully denied mortgage modifications. Wells Fargo has

4   warned its customers that even more errors and more affected customers may be uncovered as its

5   review continues.

6   **ANSWER:**      The Bank admits that in 2018, it disclosed that a calculation error in its mortgage loan

7   modification underwriting tool led to borrowers being incorrectly denied a trial loan modification,

8   and that for some of those borrowers, a foreclosure was completed.  The Bank denies the remaining

9   allegations in paragraph 9.

10          10.      Although Wells Fargo publicly claims to be turning over a new leaf to make things

11   right for its customers, it is unwilling to fairly compensate the customers whose lives its reckless

12   behavior forever changed. Hundreds lost their homes and yet Wells Fargo told its shareholders it was

13   allocating less than $13,000 per person as remediation. Wells Fargo then twice moved to dismiss this

14   action with prejudice, so that its customers would receive nothing more than it pre-allocated for

15   them. Wells Fargo wants to be the sole arbiter of how much remediation it should pay—with little

16   regard for the financial and emotional devastation its reckless behavior has wrought on Plaintiffs'

17   and class members' lives.

18   **ANSWER:**      The Bank admits that it twice moved to dismiss this action with prejudice.  The Bank

19   denies the remaining allegations in paragraph 10.

20          11.      Plaintiffs seek to hold Wells Fargo and its leadership truly responsible for their

21   repeated and deliberate failure to ensure the Bank was complying with legal requirements. They

22   originally sought certification of a nationwide class of homeowners wrongly denied a mortgage

23   modification; a larger emotional distress class; and several statewide classes that will allow class

24   members to efficiently pursue additional claims under state consumer protection laws.

25   **ANSWER:**      The Bank admits that Plaintiffs originally sought certification of several classes.  The

26   Bank denies that this action may properly be maintained as a class action and denies that Plaintiffs

27   are entitled to any of the relief they seek.  The Bank denies the remaining allegations of paragraph

28   11.

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO THIRD AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

12.   On January 29, 2020, the Court certified the following class limited to the breach of contract claim: "All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), [or] the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure."

**ANSWER:**   The Bank admits that on January 29, 2020, the Court certified the following class limited to the breach of contract claim: "All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), [or] the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure."  The Bank denies that this action may properly be maintained as a class action.

**ANSWER:**

13.   The Court appointed Plaintiffs Debora Granja and Sandra Campos as representatives of the Class.

**ANSWER:**   The Banks admits that the Court appointed Plaintiffs Debora Granja and Sandra Campos as representatives of the Class.  The Bank denies that this action may properly be maintained as a class action.

14.   Plaintiffs also intend to pursue entry of an injunction or other equitable relief sufficient to prevent the continued use of Wells Fargo's unfair practices, and treble and punitive damages pursuant to state law.

**ANSWER:**   The Bank admits that Plaintiffs Teague, Hernandez, and Wilson seek injunctive relief or other equitable relief and treble and punitive damages pursuant to state law.  The Bank denies that

-4-

Plaintiffs are entitled to any of the relief they seek.  The Bank denies the remaining allegations in Paragraph 14.

### JURISDICTION

15.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; in the aggregate, there are more than 100 members in the Class; and at least one class member is a citizen of a state different from any defendant.

**ANSWER:**     No response is required to the legal conclusions of paragraph 15.  To the extent a response is required, the Bank does not dispute the subject matter jurisdiction of this Court under 28 U.S.C. § 1332.

16.     Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendant resides in this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**ANSWER:**     No response is required to the legal conclusion of paragraph 16. To the extent a response is required, the Bank denies the allegations of paragraph 16.

### INTRADISTRICT ASSIGNMENT

17.     Assignment to the Oakland/San Francisco division is proper because Wells Fargo's designated principal place of business is in San Francisco, California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred there.

**ANSWER:**     No response is required to the legal conclusion of paragraph 17. To the extent a response is required, the Bank denies the allegations in paragraph 17.

### PARTIES

18.     Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania. Ms. Hernandez was denied a mortgage modification and her New Jersey condominium was foreclosed upon as a result of the conduct alleged herein.

**ANSWER:**     The Bank admits that Plaintiff Alicia Hernandez is a resident and citizen of Easton, Pennsylvania, upon information and belief.  The Bank also admits that Plaintiff Alicia Hernandez

1    was denied a trial mortgage modification and that the property securing her loan ultimately was

2    foreclosed upon. The Bank denies the remaining allegations in paragraph 18.

3          19.     Plaintiff Debora Granja is a resident and citizen of Eugene, Oregon. Ms. Granja was

4    denied a mortgage modification and her home in Brentwood, California, was foreclosed upon as a

5    result of the conduct alleged herein. The Court appointed Ms. Granja as a class representative.

6    **ANSWER:**     The Bank admits that Plaintiff Debora Granja is a resident and citizen of Eugene,

7    Oregon, upon information and belief.  The Bank also admits that Plaintiff Debora Granja was denied

8    a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.

9    The Bank also admits that the Court appointed Plaintiff Debora Granja as a class representative.  The

10   Bank denies the remaining allegations in paragraph 19.

11         20.     Plaintiff Sandra Campos is a resident and citizen of Paramount, California. Ms.

12   Campos was denied a mortgage modification and her home in Paramount, California, was foreclosed

13   upon as a result of the conduct alleged herein. The Court appointed Ms. Campos as a class

14   representative.

15   **ANSWER:**     The Bank admits that Plaintiff Sandra Campos is a resident and citizen of Paramount,

16   California, upon information and belief. The Bank also admits that Plaintiff Sandra Campos was

17   denied a trial mortgage modification and that the property securing her loan ultimately was

18   foreclosed upon.  The Bank also admits that the Court appointed Plaintiff Sandra Campos as a class

19   representative.  The Bank denies the remaining allegations in paragraph 20.

20         21.     Plaintiff Emma White is a resident and citizen of Jacksonville, Florida. Ms. White

21   was denied a mortgage modification and her home in Callahan, Florida, was foreclosed upon as a

22   result of the conduct alleged herein.

23   **ANSWER:**     The Bank admits that Plaintiff Emma White is a resident and citizen Jacksonville,

24   Florida, upon information and belief.  The Bank also admits that Plaintiff Emma White was denied a

25   trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.

26   The Bank denies the remaining allegations in paragraph 21.

27

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO THIRD AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

22.     Plaintiff Coszetta Teague is a resident and citizen of Homewood, Illinois. Ms. Teague was denied a mortgage modification and her home in Calumet City, Illinois, was foreclosed upon as a result of the conduct alleged herein.

**ANSWER:**    The Bank admits that Plaintiff Coszetta Teague is a resident and citizen of Homewood, Illinois, upon information and belief.  The Bank also admits that Plaintiff Coszetta Teague was denied a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 22.

23.     Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana. Mr. and Mrs. Simoneaux were denied a modification of the mortgage on their Louisiana home as a result of the conduct alleged herein.

**ANSWER:**    The Bank admits that Plaintiffs Russell and Brenda Simoneaux are residents and citizens of Baton Rouge, Louisiana, upon information and belief. The Bank also admits that Plaintiffs Russell and Brenda Simoneaux were denied a trial mortgage modification. The Bank denies the remaining allegations in paragraph 23.

24.     Plaintiff Rose Wilson is a resident and citizen of New York. Ms. Wilson was denied a mortgage modification and her New York home was foreclosed upon as a result of the conduct alleged herein.

**ANSWER:**    The Bank admits that Plaintiff Rose Wilson is a resident and citizen of New York, upon information and belief. The Bank also admits that Plaintiff Rose Wilson was denied a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon. The Bank denies the remaining allegations in paragraph 24.

25.     Plaintiff Tiffanie Hood is a resident and citizen of Ohio. Ms. Hood was denied a mortgage modification and her Ohio home was foreclosed upon as a result of the conduct alleged herein.

**ANSWER:**    The Bank admits that Plaintiff Tiffanie Hood is a resident and citizen of Ohio, upon information and belief.  The Bank also admits that Plaintiff Tiffanie Hood was denied a trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph 25.

1      26.    Plaintiffs George and Cyndi Floyd are residents and citizens of Philadelphia,

2  Pennsylvania. The Floyds were denied a mortgage modification and their house in Lancaster,

3  Pennsylvania, was foreclosed upon as a result of the conduct alleged herein.

4  **ANSWER:**    The Bank admits that Plaintiffs George and Cyndi Floyd are residents and citizens of

5  Philadelphia, Pennsylvania, upon information and belief.  The Bank also admits that Plaintiffs

6  George and Cyndi Floyd were denied a trial mortgage modification and that the property securing

7  their loan ultimately was foreclosed upon.  The Bank denies the remaining allegations in paragraph

8  26.

9      27.    Plaintiff Troy Frye is a resident and citizen of Georgia. Mr. Frye was denied a

10  mortgage modification and his home in Hephzibah, Georgia was foreclosed upon as a result of the

11  conduct alleged herein.

12  **ANSWER:**    The Bank admits that Plaintiff Troy Frye is a resident and citizen of Georgia, upon

13  information and belief.  The Bank also admits that Plaintiff Troy Frye was denied a trial mortgage

14  modification and that the property securing his loan ultimately was foreclosed upon. The Bank

15  denies the remaining allegations in paragraph 27.

16      28.    Plaintiff Diana Trevino is a resident and citizen of Richardson, Texas. Ms. Trevino

17  was denied a mortgage modification and her Texas home was foreclosed upon as a result of the

18  conduct alleged herein.

19  **ANSWER:**    The Bank admits that Plaintiff Diana Trevino is a resident and citizen of Richardson,

20  Texas, upon information and belief.  The Bank also admits that Plaintiff Diana Trevino was denied a

21  trial mortgage modification and that the property securing her loan ultimately was foreclosed upon.

22  The Bank denies the remaining allegations in paragraph 28.

23      29.    Wells Fargo & Company (WFC), is a Delaware corporation headquartered in San

24  Francisco, California, and a registered bank holding company that owns and controls Defendant

25  Wells Fargo Bank, N.A.

26  **ANSWER:**    The Bank admits that Wells Fargo & Company is a registered bank holding company

27  and a Delaware corporation headquartered in San Francisco, California.  The Bank denies the

28  remaining allegations in paragraph 29.

30.     Defendant Wells Fargo Bank, N.A., is a national banking association with its main office in Sioux Falls, South Dakota, and designated principal place of business in San Francisco, California.

**ANSWER:**     The Bank admits that it is a national banking association with its main office in Sioux Falls, South Dakota. The Bank denies the remaining allegations in paragraph 30.

31.     Defendant, along with Wells Fargo & Company, shared responsibility for ensuring that the Bank's operations were properly tested to ensure compliance with HAMP and other government requirements, with ultimate responsibility lying with WFC's Board of Directors, and its Audit & Examination Committee in particular. There also exists a high-degree of built-in overlap between Wells Fargo and WFC due to the fact that WFC owns and controls the Bank, and that the Bank directors responsible for ensuring compliance with HAMP and other government requirements were also WFC executives and/or directors.

**ANSWER:**     The Bank admits that Plaintiffs use "WFC" to refer to Wells Fargo & Company and "Bank" to refer to Wells Fargo Bank, N.A. The Bank denies the remaining allegations in paragraph 31.

## FACTUAL ALLEGATIONS

### A.     Wells Fargo Wrongfully Forecloses on Its Customers' Homes

32.     Plaintiffs are among the millions of homeowners who had trouble making ends meet during the Great Recession. They fell behind on their mortgage payments and needed help to avoid losing their homes.

**ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 32 and, on that basis, denies the allegations of paragraph 32.

33.     The Home Affordable Modification Program (HAMP) was designed to provide the very help that Plaintiffs and class members needed. Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

-9-

1  **ANSWER:**   The Bank admits that the Home Affordable Modification Program ("HAMP") was

2  introduced pursuant to the Emergency Economic Stabilization Act of 2008.  The Bank denies the

3  remaining allegations in paragraph 33.

4      34.   Similar threshold requirements were incorporated into the mortgage modification

5  requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac,

6  and the Federal Housing Administration (FHA).

7  **ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth

8  or falsity of the allegations of paragraph 34 and, on that basis, denies the allegations of paragraph 34.

9      35.   Plaintiffs and class members met the threshold requirements for a mortgage

10  modification and as their mortgage servicer, Wells Fargo was required to offer them a loan

11  modification. Wells Fargo failed to do so, however, and instead foreclosed on ten Plaintiffs and more

12  than five hundred other class members who could not make their monthly payments without a

13  modification.

14  **ANSWER:**   The Bank denies the allegations in paragraph 35.

15      36.   Another three hundred borrowers were just able to stave off foreclosure, but not

16  without overcoming numerous financial and emotional difficulties that could have been avoided if

17  Wells Fargo had lowered their mortgage payments as HAMP and other GSEs required.

18  **ANSWER:**   The Bank denies the allegations in paragraph 36.

19      **B.**   **Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over**
20  **a Period of at Least 8 Years**

21      37.   Wells Fargo has only recently acknowledged that it wrongfully denied Plaintiffs and

22  class members mortgage loan modifications to which they were entitled under HAMP and other

23  government requirements.

24  **ANSWER:**   The Bank denies the allegations in paragraph 37.

25      38.   In form letters sent to Plaintiffs and class members in late 2018, Wells Fargo claimed

26  that its decision was based on a "faulty calculation." The problem goes much deeper than a single

27  miscalculation, however, and reflects the same type of extreme and outrageous conduct that has

28  embroiled Wells Fargo in a string of public scandals.

1    **ANSWER:**     The Bank admits that letters to Plaintiffs in 2018 stated that the Bank based its

2    decision on a faulty calculation.  The Bank denies the remaining allegations in paragraph 38.

3         39.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its

4    automated decision-making tool. This software determined customers' eligibility for a government-

5    mandated mortgage modification during a time of extreme financial distress. Its importance to these

6    customers' lives cannot be overstated. Yet Wells Fargo not only failed to verify that its software was

7    correctly calculating whether customers met threshold requirements for a mortgage modification, it

8    failed to regularly and properly audit the software for compliance with government requirements—

9    allowing life-changing errors to remain uncorrected for years on end.

10   **ANSWER:**     The Bank denies the allegations in paragraph 39.

11        40.     Wells Fargo was not required to develop its own tool to calculate whether its

12   customers were eligible for government-mandated mortgage modifications. The government

13   provided a free software tool for mortgage servicers to use in determining whether homeowners met

14   threshold requirements. If Wells Fargo was not going to properly verify and audit its own software,

15   it could have—and should have—used the free software instead.

16   **ANSWER:**     The Bank denies the allegations in paragraph 40.

17        41.     As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank

18   repeatedly violated HAMP and other government requirements over a period of at least eight years

19   and denied Plaintiffs and class members mortgage modifications that the Bank was legally required

20   to offer.

21   **ANSWER:**     The Bank denies the allegations in paragraph 41.

22        **C.    Wells Fargo's Leadership Fails to Implement Adequate Testing Even After**
          **Promising to Do So as Part of 2011 Consent Decrees**
23

24        42.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a

25   2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies

26   in the Bank's mortgage modification and foreclosure practices.

27   **ANSWER:**     The Bank denies the allegations in paragraph 42.

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO THIRD AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

1   43.   The OCC found, among other things, that the Bank had failed to devote adequate

2   oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to

3   adequately audit its foreclosure procedures.

4   **ANSWER:**   To the extent paragraph 43 purports to describe specific findings by the OCC, the

5   Bank refers to those findings for a complete statement of their terms.  The Bank denies the

6   allegations of paragraph 43 to the extent they are inconsistent therewith.

7   44.   Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of

8   which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors

9   of Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution

10   passed by WFC's Board of Directors.

11   **ANSWER:**   The Bank admits that its Board of Directors signed a document entitled "Consent

12   Order" with the OCC on March 31, 2011 in the matter of *Wells Fargo Bank, N.A., Sioux Falls, South*

13   *Dakota*, AA-EC-11-19 (the "Bank's 2011 OCC Consent Order").  To the extent paragraph 44

14   purports to describe the specific contents of the Bank's 2011 OCC Consent Order, the Bank refers to

15   that document for a complete statement of its terms.  The Bank denies the allegations of paragraph

16   44 to the extent they are inconsistent with the terms of the Bank's 2011 OCC Consent Order.

17   45.   Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and

18   controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with

19   HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were

20   regularly reviewed and any deficiencies promptly detected and remedied. The Bank also promised to

21   maintain a Compliance Committee of board members to monitor its ongoing compliance with the

22   Consent Order.

23   **ANSWER:**   To the extent paragraph 45 purports to describe the specific contents of the Bank's

24   2011 OCC Consent Order, the Bank refers to that document for a complete statement of its terms.

25   The Bank denies the allegations of paragraph 45 to the extent they are inconsistent with the terms of

26   the Bank's 2011 OCC Consent Order.

27   46.   In one of the consent orders, the Federal Reserve specifically ordered WFC's Board

28   of Directors to take steps to ensure the Bank complied with its obligations under the consent orders,

-12-

1   including by strengthening the Board's oversight of compliance with HAMP and other government

2   requirements; to ensure that audit and compliance programs were adequately staffed; and to improve

3   the information and reports that would be regularly reviewed by WFC's Board of Directors.

4   **ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth

5   or falsity of the allegations of paragraph 46, and, on that basis, denies the allegations of paragraph

6   46.

7         47.   Wells Fargo subsequently reported to the Federal Reserve that the Bank's

8   Compliance Committee was meeting as required, that the Audit & Examination Committee of

9   WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance

10   based on improved reporting, and that WFC's Chief Operational Risk Officer was providing both the

11   Compliance Committee and the Audit & Examination Committee with the necessary information

12   and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure

13   practices and ensure compliance with HAMP and other government requirements.

14   **ANSWER:**   To the extent paragraph 47 purports to describe the specific contents of the Bank's

15   reports to the Federal Reserve, the Bank refers to those reports for a complete statement of their

16   contents.  The Bank denies the allegations of paragraph 47 to the extent they are inconsistent with

17   the Bank's reports to the Federal Reserve.

18         48.   Together, Wells Fargo's executives and board members—in particular, Wells Fargo's

19   Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—

20   were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any

21   violations of HAMP and other government requirements. They repeatedly failed to fulfill these

22   obligations over the course of several years, however—in violation of the promises they made in the

23   2011 Consent Order and in callous disregard of the well-being of their customers.

24   **ANSWER:**   The Bank denies the allegations in paragraph 48.

25         49.   Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June

26   2015, the OCC found that the Bank was still in continuing noncompliance. Among other things, the

27   OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and

28   other government requirements; had not ensured that the Bank's audit and compliance programs had

-13-

the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage

modification and foreclosure practices would be identified and promptly remedied; and had not

ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other

government requirements, to modify delinquent mortgage loans and prevent foreclosures of its

customers' homes.

**ANSWER:**     The Bank admits that its Board of Directors signed a document entitled "Consent

Order Amending the 2011 Consent Order and 2013 Amendment to the 2011 Consent Order" with

the OCC on June 9, 2015 in the matter of *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, which

amended AA-EC-11-19 and #2013-132 (the "Bank's 2015 OCC Consent Order").  To the extent

paragraph 49 purports to describe the specific contents of the Bank's 2015 OCC Consent Order, the

Bank refers to that document for a complete statement of its terms.  The Bank denies the allegations

of paragraph 49 to the extent they are inconsistent with the terms of the Bank's 2015 OCC Consent

Order.

### D.     Wells Fargo Conceals Its Discovery of One of the Systematic Errors from Regulators and Consumers

50.     In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC

prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo

brought its operations into compliance with an amended consent order. The OCC also stated that it

would be taking additional action against Wells Fargo, the nature and severity of which would

depend on the nature, length, and severity of the Bank's continued noncompliance with the amended

consent order.

**ANSWER:**     To the extent paragraph 50 purports to describe the specific contents of the Bank's

2015 OCC Consent Order, the Bank refers to that document for a complete statement of its terms.

The Bank denies the allegations of paragraph 50 to the extent they are inconsistent with the terms of

the Bank's 2015 OCC Consent Order.

51.     As a result of Wells Fargo's continuing failure to implement adequate auditing and

compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software

that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013

1   and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells

2   Fargo to pay a civil money penalty of $70 million.

3   **ANSWER:**   The Bank denies the allegations in paragraph 51, except it admits that it executed a

4   document entitled "Consent Order for a Civil Monetary Penalty" on May 17, 2016 in the matter of

5   *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-2016-30 (the "Bank's 2016 Consent

6   Order").

7         52.   Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage

8   modification software in August 2013—*one of the errors at issue in this case*—which caused the

9   Bank to wrongly deny mortgage modifications to 625 customers. Well Fargo decided not to tell

10   anybody it had discovered this error—likely as part of an effort to avoid a larger penalty from the

11   OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent

12   Order and lift the business restrictions it had imposed in 2015.

13   **ANSWER:**   The Bank denies the allegations in paragraph 52.

14         53.   The Bank's seven-member Board of Directors, each of whom also served on WFC's

15   Board of Directors, signed the stipulation under which the Bank accepted the $70 million penalty

16   and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184

17   customers in 2013-2014. These directors did not disclose that the Bank had discovered another

18   error—either because their oversight was so non-existent that they did not know, or because they

19   chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC

20   lifted the business restrictions it had imposed on the Bank.

21   **ANSWER:**   The Bank denies the allegations in paragraph 53.

22         54.   To make matters worse, even after discovering the 2013 error, Wells Fargo still did

23   not reform its auditing and verification practices. Related errors that would affect an additional 145

24   customers were not discovered until five years later.

25   **ANSWER:**   The Bank denies the allegations in paragraph 54.

26

27

28

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO THIRD AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

**E.    Wells Fargo's Repeated Failure to Test Its Automated Tool Stems from the Company's Chronic and Intentional Lack of Central Oversight**

55.    The failure of Wells Fargo's executives and board members to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Wells Fargo's leaders intentionally abandoned their oversight responsibilities—and did so to a shocking degree.

**ANSWER:**    The Bank denies the allegations in paragraph 55.

56.    The most notorious example is the fraudulent account scandal uncovered in 2016, when it was revealed that Wells Fargo employees were encouraged to sign up customers for some 3.5 million checking and credit card accounts without their knowledge. Wells Fargo was fined $185 million by federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce) were fired for their involvement in the scandal.

**ANSWER:**    The Bank admits that it was fined $185 million by various entities, including some of its federal regulators.  The Bank denies the remaining allegations in paragraph 56.

57.    The fraudulent account scandal also involved the Audit & Examination Committee, which ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an institutional investor's request that the Board address its lack of comprehensive audit procedures and adjust compensation policies to discourage abusive sales practices. The two executives most associated with the fraudulent account scandal—John G. Stumpf and Carrie L. Tolstedt—were signatories to one of the 2011 consent orders discussed above and among those responsible for Wells Fargo's failure to comply with the orders by implementing adequate auditing and compliance procedures.

**ANSWER:**    The Bank admits that John G. Stumpf and Carrie L. Tolstedt signed the Bank's 2011 OCC Consent Order. The Bank denies the remaining allegations in paragraph 57.

58.    This case and the fraudulent account scandal are far from the only examples of Wells Fargo's Board and executive leadership abdicating their oversight responsibilities. Wells Fargo's Board and executive leadership have consistently ignored unlawful practices throughout the Bank's

lending divisions, leading to an unprecedented series of government fines. To give just a few more examples:

1.      In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage lending practices discriminated against African-American and Hispanic borrowers

2.      In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses

3.      In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had misrepresented the quality of mortgage loans it sold to Freddie Mac

4.      In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for falsely certifying that mortgage loans were eligible for FHA insurance

5.      In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations that it engaged in illegal student loan servicing practices

6.      In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing insurance on its auto-loan customers (often leading to wrongful vehicle repossessions) and charging its mortgage-loan customers excessive rate-lock fees

7.      In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it engaged in a variety of improper practices, including selling customers renters' and life insurance they did not ask for and overcharging for GAP auto insurance

**ANSWER:**     To the extent paragraph 58 purports to describe the terms of various settlements, the Bank refers to those settlements for a complete statement of their terms.  The Bank denies the allegations of paragraph 58 to the extent they are inconsistent with those settlements.  The Bank also denies the allegations made in the matters underlying those settlements.

59.      Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law."

**ANSWER:**     The Bank denies the allegations in paragraph 59.

1    60.    Wells Fargo's persistent failure to implement adequate auditing and compliance

2    procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018,

3    the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its

4    business until it sufficiently improves its governance and controls.

5    **ANSWER:**    The Bank denies the allegations in paragraph 60.

6    61.    In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that

7    Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that

8    senior management had maintained an adequate risk management framework, which resulted in

9    weak compliance practices.

10   **ANSWER:**    To the extent paragraph 61 purports to describe the contents of the "Order to Cease

11   and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended" in the

12   matter of *Wells Fargo & Company, San Francisco, California*, Docket No. 18-007-B-HC (the "2018

13   Order"), the Bank refers to the 2018 Order for a complete statement of its terms. The Bank denies

14   the allegations of paragraph 61 to the extent they are inconsistent with the terms of the 2018 Order.

15   62.    Wells Fargo was ordered to submit a plan for reforming Board oversight and

16   governance, including steps that it will take to hold senior management accountable, maintain a

17   management structure that promotes effective oversight and compliance control, and ensure the

18   comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance

19   control program.

20   **ANSWER:**    To the extent paragraph 62 purports to describe the contents of the 2018 Order, the

21   Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations

22   of paragraph 62 to the extent they are inconsistent with the terms of the 2018 Order.

23   63.    Wells Fargo was also ordered to submit a plan for reforming its firm-wide

24   compliance program, which must include effective testing and validation measures for compliance

25   with applicable laws.

26   **ANSWER:**    To the extent paragraph 63 purports to describe the contents of the 2018 Order, the

27   Bank refers to the 2018 Order for a complete statement of its terms. The Bank denies the allegations

28   of paragraph 63 to the extent they are inconsistent with the terms of the 2018 Order.

64.     Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger.

**ANSWER:**     To the extent paragraph 64 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations of paragraph 64 to the extent they are inconsistent with the terms of the 2018 Order.

65.     As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

**ANSWER:**     To the extent paragraph 65 purports to describe the contents of specific articles or writings, the Bank refers to those writings for a complete statement of their contents.

**F.     Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors**

66.     A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error. Wells Fargo wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. Wells Fargo also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

**ANSWER:**     To the extent paragraph 66 purports to describe the contents of Wells Fargo & Company's Form 10-Q for the quarterly period ended June 30, 2018 (the "Q2 2018 10-Q"), the Bank refers to that document for a complete statement of its contents. The Bank denies the allegations of paragraph 66 to the extent they are inconsistent with the contents of the Q2 2018 10-Q.

67.     Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

-19-

1   **ANSWER:**     To the extent paragraph 67 purports to describe the contents of Wells Fargo &

2   Company's Form 10-Q for the quarterly period ended September 30, 2018 (the "Q3 2018 10-Q"),

3   the Bank refers to that document for a complete statement of its contents.  The Bank denies the

4   allegations of paragraph 67 to the extent they are inconsistent with the contents of the Q3 2018 10-Q.

5       68.     Wells Fargo's long-overdue review of its automated mortgage modification software

6   is apparently still not complete. In its recently filed 10-K Annual Report, Wells Fargo disclosed to

7   shareholders that the "effort to identify other instances in which customers may have experienced

8   harm is ongoing, and it is possible that we may identify other areas of potential concern."

9   **ANSWER:**     To the extent paragraph 68 purports to describe the contents of Wells Fargo &

10  Company's 2018 Form 10-K, the Bank refers to that document for a complete statement of its

11  contents.  The Bank denies the allegations of paragraph 68 to the extent they are inconsistent with

12  the contents of Wells Fargo & Company's 2018 Form 10-K.  The bank denies Plaintiffs' allegation

13  of a "long-overdue review of its mortgage modification software."

14      69.     In late 2018, Wells Fargo began sending form letters to the customers affected by the

15  errors in its automated decision-making tools. The letters typically included a check for around

16  $15,000, and informed customers that if they were not satisfied with that amount, they could

17  consider mediation through a third-party mediator that Wells Fargo has retained.

18  **ANSWER:**     The Bank admits that it began a voluntary remediation program in the fall of 2018,

19  and that the remediation program included payments to borrowers and invited them to participate in

20  cost-free, voluntary, and non-binding mediation if they believed their concerns had not been

21  sufficiently addressed.  The Bank denies the remaining allegations in paragraph 69.

22      70.     The amounts that Wells Fargo is offering its customers is nowhere near enough to

23  compensate them for the damage that Wells Fargo's conduct caused them, and indicates that while

24  Wells Fargo wants the Federal Reserve to believe it has changed its ways, the company is unwilling

25  to accept full responsibility for the life-altering consequences its behavior has wrought.

26  **ANSWER:**     The Bank denies the allegations in paragraph 70.

27      71.     As a result of Wells Fargo's conduct, the lives of Plaintiffs and class members have

28  been irrevocably altered. Their damages include loss of their homes; loss of equity in their homes;

-20-

loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments; stress- related illnesses; broken marriages; children coping with the financial and emotional consequences of their parents losing the family home; and severe emotional distress.

**ANSWER:**     The Bank denies the allegations in paragraph 71.

### PLAINTIFFS' EXPERIENCES

#### 1.     Debora Granja (California)

72.     Plaintiff and class representative Debora Granja purchased her home, located in Brentwood, California, with her then-husband in 2004. The couple eventually had three daughters living with them and put substantial time and money into making the house their own. Wells Fargo became Ms. Granja's mortgage lender following a refinance in 2006.

**ANSWER:**     The Bank admits that it became Plaintiff Debora Granja's mortgage lender in 2006, after she refinanced her existing mortgage loan.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 72, and, on that basis, denies the remaining allegations of paragraph 72.

73.     Around 2009, Ms. Granja's husband lost his job as a landscaping manager. Ms. Granja, who had been working only part-time, returned to full-time work to support her family.

**ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 73, and, on that basis, denies the allegations of paragraph 73.

74.     Ms. Granja began seeking a loan modification from Wells Fargo in 2010. Each time she called Wells Fargo, she spoke to a different representative. Initially, the representatives told her that she would easily qualify for a modification based on her circumstances. Ms. Granja tried submitting her loan modification application numerous times. Each time, Wells Fargo would claim it lost her paperwork and would ask her to resend it.

1    **ANSWER:**     The Bank admits that Ms. Granja began seeking a trial loan modification from the

2    Bank in 2010.  The Bank denies the remaining allegations in paragraph 74.

3          75.     Eventually, around 2012, Wells Fargo representatives falsely told Ms. Granja that she

4    did not qualify for a modification. The Bank ultimately foreclosed on her house in 2014 and Ms.

5    Granja was forced to find a rental home for her family. Her daughters had to change schools and

6    leave the only environment they knew.

7    **ANSWER:**     The Bank admits that a foreclosure was completed on the property securing Ms.

8    Granja's loan.  The Bank denies that its representatives "falsely told Ms. Granja that she did not

9    qualify for a loan modification."  The Bank lacks knowledge and information sufficient to form a

10   basis as to the truth or falsity of the remaining allegations of paragraph 75, and, on that basis, denies

11   the remaining allegations of paragraph 75.

12         76.     Wells Fargo's failure to grant Ms. Granja a loan modification caused great strain on

13   her marriage. Ms. Granja and her husband legally separated around the time of the foreclosure. The

14   stress of the foreclosure also severely affected Ms. Granja's health. She was diagnosed with severe

15   depression in 2013. Four years later, Ms. Granja was diagnosed with acute traumatic stress disorder.

16   Her breakdown was triggered by a minor car accident but caused by an accumulation of stress over

17   recent years, including from the foreclosure.

18   **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth

19   or falsity of the allegations of paragraph 76, and, on that basis, denies the allegations of paragraph

20   76.

21         77.     In September 2018, Ms. Granja's ex-husband received a letter from Wells Fargo

22   informing him and Ms. Granja that their mortgage modification should have been approved but was

23   not approved due to an error. He notified Ms. Granja of the letter and she contacted Wells Fargo to

24   provide it with her contact information. Ms. Granja was one of the customers wrongly denied a

25   mortgage modification because of systematic errors in Wells Fargo's automated decision-making

26   tool.

27   **ANSWER:**     The Bank denies that "Ms. Granja was one of the customers wrongly denied a

28   mortgage modification because of systematic errors in Wells Fargo's automated decision-making

1   tool." The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity

2   of the remaining allegations of paragraph 77, and, on that basis, denies the remaining allegations of

3   paragraph 77.

4           78.      As a result of Wells Fargo's repeated failure to properly test its automated decision-

5   making tool, Ms. Granja's life has been irrevocably altered. Her injuries include loss of her family's

6   home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

7   loss of appreciation in her home's value following the sale; loss of time and money spent to find

8   replacement housing and move her family; loss of time and money spent in an effort to avoid

9   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

10  **ANSWER:**   The Bank denies the allegations in paragraph 78.

11                    **2.      Sandra Campos (California)**

12          79.      Plaintiff and class representative Sandra Campos, with her husband Alfonso,

13  purchased a home for their family in Paramount, California, in 2008. The purchase was financed

14  with a mortgage loan from Wells Fargo. The couple moved into the home with their three children,

15  who ranged in age from about four to 12 years old, and Ms. Campos's mother, who was about 67

16  years old at the time.

17  **ANSWER:**   The Bank admits that Sandra and Alfonso Campos purchased a home in Paramount,

18  California in 2008.  The Bank admits that Sandra and Alfonso Campos financed their purchase of

19  the subject property through a mortgage loan with the Bank.   The Bank lacks knowledge and

20  information sufficient to form a basis as to the truth or falsity of the remaining allegations of

21  paragraph 79, and, on that basis, denies the allegations of paragraph 79.

22          80.      Mr. Campos is handy and made many valuable improvements to the home. These

23  included painting the exterior of the home and installing a new roof and plumbing.

24  **ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth

25  or falsity of the allegations of paragraph 80, and, on that basis, denies the allegations of paragraph

26  80.

27

28

1    81.    In around August of 2010, Ms. Campos lost her job as an office assistant. She

2  received unemployment insurance for a few months, but when that was exhausted, she and her

3  husband had difficulty making the mortgage payments on their home.

4  **ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth

5  or falsity of the allegations of paragraph 81, and, on that basis, denies the allegations of paragraph

6  81.

7    82.    Ms. Campos approached Wells Fargo to find out what programs were available to

8  help her family avoid foreclosure and remain in their beloved home. The Camposes were offered a

9  forbearance agreement which featured temporarily lower mortgage payments, and the Camposes did

10  their best to make the required payments over the course of several months. However, the payments

11  then returned to their previous level, which the Camposes again had difficulty making.

12  **ANSWER:**    The Bank admits that it offered the Camposes several forbearance agreements, the

13  terms of which speak for themselves, and that the Camposes did not comply with those forbearance

14  agreements.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or

15  falsity of the remaining allegations of paragraph 82, and, on that basis, denies the remaining

16  allegations of paragraph 82.

17    83.    For the next several years, the Camposes tried to get a modification of their mortgage

18  that would result in a manageable payment that would allow them to remain in their home. Despite

19  these continued efforts, they were never granted a mortgage modification that provided them

20  affordable payments. The Bank ultimately foreclosed on their house in or around February 2014.

21  **ANSWER:**    The Bank admits that it foreclosed on the subject property in or around February 2-

22  14.  The Bank denies the remaining allegations in paragraph 83.

23    84.    In around April of 2014, sheriffs knocked on the door of the Campos home and told

24  the Camposes that their home had been sold at a foreclosure sale and they had five days to vacate the

25  premises. Ms. Campos was very lucky to find a rental home for her family, as the foreclosure and

26  associated damage to her credit made it very difficult to find a landlord willing to rent to her and her

27  husband.

28

**ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 84, and, on that basis, denies the allegations of paragraph 84.

85.    Ms. Campos eventually found a home to rent, but it was much smaller than the home she had lost and in a less desirable part of Paramount. Ms. Campos's daughters went from having their own rooms to sharing a room in the rental home, and Ms. Campos's mother was forced to find her own accommodations because the rental home didn't have room for her. The Campos children lost their neighborhood friends and had to start over in an unfamiliar part of town.

**ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 85, and, on that basis, denies the allegations of paragraph 85.

86.    In or around September 2018, Ms. Campos received a letter from Wells Fargo informing her and Mr. Campos that their mortgage modification should have been approved but was not approved due to an error. Ms. Campos was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

**ANSWER:**   The Bank admits that Ms. Campos received a letter from the Bank in or around September 2018, upon information and belief.  To the extent paragraph 86 purports to describe the contents of that letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations of paragraph 86 to the extent they are inconsistent with the contents of the letter. The Bank also denies that "Ms. Campos was one of the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool."

87.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Campos's life has been irrevocably altered. Her injuries include loss of her family's home and the time and money put into that home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following the sale; loss of time and money spent to find replacement housing and move her family; loss of time and money spent in an effort to avoid foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

1    **ANSWER:**    The Bank denies the allegations in paragraph 87.

2        **3.    Emma White (Florida)**

3        88.    Plaintiff Emma White purchased her home, located in Callahan, Florida, in 2006. She

4    was a single mother who moved into the house with her four children. The property was purchased

5    through a mortgage loan that Wells Fargo later acquired.

6    **ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth

7    or falsity of the allegations of paragraph 88, and, on that basis, denies the allegations of paragraph

8    88.

9        89.    Around 2009, Ms. White began experiencing financial hardship. She had

10   accumulated debt supporting her children and applied for a mortgage loan modification so that the

11   family could keep their home. The loan modification process was long and complicated. Ms. White

12   kept having to send in the same paperwork over and over again, only to ultimately receive a letter

13   from Wells Fargo in 2013 saying that she did not qualify for a modification.

14   **ANSWER:**    The Bank denies that Ms. White received a letter from the Bank in 2013 "saying that

15   she did not qualify for a modification." The Bank lacks knowledge and information sufficient to

16   form a basis as to the truth or falsity of the remaining allegations of paragraph 89, and, on that basis,

17   denies the remaining allegations of paragraph 89.

18       90.    Wells Fargo had already initiated foreclosure proceedings, so after it denied her

19   request for a mortgage modification, Ms. White was forced to leave her house. She found a rental

20   apartment in Jacksonville, Florida, for her and three of her children, while Wells Fargo completed its

21   foreclosure of their old home.

22   **ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth

23   or falsity of the allegations of paragraph 90, and, on that basis, denies the allegations of paragraph

24   90.

25       91.    Wells Fargo's actions caused Ms. White significant emotional distress. The

26   foreclosure devastated her, especially because she had to support her children and work to make sure

27   the family had a place to live. Ms. White had been suffering from the stress of supporting her

28   children and other recent events in her life, and the foreclosure multiplied that stress. As a result of

-26-

1    everything that was going on in her life, including the foreclosure, Ms. White was diagnosed with

2    depression and began taking antidepressants. Ms. White's children were also affected by the

3    foreclosure. She had to explain to them that she tried her best to keep the house, but ultimately could

4    not do so.

5    **ANSWER:**    The Bank denies the allegations in paragraph 91.

6        92.    In late 2018, Ms. White received a letter from Wells Fargo informing her that her

7    mortgage modification should have been approved but was not approved due to an error. Ms. White

8    was one of the customers wrongly denied a mortgage modification because of systematic errors in

9    Wells Fargo's automated decision-making tool.

10    **ANSWER:**    The Bank admits that Ms. White received a letter from the Bank in the fall of 2018,

11    upon information and belief.  To the extent paragraph 92 purports to describe the contents of that

12    letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

13    the allegations of paragraph 92 to the extent they are inconsistent with the contents of the letter.  The

14    Bank denies that "Ms. White was one of the customers wrongly denied a mortgage modification

15    because of systematic errors in Wells Fargo's automated decision-making tool."

16        93.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

17    making tool, Ms. White's life has been irrevocably altered. Her injuries include loss of her family's

18    home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

19    loss of appreciation in her home's value following the sale; loss of time and money spent to find

20    replacement housing and move her family; loss of time and money spent in an effort to avoid

21    foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

22    **ANSWER:**    The Bank denies the allegations in paragraph 93.

23        **4.    Troy Frye (Georgia)**

24        94.    In 2009, Mr. Frye bought a home in Hephzibah, GA for himself and his partner, their

25    two young sons (who were about five and seven years old at the time), and his partner's daughter.

26    **ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth

27    or falsity of the allegations of paragraph 94, and, on that basis, denies the allegations of paragraph

28    94.

95.     Around the beginning of 2013, Mr. Frye was laid off from his job at a local manufacturing plant where he had been employed for about eight to ten years. He applied for and received unemployment assistance, but still was not able to make the monthly mortgage payments on his home. He reached out to Wells Fargo (his mortgage servicer), to see if they would grant him a mortgage modification, which they did in late February 2013.

**ANSWER:**     The Bank admits that it entered into a document entitled "Loan Modification Agreement" with Mr. Frye in February 2013.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 95, and, on that basis, denies the remaining allegations of paragraph 95.

96.     Unfortunately, Mr. Frye's new monthly mortgage payment was not significantly lower, and Mr. Frye continued to have difficulty making his payments. He attempted to get a second modification from Wells Fargo, but this time he was denied—both verbally and in writing. Wells Fargo then initiated foreclosure proceedings.

**ANSWER:**     The Bank admits that Mr. Frye attempted to get a second trial loan modification and that his request for a trial modification was denied.  The Bank also admits that it initiated foreclosure proceedings.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 96, and, on that basis, denies the remaining allegations of paragraph 96.

97.     The strain of Mr. Frye's financial hardship, coupled with the uncertainty and stress of the impending foreclosure, had a big impact on Mr. Frye and his family. The relationship between Mr. Frye and the mother of his children became very strained, and in 2014, she moved out with their two boys and her daughter, leaving Mr. Frye alone in the home.

**ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 97, and, on that basis, denies the allegations of paragraph 97.

98.     Mr. Frye was able to delay foreclosure proceedings for a while, but Wells Fargo persisted in their efforts to remove him from his home. Around the beginning of 2015, Wells Fargo asked him how much they would need to pay him to leave. Confused and frustrated by the situation,

-28-

1  Mr. Frye said he would accept $2,000. The house had recently been damaged by a kitchen fire that
2  broke out while Mr. Frye was sleeping, and from which he was fortunate to escape with his life. He
3  accepted the $2,000 from Wells Fargo and moved out, as the house was no longer habitable.

4  **ANSWER:**     The Bank admits that it provided Mr. Frye $2,000 in relocation assistance. The Bank
5  denies that it "persisted" in "efforts to remove him from his home."  The Bank lacks knowledge and
6  information sufficient to form a basis as to the truth or falsity of the remaining allegations of
7  paragraph 98, and, on that basis, denies the remaining allegations of paragraph 98.

8          99.     Mr. Frye and his children suffered emotional trauma and depression as a result of the
9  foreclosure and the effects that it had on their lives. They all tried to move on as best they could.

10  **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth
11  or falsity of the allegations of paragraph 99, and, on that basis, denies the allegations of paragraph
12  99.

13         100.     In late 2018, Mr. Frye received a letter from Wells Fargo informing him that his
14  second mortgage modification request should have been approved but was not approved due to an
15  error. Mr. Frye was one of the customers wrongly denied a mortgage modification because of
16  systematic errors in Wells Fargo's automated decision-making tool.

17  **ANSWER:**     The Bank admits that Mr. Frye received a letter from the Bank in the fall of 2018,
18  upon information and belief.  To the extent paragraph 100 purports to describe the contents of that
19  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies
20  the allegations of paragraph 100 to the extent they are inconsistent with the contents of the letter.
21  The Bank denies that "Mr. Frye was one of the customers wrongly denied a mortgage modification
22  because of systematic errors in Wells Fargo's automated decision-making tool."

23         101.     As a result of Wells Fargo's repeated failure to properly test its automated decision-
24  making tool, Mr. Frye's life has been irrevocably altered. His injuries include loss of his family's
25  home and the time and money put into that home; loss of equity in his home; loss of tax benefits;
26  loss of appreciation in his home's value; loss of time and money spent to find replacement housing
27  and move his family; loss of time and money spent in an effort to avoid foreclosure; damage to his
28  credit and resulting opportunity costs; and severe emotional distress.

1    **ANSWER:**    The Bank denies the allegations in paragraph 101.

2              **5.**    **Coszetta Teague (Illinois)**

3         102.    Plaintiff Coszetta Teague purchased a home in Calumet City, Illinois, for herself and

4    her daughter, Iesha Brown, in June 2010. Ms. Teague's two young grandchildren moved in shortly

5    thereafter. The property was purchased through a mortgage loan with Wells Fargo.

6    **ANSWER:**    The Bank admits that Ms. Teague financed her purchase of the subject property

7    through a mortgage loan with the Bank.  The Bank lacks knowledge and information sufficient to

8    form a basis as to the truth or falsity of the remaining allegations of paragraph 102, and, on that

9    basis, denies the remaining allegations of paragraph 102.

10        103.    In 2010, Ms. Teague was laid off from her job at Chase Bank. In 2011, Ms. Teague

11   lost her mother and her property taxes went up. As a result, Ms. Teague could no longer afford to

12   make her monthly payments, and reached out to Wells Fargo to see if they could help.

13   **ANSWER:**    The Bank admits that Ms. Teague requested assistance from the Bank.  The Bank

14   lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

15   allegations of paragraph 103, and, on that basis, denies the remaining allegations of paragraph 103.

16        104.    Wells Fargo told Ms. Teague to fill out paperwork. Ms. Teague did as she was told,

17   but when she later inquired about the status of her modification request, she was told that it had been

18   lost and that she would have to redo it. It took a long time for Wells Fargo to process Ms. Teague's

19   application, and Wells Fargo's representatives were often impolite during the process, but eventually

20   Wells Fargo told Ms. Teague that she did not qualify for a mortgage modification and it was going

21   to initiate foreclosure proceedings.

22   **ANSWER:**    The Bank admits that it asked Ms. Teague to fill out paperwork and that it eventually

23   told her it could not offer her a trial mortgage modification.  The Bank denies the remaining

24   allegations in paragraph 104.

25        105.    Afraid that the sheriff was going to remove her from her home, Ms. Teague asked her

26   brother to help move her belongings to storage. She hired a foreclosure defense attorney, who

27   charged her $4,000 but was unable to help. Ms. Teague and her family vacated the home in the latter

28   part of 2014 and Wells Fargo foreclosed shortly thereafter.

1   **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth
2   or falsity of the remaining allegations of paragraph 105, and, on that basis, denies the remaining
3   allegations of paragraph 105.

4          106.    Ms. Teague, her daughter, and her two grandchildren lived in Ms. Teague's car for
5   several months, until she was able to find an apartment sometime around March 2015.

6   **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth
7   or falsity of the allegations of paragraph 106, and, on that basis, denies the allegations of paragraph
8   106.

9          107.    The experience was emotionally devastating for all concerned. Ms. Brown was very
10  depressed and had suicidal ideations. She was prescribed antidepressants, including Zoloft. The
11  grandchildren, who were around four and nine at the time, were sad and confused about losing their
12  home and having to live in a car, change schools, and leave all their friends. They shut down,
13  stopped interacting with people, and attended therapy. Ms. Teague also experienced depression
14  following the foreclosure, and was prescribed antidepressants, including Zoloft. She is currently on
15  Social Security and disability benefits.

16  **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth
17  or falsity of the allegations of paragraph 107, and, on that basis, denies the allegations of paragraph
18  107.

19         108.    In late 2018, Ms. Teague received a letter from Wells Fargo informing her that her
20  mortgage modification should have been approved but was not approved due to an error. Ms. Teague
21  was one of the customers wrongly denied a mortgage modification because of systematic errors in
22  Wells Fargo's automated decision-making tool.

23  **ANSWER:**     The Bank admits that Ms. Teague received a letter from the Bank in the fall of 2018,
24  upon information and belief.  To the extent paragraph 108 purports to describe the contents of that
25  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies
26  the allegations of paragraph 108 to the extent they are inconsistent with the contents of the letter.
27  The Bank denies that "Ms. Teague was one of the customers wrongly denied a mortgage
28  modification because of systematic errors in Wells Fargo's automated decision-making tool."

-31-

109.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Ms. Teague and her family's lives have been irrevocably altered. Their injuries include loss of their home and the time and money put into that home; loss of equity in the home; loss of tax benefits; loss of appreciation in the home's value following the sale; loss of time and money spent to find replacement shelter and relocate; loss of time and money spent in an effort to avoid foreclosure; damage to Ms. Teague's credit and resulting opportunity costs; and severe emotional distress.

**ANSWER:**    The Bank denies the allegations in paragraph 109.

        **6.    Russell and Brenda Simoneaux (Louisiana)**

110.    Plaintiffs Russell and Brenda Simoneaux purchased their home in Baton Rouge, Louisiana, in 1992.

**ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 110, and, on that basis, denies the allegations of paragraph 110.

111.    Mr. and Mrs. Simoneaux contacted Wells Fargo, their mortgage loan servicer, in 2013 because Mr. Simoneaux had recently retired and the couple was living on a fixed income. They applied for a mortgage modification but were denied.

**ANSWER:**    The Bank admits that Mr. and Mrs. Simoneaux applied for a trial mortgage modification and were denied a trial mortgage modification.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 111, and, on that basis, denies the remaining allegations of paragraph 111.

112.    Without a mortgage modification, Mr. and Mrs. Simoneaux had a very difficult time meeting their mortgage obligations. Mr. and Mrs. Simoneaux were both forced to take side jobs for extra income, the couple avoided eating out, and they watched every penny they spent for several years—until their mortgage was finally paid off in late 2018. It was an extremely stressful time.

**ANSWER:**    The Bank admits that Mr. and Mrs. Simoneaux paid off their mortgage in 2018.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 112, and, on that basis, denies the remaining allegations of paragraph 112.

113.    In October 2018, Mr. and Mrs. Simoneaux received a letter from Wells Fargo informing them that their request for a mortgage modification should have been approved but was not approved due to an error. Mr. and Mrs. Simoneaux were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool.

**ANSWER:**    The Bank admits that Mr. and Mrs. Simoneaux received a letter from the Bank in the fall of 2018, upon information and belief.  To the extent paragraph 113 purports to describe the contents of that letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations of paragraph 113 to the extent they are inconsistent with the contents of the letter.  The Bank denies that "Mr. and Mrs. Simoneaux were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decisionmaking tool."

114.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, Mr. and Mrs. Simoneaux were forced to make numerous sacrifices and endure significant stress as they struggled to meet mortgage payments that should have been lowered. Their injuries include loss of more beneficial loan terms; loss of time spent avoiding foreclosure; and opportunity costs resulting from higher mortgage payments.

**ANSWER:**    The Bank denies the allegations in paragraph 114.

### 7.    Alicia Hernandez (New Jersey)

115.    Plaintiff Alicia Hernandez bought her studio condominium, located in North Bergen, New Jersey, in 2006. The property was purchased through a mortgage loan with Wells Fargo.

**ANSWER:**    The Bank admits that Plaintiff Alicia Hernandez purchased the subject property in North Bergen, New Jersey in 2006 and that she financed that purchase through a mortgage loan with the Bank.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 115, and, on that basis, denies the remaining allegations of paragraph 115.

116.    Ms. Hernandez already owned another unit in the complex and thought the studio, with a lot of work, could be developed into an attractive rental due to its close proximity to New

-33-

1   York City.  It's right across the river from Manhattan, and only a seven-minute drive from Times

2   Square with no traffic. Ms. Hernandez planned to keep the property in her family forever. The unit

3   also had a deeded parking spot, and parking is very difficult to come by in that area.

4   **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth

5   or falsity of the allegations of paragraph 116, and, on that basis, denies the allegations of paragraph

6   116.

7          117.    When Ms. Hernandez purchased her studio, it was just a shell—it had no kitchen and

8   there were bullet holes in the door. But Ms. Hernandez was willing to put in the work, time, and

9   money to create an income-generating property that could provide for her and her family. She tapped

10  into her retirement account and installed new flooring, new appliances, new bathroom fixtures,

11  recessed lighting, and a new air conditioning unit. She also had to contribute additional money when

12  the homeowners' association imposed special assessments.

13  **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth

14  or falsity of the allegations of paragraph 117, and, on that basis, denies the allegations of paragraph

15  117.

16         118.    During the Great Recession, Ms. Hernandez lost her job in a mass layoff, and with the

17  property now her only source of income, had difficulty making her monthly mortgage payment. She

18  applied for a mortgage modification in 2012-13, but Wells Fargo told her that she didn't qualify and

19  instituted foreclosure proceedings in late 2013.

20  **ANSWER:**     The Bank denies that "Ms. Hernandez applied for a mortgage modification in 2012-

21  13, but [the Bank] told her that she didn't qualify" and denies that the Bank "instituted foreclosure

22  proceedings in late 2013."  The Bank lacks knowledge and information sufficient to form a basis as

23  to the truth or falsity of the remaining allegations of paragraph 118, and, on that basis, denies the

24  remaining allegations of paragraph 118.

25         119.    Ms. Hernandez fought foreclosure for several years, but Wells Fargo eventually

26  foreclosed on her property in late 2015. The stress of the foreclosure process had a devastating effect

27  on Ms. Hernandez and her husband. As non-lawyers, the anxiety and confusion of dealing with the

28  court system and the legal process took a severe toll on them emotionally. Ms. Hernandez had a

-34-

1  miscarriage during the foreclosure process and was hospitalized for the first time in her life. She also

2  suffered insomnia, panic attacks, and difficulty breathing.

3  **ANSWER:**      The Bank admits that Ms. Hernandez contested the foreclosure of the subject

4  property.  The Bank denies that it "eventually foreclosed on her property in late 2015." The Bank

5  lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

6  allegations of paragraph 119, and, on that basis, denies the remaining allegations of paragraph 119.

7        120.    Ms. Hernandez's husband is a police officer, and both were very concerned about the

8  effects that the foreclosure might have on him professionally. This put a lot of strain on their

9  marriage and caused embarrassment when they ran into colleagues of his while attending court to

10  fight foreclosure. Eventually, Ms. Hernandez and her husband moved to Easton, Pennsylvania, to

11  escape the stress of being in the same community, and her husband now commutes approximately an

12  hour and 15 minutes to work.

13  **ANSWER:**      The Bank lacks knowledge and information sufficient to form a basis as to the truth

14  or falsity of the allegations of paragraph 120, and, on that basis, denies the allegations of paragraph

15  120.

16        121.    In late 2018, Ms. Hernandez received a letter from Wells Fargo informing her that her

17  request for a mortgage modification should have been approved but was not approved due to an

18  error.  Ms. Hernandez was one of the customers wrongly denied a mortgage modification because of

19  systematic errors in Wells Fargo's automated decision-making tool.

20  **ANSWER:**      The Bank admits that Ms. Hernandez received a letter from the Bank in the fall of

21  2018, upon information and belief.  To the extent paragraph 121 purports to describe the contents of

22  that letter, the Bank refers to that document for a complete statement of its contents.  The Bank

23  denies the allegations of paragraph 121 to the extent they are inconsistent with the contents of the

24  letter.  The Bank denies that "Ms. Hernandez was one of the customers wrongly denied a mortgage

25  modification because of systematic errors in Wells Fargo's automated decision-making tool."

26        122.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

27  making tool, Ms. Hernandez has suffered life-altering consequences. Her injuries include loss of her

28  property and the time and money put into that property; loss of equity in her property; loss of

-35-

1   appreciation in her property's value following the sale; loss of time and money spent fighting

2   foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

3   **ANSWER:**   The Bank denies the allegations in paragraph 122.

4                  8.    **Rose Wilson (New York)**

5         123.    Plaintiff Rose Wilson purchased her home, located in Rochester, New York, in or

6   around 1995. Ms. Wilson lived in the home for many years with her family and put a lot of time and

7   money into the property—including by renovating the kitchen and bathroom.

8   **ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth

9   or falsity of the allegations of paragraph 123, and, on that basis, denies the allegations of paragraph

10  123.

11        124.    After Ms. Wilson lost her job due to the economic downturn, however, she struggled

12  to make the mortgage payments on her home.

13  **ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth

14  or falsity of the allegations of paragraph 124, and, on that basis, denies the allegations of paragraph

15  124.

16        125.    She applied for a mortgage modification from Wells Fargo (her mortgage servicer)

17  multiple times over the course of several years. Wells Fargo kept stringing her along, requiring her

18  to make monthly payments she could not afford in order to qualify for a mortgage modification, and

19  then telling her the request had been denied and she would need to reapply and start the process all

20  over again.

21  **ANSWER:**   The Bank denies the allegations in paragraph 125.

22        126.    Ms. Wilson's attempt to obtain a mortgage modification from Wells Fargo and save

23  her home went on for years. During this time, Ms. Wilson had to make many sacrifices to keep

24  making her mortgage payments. She tapped into her retirement account early, incurring tax penalties

25  to do so.

26  **ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth

27  or falsity of the allegations of paragraph 126, and, on that basis, denies the allegations of paragraph

28  126.

1       127.    Ms. Wilson's efforts to save her home were ultimately unsuccessful, however, and

2  Wells Fargo foreclosed in 2014. At the time of the foreclosure, Ms. Wilson's daughter, son-in-law,

3  and their two children lived with her. They were all forced to move from their home to a cramped,

4  moldy, rodent-infested rental property. The aftermath of the foreclosure caused Ms. Wilson

5  significant stress and depression. She had worked hard to purchase a home and provide for her

6  family, but after the foreclosure, Ms. Wilson felt utterly defeated and left with nothing. It has taken

7  many years for the pain to subside, but she still feels immense sadness whenever she drives by her

8  former house or thinks about her old life.

9  **ANSWER:**    The Bank admits that a foreclosure was completed on the property securing Ms.

10  Wilson's loan in 2014.  The Bank lacks knowledge and information sufficient to form a basis as to

11  the truth or falsity of the remaining allegations of paragraph 127, and, on that basis, denies the

12  remaining allegations of paragraph 127.

13       128.    In late 2018, Ms. Wilson received a letter from Wells Fargo informing her that her

14  request for a mortgage modification should have been approved but was not approved due to an

15  error. Ms. Wilson was one of the customers wrongly denied a mortgage modification because of

16  systematic errors in Wells Fargo's automated decision-making tool.

17  **ANSWER:**    The Bank admits that Ms. Wilson received a letter from the Bank in the fall of 2018,

18  upon information and belief.  To the extent paragraph 128 purports to describe the contents of that

19  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

20  the allegations of paragraph 128 to the extent they are inconsistent with the contents of the letter.

21  The Bank denies that "Ms. Wilson was one of the customers wrongly denied a mortgage

22  modification because of systematic errors in Wells Fargo's automated decision-making tool."

23       129.    As a result of Wells Fargo's repeated failure to properly test its automated decision-

24  making tool, Ms. Wilson has suffered life-altering consequences. Her injuries include loss of her

25  home and the time and money put into that property; loss of equity in her property; loss of

26  appreciation in her property's value following the sale; loss of time and money spent fighting

27  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

28  **ANSWER:**    The Bank denies the allegations in paragraph 129.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 9.    Tiffanie Hood (Ohio)

130.    In May of 2001, Ms. Hood bought a three-bedroom home for her family in Cincinnati, Ohio. She moved in with her young children—her son was about eight years old at the time, and her daughter was about 11.

**ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 130, and, on that basis, denies the allegations of paragraph 130.

131.    The home was built in 1926 and needed quite a bit of work. Ms. Hood invested significant resources putting in a kitchen, repairing the roof, replacing the garage door and front door, and completing various other necessary repairs.

**ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 131, and, on that basis, denies the allegations of paragraph 131.

132.    In or around 2013, Ms. Hood had difficulty making the monthly payment and reached out to Wells Fargo for help. Her request for a mortgage modification was denied, and Wells Fargo initiated foreclosure proceedings. Ms. Hood and her family were forced out of their home in late 2014.

**ANSWER:**    The Bank admits that it opened several home preservation reviews for Ms. Hood. The Bank denies that it never provided Ms. Hood with home preservation assistance.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 132, and, on that basis, denies the remaining allegations of paragraph 132.

133.    Ms. Hood and her children suffered emotional trauma and depression as a result of the foreclosure and the effects that it had on their lives. They all tried to move on as best they could.

**ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 133, and, on that basis, denies the allegations of paragraph 133.

134.    In late 2018, Ms. Hood received a letter from Wells Fargo informing her that her mortgage modification should have been approved but was not approved due to an error. Ms. Hood

-38-

1  was one of the customers wrongly denied a mortgage modification because of systematic errors in

2  Wells Fargo's automated decision-making tool.

3  **ANSWER:**     The Bank admits that Ms. Hood received a letter from the Bank in the fall of 2018,

4  upon information and belief.  To the extent paragraph 134 purports to describe the contents of that

5  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

6  the allegations of paragraph 134 to the extent they are inconsistent with the contents of the letter.

7  The Bank denies that "Ms. Hood was one of the customers wrongly denied a mortgage modification

8  because of systematic errors in Wells Fargo's automated decision-making tool."

9          135.     As a result of Wells Fargo's repeated failure to properly test its automated decision-

10  making tool, Ms. Hood life has been irrevocably altered. Her injuries include loss of her family's

11  home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

12  loss of appreciation in her home's value following foreclosure; loss of time and money spent to find

13  replacement housing and move her family; loss of time and money spent in an effort to avoid

14  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

15  **ANSWER:**     The Bank denies the allegations in paragraph 135.

16              **10.     George and Cyndi Floyd (Pennsylvania)**

17          136.     Plaintiffs George and Cyndi Floyd purchased their home, located in Lancaster,

18  Pennsylvania, in 2004. The property was purchased through a mortgage loan with Wachovia, which

19  was later transferred to Wells Fargo.

20  **ANSWER:**     The Bank admits the allegations in paragraph 136.

21          137.     After the financial crisis hit, the Floyds had difficulty making their mortgage

22  payments. Mr. Floyd lost his job when the company he worked for closed, and Mrs. Floyd later lost

23  her job due to the economic recession as well.

24  **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth

25  or falsity of the allegations of paragraph 137, and, on that basis, denies the allegations of paragraph

26  137.

27          138.     In an effort to save their home, the Floyds went to great lengths: they applied for

28  numerous mortgage modifications over a period of two years; they paid a company to help them

1  avoid foreclosure; and they spent countless hours reaching out to various other companies,

2  government agencies, and even Congressional representatives for help.

3  **ANSWER:**   The Bank admits that the Floyds requested home preservation assistance from the

4  Bank. The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity

5  of the remaining allegations of paragraph 138, and, on that basis, denies the remaining allegations of

6  paragraph 138.

7         139.    The Floyds' efforts were ultimately unsuccessful. Wells Fargo denied their final

8  request for a mortgage modification in November 2011 and initiated foreclosure proceedings. The

9  Floyds were forced to move to a new home in Philadelphia.

10  **ANSWER:**   The Bank admits that it denied the Floyds a trial mortgage modification in November

11  2011 but denies that it initiated foreclosure proceedings in November 2011. The Bank lacks

12  knowledge and information sufficient to form a basis as to the truth or falsity of the remaining

13  allegations of paragraph 139, and, on that basis, denies the remaining allegations of paragraph 139.

14         140.    The foreclosure process was emotionally devastating for the Floyds. Mr. Floyd is

15  disabled and suffers from degenerative disc disease, arthritis throughout his body, and the

16  aftereffects of failed bilateral knee replacements. Being forced to move by Wells Fargo was an

17  extreme hardship that caused Mr. Floyd severe depression and emotional distress. He was

18  hospitalized during the foreclosure process, and though he was eventually able to get through the

19  move to Philadelphia, it took weeks and required the help of Mr. Floyd's nephew and high doses of

20  pain medication. To this day, Mr. Floyd suffers from deep depression and anxiety because of what

21  Wells Fargo has done to him and his family.

22  **ANSWER:**   The Bank lacks knowledge and information sufficient to form a basis as to the truth

23  or falsity of the allegations of paragraph 140, and, on that basis, denies the allegations of paragraph

24  140.

25         141.    In late 2018, the Floyds received a letter from Wells Fargo informing them that their

26  mortgage modification should have been approved but was not approved due to an error. The Floyds

27  were among the customers wrongly denied a mortgage modification because of systematic errors in

28  Wells Fargo's automated decision-making tool.

**ANSWER:**    The Bank admits that the Floyds received a letter from the Bank in the fall of 2018, upon information and belief.  To the extent paragraph 141 purports to describe the contents of that letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations of paragraph 141 to the extent they are inconsistent with the contents of the letter. The Bank denies that "the Floyds were among the customers wrongly denied a mortgage modification because of systematic errors in Wells Fargo's automated decision-making tool."

142.    As a result of Wells Fargo's repeated failure to properly test its automated decision-making tool, the Floyds lives were irrevocably altered. Their injuries include loss of their home and the time and money put into that home; loss of equity in their home; loss of tax benefits; loss of appreciation in their home's value following the sale; loss of time and money spent to find replacement housing and move their belongings; loss of time and money spent in their efforts to avoid foreclosure; damage to their credit and resulting opportunity costs; and severe emotional distress.

**ANSWER:**    The Bank denies the allegations in paragraph 142.

**11.   Diana Trevino (Texas)**

143.    In 2007, Plaintiff Diana Trevino purchased a three-bedroom home in Garland, Texas, where she lived with her husband and four children. Close family friend Roder Contreras co-signed the mortgage loan and resided in the home as well. When Mr. Contreras's grandmother became ill in 2010, he moved to El Salvador to take care of her. He stopped making his share of the payments on the Trevino home, and quitclaimed his interest in it to the Trevinos.

**ANSWER:**    The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations of paragraph 143, and, on that basis, denies the allegations of paragraph 143.

144.    Because the Trevinos were unable to make the entire monthly mortgage payment without Mr. Contreras's contribution, Ms. Trevino applied for a mortgage modification from Wells Fargo and was approved. After making approximately five to eight payments under the modification plan, Ms. Trevino suffered another setback when her mother became ill with cancer. Ms. Trevino

1   began missing a significant amount of work because she was taking time off to take care of her

2   mother. She fell behind on the mortgage payments, and again sought assistance from Wells Fargo.

3   **ANSWER:**      The Bank admits that it entered into a document entitled "Loan Modification

4   Agreement" with Ms. Trevino on or about October 13, 2009.  The Bank also admits that it entered

5   into a document entitled "Loan Modification Agreement" with Ms. Trevino on or about May 18,

6   2011.  The Bank also admits that Ms. Trevino fell behind on her modified mortgage payments and

7   that she contacted the Bank to request assistance.  The Bank lacks knowledge and information

8   sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 144, and,

9   on that basis, denies the remaining allegations of paragraph 144.

10        145.    Wells Fargo told Ms. Trevino to stop making mortgage payments so that she could

11   qualify for another mortgage modification, which they assured her she was likely to get. Ms. Trevino

12   stopped making payments as instructed, instead devoting her limited financial resources to her

13   children and ailing mother.

14   **ANSWER:**      The Bank denies the allegations in paragraph 145.

15        146.    In 2013, Ms. Trevino received a call from Wells Fargo notifying her that she had not

16   been approved for a mortgage modification, and that Wells Fargo planned to initiate foreclosure

17   proceedings. She was told she had 60 days to vacate the premises; a follow-up letter conveyed the

18   same information.

19   **ANSWER:**      The Bank admits that in 2013, Ms. Trevino received a call notifying her that she had

20   not been approved for a trial mortgage modification.  The Bank lacks knowledge and information

21   sufficient to form a basis as to the truth or falsity of the remaining allegations of paragraph 146, and,

22   on that basis, denies the allegations of paragraph 146.

23        147.    Ms. Trevino had great difficulty finding a new place for her family to live, but

24   eventually found a three-bedroom apartment in an undesirable neighborhood in Richardson, Texas.

25   The lease was solely in her husband's name, because the foreclosure had ruined Ms. Trevino's

26   credit.

27

28

1    **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth

2    or falsity of the allegations of paragraph 147, and, on that basis, denies the allegations of paragraph

3    147.

4            148.     In April of 2013, the Trevinos moved into the apartment. Ms. Trevino tried to keep

5    her children in the same school in Garland, but the travel proved very difficult for the family. At

6    times, some of the children were forced to live with their aunt so they could be nearer to their school.

7    This was hard on the children, who couldn't understand why they had lost their home, or why their

8    mother was so sad all of the time. Some of the children lost friends and started acting out at school.

9    Uncharacteristically, her son and daughter were both suspended from school for misbehavior during

10   this time period.

11   **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth

12   or falsity of the allegations of paragraph 148, and, on that basis, denies the allegations of paragraph

13   148.

14           149.     The stress of the foreclosure, among other factors, strained the Trevinos' marriage,

15   and in 2013 they separated. Eventually they divorced. When the lease on their apartment expired,

16   Ms. Trevino was unable to renew it because she had not been on the original lease, and her poor

17   credit prevented her from getting a lease on her own. The Trevinos were evicted from the apartment

18   and had a very hard time finding a new place to live.

19   **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth

20   or falsity of the allegations of paragraph 149, and, on that basis, denies the allegations of paragraph

21   149.

22           150.     Around the same time, Ms. Trevino's stress and depression got to the point that she

23   wasn't eating or sleeping, and she had to be hospitalized with a bacterial infection. She lost her job

24   and was unemployed for around ten months. She and her children survived on her unemployment

25   benefits and the financial assistance of her sister. Two of Ms. Trevino's sons left college so that they

26   could work and help support the family. Ms. Trevino and her family have worked hard to try to

27   rebuild their lives in the wake of the foreclosure in 2013, and continue to do so to this day.

28

1   **ANSWER:**     The Bank lacks knowledge and information sufficient to form a basis as to the truth

2   or falsity of the allegations of paragraph 150, and, on that basis, denies the allegations of paragraph

3   150.

4          151.     In late 2018, Ms. Trevino received a letter from Wells Fargo informing her that her

5   mortgage modification should have been approved but was not approved due to an error. Ms.

6   Trevino was one of the customers wrongly denied a mortgage modification because of systematic

7   errors in Wells Fargo's automated decision-making tool.

8   **ANSWER:**     The Bank admits that Ms. Trevino received a letter from the Bank in the fall of 2018,

9   upon information and belief.  To the extent paragraph 151 purports to describe the contents of that

10  letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies

11  the allegations of paragraph 151 to the extent they are inconsistent with the contents of the letter.

12  The Bank denies that "Ms. Trevino was one of the customers wrongly denied a mortgage

13  modification because of systematic errors in Wells Fargo's automated decision-making tool."

14         152.     As a result of Wells Fargo's repeated failure to properly test its automated decision-

15  making tool, Ms. Trevino's life has been irrevocably altered. Her injuries include loss of her family's

16  home and the time and money put into that home; loss of equity in her home; loss of tax benefits;

17  loss of appreciation in her home's value following the sale; loss of time and money spent to find

18  replacement housing and move her family; loss of time and money spent in an effort to avoid

19  foreclosure; damage to her credit and resulting opportunity costs; and severe emotional distress.

20  **ANSWER:**     The Bank denies the allegations in paragraph 152.

21                                **CLASS ALLEGATIONS**

22         153.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Granja and

23  Campos pursue their contract claims on behalf of the following certified class ("Class"):

24

25          All persons in the United States who between 2010 and 2018 (i) qualified for a
            home loan modification or repayment plan pursuant to the requirements of
26          government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the
            Federal Housing Administration (FHA), [or] the U.S. Department of Treasury's
27          Home Affordable Modification Program (HAMP); (ii) were not offered a home
            loan modification or repayment plan by Wells Fargo due to excessive attorney's
28          fees being included in the loan modification decisioning process; and (iii) whose
            home Wells Fargo sold in foreclosure.

                                          -44-

1    **ANSWER:**     The allegations of paragraph 153 constitute characterizations of Plaintiffs' Third

2    Amended Complaint to which no response is required. To the extent a response is required, the Bank

3    admits that the Court certified the following class limited to the breach of contract claim: "All

4    persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification

5    or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie

6    Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of

7    Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan

8    modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in

9    the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure."

10    The Bank denies that this action is appropriate for class treatment.

11        154.     For purposes of this class definition, "home loan" refers to any loan secured by

12    residential real property.

13    **ANSWER:**     The Bank admits that Plaintiffs have defined "home loan" to refer to any loan secured

14    by residential real property.  The Bank denies that this action is appropriate for class treatment.

15        155.     Plaintiffs Granja and Campos anticipate that they will be able to identify all class

16    members from Wells Fargo's records and that class members can be notified of the pendency of this

17    class action by mail.

18    **ANSWER:**     The allegations of paragraph 155 constitute characterizations of Plaintiffs' Third

19    Amended Class Action Complaint to which no response is required. To the extent a response is

20    required, the Bank denies the allegations of paragraph 155.  The Bank specifically denies that this

21    action is appropriate for class treatment.

22        156.     The Class meets each of the requirements for class certification pursuant to Rule

23    23(a) and Rule 23(b)(3).

24    **ANSWER:**     The Bank denies the allegations in paragraph 156.

25        157.     Numerosity. The Class is sufficiently numerous such that individual joinders are

26    impracticable and less advantageous than proceeding through the class device. Based on Wells

27    Fargo's public disclosures to date, the Class consists of approximately 505 persons.

28    **ANSWER:**     The Bank denies the allegations in paragraph 157.

158.     <u>Commonality & Predominance</u>. Common questions of law and fact exist as to the Class, and those common questions predominate over questions affecting only individual class members. The central common question is: Whether Wells Fargo breached a standard notice requirement in mortgage contracts by failing to notify class members they qualified for a mortgage modification.

**<u>ANSWER:</u>**     The Bank denies the allegations in paragraph 158.

159.     <u>Typicality</u>. Plaintiffs' claims are typical of those asserted by the Class. Both Plaintiffs and class members seek to recover for injuries caused by Wells Fargo's failure to properly verify or audit its automated decision-making tool, which caused both Plaintiffs and class members to be denied mortgage modifications.

**<u>ANSWER:</u>**     The Bank denies the allegations in paragraph 159.

160.     <u>Adequacy</u>. Plaintiffs will continue to fairly and adequately represent and protect the interests of the members of the Class, as their interests do not conflict with the interest of the class members they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation who will continue to prosecute this action diligently and vigorously.

**<u>ANSWER:</u>**     The Bank denies the allegations in paragraph 160.

161.     <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims will require an in-depth knowledge of HAMP-related jurisprudence; intensive discovery of a banking giant defended by a large, global law firm; and depositions of several sophisticated banking executives and board members. These are matters that can only realistically be handled through unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

**<u>ANSWER:</u>**     The Bank denies the allegations in paragraph 161.

1

**TOLLING ALLEGATIONS**

2       162.    The causes of actions alleged herein did not accrue or were tolled until Plaintiffs and

3   Class members discovered, or could have discovered with the exercise of reasonable diligence, the

4   facts giving rise to their legal claims.

5   **ANSWER:**    The Bank denies the allegations in paragraph 162.

6       163.    Plaintiffs and Class members were not aware that they qualified for a mortgage

7   modification, and that Wells Fargo's automated decision-making tool had miscalculated their

8   eligibility, until Wells Fargo informed them through letters mailed the second half of 2018.

9   **ANSWER:**    The Bank denies the allegations in paragraph 163.

10      164.    Plaintiffs and Class members had no realistic ability to discover these facts on their

11  own. Wells Fargo's automated decision-making tool is not public, and the mathematical calculations

12  used to determine eligibility for a mortgage modification depended on variables within Wells

13  Fargo's exclusive control.

14  **ANSWER:**    The Bank denies the allegations in paragraph 164.

15      165.    Any applicable statues of limitations are also tolled by Wells Fargo's knowing,

16  active, and ongoing concealment of the facts alleged herein. Wells Fargo discovered one of the

17  software errors in August 2013 but deliberately concealed its discovery from Plaintiffs and from

18  class members until the second half of 2018. Wells Fargo was under a continuous duty to disclose

19  the truth to Plaintiffs and class members, and Plaintiffs and class members reasonably relied on

20  Wells Fargo's ongoing concealment.

21  **ANSWER:**    The Bank denies the allegations in paragraph 165.

22                    **FIRST CAUSE OF ACTION**
                      **Breach Of Contract**
23                    **Brought On Behalf Of The Class**

24      166.    Plaintiffs Debora Granja and Sandra Campos incorporate all preceding paragraphs as

25  if fully set forth herein. They bring this claim on behalf of themselves and the Class.

26  **ANSWER:**    The Bank incorporates by reference its responses to each and every allegation

27  contained in all the foregoing paragraphs as if fully set forth herein.  The Bank denies that this action

28  is appropriate for class treatment.

167.     When Plaintiffs and class members financed their homes, they entered into Security Instruments (typically referred to as a mortgage, deed of trust, or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and foreclose on the property.

**ANSWER:**     To the extent paragraph 167 purports to describe specific documents, the Bank refers to those document for complete statements of their terms. The Bank denies the allegations of paragraph 167 to the extent they are inconsistent with the terms of Plaintiffs' and class members' loan documents.

168.     Plaintiffs' and class members' mortgage loans were insured, guaranteed, or held by a federal government agency and their Security Instruments were typically government-issued, form Federal Housing Administration (FHA) and/or Fannie Mae/Freddie Mac Security Instruments.[1] Plaintiff Granja's home was secured by a Fannie/Freddie Security Instrument, while Plaintiff Campos's home was secured by an FHA Security Instrument. Wells Fargo breached the terms of both types of Security Instruments. References to "Security Instruments" in this complaint refer to all Plaintiffs' mortgage contracts. Reference to "FHA Security Instruments" is to the type of mortgage contract that Plaintiff Campos had, while reference to "Fannie/Freddie Security Instruments" is to the type of mortgage contract that Plaintiff Granja had.

**ANSWER:**     The Bank admits Plaintiffs use "Security Instruments," "FHA Security Instruments," and "Fannie/Freddie Security Instruments" to reference certain documents.  To the extent paragraph 168 purports to describe specific documents, the Bank refers to those documents for complete statements of their terms.  The Bank denies the allegations of paragraph 168 to the extent they are inconsistent with the terms of Plaintiffs' and class members' loan documents.  The Bank denies that it breached the Security Instruments or other loan documents, and denies all other allegations in paragraph 168.

---

[1] *See* Wells Fargo's Request for Judicial Notice, Dkt. 60, attaching copies of certain Plaintiffs' Security Instruments as "exemplars" that were "substantially similar to the security instruments of the remaining named Plaintiffs." The exemplars included Security Instruments for Plaintiffs Floyd (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), Hood (FHA Ohio Open-End Mortgage), Hernandez (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT), and Wilson (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT).

169.    Wells Fargo Bank was subject to the terms of these Security Instruments, either as the original lender, an assignee, or as the mortgage servicer authorized to act on behalf of the lender.

**ANSWER:**    To the extent paragraph 169 states a legal conclusion, no response is required. To the extent a response is required, the Bank denies the allegations in paragraph 169.

170.    Under the Fannie/Freddie Security Instruments, the Bank was required to give notice to Plaintiffs and class members before it was permitted to accelerate the remaining balance on their loans and initiate the foreclosure process. That notice was required to specify the borrower's default, the action required by the borrower to cure the default, and the date by which the borrower must cure the default to avoid acceleration and foreclosure proceedings.

**ANSWER:**    To the extent paragraph 170 purports to describe the "Fannie/Freddie Security Instruments," the Bank refers to those documents for complete statements of their terms. The Bank denies the allegations of paragraph 170 to the extent they are inconsistent with the terms of the "Fannie/Freddie Security Instruments" or other loan documents.

171.    The Bank also agreed that "[i]f the Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued…" prior to the sale of the property. Those conditions included, among other things, that the Borrower "(a) pays Lender all sums which then would be due under this Security Instrument…" and "(b) cures any defaults of any other covenants or agreements."[2]

**ANSWER:**    To the extent paragraph 171 purports to describe the "Fannie/Freddie Security Instruments," the Bank refers to those documents for complete statements of their terms. The Bank denies the allegations of paragraph 171 to the extent they are inconsistent with the terms of the "Fannie/Freddie Security Instruments" or other loan documents.

172.    The Fannie/Freddie Security Instruments specifically contemplated the possibility of both a forbearance and modification of the sums secured by the Security Instruments. The Fannie/Freddie Security Instruments provided, "Extension of the time for payment *or modification*

---

[2] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at pg. 24, ¶ 19; *see also* Plaintiff Hernandez at p. 56, ¶ 19; Plaintiff Wilson at p. 76, ¶ 21(B).

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO THIRD AMENDED CLASS ACTION COMPLAINT No. 3:18-cv-07354-WHA**

1   of amortization of the sums secured by this Security Instrument … shall not operate to release the

2   liability of Borrower…"[3] (emphasis added).

3   **ANSWER:**     The Bank denies the allegations in paragraph 172.

4          173.     Similarly, under the FHA Security Instruments, the Bank agreed it was not able to

5   require full payment and its rights were otherwise limited "by regulations issued by the Secretary in

6   the case of payment defaults…"[4] The Bank also agreed that, "In many circumstances regulations

7   issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require

8   immediate payment in full and foreclose if not paid. This Security Instrument does not authorize

9   acceleration or foreclosure if not permitted by regulations of the Secretary."[5]

10  **ANSWER:**     To the extent paragraph 173 purports to describe the "FHA Security Instruments," the

11  Bank refers to those documents for complete statements of their terms.  The Bank denies the

12  allegations of paragraph 173 to the extent they are inconsistent with the terms of the "FHA Security

13  Instruments" or other loan documents.

14         174.     Consistent with the Security Instruments, once a borrower missed a mortgage

15  payment, Wells Fargo sent correspondence advising of the amount owed and invited borrowers to

16  call Wells Fargo's "trained professionals" who are "available to assist you in bringing your loan

17  current … [and] will work with you to determine the best option available to you." These letters

18  show Wells Fargo's understanding that there is more than one way to bring a loan current under the

19  Security Instruments.

20  **ANSWER:**     The Bank denies the allegations in paragraph 174.

21         175.     One of the ways a loan could be brought current was a loan modification. In a recent

22  Rule 30(b)(6) deposition, Wells Fargo's corporate representative testified that a mortgage

23  modification could cure a default and bring a loan current.

24  **ANSWER:**     The Bank denies the allegations in paragraph 175. The Bank also denies that the

25  referenced testimony relates to the "Security Instruments."

26

27  [3] *See, e.g.*, Plaintiff Floyd Fannie/Freddie Security Instrument (Dkt.60-3) at p. 23, ¶ 12; *see also* Plaintiff Hernandez at p. 52, ¶ 12.

28  [4] *See, e.g.*, Plaintiff Hood FHA Security Instrument (Doc. 60-3) at p. 33, ¶ 9(a).
    [5] *See id.* at ¶ 9(d).

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO THIRD AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

176.     This testimony is consistent with other correspondence Wells Fargo sent in response to a request for mortgage assistance. In one letter, Wells Fargo told Plaintiff Troy Frye it was "considering a program that may assist you in bringing your loan current … This program, known as a loan modification, would provide you with the opportunity for a fresh start by adjusting the current terms of your loan."

**ANSWER:**     To the extent paragraph 176 purports to describe a specific document, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations of paragraph 176 to the extent they are inconsistent with the terms of the referenced document. The Bank denies all other allegations in paragraph 176, including that the "Security Instruments" required it to offer borrowers loan modifications.

177.     In a different letter, Wells Fargo advised Plaintiffs and class members that a loan modification is "an agreement that changes the terms of your existing mortgage. It brings your account up-to-date and may result in a lower monthly payment."

**ANSWER:**     To the extent paragraph 177 purports to describe a specific document, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations of paragraph 177 to the extent they are inconsistent with the terms of the referenced document. The Bank denies all other allegations in paragraph 177, including that the "Security Instruments" required it to offer borrowers loan modifications.

178.     Once borrowers, such as Plaintiffs, requested mortgage assistance from Wells Fargo, the Bank would tell borrowers: "We'll continue to work with you to help avoid a foreclosure sale. If your loan has not previously been referred to foreclosure and you have submitted all of the required documentation needed to evaluate for an alternative, this loan will not be referred to foreclosure while the application is evaluated. If your loan has been referred to foreclosure, we will not conduct a foreclosure sale on this loan while your documents are being reviewed and if allowed by state law and/or investor guidelines." This message from Wells Fargo shows its understanding that a modification would bring an account current and allow the borrower to avoid foreclosure.

**ANSWER:**     To the extent paragraph 178 purports to describe a specific document, the Bank refers to that document for a complete statement of its terms.  The Bank denies the allegations of paragraph

178 to the extent they are inconsistent with the terms of the referenced document.  The Bank denies all other allegations in paragraph 178, including that the referenced document "shows its understanding that a modification would bring an account current, and allow the borrower to avoid foreclosure," and that the "Security Instruments" required it to offer borrowers loan modifications.

179.    The Bank breached its contractual obligations to Plaintiffs and class members by failing to give Plaintiffs and class members adequate notice prior to accelerating their loan payments, commencing the foreclosure process, and, in many instances, foreclosing on Plaintiffs' and class members' homes.

**ANSWER:**    The Bank denies the allegations in paragraph 179.

180.    In particular, the Bank did not notify Plaintiffs and class members that they could cure their default and avoid acceleration and foreclosure by accepting a mortgage modification. Plaintiffs and class members qualified for a government-mandated mortgage modification, and the Bank was required to offer them a mortgage modification but failed to do so. While HAMP and other types of government-mandated mortgage modifications might have come into effect after Plaintiffs and class members signed their Security Instruments, a reasonable interpretation of these contracts required Wells Fargo to inform Plaintiffs of actions available to cure their default *at the time of the default* – not just any action available at the time the parties executed the contract. And at the time of Plaintiffs' defaults, a mortgage modification was an option that should have been available to them.

**ANSWER:**    The Bank denies the allegations in paragraph 180.

181.    The FHA Security Instruments specifically contemplated HUD Secretary regulations placing a limitation on Wells Fargo's right to foreclose in the event of a default. These contracts stated, "In many circumstances regulations issued by the [HUD] Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary."[6] Indeed, as a part of the financial crisis, the HUD Secretary stated in a report to Congress that "During this time of elevated financial stress on households, FHA maintained a robust

---

[6] *See id.* at ¶ 9(d).

**DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO THIRD AMENDED CLASS ACTION COMPLAINT**
**No. 3:18-cv-07354-WHA**

1   set of policies…to provide assistance in *curing* mortgage delinquencies." Those tools included,

2   among other things, loan modifications.[7] The FHA (Federal Housing Administration) is a part of

3   HUD. And HUD was one of the administering offices for HAMP; thus HUD was responsible for

4   issuing regulations on borrower eligibility for a modification under the program.

5   **ANSWER:**      To the extent paragraph 181 purports to describe the "FHA Security Instruments," the

6   Bank refers to those document for complete statements of their terms.  The Bank denies the

7   allegations of paragraph 181 to the extent they are inconsistent with the terms of the "FHA Security

8   Instruments."  The Bank denies all other allegations in paragraph 181, including that the "FHA

9   Security Instruments" required it to offer borrowers loan modifications.

10       182.     As a result of the Bank's breach, Plaintiffs and class members suffered damages in an

11   amount subject to proof, including loss of their homes; loss of equity in their homes; loss of tax

12   benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

13   spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

14   money to find new housing and move their families and belongings; loss of favorable interest rates

15   or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher

16   mortgage payments.

17   **ANSWER:**      The Bank denies the allegations in paragraph 182.

18                    **SECOND CAUSE OF ACTION**
                 **Intentional Infliction of Emotional Distress**
19                  **Brought on Behalf of all Plaintiffs**

20       183.     Plaintiffs Debora Granja, Sandra Campos, Emma White, Troy Frye, Coszetta Teague,

21   Alicia Hernandez, Rose Wilson, Tiffanie Hood, Russell and Brenda Simoneaux, George and Cyndi

22   Floyd, and Diana Trevino (referred to in this Second Cause of Action as "IIED Plaintiffs")

23   incorporate all preceding paragraphs as if fully set forth herein.

24   **ANSWER:**      The Bank incorporates by reference its responses to each and every allegation

25   contained in all the foregoing paragraphs as if fully set forth herein.

26

27   [7] *See* U.S. Department of Housing and Urban Development November 15, 2011 Annual Report to Congress Fiscal Year
     2011 Financial Status FHA Mutual Mortgage Insurance Fund at p. 23-24, available at
28   https://www.hud.gov/sites/documents/FHAMMIFANNRPTFY2011.PDF (last accessed July 10, 2019).

184.    Wells Fargo engaged in extreme and outrageous conduct as alleged herein. Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its customers' homes and wellbeing depended. It allowed systemic errors to persist for five to eight years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices; failed to reform its verification and auditing practices even after the government found a software error had led the Bank to wrongfully deny mortgage modifications; concealed its discovery of an additional software error from regulators and customers; and failed to identify other related errors for an additional three years.

**ANSWER:**    The Bank denies the allegations in paragraph 184.

185.    The same extreme and outrageous conduct that caused a series of scandals and consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines and to forbid Wells Fargo from growing until reforms were implemented—was also responsible for IIED Plaintiffs losing their homes here. Wells Fargo's Board and executive leadership abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance failures, government fines, and consent decrees requiring leadership to implement appropriate auditing and compliance procedures.

**ANSWER:**    The Bank denies the allegations in paragraph 185.

186.    With regard to the Bank's mortgage modification and foreclosure processes in particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP or other government requirements. Wells Fargo's leadership ignored its oversight responsibilities even after the government found it had not adequately overseen the Bank's mortgage modification and foreclosure operations, even after it agreed to implement proper oversight as part of two 2011 consent orders, and even after the government found in 2015 that Wells Fargo had continuously failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it will be prohibited from growing unless and until it reforms its oversight and governance.

**ANSWER:**    The Bank denies the allegations in paragraph 186.

187.     Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to customers, including IIED Plaintiffs, who were wrongfully denied mortgage modifications and foreclosed upon.

**ANSWER:**     The Bank denies the allegations in paragraph 187.

188.     As a result of Wells Fargo's conduct, IIED Plaintiffs have suffered severe emotional distress, as alleged herein, which has contributed to diagnoses of anxiety and depression, extended psychological therapy, hospitalizations, high blood pressure, various health problems, marital struggles, social withdrawal, childhood trauma, suicidal ideation, stress disorders, and a number of other physical, psychological, and social afflictions.

**ANSWER:**     The Bank denies the allegations in paragraph 188.

189.     IIED Plaintiffs seek compensatory damages as well as punitive damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of IIED Plaintiffs.

**ANSWER:**     The Bank admits that Plaintiffs seek compensatory and punitive damages, but denies that "IIED Plaintiffs" are entitled to any such damages.  The Bank denies the remaining allegations in paragraph 189.

## THIRD CAUSE OF ACTION

### Wrongful Foreclosure Brought on Behalf of Plaintiffs Granja, Campos and Frye

190.     Plaintiffs Granja, Campos, and Frye incorporate all preceding paragraphs as if fully set forth herein.

**ANSWER:**     The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

### California Wrongful Foreclosure

191.     Plaintiffs Debora Granja and Sandra Campos bring this claim on their own behalves.

**ANSWER:**     The allegations of paragraph 191 constitute characterizations of Plaintiffs' Third Amended Class Action Complaint to which no response is required.

192.     Wells Fargo wrongfully foreclosed on Plaintiffs Granja and Campos's respective real property pursuant to a power of sale in their Security Instruments. The foreclosure was unlawful

-55-

1   and/or unfair because Wells Fargo did not first notify Plaintiffs Granja and Campos that they could

2   cure their default by accepting a mortgage modification. Plaintiffs Granja and Campos qualified for

3   the mortgage modification and Wells Fargo was required by the Security Agreements to notify

4   Plaintiffs of actions they could take to cure their default before exercising its power of sale.

5   **ANSWER:**   The Bank denies the allegations in paragraph 192.

6       193.   Plaintiffs Granja and Campos were excused from tendering the amount of their

7   secured indebtedness, and no breach of condition or failure of performance existed on the part of

8   Plaintiffs Granja and Campos that would have authorized the foreclosure, because Wells Fargo was

9   required to offer Plaintiffs Granja and Campos a mortgage modification before it could accelerate

10   their secured indebtedness and initiate foreclosure proceedings.

11   **ANSWER:**   The Bank denies the allegations in paragraph 193.

12       194.   Plaintiffs Granja and Campos were harmed by the wrongful foreclosure and suffered

13   damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax

14   benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money

15   spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and

16   money to find new housing and move their families; loss of favorable interest rates or other

17   favorable loan terms; damage to credit; opportunity costs due to damaged credit; and emotional

18   distress.

19   **ANSWER:**   The Bank denies the allegations in paragraph 194.

20       195.   Plaintiffs Granja and Campos seek compensatory damages as well as punitive

21   damages against Wells Fargo, whose conduct evidences a willful, wanton, and reckless disregard for

22   the rights of Plaintiffs Granja and Campos.

23   **ANSWER:**   The Bank admits that Plaintiffs Granja and Campos seek compensatory and punitive

24   damages, but denies that Plaintiffs are entitled to any such damages. The Bank denies the remaining

25   allegations in paragraph 195.

26                        **Georgia Wrongful Foreclosure**

27       196.   Plaintiff Troy Frye brings this claim on his own behalf.

28

1   **ANSWER:**     The allegations of paragraph 196 constitute characterizations of Plaintiffs' Third

2   Amended Class Action Complaint to which no response is required.

3          197.     Wells Fargo owed Plaintiff Frye a duty to exercise the power of sale afforded it by

4   Plaintiff's Security Instrument in conformance with the terms of the Security Instrument and in good

5   faith.

6   **ANSWER:**     The Bank denies the allegations in paragraph 197.

7          198.     Wells Fargo breached its duty by initiating foreclosure proceedings on Plaintiff

8   Frye's home without first giving him notice that he could cure his default by accepting a mortgage

9   modification. Wells Fargo was required to do so under the terms of Plaintiff Frye's Security

10  Instrument. Alternatively, initiating foreclosure proceedings on Plaintiff Frye's home without first

11  offering him a mortgage modification to which he was entitled constitutes bad faith and unfair

12  execution of the Wells Fargo's power of sale.

13  **ANSWER:**     The Bank denies the allegations in paragraph 198.

14         199.     As a result of Wells Fargo's conduct, Plaintiff Frye lost his home and suffered other

15  damages to be proven at trial, including loss of equity in his home; loss of tax benefits; loss of

16  appreciation in his home's value; loss of time and money spent in an effort to avoid foreclosure; loss

17  of time and money put into his home; loss of time and money to find new housing and move his

18  family; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity

19  costs due to damaged credit; and emotional distress.

20  **ANSWER:**     The Bank denies the allegations in paragraph 199.

21         200.     Plaintiff Frye seeks compensatory damages as well as punitive damages against Wells

22  Fargo, whose conduct evidences a willful, wanton, and reckless disregard for the rights of Plaintiff

23  Frye.

24  **ANSWER:**     The Bank admits that Plaintiff Frye seeks compensatory and punitive damages, but

25  denies that Plaintiff is entitled to any such damages. The Bank denies the remaining allegations in

26  paragraph 200.

27

28

**FOURTH CAUSE OF ACTION**
**Violation of California's Homeowners Bill of Rights**
**Brought on Behalf of Plaintiffs Granja and Campos**

201.    Plaintiffs Debora Granja and Sandra Campos incorporate all preceding paragraphs as if fully set forth herein. They bring this claim on their own behalves.

**ANSWER:**    The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

202.    Under California's Homeowners Bill of Rights, Wells Fargo had an obligation to ensure that competent and reliable evidence, including the borrower's loan status and information, supported its right to foreclose before it filed a notice of default or notice or sale in connection with the foreclosure of Plaintiffs Granja's and Campos's respective real property. Cal. Civ. Code § 2924.17.

**ANSWER:**    To the extent paragraph 202 states a legal conclusion, no response is required. To the extent a response is required, the Bank denies the allegations in paragraph 202.

203.    Wells Fargo materially and recklessly violated its obligation because Plaintiffs Granja's and Campos's respective loan information did not support Wells Fargo's right to foreclose. Plaintiffs Granja's and Campos's loan information showed that they qualified for a mortgage modification. Wells Fargo was therefore required to offer Plaintiffs Granja and Campos the opportunity to cure their default by accepting a mortgage modification before it could exercise its right to foreclose under Plaintiffs Granja's and Campos's Security Instruments.

**ANSWER:**    The Bank denies the allegations in paragraph 203.

204.    The automated software that Wells Fargo used to wrongly determine that Plaintiffs Granja and Campos did not qualify for a mortgage modification was not reliable and Wells Fargo was reckless in using the software and relying upon it to support its right to foreclose. The software's results had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led

-58-

1   the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo

2   discovered another software error that caused it to wrongly deny modifications in 2015.

3   **ANSWER:**   The Bank denies the allegations in paragraph 204.

4   205.   As a result of Wells Fargo's violation of the Homeowners Bill of Rights, Plaintiffs

5   Granja and Campos suffered damages according to proof, including loss of their homes; loss of

6   equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following

7   foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money

8   put into their homes; loss of time and money to find new housing and move their families; loss of

9   favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to

10  damaged credit.

11  **ANSWER:**   The Bank denies the allegations in paragraph 205.

12  206.   Pursuant to California Civil Code section 2924.19(b), Plaintiffs Granja and Campos

13  seek an award of treble actual damages or statutory damages of $50,000, whichever is greater.

14  **ANSWER:**   The Bank admits that Plaintiffs Granja and Campos seek treble actual damages or

15  statutory damages of $50,000, whichever is greater, but denies that Plaintiffs are entitled to any such

16  damages. The Bank denies the remaining allegations in paragraph 206.

17  **FIFTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law**
18  **Brought on Behalf of Plaintiffs Granja and Campos**

19  207.   Plaintiffs Debora Granja and Sandra Campos incorporate all preceding paragraphs as

20  if fully set forth herein. They bring this claim on their own behalves.

21  **ANSWER:**   The Bank incorporates by reference its responses to each and every allegation

22  contained in all the foregoing paragraphs as if fully set forth herein.

23  208.   Wells Fargo has violated and continues to violate California's Unfair Competition

24  Law (UCL), which prohibits unlawful, unfair, or fraudulent practices.

25  **ANSWER:**   The Bank denies the allegations in paragraph 208.

26  209.   Wells Fargo engaged in unlawful practices by denying mortgage modifications to

27  Plaintiffs Granja and Campos in violation of HAMP and other governmental requirements.

28  **ANSWER:**   The Bank denies the allegations in paragraph 209.

210.    Wells Fargo engaged in unfair practices by failing to properly verify or audit the automated software it used to determine whether Plaintiffs Granja and Campos were eligible for a mortgage modification. Wells Fargo's faulty verification and auditing practices allowed multiple systemic errors to remain uncorrected for five to eight years and persisted even after the government cited Wells Fargo for failing to adequately audit its mortgage modification and foreclosure processes; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER:**    The Bank denies the allegations in paragraph 210.

211.    Wells Fargo's Board and executive leadership further engaged in unfair practices by failing to properly oversee the Bank's compliance with HAMP and other governmental requirements. Wells Fargo's lack of central oversight has led to series of consumer abuses and billions of dollars in government fines. Yet despite repeatedly promising to reform its oversight practices, Wells Fargo's Board and executive leadership repeatedly failed to implement or maintain procedures to ensure the Bank was complying with HAMP or other applicable government requirements.

**ANSWER:**    The Bank denies the allegations in paragraph 211.

212.    Both Wells Fargo's verification and auditing practices and its oversight practices are unethical, unscrupulous, or substantially injurious to consumers; any legitimate utility of the practices are outweighed by the harm to consumers; and the practices run afoul of the public policies underlying HAMP and California Homeowners Bill or Rights, which seek to help homeowners avoid foreclosure and promote fair mortgage lending and servicing practices.

**ANSWER:**    The Bank denies the allegations in paragraph212.

213.    As a result of Wells Fargo's violations of the UCL, Plaintiffs Granja and Campos have suffered injury in fact and lost money and property, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of

1  favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to

2  damaged credit.

3  **ANSWER:**     The Bank denies the allegations in paragraph 213.

4          214.     Pursuant to California Business and Professions Code section 17203, Plaintiffs

5  Granja and Campos seek such orders or judgments as may be necessary to prevent the Wells Fargo's

6  future use of its unfair and unlawful practices, and to restore to Plaintiffs Granja and Campos any

7  money or property that may have been acquired by means of Wells Fargo's unfair competition.

8  **ANSWER:**     The Bank admits that Plaintiffs Granja and Campos seek relief under California

9  Business and Professions Code section 17203, but denies that Plaintiffs Granja and Campos are

10  entitled to any such relief. The Bank denies the remaining allegations in paragraph 214.

11                  **SIXTH CAUSE OF ACTION**
                **Violation of State Consumer Protection Laws**
12  **Brought on Behalf of Plaintiffs Teague, Hernandez, Wilson and Floyds**

13          215.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein. Plaintiffs

14  Teague, Hernandez, Wilson and Floyds seek recovery under the following state consumer protection

15  statutes as detailed below.

16  **ANSWER:**     The Bank incorporates by reference its responses to each and every allegation

17  contained in all the foregoing paragraphs as if fully set forth herein.  The Bank admits that Plaintiffs

18  Teague, Hernandez, Wilson and Floyd seek recovery under the following consumer protection

19  statutes as detailed below, but denies that Plaintiffs Teague, Hernandez, Wilson, and Floyd are

20  entitled to any such relief.

21                  **Illinois Consumer Fraud Act**

22          216.     Plaintiff Coszetta Teague brings this claim on her own behalf.

23  **ANSWER:**     The allegations of paragraph 226 constitute characterizations of Plaintiffs' Third

24  Amended Class Action Complaint to which no response is required.

25          217.     Wells Fargo's conduct as alleged herein violates the Illinois Consumer Fraud Act

26  (ICFA), 815 ILCS 505/2, which prohibits unfair acts or practices in the conduct of any trade or

27  commerce. Wells Fargo engaged in unfair practices by denying a mortgage modification to Plaintiff

28  Teague in violation of HAMP and other governmental requirements; by failing to properly verify or

1   audit the automated software it used to determine whether she were eligible for a mortgage

2   modification; and by failing to implement or maintain procedures to ensure the Bank was complying

3   with HAMP or other government requirements.

4   **ANSWER:**     The Bank denies the allegations in paragraph 217.

5        218.   As a result of Wells Fargo's violation of the ICFA, Plaintiff Teague suffered damages

6   according to proof, including loss of her home; loss of equity in her home; loss of tax benefits; loss

7   of appreciation in her home's value following foreclosure; loss of time and money spent in an effort

8   to avoid foreclosure; loss of time and money put into her home; loss of time and money to find new

9   housing and move her family; loss of favorable interest rates or other favorable loan terms; damage

10  to credit; and opportunity costs due to damaged credit or higher mortgage payments.

11  **ANSWER:**     The Bank denies the allegations in paragraph 218.

12       219.   Pursuant to 815 ILCS 505/10a, Plaintiff Teague seeks recovery of her actual

13  economic damages, punitive damages, injunctive relief, and attorneys' fees and costs.

14  **ANSWER:**     The Bank admits that Plaintiff Teague seeks recovery of actual damages, punitive

15  damages, injunctive relief, and attorneys' fees and costs, but denies that Plaintiff Teague is entitled

16  to any such relief.

17                            **New Jersey Consumer Fraud Act**

18       220.   Plaintiff Alicia Hernandez brings this claim on her own behalf.

19  **ANSWER:**      The allegations of paragraph 220 constitute characterizations of Plaintiffs' Third

20  Amended Class Action Complaint to which no response is required.

21       221.   Wells Fargo's conduct as alleged herein violates the New Jersey Consumer Fraud Act

22  (NJCFA), N.J.S.A. 56:8-2, which prohibits the use of any misrepresentation or deception in

23  connection with the extension of credit or subsequent servicing of that credit.

24  **ANSWER:**     The Bank denies the allegations in paragraph 221.

25       222.   Wells Fargo represented to Plaintiff Hernandez that she did not qualify for a

26  mortgage modification. That representation was false and caused her ascertainable loss, including

27  loss of her home; loss of equity in her home; loss of tax benefits; loss of appreciation in her homes'

28  value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of

1    time and money put into her home; loss of time and money to find new housing and move her

2    family; loss of favorable interest rates or other favorable loan terms; damage to credit; and

3    opportunity costs due to damaged credit or higher mortgage payments.

4    **ANSWER:**    The Bank denies the allegations in paragraph 222.

5         223.    Had Wells Fargo presented accurate information to Plaintiff Hernandez, she would

6    have opted for the mortgage modification for which she qualified. If Wells Fargo still refused to

7    provide her with a mortgage modification, she could and would have used the knowledge that she

8    qualified for a mortgage modification to fight foreclosure.

9    **ANSWER:**    The Bank denies the allegations in paragraph 223.

10        224.    Pursuant to N.J.S.A 56:8-19, Plaintiff Hernandez seeks an award of treble damages,

11   injunctive relief, and attorneys' fees and costs.

12   **ANSWER:**    The Bank admits that Plaintiff Hernandez seeks an award of treble damages,

13   injunctive relief, and attorneys' fees and costs, but denies that Plaintiff Hernandez is entitled to any

14   such relief.

15                        **New York General Business Law**

16        225.    Plaintiff Rose Wilson brings this claim on her own behalf.

17   **ANSWER:**    The allegations of paragraph 225 constitute characterizations of Plaintiffs' Third

18   Amended Class Action Complaint to which no response is required.

19        226.    Wells Fargo's conduct as alleged herein violates Section 349(a) of New York's

20   General Business Law (GBL), which prohibits deceptive acts or practices

21   **ANSWER:**    The Bank denies the allegations in paragraph 226.

22        227.    Wells Fargo's acts and practices were consumer-oriented, as they affected not only

23   Plaintiff Wilson but similarly-situated consumers as well, and they had the potential to affect even

24   more consumers. The automated software that used to determine Plaintiff Wilson's and other

25   consumers' eligibility for mortgage modifications was systematically flawed and generated

26   inaccurate calculations.

27   **ANSWER:**    The Bank denies the allegations in paragraph 227.

28

228.    The automated software's calculations had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER:**    The Bank denies the allegations in paragraph 228.

229.    Wells Fargo's practice of using systematically-flawed software was deceptive or misleading in a material respect, as it led Plaintiff Wilson to believe that she did not qualify for a mortgage modification and caused her to be wrongly denied a mortgage modification.

**ANSWER:**    The Bank denies the allegations in paragraph 229.

230.    Had Wells Fargo presented accurate information to Plaintiff Wilson, she would have opted for the mortgage modification for which she qualified. If Wells Fargo still refused to provide her with a mortgage modification, she could and would have used the knowledge that she qualified for a mortgage modification to fight foreclosure.

**ANSWER:**    The Bank denies the allegations in paragraph 230.

231.    As a result of Wells Fargo's violation of the GBL, Plaintiff Wilson suffered damages, including loss of her home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into her home; loss of time and money to find new housing and move her family; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

**ANSWER:**    The Bank denies the allegations in paragraph 231.

232.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff Wilson seeks an award of damages, injunctive relief, and attorneys' fees.

**ANSWER:**    The Bank admits that Plaintiff Wilson seeks an award of damages, injunctive relief, and attorneys' fees, but denies that Plaintiff Wilson is entitled to any such relief.

**Pennsylvania Unfair Trade Practices and Consumer Protections Law**

233.    Plaintiffs Cyndi and George Floyd bring this claim on their own behalves.

**ANSWER:**    The allegations of paragraph 233 constitute characterizations of Plaintiffs' Third Amended Class Action Complaint to which no response is required.

234.    Wells Fargo's conduct as alleged herein constitutes a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Stat. Ann. § 201-3, which prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.

**ANSWER:**    The Bank denies the allegations in paragraph 234.

235.    Wells Fargo's practice of using systematically-flawed software to calculate the Floyds' eligibility for mortgage loan modifications was unfair and deceptive, as it led them to believe that they did not qualify for a mortgage modification and caused them to be wrongly denied a mortgage modification.

**ANSWER:**    The Bank denies the allegations in paragraph 235.

236.    The automated software's calculations had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

**ANSWER:**    The Bank denies the allegations in paragraph 236.

237.    The Floyds justifiably relied on Wells Fargo's determination that they did not qualify for a mortgage modification. Had Wells Fargo presented accurate information to them, they would have opted for the mortgage modification for which they qualified. If Wells Fargo still refused to provide the Floyds with a mortgage modification, they could and would have used the knowledge that they qualified for a mortgage modification to fight foreclosure.

**ANSWER:**    The Bank denies the allegations in paragraph 237.

238.     As a result of Wells Fargo's violation of the UTPCPL, the Floyds suffered damages, including loss of their home; loss of equity in their home; loss of tax benefits; loss of appreciation in their home's value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their home; loss of time and money to find new housing and move their family; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher mortgage payments.

**ANSWER:**     The Bank denies the allegations in paragraph 238.

239.     Pursuant to 73 Pa. Stat. Ann. § 201-9.2, the Floyds seek an award of treble damages, equitable relief, and attorneys' fees and costs.

**ANSWER:**     The Bank admits that Plaintiffs Floyd seek an award of treble damages, injunctive relief, equitable relief, and attorneys' fees and costs, but denies that Plaintiffs Floyd are entitled to any such relief.

**PRAYER FOR RELIEF**

The Bank denies that Plaintiffs have any valid claim and denies that Plaintiffs are entitled to any of the relief requested in their Prayer for Relief.

**<u>AFFIRMATIVE DEFENSES</u>**

Without conceding that it bears the burden of proof or persuasion as to any of the issues raised in these defenses (whether denominated as affirmative defenses or otherwise), as separate and distinct affirmative defenses to Plaintiffs' Third Amended Class Action Complaint, the Bank alleges as follows:

**<u>FIRST DEFENSE</u>**

(Failure to State a Claim for Relief)

Neither the Third Amended Class Action Complaint nor any claim for relief asserted therein states facts sufficient to constitute a claim for relief against the Bank.

**<u>SECOND DEFENSE</u>**

(Lack of Standing)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing to sue.

**THIRD DEFENSE**

(Statute of Limitations)

Some or all of Plaintiffs' and the putative class members' claims are barred by the applicable statutes of limitation and repose.

**FOURTH DEFENSE**

(Actual and Proximate Injury)

The relief sought by Plaintiffs is barred, in whole or in part, because Plaintiffs were not actually and proximately injured by reason of any action(s) or omission(s) of the Bank.

**FIFTH DEFENSE**

(Failure to Satisfy Rule 23)

This action cannot be maintained as a class action because the requirements of Fed. R. Civ. P. 23 are not satisfied.

**SIXTH DEFENSE**

(Preemption)

Plaintiffs' claims are barred because they are preempted by applicable federal law and regulations, including the National Bank Act and the Home Owners' Loan Act.

**SEVENTH DEFENSE**

(Unjust Enrichment)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and members of the putative class would be unjustly enriched if allowed to recover any portion of the damages alleged in the Third Amended Class Action Complaint.

**EIGHTH DEFENSE**

(Waiver and Estoppel)

Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

**NINTH DEFENSE**

(Failure to Mitigate)

The Bank alleges Plaintiffs' claims for relief are barred, in whole or in part, because Plaintiffs failed to mitigate, reduce, or otherwise avoid the damages that they allegedly suffered.

-67-

**TENTH DEFENSE**

(Unclean Hands)

The Bank alleges some or all of Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

**ELEVENTH DEFENSE**

(Homeowner Bill of Rights Not Retroactive)

The California Homeowner Bill of Rights does not apply to conduct that occurred before January 1, 2013.

**TWELFTH DEFENSE**

(Compliance with the National Mortgage Settlement Term Sheet)

Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank complied with the National Mortgage Settlement Term Sheet.

**THIRTEENTH DEFENSE**

(Non Owner-Occupied Properties)

Some or all of Plaintiffs' claims are barred, in whole or in part, because their loans were secured by non-owner occupied properties.

**FOURTEENTH DEFENSE**

(Voluntary Payment Doctrine)

Some or all of Plaintiffs' claims are barred, in whole or in part, by the voluntary payment doctrine.

**FIFTEENTH DEFENSE**

(Compliance with Federal Rules and Regulations)

Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank complied with applicable federal rules and regulations.

**SIXTEENTH DEFENSE**

(HAMP Does Not Have the Force of Law)

Some or all of Plaintiffs' claims are barred, in whole or in part, because HAMP does not have the force of law.

1

## SEVENTEENTH DEFENSE

2
(No Intent)

3       Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank's alleged

4 actions were not intentional or reckless.

5

## EIGHTEENTH DEFENSE

6
(Contributory and/or Comparative Negligence)

7       Plaintiffs' damages or injuries, if any, were the direct and proximate result of Plaintiffs' own

8 negligence.

9

## NINETEENTH DEFENSE

10
(No Duty)

11       Some or all of Plaintiffs' claims are barred, in whole or in part, because the Bank had no duty

12 to modify their loans as a matter of law.

13

## TWENTIETH DEFENSE

14
(Claims Barred by Contract)

15       The Bank's relationship with Plaintiffs was governed by the contract documents entered into

16 by and between the parties.  The contract documents set forth the various terms concerning duties

17 and limitations of liability; and those terms are incorporated herein by reference.  Because the Third

18 Amended Class Action Complaint seeks relief contrary to the terms of those contract documents, it

19 fails to state facts sufficient to constitute causes of action upon which relief can be granted and is,

20 accordingly, barred.

21

## TWENTY-FIRST DEFENSE

22
(Lack of Deception or Misrepresentation)

23       Plaintiffs' claims are barred, in whole or in part, because there was no deceptive act or

24 practice, and no misrepresentation or omission.

25

## TWENTY-SECOND DEFENSE

26
(Unjustified Reliance)

27       Plaintiffs' claims are barred, in whole or in part, because the challenged actions are not

28 material enough to justify reliance on them.

**TWENTY-THIRD DEFENSE**

(Lack of Detrimental Reliance)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs did not detrimentally rely upon any conduct alleged in the Third Amended Class Action Complaint.

**TWENTY-FOURTH DEFENSE**

(Good Faith)

This action is barred, in whole or in part, because Wells Fargo always acted in good faith and honesty in fact, and always observed reasonable commercial standards of fair dealing in the trade, when dealing with Plaintiffs.

**TWENTY-FIFTH DEFENSE**

(Plaintiffs' Breaches of Contract)

Plaintiffs' claims are barred, in whole or in part, as a result of Plaintiffs' breaches of their mortgage contracts.

**TWENTY-SIXTH DEFENSE**

(Set-Off/Recoupment)

Plaintiffs' claims are barred, in whole or in part, by the doctrines of set-off and recoupment to the extent that Plaintiffs have already received payment, or that Plaintiffs have unpaid debt.

**TWENTY-SEVENTH DEFENSE**

(Abandonment)

Some or all of Plaintiffs' claims are barred because they abandoned the properties securing their loans.

**TWENTY-EIGHTH DEFENSE**

(Improper Venue)

Plaintiffs' claims are barred, in whole or in part, because venue is not proper in this District.

**RESERVATION OF DEFENSES**

(Additional Defenses)

The Bank presently has insufficient knowledge or information on which to form a belief as to whether it may have available additional, as yet unstated, defenses.  The Bank hereby reserves the

-70-

1  right to assert other defenses and affirmative defenses as this action proceeds, the right to file an

2  amended answer asserting additional defenses or affirmative defenses, and/or file a cross-complaint,

3  in the event that discovery indicates that such pleadings are appropriate.

4

5  DATED: February 20, 2020                    **WINSTON & STRAWN LLP**

6

7                                                By:    /s/ *Amanda L. Groves*
                                                        Amanda L. Groves (SBN: 187216)
8                                                       Morgan E. Stewart (SBN: 321611)
                                                        101 California Street, 34th Floor
9                                                       San Francisco, CA 94111
                                                        Telephone: (415) 591-1000
10                                                      Facsimile: (415) 591-1400
                                                        agroves@winston.com
11                                                      mstewart@winston.com

12                                                      Kobi K. Brinson*
                                                        Stacie C. Knight*
13                                                      300 South Tryon Street, 16th Floor
                                                        Charlotte, NC 28202
14                                                      Telephone: (704) 350-7700
                                                        Facsimile: (704) 350-7800
15                                                      kbrinson@winston.com
                                                        sknight@winston.com
16                                                      *Admitted pro hac vice

17                                                      Attorneys for Defendant
                                                        WELLS FARGO BANK, N.A.
18

19

20

21

22

23

24

25

26

27

28