Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HERNANDEZ *et al*., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO BANK, N.A., <br><br> Defendant. | Case No. 3:18-cv-07354-WHA <br><br> **PLAINTIFFS' OPPOSITION TO WELLS FARGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date: April 2, 2020 <br> Time: 8:00 a.m. <br> Courtroom: 12 <br> Judge: Hon. William H. Alsup |

# <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ............................................................................................................. 1

**RELEVANT FACTUAL BACKGROUND** ........................................................................ 2

**ARGUMENT** ..................................................................................................................... 4

    I.     The United States' Intent Governs the Meaning of Both Contracts ................................ 4

    II.    Wells Fargo Breached the Fannie/Freddie Agreement ....................................... 7

          A.    Fannie/Freddie are U.S. agents and interpret a loan modification as a way to cure a default ............................................................................................... 7

          B.    Fannie/Freddie's interpretation is consistent with the plain meaning of "cure" ... 8

          C.    Even if Extrinsic Evidence Is Admissible, the Evidence Favors Interpreting the Contracts as Requiring Wells Fargo to Offer a Loan Modification ................... 10

          D.    Wells Fargo's Arguments to the Contrary Do Not Warrant Summary Judgment ................................................................................... 11

               1.    Whether the deed of trust and note are read together does not change the result ........................................................................................... 11

          E.    That HAMP did not exist when contracts were executed is irrelevant .............. 12

          F.    Wells Fargo Did Not Comply With the Deed of Trust ...................................... 13

    III.    Wells Fargo Breached the FHA Security Instruments .................................................... 15

          A.    Plaintiffs have a valid breach of contract claim based on HUD regulations incorporated into the FHA contract ................................................................. 15

          B.    HUD regulations precluded Wells Fargo from foreclosing without offering modifications to eligible borrowers ................................................................. 16

          C.    Wells Fargo Breached the FHA Contracts ....................................................... 19

    IV.    Wells Fargo is liable for wrongful foreclosure as to Granja and Campos ...................... 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

V.      The value of the property Wells Fargo took is restitution under the UCL ..................... 21

VI.     There are triable issues of fact as to whether Wells Fargo violated HBOR ................... 23

**CONCLUSION** ......................................................................................................................**24**

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*Audino v. JPMorgan Chase Bank, N.A.,*
   2017 WL 7693387 (S.D. Iowa June 27, 2017) ...................................................................15

*Bank of Am. Nat'l Trust & Sav. Ass'n v. Parnell,*
   352 U.S. 29 (1956).................................................................................................................6

*Bates v. JP Morgan Chase Bank, NA.,*
   768 F.3d 1126 (11th Cir. 2014) ..........................................................................................15

*Boyle v. United Techs. Corp.,*
   487 U.S. 500 (1988)...............................................................................................................6

*Bushell v. JPMorgan Chase Bank, N.A.,*
   220 Cal. App. 4th 915 (2013) ..............................................................................................18

*Chavez v. Indymac Mortg. Servs.,*
   219 Cal. App. 4th 1052 (2013) ............................................................................................20

*Colgan v. Leatherman Tool Group, Inc.,*
   135 Cal. App. 4th 663 (2006) ..............................................................................................21

*Davis v. DRRF Tr. 2015-1,*
   2016 WL 8257126 (W.D. Tex. Jan. 26, 2016) .....................................................................9

*DeLeon v. Wells Fargo Bank, N.A.,*
   2011 WL 311376 (N.D. Cal. Jan. 28, 2011) .......................................................................12

*Dorado v. Bank of Am., N.A.,*
   2016 WL 3924115 (S.D. Fla. July 21, 2016).......................................................................15

*EEOC v. Shell Oil Co.,*
   464 U.S. 54 (1984)..........................................................................................................13, 14

*Feaz v. Wells Fargo Bank, N.A.,*
   745 F.3d 1098 (11th Cir. 2014) ............................................................................................6

*Fletcher v. Sec. Pac. Nat'l. Bank,*

   23 Cal.3d 442 (1979) ................................................................................................21

*Flintkote Co. v. Gen. Acc. Assur. Co.,*

   410 F. Supp. 2d 875 (N.D. Cal. 2006) .....................................................................8

*Fonteno v. Wells Fargo Bank, N.A.,*

   228 Cal.App.4th 1358 (2014) ..................................................................................16

*Fowler v. Wells Fargo Bank, N.A.,*

   2017 WL 3977385 (N.D. Cal. Sept. 11, 2017) ................................................. 15, 16

*Gilmore v. Wells Fargo Bank N.A.,*

   75 F. Supp. 3d 1255 (N.D. Cal. 2014) .....................................................................23

*Hahn v. Select Portfolio Servicing,*

   2018 WL 6046463 (N.D. Cal. Nov. 19, 2018) .........................................................22

*Haynish v. Bank of Am., N.A.,*

   284 F. Supp. 3d 1037 (N.D. Cal. 2018) ...................................................................23

*Hernandez v. Home Sav. Ass'n of Dallas Cty.,*

   606 F.2d 596 (5th Cir. 1979) ...................................................................................15

*Jordan v. Paul Fin., LLC,*

   285 F.R.D. 435 (N.D. Cal. 2012) .............................................................................22

*Kolbe v. BAC Home Loans Servicing, LP,*

   738 F.3d 432 (1st Cir. 2013) ........................................................................... 5, 7, 17

*Korea Supply Co. v. Lockheed Martin Corp.,*

   29 Cal.4th 1134 (2003) ...................................................................................... 22, 23

*Lueras v. BAC Home Loans Servicing, LP,*

   221 Cal.App.4th 49 (2013) ......................................................................................22

*Majd v. Bank of America, N.A.,*

   243 Cal.App.4th 1293 (2015) ..................................................................................22

*Miles v. Deutsche Bank National Trust Co.,*

   236 Cal.App.4th 394 (2015) ....................................................................................20

*Nolasco v. CitiMortgage, Inc.*,

   2012 WL 3648414 (S.D. Tex. Aug. 23, 2012) ........................................................................9

*Paik v. Wells Fargo Bank, N.A.*,

   2011 WL 109482 (N.D. Cal. Jan. 13, 2011) ........................................................................9

*People v. Superior Court (Jayhill)*,

   9 Cal.3d 283 (1973) ........................................................................21

*Pfeifer v. Countrywide Home Loans, Inc.*,

   211 Cal. App. 4th 1250 (Cal. Ct. App. 2012) ........................................................... 15, 16

*Pankow Constr. Co. v. Advance Mortg. Corp.*,

   618 F.2d 611 (9th Cir. 1980) ........................................................................6

*Pulaski & Middleman, LLC v. Google, Inc.*,

   802 F.3d 979 (9th Cir. 2015) ................................................................... 21, 22

*Rogers v. EEOC*,

   454 F.2d 234 (5th Cir. 1971) ........................................................................13

*Ryan-Beedy v. Bank of New York Mellon*,

   293 F. Supp. 3d 1101 (E.D. Cal. 2018) ........................................................................20

*Scott v. Continental Ins. Co.*,

   44 Cal.App.4th 24 (1996) ................................................................... 8, 10

*Vedachalam v. Tata Consultancy Servs., Ltd.*,

   2012 WL 1110004 (N.D. Cal. Apr. 2, 2012) ................................................................... 10, 12

*West v. JPMorgan Chase Bank, N.A.*,

   214 Cal. App. 4th 780 (2013) ........................................................................18

**Statutes**

12 U.S.C. § 1715u(a) ................................................................... 16, 18

12 U.S.C. § 4511(b)(2) ........................................................................7

12 U.S.C. § 5220(a)(1)(A) ........................................................................7

12 U.S.C. § 5220(b)(1) ........................................................................7

Cal. Civ. Code § 2924.17(b) ................................................................................................24

Cal. Civ. Code § 2924.17 ...................................................................................................23

Cal. Civ. Code § 2924.17(a) ..............................................................................................23

**Regulations**

24 C.F.R. § 203.600 ...........................................................................................................19

24 C.F.R. § 203.602 ...........................................................................................................17

24 C.F.R. § 203.604(b) .......................................................................................................17

24 C.F.R. § 203.605(a)...................................................................................................17, 20

24 C.F.R. § 203.606(a)...................................................................................................18, 20

24 C.F.R. § 203.616 ...........................................................................................................17

24 C.F.R. §§ 203.500 .........................................................................................................16

24 C.F.R. §§ 203.501, 203.605(a), 203.606(b)................................................16, 17, 19, 20

**Other Authorities**

Restatement (First) of Restitution § 151 .............................................................................21

Restatement (Second) of Contracts § 203(a) .......................................................................12

**INTRODUCTION**

Defendant Wells Fargo's motion for partial summary judgment relies on a contract interpretation that contradicts the sworn testimony of its own corporate representative, who admitted that a loan modification cures a default. The bank also urges the Court to reject the plain meaning of the contract provisions at issue. More fundamentally, Wells Fargo fails to analyze how the U.S. government views the relevant provisions of the form agreements drafted by Fannie/Freddie and the FHA, government agencies. Where contract language is drafted and required by the United States in standardized agreements, the contract must be interpreted uniformly and the government's intent controls. Here, Fannie/Freddie viewed loan modifications as a way to cure the default, which is consistent with the plain meaning of the contract language. And with respect to the FHA contract, HUD regulations prohibited Wells Fargo from foreclosing before taking all appropriate loss mitigation actions, which includes offering eligible borrowers—like Plaintiffs and Class members here—loan modifications.

In trying to avoid this analysis, Wells Fargo's motion poses the wrong question. The question that must be answered here is not whether, at the time the form contracts were prepared, the drafter intended *HAMP* loan modifications as a way to cure defaults, but rather whether loan modifications generally existed and are regarded as a way to cure defaults. There can be no reasonable dispute that a loan modification existed at the time the contracts were drafted and was (and remains) a way to cure a payment default.

Here, Wells Fargo admits that all Class members qualified for modifications, that it failed to offer them those modifications, and that it subsequently foreclosed on all their homes. Because Fannie/Freddie view a loan modification as a means to cure a loan default, their contract required Wells Fargo to provide notice that the borrower qualified for a modification. Wells Fargo breached this obligation. It also foreclosed on FHA Class members in violation of HUD regulations and thus is not entitled to judgment as a matter of law on the class-wide breach of contract claim.

Plaintiffs Granja and Campos also assert individual claims for the tort of wrongful foreclosure and violation of two California statutes: the Homeowner Bill of Rights (HBOR) and the Unfair Competition Law (UCL). Evidence that Wells Fargo engaged in unfair business practices and breached its obligations under the security instruments precludes summary judgment on Plaintiffs' wrongful

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   foreclosure claims. Summary judgment should likewise be denied as to Campos's HBOR claim

2   because Wells Fargo wrongfully recorded a notice of trustee's sale more than 11 months after HBOR

3   took effect – rendering irrelevant the date the bank recorded the notice of default. As to the UCL claim,

4   Wells Fargo does not seek summary judgment on liability, but argues only that Plaintiffs cannot

5   recover restitution from the bank that took their homes in foreclosure. To the contrary, Plaintiffs are

6   entitled to recover lost equity as restitution under the UCL and thus Wells Fargo is not entitled to

7   summary judgment on this basis, either.

8   ## RELEVANT FACTUAL BACKGROUND

9   Granja entered into a Fannie Mae/Freddie Mac mortgage contract serviced by Wells Fargo in the

10  course of financing her home. Dkt. 232-6 ("Fannie/Freddie Contract"). The Fannie/Freddie contract

11  "combines uniform covenants for national use and non-uniform covenants with limited variations by

12  jurisdiction to constitute a *uniform security instrument covering real property*." *Id.* at p.3 (emphasis

13  added). The choice-of-law provision states that the contract "shall be governed by federal law and the

14  law of the jurisdiction in which the Property is located." *See id.* at ¶ 16.

15  The contract language at issue states:

16  > **Acceleration; Remedies.**  Lender shall give notice to Borrower prior to acceleration
    > following Borrower's breach.... The notice shall specify: (a) the default; (b) *the action*
17  > *required to cure the default*; (c) a date, not less than 30 days from the date the notice is
    > given to Borrower, by which the default must be cured; and (d) that failure to cure the
18  > default on or before the date specified in the notice may result in acceleration of the
    > sums secured by this Security Instrument, and sale of the Property. . .
19

20  *See id*. at ¶ 22 (emphasis added).

21  The Fannie/Freddie contract specifically contemplated modifications by noting that, "[e]xtension of

22  the time for payment *or modification* of amortization of the sums secured by this Security Instrument

23  granted by Lender to Borrower . . . shall not operate to release the liability of Borrower . . ." *Id.* at ¶ 12

24  (emphasis added).

25  In late 2012, Granja encountered financial hardship and had difficulty making her mortgage

26  payments. Deposition of Debora Granja ("Granja Depo."), Ex. 1 to Declaration of Michael Schrag

27  ("Schrag Decl.") at 75:12-76:10. Before then, from the time the loan originated in 2006, Granja had

28  made her payments every month, totaling nearly $165,000 in interest-only payments to Wells Fargo.

Ex. 2 to Schrag Decl.; *see also* Dkt. 231-3 at ¶ 3(B). At the time of her default, Granja tried to apply for

a mortgage modification. She qualified for one under HAMP, but as Wells Fargo admits, it wrongfully

denied her a loan modification. *See, e.g.,* Ex. 3 to Schrag Decl.

Without notifying her that she qualified for a loan modification, Wells Fargo then accelerated her

debt and, in April 2014, sold her home in foreclosure.  The home was sold for approximately $429,000.

*See* Dkt. 232-9. The current value of the home is approximately $692,580. *See* Expert Report of Dan

Salah, Ex. 4 to Schrag Decl. at ¶ 40. Granja has suffered economic harm and also severe emotional

distress that started around the time of foreclosure. *See* Granja Depo. at 143:3-24, 147:3-148:5. Because

of the loss of her home, Granja was forced to pull her children out of the only environment they knew

and her family ultimately dissolved. *See id.*

The other Class representative, Sandra Campos, entered into an FHA Deed of Trust and Note

serviced by Wells Fargo. *See* Dkt. 232-1 ("FHA Deed of Trust") and Dkt. 231-7 ("FHA Note"). The

FHA Deed of Trust specifically contemplated a modification by noting that "[e]xtension of the time of

payment *or modification of amortization of the sums secured by this Security Instrument* . . . shall not

operate to release the liability of the original Borrower." FHA Deed of Trust at ¶ 11. Like the

Fannie/Freddie instruments, the FHA Deed of Trust "combines uniform covenants for national use and

non-uniform covenants with limited variations by jurisdiction *to constitute a uniform security

instrument* covering real property." FHA Deed of Trust at 2 (emphasis added).

The FHA Note explained that:

> If Borrower defaults by failing to pay in full any monthly payment, then Lender may,
> except as limited by regulations of the Secretary in the case of payment defaults, require
> immediate payment in full of the principal balance remaining due and all accrued
> interest. Lender may choose not to exercise this option without waiving its rights in the
> event of any subsequent default. *In many circumstances regulations issued by the
> Secretary will limit Lender's rights to require immediate payment in full in the case of
> payment defaults.* **This Note does not authorize acceleration when not permitted by
> HUD regulations.** As used in this Note, "Secretary" means the Secretary of Housing and
> Urban Development or his or her designee.[1]

The FHA Note further states, in relevant part:

---

[1] FHA Note at ¶ 6(B) (emphasis added).

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

**10. GROUNDS FOR ACCELERATION OF DEBT**

    **(A) Default.** Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by the Security Instrument and due under this Note . . .

    **(D) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights in the case of payment defaults to require immediate payment in full and foreclose if not paid. This Note and the Security Instrument do not authorization acceleration or foreclosure if not permitted by regulations of the Security.[2]

At the time of her default, Campos qualified for a mortgage modification under the FHA-HAMP program. Wells Fargo admits that it wrongfully denied Ms. Campos a loan modification. *See, e.g.*, Ex. 5 to Schrag Decl. Wells Fargo accelerated on the loan and sold her home through foreclosure in early 2014 for approximately $289,000.[3] The current value of her home is approximately $555,000. *See* Ex. 4 to Schrag Decl. at ¶ 5.

Campos purchased the home in Paramount, California so that she could raise her children, then between four and 12 years old, in a safe area away from gang violence and shootings. Deposition of Sandra Campos ("Campos Depo."), Ex. 6 to Schrag Decl. at 217:12-219:11. She also wanted to have a safe home for her mother, who also lived with her. *Id.* at 49:16-23. Campos and her family lost what they thought was going to be their "forever home." *Id.* at 218:19-20.

## ARGUMENT

### I.   The United States' Intent Governs the Meaning of Both Contracts

Because the United States created both contracts at issue, and both are uniform agreements designed to apply to each borrower in the same way, the United States' intent controls. Both the Fannie/Freddie and FHA contracts contain the same choice-of-law provision, which states: "This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located." Fannie/Freddie Contract at ¶ 16; FHA Deed of Trust at ¶ 14. Relatedly, both contracts say they "combine[] uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a *uniform security instrument covering real property*."

---

[2] FHA Note at ¶ 10.

[3] Wells Fargo's motion says Ms. Campos' home was sold for $289,200 and that the "winning bid was over $164,240 less than Ms. Campos' outstanding principal balance, which at the time of the sale, was 369,323.01." Dkt. 231 at 7:22-25. But Wells Fargo's numbers do not support the purported $164,240 difference.

*See id.* at 3 (Fannie/Freddie); *see also id.* at 2 (FHA) (emphasis added).

*Kolbe v. BAC Home Loans Servicing, LP* is instructive on the interpretation of these security instruments. 738 F.3d 432 (1st Cir. 2013) (en banc). That case was a putative class action about a contract dispute over the terms of a paragraph in an FHA mortgage that was mandated by HUD. *Id.* Writing for herself, Judge Howard, and Judge Kayatta, Chief Judge Lynch concluded that "[w]hen dealing with uniform contract language imposed by the United States, it is the meaning of the United States that controls." *Id.* at 442. The court stated that interpretation of government-mandated terms is a matter of law for the court to decide, and that "[w]hen the United States mandates that private parties use uniform language for a certain type of contract, the United States is enacting a policy that all parties to that type of contract should be subject to identical obligations." *Id.*

The United States appeared as *amicus curiae* in *Kolbe* and argued that "the interpretation of [the uniform covenant] is properly a matter of federal law." Br. of United States as Amicus Curiae, 2012 WL 6837765, at *13 n.3. "State law may govern the portions of the standard FHA mortgage that vary from state to state," the government explained, "but it would make little sense for the meaning of a uniform provision prescribed by a federal agency as a nationwide condition of participation in a federal program to depend on the content of state law." *Kolbe*, 2012 WL 6837765 at *13 n.3 (amicus brief).

In vacating dismissal in favor of the loan servicer, the First Circuit relied on HUD's interpretation of the form contract language to ensure consistent interpretation of the uniform clause and rejected the parties' arguments that it needed to rely on the "particularized intentions of the parties." *Id.* at 441. Specifically, the court found that contract language required by HUD must be interpreted based on the intent "meant by the United States when it drafted the regulation." *Id.* at 437, 442 ("if the specified provision is expressly included in the contract in the exact terms required, the provision must be interpreted and given effect in accordance with the intention of the legislature, regardless of what the contracting parties may have understood it to mean").

In *Feaz v. Wells Fargo Bank, N.A.*, the Eleventh Circuit reached the same conclusion: "[w]hen a contract contains a uniform, standard-form provision required by the United States in every such contract across the country, two considerations supplement those general principles: interpretation of

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   the provision cannot vary from place to place or from contract to contract; and the United States drafted

2   the language to implement congressional directives." 745 F.3d 1098, 1104-05 (11th Cir. 2014).

3   Both contracts therefore must be interpreted in a uniform manner based on the United States' intent.

4   *Kolbe* and *Feaz* show that while California state law may govern state-specific provisions (such as the

5   foreclosure process), state law cannot be used to vary the meaning of a contract provision meant to

6   apply in the same way across the country.

7   The cases Wells Fargo cites do not support its argument that state law applies here. *Boyle v. United*

8   *Techs. Corp.* was a tort action based on an alleged design defect in a helicopter that a military

9   contractor manufactured. 487 U.S. 500, 502 (1988). The issue was whether Virginia tort law or federal

10   law applied. *Id*. at 504. The Supreme Court held that federal law applied because the procurement of

11   United States military equipment "is an area of uniquely federal interest" and Virginia law conflicted

12   with the federal government's policies. *Id*. at 505, 507. *Boyle* did not address whether federal common

13   law applies on a breach of contract claim, where the agreement at issue specifies that federal law will

14   govern. *Bank of Am. Nat'l Trust & Sav. Ass'n v. Parnell* is similarly inapplicable. 352 U.S. 29 (1956).

15   The Court there addressed whether state or federal law applied in an action about allegedly stolen

16   government bonds, not which law applies in a contract setting. *Id*. at 30-31.

17   *Pankow Constr. Co. v. Advance Mortg. Corp*., another case Wells Fargo cites, actually supports

18   Plaintiffs' position. 618 F.2d 611, 613-14 (9th Cir. 1980). There, the Ninth Circuit made clear that

19   federal rules should be applied "where a uniform national rule is necessary to further the interests of the

20   Federal Government." *Id*. at 613. The court held that there was no need to apply a uniform rule under

21   *Pankow*'s specific facts concerning a dispute between a mortgage lender and a construction project

22   developer. *Id*. at 613-614. Here, there *is* a need for a uniform rule; the United States itself has stated

23   that its interests would not be served if the meaning of uniform clauses in these standardized

24   government mortgage contracts depended on the vagaries of each state's law. *Kolbe*, 2012 WL

25   6837765 at *13 n.3 (amicus brief).

26   In any event, Wells Fargo does not explain how applying state law over federal common law would

27   make a difference. Dkt. 231 at 9:9-10. "Numerous federal *and* state courts, including the Supreme

28   Court" have affirmed the principle that the meaning of government-mandated contract language should

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  be interpreted in light of the government's interpretation. *Kolbe*, 738 F.3d at 443 (emphasis added).

2  **II.   Wells Fargo Breached the Fannie/Freddie Agreement**

3  **A.   Fannie/Freddie are U.S. agents and interpret a loan modification as a way to**

4  **cure a default**

5  Here, like in *Kolbe*, the federal government mandated the contract language. Fannie and Freddie

6  were (and remain) designated financial agents of the United States government. In September 2008,

7  Fannie and Freddie were placed under conservatorship by the U.S. Treasury.[4] *See also* 12 U.S.C. §

8  5220(a)(1)(A). Under this act, the Federal Housing Finance Agency (FHFA) was created to take control

9  of GSEs and "to implement a plan that seeks to maximize assistance for homeowners and use its

10  authority to encourage the servicers of the underlying mortgages, and considering net present value to

11  the taxpayer, to take advantage of … available programs to minimize foreclosures" like HAMP. 12

12  U.S.C. § 5220(b)(1). The FHFA's authorizing statute gave it broad authority to regulate and control

13  Fannie and Freddie for the duration of the conservatorship. 12 U.S.C. § 4511(b)(2).

14  Moreover, Fannie and Freddie were designated as "financial agents of the United States" to "assist

15  the Treasury with foreclosure prevention" by helping "design and execute a program that implements

16  standardized, streamlined mortgage modifications for all types of servicers" and "lowers monthly

17  payments for qualified borrowers."[5] The Treasury tasked Fannie to "[d]evelop and implement

18  procedures for reporting the initiation and terms of the modification," "communicate the terms of the

19  program to servicers," and "[p]rovide policy management support, including authorship of program

20  documentation." *Id*. at Ex. A, 1.C. 3, 6, 9. Thus, *Kolbe* applies to Fannie and Freddie, as designated

21  financial agents of the United States and through their conservatorship by a U.S. federal agency, in the

22  same way it applied to HUD.

23  Because Fannie and Freddie required the notice language at issue in this case, their interpretation

24  that loan modifications cure defaults is controlling. Fannie requires servicers to include "information

25

26  [4] Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency
    Action to Protect Financial Markets and Taxpayers, September 7, 2008,

27  https://www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx (last visited March 5, 2020).
    [5] *See* Financial Agency Agreement for a Home Ownership Preservation Program under the Emergency

28  Economic Stabilization Act of 2008, Ex. A to Request for Judicial Notice (RJN) at ¶ 1 and Ex. A at ¶
    1A.

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

about the different options that are available to help the borrower cure the delinquency, including HAMP" in solicitation letters. *See Fannie Mae Servicing Guide* (2010) at Section 601, Ex. B to RJN. The guide goes on to state "… any mortgage loan for which an action was taken to cure the delinquency (such as granting forbearance, agreeing to a loan modification…." *See id.* at Section 702; Section 203 (solicitation letters must include "a solicitation of the borrower for participation in HAMP" and "[a] summary of the other options that may be available to cure delinquency").

Freddie Mac's 2012 servicing guide similarly explained that "[a]lternatives to foreclosure are reinstatements, and relief and *workout options that, when used, result in a resolution of a Mortgage Delinquency without foreclosing on the property. See* Freddie Mac Servicing Guide (2011) at Section 65:9, Ex. C to RJN (emphasis added). In a later section, Freddie defines a loan modification as "a workout option that will enable the borrower to retain homeownership." *Id.* at Section 65:12. Read together, Freddie clearly conceives of the loan modification as a workout option that resolves mortgage delinquencies.

Fannie and Freddie agree that under the mortgage contracts, loan modifications cure defaults. And because Fannie and Freddie drafted the provision as financial agents on behalf of the United States, this interpretation controls.

> **B.  Fannie/Freddie's interpretation is consistent with the plain meaning of "cure"**

The government's interpretation accords with the plain reading of the contract language. "In determining the plain meaning of language in a contract, a court may look to a "general" dictionary definition to aid in its analysis." *Flintkote Co. v. Gen. Acc. Assur. Co.*, 410 F. Supp. 2d 875, 887 (N.D. Cal. 2006) (internal citations omitted); *see also Scott v. Continental Ins. Co.*, 44 Cal.App.4th 24, 29 (1996). Both the legal and common definitions define "cure" as a means "to deal with in a way that eliminates or corrects."[6] The legal dictionary further defines the word as meaning "to negate … by restoring the debtor and creditor to their positions before the default." *Id.*

A loan modification "cures" the default because, it "restor[es] the debtor and creditor to their position before the default." *See id.* The plain language and legal definitions show that Wells Fargo's

---

[6] Webster's legal dictionary, accessed January 14, 2020, available at https://www.merriam-webster.com/dictionary/cure#legalDictionary; Merriam-Webster Dictionary, "cure," accessed January 14, 2020, available at https://www.merriam-webster.com/dictionary/cure.

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

interpretation that "cure" could only mean full monetary payment of the amount of the default is overly narrow. *See* Dkt. 59. A modification wipes the slate clean as if the borrower never was in default because any arrearages are added to the principal balance of the loan. A modification therefore "restor[es] the debtor and creditor to their positions before the default." *See supra* n.6. Thus, under the plain language reading of the agreement, a loan modification "cures" the default.

The HAMP cases (mostly from Texas) that Wells Fargo cite are not binding authority on this court and do not support granting Wells Fargo's motion. In those cases, the defendants had not admitted that they were obligated to offer a modification. For example, in *Davis v. DRRF Tr. 2015-1*, the plaintiff was seeking a temporary restraining order one day before a foreclosure sale. 2016 WL 8257126, at *1 (W.D. Tex. Jan. 26, 2016). She argued that the defendant breached the mortgage contract by failing to give her an opportunity to cure her default by modifying her loan under HAMP. *Id*. at *2. The district court dismissed her claim because she failed to offer any support for the notion that a modification was required under the contract. *Id*. Here, however, Wells Fargo has admitted that it had a duty to modify Class members' loans under government-sponsored programs – and has already breached the security instruments by foreclosing on their homes without offering the right to modify.

Similarly, in *Nolasco v. CitiMortgage, Inc*. the Plaintiff also failed to establish her right to a loan modification, and the court merely held she was not entitled to receive a list of possible actions she could take to cure her default. 2012 WL 3648414 at *3 (S.D. Tex. Aug. 23, 2012). In fact, none of these Texas cases Wells Fargo relies on involved borrowers, like Plaintiffs and Class members here, whom the bank admitted were eligible for loan modifications but didn't receive them. Nor do any of those cases properly analyze whether the U.S. government considers a loan modification a way to cure default and thus cannot even be used as persuasive precedent on that point. *See also Paik v. Wells Fargo Bank, N.A.*, 2011 WL 109482, at *4 (N.D. Cal. Jan. 13, 2011) (bank "did not comply with their legal obligations attending contacting plaintiff prior to entry of notice of default, and that failure must be cured before any foreclosure sale can proceed. This failure can be the basis of plaintiff's . . . breach of contract claims").

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1

2      **C.     Even if Extrinsic Evidence Is Admissible, the Evidence Favors Interpreting**

3             **the Contracts as Requiring Wells Fargo to Offer a Loan Modification**

4          The form contracts at issue are also adhesive. Courts interpret adhesive contract terms to give them

5      their "reasonable" meaning "without regard to [class members'] knowledge or understanding of the

6      standard terms of the writing." *Vedachalam v. Tata Consultancy Servs., Ltd.,* 2012 WL 1110004, at *9

7      (N.D. Cal. Apr. 2, 2012) (citations omitted). Thus even if extrinsic evidence is admitted, it will not be

8      based on class members' understanding. The bank's own documents, as well as testimony from its

9      corporate representative at a Rule 30(b)(6) deposition, demonstrate that Wells Fargo always understood

10     that a modification would cure a default, bring an account current, and allow a borrower to avoid

11     foreclosure.[7]

12         Wells Fargo's corporate representative, Robert Ferguson, admitted that a "default would be cured if

13     the loan modification goes through the final settlement process, thus curing the default." Deposition of

14     Robert Ferguson ("Ferguson Depo."), Ex. 7 to Schrag Decl. at 50:5-7. He further testified:

15         Q:  And then the third bullet point says, "[Loan modification] brings your account up to
16              date and may result in a lower, more manageable monthly payment."  Let's break
               that out.  The first part, bringing your account up to date, just means bringing the
17              loan current?
           A:  Correct.
18         Q:  And that would be the same as the language we have been using, curing the default?
           A:  Yes.
19
       *Id*. at 52:11-19.
20

21         This testimony shows there is more than one way to cure a default. Documents Wells Fargo created

22     also show its understanding that modifications cure defaults. For example, Wells Fargo sent letters to

23     Plaintiffs advising them that a modification "would provide you with the opportunity for a fresh start"

24     and "may assist you in bringing your loan current." *See, e.g.,* Ex. 8 and 9 to Schrag Decl. Thus if

25     extrinsic evidence is admitted, there is, at a minimum, a question of fact as to the meaning of the

26     contract which cannot be resolved in Wells Fargo's favor on summary judgment.

27
       ---
28     [7] Plaintiffs contended extrinsic evidence should "not be necessary" to interpret the provisions at issue,
       however, Plaintiffs have never "expressly disclaimed" reliance on extrinsic evidence as Wells Fargo
       argues. Dkt. 231 at 11:10-13.

PLAINTIFFS' OPPOSITION TO MOTION FOR
                                                     PARTIAL SUMMARY JUDGMENT

1

2       **D.**    **Wells Fargo's Arguments to the Contrary Do Not Warrant Summary**

3              **Judgment**

4           **1.**   **Whether the deed of trust and note are read together does not change**

5              **the result**

6     Reading the relevant provisions of the Note and Deed of Trust together still shows Wells Fargo

7 had a duty to notify Granja that she could cure her default through a loan modification. The Note says:

8

9     If I am in default, the Note Holder *may* send me a written notice telling me that if I do
    not pay the overdue amount by a certain date, the Note Holder may require me to pay

10     immediately the full amount of principal which has not been paid and all the interest that
    I owe on that amount. That date must be at least 30 days after the date on which the

11     notice is mailed to me or delivered by other means." Dkt. 231-3 at ¶ 7(C).

12     While the Deed of Trust provides:

13     "Lender *shall* give notice to Borrower prior to acceleration following Borrower's breach
    of any covenant or agreement in this Security Instrument…The notice shall specify: (a)

14     the default; (b) the action required to cure the default; (c) a date, not less than 30 days
    from the date the notice is given to Borrower, by which the default must be cured; and

15     (d) that failure to cure the default on or before the date specified in the notice may result
    in acceleration of the sums secured by this Security Instrument and sale of the Property."

16

17 Dkt. 232-6 at ¶ 22 (emphasis added).

18     Moreover, the Note says:

19     "In addition to the protections given to the Note Holder under this Note, a Mortgage,
    Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this

20     Note…That Security Instrument describes how and under what conditions I may be
    required to make immediate payment in full of all amounts I owe under this Note."

21

22 Dkt. 231-3 at ¶ 11.

23     Wells Fargo contends these provisions, read together, show that the *only* action to cure the default

24 is payment of the overdue amount by a date certain. That argument overreads these provisions.

25 Nothing in the Note or Deed of Trust indicates that payment is the *only* way to cure a default. More

26 importantly, by the plain terms of the Note, it is the Deed of Trust that "describes how and under what

27 conditions I may be required to make immediate payment in full of all amounts I owe under this

28

           PLAINTIFFS' OPPOSITION TO MOTION FOR
                          PARTIAL SUMMARY JUDGMENT

Note." Dkt. 231-3 at ¶ 11. The Note therefore provides an example of one type of notice that a lender *may* send, but that is not the exclusive form of notice.

Further, "[s]ince an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous." Restatement (Second) of Contracts § 203(a) cmt. b (1979). Wells Fargo's interpretation that the term "cure" is synonymous with "payment" would render portions of the paragraph at issue to be superfluous. The Fannie/Freddie contract requires a lender to send notice of acceleration containing "the action required to cure the default." Dkt. 232-6 at ¶ 22. In the same paragraph, there are references to the lender's ability to require "immediate payment" and to the term "sums" twice. *See id.* If to "cure the default" the borrower could only make a "payment" or tender the proper "sum," then the contract would specifically use those terms, as it did in other parts of the same paragraph. If there were multiple ways to cure a default, such as through a loan modification, then this distinction in language would make sense.[8] Wells Fargo's interpretation ignores this distinction. Moreover, because there are defaults other than payment defaults, there is necessarily more than one way to cure a default.

Wells Fargo's reliance on *DeLeon v. Wells Fargo Bank, N.A.* is misplaced. There, the plaintiffs alleged that Wells Fargo engaged in fraudulent practices by misrepresenting its commitment to complete a loan modification for plaintiffs. 2011 WL 311376, at *7 (N.D. Cal. Jan. 28, 2011). The plaintiffs claimed "if they had known Wells Fargo never intended to complete the loan modification process, they would have instead concentrated their efforts on reinstating the loan prior to the trustee's sale." *Id.* It is in this specific context, that the plaintiffs would have attempted to pay off their loan in full if they knew Wells Fargo wasn't committed to offering a loan modification, that the court wrote: "In order to cure the default, Plaintiffs would have had to pay [the amount in arrears] in full, plus any payment obligations that accrued after the default was recorded. *Id. DeLeon*, therefore, does not stand for the broad proposition that paying the amount in arrears is the *only* way to cure a default.

### E.    That HAMP did not exist when contracts were executed is irrelevant

Wells Fargo argues that HAMP loan modifications were not always among the options in the

---

[8] According to Wells Fargo's narrow interpretation, a borrower facing a non-monetary default has only one option to cure such a default: payment of money. Such a result makes no sense.

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   mortgage industry to cure a default. This timing argument, however, improperly disregards that when

2   contract (no less than a statute) use general words, those words are to be accorded their full and fair

3   scope. *Cf.* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 10

4   (2012) ("Without some indication to the contrary, general words (like all words, general or not) are to

5   be accorded their full and fair scope. They are not to be arbitrarily limited."). Here, the government

6   chose not to identify those specific practices that could qualify as actions to cure the default but simply

7   used general language that produces general coverage. *Cf. Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.

8   1971) ("Congress chose neither to enumerate specific discriminatory practices, nor to elucidate in

9   extenso the parameter of such nefarious activities. Rather, it pursued the path of wisdom by being

10  unconstrictive, knowing that constant change is the order of our day and that the seemingly reasonable

11  practices of the present can easily become the injustices of the morrow."), *disapproved on other*

12  *grounds by EEOC v. Shell Oil Co*., 464 U.S. 54 (1984). That general language thus was always

13  sufficiently broad to include a loan modification as an action to cure the default, which is precisely why

14  the United States has expressed that this is one such option.

15       In any event, while the security instruments don't mention HAMP, they expressly refer to loan

16  modifications generally. Dkt. 232-6 at ¶ 12 ("Extension of the time for payment *or modification* of

17  amortization of the sums secured by this Security Instrument granted by Lender to Borrower…. Shall

18  not operate to release the liability of Borrower…"). Wells Fargo does not even address this provision of

19  the agreement. Moreover, relying in part on this provision Wells Fargo ignores that this Court has

20  already considered and rejected Wells Fargo's overly narrow timing argument in granting plaintiffs

21  leave to file the second amended complaint. *See* Dkt. 136 at 4:4-8, ("Plaintiffs' proposed amended

22  complaint alleges that the instrument references the possibility of modification. Even though such

23  modifications were not government-mandated at the time of contracting, it is nonetheless plausible that

24  the mutual understanding at the time of contracting was that all available default-avoidance measures

25  would be considered…").[9]

26  

27  [9] Wells Fargo argues that this Court previously found that the requirement to offer a loan modification
    only comes from HAMP; but this citation to the initial motion to dismiss order is *at best* misleading.

28  Dkt. 87. The Court noted, "The secured-loan instrument does not mention mortgage modification at

1

2
**F.    Wells Fargo Did Not Comply With the Deed of Trust**

3
Despite being faced with a document titled "Notice of Default," Wells Fargo attempts to argue that

4
a form delinquency letter is the notice of default contemplated by the Fannie/Freddie contract. But as

5
Wells Fargo's expert explains, the first notice is a notice of delinquency, which precedes a notice of

6
default. Deposition of Peter Ross, Ex. 10 to Schrag Decl. at 15:7-16:1 ("Q: Aren't there actually two

7
notices that would go to the borrower? The first one saying, "Hey, we noticed you're behind. Contact

8
us. We'd like to help get you on track," before an actual notice of default is filed? A: Yes. I would

9
amplify there's usually multiple such notices and perhaps verbal attempts to contact the borrower. Q:

10
Sure. And so – so I – I call that a notice of delinquency. I don't know if that's the industry term you're

11
familiar with, but what – what would you refer the letter to borrowers – the initial letter or letters to

12
borrowers notifying them that they're behind before notice of default is filed? A: Okay. I would call

13
them delinquency notices.").

14
The language of the security instruments supports this interpretation. In reviewing the language of

15
the Note and the Deed of Trust, it is clear the document Wells Fargo sent is not a notice of default but

16
rather a notice of delinquency. As the Note provides, Wells Fargo *may* send out a notice of

17
delinquency. Dkt. 231-3 at 7(C) ("If I am in default, the Note Holder *may* send me a written notice

18
telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to

19
pay immediately the full amount of principal which has not been paid and all the interest that I owe on

20
that amount …") (emphasis added). In comparison, the Deed of Trust provides that Wells Fargo *shall*

21
send out the notice that provides the way in which to cure. Dkt. 232-6 at ¶ 22. Read together, the notice

22
of delinquency is permissive while the notice of default is mandatory.

23
Further, Wells Fargo's proposed interpretation that the January 2013 letter is the notice of default

24
requires the Court to ignore the separate document titled, "Notice of Default and Election to Sell Under

25
Deed of Trust." *See* Dkt. 232-7. This notice of default was recorded on December 20, 2013, *after* the

26
error at issue occurred. *See id.*; *see also* Dkt. 231-1 (identifying Granja's error date). This evidence

27

28
all." *Id.* at 15:6-7. In response, Plaintiffs sought and were granted leave to file a second amended
complaint that added citations to the security instruments regarding modification. *See* Dkt. 136 at 4:4-8.

1   shows that Wells Fargo failed to notify Granja that she qualified for a loan modification that would

2   have cured her default. But Wells Fargo takes the untenable position that a delinquency notice

3   somehow counts as the notice of default in an effort to show it provided some form of notice before it

4   accelerated Granja's debt. This argument is akin to the famous line in the Wizard of Oz, "pay no

5   attention to the man behind the curtain" and should be rejected.

6   **III.   Wells Fargo Breached the FHA Security Instruments**

7   **A.   Plaintiffs have a valid breach of contract claim based on HUD regulations**

8   **incorporated into the FHA contract**

9   Similarly, the FHA Deed of Trust provided that Wells Fargo could not require immediate payment

10   in full where "limited by regulations issued by the [HUD] Secretary…" and that the "Security

11   Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the

12   Secretary." *See, e.g.*, Dkt. 232-1at ¶ 9(a), (d). Wells Fargo was thus required to comply with HUD

13   regulations as a **condition precedent** to foreclosure. *See, e.g.*, *Dorado v. Bank of Am., N.A.*, 2016 WL

14   3924115, at *5 (S.D. Fla. July 21, 2016) (describing "the majority rule that 'breach of contract claims

15   based on a failure to comply with HUD regulations' are viable where the mortgage instrument

16   expressly incorporates HUD regulations"). Moreover, "a California court would most likely apply the

17   majority rule that 'breach of contract claims based on a failure to comply with HUD regulations' are

18   viable." *Id.*[10]

19   As Wells Fargo acknowledged, Judge Gilliam from this district agrees that HUD violations can be

20   the basis of a contract claim. *See Fowler v. Wells Fargo Bank, N.A.*, 2017 WL 3977385, at *4 (N.D.

21   Cal. Sept. 11, 2017) (holding breach of contract claim for HUD violations was viable). The Court in

22   *Fowler* examined and summarily rejected the perfunctory holding of the California appellate court

23   opinion, *Pfeifer v. Countrywide Home Loans, Inc.*, which Wells Fargo cites. 211 Cal. App. 4th 1250

24

25   [10] *See also, e.g.*, *Bates v. JP Morgan Chase Bank,  NA.*, 768 F.3d 1126, 1132 (11th Cir. 2014) (holding
    "HUD regulations clearly referenced in a deed as conditions precedent to the power to accelerate and

26   the power of sale could form the basis of a breach of contract action"); *Hernandez v. Home Sav. Ass'n
    of Dallas Cty.*, 606 F.2d 596, 601 (5th Cir. 1979) (finding that HUD regulations incorporated into

27   mortgage documents become part of the contract); *Audino v. JPMorgan Chase Bank, N.A.*, 2017 WL
    7693387, at *6 (S.D. Iowa June 27, 2017) ("HUD regulations were clearly referenced in the promissory

28   note and incorporated into the contract as an enforceable term").

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  (Cal. Ct. App. 2012). Specifically, the *Fowler* court noted that the California appellate court "did not

2  discuss…why HUD regulations that are properly incorporated into a contract are not contract terms that

3  can form the basis of a breach of contract claim." *See id.* at \*4. Thus, *Fowler* allowed the plaintiff's

4  contract claim to proceed. *See id.*

5      Wells Fargo's reliance on *Fonteno v. Wells Fargo Bank, N.A.* is misplaced. 228 Cal.App.4th 1358

6  (2014). In *Fonteno*, the appellate court affirmed a claim for breach of contract based on HUD

7  regulations. *Id.* at \*1370 ("To be clear, we are being asked to permit enforcement of a contract, not a

8  statute."). In examining *Pfeifer*, the court in *Fonteno* stated that it was following the "part of *Pfeifer*

9  that allows a party to pursue equitable relief. We have no need to reconsider its holding regarding a

10  party's pursuit of damages because the only viable relief sought by plaintiffs in this case is equitable").

11  *Id.* at \*1371.

12            **B.**    **HUD regulations precluded Wells Fargo from foreclosing without offering**

13                    **modifications to eligible borrowers**

14      Here, Wells Fargo breached the FHA contract because HUD regulations did not authorize the

15  bank to foreclose on borrowers who should have been offered loan modifications. Wells Fargo is wrong

16  when it argues that Plaintiffs did not identify regulations supporting the HUD breach of contract claim.

17  Dkt. 231 at 18. In fact, Plaintiffs rely on at least three regulations plus a Supplemental Directive. The

18  regulations required that Wells Fargo give notice of options available to cure a default, and they

19  specifically contemplate loan modifications.[11] *See* 24 C.F.R. §§ 203.501, 203.605(a), 203.606(b).

20  Accordingly, the Court found the FHA contract claim was "neither futile nor frivolous" and that

21  "…plaintiffs have alleged mortgage modification was part of the policies at the time…" *See* Dkt. 136,

22  4:20-22.

23      HUD regulations prevent servicers from proceeding with foreclosure if they have not complied with

24  the requirements set forth in the regulations. *See* 24 C.F.R. §§ 203.500 ("[i]t is the intent of the

25

26  ───────────────

[11] The requirement to offer loan modifications to prevent foreclosure (a key aim of the HAMP program)

27  is reiterated under the National Housing Act. *See* 12 U.S.C. § 1715u(a). For mortgages insured by the
U.S. government, including FHA-insured mortgages, "mortgagees **shall** engage in loss mitigation actions

28  **for the purpose of providing an alternative to foreclosure** (including but not limited to actions such
as … **loan modification[s]**)." *Id.* (emphasis added).

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

Department that no mortgagee shall commence foreclosure or acquire title to a property until the requirements of this subpart have been followed.") and 203.606(a) ("Before initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met."). For example, lenders "shall evaluate on a monthly basis all of the loss mitigation techniques provided at §203.501" and then "**shall** take the appropriate loss mitigation action." 24 C.F.R. § 203.605(a) (emphasis added). Therefore, if a borrower was eligible for a loan modification, the "appropriate loss mitigation action" would be to offer that loan modification to the eligible borrower.[12] Section 203.501 refers to loss mitigation actions, including "recasting of mortgages under §203.616." 24 C.F.R. § 203.501. "Recasting of mortgages" refers to mortgage modification, which is the verbatim title of §203.616. 24 C.F.R. § 203.616.

In official guidance issued by the Treasury Department ("Treasury") regarding HAMP, the Treasury mandated that servicers offer eligible homeowners HAMP loans:

> To ensure that a borrower currently at risk of foreclosure has the opportunity to apply for the HAMP, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program and, **if eligible, an offer to participate in the HAMP has been made**. Servicers must use reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for the HAMP, including in-person contacts at the servicer's discretion.

HAMP Supplemental Directive No. 09-01, Ex. D to RJN at p. 14 (Apr. 6, 2009) (emphasis added). This directive states in no uncertain terms that "[t]he guidelines set forth in this document apply to all eligible mortgage loans." *Id.* at 1. Wells Fargo, as a participant in the HAMP program, was required to offer HAMP loan modifications to eligible homeowners like Campos. Her FHA Note and Deed of Trust incorporated applicable HUD regulations. Thus, the requirements set forth in those regulations are binding upon Wells Fargo, and its failure to abide by those regulations constitutes a breach of the mortgage contracts. *See also Kolbe*, 738 F.3d at 436 ("When interpreting a written contract, we look at text, context, and purpose to discover whether a proffered reading of the contract is reasonable. For contract language mandated by a federal regulation, this context includes the regulation and the federal

---

[12] Moreover, HUD regulations provide that a servicer must send a delinquency notice to a borrower on an approved form, conduct a face-to-face interview if reasonably close to a borrower's location, and evaluate borrowers for loss mitigation actions and "**shall** take the appropriate loss mitigation action." *See* 24 C.F.R. § 203.602; 24 C.F.R. § 203.604(b); and 24 C.F.R. § 203.605(a) (emphasis added).

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  policy underlying the regulatory scheme.").

2     Wells Fargo's arguments to the contrary fail. First, Wells Fargo does not dispute that it was

3  required to provide loan modifications to qualifying borrowers, but it does dispute that it was required

4  to *tell* borrowers about the modification for which they qualified. This is makes no sense. The

5  regulations state that, "mortgagees **shall** engage in loss mitigation actions for the purposes of **providing**

6  an alternative to foreclosure." *See* 12 U.S.C. § 1715u(a) (emphasis added). In order to *provide* an

7  alternative to foreclosure, the mortgagee must *communicate* that alternative to the borrower. Wells

8  Fargo's argument that it did not have to tell Ms. Campos that she qualified for a mortgage modification

9  runs afoul of this provision. As the HUD Secretary stated in the 2011 report to Congress, "FHA has

10  maintained a robust set of policies for loan servicer *engagement with borrowers* to provide assistance in

11  curing mortgage delinquencies," including loan modifications.[13] *See also* Supplemental Directive, Ex.

12  D to RJN p. 14 ("Servicers must use reasonable efforts to contact borrowers facing foreclosure to

13  determine their eligibility for HAMP, including in-person contacts at the servicer's discretion. Servicers

14  must not conduct foreclosure sales on loans previously referred to foreclosure or refer new loans to

15  foreclosure during the 30-day period that the borrower has to submit documents evidencing an intent to

16  accept the Trial Period Plan offer.").[14] Wells Fargo's arguments that it did not have to tell borrowers

17  they qualified for a mortgage modification cannot be squared with the overarching policies of FHA,

18  HAMP, and HUD regulations.

19     HUD also provided detailed regulations and guidelines on how mortgagees should provide loss

20  mitigation options to borrowers in order to avoid foreclosure. Wells Fargo contends 203.606(a) does

21  not say anything about "notifying" borrowers of a loan modification and that Wells Fargo complied

22  with its requirements. But Wells Fargo is mistaken that this section does not say anything about a loan

---

23

24  [13] HUD Annual Report to Congress for Fiscal Year 2011,
   https://www.hud.gov/sites/documents/FHAMMIFANNRPTFY2011.PDF (last visited March 4, 2020)

25  (emphasis added).
   [14] "Supplemental Directive 09-01, a regulation the Treasury issued in April 2009, delineates HAMP's

26  eligibility requirements and modification procedures. Lenders must perform HAMP loan modifications
   in accordance with Treasury regulations." *Bushell v. JPMorgan Chase Bank, N.A.*, 220 Cal. App. 4th

27  915, 923 (2013) (internal citations omitted); *see also West v. JPMorgan Chase Bank, N.A.*, 214 Cal.
   App. 4th 780, 797-98 (2013) (finding Supplemental Directive 09-01 governed lender's conduct

28  concerning offers of loan modifications).

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

modification. Rather, this section provides a foreclosure may not occur until "all servicing requirements of this subpart have been met." 24 C.F.R. § 203.606(a). Among other requirements, "mortgagees shall take prompt action to collect amounts due from mortgagors to minimize the number of accounts in a delinquent or default status. Collection techniques must be adapted to individual differences in mortgagors and take account of the circumstances peculiar to each mortgagor." 24 C.F.R. § 203.600. If the only way to cure a default is simply paying the amount in full, to what "circumstances peculiar to each mortgagor" would HUD be referring?

This understanding is bolstered by the HUD handbook that provides, "[t]he purpose of all collection efforts is to bring a delinquent mortgage current in as short a time as possible, to avoid foreclosures to the extent possible, and to minimize losses. HUD does not expect to see a delinquent mortgage foreclosed if there is a reasonable chance of saving the mortgage…A successful servicing strategy treats each delinquent mortgagor individually; and, based on the circumstances involved, custom tailors a foreclosure prevention workout plan that will be successful in *curing the delinquency* and preventing a foreclosure." Chapter 7-1 Collection Activities (24 CFR 203.600), Ex. E to RJN (emphasis added).

Wells Fargo also contends that 24 C.F.R. §§ 203.501 and 203.605(a) only require that servicers minimize financial losses to HUD. With respect to 203.501, the section relates to "elective servicing actions" and includes "recasting of mortgages," or a modification. Whether these sections also minimized financial losses to HUD does not change that HUD directed servicers to offer a loan modification if a borrower qualified. Moreover, they were designed to save FHA money in light of the financial crisis.[15]

### C.   Wells Fargo Breached the FHA Contracts

By Wells Fargo's own admission, it failed to comply with the incorporated regulations in Campos's Note and Deed of Trust. Wells Fargo confessed to its failure in letters to Campos:

> We have some difficult news to share. When you were considered for a loan

---

[15] HUD Annual Report to Congress for Fiscal Year 2011 at [/ 54, https://www.hud.gov/sites/documents/FHAMMIFANNRPTFY2011.PDF (last visited March 4, 2020) ("…enhancements were made to FHA's loss mitigation requirements to increase the use of trial payment periods prior to the mortgagee executing a Loan Modification or Partial Claim action to cure a default. Trial payment plans are expected to reduce re-default rates on loan modifications and partial claims, and thereby reduce costs to the FHA Insurance Fund.").

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation, and we're sorry. If it had been correct, you would have been approved for a trial modification.

*See* Ex. 5 to Schrag Decl.

Wells Fargo's confession reveals its failure to abide by the regulations incorporated into Campos' Note and Deed of Trust and constitutes a breach of the FHA contract. Wells Fargo admits it failed to properly evaluate homeowners for loss mitigation actions, and therefore did not "take the appropriate loss mitigation action" by offering HAMP loans to those eligible homeowners. 24 C.F.R. § 203.605(a). Further, Wells Fargo clearly did not "consider the comparative effects of [its] elective servicing actions" and, therefore, did not "take those appropriate actions" as required by HUD regulation. 24 C.F.R. § 203.501. In addition, Wells Fargo's proper evaluation of homeowners and its offer of loan modifications to eligible borrowers were conditions precedent to foreclosure according to HUD regulations. *See* 24 C.F.R. § 203.606(a) ("Before initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met").

## IV.     Wells Fargo is liable for wrongful foreclosure as to Granja and Campos

Granja and Campos's wrongful foreclosure claim is based in part on their breach of contract claim, since the wrongful foreclosure claim asks whether the bank failed to exercise its power of sale in compliance with the mortgage contracts' terms. *See Chavez v. Indymac Mortg. Servs.*, 219 Cal. App. 4th 1052, 1062-63 (2013).  "An action for the tort of wrongful foreclosure will lie if the trustor or mortgagor can establish that at the time the power of sale was exercised or the foreclosure occurred, no breach of condition or failure of performance existed on the mortgagor's or trustor's part which would have authorized the foreclosure or exercise of the power of sale." *See Miles v. Deutsche Bank National Trust Co.*, 236 Cal.App.4th 394, 408 (2015) (citation omitted). Summary judgment should be denied for the same reasons Plaintiffs' contract claim should not be dismissed.

Their wrongful foreclosure claim is also based on the bank's unfair business practices. Dkt. 220 at ¶ 192; *Ryan-Beedy v. Bank of New York Mellon,* 293 F. Supp. 3d 1101, 1115 (E.D. Cal. 2018). Both the Fannie/Freddie and FHA contracts required Wells Fargo to provide notice to Granja and Campos that they could cure their default by accepting a loan modification before foreclosing, and Wells Fargo admits that it failed to offer a modification before foreclosing.

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

1    There is also ample evidence showing Wells Fargo engaged in unfair practices. The bank

2  discovered the error that caused the incorrect loan modification decisions in 2013, and its senior leaders

3  were briefed on the issue. Ex. 11 to Schrag Decl. Around that time, Wells Fargo identified 50 loans

4  where a modification was wrongly denied because of the error. Ex. 12 to Schrag Decl. The employee

5  who discovered it and a risk consultant recommended a fix, but the bank felt no urgency to implement

6  even a partial fix until 2015. Ex. 13 to Schrag Decl. It wasn't until 2018 that the bank definitively

7  concluded that this error had been harming borrowers from 2010 to 2018, and 500 of those impacted

8  borrowers lost their homes through foreclosure. This evidence, coupled with the parties' dispute over

9  Wells Fargo's obligations under the security instruments, precludes summary judgment on the wrongful

10  foreclosure claim. *See also* Dkt. 173-3 to 173-64.

11    **V.    The value of the property Wells Fargo took is restitution under the UCL**

12    The California Supreme Court has made clear that a court may exercise broad powers in

13  awarding restitution in order to restore "the *status quo ante* as nearly as may be achieved." *Colgan v.*

14  *Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 698 (2006); *see also Fletcher v. Sec. Pac. Nat'l.*

15  *Bank*, 23 Cal.3d 442, 452 (1979) ("A court of equity may exercise its full range of powers 'in order to

16  accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as

17  may be achieved.'") (quoting *People v. Superior Court (Jayhill)*, 9 Cal.3d 283, 286 (1973)).

18    The primary purpose of UCL restitution is restoring the plaintiff to the position she would have

19  been in absent the wrongdoing. *Colgan*, 135 Cal.App.4th at 697-698 (citing *Fletcher*, 23 Cal.3d at 452*);*

20  *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988-89 (9th Cir. 2015). Where a defendant

21  has wrongfully taken a plaintiff's property, the measure of restitution "'is the value of the property at

22  the time of its improper acquisition … *or a higher value if this is required to avoid injustice' where the*

23  *property has changed in value*." *Id*. (citations omitted) (emphasis added). The Ninth Circuit cites to the

24  Restatement of Restitution in *Pulaski*; and the Restitution states that if property the defendant took has

25  fluctuated in value, the measure of restitution can be adjusted (and made higher) to avoid injustice.

26  Restatement (First) of Restitution § 151.

27    Courts have established that the specific form of restitution Plaintiffs seek – the value of the

28  homes Wells Fargo took from them -- is recoverable under the UCL. For example, in *Majd v. Bank of*

*America, N.A.*, the plaintiff sued under the UCL based on the defendant-bank's "dual tracking" (*i.e.* initiating a loan modification review while simultaneously proceeding with foreclosure) and ultimate wrongful foreclosure of his home. 243 Cal.App.4th 1293, 1302 (2015). The court considered whether the plaintiff had "lost money or property as a result of the unfair competition," and stated, "[t]here is no question that plaintiff alleged economic injury in the form of the loss of his home." *Id*. at 1034 (citing *Lueras v. BAC Home Loans Servicing, LP*, 221 Cal.App.4th 49, 82 (2013)). The *Lueras* court similarly held that "[s]ale of a home through a foreclosure sale is certainly a deprivation of property to which a plaintiff has a cognizable claim" for UCL purposes. 221 Cal.App.4th at 82; *see also Hahn v. Select Portfolio Servicing*, 2018 WL 6046463, at *4 (N.D. Cal. Nov. 19, 2018) (plaintiffs established claim for UCL standing by alleging they lost equity in their property and paid "improper foreclosure fees").

As in *Majd* and *Lueras*, Wells Fargo wrongfully took Plaintiffs' homes at the time of foreclosure and later sold them; it is therefore impossible to return the actual property back to Plaintiffs. So, to restore the *status quo ante* "as nearly as can be achieved," Plaintiffs seek the value of the homes as restitution. And because those homes have increased in value since the time of the foreclosures, the Court may award that higher value to avoid injustice. It would be unjust to measure the value of the property taken at a time when values were low, given that one of the purposes of the modification was to allow borrowers to stay in their homes and enjoy the benefits of long-term home ownership, including appreciation in value. *See Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 455 (N.D. Cal. 2012) (Illston, J.) (finding plaintiffs had shown injury in fact under the UCL with lost equity in their home as well as loan payments they paid due to the wrongful conduct).

Wells Fargo's reliance on *Korea Supply Co. v. Lockheed Martin Corp*., is misplaced. 29 Cal.4th 1134 (2003). In *Korea Supply*, the plaintiff alleged that the defendant unlawfully induced a foreign government to award a military purchase contract to the defendant rather than the plaintiff's client. *Id* at 1140. The plaintiff stood to receive a $30 million commission had its client been awarded the contract. *Id*. The Supreme Court of California held because the plaintiff did not have "an ownership interest in the money it seeks to recover from defendants" and was "not seeking the return of money or property that was once in its possession," *id*. at 1149, it was seeking non-restitutionary disgorgement, which the UCL does not permit. Here, in contrast, Wells Fargo took Plaintiffs' homes that *were* once in their

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  possession; thus, Plaintiffs are not attempting to recover the non-restitutionary disgorgement *Korea*

2  *Supply* prohibits.

3       Plaintiff's expert Dan Salah has estimated the current value of the homes today, and to avoid a

4  windfall to Plaintiffs, subtracted out the full amount that they owed on those properties under the

5  mortgage modifications they should have received. Awarding restitution in the form of lost home value

6  minus debt owed on the home will restore the *status quo ante* as nearly as possible, since Wells Fargo

7  no longer owns those homes and is not able to return them to Plaintiffs. That Wells Fargo disagrees

8  with Salah's restitution estimates is a question of fact for the jury and not a basis on which to grant

9  summary judgment.

10  **VI.    There are triable issues of fact as to whether Wells Fargo violated HBOR**

11       Wells Fargo argues that Plaintiff Campos's HBOR claim fails because HBOR was not yet in

12  effect at the time the bank wrongfully recorded a notice of default against her home on February 10,

13  2011.  A cursory review of the facts exposes this argument as specious.

14       California Civil Code § 2924.17 provides, in relevant part:

15       (a)  A declaration recorded pursuant to Section 2923.5 or pursuant to Section 2923.55, a notice
16       of default, ***notice of sale***, assignment of a deed of trust, or substitution of trustee recorded by or
         on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements
17       of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure
         proceeding shall be accurate and complete and supported by competent and reliable evidence.
18
19       (b)  Before recording or filing any of the documents described in subdivision (a), a mortgage
         servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the
20       borrower's default and the right to foreclose, including the borrower's loan status and loan
         information.
21
22       *Id*. (emphasis added).

23       The bank focuses on the wrongful notice of default it recorded against Campos's home on

24  February 10, 2011, but neglects to mention the notice of trustee's sale it wrongfully recorded on

25  November 5, 2013[16] – more than 11 months after HBOR took effect in January 2013. As the language

26  of § 2924.17(a) plainly states, wrongfully recording a notice of sale gives rise to liability under HBOR

27  just like wrongfully recording a notice of default does. *See also Haynish v. Bank of Am., N.A.*, 284 F.

28

---

[16] Dkt. 232-4.

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

1  Supp. 3d 1037, 1047 (N.D. Cal. 2018) (plaintiff stated claim of HBOR violation arising out of

2  servicer's recording of notice of trustee's sale); *Gilmore v. Wells Fargo Bank N.A.*, 75 F. Supp. 3d

3  1255, 1266 (N.D. Cal. 2014) (same). And there is evidence showing that Wells Fargo failed to "review[

4  ] competent and reliable evidence to substantiate" its right to foreclose. Cal. Civ. Code § 2924.17(b);

5  Ex. 14 and 15 to Schrag Decl. Had Wells Fargo calculated Campos' eligibility for a loan modification

6  using an accurate attorney's fees matrix – which it admits it did not – it would have realized that

7  Campos qualified for a loan modification that would have cured her default and given her a chance to

8  avoid foreclosure.

9       Thus, Wells Fargo's arguments regarding the non-retroactive nature of HBOR are irrelevant.

10  The notice of trustee's sale wrongfully recorded against Campos's home on November 5, 2013 is a

11  proper basis for her HBOR claim, and summary judgment on this claim should be denied.

12  **CONCLUSION**

13       For the foregoing reasons, Plaintiffs respectfully request that the Court deny Wells Fargo's

14  Motion for Partial Summary Judgment.

15  Dated: March 5, 2020                                    Respectfully submitted,

16

17  /s/ Michael Schrag
     **GIBBS LAW GROUP LLP**

18       Michael L. Schrag (SBN 185832)
     Joshua J. Bloomfield (SBN 212172)

19       Linda P. Lam (SBN 301461)
     505 14th Street, Ste. 1110

20       Oakland, California 94612
     Telephone:  510-350-9700

21       Facsimile:  510-350-9701

22       mls@classlawgroup.com
     lpl@classlawgroup.com

23       Richard M. Paul III

24       Ashlea G. Schwarz
     Laura C. Fellows

25       **PAUL LLP**

26       601 Walnut Street, Suite 300
     Kansas City, Missouri 64106

27       Telephone: 816-984-8100
     Facsimile:  816-984-8101

28       Rick@PaulLLP.com
     Ashlea@PaulLLP.com

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

*Counsel for Plaintiffs and the Class*

PLAINTIFFS' OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT