Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HERNANDEZ, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 3:18-cv-07354 -WHA<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT (UNOPPOSED)**<br><br>Date:  April 16, 2020<br>Time:  8 a.m.<br>Dept:  Courtroom 12<br>Judge:  Hon. William H. Alsup |

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE THAT** on April 16, 2020, at 8:00 a.m., or as soon thereafter as this matter may be heard before the Honorable William H. Alsup, Courtroom 12, United States District Court for the Northern District of California, located at 450 Golden Gate, San Francisco, California, Plaintiffs and class representatives Debora Granja and Sandra Campos will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 23, for an Order:

1.   Preliminarily approving the parties' proposed class action settlement;

2.   Provisionally certifying the settlement class as defined in the settlement agreement;

3.   Appointing Granja and Campos as class representatives for the settlement class;

4.   Appointing Michael Schrag of Gibbs Law Group LLP and Richard Paul of Paul LLP as class counsel for the settlement class;

5. Approving the notice program, including the form of notice proposed in the settlement and submitted with this motion, and directing that notice be disseminated in accordance with this program;

6. Appointing JND Legal Administration as settlement administrator and directing it to carry out the duties and responsibilities stated in the settlement agreement, along with Cathy Yanni;

7. Approving NeighborWorks America as next-best recipient of residual settlement funds in the event such funds cannot feasibly be distributed to settlement class members;

8. Setting a final approval hearing and other deadlines necessary for final settlement approval as well as staying other litigation deadlines.

This motion is unopposed and based on this notice of motion and motion, the accompanying memorandum of points and authorities, the settlement agreement and corresponding exhibits, and the following declarations in support of preliminary approval:

- Declarations of counsel Michael Schrag and Richard Paul with exhibits
- Declaration of Jennifer Keough of JND Legal Administration
- Declaration of Cathy Yanni of JAMS.

This motion is also based on all papers and records on file in this matter, and such other matters as the Court may consider. An agreed-upon proposed order is also being filed contemporaneously. Based thereon, the motion for preliminary approval of the proposed class action settlement should be granted

MOTION FOR PRELIMINARY APPROVAL

## TABLE OF CONTENTS

I.     INTRODUCTION                                                                  1

II     SUMMARY OF ARGUMENT                                                           2

III.   OVERVIEW OF LITIGATION                                                        2

       A.   The Alleged Circumstances that Prompted This Lawsuit                     2

       B.   An Abbreviated History of These Legal Proceedings                        3

IV.    TERMS OF PROPOSED SETTLEMENT                                                  5

       A.   Proposed Settlement Class                                                5

       B.   Settlement Fund                                                          6

       C.   Settlement Allocation                                                    7

            1.   Economic Damages Fund                                               7

            2.   Severe Emotional Distress Fund                                      8

            3.   Secondary or Cy Pres Distribution                                   8

       D.   Settlement Administration & Notice                                       8

       E.   Release                                                                  10

V.     ARGUMENT                                                                      10

       A.   Certification of the Proposed Settlement Class Is Appropriate, and Appointment of

            Class Counsel Is Merited                                                 10

       B.   The Proposed Settlement Merits Preliminary Approval                      11

            1.   Strength of the Class's Case                                        12

            2.   Risk, Complexity, Costs, and Likely Duration of Further Litigation  13

            3.   Amount Offered in Settlement and the Release                        15

            4.   Method of Distributing Relief                                       20

            5.   Stage of the Proceedings and Extent of Discovery Completed          20

            6.   Support of Experienced Counsel                                      20

            7.   Attorney's Fees and Costs                                           21

            8.   No Signs of Collusion                                               21

            9.   Equitable treatment of Class Members                                22

MOTION FOR PRELIMINARY APPROVAL

1

      10.   **Class Representatives and Counsel Are Adequate**     **23**

2

  **C.**    **The Settlement Provides the Best Method of Notice Practicable**     **24**

3

  **D.**    **Approval of the Proposed Settlement Administrators and Cy Pres Recipients**     **24**

4

**VI.**  **CONCLUSION**     **24**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    MOTION FOR PRELIMINARY APPROVAL

# TABLE OF AUTHORITIES

**Cases**

*Altamirano v. Shaw Indus., Inc.,*
 No. 13-cv-00939-HSG, 2015 WL 4512372 (N.D. Cal. July 24, 2015) ................................ 22, 23

*Boyd v. Bechtel Corp.,*
 485 F. Supp. 610 (N.D. Cal. 1979) ........................................................................... 20

*Calderon v. Wolf Firm,*
 No. 16-1266-JLS (KESx), 2018 WL 6843723 (C.D. Cal. Mar. 13, 2018) ................................ 15

*Chao v. Aurora Loan Services,*
 2015 WL 294823 (N.D. Cal. Jan. 21, 2015) ........................................................... 15

*Class. See Etter v. Allstate Ins. Co.,*
 No. 17-00184, 2018 WL 5761755 (N.D. Cal. May 30, 2018) ...................................... 13

*Class Plaintiffs v. Seattle,*
 955 F.2d 1268 (9th Cir. 1992) ........................................................................ 13

*Clesceri v. Beach City Investigations & Protective Servs., Inc.,*
 No. 10-3873-JST (RZx), 2011 WL 320998 (C.D. Cal. Jan. 27, 2011) ............................. 20

*Gaudin v. Saxon Mortgage Services, Inc.,*
 2015 WL 7454183 (N.D. Cal. Nov. 23, 2015) ................................................... 16, 17

*Hanlon v. Chrysler Corp.,*
 150 F.3d 1011 (9th Cir. 1998) ..................................................................... 21, 22

*Hayes v. MagnaChip Semiconductor Corp.,*
 No. 14-1160-JST, 2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) .................................. 18

*Hesse v. Sprint Corp.,*
 598 F.3d 581 (9th Cir. 2010) ........................................................................ 19

*In re Anthem, Inc. Data Breach Litig.,*
 327 F.R.D. 299 (N.D. Cal. 2018) .................................................................... 14

*In re Bluetooth Headset Prods. Liab. Litig.,*
 654 F.3d 935 (9th Cir. 2011) ......................................................................... 21

MOTION FOR PRELIMINARY APPROVAL

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.,*
    No. 17-md-027770EMC, 2019 WL 536661 (N.D. Cal. Feb. 11, 2019) .................................... 18

*In re Diamond Foods, Inc.,*
    No. 11-05386 WHA, 2013 WL 5400539 (N.D. Cal. Sept. 26, 2013) ........................................ 19

*In re LendingClub Sec. Litig.,,*
    No. C 16-02627 WHA, 2018 WL 1367336 (N.D. Cal. Mar. 16, 2018) .................................... 19

*In re LinkedIn User Privacy Litig.,*
    309 F.R.D. 573 (N.D. Cal. 2015) ........................................................................................... 15

*In re MyFord Touch Consumer Litig.,*
    2019 WL 1411510 (N.D. Cal. Mar. 28, 2019) ................................................................. 21, 22

*In re Omnivision Techs., Inc.,*
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................................. 20

*In re Painewebber Ltd. P'ships Litig.,*
    171 F.R.D. 104 (S.D.N.Y. 1997) .......................................................................................... 21

*In re Tableware Antitrust Litig.,*
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ........................................................................... 12, 15

*Linney v. Cellular Alaska P'ship,*
    151 F.3d 1234 (9th Cir. 1998) ....................................................................................13, 18, 20

*Linney v. Cellular Alaska P'ship,*
    Nos. C-96-3008 DLJ, 1997 WL 450064 (N.D. Cal. July 18, 1997) ........................................ 21

*Messineo v. Ocwen Loan Servicing, LLC,*
    2017 WL 733219 (N.D. Cal. Feb. 24, 2017) ......................................................................... 18

*Munday v. Navy Fed. Credit Union,*
    2016 WL 7655807 (C.D. Cal. Sept. 15, 2016) ....................................................................... 12

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
    221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................................... 15, 20

*Saravia v. Dynamex Operations West, LLC,*
    No. 14-05003 WHA, 2017 WL 1295069 (N.D. Cal. Apr. 4, 2017) ........................................ 19

*Officers for Justice v. Civil Serv. Comm'n of S.F.*,
  688 F.2d 615 (9th Cir. 1982) ........................................................................ 12

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ........................................................................ 18

*Sadowska v. Volkswagen Grp. of Am., Inc.*,
  No. 11-00665-BRO (AGRx), 2013 WL 9600948 (C.D. Cal. Sept. 25, 2013) ............ 22

*Schuchardt v. Law Office of Rory W. Clark*,
  2016 WL 232435 (N.D. Cal. Jan. 20, 2016) ..................................................... 15

*Schwartz v. Dall. Cowboys Football Club, Ltd.*,
  157 F. Supp. 2d 561 (E.D. Pa. 2001) ............................................................. 12

*Smith v. Levine Leichtman Capital Partners, Inc.*,
  2012 WL 12920189 (N.D. Cal. Nov. 15, 2012) ................................................. 20

*Staton v. Boeing*,
  327 F.3d 938 (9th Cir. 2003) ........................................................................ 22

*Steiner v. Am. Broad. Co., Inc.*,
  248 F. App'x 780 (9th Cir. 2007) .................................................................. 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  895 F.3d 597, 611 (9th Cir. 2018) ................................................................. 12

*Wershba v. Apple Comput., Inc.*,
  91 Cal. App. 4th 224 (2001) ......................................................................... 22

**Regulations**

24 C.F.R. § 203.605(a) ................................................................................. 13

**Other Authorities**

4 A. Conte & H. Newberg, *Newberg on Class Actions* § 11:50 (4th ed. 2002) ............ 16

Manual for Complex Litigation, Fourth § 21.63 (2004) .......................................... 10

1

## I.     INTRODUCTION

2       Plaintiffs seek preliminary approval of a proposed class action settlement providing monetary relief

3  for all individuals in the United States who lost their homes in foreclosure after defendant Wells Fargo

4  erroneously failed to offer them trial mortgage modifications because the bank overstated the amount of

5  attorney's fees in the eligibility calculation. The nationwide relief negotiated under the supervision of

6  Magistrate Judge Donna Ryu, after over a year of intensive litigation and probing discovery, would end

7  this litigation against Wells Fargo on the following terms.

8       Wells Fargo would establish a non-reversionary $18.5 million fund for monetary payments for

9  settlement class members. Under the proposed allocation plan, the 512 settlement Class members—the

10 same class this Court certified—would each receive between $14,000 and $120,000, depending on

11 factors such as their unpaid principal balance, period of delinquency, and how much they already

12 received from Wells Fargo in remediation. No claim form is required for these payments.

13      The proposed settlement also allocates $1 million to compensate settlement Class members who

14 suffered severe emotional distress as a result of the foreclosure of their homes. Qualifying settlement

15 Class members would substantiate their emotional injuries through a claims process. Cathy Yanni, a

16 seasoned mediator, would evaluate submissions and award compensation. Following that process, the

17 settlement would provide a second distribution if funds remain. If a second distribution is not feasible,

18 then a proposed next-best recipient—a national non-profit housing organization—would receive

19 residual funds. The $18.5 million fund will also cover any court-approved administration expenses,

20 costs, and attorney's fees.

21      The proposed settlement compares favorably to other class action settlements for wrongful loan

22 modification denials. Courts in this District and elsewhere have granted final approval of class

23 settlements that have returned far less in compensation for similar harms. From our research, it appears

24 that this settlement offers Class members among the highest monetary awards in a negotiated

25 compromise concerning similar allegations. Given the settlement's many strengths and the real risk of

26 losing or achieving far less after trial, the Court should grant this unopposed motion to begin the

27 settlement approval process.

28

MOTION FOR PRELIMINARY APPROVAL

## II.      SUMMARY OF ARGUMENT

All the factors this Court must consider weigh in favor of granting preliminary approval here. *First*, it is appropriate to conditionally certify a settlement class coextensive with the litigation class that this Court certified just two months ago after rigorously applying Rule 23. (Dkt. 217.) There is no reason to depart from the Court's previous certification decision.

*Second*, the proposed settlement is fair, reasonable, and adequate, and meets the criteria for final approval. It is the product of serious, informed, non-collusive negotiations, before a federal magistrate judge, after hard-fought litigation and extensive discovery. It does not improperly grant preferential treatment to class representatives or segments of the class. It falls within the range of possible approval and has no obvious deficiencies. To assure the Court that preliminary approval is appropriate and final approval likely, Plaintiffs discuss below the class definition, the substantial and non-reversionary settlement benefits, allocation plan (including for unclaimed funds and the claims process for emotional distress awards), scope of the release, the risks and range of litigated outcomes, the extent of discovery, the views of Plaintiffs and Class Counsel, and the manner in which attorney's fees will be addressed. Plaintiffs will also demonstrate that there are no signs, explicit or subtle, of collusion between the parties. For example, there is no "clear sailing" agreement for attorney's fees, the class representatives will not be seeking any service awards, and there is no undisclosed side agreement made in connection with the proposed settlement. Plaintiffs will also seek the Court's approval of a settlement administrator, the appointment of Yanni as special master to assess claims for compensation for severe emotional distress, and a national non-profit housing agency as a potential *cy pres* recipient.

*Third*, the proposed content and method of the class notice plan is the best practicable for this case. It includes direct notice by mail to all settlement class members, which is the same form of notice the Court ordered after certification. The notice will also be available online in English and Spanish. It will answer typical questions and provide all important information.

## III.      OVERVIEW OF LITIGATION

### A.      The Alleged Circumstances that Prompted This Lawsuit

This case concerns allegations that Wells Fargo wrongfully denied trial loan modifications to approximately 870 homeowners, over 500 of whom lost their homes via foreclosure. From 2010 to

2018, a calculation error in Wells Fargo's software overstated the amount of attorney's fees used when calculating borrowers' eligibility for a trial loan modification under the federal Home Affordable Modification Program (HAMP). Rather than limit such fees to the maximum allowable under HAMP, the bank added the limits to fees actually incurred, and consequently, certain homeowners who should have qualified for trial modifications were deemed unqualified for such financial assistance.

Wells Fargo discovered the error in 2013 and implemented a partial fix in 2015. A related error, however, continued until 2018. That same year, Wells Fargo publicized the error and implemented a comprehensive fix. The bank also sent affected homeowners a letter apologizing for its mistake, and it provided compensation, mainly between $5,000 and $15,000, to some of these homeowners. The letters also invited borrowers to mediate legal disputes.

### B.    An Abbreviated History of These Legal Proceedings

Plaintiff Alicia Hernandez filed a putative class action in December 2018, seeking damages for all such affected homeowners nationwide. Shortly after initiating suit, Plaintiff asked this Court to order Wells Fargo to explain the propriety of its communications with putative class members. After a hearing, the Court ordered Wells Fargo to send borrowers corrective letters to advise them of this litigation and their right to be represented by counsel in mediations with Wells Fargo. (Dkt. 28.)

Plaintiffs then filed a First Amended Complaint on behalf of Hernandez and 14 other proposed class representatives against Wells Fargo Bank and its parent company. (Dkt. 44.) Both defendants moved to dismiss. (Dkts. 59, 73.) The Court dismissed the parent company and granted in part and denied in part Wells Fargo's motion. Specifically, the Court denied the motion to dismiss with respect to Plaintiffs' intentional infliction of emotional distress, UCL, Homeowner's Bill of Rights, and other state consumer protection claims (Dkt. 87.) The Court dismissed the breach of contract, wrongful foreclosure, and negligence claims. (*Id.* at p. 17.) Plaintiffs, however, later resurrected the contract claim. During discovery, Plaintiffs deposed a corporate representative who testified that a loan modification was a way to cure a payment default. Plaintiffs argued this supported their contract interpretation and they sought and were granted leave to amend the contract claim in a Second Amended Complaint. (Dkts. 136, 137.) Wells Fargo answered this complaint. (Dkt. 141.)

During and after that motion practice, the parties engaged in robust discovery. Class Counsel

MOTION FOR PRELIMINARY APPROVAL

reviewed more than 200,000 pages of documents and deposed seven Wells Fargo employees in Iowa, Oregon, Minnesota, North Carolina, and California. (Declaration of Michael Schrag ("Schrag Decl.") at ¶ 8.) Plaintiffs also served five sets of interrogatories and three sets of requests for production (to which Wells Fargo responded and later supplemented on several occasions). (*Id*.) Wells Fargo served requests for production and multiple sets of interrogatories to fifteen named Plaintiffs and deposed 16 named Plaintiffs (including class representative Sandra Campos, who was recently added). The bank also deposed 18 other *absent* Class members throughout California. (*Id*. at ¶ 10.) Class Counsel spent many hours reviewing each Class member's loan file (hundreds, if not thousands of pages, and often produced a day or two before the deposition) and preparing each for a deposition that often lasted all day. (*Id*.)

Class Counsel retained Brian Kelley, a banking industry expert, to opine about liability issues and Dan Salah, a damages expert, to build a model to estimate Class member damages. Each expert prepared a report and supplemental report, and Class Counsel defended their depositions. Class Counsel also deposed the two experts Wells Fargo hired to rebut Kelley's and Salah's opinions. (*Id*. at ¶ 13.)

Discovery was contentious and the parties submitted more than five discovery disputes to the Court. (Dkts. 102, 105, 106, 110, 175, 181, 193, 196, 218, 219; Schrag Decl. at ¶ 11.) The Court compelled Wells Fargo to produce several categories of discovery, including testimony regarding the bank's efforts to comply with certain government consent orders and certain documents concerning loan modification practices that were given to board-level committees. (Dkt. 115 at ¶¶ 1, 3.)

There were two rounds of class certification briefing and arguments. (Dkts. 138, 173.) Plaintiffs' second motion argued that class certification was appropriate because common issues regarding Wells Fargo's conduct predominated, while Wells Fargo opposed, arguing that individual causation and damages issues predominated. (Dkt. 188 at 10-15.) After carefully considering certification of a California-only class to test the manageability of a class trial, on January 29, 2020, the Court certified a nationwide class under Rule 23(b)(3) to pursue the breach of contract claim on behalf of foreclosed borrowers. (Dkt. 217 at 4.) In that order, the Court appointed Debora Granja and Sandra Campos as class representatives and Gibbs Law Group LLP and Paul LLP as Class Counsel. (Dkt. 217 at 11.)

Per that order, Plaintiffs filed a Third Amended Complaint that added Campos and included all the

named Plaintiffs' individual claims (such as intentional infliction of emotional distress, HBOR, UCL, and other state consumer protection claims) as well as the certified breach of contract claim on behalf of the nationwide class. (Dkt. 220.) Shortly after the Court's certification order, the parties filed a joint proposal for class notice. (Dkt. 233.) Under Rule 23(f), Wells Fargo petitioned the Ninth Circuit for permission to appeal the class certification order and asked this Court to stay proceedings pending the appeal. (Dkt. 229.) Plaintiffs opposed the Rule 23(f) petition as well as the motion to stay. (Dkt. 243.)

In late February, Wells Fargo filed a motion for partial summary judgment seeking to dismiss the class-wide breach of contract claim, Granja's and Campos's individual UCL and wrongful foreclosure claims, and Campos' HBOR claim. (Dkt. 231.) Wells Fargo argued that it was entitled to judgment as a matter of law on the contract claim—the only claim the Court certified—because neither the Fannie/Freddie nor FHA contracts required the bank to notify Plaintiffs and Class members that they qualified for loan modifications before foreclosing on their homes. (Dkt. 231.) That motion was pending when the parties settled.

The parties participated in a settlement conference before Judge Ryu on March 3, 2020, while Plaintiffs were in the midst of opposing Wells Fargo's summary judgment motion. (Dkt. 180; Schrag Decl. at ¶ 14.) Although the parties did not reach an agreement on that day, they agreed to consider Judge Ryu's mediator's proposal. (Schrag Decl. at ¶ 14.) Two days later, the parties agreed to Judge Ryu's monetary proposal and over the next three weeks negotiated the remaining settlement terms. (*Id.*) On March 26, the parties executed the formal settlement agreement now before the Court. The parties also retained an experienced settlement administrator, JND Legal Administration, after soliciting three bids. (*Id.* at ¶ 15.) With JND's help, the parties developed a notice and funds distribution plan. (*Id.*)

## IV.    TERMS OF PROPOSED SETTLEMENT

### A.    Proposed Settlement Class

If approved, the settlement would offer relief to the following proposed class:

> All persons in the United States who between 2010 and 2013 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

(Settlement Agreement, Ex. 1 to Schrag Decl. ("Settlement") at § II, ¶¶ 6, 39).

The settlement Class is the same as the certified litigation class (Dkt. 217 at 4) and thus satisfies Section 1(b) of the Northern District's Procedural Guidelines for Class Action Settlements.

The settlement bars any recovery by: (a) Wells Fargo and its principals, affiliated entities, legal representatives, successors, and assigns; (b) any Person who files a valid, timely Request for Exclusion; (c) federal, state, and local governments (including all agencies and subdivisions thereof); and (d) any Person who settled and released claims at issue in this Action. (Settlement at § II, ¶ 39). Plaintiffs are not aware, however, of any Class member who is also a Wells Fargo principal or governmental entity. And, as a practical matter, the exclusion of persons who signed individual releases is a function of those releases, not any material change to the class definition.

### B.     Settlement Fund

The proposed settlement provides an $18,500,000 settlement fund. (Settlement at § IV.) The settlement fund is non-reversionary, meaning Wells Fargo would not be entitled to retain any part of the Settlement for any reason. (*Id.*)

After payment of attorney's fees and expenses to Class Counsel and settlement administration costs to JND, the remaining balance (or net settlement fund) would be distributed to Class members to compensate for economic loss, except that $1 million would be allocated to compensate for severe emotional distress. (*Id.* at § IV, ¶ B.)

There is no claims process associated with compensation for economic loss because the Class members are known, and Plaintiffs submit the amount of their monetary payments can be fairly determined based on economic modeling, as discussed below. As such, upon final approval, JND would mail checks to Class members and follow-up with them if checks are not deposited.

The claims process for severe emotional distress funds would require Class members to complete a straightforward claim form that allows them to substantiate any emotional distress. A proposed special master, Cathy Yanni of JAMS, would evaluate such claims and award compensation from the fund.

Any residual would be distributed to Class members on a pro rata basis based on each Class member's share of the total checks cashed from the Severe Economic Damages Fund. (Allocation Plan, Ex. 2 to Schrag Decl. at 2.) If, however, a second distribution is infeasible, then the settlement

agreement proposes that NeighborWorks America, a congressionally chartered, nonpartisan, charitable organization focused on affordable housing, receive any residual as a *cy pres*.

### C. Settlement Allocation

#### 1. Economic Damages Fund

For this fund, the allocation plan recognizes that Wells Fargo has already paid Class members an average of 38% of the Unpaid Principal Balance (UPB) of their loan at the time of the decision error. (Allocation Plan at 1; Schrag Decl. at ¶ 21.) The allocation plan uses this percentage as a benchmark, and initially provides each Class member the amount needed to bring the total of each Class member's settlement payment and their remediation payments to 38% of their UPB. The allocation plan, however, reduces this amount by 5% for every six months of delinquency, but sets a minimum payment from the settlement fund of $14,000, in recognition of the fact that each Class member was denied a trial modification and later lost his or her home to foreclosure. The plan thus results in a minimum total compensation of $14,000, which, including prior payments Wells Fargo made, means each Class member will have received at least $24,000 in connection with the error. (*Id.*)

This plan recognizes that lost equity varies among Class members, and some have already received substantial compensation from Wells Fargo for such losses. As such, the allocation plan uses the UPB at the time of the error as a proxy for the value of the modification denied. In general, Class members with larger UPBs are more likely to have suffered more lost equity and, under Plaintiffs' theory, more damages as a result of the lost modification opportunity. (Schrag Decl. at ¶ 21.)

The allocation plan reduces payments to Class members with long delinquency periods (unless they are already receiving the minimum $14,000 payment). This reduction captures the economic realities of this case: long delinquencies decrease the potential economic value of a loan modification. The number of days of each Class member's delinquency has a practical correlation to both the ability of the borrower to perform under a loan modification and the amount of equity versus unpaid interest and fees being re-amortized in a loan modification. Further, higher delinquency equates to longer occupancy in properties for which mortgage payments were not made; meaning Class members received the value of keeping their properties longer without making mortgage payments. The allocation plan thus applies a discount factor of 5% for each six-month period of loan delinquency. (Allocation Plan at 1; Schrag

MOTION FOR PRELIMINARY APPROVAL

Decl. at ¶ 21.) In these ways, the allocation plan fairly and appropriately distributes compensation for economic harm based on the realities of this case.

### 2.     Severe Emotional Distress Fund

Class members may claim compensation for severe emotional distress. Recognizing not all would be able to show severe emotional distress caused by the bank's error, the Settlement sets aside $1 million and requires Class members to submit a claim. The proposed form asks for a narrative statement and, if available, supporting documentation, such as medical records. (Claim Form, Ex. 3 to Schrag Decl.) Cathy Yanni, a special master at JAMS with experience valuing settling plaintiffs' claims for emotional distress, helped design the form, and if appointed by this Court, would resolve claims for compensation based on factors including the severity of emotional distress and the extent to which the Class member can demonstrate it was caused by Wells Fargo's error as opposed to other life issues. (*See* Yanni CV, Ex. 6 to Schrag Decl. and Declaration of Cathy Yanni.)  Yanni will also entertain a single request for reconsideration from each participating Class member. (Settlement at § 4, ¶ B). Based on her experience administering similar settlements, she estimates approximately 10% (or 50 individuals) of Class members will submit a claim form to the severe emotional distress damages fund. (*See* Yanni Decl. at ¶ 10; N.D. Cal., *Proc. Guidance for Class Action Sett.* § 1(g).)

### 3.     Secondary or Cy Pres Distribution

Finally, funds remaining from the economic damages fund (opt-out amounts and uncashed checks) along with any undistributed funds from the severe emotional distress fund will either be redistributed to Class members who cash their checks (pro rata based on each Class member's proportionate share of the cashed checks from the initial payment) or, if the residual is less than $25,000, then awarded to a *cy pres* recipient. The parties propose NeighborWorks America, a congressionally chartered, nonpartisan, charitable organization focused on affordable housing. (Settlement at § IV ¶ C.)

### D.     Settlement Administration & Notice

The Settlement provides that a Class Action Administrator will administer the notice plan and distribute the net settlement fund in accordance with the Settlement and the Court's orders. (Settlement at § V.) Wells Fargo solicited bids from a list of three qualified administrators. JND's bid was the most cost effective; it agreed to provide settlement administration services for no more than $65,000—of

MOTION FOR PRELIMINARY APPROVAL

which, $12,950 will be allocated to pay Yanni. Gibbs Law Group has worked favorably with JND in the past two years. (*Id.* at ¶ 15.) (Paul LLP has not worked with JND in the past two years.) The parties selected JND because of the reasonableness of its costs in relation to the value of the settlement and its proven track record in settlement administration and notice.

Together, the parties and JND developed a robust "Notice Program" that uses all available data and tools to provide notice to all members of the Class. (Declaration of Jennifer Keough at ¶¶ 15-17.) JND will send notice via first-class mail. As part of its remediation program, Wells Fargo mailed letters to each Class member and employed detailed skip tracing procedures for any letters that were returned as undeliverable. (Schrag Decl. at ¶ 15.) Wells Fargo will provide the most updated names and addresses for each class member to JND. (*Id.*) JND will initially perform a National Change of Address search and conduct advanced address updating using a variety of tools such as Lexis Nexis or other locator services to obtain a current address. (Keough Decl. at 16.)

JND will mail Notice to all Class members using first class mail, address correction requested. (Settlement at § II, ¶ A.10.) For Class members whose notices are returned as undeliverable, JND will update addresses and promptly resend notices. Similarly, JND will update its database with any notices that are forwarded by the post office to addresses that have recently changed. (Keough Decl. at ¶ 17.)

The Class Notice itself is modeled on Federal Judicial Center examples and the notice form this Court approved on March 12. (Dkt. 256.)  The Class Notice clearly explains the material aspects of the settlement, as well as how to opt out of or object to the settlement. (Proposed Notice, Ex. 5 to Schrag Decl.). The Notice will identify a dedicated Settlement Website with links to important case documents as well as a Spanish translation of the Notice. Class members will have 45 days from the date of initial mailing of the Notice to opt out of or object to the Settlement. The Notice will direct Class members to submit opt-out requests to JND, who will promptly forward copies to the parties. The Notice will also instruct Class members who wish to object to the Settlement to submit their objections to the Court and will detail what information must be provided. After the deadline for opt-outs and objections, JND will prepare a report for the Court and the parties summarizing all requests for exclusion.[1]

---

[1] JND will provide notice of the proposed settlement under CAFA. (Keough Decl. at ¶ 12.)

MOTION FOR PRELIMINARY APPROVAL

1   **E.     Release**

2   In exchange for the benefits provided under the Settlement, Class members will provide a release of

3   claims against Wells Fargo and its officers, directors, legal representatives, successors, subsidiaries, and

4   assigns limited to "all claims, rights, causes of action, liabilities, actions, suits, damages, or demands

5   (including Unknown Claims as defined in Paragraph 47, herein), of any kind whatsoever that arise out

6   of or are based on the claims set forth in the Action, including claims based on the subject Loan

7   Modification Denials, damages based on any failure to modify the Loans and/or damages based on the

8   foreclosures challenged in the Action."[2] (Settlement at §II, ¶ 32.) In turn, Wells Fargo will release class

9   members from any claims related to this litigation or settlement. (*Id.*)

10  ## V.     ARGUMENT

11  The procedure for judicial approval of a proposed class action settlement under Rule 23(e) typically

12  involves three main steps: (1) certification of a settlement class and preliminary approval of the

13  proposed settlement after submission to the Court of a written motion for preliminary approval; (2)

14  dissemination of notice of the proposed settlement to the Class members; (3) a hearing at which

15  evidence and argument concerning the fairness, adequacy, and reasonableness of the proposed

16  settlement may be presented. *See* Federal Judicial Center, Manual for Complex Litigation, Fourth §

17  21.63 (2004).

18  Plaintiffs respectfully request that the Court begin this process by provisionally certifying the

19  Settlement Class, granting preliminary approval of the settlement, and directing that notice be provided.

20  **A.     Certification of the Proposed Settlement Class Is Appropriate, and Appointment of**

21  **Class Counsel Is Merited**

22  The proposed settlement class definition corresponds with the scope of the litigation class this Court

23  certified just two months ago after rigorously applying Rule 23. (Dkt. 217.) Because there is no reason

24  to depart from the Court's previous conclusions regarding the propriety of certification, Plaintiffs

25

26  [2] Given the quality of Class member contact information, the small class size, and the substantial
    compensation to all Class members, it is unlikely in these circumstances that Class members who do
27  not opt out will not follow through with the ministerial task of depositing checks. The release thus
    extends to Class members who do not opt out but fail to accept payment. JND will make repeated
28  attempts to apprise Class members that a payment has issued. *See* Notice and Order re Putative Class
    Actions, Dkt. 12 at § 4.

address certification of the proposed settlement class only briefly.

First, all Rule 23(a) requirements are readily satisfied. There are 512 class members (numerosity); questions common to all Class members, including whether uniform contracts required notice of loan modifications as an option to cure a default, are answerable through common proof (commonality); the type of harm that Plaintiffs have suffered is identical to the harm suffered by all Class members (typicality); and class representatives and Class Counsel will continue to vigorously prosecute this litigation on behalf of the Class, as they have to date (adequacy).

Next, all Rule 23(b)(3) requirements are satisfied. For one, common questions predominate over any individual ones because Wells Fargo engaged in a uniform course of conduct applicable to all Class members. This includes the core allegation that Wells Fargo failed to offer loan modifications because of a widespread software error that miscalculated Class members' eligibility for financial relief under HAMP. The proposed settlement class is thus sufficiently cohesive to warrant adjudication by representation. For another, class adjudication is superior to other available methods of adjudication, such as individual litigation, for two reasons. The cost of litigating this case on an individual basis would be significant for all Class members and the only economically rational way for litigants and the courts to resolve hundreds of such claims is through the class device.

Lastly, under Rule 23(g), "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g). This Court appointed Michael Schrag and Richard Paul as Class Counsel for the litigation class just two months ago. (Dkt. 217 at 8.) The Court should reappoint counsel to represent the settlement Class because each has the skill and expertise to ably represent the Class through settlement approval.

For these reasons and the reasons this Court accepted in certifying a litigation class, the Court should conditionally certify the proposed nationwide settlement Class and reappoint Class Counsel.

### B.    The Proposed Settlement Merits Preliminary Approval

"The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object." Fed. R. Civ. P. 23(e)(1), advisory committee's note to 2018 amendments. "If the court has already certified a class, the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims,

1    defenses, or issues regarding which certification was granted." *Id.*

2        The revised Rule 23 now provides a checklist of factors to consider when assessing whether a

3    proposed settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2). Ultimately,

4    however, the factors are "guideposts. 'The relative degree of importance to be attached to any particular

5    factor will depend upon . . . the unique facts and circumstances presented by each individual case.'" *In*

6    *re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597, 611 (9th

7    Cir. 2018) (quoting *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 625 (9th Cir.

8    1982)). "Deciding whether a settlement is fair is ultimately an amalgam of delicate balancing, gross

9    approximations and rough justice," that is "best left" to the sound discretion of the trial judge. *Id.*

10   (internal citation and quotation marks omitted).

11       Further, "[a]t this preliminary stage and because Class members will receive an opportunity to be

12   heard on the Settlement Agreement, a full fairness analysis is unnecessary." *Munday v. Navy Fed.*

13   *Credit Union*, 2016 WL 7655807, at *7 (C.D. Cal. Sept. 15, 2016). While the 2018 amendments to

14   Rule 23 require courts to ask whether a proposed settlement is likely to win final approval, the

15   preliminary approval standard remains "more lenient than the eventual standard required to grant final

16   approval." Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices Implementing*

17   *2018 Amendments to Rule 23 Class Action Settlement Provisions* 2 (2018).

18       As such, preliminary approval and notice of the settlement terms to the proposed Class are

19   appropriate where (1]) "the proposed settlement appears to be the product of serious, informed, non-

20   collusive negotiations," (2) "has no obvious deficiencies," (3) "does not improperly grant preferential

21   treatment to class representatives or segments of the class", and (4) falls within the range of *possible*

22   approval . . . .'" *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quoting

23   *Schwartz v. Dall. Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 570 n.12 (E.D. Pa. 2001)).

24       After evaluating the "lengthy but non-exhaustive list of [overlapping fairness] factors," *In re*

25   *Volkswagen*, 895 F.3d at 610, the Court should preliminarily approve the settlement agreement because

26   it is fair, reasonable, and adequate, and will likely be granted final approval.

27                **1.      Strength of the Class's Case**

28   Wells Fargo publicly disclosed that it erroneously denied Class members trial modifications even

though each Class member qualified for one, and that Class members ultimately lost their homes to foreclosure. Wells Fargo followed its disclosure by sending Class members apology letters and remediation payments. Discovery showed that the bank discovered the error in 2013, only partially fixed it in 2015, and did not fully fix it until 2018.

Plaintiffs also had strong arguments for their interpretation of the contract language at issue. The breach of contract claim was based on language requiring Wells Fargo to notify Class members of "the action required to cure the default" (with respect to the Fannie/Freddie contract) and language limiting the bank's right to accelerate the debt and foreclose "by regulations of the [HUD] Secretary" (for the FHA contract). Plaintiffs argued that Wells Fargo breached both contracts by foreclosing without first offering Class members a modification. Wells Fargo's own corporate representative testified that a modification can cure a default. And on the FHA contract, the HUD regulations clearly required lenders to "evaluate on a monthly basis all of the loss mitigation techniques provided at § 203.501" before foreclosing; § 203.501 refers specifically to "recasting of mortgages," *i.e.*, loan modifications. 24 C.F.R. § 203.605(a). Plaintiffs therefore had solid bases for their breach of contract claims. But as discussed below, Wells Fargo had potentially viable legal defenses.

### 2.    Risk, Complexity, Costs, and Likely Duration of Further Litigation

Almost all class actions involve high levels of cost, risk, and lengthy duration, which supports the Ninth Circuit's "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998) (quoting *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)). Here, had the parties not settled, the litigation would have been particularly risky, protracted, and costly.

With respect to the remaining cost and time needed to prosecute the case, the parties had already completed the vast majority of discovery, but still needed to brief *Daubert* issues and a potential Rule 23(f) appeal if the Ninth Circuit were to grant Wells Fargo's petition, followed by motions in limine, a possible decertification motion, and then trial. Each stage would have added risk and necessarily imposed delay before relief could be provided to the Class. *See Etter v. Allstate Ins. Co*., No. 17-00184, 2018 WL 5761755, at *2 (N.D. Cal. May 30, 2018) (Alsup, J.) ("Given that this proposed settlement comes after over a year of litigation, discovery, and motion practice, both sides have had ample

opportunity to carefully assess … the relative strengths and weaknesses of their legal positions.").

On the merits, the facts favored Plaintiffs, but case law developed in the more traditional wrongful foreclosure context provided Wells Fargo with numerous arguments to prevail. Throughout the case Plaintiffs were developing legal theories to address each of Wells Fargo's arguments, including novel theories that Plaintiffs believed were legally justified. As described above, Plaintiffs believed that Wells Fargo's calculation error breached the mortgage contracts and caused Plaintiffs resulting economic damages. However, Wells Fargo, while admitting it erroneously denied trial loan modifications, relied on case law stating that the contracts do not require the bank to notify Class members of their eligibility for a modification. The bank's position was that it only had to notify Class members that they could cure their defaults (and avoid foreclosure) by paying the amounts in arrears.

On the Fannie/Freddie contract, Plaintiffs faced the obstacle of rulings in other districts that found the relevant language did not mandate notification of a modification as a way to cure a default. (Dkt. 231 at 13-14). On the FHA contract, Wells Fargo would continue arguing that nothing in the regulations required the bank to offer a modification. Wells Fargo also argued that claims based on violations of HUD regulations have not been expressly recognized under California law and are not recognized in every state. There was no guarantee Plaintiffs would survive summary judgment, let alone trial. *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 319, 321-22 (N.D. Cal. 2018) (granting final approval of settlement fund representing 14.5% of Plaintiffs' damages estimate, while overruling objections to the amount of the settlement because "none of these [objectors] adequately take into account the risks and delays involved in proceeding to summary judgment or trial").

Further, if Wells Fargo succeeded in convincing the Court that lost equity damages can only be measured at the time of foreclosure, damages would be severely diminished. Most Class members lost their homes during the financial crisis, when home prices were severely depressed. And most had little or no equity in their homes when the foreclosures took place. While Plaintiffs believe that calculating lost equity damages based on current home values is more fair and has support in the case law, this dispute presented substantial risk.

Plaintiffs believe they had reasonably strong prospects of overcoming Wells Fargo's arguments and defenses, but there can be little doubt that those defenses presented the possibility that the Class would

MOTION FOR PRELIMINARY APPROVAL

recover nothing if the case continued, or at least far less than what Plaintiffs were seeking. This settlement, by comparison, "eliminates the risks inherent in certifying a class, prevailing at trial, and withstanding any subsequent appeals, and it may provide the last opportunity for class members to obtain" monetary and injunctive relief. *Calderon v. Wolf Firm*, No. 16-1266-JLS (KESx), 2018 WL 6843723, at *7 (C.D. Cal. Mar. 13, 2018). This factor therefore weighs in favor of settlement approval. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." (quoting 4 A. Conte & H. Newberg, *Newberg on Class Actions* § 11:50 (4th ed. 2002)).

### 3.   Amount Offered in Settlement and the Release

"To determine whether a settlement 'falls within the range of possible approval,' courts focus on 'substantive fairness and adequacy' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.'" *Schuchardt v. Law Office of Rory W. Clark*, 2016 WL 232435, at *10 (N.D. Cal. Jan. 20, 2016) (quoting *Tableware*, 484 F. Supp. 2d at 1080). "Immediate receipt of money through settlement, even if lower than what could potentially be achieved through ultimate success on the merits, has value to a class, especially when compared to risky and costly continued litigation." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

The proposed settlement provides substantial relief—$18.5 million for 512 Class members. This amount is in addition to the approximately $15 million that Wells Fargo already paid Class members, making the gross amount Class members will receive over $33 million. Notably, this settlement provides *substantially* more relief than that approved in similar settlements involving wrongful loan modifications in this District. For example, in *Chao v. Aurora Loan Services*, the Court approved a $5.25 million California class settlement for over 15,000 California borrowers who lost their homes to foreclosure after making payments under a voluntary forbearance agreement under the false hope that the lender would then provide a loan modification. No. 10-03118-SBA, 2015 WL 294823 (N.D. Cal. Jan. 21, 2015). The gross settlement represented approximately 19% of the claimed damages for breach of contract and UCL restitution and provided an average payment of $1,600 for one class of borrowers and payments of approximately $25 for the remaining borrowers. *Id.,* Dkt. 218 at 13.

1    In *Gaudin v. Saxon Mortgage Services, Inc.*, the court approved a $4.5 million settlement on behalf

2    of a class of 2,705 members who made at least three HAMP trial plan payments but were not offered a

3    permanent loan modification and ultimately lost their homes to foreclosure. No. 11-cv-01663-JST,

4    2015 WL 7454183 (N.D. Cal. Nov. 23, 2015). The settlement represented approximately 13.6% of the

5    maximum breach of contract, UCL, and Rosenthal Act damages, and class members received an

6    average payment of over $1,100. *Id.* at *6. Unlike the plaintiffs in *Gaudin* who alleged they made the

7    required trial period payments but were denied a final HAMP loan modification, plaintiffs here alleged

8    they were denied a *trial* loan modification. Thus, the result in this case that provides a minimum

9    payment of $14,000, or approximately 12 times the $1,100 average payment in *Gaudin*, is imminently

10   fair and reasonable.

11    Further, the recovery provides more relief than has been approved in cases outside of this district. In

12   *Wigod v. Wells Fargo Bank, N.A.*, the plaintiffs similarly alleged they made all required trial period

13   payments but were not offered a permanent HAMP loan modification. *See* Case 1:10-cv-02348 (N.D.

14   Ill.) at Dkts. 269, 274, and 277. The approved, claims-made settlement offered relief to 835 borrowers

15   divided into three groups, based on whether each borrower was still in his or her home. Those who lost

16   their homes to foreclosure were eligible to receive a share of the $2 million fund based on "objective

17   criteria," including "whether the borrower previously received a modification and whether the terms of

18   the modification were more or less favorable than the terms Wachovia had promised them." *See* Dkt.

19   274-2 at 17 and Dkt. 274 at 7 (Motion for Final Approval, Oct. 17, 2014). At the time of final approval,

20   170 claims were submitted. The record does not clearly reflect the average claim amount but assuming

21   a pro rata payment, each borrower would have received approximately $11,800, less than the minimum

22   payment here. *See id.*

23    The $18.5 million settlement fund also represents 37% of what Plaintiffs estimate they could have

24   recovered in economic damages on their best day at trial. Plaintiffs' damages expert, Dan Salah,

25   prepared an expert report for the named Plaintiffs and California Class members in which he calculated

26   two categories of economic damages: lost equity in Class members' homes, and the value of the "loss

27   of use" of their homes. (Schrag Decl. at ¶ 19; Dkt. 192-12.) Before the settlement conference, Salah

28   used the same methodology to calculate damages for all Class members. Salah estimates that aggregate

1  maximum amount of damages would have been approximately $65 million[3] from which the

2  approximately $15 million already paid would be subtracted, meaning a $50 million breach of contract

3  judgment would have been possible if *everything* worked in the Class's favor at summary judgment,

4  trial, and appeals ($18.5 out of a possible $50 million yields 37%). (Schrag Decl. at ¶ 19-20.)[4]

5      Of course, the Class's estimated realistic recovery at trial is subject to substantial downward

6  pressure from many angles. First, the risk of zero recovery is real. Wells Fargo could prevail on its

7  motion for partial summary judgment or at trial on the breach of contract claim, given that the bank

8  cited authority interpreting the Fannie/Freddie contract as not requiring it to give notice of loan

9  modification eligibility. What's more, Wells Fargo has argued that Class members' loss of use damages

10 are not recoverable at all, relying on this Court's class certification order. (Dkt. 252 at 4 ("The only

11 purpose of [the class] trial is to 'determine the value of the equity lost by each homeowner through a

12 foreclosure.…").) Salah's estimate of lost equity damages was $37.9 million. (Schrag Decl. at ¶ 20.)

13 This would mean that the Class's best day at trial would result in a $37.9 million verdict and if some or

14 all of the $15 million in remediation payments were treated as an offset, this amount would be reduced

15 to as little as $22.9 million. *Id*. Thus, if only lost equity damages were in play, the settlement recovers

16 far more than 37% of the damages the Class could win at trial.

17     Not only that, but Wells Fargo strenuously argued (and had some authority to support) that lost

18 equity damages must be measured at the time of foreclosure, which would bring those damages nearly

19 to zero because, as described above, the vast majority of foreclosures occurred when Class members

20 were "under water" on their homes—meaning they had no equity to lose at the time of foreclosure.

21 Although Plaintiffs had authority to counter this and believe strongly that it would be unfair to measure

22 lost equity when property values were at their lowest, this issue presented substantial risk. Wells Fargo

23 would undoubtedly have brought a *Daubert* motion on this legal issue.

24     Given this substantial recovery, Class Counsel have no reservation recommending that the Court

25 approve this settlement. In other class cases, courts have recognized that a recovery of 10-40% of what

26 could be potentially recovered at trial easily justifies compromising the Class's claims through

27 ─────────────

28 [4] *See* N.D. Cal., *Procedural Guidance for Class Action Settlements* § 1(e) (2018) (requiring the parties state "the potential class recovery if plaintiffs had fully prevailed on each of their claims").

settlement rather than bearing additional risk and delay through continued litigation. *See, e.g., Messineo v. Ocwen Loan Servicing, LLC*, 2017 WL 733219, at *5 (N.D. Cal. Feb. 24, 2017) (stating "it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial," and noting that this District has approved settlements valued at 14% and 13.6% of the maximum recovery (quoting *Linney*, 151 F.3d at 1242)); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (upholding class settlement valued at 10% of total damages when accounting for trebling); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 17-md-027770EMC, 2019 WL 536661, at *9 (N.D. Cal. Feb. 11, 2019) (granting preliminary approval of settlement that, with 100% claims rate, would deliver 33% of primary damages estimate); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-1160-JST, 2016 WL 6902856, at *2 (N.D. Cal. Nov. 21, 2016) (granting final approval of "Settlement Amount [that] represents 15 percent of Plaintiffs' likely recovery at trial if they were to prevail").

Moreover, individual Class member awards are substantial and differentiated based on estimated value of the lost modification opportunity. For example, one Class member, "Jane Smith" (loan number ending in 3433) is receiving the minimum of $14,000 under the settlement because she had a relatively low UPB ($88,941) and had already received $30,000 in remediation payments. In contrast, another borrower, "John Doe" (loan number ending in 9385) is receiving $99,082, an amount on the high end of the range under the settlement, because he had a much higher UPB ($394,978), meaning he lost a more expensive home and thus arguably suffered more economic harm than Jane.

Finally, the amount of the settlement is fair in view of the claims released by Plaintiffs and the Class. The proposed release here covers only claims related to the conduct at issue and relates to the types of damages Class members suffered in losing their homes. The operative amended complaint asserts six causes of action: breach of contract, intentional infliction of emotional distress, wrongful foreclosure (California and Georgia), California Homeowners Bill of Rights, UCL, and violations of the state consumer protection laws for Illinois, New Jersey, New York, and Pennsylvania. (Dkt. 220). The damages alleged for each claim, with the exceptions noted below, were the same and all related to damages resulting from the loss of Plaintiffs' homes. *See id.* at ¶ 182 (breach of contract), ¶ 194 (CA wrongful foreclosure), ¶ 199 (GA wrongful foreclosure), ¶ 205 (HBOR), ¶ 213 (UCL), ¶ 218 (IL

Consumer Fraud Act), ¶ 222 (NJ Consumer Fraud Act), ¶ 231 (NY General Business Law), ¶ 238 (PA Unfair Trade Practices). The proposed settlement provides adequate compensation for the damages sought in this case in that they each relate to damages for the loss of Plaintiffs' homes, which is what the settlement payments are designed to cover.

Plaintiffs also sought emotional distress damages through the IIED claim, as well as a component of damages for the wrongful foreclosure claims in Georgia and California only. *See id.* at ¶ 183-189, 194, 199. Proving that Wells Fargo intentionally caused emotional distress would be challenging given their defense that the calculation error was an innocent mistake. Nevertheless, the settlement creates a $1 million fund and Class members can submit a claim if they believe they suffered severe emotional distress as a result of the calculation error.

This Court has approved similar releases that are anchored to the conduct at issue. *See In re LendingClub Sec. Litig.*, No. C 16-02627 WHA, 2018 WL 1367336, at *4 (N.D. Cal. Mar. 16, 2018) (approving release anchored to conduct and discussing approval of similar release in *Luna v. Marvell*, No. 15-5447). In *Saravia v. Dynamex Operations West, LLC*, for example, this Court approved a release of the claims pled in the complaint, as well as "other claims seeking substantially the same lost wages." No. 14-05003 WHA, 2017 WL 1295069, at *2 (N.D. Cal. Apr. 4, 2017) (Alsup, J.); *see also Parrish v. Manatt, Phelps & Phillips, LLP*, No. 10-03200 WHA (Dkt. 125 at 3) (approving release of "all claims and causes of action . . . that arise out of the facts, occurrences, transactions, or other matters that were alleged in, are the subject of or relate to the Present Action" in legal malpractice case); *In re Diamond Foods, Inc.*, No. 11-05386 WHA, 2013 WL 5400539 (N.D. Cal. Sept. 26, 2013) (Alsup, J.) (approving release of "claims that relate to those certified for class treatment"). For similar reasons, this release is reasonable.

In sum, because the release mirrors those that have won approval in other similar cases, its scope supports the conclusion that the amount offered in this settlement is fair. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future even though the claim was not presented and might not have been presentable in the class action, but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action." (internal quotation marks and citations omitted)).

1    For these reasons, the amount offered in settlement and the release favor preliminary approval.

2              **4.    Method of Distributing Relief**

3    The 2018 amendments to Rule 23 instruct that the effectiveness of any proposed method of

4    distributing relief to the class, including the method of processing class-member claims, should be

5    considered as part of the fairness inquiry. This factor supports approval because the proposed

6    settlement contemplates an efficient and effective distribution process.

7    Here, there is no claims process for the bulk of the funds. Class members will receive their

8    economic damages settlement payments automatically in the mail, without the need to submit a claim.

9    *See, e.g., Smith v. Levine Leichtman Capital Partners, Inc.*, 2012 WL 12920189, at *2 (N.D. Cal. Nov.

10   15, 2012) ("For the proposed class members for whom Defendants have accurate mailing addresses,

11   Defendants could simply mail them a check."). As to the severe emotional distress fund, the claims

12   process is straightforward and can be done online.

13             **5.    Stage of the Proceedings and Extent of Discovery Completed**

14   To settle a class action, the parties must have "sufficient information to make an informed decision

15   about settlement." *Linney*, 151 F.3d at 1239. This information can be obtained through formal or

16   informal discovery. *See Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. 10-3873-

17   JST (RZx), 2011 WL 320998, at *9 (C.D. Cal. Jan. 27, 2011) (granting preliminary approval where

18   "significant informal discovery" had taken place). Here, Plaintiffs engaged in extensive discovery,

19   including the production and review of voluminous documents, interrogatories, fact depositions, expert

20   reports and depositions and were all but prepared to proceed to trial. Given this extensive work, the

21   parties possess sufficient information to make an informed decision about the settlement. This factor,

22   then, weighs in favor of granting preliminary approval.

23             **6.    Support of Experienced Counsel**

24    "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In*

25   *re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quoting *Boyd v. Bechtel*

26   *Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)). In fact, experienced counsel's judgment in this respect

27   carries considerable weight. *See Rural Telcomms.*, 221 F.R.D. at 528 ("'Great weight' is accorded to

28   the recommendation of counsel, who are most closely acquainted with the facts of the underlying

litigation.") (quoting *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997)).

Class Counsel wholeheartedly endorse the settlement agreement as fair, reasonable, and adequate. The Court should credit counsel's recommendation because it is the product of arm's length negotiations before a federal magistrate judge and following relevant discovery. *See Linney v. Cellular Alaska P'ship*, Nos. C-96-3008 DLJ, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998) ("The involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair.").

### 7.    Attorney's Fees and Costs

At this stage, courts do not formally consider whether to approve attorney's fees. Nevertheless, in light of the amendments to Rule 23, we forecast the application for such payments.

In the Ninth Circuit, when the percentage-of-recovery method is employed, 25% of a common fund is a presumptively reasonable amount of attorney's fees. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). Most commonly, this benchmark is applied against the gross, because expenses such as reimbursable settlement administration costs are understood to be for the benefit of the Class. That said, Class Counsel here will not seek more than 25% of the *net* recovery and estimate that this will be $4,525,000. (Schrag Decl. ¶ 24.) at Class Counsel will also request reimbursement of litigation expenses (currently $331,734 and will not exceed $335,000). (*Id.*)

### 8.    No Signs of Collusion

While a district court usually scrutinizes a negotiated settlement more closely, "[b]ecause the class[] in this case ha[]s already been certified, the Settlement Agreement need not be held to the "higher standard of fairness" required of pre-certification settlements." *See In re MyFord Touch Consumer Litig.*, 2019 WL 1411510, at *5 n.2 (N.D. Cal. Mar. 28, 2019) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). Even so, there are no signs, explicit or subtle, of collusion here.

First, settlement funds will not revert to Wells Fargo under any circumstances.

Second, there will not be a disproportionate distribution of the settlement fund to counsel. As mentioned, counsel will not seek more than 25% of the net recovery. Class Counsel's lodestar through

March 27 is $4,272,135.[5] (Schrag Decl. at ¶ 24.) This would result in a multiplier of approximately 1.06. (*Id*.) At this preliminary stage, then, there can be no argument that Class Counsel would receive a windfall. *See, e.g., Sadowska v. Volkswagen Grp. of Am., Inc.*, No. 11-00665-BRO (AGRx), 2013 WL 9600948, at *9 (C.D. Cal. Sept. 25, 2013) ("Multipliers can range from 2 to 4 or even higher.") (quoting *Wershba v. Apple Comput., Inc.*, 91 Cal. App. 4th 224, 255 (2001)); *Steiner v. Am. Broad. Co., Inc.*, 248 F. App'x 780, 783 (9th Cir. 2007) (approving 6.85 multiplier and stating that "still falls well within the range of multipliers that courts have allowed").

Third, the settlement agreement does not impede the Court's "supervisory discretion" in approving fees. *See Staton v. Boeing*, 327 F.3d 938, 970-71 (9th Cir. 2003). For example, there is no "clear sailing" agreement.

Fourth, settlement negotiations did not occur until after class certification and near trial, (Schrag Decl. at ¶ 14), and were led by Judge Ryu, whose mediator's proposal was accepted by the parties after lengthy, and informed, negotiations. These circumstances eliminate any cause for concern that the settlement was the product of collusion. *See MyFord*, 2019 WL 1411510 at *7 (possible collusion obviated by experienced mediator).

Lastly, there is no undisclosed agreement made in connection with the settlement proposal. (Schrag Decl. at ¶ 14.); s*ee* Fed. R. Civ. P. 23(e)(2)(C)(iv), (e)(3).

For all these reasons, there is no cause for concern that the settlement is the product of collusion.

### 9.  Equitable Treatment of Class Members

The settlement also "treats class members equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(D), including by considering Class members' relative economic losses. *See id*. Here, payments will be divided proportionally based on a sound methodology for estimating economic harm. The use of an experienced neutral to assess awards for non-economic damages on a case-by-case basis also ensures equitable treatment. *See, e.g., Altamirano v. Shaw Indus., Inc.*, No. 13-cv-00939-HSG, 2015 WL 4512372, at *8 (N.D. Cal. July 24, 2015) (finding no preferential treatment because the settlement "compensates class members in a manner generally proportionate to the harm they suffered on account

---

[5] Class Counsel will continue to review its lodestar and will fully support its ultimate request. (Schrag Decl. at ¶ 23.)

1    of [the] alleged misconduct").

2       Class members are all being treated equitably in another way: no named representative will seek an

3    incentive award. Thus, there can be no argument that any named Plaintiff is being treated more

4    favorably or has been promised a benefit not available to other Class members.[6]

5                    **10.    Class Representatives and Counsel Are Adequate**

6       Lastly, just as it did in certifying the litigation class, the Court should again find that Class

7    representatives Granja and Campos will adequately represent the settlement Class. (Dkt. 217 at 8.)

8       To begin, Class representatives have diligently represented the Class. They actively participated in

9    the litigation and discovery, including by sitting for their depositions, conducting ESI searches, and

10   producing documents. (Schrag Decl. at ¶ 26.) Throughout, they have remained in contact with Class

11   Counsel, stayed apprised of the litigation, and have acted with the interests of the Class in mind. (*Id*.)

12      Class Counsel have also adequately represented the Class. They vigorously prosecuted this case,

13   completing most pre-trial work in less than 18 months. They briefed and argued a motion to transfer,

14   two motions to dismiss, five discovery letter briefs, class certification, and partial summary judgment.

15   (*Id*. at ¶ 8-14.) They conducted robust discovery and were in the midst of preparing an exhibit list for

16   trial when the parties reached a proposed settlement. (*Id*. at ¶ 9.) Class Counsel had developed evidence

17   revealing that Wells Fargo discovered the error in 2013, but despite recognition that the error could

18   negatively impact borrowers and recommendations from Wells Fargo employees to review and

19   remediate if customer harm was identified, the bank did not fully fix the problem until 2018.

20      As part of these efforts, Class Counsel worked over 7,823 hours on the case and have advanced

21   more than $331,734 in litigation expenses on behalf of the Class, with no assurance that those expenses

22   would be reimbursed. (*Id*. at ¶ 23-24.) In granting class certification, this Court found Class Counsel to

23   be diligent and adequate. (Dkt. 217 at 8.)

24      Considering all these guideposts, the Court should preliminarily conclude that the proposed

25   settlement is fair, reasonable, and adequate, and likely to receive final approval.

26

27

28   _____
     [6] Although Class Counsel will not request service awards, Class Counsel appreciate the sacrifices that
     Campos and Granja have made in the prosecution of this case. (Schrag Decl. at ¶ 26.)

### C.   The Settlement Provides the Best Method of Notice Practicable

This Court approved class notice when it certified a litigation class. The proposed settlement notice also meets preliminary settlement approval standards. *See* Fed. R. Civ. P. 23(e)(1). For one, notice will be accomplished through first-class mail to all Class members. For another, the notice provides all the required information, concisely and plainly. In fact, it is consistent with the samples provided by the Federal Judicial Center and the one that the Court approved. (*See* Class Notice, Ex. 5 to Schrag Decl.)

Because the notice plan in the settlement satisfies the requirements of due process and Rule 23 and provides the best notice practicable under the circumstances, the Court should authorize notice as proposed here.

### D.   Approval of the Proposed Settlement Administrators and Cy Pres Recipients

The parties propose the appointment of both JND as settlement administrator, and Yanni as administrator of the Severe Emotional Distress Fund. Documentation of their competence is included in the Keough and Yanni Declarations.

The parties also propose NeighborWorks America as a *cy pres* recipient. This national non-profit has committed to using funds to address issues related to home affordability, which is one of the bases of this lawsuit and hence benefits the Class. This organization, moreover, is independent of the parties, their counsel, and the district court.

For these reasons, the Court should appoint JND and Yanni to provide settlement administration services, and it should appoint NeighborWorks America as a potential *cy pres* recipient.

### VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the concurrently filed proposed preliminary approval order.

Dated: March 31, 2020                           Respectfully submitted,

*/s/ Michael Schrag*
**GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda Lam (SBN 301461)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Class*

MOTION FOR PRELIMINARY APPROVAL