Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HERNANDEZ et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 3:18-cv-07354-WHA<br><br>**DECLARATION OF MICHAEL SCHRAG IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL**<br><br>Date:   April 16, 2020<br>Time:  8 a.m.<br>Dept:  Courtroom 12<br>Judge: Hon. William H. Alsup |

I, Michael Schrag, declare as follows:

1. I am a member of the California State Bar in good standing and a partner in the law firm of Gibbs Law Group LLP. My firm, along with Paul LLP, was appointed as Class Counsel in this action. I make this declaration in support of the Motion for Preliminary Approval of Class Action Settlement. A copy of the Settlement Agreement is attached as **Exhibit 1**. The Allocation Plan and Severe Emotional Distress claim form, which are a part of the Settlement Agreement, are attached as **Exhibits 2** and **3**, respectively. I have personal knowledge of the matters stated herein and could and would competently testify thereto if called upon to do so.

2. Gibbs Law Group is a national litigation firm dedicated to representing plaintiffs in class and collective actions in state and federal courts. The firm serves clients in consumer protection, securities, antitrust, whistleblower, personal injury, and employment cases. A true and correct copy of the Gibbs Law Group firm resume is attached as **Exhibit 4**.

3. For over 23 years, I have represented consumers and small businesses in a variety of class actions against banks, credit card companies, insurers, and other large corporations. I joined Gibbs Law Group in the spring of 2015. Ex. 4 at p. 11.

4. I served as co-lead class counsel in a lawsuit against the developer of the Hard Rock Hotel & Condominium project in San Diego, *Beaver v. Tarsadia Hotels,* Case No. 11-cv-01842 (S.D. Cal.). The plaintiffs brought a UCL claim based on the developer's failure to disclose a right to rescind under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701, *et seq.* The case resulted in a $51.1 million settlement and a Ninth Circuit ruling firmly establishing that the UCL statute of limitations applies to all UCL actions, including those that "borrow" a federal predicate violation with a shorter limitations period. *See Beaver v. Tarsadia Hotels,* 816 F.3d 1170, 1179-1181 (9th Cir. 2016). That settlement paid substantial amounts to hundreds of class members, like the present action; and, we were able to pay 100% of the class. Dkt. 328 at 2 in *Beaver,* Case No. 11-cv-01842 (S.D. Cal.).

5. I was also on the Plaintiffs' Executive Committee in *In Re Wells Fargo Collateral Protection Insurance Litigation*, Case No. 8:17-ML-2797-AG-KES (C.D. Cal.)*,* which resulted in a $393 million settlement for consumers who had auto loans with Wells Fargo and were forced to buy duplicative collateral protection insurance policies. Since 2015, I have served on the Expert Committee

-1-   SCHRAG DECL. ISO MOTION FOR PRELIMINARY APPROVAL

in *In re: Disposable Contact Lens Antitrust Litig.,* MDL No. 2626, an antitrust class action set for trial in June 2020.

6. Before joining Gibbs Law Group, I worked on a wide array of class actions, including:

    a. *Ammari Electronics et al. v. Pacific Bell Directory* (Alameda County Case No. RG05198014). I was co-lead counsel in this class action on behalf of 375,000 California businesses that advertised in the SBC Yellow Pages directories and were owed a refund because of incomplete distribution of the directories. After a class trial and two appeals, a final judgment of over $27 million was entered for the class.

    b. *In Re Currency Conversion Fee Litigation* (MDL No. 1409); *Schwartz v. Visa et al.* (Alameda County Case No. 822404-4); *Shrieve v. Visa USA, Inc. et al.,* (Alameda County Case No. RG04155097). I was part of the team litigating state and federal class actions against Visa, MasterCard, and several large banks for failing to disclose and fixing the price of currency conversion fees charged to cardholders who used credit cards in foreign countries. These cases resulted in a $336 million dollar global settlement in the MDL action.

7. This class action began in December 2018, soon after Wells Fargo publicly disclosed in an SEC filing that due to a software error, it had wrongfully denied trial loan modifications to over 800 borrowers who qualified for a modification under the Home Affordable Modification Program (HAMP). Of those, Wells Fargo admitted to foreclosing on over 500 borrowers' homes.

8. Since the start of the litigation, Class Counsel have vigorously prosecuted this case, with Wells Fargo consistently denying liability and contesting our legal theories. We briefed and argued a motion to transfer, two motions to dismiss, five discovery letter briefs, class certification, and fully briefed partial summary judgment. In terms of discovery, we reviewed over 200,000 pages of documents and deposed seven Wells Fargo employees in Iowa, Oregon, North Carolina, Minnesota, and Southern California. We also served five sets of interrogatories and three sets of requests for production (to which Wells Fargo responded and later supplemented on several occasions).

9. During discovery, Class Counsel prepared a descriptive chronology of all the hot documents and were in the process of culling the list down to create an exhibit list for trial and identifying the witnesses that would authenticate each document.

10. Class Counsel also spent many hours assisting clients in responding to discovery Wells Fargo served and defending plaintiff depositions. The bank served three sets of interrogatories to Plaintiff Alicia Hernandez and two sets of interrogatories to the other fourteen Plaintiffs named in the first amended complaint, and served requests for production to each of those named Plaintiffs. Wells Fargo deposed each of the 16 named Plaintiffs (which includes Class representative Sandra Campos, who was recently added as a named Plaintiff) as well as 18 other absent Class members throughout California. Class Counsel spent many hours reviewing each Class member's loan file (typically hundreds, if not thousands of pages, and often produced a day or two before the deposition), preparing each for his or her deposition, and defending the deposition, which often lasted all day.

11. During discovery, the parties engaged in numerous meet-and-confer discussions. Through these efforts, they were able to resolve many issues, but still submitted more than five discovery disputes to the Court. The Court ultimately compelled Wells Fargo to produce several categories of discovery, including testimony regarding the bank's effort to comply with government consent orders and documents regarding loan modification practices that were given to certain board-level committees.

12. Although the parties had nearly completed discovery by the time they settled, a few additional depositions remained: the depositions of Mike Nold (a Wells Fargo employee), a Rule 30(b)(1) witness on the "cap sheets" that Wells Fargo produced showing the terms of each Class member's would-be loan modification, Wells Fargo's records custodian, and possibly two more Wells Fargo employees (subject to the parties' agreement).

13. Class Counsel also engaged the services of two experts who supplied merits reports. Banking veteran Brian Kelley opined on whether Wells Fargo's banking practices were adequate and consistent with industry norms, and damages expert Dan Salah developed methodologies to reasonably calculate class damages. Class Counsel defended Kelley's and Salah's depositions. We also deposed the two experts Wells Fargo hired to rebut Kelley's and Salah's opinions.

14. The parties did not begin settlement negotiations until after the case had been pending for over a year and the Court had granted class certification. On March 3, 2020, the parties participated in a settlement conference before Magistrate Judge Ryu. During that time, Plaintiffs were in the midst of opposing Wells Fargo's summary judgment motion. Judge Ryu had numerous phone calls with the

parties before and after the settlement conference; she also analyzed both shared and confidential mediation statements. Although the parties did not reach an agreement on the day of the settlement conference, they agreed to consider a mediator's proposal from Judge Ryu. Two days later, the parties agreed to Judge Ryu's monetary proposal and over the next three weeks negotiated the remaining material terms, including the allocation and notice plans, under her supervision. On March 26, the parties executed the formal Settlement Agreement (*see* Ex. 1) now before the Court. The Settlement Agreement is the only agreement between the parties; there is no undisclosed agreement made in connection with the settlement proposal.

15. Since then, the parties also retained the services of an experienced settlement administrator, JND Legal Administration. Wells Fargo solicited bids from three qualified administrators. In addition to JND, the bank solicited bids from KCC and Epiq. The parties ultimately selected JND because it submitted the lowest bid and had a reputation for being able to handle the class administrator duties needed in this case. JND developed a robust notice program, as described in the concurrently filed declaration of Jennifer Keough. In summary, JND will receive Class members' names and addresses from Wells Fargo and update the addresses by running them through the U.S. Postal Service's National Change of Address database. JND will then send notice by first class mail to all Class members and make reasonable efforts to resend notices to forwarding addresses for any returned notices. Keough Decl. at ¶ 16-17. The proposed Class Notice is attached hereto as **Exhibit 5**. JND will also post the notice on a settlement website in English and Spanish. *Id*. at ¶ 16. Class Counsel is currently working with JND on two other matters, *Deora v. Nanthealth*, Case No. 2:17-cv-01825-TJH-MRWx (C.D. Cal.) and *In re Equifax, Inc.: Customer Data Security Breach Litigation*, MDL Docket No. 2800 (N.D. Ga.). We believe those are the only two cases where either Class Counsel firm has worked with JND in the last two years.

16. The parties also propose that Cathy Yanni of JAMS in San Francisco serve as the special master to decide Class members' claims for relief from the Severe Emotional Distress Fund. Yanni will charge a flat fee of $12,950 and, if approved by the Court, will be retained by JND. Settlement administration costs paid to JND from the settlement fund, including Yanni's fee, will be no more than $65,000. Yanni's CV is attached as **Exhibit 6**.

17. With the exception of $1,000,000 reserved for Class members with severe emotional distress (described below), JND will distribute settlement proceeds directly to Class members by check without requiring them to file a claim or submit documents.

18. If any settlement checks are uncashed after 60 days or undeliverable, JND will make adequate and customary efforts to contact and/or locate Class members and will send a postcard reminder notice to any Class members who have not cashed their checks 60 days after issue. Ex. 1 at § V, ¶ D.

19. The $18.5 million settlement fund represents at least 37% of the economic damages Class Counsel estimate the Class could have recovered on their best day at trial. During the same period that the parties were working with Judge Ryu to settle this case, Class Counsel were also working with their damages expert, Dan Salah, to calculate class-wide damages. Salah had prepared an expert report on the named Plaintiffs' and California Class members' damages before the Class was certified. Using the exact same model that he used in this expert report (submitted to the Court at Dkt. 192-12), Salah estimated the aggregate nationwide Class economic damages to be approximately $65 million. This included both lost equity and lost use damages. As in his report, Salah relied on a combination of publicly available data and data provided by Wells Fargo for each Class member. *Id.* The $65 million does not subtract out the approximately $15 million in remediation payments already paid and does not include seven Class members whom Wells Fargo identified and disclosed later in the settlement negotiations process. Thus, the $15 million in remediation payments would have been credited against any judgment – meaning that a judgment of approximately $50 million would have been the best result if *everything* worked in the Class's favor at summary judgment, trial, and appeals. Recovering $18.5 out of a possible $50 million yields 37%. Moreover, given that the Class has already recovered $15 million in the bank's remediation program, the aggregate gross payments to the Class members in connection with the error at issue (if this settlement is approved) would be $33.5 million.

20. Wells Fargo further argued that the class certification order limited the Class to pursuing only lost equity damages at trial. Dkt. 252 at 1 (asserting that the "only purpose" of the class trial is to determine breach of contract liability and lost equity damages). Plaintiffs' expert estimated that the Class's lost equity damages were $37.9 million and, again, Wells Fargo paid $15 million in

remediation. Thus, while Plaintiffs disagreed that contract damages should be limited to lost equity, if Wells Fargo prevailed on that issue, and if the remediation payments offset those amounts, the Class's maximum recovery would have been only $22.9 million ($37.9m-$15m) and the settlement is 80% of that amount. Moreover, Wells Fargo vigorously asserted that the Class was entitled to little or no lost equity damages because such damages must be measured at the time of the foreclosure when most Class members' homes were "under water."

21. The settlement fairly allocates net settlement proceeds to Class members. The net settlement proceeds (after attorneys' fees and costs and administration expenses are deducted) will be divided into an Economic Damages Fund and a Severe Emotional Distress Fund. All but $1 million will go into the Economic Damages Fund. For this fund, the allocation plan (1) sets a minimum payment of $14,000 per Class member to provide each significant relief for having to undergo the wrongful denial and foreclosure; (2) considers the amount of remediation payments already received from Wells Fargo; (3) provides Class members at least 38%[1] of their unpaid principal balance at the time of the decision error reduced by 5% for every six months of delinquency. *See* Allocation Plan, Ex. 2. The plan uses unpaid principal balance as a proxy for the value of the modification denied because, in general, Class members with larger unpaid principal balances are more likely to have suffered more lost equity and, under Plaintiffs' theory, more damages as a result of the lost modification opportunity. The settlement will provide at least $14,000 and as much as $119,934 to each Class member with no need to file a claim. And it does so in a case that was fiercely contested, where there was substantial litigation risk on both liability and damages. Wells Fargo cited case law that under the contracts at issue, a loan modification would not cure a default and thus did not have to be disclosed. Had the bank prevailed on that argument, the Class would have lost the breach of contract claim, the only claim the Court certified. And even if the Class prevailed on liability, Wells Fargo would have argued, again supported by some cases, that few if any Class members had a valid claim for lost equity damages because they owed more on their homes than they were worth at the time of foreclosure. Given these risks and the

---

[1] In its remediation program, Wells Fargo paid Class Members on average 38% of their unpaid principal balance.

substantial settlement payments Class members will receive, Class Counsel strongly believe the $18.5 million non-reversionary settlement is fair, reasonable, and adequate.

22. Class members who seek additional funds for severe emotional distress can submit a simple claim form to the settlement administrator, who will then provide all such claims to special master Cathy Yanni. *See* Ex. 3. Yanni, who has over two decades of experience allocating settlement funds to injured plaintiffs, will decide the monetary awards for each claimant. In addition to relying on her experience and discretion, Yanni will consider (1) the severity of the emotional distress: e.g. did it require mental health or medical treatment or cause lack of functionality at home or work?; and (2) whether the trial payment denial, as opposed to factors not related to this lawsuit, appeared to cause (or exacerbate) the emotional distress. *See* Declaration of Cathy Yanni at ¶ 10.

23. Through March 27, 2020, Class Counsel has devoted 7,823 hours to this case (4,923 hours by my firm and 2900 hours by Paul LLP), and our lodestar using our typical hourly billing rates is $4,272,135 ($2,938,004 for my firm and $1,334,131 for Paul LLP). This lodestar reflects reductions made by Class Counsel exercising billing discretion. For example, it does not include the time Class Counsel spent briefing the first motion for class certification and any time relating to John Kilpatrick, the expert Class Counsel retained in connection with the first class certification motion (who ultimately did not submit a merits report), which was about 707 hours (467 hours by my firm and 240 hours by Paul LLP). We will continue to audit this time, and will present detailed billing by project at the final approval stage. Class Counsel has also advanced $331,734 in litigation expenses. Based on my experience with similar settlements in past cases, Class Counsel will continue to devote many hours through final approval and during the distribution process. We may also continue to incur expenses, but we will not seek reimbursement of more than $335,000 in expenses.

24. Class Counsel will request a fee of no more than 25% of the *net* settlement amount. We expect the net settlement amount to be approximately $18.1 million ($18.5 million minus approximately $400,000 in litigation and administration expenses). Thus, the requested fee will be approximately $4.525 million. This fee request would represent a 1.06 multiplier of the present lodestar. The final lodestar and multiplier may change slightly as Class Counsel (a) performs more work between now and when the fee application is final and (b) does further auditing and

categorization of their time records. Class Counsel will also request reimbursement of litigation expenses (currently $331,734 and will not exceed $335,000).

25. Class Counsel received $38,800 in attorney's fees for representing seven borrowers in mediations with Wells Fargo as part of the bank's remediation program. We have not received any other compensation in connection with this matter. Class Counsel will not seek any fees from the Class members whom they individually represent (aside from the fees that Class Counsel will seek at final approval, as discussed in the previous paragraph).

26. While Class Counsel will not ask the Court to award service awards, we note that Class representatives Debora Granja and Sandra Campos expended significant time and effort for the benefit of the class. Both participated in discovery, searched for and produced all their relevant documents, appeared for their depositions, and traveled to San Francisco from Oregon and Southern California, respectively, to attend the settlement conference with Judge Ryu. Class Counsel greatly appreciates their service.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge. Executed on March 31, 2020 in Oakland, California.

*/s/ Michael Schrag*
Michael Schrag