Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HERNANDEZ et al., individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 3:18-cv-07354 -WHA<br><br>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT (UNOPPOSED)**<br><br>Date:   August 20, 2020<br>Time:  8 a.m.<br>Dept:   Courtroom 12<br>Judge:  Hon. William H. Alsup |

# TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

II.  OVERVIEW OF THE LITIGATION ........................................................................ 2

    A.   The alleged circumstances that prompted this lawsuit ...................................... 2

    B.   An abbreviated procedural history ..................................................................... 2

III. OVERVIEW OF THE SETTLEMENT ....................................................................... 5

    A.   The proposed settlement class ........................................................................... 5

    B.   Benefits to the settlement class ........................................................................ 5

        1.   Settlement fund .......................................................................................... 5

        2.   Settlement allocation ................................................................................. 6

           a.   Economic Damages Fund ................................................................. 6

           b.   Severe Emotional Distress Fund ...................................................... 7

           c.   Secondary or *cy pres* distribution ................................................. 7

    C.   The scope of class members' release of claims ................................................. 8

    D.   The notice plan .................................................................................................. 8

    E.   The provision for attorney's fees and cost reimbursements .............................. 9

IV.  FINAL APPROVAL OF THE SETTLEMENT IS WARRANTED ........................... 9

    A.   The proposed settlement merits approval .......................................................... 9

        1.   The parties negotiated the proposed settlement at arm's length ..................... 10

        2.   The quality of relief to the class weighs in favor of approval ....................... 11

           a.   The settlement provides substantial relief to class members .................... 11

           b.   Continued litigation would entail substantial risk, cost, and delay ............ 13

           c.   The settlement agreement provides for an effective distribution of
              proceeds to the class .......................................................................... 15

           d.   The terms of the proposed award of attorney's fees also support
              settlement approval ............................................................................ 16

           e.   The parties have no other agreements pertaining to the settlement ............ 16

        3.   The class representatives and Class Counsel have adequately represented the class ...... 16

4.    The settlement treats all settlement class members equitably ...........................17

B.    Certification of the settlement class is appropriate ......................................... 18

1.    The settlement class satisfies the requirements of Rule 23(a) .......................... 18

2.    The settlement class meets the requirements of Rule 23(b)(3)....................... 19

C.    Notice to the settlement class comported with Rule 23 and Due Process ...................... 19

V.    CONCLUSION.................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Altamirano v. Shaw Indus., Inc.*,
 2015 WL 4512372 (N.D. Cal. July 24, 2015) ................................................................. 18

*Calderon v. Wolf Firm,*
 2018 WL 6843723 (C.D. Cal. Mar. 13, 2018) ................................................................. 15

*Campbell v. Facebook, Inc.*,
 951 F.3d 1106 (9th Cir. 2020) ................................................................................................. 9

*Chao v. Aurora Loan Services,*
 2015 WL 294823 (N.D. Cal. Jan. 21, 2015) ................................................................. 11

*Gaudin v. Saxon Mortgage Services, Inc.,*
 2015 WL 7454183 (N.D. Cal. Nov. 23, 2015) ........................................................ 11, 12

*Hanlon v. Chrysler Corp.,*
 150 F.3d 1011 (9th Cir. 1998) ................................................................................................. 10

*In re Anthem, Inc. Data Breach Litig.,*
 327 F.R.D. 299 (N.D. Cal. 2018) ................................................................... 10, 14, 15

*In re Bluetooth Headset Prod. Liab. Litig.,*
 654 F.3d 935 (9th Cir. 2011) ................................................................... 10, 16, 18

*In re Diamond Foods, Inc.,*
 2013 WL 5400539 (N.D. Cal. Sept. 26, 2013) ................................................................. 13

*In re LendingClub Sec. Litig.,*
 2018 WL 1367336 (N.D. Cal. Mar. 16, 2018) ................................................................. 13

*In re MyFord Touch Consumer Litig.,*
 2019 WL 1411510 (N.D. Cal. Mar. 28, 2019) ................................................................. 10

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,*
 895 F.3d 597 (9th Cir. 2018) ................................................................................................. 11

*Linney v. Cellular Alaska P'ship,*
 151 F.3d 1234 (9th Cir. 1998) ................................................................................................. 13

MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS ACTION SETTLEMENT

*Saravia v. Dynamex Operations West, LLC,*

   2017 WL 1295069 (N.D. Cal. Apr. 4, 2017) ................................................................. 13

*Takiguchi v. MRI Int'l, Inc.,*

   2016 WL 1091090 (D. Nev. Mar. 21, 2016) ............................................................... 19

*Wannemacher v. Carrington Mortg.,*

   2014 WL 12586117 (C.D. Cal. Dec. 22, 2014) ........................................................... 10

**Statutes**

28 U.S.C. § 1715 ..................................................................................................................... 20

MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS ACTION SETTLEMENT

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on August 20, 2020 at 8 a.m., or as soon thereafter as this matter may be heard before the Honorable William H. Alsup, either by telephone or videoconference, *see* N.D. Cal. General Order No. 72-3, or in Courtroom 12, 19th Floor of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs will and hereby do move the Court for an order granting final approval of the proposed class action settlement under Federal Rule of Civil Procedure 23(e); granting final certification of the settlement class under Rules 23(a) and 23(b)(3); and finding that notice has been implemented in accordance with the Court-approved notice plan and comports with due process.

This motion is based on the following memorandum of points and authorities, the joint declaration of Richard Paul and Michael Schrag as Class Counsel and exhibits thereto, the arguments of counsel, and any other matters in the record or that properly come before the Court.

Dated: June 8, 2020

Respectfully submitted,

*/s/ Michael Schrag*
**GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda Lam (SBN 301461)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Class*

# I.     INTRODUCTION

After much contentious litigation and with the case approaching trial, the parties reached a class-wide settlement of $18.5 million. On April 19, 2020, this Court preliminarily approved the settlement, and per that order, the settlement administrator mailed notice to the class on May 18, 2020. (Dkt. 277.) The parties now request that the Court grant final approval of their settlement because it is fair, reasonable, and adequate and poised to deliver significant payments to over 500 class members.

The settlement was negotiated at arms-length under the supervision of Magistrate Judge Donna M. Ryu and comes after Plaintiffs litigated two motions to dismiss, completed the vast majority of fact and expert discovery, achieved certification of a litigation class, and as the parties were briefing Wells Fargo's motion for summary judgment on the claim certified for class treatment. The settlement class is the same class that this Court certified during the litigation. If the settlement is approved, class members will receive net payments ranging between $14,000 and $120,000. Given the risks in proving breach of contract liability and establishing damages, considerable uncertainty remains as to whether the class would recover this much (or anything at all) if this case went through trial and appeals.

To fully resolve this litigation, Wells Fargo will establish a non-reversionary $18.5 million fund for monetary payments to class members. All 510 class members will automatically receive a check for economic harm without having to submit a claim form. Under the proposed allocation plan, each class member's net settlement amount will be calculated based on factors designed to approximate the value of their lost modification opportunity, such as their unpaid principal balance and period of delinquency, as well as how much they already received from Wells Fargo in remediation.

The proposed settlement also allocates $1 million to compensate class members who suffered severe emotional distress as a result of the foreclosure of their homes. Class members can submit a simple claim form for a portion of this fund. The Court has appointed Cathy Yanni, a seasoned mediator, to evaluate submissions and award compensation for severe emotional injuries. The $18.5 million fund will also cover settlement administration expenses, attorney's fees, and litigation costs.

Class Counsel strongly believe the settlement is in the best interests of the class. Because the settlement readily meets Rule 23(e) standards of fair, reasonable, and adequate, Plaintiffs respectfully request that the Court grant final approval.

## II.   OVERVIEW OF THE LITIGATION

### A.   The alleged circumstances that prompted this lawsuit

Wells Fargo wrongfully denied trial loan modifications to approximately 870 homeowners, over 500 of whom lost their homes through foreclosure. From 2010 to 2018, a calculation error in Wells Fargo's software overstated the amount of attorney's fees used to calculate borrowers' eligibility for a trial loan modification under the federal Home Affordable Modification Program (HAMP). Rather than limit such fees to the maximum allowable under HAMP, the bank added the limits to fees actually incurred, and consequently, certain homeowners who should have qualified for trial modifications were deemed unqualified for such financial assistance.

Wells Fargo discovered the error in 2013 and implemented a partial fix in 2015. A related error, however, continued until 2018. That same year, Wells Fargo publicly admitted the error and implemented a comprehensive fix. The bank sent affected borrowers a letter apologizing for its mistake, and provided compensation, mainly between $5,000 and $15,000, to nearly all of those borrowers who subsequently lost their homes through foreclosure. The letters also invited borrowers to mediate legal disputes.

### B.   An abbreviated procedural history

Plaintiff Alicia Hernandez filed a putative class action in December 2018 seeking damages for all such affected homeowners nationwide. Shortly after filing suit, Plaintiff asked this Court to order Wells Fargo to explain the propriety of its communications with putative class members. (Dkt. 14.) After a hearing, the Court ordered Wells Fargo to send borrowers corrective letters to advise them of this litigation and their right to be represented by counsel in mediations with Wells Fargo. (Dkt. 28.)

Plaintiffs then filed a first amended complaint on behalf of Hernandez and 14 other proposed class representatives against Wells Fargo Bank and its parent company. (Dkt. 44.) Both defendants moved to dismiss. (Dkt. 59, 73.) The Court dismissed the parent company and Plaintiffs' breach of contract, wrongful foreclosure, and negligence claims but denied the motion as to Plaintiffs' intentional infliction of emotional distress, UCL, Homeowner's Bill of Rights, and other state consumer protection claims. (Dkt. 87.) After Plaintiffs deposed a corporate representative, who testified that a loan modification would cure a payment default, the Court permitted Plaintiffs to re-assert the contract claim

in a second amended complaint. (Dkt. 136, 137.) Wells Fargo answered this complaint. (Dkt. 141.)

During and after that motion practice, the parties engaged in robust discovery. Class Counsel reviewed more than 200,000 pages of documents and deposed seven Wells Fargo employees in Iowa, Oregon, Minnesota, North Carolina, and California. (Joint Class Counsel Declaration ("Joint Decl.") at ¶ 5.) Plaintiffs also served five sets of interrogatories and three sets of requests for production (to which Wells Fargo responded and later supplemented on several occasions). (*Id.*) Wells Fargo served requests for production and multiple sets of interrogatories to fifteen named Plaintiffs and deposed 16 named Plaintiffs (including class representative Sandra Campos, who was later added). The bank also deposed 18 *absent* California class members. (*Id.* at ¶ 7-8.) Class Counsel spent many hours reviewing each deponent's loan file (hundreds, if not thousands of pages) and preparing each for a deposition that often lasted all day. (*Id.*)

Discovery was contentious. The parties submitted more than five discovery disputes to the Court. (Dkt. 102, 105, 106, 175, 193, 196, 218, 219.) The Court compelled Wells Fargo to produce several categories of discovery, including testimony regarding the bank's efforts to comply with certain government consent orders and certain documents concerning loan modification practices that were given to board-level committees. (Dkt. 115 at ¶¶ 1, 3.)

Class Counsel retained Brian Kelley, a banking industry expert, to opine about liability issues and Dan Salah, a damages expert, to build a model to estimate class member damages. Each expert prepared a report and supplemental report, and sat for deposition. Class Counsel also deposed the two experts Wells Fargo hired to rebut Kelley's and Salah's opinions. (Joint Decl. at ¶ 10.)

There were two rounds of class certification briefing and argument. (Dkt. 138, 173.) Plaintiffs' second motion argued that class certification was appropriate because common issues regarding Wells Fargo's conduct predominated, while Wells Fargo opposed, arguing that individual causation and damages issues predominated. (Dkt. 188 at pp. 10-15.) On January 29, 2020, the Court certified a nationwide class under Rule 23(b)(3) to pursue the breach of contract claim on behalf of foreclosed borrowers. (Dkt. 217 at p. 4.) In that order, the Court appointed Debora Granja and Sandra Campos as class representatives and Gibbs Law Group LLP and Paul LLP as Class Counsel. (*Id.* at p. 11.)

Per that order, Plaintiffs filed a third amended complaint that added Campos and included all

the named Plaintiffs' individual claims (such as intentional infliction of emotional distress, HBOR, UCL, and other state consumer protection claims) as well as the certified breach of contract claim on behalf of the nationwide class. (Dkt. 220.) Shortly after the Court's certification order, the parties filed a joint proposal for class notice. (Dkt. 233.) Under Rule 23(f), Wells Fargo petitioned the Ninth Circuit for permission to appeal the class certification order and asked this Court to stay proceedings pending the appeal. (Dkt. 229.) Plaintiffs opposed the Rule 23(f) petition as well as the motion to stay. (Dkt. 243.) The Court later denied the motion to stay. (Dkt. 259.)

In late February, Wells Fargo moved for summary judgment on the class-wide breach of contract claim, Granja's and Campos's individual UCL and wrongful foreclosure claims, and Campos's HBOR claim. (Dkt. 231.) Wells Fargo argued that it was entitled to judgment as a matter of law on the contract claim—the only certified claim—because neither the Fannie/Freddie nor FHA contract required the bank to notify Plaintiffs and class members that they qualified for trial loan modifications before foreclosing on their homes. (*Id.*) That motion was pending when the parties settled.

The parties participated in a settlement conference before Judge Ryu on March 3, 2020. (Dkt. 180; Joint Decl. at ¶ 11.) Although the parties did not reach an agreement on that day, they agreed to consider Judge Ryu's mediator's proposal. (Joint Decl. at ¶ 11.) Two days later, the parties agreed to Judge Ryu's monetary proposal and over the next three weeks negotiated the remaining settlement terms. (*Id.*) On March 26, the parties executed the formal settlement agreement. The parties also retained an experienced settlement administrator, JND Legal Administration, after soliciting three bids. (*Id.* at ¶ 15.) With JND's help, the parties developed a notice and funds distribution plan. (*Id.*)

Plaintiffs then filed a motion requesting that the Court preliminarily approve the settlement and direct notice of the settlement to the class. (Dkt. 269.) The Court entered an order preliminarily approving the settlement and the notice plan on April 19, 2020. (Dkt. 277.) Since preliminary approval, JND and the parties established the settlement website and disseminated class notice.[1] (Dkt. 276-1 at p. 7.) The deadline for class members to opt out or object to the settlement is July 2, 2020. (*Id.*) Therefore, Plaintiffs will wait for their reply brief (due on July 23, 2020) to address the class's reaction to the

---

[1] Consistent with the settlement agreement, no later than 10 days before the final approval hearing, JND will file a declaration attesting that notice was disseminated in accordance with the settlement. (Dkt. 269-2 at § VI, ¶ C; Dkt. 276-1 at ¶ 14.)

MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS ACTION SETTLEMENT

settalement.

## III. OVERVIEW OF THE SETTLEMENT

### A. The proposed settlement class

If approved, the settlement would offer relief to the following class:

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

(Settlement Agreement ("Settlement"), Dkt. 269-2 § II, ¶¶ 6, 39).

The settlement class is the same as the certified litigation class. (Dkt. 217 at 4.) The settlement excludes: (a) Wells Fargo and its principals, affiliated entities, legal representatives, successors, and assigns; (b) any person who files a valid, timely Request for Exclusion; (c) federal, state, and local governments (including all agencies and subdivisions thereof); and (d) any Person who settled and released claims at issue in this action. (Settlement at § II, ¶ 39.).

### B. Benefits to the settlement class

#### 1. Settlement fund

The proposed settlement delivers a non-reversionary fund of $18,500,000, meaning Wells Fargo will not be entitled to retain any part of the settlement for any reason. (Settlement at § VI.) After paying attorney's fees and expenses to Class Counsel and settlement administration costs to JND, the remaining balance will be distributed to class members to compensate them for economic loss, except that $1 million will be set aside to compensate for severe emotional distress. (*Id*. at § IV, ¶ B.)

There is no claims process associated with compensation for economic loss because the class members are known, and the amount of their monetary payments can be fairly determined by setting a minimum payment and using factors and data designed to approximate the value of each class member's lost opportunity to modify his or her loan. The allocation plan is described below. As such, upon final approval, JND will mail checks to class members and follow-up with them if checks are not deposited.

The claims process for severe emotional distress funds requires class members to complete a

straightforward form that allows them to explain and substantiate any emotional distress. At preliminary approval, the Court appointed Cathy Yanni of JAMS as special master to evaluate such claims and award compensation from the fund.

The residual amount will be distributed to class members on a pro rata basis based on each class member's share of the total amount paid from the economic damages fund. (Allocation Plan, Dkt. 276-3 at 2.) If there are any uncashed checks from the second distribution, the agreement proposes that NeighborWorks America, a congressionally chartered, nonpartisan, charitable organization focused on affordable housing, receive any residual as a *cy pres*. (*Id.*; Settlement at § IV, ¶ C.)

### 2. Settlement allocation

#### a. Economic Damages Fund

For this fund, the allocation plan recognizes that Wells Fargo has already paid class members an average of 38% of the unpaid principal balance (UPB) of their loan at the time of the decision error. (Allocation Plan at 1; Joint Decl. at ¶ 24.) The allocation plan uses this percentage as a benchmark, and initially provides each class member the amount needed to bring the total of each class member's settlement payment and their remediation payments to 38% of his or her UPB. The allocation plan, however, reduces this amount by 5% for every six months of delinquency, but sets a minimum payment from the settlement fund of $14,000, in recognition of the fact that each class member was denied a trial modification and later lost his or her home to foreclosure. The plan thus results in a minimum payment of $14,000, which, including prior payments Wells Fargo made, means each class member will receive at least $24,000 in compensation for the error. (*Id.* at ¶ 25.)

This plan recognizes that the value of the lost modification opportunity varies among class members, and some have already received substantial compensation from Wells Fargo for such losses. As such, the allocation plan uses the UPB at the time of the error as a proxy for the value of the modification denied. In general, under Plaintiffs' theory, class members with larger UPBs are more likely to have suffered more lost equity and more damages as a result of the lost modification opportunity. (*Id.*)

The allocation plan reduces payments to class members with long delinquency periods (unless they are already receiving the minimum $14,000 payment). This reduction captures the economic

realities of this case: long delinquencies decrease the potential economic value of a loan modification. The number of days of each class member's delinquency has a practical correlation to both the class member's ability to perform under a loan modification and the amount of equity versus unpaid interest and fees being re-amortized in a modification. Also, higher delinquency equates to longer occupancy in properties for which mortgage payments were not made; meaning class members received the value of keeping their properties longer without making mortgage payments. The allocation plan thus applies a discount factor of 5% for each six-month period of loan delinquency. (Allocation Plan at 1; Joint Decl. at ¶ 24.) In these ways, the allocation plan fairly distributes compensation for economic harm based on the realities of this case.

### b. Severe Emotional Distress Fund

In addition to their share of the economic damages fund, class members may seek compensation for severe emotional distress. Recognizing that not all would be able to show the bank's error caused severe emotional distress, the settlement sets aside $1 million and requires class members to submit a claim. The form asks for a narrative statement and, if available, supporting documentation, such as medical records. (Claim Form, Dkt. 276-4.) Cathy Yanni, whom the Court appointed as special master, helped design the form and will resolve claims for compensation based on factors including the severity of emotional distress and the extent to which the class member can demonstrate it was caused by Wells Fargo's error as opposed to other life issues. (*See* Declaration of Cathy Yanni ("Yanni Decl."), Dkt. 269-11.) Yanni will also entertain a single request for reconsideration from each participating class member. (Settlement at § IV, ¶ B.) As of June 4, 37 class members have applied for compensation from this fund. (Joint Decl. at ¶ 27.)

### c. Secondary or *cy pres* distribution

Finally, funds remaining from the economic damages fund (opt-out amounts and uncashed checks) along with any undistributed funds from the severe emotional distress fund will be redistributed to class members who cash their checks (pro rata based on each class member's proportionate share of the cashed checks from the initial payment). If there are any uncashed checks from this second distribution, the residual will be sent to the *cy pres* recipient.

### C.     The scope of class members' release of claims

In exchange for the settlement payments, class members will release claims against Wells Fargo and its officers, directors, legal representatives, successors, subsidiaries, and assigns limited to "all claims, rights, causes of action, liabilities, actions, suits, damages, or demands (including Unknown Claims as defined in Paragraph 47, herein), of any kind whatsoever that arise out of or are based on the claims set forth in the Action, including claims based on the subject Loan Modification Denials, damages based on any failure to modify the Loans and/or damages based on the foreclosures challenged in the Action." (Settlement at § II, ¶ 32.) In turn, Wells Fargo will release class members from any claims related to this litigation or settlement. (*Id.*)

### D.     The notice plan

On May 18, 2020, JND mailed the court-approved notice to all class members. (Dkt. 276-2, 277.) The class notice clearly explains the material aspects of the settlement, as well as how to opt out of or object to the settlement. (Notice, Dkt. 276-2.) Each class member's notice specifies the amount he will receive from the economic damages fund and states the amount he has already received in remediation payments. (*Id.* at Sec. 9.) The notice also identifies a website with links to important case documents, a Spanish translation of the notice, and updates on the settlement approval process. (*See* www.homeloanmodificationsettlement.com.)

As part of its remediation program, Wells Fargo mailed letters to each class member and employed detailed skip tracing procedures for any letters that were returned as undeliverable. (Joint Decl. at ¶ 16.) Wells Fargo provided those updated names and addresses for each class member to JND. (*Id.*) JND then performed a National Change of Address search and conducted advanced address updating using a variety of tools such as LexisNexis to obtain a current address. (*Id.*)

The notice plan has been effective. JND mailed notice to all class members using first-class mail, address correction requested. (Settlement at § II, ¶ A.10.) To date, only 33 notices have been returned as undeliverable. JND's research identified updated addresses for 27 of those undeliverable notices, which were re-mailed. JND is using additional search tools to research the remaining six names in continuing efforts to have notice reach all class members. (Joint Decl. at ¶ 16.)

**E.    The provision for attorney's fees and cost reimbursements**

Under the settlement, attorney's fees and costs are to be awarded from the gross settlement fund. As detailed in Plaintiffs' motion for attorney's fees and costs, Class Counsel request an award of $4,525,000 (25% of the *net* settlement fund after deducting litigation and administration expenses) in attorney's fees and reimbursement of their $335,000 in litigation expenses. These amounts were included in the notice disseminated to the class. (Dkt. 276-2 at p. 1, Sec. 17.)

**IV.    FINAL APPROVAL OF THE SETTLEMENT IS WARRANTED**

In December 2018, Rule 23(e) was updated to formalize the standard for approving class action settlements. At the initial, or "preliminary" stage, courts are asked to decide whether they "will likely be able" to approve the settlement and certify the settlement class. Fed. R. Civ. P. 23(e)(1)(B). If so, the settlement notice is provided to the class and the final approval stage follows.

Here, the Court granted Plaintiffs' motion for preliminary approval and ordered notice to be sent to the class. (Dkt. 277.) With the notice now disseminated, the parties request that the Court certify the proposed settlement class and grant final approval of their settlement.

**A.    The proposed settlement merits approval**

A proposed class settlement should be approved only if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Ninth Circuit has described the following factors for district courts to consider when evaluating the fairness of a proposed class settlement: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020).

The new Rule 23(e)(2) factors are substantially similar to those the Ninth Circuit has instructed district courts to consider in determining whether to approve a settlement, and were not designed "to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Therefore, Plaintiffs apply the framework set forth in

the recently amended Rule 23(e)(2), while drawing guidance from the Ninth Circuit's factors and precedent.

As discussed below, each factor under Rule 23(e)(2) weighs in favor of final approval.

### 1. The parties negotiated the proposed settlement at arm's length

This Rule 23(e)(2) factor asks the Court to confirm the settlement was negotiated at arm's length. Fed. R. Civ. P. 23(e)(2)(B). This can be "described as [a] 'procedural' concern[], looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2)(B), advisory committee's note. Where, like here, a litigation class has already been certified, "the Settlement Agreement need not be held to the 'higher standard of fairness' required of pre-certification settlements." *See In re MyFord Touch Consumer Litig.,* 2019 WL 1411510, at *5 n.2 (N.D. Cal. Mar. 28, 2019) (citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998)). Even so, there are multiple indicia of the arm's length nature of the negotiations.

First, the parties did not begin settlement discussions until after class certification and two months before trial. (Joint Decl. at ¶ 11.) At that time, fact and expert discovery was nearly complete, the parties had engaged in significant pretrial motion practice, and Wells Fargo had filed a motion for summary judgment (seeking partial summary judgment on the individual claims and full judgment on the only class claim). (*Id.* at ¶ 5-11.); *In re Anthem, Inc. Data Breach Litig.,* 327 F.R.D. 299, 320 (N.D. Cal. 2018) (finding no signs of collusion where the parties had conducted substantial "factual investigation and legal analysis," "litigated two motions to dismiss," and fully briefed a class certification motion); *see also Wannemacher v. Carrington Mortg.,* 2014 WL 12586117, at *8 (C.D. Cal. Dec. 22, 2014) (finding no signs of collusion where "significant … discovery [was] conducted;" "plaintiffs had already drafted a class certification brief;" and before "exploring settlement, the parties litigated the case for a year").

Second, the parties resolved the litigation with the assistance of Magistrate Judge Ryu. (Joint Decl. at ¶ 11.) "[T]he involvement of a neutral or court-affiliated mediator or facilitator in [the parties'] negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e)(2)(B) advisory committee's notes; *accord In re Bluetooth Headset Prod. Liab. Litig.,* 654 F.3d 935, 948 (9th Cir. 2011) (participation of mediator, while not dispositive,

"weigh[s] in favor of a finding of non-collusiveness"). The parties mediated under Judge Ryu's guidance in March 2020, and ultimately accepted her mediator's proposal. (Joint Decl. at ¶ 11.)

Third and finally, the requested attorney's fees (25% of the net settlement fund) are proportional to class member compensation, there is no "clear sailing" arrangement whereby Wells Fargo has agreed not to contest the fee motion, and settlement funds will not revert to Wells Fargo under any circumstances. *See In re Volkswagen,* 895 F.3d 597, 611 n.19 (9th Cir. 2018). For all these reasons, there is no cause for concern that the settlement is the product of collusion.

## 2. The quality of relief to the class weighs in favor of approval

The next factor to consider is whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C).

### a. The settlement provides substantial relief to class members

The proposed settlement provides substantial relief—$18.5 million for 510 class members. This settlement provides substantially more relief than that approved in similar settlements involving wrongful loan modifications in this district. For example, in *Chao v. Aurora Loan Services*, the Court approved a $5.25 million California class settlement for over 15,000 California borrowers who lost their homes to foreclosure after making payments under a voluntary forbearance agreement under the false hope that the lender would then provide a loan modification. No. 10-03118-SBA, 2015 WL 294823 (N.D. Cal. Jan. 21, 2015). The gross settlement in *Chao* represented approximately 19% of the claimed damages for breach of contract and UCL restitution and provided an average payment of $16,000 for one class of borrowers and payments of approximately $25 for the remaining borrowers. *Id.*; Dkt. 218 at 13.

In *Gaudin v. Saxon Mortgage Services, Inc.,* the court approved a $4.5 million settlement on behalf of 2,705 borrowers who made at least three HAMP trial plan payments but were not offered a permanent loan modification and ultimately lost their homes to foreclosure. No. 11-cv-01663-JST, 2015 WL 7454183 (N.D. Cal. Nov. 23, 2015). The settlement represented about 13.5% of the

maximum breach of contract, UCL, and Rosenthal Act damages, and class members received an average payment of over $1,100. *Id.* at *6. Unlike the plaintiffs in *Gaudin* who alleged they made the required trial period payments but were denied a permanent HAMP modification, Plaintiffs here alleged they were denied a *trial* modification. Thus, the settlement here – which provides a minimum payment of $14,000 or around 12 times the $1,100 average payment in *Gaudin* – provides relief that is significant and fair. *See also Wigod v. Wells Fargo Bank, N.A.,* No. 1:10-cv-02348 (N.D. Ill.) at Dkts. 269, 274 at 7, and 277 (approving a claims-made settlement where a group of borrowers who lost their homes to foreclosure were eligible to receive a share of a $2 million fund based on criteria such as whether the borrower previously received a modification; at final approval, 170 claims were submitted).

The $18.5 million settlement fund also represents 37% of what Plaintiffs estimate they could have recovered in economic damages on their best day at trial. Plaintiffs' damages expert, Dan Salah, prepared an expert report for the named Plaintiffs and California class members in which he calculated two categories of economic damages: lost equity in class members' homes and the value of the "loss of use" of their homes. (Joint Decl. at ¶ 19-20; Dkt. 192-12.) Before the settlement conference, Salah used the same methodology to calculate damages for all class members. He estimates that aggregate damages would have been approximately $65 million. It is important to note that in addition to the settlement funds, class members have already received approximately $15 million from Wells Fargo in voluntary remediation payments. The gross amount class members will receive in connection with this error will therefore be over $33 million. Even if Plaintiffs obtained a judgment for their "soaking wet" damages of $65 million, the $15 million already paid would be subtracted, meaning a $50 million breach of contract judgment would have been possible if everything worked in the class's favor at summary judgment, trial, and appeals. The settlement of $18.5 million is 37% of this maximum potential $50 million judgment. (Joint Decl. at ¶ 19.) Of course, that estimate is subject to substantial downward pressure due to the litigation risks remaining: Wells Fargo could prevail at summary judgment, trial, or on appeal, leaving the class with no recovery at all.

Plaintiffs also sought emotional distress damages through the IIED claim, as well as a component of damages for the wrongful foreclosure claims in Georgia and California only. *See* Dkt.

220 at ¶ 183-189, 194, 199. Proving that Wells Fargo intentionally caused emotional distress would be challenging given their defense that the calculation error was an innocent mistake. Nevertheless, the settlement creates a $1 million fund and class members can submit a claim if they believe they suffered severe emotional distress as a result of the calculation error.

Finally, the amount of the settlement is fair in view of the claims released by class members. The proposed release here covers only claims related to the conduct at issue and relates to the types of damages class members suffered in losing their homes. This Court has approved similar releases that are anchored to the conduct at issue. *See In re LendingClub Sec. Litig*., No. C 16-02627 WHA, 2018 WL 1367336, at *4 (N.D. Cal. Mar. 16, 2018) (approving release anchored to conduct and discussing approval of similar release in *Luna v. Marvell*, No. 15-5447). In *Saravia v. Dynamex Operations West, LLC*, for example, this Court approved a release of the claims pled in the complaint, as well as "other claims seeking substantially the same lost wages." No. 14-05003 WHA, 2017 WL 1295069, at *2 (N.D. Cal. Apr. 4, 2017) (Alsup, J.); *see also Parrish v. Manatt, Phelps & Phillips, LLP*, No. 10-03200 WHA (Dkt. 125 at 3) (approving release of "all claims and causes of action . . . that arise out of the facts, occurrences, transactions, or other matters that were alleged in, are the subject of or relate to the Present Action" in legal malpractice case); *In re Diamond Foods, Inc*., No. 11-05386 WHA, 2013 WL 5400539 (N.D. Cal. Sept. 26, 2013) (Alsup, J.) (approving release of "claims that relate to those certified for class treatment"). For similar reasons, this release is reasonable.

The negotiated relief is therefore more favorable than what classes in comparable cases received and readily satisfies the Rule 23 standard of fair, reasonable, and adequate. This settlement provides a substantial payment to each class member in a case that was fiercely contested, where Plaintiffs' contract interpretation theory presented substantial litigation risk, and where even upon a showing of liability there would have been questions about Plaintiffs' ability to demonstrate damages. Under these circumstances, Plaintiffs and Class Counsel wholeheartedly endorse this negotiated resolution.

### b. Continued litigation would entail substantial risk, cost, and delay

Most class actions are long, costly and risky, which supports the Ninth Circuit's "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1238 (9th Cir. 1998). Here, had the parties not settled, the

litigation would have remained risky, protracted, and costly.

With respect to the remaining cost and time needed to prosecute the case, though the parties had already completed the vast majority of discovery, they still needed to brief *Daubert* issues and a potential Rule 23(f) appeal if the Ninth Circuit were to grant Wells Fargo's petition, followed by motions in limine, a possible decertification motion, and then trial. Each stage would have added risk and necessarily imposed delay before the class could receive any relief. And due to the COVID-19 public health crisis, trials in this district have been delayed until at least September 30, 2020. N.D. Cal. General Order No. 72-3. Had the parties not settled, the class would have needed to wait until at least then for a trial date.

On the merits, certain key facts favored Plaintiffs, but case law developed in the wrongful foreclosure context provided Wells Fargo with many arguments that could have allowed the bank to prevail. Plaintiffs believed that Wells Fargo's calculation error breached their mortgage contracts and caused Plaintiffs economic damage. But Wells Fargo, while admitting that it mistakenly denied trial loan modifications, relied on case law stating that the contracts do not require the bank to notify borrowers of their eligibility for a modification. On the Fannie/Freddie contract, the bank's position was that it only had to notify class members that they could cure their defaults (and avoid foreclosure) by paying the amounts in arrears. Plaintiffs faced the obstacle of rulings in other districts that found the relevant language did not mandate a modification as a way to cure a default. (Dkt. 231 at p. 13-14.) On the FHA contract, Wells Fargo would continue arguing that nothing in the incorporated HUD regulations required the bank to offer a modification. Wells Fargo also argued that claims based on violations of HUD regulations have not been expressly authorized under California law and are not recognized in every state. (Dkt. 231 at p. 16-18.) There was no guarantee Plaintiffs would survive summary judgment, let alone trial. *See In re Anthem*, 327 F.R.D. at 319, 321-22 (granting final approval of settlement fund representing 14.5% of plaintiffs' damages estimate, while overruling objections to the amount of the settlement because "none of these [objectors] adequately take into account the risks and delays involved in proceeding to summary judgment or trial").

Even if Plaintiffs ultimately prevailed on liability, Wells Fargo would have continued arguing that there were little or no damages. The bank has argued that class members' loss of use damages are

not recoverable at all, relying on this Court's class certification order. (Dkt. 252 at 4 ("The only purpose of [the class] trial is to 'determine the value of the equity lost by each homeowner through a foreclosure…").) Salah's estimate of lost equity damages was $37.9 million. (Joint Decl. at ¶ 20.) If Wells Fargo prevailed on the loss of use issue, the class's best day at trial would result in a $37.9 million verdict – and if the $15 million in remediation payments were treated as an offset, this amount would be reduced to as little as $22.9 million. (*Id.*) Thus, if only lost equity damages were in play, the settlement recovers a substantial portion of the damages the class could win at trial.

Wells Fargo also strenuously argued (and had some authority to support) that lost equity damages must be measured at the time of foreclosure, which would bring those damages to nearly zero. The vast majority of class members' foreclosures occurred when they were "under water" on their homes – meaning they had no equity to lose at the time of foreclosure. Although Plaintiffs had authority to counter this and believe that it would be unfair to measure lost equity when property values were at their lowest, this dispute presented substantial risk.

Plaintiffs believe they had reasonably strong prospects of overcoming Wells Fargo's arguments and defenses, but there can be little doubt that those defenses presented the possibility that the class would recover nothing if the case persisted, or at least far less than what Plaintiffs were seeking. Even if Plaintiffs had prevailed on each of these issues through trial, an appeal would likely follow, taking another two-plus years to resolve. This settlement "eliminates the risks inherent in certifying a class, prevailing at trial, and withstanding any subsequent appeals, and it may provide the last opportunity for class members to obtain relief." *Calderon v. Wolf Firm,* 2018 WL 6843723, at *7 (C.D. Cal. Mar. 13, 2018). This factor therefore weighs in favor of settlement approval.

### c. The settlement agreement provides for an effective distribution of proceeds to the class

The settlement has an efficient and effective distribution process. Class members will receive checks for their share of the economic damages fund automatically in the mail, without the need to submit a claim or gather any documentation. In other words, no affirmative steps on their part are required to receive their economic damages payments.

As for the severe emotional distress fund, the claims process is simple and can be completed

online or by mail. Class members have been asked to describe, in narrative form, their claim for severe emotional distress, and have the opportunity to submit documentation supporting their claim. (Allocation Plan, Dkt. 276-3 at p. 2.) Once Yanni makes her final decision on each claim, a check will be sent to each class member for his or her share of the severe emotional distress fund.

### d. The terms of the proposed award of attorney's fees also support settlement approval

As detailed in Plaintiffs' concurrently filed motion for attorney's fees and costs, Class Counsel seek compensation from the settlement fund, proportional to the class's recovery. Class Counsel seek $4,525,000, which is 25% of the *net* recovery and also request reimbursement of $335,000 in litigation expenses. This fee request is below the Ninth Circuit's benchmark of 25% of a common fund, as that benchmark is typically applied to the *gross* settlement amount. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 942. Nothing about the proposed award of attorney's fees should detract from the fairness of the settlement.

### e. The parties have no other agreements pertaining to the settlement

The Court also must evaluate any agreement made in connection with the proposed settlement. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv), (e)(3). Here, the settlement agreement before the Court is the only agreement between the parties. (Joint Decl. at ¶ 12.)

### 3. The class representatives and Class Counsel have adequately represented the class

Under Rule 23(e)(2)(A), courts look to the adequacy of representation, which includes an analysis of "the nature and amount of discovery" undertaken in the litigation. Fed. R. Civ. P. 23(e)(2)(A), advisory committee's notes.

To begin with, class representatives Debora Granja and Sandra Campos have diligently represented the class. They actively participated in the litigation and discovery, including by sitting for their depositions, conducting ESI searches, producing documents, and traveling to San Francisco to attend the settlement conference. (Joint Decl. at ¶ 79.) Throughout, they remained in contact with Class Counsel, stayed updated on the litigation, and acted with the interests of the class in mind. (*Id.*)

In granting class certification, this Court found Class Counsel to be diligent and adequate. (Dkt.

218 at p. 8.) Class Counsel's work supports this conclusion. They vigorously prosecuted this case, completing most pre-trial work in less than 18 months. They briefed and argued a motion to transfer, two motions to dismiss, five discovery letter briefs, class certification, and partial summary judgment. (*Id.* at ¶ 5.) They conducted extensive discovery and were in the midst of preparing an exhibit list for trial when the parties reached a proposed settlement. (*Id.* at ¶ 6.) Class Counsel developed evidence revealing that Wells Fargo discovered the error in 2013, but despite recognizing that the error could negatively impact borrowers and recommendations from employees to review and remediate if borrower harm was identified, the bank did not fully fix the problem until 2018. Class Counsel also engaged the services of two experts, one who opined on industry standards for banking practices and another who assisted in developing a damages methodology. (*Id.* at ¶ 10.)

As part of these efforts, Class Counsel worked over 6,877 hours on the case and advanced more than $335,000 in litigation expenses, with no assurance that those expenses would be reimbursed. (*Id.* at ¶ 63, 76.) Throughout the investigation, litigation and settlement process, Class Counsel have continuously and adequately represented the class's best interests.

### 4. The settlement treats all settlement class members equitably

The final Rule 23(e)(2) factor turns on whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2)(D), advisory committee's notes.

Here, the settlement treats class members equitably by taking into account differences in the value of their claims. With respect to the economic damages fund, individual class member awards are differentiated based on estimated value of the lost modification opportunity. Factors that went into the allocation formula include each class member's unpaid principal balance (UPB), his period of delinquency, and the amount Wells Fargo already paid him in remediation. (Allocation Plan, Dkt. 276-3 at 1.). For example, one class member, "Jane Smith" (loan number ending in 3433) is receiving the minimum of $14,000 under the settlement because she had a relatively low UPB ($88,941) and had already received $30,000 in remediation payments. In contrast, another class member, "John Doe"

MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS ACTION SETTLEMENT

(loan number ending in 9385) is receiving $99,082, an amount on the high end of the range under the settlement, because he had a much higher UPB ($394,978), meaning he lost a more expensive home and thus arguably suffered more economic harm than Jane. Both class members' allocation amounts were discounted for every six months of delinquency.

Payments from the severe emotional distress fund will similarly take differences in the strength of class members' emotional distress claims into account. For those who apply for a portion of this fund, Yanni will take into account the severity of their emotional distress and whether the trial modification denial (as opposed to other factors unrelated to this lawsuit) caused the stress. (Yanni Decl., Dkt. 269-11 at ¶ 10.) While evaluating emotional distress claims necessarily involves subjective judgment, Yanni will draw on her years of experience administering settlements in similar cases to fairly allocate this fund. (*Id.*)

Class members are all being treated equitably in another way: no class representative will seek an incentive award. Thus, because no named Plaintiff is receiving a benefit not available to other class members, and class members' awards are directly proportional to any damages they might have been able to recover at trial, this factor weighs in favor of settlement approval. *See, e.g., Altamirano v. Shaw Indus., Inc.*, 2015 WL 4512372, at *8 (N.D. Cal. July 24, 2015) (finding no preferential treatment because the settlement "compensates class members in a manner generally proportionate to the harm they suffered on account of [the] alleged misconduct").

## B.    Certification of the settlement class is appropriate

The proposed settlement class definition is the same as the litigation class this Court certified in January 2020 and the settlement class the court preliminarily approved in April. (Dkt. 217.) Because there is no reason to depart from the Court's previous conclusions regarding the propriety of certification, Plaintiffs address certification of the proposed settlement class only briefly.

### 1.    The settlement class satisfies the requirements of Rule 23(a)

All Rule 23(a) requirements are readily satisfied. There are 510 class members (numerosity); questions common to all class members, including whether uniform contracts required Wells Fargo to provide notice of eligibility for a loan modification as a way to cure a default, are answerable through common proof (commonality); the type of harm Plaintiffs suffered is the same as that suffered by all

class members (typicality); and the class representatives and Class Counsel will continue to represent the class's best interests, as they have to date (adequacy). Fed. R. Civ. P. 23(a).

### 2. The settlement class meets the requirements of Rule 23(b)(3)

Each Rule 23(b)(3) requirement is also satisfied. For one, common questions predominate over any individual ones because Wells Fargo engaged in a uniform course of conduct applicable to all class members. This includes the core allegation that Wells Fargo failed to offer loan modifications because of a widespread software error that miscalculated class members' eligibility for financial relief under HAMP. The proposed settlement class is therefore sufficiently cohesive to warrant adjudication by representation.

Similarly, it is superior to resolve all class members' claims through a single class action as opposed to individual lawsuits. Given the time and expense this case requires, even a relatively large award is likely to be lower than the cost of individual litigation. *Takiguchi v. MRI Int'l, Inc.*, 2016 WL 1091090, at \*12 (D. Nev. Mar. 21, 2016) (finding a class action to be superior even where damages ran from "tens of thousands to hundreds of thousands of dollars," since litigation would present hardship on individual class members' finances and health).

For these reasons and the reasons this Court accepted in certifying a litigation class, certification of the proposed nationwide settlement class is appropriate.

### C. Notice to the settlement class comported with Rule 23 and Due Process

Where a settlement class is certified under Rule 23(b)(3), the notice must be the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

Here, notice was disseminated to each class member via first-class mail on May 18, 2020. The notices were sent in envelopes that were stamped with the phrase "NOTICE RE: WELLS FARGO LOAN MODIFICATION SETTLEMENT," so that they are more likely to be opened than thrown away as junk mail. (Dkt. 12 at Sec. 13.) JND received class member addresses from Wells Fargo, and ran all addresses through the United States Postal Service's National Change of Address database. (JND Declaration, Dkt. 269-10 at ¶ 16.) JND also established a settlement website, where class members can find a full version of the notice in both English and Spanish, the claim form for the severe

emotional distress fund (in both English and Spanish), important documents from the litigation, and up-to-date information on the settlement approval process. (*See* www.homeloanmodificationsettlement.com.)

The notice also complies with Rule 23(c)(2)(B) in that it "clearly and concisely state[s] in plain, easily understood language" the nature of the action; the class definition; the class claims, issues, or defenses; that the class member may appear through counsel; that the court will exclude from the class any member who requests exclusion; the time and manner for requesting exclusion; and the binding effect of a class judgment on class members. (*See* Dkt. 276-2.) To that end, the notice is consistent with the samples provided by the Federal Judicial Center.[2]

Finally, notice was also provided to the U.S. Attorney General and appropriate regulatory officials, as required by the Class Action Fairness Act, 28 U.S.C. § 1715. (Settlement, Dkt. 269-2 at § VII.)

## V. CONCLUSION

For all the above reasons, Plaintiffs respectfully request that the Court enter the proposed final approval order, thus finally approving the proposed settlement; finally certifying the proposed settlement class; and determining that Plaintiffs' class notice plan comports with Rule 23 and due process. Plaintiffs will file a reply addressing the class's reaction to the settlement by July 23, 2020.

Dated: June 8, 2020                                        Respectfully submitted,

                                                           */s/ Michael Schrag*
                                                           **GIBBS LAW GROUP LLP**
                                                           Michael L. Schrag (SBN 185832)
                                                           Joshua J. Bloomfield (SBN 212172)
                                                           Linda Lam (SBN 301461)
                                                           505 14th Street, Suite 1110
                                                           Oakland, California 94612
                                                           Telephone: (510) 350-9700
                                                           Facsimile: (510) 350-9701
                                                           mls@classlawgroup.com
                                                           jjb@classlawgroup.com
                                                           lpl@classlawgroup.com

---

[2] *See* https://www.fjc.gov/sites/default/files/2016/ClaAct04.pdf.

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and the Class*

MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS ACTION SETTLEMENT