United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALICIA HERNANDEZ, EMMA WHITE,
KEITH LINDNER, TROY FRYE,
COSZETTA TEAGUE, IESHA BROWN,
JOHN and YVONNE DEMARTINO, ROSE
WILSON, TIFFANIE HOOD, GEORGE
and CYNDI FLOYD, DEBORA GRANJA,
and DIANA TREVINO, individually and on
behalf of all others similarly situated,

    Plaintiffs,

  v.

WELLS FARGO BANK, N.A.,

    Defendant.

No.  C 18-07354 WHA

**ORDER RE MOTION FOR FINAL
APPROVAL OF CLASS
SETTLEMENT AND MOTION FOR
ATTORNEY'S FEES AND
EXPENSES**

**INTRODUCTION**

    In this class action certified under Rule 23(b)(3), plaintiffs move for final approval of a settlement agreement and for attorney's fees and costs.  Defendant does not oppose.  For the following reasons, both motions are **GRANTED.**

**STATEMENT**

    The background of this action has been set forth in prior orders and need not be discussed in detail herein (*see* Dkt. Nos. 87, 217).  In brief, plaintiffs had their mortgage loans serviced by defendant Wells Fargo Bank, N.A.  Although plaintiffs met the Home Affordable Modification Program (HAMP) requirements, the bank failed to offer them loan modification

and/or repayment plans due to an algorithmic error in its system that caused certain fees to be misstated, which then resulted in incorrect mortgage modification denials. As a result, between 2010 and 2018, the bank denied trial loan modifications to approximately 870 homeowners who should have qualified but were deemed unqualified as a result of the error in the bank's system. Over 500 of those homeowners then lost their homes in foreclosures.

In 2018, the bank publicly admitted the error. By December 2018, plaintiff Alicia Hernandez had commenced this then-putative class action. The amended complaint then added fourteen other class representatives, asserting claims for breach of contract, negligence, wrongful foreclosure, intentional infliction of emotional distress, violation of California's Homeowners Bill of Rights, violations of California's unfair competition law, and violations of state consumer protection laws (Dkt. No. 44). Though a prior order initially dismissed the breach of contract claim, plaintiffs were later allowed to reassert their breach of contract claims based on evidence obtained through discovery (*see* Dkt. Nos. 136, 137).

In January 2020, after two rounds of class certification briefings, a prior order appointed Debora Granja and Sandra Campos as class representatives and Gibbs Law Group LLP and Paul LLP as class counsel, certifying the following nationwide class under FRCP 23(b)(3) only as to the breach of contract claim (Dkt. No. 217 at 4):

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

The bank then filed an interlocutory appeal of the class certification order and requested a stay of proceedings pending our court of appeals' decision to either grant or deny the bank's petition. The motion to stay was denied (Dkt. No. 259). The bank also filed a partial motion for summary judgment and a motion to sever the individual claims from the class claim (Dkt. Nos. 231, 252). During the same time, in March 2020, the parties reached a proposed

2

settlement agreement mediated under the supervision of Magistrate Judge Donna M. Ryu. Accordingly, all other motion hearings were vacated pending preliminary approval of the proposed settlement.

The proposed settlement fund establishes a non-revisionary gross settlement fund of $18.5 million. This amount is over and above the fifteen million dollars the bank already paid to the class members as part of its remediation efforts following its public acknowledgment of the error. Plaintiffs estimated their total potential damages to be $65 million. Since the bank had already paid fifteen million dollars, however, their total recoverable damages at trial would have been $50 million. The settlement figure of $18.5 million thus represents approximately 37% of plaintiffs' maximum recoverable damages.

After deducting the costs for class notice and settlement administration, attorney's fees, and expenses, the remaining amount will be allocated between two funds: (1) the "economic damages fund" and (2) the "severe emotional distress fund." The fixed amount of one million dollars will then be placed into the "severe emotional distress fund" for which class members who suffered severe emotional distress are required to submit claim-forms in order to obtain damages from that fund.

The remaining and majority balance of the fund will then be allocated to the "economic damages fund" to compensate all class members for the economic harm associated with losing their homes. Class members need not submit any claim-form to receive damages under this fund. Rather, each class member will automatically get checks in the mail in an amount representing their pro rata share of the settlement, taking into account how much the bank already paid each class member in connection with its remediation efforts.

A prior order granted plaintiffs' motion for preliminary approval of the proposed class settlement; approved, as to form and content, a notice concerning the class settlement agreement and the final hearing; approved the claim-form for the "severe emotional distress fund;" and appointed Cathy Yanni as special master for processing class members' claims for damages under said fund (Dkt. No. 277). That order set July 2, 2020, as the date by which to

opt-out of the class, object to the settlement, and to submit claims for relief from the "severe emotional distress fund."

The class administrator also mailed notice of the proposed class settlement and fee request to all 510 class members via first-class mail (Keough Decl. ¶ 7, Exh. B).  The envelopes containing the notice letters were conspicuously marked to signify importance.  For the 57 notices that returned as undeliverable, the administrator conducted advanced searches using multiple databases and re-mailed notices to updated addresses for class members or their next of kin if the class member is now deceased.

At the time of the first hearing for final approval on August 20, however, sixteen class members had not yet received notice — either because no updated address for them could be found, or because notices were returned as undeliverable after all attempts (*id.* ¶ 8).

Additionally, at that time, out of the 494 class members whose notices had been delivered, only five had opted out of the class and no class member had objected to the settlement (*id.* ¶ 15, Exh. C; ¶ 17).  Moreover, 121 class members had submitted claims for damages under the "severe emotional damanges fund" and Yanni, the special master, had allocated all but $28,500 of the one million dollar fund towards said claims, subject to final approval of the settlement.  Furthermore, Yanni had not yet ruled on fifteen appeals filed by class members challenging Yanni's initial decision.

During the August 20 hearing, the undersigned expressed concern that, under the terms of the settlement, the sixteen unfound class members' emotional distress claims would have been waived without being afforded an opportunity to file a claim for damages under the "severe emotional distress fund."  Moreover, under the terms of the settlement, uncashed checks distributed under the "economic damages fund" would have reverted back to the fund and been redistributed on a pro rata basis to class members who did cash their checks.

In response to these issues, the undersigned ordered (1) additional efforts be made to locate the sixteen unfound class members; (2) Yanni's completion of all claims made under the "severe emotional distress fund" and any appeals thereto; and (3) the preservation of settlement amounts owed to unfound class members in an appropriate state's unclaimed property fund.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Thereafter, the parties engaged in further efforts to find the previously unfound sixteen

2   class members.  Four of the sixteen are now deceased.  One of them had a co-borrower to

3   whom the class administrator sent notice to.  With respect to the other three deceased

4   members, the parties could not find next of kin information.  As to the twelve living members,

5   ten were re-mailed notice.  To date, out of the eleven notices delivered to the previously

6   unfound class members or their co-borrower, only one returned as undeliverable (Schrag Decl.

7   ¶ 4); (Keough Decl. ¶ 5).  None have objected or opted out.

8        For the remaining six unfound class members "in addition to any class member whose

9   notice is later returned as undeliverable and remains unfound, and any other class member who

10  does not cash his or her settlement check," the parties propose preserving their economic

11  damages award "in the unclaimed property fund for the state in which they were last known to

12  reside.  This payment will be remitted to the unclaimed property fund within 180 calendar days

13  after the last stale check on a date for any settlement class member receiving monetary relief"

14  (Dkt. No. 289 at 4) (citing Dkt. No. 269-2 at §V, ¶ D; Schrag Decl. at ¶ 4).  Thus, these class

15  members will have fully released any claims for economic damages per the settlement

16  agreement.

17       Moreover, Yanni has now completed all the 121 severe emotional distress claims and all

18  fifteen requests for reconsideration.  The entirety of the fund has now been allocated amongst

19  the 121 class members.  Because the deadline for filing a claim under the "severe emotional

20  distress fund" had already passed and Yanni had already allocated the entire fund, the parties

21  further agree and propose that the emotional distress claims of the sixteen previously unfound

22  class members, "to the extent any such claims are allowed under applicable law, will not be

23  released" (Dkt. No. 289 at 2).

24       Since the first notices were mailed, moreover, the class administrator maintained a toll-

25  free number for class members to call and obtain information as well as a website.  The

26  website supplied all the important court documents related to this litigation as well as up-to-

27  date information about the settlement approval process (Keough Decl. ¶¶ 10, 12).  Moreover,

28

the website enabled class members to electronically submit their claim-form through the website, though class members could also do so via mail or email.

Plaintiffs now move for final approval of the proposed class settlement, an award of $4,525,000 in attorney's fees, and $335,000 in unreimbursed expenses to be paid from the settlement fund. The bank does not oppose (Dkt. Nos. 280, 281). This order follows full briefing and oral argument.

## ANALYSIS

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class . . . may be settled . . . only with the court's approval." When a proposed settlement agreement is presented, the district court must perform two tasks: (1) direct notice in a reasonable manner to all class members who would be bound by the proposal, and (2) approve the settlement only after a hearing and on finding that the terms of the agreement are fair, reasonable, and adequate.

### 1.    FINAL APPROVAL OF PROPOSED CLASS SETTLEMENT.

#### A.    ADEQUACY OF NOTICE.

The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950) (citations omitted). It must also describe "the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Mendoza v. Tucson Sch. Dist. No. 1,* 623 F.2d 1338, 1352 (9th Cir. 1980).

The undersigned judge previously approved the form, content, and planned distribution of the class notice (Dkt. No. 277). As described above, the claims administrator has fulfilled the notice plan. Indeed, as of October 7, 2020, all but seven class members have been sent notice. Of those seven, four are deceased. Notice has been sent to the co-borrower of one of the deceased members, however. Since 98.82% of the settlement class have been sent notice, this order accordingly finds that notice to class members was adequate.

United States District Court
Northern District of California

**B.    SCOPE OF RELEASE.**

The proposed settlement class is co-extensive with the class certified in January (*see* Dkt. Nos. 217 at 4; 269-2 at 3).  The proposed settlement agreement contains a release of claims that exceeds the scope of the certified class claim, however.  Specifically, though the Court certified the class only as to the breach of contract claim, under the proposed settlement, class members — as well as their spouses, children, heirs, devisees, and so forth — will release the bank and its officers, directors, legal representatives, successors, subsidiaries, and assigns of (Dkt. No. 269-2 at ¶¶ 32–33, 47):

> any and all claims, rights, causes of action, liabilities, actions, suits, damages, or demands (including Unknown Claims as defined in Paragraph 47, herein), of any kind whatsoever that arise out of or are based on the claims set forth in the Action, including claims based on the subject Loan Modification Denials, damages based on any failure to modify the Loans and/or damages based on the foreclosures challenged in this Action.
>
> *          *          *
>
> "Unknown Claims" means any Released Claims that Plaintiffs or any Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties, and any Released Parties' Claims that Wells Fargo does not know or suspect to exist in his, her or its favor, which, if known by him, her or it, might have affected his, her or its settlement with and release of the Class Representatives, Settlement Class Members, and Class Counsel, or might have affected his, her or its decisions with respect to the Settlement.

In turn, the bank will release class members from any claims related to this litigation or settlement (*id*. at ¶ 32).

Although the undersigned judge usually requires that a release of class claims "be limited only to the claims certified for class treatment" and avoid "releasing claims that 'could have been brought'" (*see* Dkt. No. 12 at 3), the release here is anchored to "claims set forth in this [a]ction, including claims based on the subject [l]oan [m]odification [d]enials" (Dkt. No. 269-2 at ¶¶ 32).  The scope of the release, therefore, is tailored to the conduct at issue in this action — wrongful denials of loan modification — as well as the harm suffered by class members — damages stemming from the loss of plaintiffs' homes.  That is, with the exception of the intentional infliction of emotional distress claim, the damages plaintiffs alleged for the

7

remaining claims in the operative complaint were the same as the damages for the breach of contract claim in that they each relate to damages for the loss of class members' homes.

As to the emotional distress damages plaintiffs sought as part of their intentional infliction of emotional distress claim and as a component of their damages for wrongful foreclosure claims in California and Georgia, this order finds that the one million dollar fund specifically allocated for this type of harm in the proposed settlement overcomes the undersigned's admonishment that the scope of the release be limited to claims that were certified for class treatment.

Furthermore, as discussed above, the parties agree to revise the settlement so that the emotional distress claims of the sixteen class members who had not initially received notice will not be released. This compromise is fair given that six members of the sixteen remain unfound and the other ten did not have a practical opportunity to file a claim given that they received notice late in the game — and because Yanni has already allocated the entire fund.

In sum, all class members' economic damages claims will be released. But, as to emotional distress claims, the claims of all except sixteen of the class members will be released.

Accordingly, under the circumstances of this case — only 510 class members, all but six of whom received notice, with only five opt-outs and zero objections, and a settlement figure representing 37% of plaintiffs' projected damages — this order finds that the scope of the release is reasonable.

### C.    FAIRNESS, REASONABLENESS, AND ADEQUACY OF PROPOSED SETTLEMENT.

A district court may approve a proposed class settlement only upon finding that it is fair, reasonable, and adequate, taking into account (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and view of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. FRCP 23(e); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944

United States District Court
Northern District of California

(9th Cir. 2015).  For the following reasons, this order finds that the proposed class settlement is fair, reasonable, and adequate under FRCP 23(e).

*First*, the settlement terms are fair, reasonable, and adequate.  The settlement here will provide class members with a non-revisionary gross settlement fund of $18.5 million.  According to plaintiffs' own expert, their total damages amounted to $65 million.  This amount represents not just lost equity, but lost usage.  Because the bank had already paid fifteen million dollars to class members in remediation, plaintiffs' maximum total recoverable damages at trial would have been $50 million (Joint Decl. ¶ 19).  The proposed settlement figure would therefore result in an approximately 37% recovery of the maximum possible recoverable damages.

This percentage of recovery represents an amount greater than those approved by other courts in this district involving similar claims concerning loan modifications and HAMP.  *See e.g.*, *Chao v. Aurora Loan Services*, 2015 WL 294823 (N.D. Cal. Jan. 21, 2015) (Judge Saundra Brown Armstrong) (approved a settlement representing approximately 19% of the claimed damages for breach of contract and UCL restitution); *see also Gaudin v. Saxon Mortgage Sevices, Inc.*, 2015 WL 7454183 (N.D. Cal. Nov. 23, 2015) (Judge Jon S. Tigar) (approved a settlement representing approximately 13.6% of the claimed damages).

The 37% of recovery is particularly significant given the risks involved in protracted litigation, trial, and appeal.  For one thing, the parties sharply contested at what point in time the value of plaintiffs' foreclosed homes should be appraised for purposes of calculating their lost equity.  As plaintiffs concede, had lost equity been evaluated at the time of foreclosure, as the bank contended, as opposed to the time of the error, many plaintiffs were "under water" with their mortgages at that point because their homes were foreclosed on during the most recent financial crisis wherein home prices had plummeted significantly (Joint Decl. ¶ 20).  Thus, many of the class members risked little to no recovery.

For another, class members with Fannie/Freddie contracts faced adverse authorities from other districts, which found relevant language in those contracts did not require a lender to notify or offer a loan modification to the mortgagor as a way to cure default (Dkt No. 231 at

United States District Court
Northern District of California

13–14).  That subset of class members, therefore, faced the prospect of not being able to establish liability for breach of contract — the only certified claim.  Given the avoided risks of surviving summary judgment and proving both liability and damages at trial, this recovery is reasonable.

*Second,* the plan of the allocation of the settlement proceeds is fair and reasonable.  The proposed gross settlement fund consists of $18.5 million for 510 class members.  After subtracting the attorney's fees, litigation expenses, and settlement administration costs, the net settlement fund will be placed into an "economic damages fund" and a "severe emotional damages fund."   One million dollars of the net settlement amount will be allocated to the latter fund, and the remaining funds will go into the former.  As to the "economic damages fund," each class member will automatically receive a check of at least $14,000 and as much as $119,934, based on factors that are designed to represent each member's proportionate damages.[*]

As part of its remediation efforts, the bank already paid class members an average of 38% of the unpaid principal balance of their loans at the time of the decision error.  Accordingly, the allocation plan uses 38% as a benchmark, and will initially provide each class member with the amount needed to the bring the total of their compensation — settlement payment together with remediation payment — to at least 38%, reduced by five percent for every six months of delinquency.  The allocation plan, however, sets a minimum payment from the "economic damages fund" of $14,000.  Thus, no matter how long a class member was delinquent, each will still receive at least $14,000.  Because the bank already paid a minimum of ten thousand dollars in remediation to class members, each class member will have received at least $24,000 in compensation relating to the bank's error.

---

[*] The allocation plan "recognizes that lost equity varies among [c]lass members, and some have already received substantial compensation from Wells Fargo for such losses.  As such, the allocation plan uses the [unpaid principal balance] at the time of the error as a proxy for the value of the modification denied" because, in general, class members with larger unpaid balances "are more likely to have suffered more lost equity and, under [p]laintiffs' theory, more damages as a result of the lost modification opportunity" (Dkt. No. 269 at 7) (citing Schrag Decl. at ¶ 21).

10

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

As to the "severe emotional distress fund," Yanni has allocated the one million dollar fund between the 121 class members who submitted claims. Each of the 121 members will receive either $6,700 or $13,400. The Court appreciates the good work of special master Cathy Yanni in allocating the emotional distress claims.

Once distributions under both funds have completed, the residual funds, if any, will be distributed as follows: if the residual funds exceed $25,000, they will be distributed to all class members on a pro-rata basis in accordance with the initial distribution. If, however, there is less than $25,000 remaining, NeighborWorks America, a congressionally chartered, non-partisan, charitable organization focused on affordable housing, will receive any residual as a *cy pres*.

*Third*, this settlement follows the efforts of Magistrate Judge Ryu in facilitating mediation between the parties. Indeed, Judge Ryu's mediator made the $18.5 million monetary proposal during a March 3 settlement conference. The parties agreed to the amount two days later, and negotiated the remaining terms over the course of the next three weeks under Judge Ryu's supervision. Moreover, the parties began settlement negotiations only after class certification (Joint Decl. ¶ 11). This background is relevant to whether or not the proposed settlement agreement appears to be "the product of serious, informed, non-collusive negotiations." *See In re Tableware Antitrust Litig.*, 484 F.Supp.2d 1078 1079 (N.D. Cal. Apr. 12, 2017) (Chief Judge Vaughn Walker).

*Fourth,* the class representatives and class counsel have adequately represented the class. The parties reached the proposed settlement after one and a half years of litigation involving extensive discovery, two motions to dismiss, over five submitted discovery disputes, two motions for class certification, motion for summary judgment, and three settlement conferences with Judge Ryu. Moreover, the class representatives are not seeking service awards.

Having considered the applicable factors, this order finds the proposed class settlement is fair, reasonable, and adequate as to warrant final approval. Accordingly, final approval of the class settlement and plan of allocation is **GRANTED**.

11

United States District Court
Northern District of California

## 2.      MOTION FOR ATTORNEY'S FEES AND COSTS.

### A.      COST AND EXPENSES.

Class counsel seek to recover from the settlement fund a total of $335,000 in litigation costs and expenses.  The largest component of these expenses is "Expert Witness Fees" in the amount of $139,196.32.  Counsel also seek reimbursement for, among other things, transcripts ($55,487.71), lodging ($22,220.57), and travel and transportation ($36,900.81).  These expenses were all a reasonable and necessary part of the litigation, and are of a type customarily billed to a fee-paying client.  No class member objected to recovery of these costs. The motion for reimbursement of these costs is therefore **GRANTED**.

### B.      ATTORNEY'S FEES.

A district court must ensure that attorney's fees are "fair, adequate, and reasonable," even if the parties have entered into a settlement agreement that provides for those fees.  *Staton v. Boeing Co.*, 327 F.3d 938, 963–64 (9th Cir. 2003).  "In 'common-fund' cases where the settlement or award creates a large fund for distribution to the class, the district court has discretion to use either a percentage or lodestar method."  Our court of appeals has recognized 25 percent of the common fund as a benchmark award for attorney's fees.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  The benchmark may, however, be adjusted, or replaced by a lodestar calculation to account for the specific circumstances of the case.  *See Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

Class counsel, Gibbs Law Group LLP and Paul LLP, seek $4,525,000 — or 25% of the *net* settlement fund after deduction of litigation cost and expenses ($335,000) and settlement administration costs ($65,000), representing a multiplier of 1.2 of their claimed lodestar of $3,758,689.  Notably, class counsel provides its billing charts showing that it exercised "billing judgment" — that is, they cut "excessive, redundant, or unnecessary" billable hours — which led to the cutting of 2,675 hours that they expended on many of the different tasks throughout this litigation, including all the time spent briefing the first motion for class certification, which had to be re-briefed due to counsel's own error (*see* Joint Decl. ¶¶ 31–32, 66, 74–75).  Thus,

the stated lodestar above represents $1.4 million less than what would have otherwise been the lodestar amount.

As class counsel's motion for attorney's fees explains, they undoubtedly worked hard on this suit.  For instance, class counsel responded to over fifty discovery requests on behalf of named plaintiffs; reviewed over 200,000 pages of documents; took seven depositions in Iowa, Oregon, Minnesota, North Carolina, and California; and defended sixteen named plaintiffs and eighteen absent class members in depositions taken by the bank (Joint Decl. ¶¶ 7–8, 74).

Their representation, however, was not without hiccups.  Indeed, due to their snafu at class certification, the undersigned had to order re-briefing, which led to protracted litigation and costs.  On the other hand, as class certification later proved, the litigation carried substantial risk for counsel proceeding on a contingent-fee basis, as only the breach of contract claim was certified, which was a claim a prior order initially dismissed but counsel was able to revive through discovery and motion practice.

Moreover, as stated previously in this order, class counsel negotiated a settlement figure which brings significant relief to each class member compared to similar settlements in this district.  The requested award of $4,525,000 (25% of the net settlement fund after payment of expenses) representing a lodestar multiplier of 1.2 is thus reasonable here.  The motion for attorney's fees is accordingly **GRANTED**.

## CONCLUSION

Accordingly, it is hereby ordered as follows:

1.       The notice of settlement, as well as the manner in which it was sent to class members, fairly and adequately described the proposed class settlement, the manner in which class members could object to or participate in the settlement, and the manner in which class members could opt out of the class; was the best notice practicable under the circumstances was valid, due, and sufficient notice to class members; and complied fully with the Federal Rules of Civil Procedure, due process, and all other applicable laws.  A full and fair opportunity has been afforded to class members to participate in the proceedings convened to determine whether the proposed class settlement should be given final approval.  Accordingly,

the undersigned hereby determines that all class members who did not exclude themselves from the settlement by filing a timely request for exclusion are bound by this settlement order. The emotional distress claims of the sixteen class members who remain either unfound or who received late notice, however, are not barred.

2.      The undersigned also finds that the proposed class settlement is fair, reasonable, and adequate as to the class, plaintiffs, and defendant; that it is the product of good faith, arms-length negotiations between the parties; and that the settlement is consistent with public policy and fully complies with all applicable provisions of law.  The settlement and plan of allocation is therefore **APPROVED**.

3.      Having considered class counsel's motion for attorney's fees and reimbursement of expenses, the undersigned hereby awards class counsel attorney's fees of $4,525,000.  Half of this amount shall be paid after the "effective date" as defined in the settlement agreement. The other half shall be paid when class counsel certify that all funds have been properly distributed and the file can be completely closed.

4.      Class counsel shall also receive $335,000 as reimbursement for their litigation expenses, to be paid from the settlement fund.

5.      The motions (*see* Dkt. Nos. 285, 288) to file the class list under seal are **DENIED**. The names and the cities they reside in should be public.  Their contact information and addresses can be redacted, however.

**IT IS SO ORDERED.**

Dated:  October 12, 2020.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE