UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HERNANDEZ, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>WELLS FARGO BANK, N.A.,<br><br>   Defendant. | No. C 18-07354 WHA<br><br>**ORDER GRANTING FINAL APPROVAL OF SUPPLEMENTAL CLASS ACTION SETTLEMENT AND MOTIONS FOR ATTORNEY'S FEES AND EXPENSES** |

## INTRODUCTION

In this long-running wrongful foreclosure class action, plaintiffs move for final approval of a supplemental class settlement and for attorney's fees and litigation expenses. Because the settlement is fair, adequate, and reasonable, final approval is **GRANTED**. And because class counsel has worked diligently and represented the class ably, and the request for fees is reasonable, the request for attorney's fees is **GRANTED**. The requests for administration and litigation expenses are also **GRANTED**.

## STATEMENT

"In response to the unfolding financial crisis of 2008, Congress passed the Emergency Economic Stabilization Act, Pub. L. No. 110-343, 122 Stat. 3765. This law included the Troubled Asset Relief Program, which required the Secretary of the Treasury, among many other duties and powers, to implement a plan that seeks to maximize assistance for homeowners and encourage the servicers of the underlying mortgages to take advantage of available programs to minimize foreclosures. Pursuant to this instruction, the Treasury

Department in 2009 started the [Home Affordable Modification Program (HAMP)] program to incentivize banks to refinance mortgages of distressed homeowners so they could stay in their homes. Home loan servicers, including [defendant Wells Fargo Bank, N.A.], signed Servicer Participation Agreements with Treasury that entitled them to $1,000 for each permanent modification they made, but required them to follow Treasury guidelines and procedures." *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 880 (9th Cir. 2013) (*per curiam*).

In 2011, however, after "an examination of the residential real estate mortgage foreclosure processes of Wells Fargo Bank, N.A.," the Office of the Comptroller of the Currency "identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings." *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-11-19, #2011-051 (Dep't of Treasury, Comptroller of Currency, Apr. 13, 2011) (consent order), https://www.occ.gov/static/enforcement-actions/ea2011-051.pdf. The Comptroller and the bank entered into a consent order, whereby Wells Fargo agreed, among other things, to implement an "action plan" to "ensure compliance with . . . servicing guides of the Government Sponsored Enterprises or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program . . . ." *Id.*

In 2015, the Comptroller found that the bank had failed to meet its obligations under those provisions (and many others) of the 2011 consent order. *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-11-19, #2015-067 (Dep't of Treasury, Comptroller of Currency, June 16, 2015) (consent order amending 2011 consent order), https://www.occ.gov/static/enforcement-actions/ea2015-067.pdf. The Comptroller ordered, and the bank agreed, that the bank would not expand its residential mortgage servicing business until termination of the consent order. *Id.*

Finally, in 2016, the Comptroller found:

> Between March 2013 through October 2014, the Bank made escrow calculation errors in 76,720 accounts due to an error in a proprietary loan decisioning software tool. . . . [¶] The escrow calculation errors also led to approximately 184 incorrect loan modification denials.

*Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-11-19, #2016-055 (Dep't of Treasury, Comptroller of Currency, May 24, 2016) (consent order for civil money penalty), https://www.occ.gov/static/enforcement-actions/ea2016-055.pdf. The bank agreed to pay a $70 million penalty and the consent order was terminated. *Id.*; *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-11-19, #2016-056 (Dep't of Treasury, Comptroller of Currency, May 24, 2016) (termination order), https://www.occ.gov/static/enforcement-actions/ea2016-056.pdf.

Plaintiff Alicia Hernandez owned a condominium in New Jersey purchased with a mortgage loan serviced by defendant. In or around 2012 or 2013, Hernandez defaulted on the loan. Defendant denied Hernandez a trial mortgage modification under HAMP and foreclosed on the property in 2015. In 2018, defendant sent Hernandez a letter stating that she had been denied a trial loan modification due to a miscalculation; the letter included a check for about $15,000 as remediation.

Plaintiff Hernandez filed this action in 2018 as a putative nationwide class action asserting several claims for relief. In February 2019, in response to a motion to dismiss, plaintiff filed a first amended complaint adding fifteen new named plaintiffs and additional claims for relief, including breach of contract. All plaintiffs had residential mortgage loans serviced by defendant and were denied loan modifications. At all material times, plaintiffs have alleged that an error in defendant's software tool used to determine whether a borrower qualified for a trial loan modification overstated the amount of attorney's fees the bank used in calculating borrowers' eligibility for a trial loan modification under HAMP. Rather than limit such fees to the maximum allowable under HAMP, plaintiffs allege, the bank added the limits to fees actually incurred and consequently denied loan modifications to homeowners who actually qualified under HAMP. In 2018, the bank disclosed the error and sent affected borrowers a letter apologizing for its mistake along with remediation payments, usually between $5,000 and $15,000.

For their breach of contract claims, plaintiffs relied on provisions in their loan contracts which required the bank to give them notice before accelerating the payments and initiating

foreclosure proceedings after default. The notice had to include "the action required to cure the default." Because they qualified for trial loan modifications under HAMP at the time of their defaults, plaintiffs argued that "action required to cure the default" included acceptance of a trial loan modification offer, which the bank was required to give under the guidelines and procedures. Therefore, plaintiffs contended, defendant breached the agreements by foreclosing without first offering them a trial loan modification.

A June 2019 order disagreed, finding (Dkt. No. 87):

> Nothing in this provision (or any other provision in the contract) supports plaintiffs' proposed interpretation. The secured-loan instrument does not mention mortgage modification at all. Instead, it gives the bank the absolute right to foreclose in the event of an uncured default. The alleged requirement to offer plaintiffs a loan modification comes only from "HAMP or related programs," none of which are referenced in the contract that Wells Fargo purportedly breached.

An August 2019 order then granted plaintiffs' motion for leave to file a second amended complaint, finding (Dkt. No. 136):

> Plaintiffs have now alleged additional facts to demonstrate defendant bank knew loan modification was an action that could cure default. For example, the complaint now alleges defendant sent a letter to plaintiff Troy Frye stating it was "considering a program that may assist you in bringing your loan current . . . This program, known as a loan modification, would provide you with the opportunity for a fresh start by adjusting the current terms of your loan." Furthermore, the complaint also alleges the instruments referenced loan modifications stating, "extensions of the time for payment *or modification* of amortization of the sums secured by this Security instruments . . . shall not operate to release the liability of Borrowers."

The parties then vigorously litigated two motions for class certification (the first was denied without prejudice because of deficient briefing) and a motion to exclude plaintiffs' expert. A January 2020 order certified only the breach of contract claim under FRCP 23(b)(3) for the following class (Dkt. No. 217):

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home

4

>Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

The class certification order appointed plaintiffs Debora Granja (she had a Fannie/Freddie contract) and Sandra Campos (she had an FHA contract) class representatives and appointed Michael Schrag of Gibbs Law Group LLP and Richard Paul of Paul LLP as class counsel. Notice of the class action was distributed using the bank's records by way of first-class mail.

The bank then filed a petition for an interlocutory appeal of the class certification order under FRCP 23(f) and moved to stay proceedings here pending our court of appeals' decision on the petition. The motion to stay was denied. Around the same time, the bank moved for partial summary judgment as to the certified claim. The bank's partial summary judgment motion relied on several district court decisions directly contrary to plaintiffs' asserted interpretation of the Fannie Mae/Freddie Mac contracts, upon which the cases of class members with those instruments hinged.

The bank's motion for partial summary judgment had been fully briefed in March 2020, and the parties had conducted (and litigated) extensive discovery, when plaintiffs moved for preliminary approval of the original class action settlement. The original settlement had been reached under the supervision of Magistrate Judge Donna M. Ryu. The settlement agreement that is the subject of the instant motion is an enlarged version of the original settlement; it provides an identical amount of money per individual class member and uses the same plan of allocation. Namely, the original settlement provided an economic damages payment for each class member which, when added to the remediation payment already made by the bank to the class member, equaled 38% of the unpaid principal balance on the loan at the time of loan decision error, minus 5% for every six months of loan delinquency. The original gross settlement totaled $18.5 million, of which $1 million was set aside for claims for severe emotional distress, to be adjudicated by Special Master Cathy Yanni, a highly experienced special master in the area of emotional distress claims.

An April 2020 order granted preliminary approval of the original settlement, approved the settlement notice and emotional distress claim form, and appointed JND Legal Administration as settlement administrator and Cathy Yanni as special master for adjudicating emotional distress claims. Notice of the proposed settlement proceeded via first-class mail. An October 2020 order granted final approval to the original $18.5 million class settlement, finding it to be fair, reasonable, and adequate, and the product of good faith, arms-length negotiations between the parties. Class counsels' requests for attorney's fees and litigation expenses were also approved in full. The original settlement resolved the claims of 505 class members.

Shortly after final approval of the original class settlement, the bank identified 741 additional affected borrowers who fell within the class definition but who the bank did not identify in connection with the original settlement. At a status conference in December 2020, the undersigned judge ordered the parties to present a separate, supplemental settlement for the newly identified class members. Distribution of the original settlement fund continued apace.

The parties then negotiated the supplemental class settlement that is the subject of the instant motion. The proposed supplemental settlement class is defined identically as the class certified in January 2020 except that it excludes the class members who were part of the original settlement. The proposed settlement provides a total, net, non-reversionary fund of $18,169,325 for economic damages and emotional distress. In July 2021, an order granted preliminary approval of the supplemental settlement, approved the form of notice, the emotional distress claim form, and appointed JND Legal Administration as class administrator and Cathy Yanni as special master for the emotional distress fund. Plaintiffs now move for final approval of the supplemental class settlement, and for attorney's fees of $3,623,865, settlement administration expenses of $70,000, and litigation expenses of $1,483. This order follows full briefing and a telephonic hearing.

//

//

//

**ANALYSIS**

"The class action device, while capable of the fair and efficient adjudication of a large number of claims, is also susceptible to abuse and carries with it certain inherent structural risks." *Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 623 (9th Cir. 1982).

Rule 23(e)(2) provides that if a proposed class settlement "would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate . . . ." "In this Circuit, a district court examining whether a proposed settlement comports with Rule 23(e)(2) is guided by the eight *Churchill* factors, viz., (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (cleaned up).

1. **SUMMARY OF THE SETTLEMENT.**

As noted, the supplemental class settlement provides the 740 supplemental class members (one opted-out) with the same recovery as the original 505 class members; the numbers are bigger because the supplemental class is bigger. Wells Fargo has agreed to pay a total of $21,864,673 for the release of the supplemental class members' claims. The bank will pay the supplemental class a net, non-reversionary amount of $18,169,325 for economic damages and severe emotional distress. Separate from the $18.2 million for class members, the bank has agreed to pay $3,623,865 for attorney's fees to class counsel, and $71,483 in administration and litigation expenses. Crucially, the payment to class members is not affected by the ruling on the request for attorney's fees; under the parties' agreement, any unawarded fees revert to the bank.

$16,719,325 is for economic damages. Class members whose remediation payments were less than 38% of their unpaid principal balance will receive from the economic damages

7

1    fund such additional amount that will bring their total remediation payment plus economic

2    damages fund payment to 38% of their unpaid principal balance. However, the payment will

3    be reduced by 5% for every six months the class member was delinquent on her loan but not

4    below $14,000. This formula was chosen based on using the unpaid principal balance on the

5    loan as a proxy for the value of the denied loan modification because, in general, class

6    members with larger unpaid principal balances more likely suffered more lost equity. Under

7    this formula, each class member will receive an economic damages payment of at least

8    $14,000 and at most $116,502.

9    $1,450,000 is for emotional distress. The emotional distress claim form, designed by

10   Special Master Yanni designed, asked class members for a narrative statement and, if

11   available, supporting documentation, such as medical records. 104 supplemental class

12   members have submitted claims for severe emotional distress. Yanni made her initial

13   decisions on November 15, and class members had until December 6 to request

14   reconsideration. Ten supplemental class members did so, and Ms. Yanni increased their initial

15   awards. In the end, each supplemental class member who applied for emotional distress funds

16   received a final allocation between $11,400 and $34,420, accounting for 100% of the

17   $1,450,000 emotional distress fund.

18   **2.    THE *CHURCHILL* FACTORS.**

19   *First*, the relative strength of plaintiffs' case supports the settlement. The bank's motion

20   for summary judgment as to the breach of contract claim (the only certified claim) cited

21   several district court decisions whose reasoning, if applied here, would defeat the contract

22   claims of the class members who had Fannie Mae/Freddie Mac contracts. *See, e.g.*, *Davis v.

23   DRRF Tr. 2015-1*, 2016 WL 8257126 (W.D. Tex. Jan. 6, 2016); *see also Nolasco v.

24   CitiMortgage, Inc.*, 2012 WL 3648414 (S.D. Tex. Aug. 23, 2012). Moreover, relying in part

25   on the reasoning of the June 2019 order dismissing the breach of contract claim, the bank

26   argued forcefully that the language relied on by plaintiffs was unambiguous so resort to

27   extrinsic evidence to interpret it would be incorrect.

28

*Second*, the risk, expense, complexity, and likely duration of further litigation supports the settlement. Wells Fargo has consistently maintained that the contract law of the state where each class members' property was located would need to be considered, not just federal common law, to interpret the contracts. The bank argued this position in its summary judgment motion and the judge has yet to definitely rule on the question. The prospect of having to apply more than one body of contract law to a nationwide class complicates the case. Proving classwide damages with common proof would also be difficult and complex. Finally, even if the class survived summary judgment and prevailed at trial, the bank would almost certainly appeal.

*Third*, the risk of maintaining class action status throughout the trial in this case does not appear to present a particularly greater risk than a typical class action, so this factor is neutral.

*Fourth*, the amount of the settlement strongly favors approval. The settlement will provide a net, total, non-reversionary fund of $18,169,325 for 740 class members. Plaintiffs have not submitted a fresh damages analysis in support of the supplemental settlement, but because the supplemental settlement provides the same level of relief, the expert analysis of the original class' damages demonstrates that the supplemental settlement represents a good recovery for class members.

Plaintiffs' damages expert opined that damages could be measured by combining the value of the lost use and lost equity of the class members' homes (Dkt. No. 192-12.) As for lost use (*id.* at 19):

> The proper calculation to measure the lost use of Plaintiffs' homes lost to foreclosure is the difference between the cost of renting an equivalent home and the cost of living in and maintaining their own homes. They lost the use of their home, which can be valued at the cost of renting a roughly equivalent property. They also avoided the cost of living in and maintaining their homes, which I therefore subtract to arrive at lost use damages.

As for lost equity: "Lost equity as of today can be calculated as the difference between the current market value of the homes lost by Plaintiffs less the amount that would have been owed under the loan modification that was wrongfully denied" (*id.* at 13.)

9

Plaintiffs' damages expert estimated that the maximum total classwide economic damages, a combination of lost use and lost equity, equaled $50 million (Dkt. No. 269-1 at 6.) Thus, the original $18.5 million settlement represented a 37% recovery of the maximum possible.

But the bank argued that under the following statement in the class certification order, only lost equity damages were in play (Dkt. No. 217 at 7):

> [T]he bank next argues causation and damages cannot be determined with common evidence. Defendant is correct that calculating damages for each of the class members in a nationwide breach of contract class would require individualized inquiries . . . . Under the new class definition, which limits the class only to those whose homes were foreclosed on, however, damages can be calculated through common evidence based on the value of the equity lost by each homeowner through a foreclosure.

As for lost equity alone, the damages expert estimated that the total maximum recoverable lost equity for the original class was $22.9 million (Dkt. No. 269-1 at 6–7.) So, if the bank was right, and class damages were limited to lost equity, the original class settlement ($18.5 million) equaled 80% of the maximum recoverable damages.

Again, the 37% and 80% were in connection with the original settlement but because the supplemental settlement provides the same level of relief as the original settlement, we know that the supplemental fund represents a similar percentage of recovery for supplemental class members. This recovery is better than other settlements approved in similar wrongful loan foreclosure class actions. *See Chao v. Aurora Loan Servs., LLC*, 2015 WL 294823 (N.D. Cal. Jan. 21, 2015) (Judge Saundra B. Armstrong) (granting final approval of gross $5.25M settlement for 15,000 class members); *see also Gaudin v. Saxon Mortgage Servs. Inc.*, 2015 WL 7454183 (N.D. Cal. Nov. 23, 2015) (Judge Jon S. Tigar) (granting final approval to net $4.5M settlement providing $1,100 for each class member on average, representing 13.6% of maximum possible damages).

*Fifth*, the extent of discovery and stage of the litigation strongly support approval. This supplemental settlement comes after final approval of a materially identical settlement which was finally approved. The original settlement came after extensive discovery, including

10

several discovery motions, after class certification, and after a fully briefed motion for summary judgment.

*Sixth*, the abilities and views of counsel support approval. The record readily demonstrates that class counsel have litigated this case ably, and represented the class diligently, including by following up on class members whose notices were returned undeliverable to ensure as many class members as practically possible received actual notice and by following up with original class members to ensure they cashed their checks. That class counsel strongly support this settlement weighs in favor of approval.

*Seventh*, no governmental entity participated in this action so this factor is neutral.

*Eighth*, the reaction of the class members has been positive. Only one class member opted out, and only because she was concerned her settlement award would disrupt governmental benefits (Dkt. No. 328-2 at 9.) No class member objected.

### 3. THE NOTICE AND OTHER RELEVANT CONSIDERATIONS.

In addition to the *Churchill* factors, "Rule 23(e)(2) also requires the court to consider the terms of any proposed award of attorney's fees and scrutinize the settlement for evidence of collusion or conflicts of interest before approving the settlement as fair." *Kim*, 8 F.4th at 1179 (cleaned up).

#### A. ADEQUACY OF NOTICE.

The undersigned judge previously approved the form, content, and planned distribution of the supplemental class notice under Rule 23(e)(1).

In August, after preliminary approval had been granted, the parties notified the Court that JND had made an envelope-stuffing error. That is, the administrator placed notices, which stated the remediation payment and expected economic damages payment specific to the class member, in envelopes addressed to the wrong class member. The Court ordered: the administrator to mail corrected notices; a new opt-out date 45 days after the corrected notice date; the corrected notices to specifically call out the new opt out date, and to state that the new notice superseded the prior notice. The Court also admonished class counsel that the Court

11

relied on counsel to avoid such errors and not to lay off their responsibilities onto the administrator.

Declarations by Gretchen Eoff, senior vice president of operations at JND (Dkt. No. 328-1 at 1), and class counsel (Dkt. No. 328-2), describe the thorough effort the administrator and counsel undertook in the corrected notice mailing to ensure that the error did not repeat, and that as many class members as practicable received notice.

The notice sent by first class mail to all 741 supplemental class members satisfied all of the requirements of Rule 23(c)(2)(B) (*see* Dkt. No. 328-1 at 20.)  The administrator, class counsel, and the bank made diligent efforts to redeliver notice to class members whose notices were returned undeliverable.  After these efforts, 52 supplemental class members' notices remain undeliverable and it appears that at least 21 of those are deceased and no known next-of-kin have been located, leaving no more than 31 living supplemental class members unfound. The emotional distress claims of the 52 class members whose notices were returned as undeliverable and who have not been located will not be released.

The notice program for the supplemental settlement was the same as the original settlement and was executed by the same administrator.  According to the status report on the distribution of the original settlement fund, filed by class counsel in June 2021, 94% of the net settlement fund had been cashed (Dkt. No. 314).  Thus, the adequacy of the supplemental notice program is further evidenced by the robust participation in the original settlement.

### B.     CLAIM PROCEDURE.

Unduly burdensome claims procedures are a red flag under Rule 23(e)(2)(C)(ii).  The bulk of the settlement fund ($16,719,325) will be distributed to class members automatically with no claims process.  Class members who felt they had suffered severe emotional distress were required to submit a claim form to recover from the emotional distress fund ($1.45M). Ordinarily, a claims process is disfavored, but given the simplicity and straightforwardness of the claim form and process used here, which included the option to submit everything online (*see* Dkt. No. 328-1 at 28), this part of the settlement was not unduly burdensome.

### C. ANY OTHER AGREEMENT.

The parties have no agreement in connection with the proposed settlement other than the settlement itself. *See* FRCP 23(e)(2)(iv).

### D. INCENTIVE PAYMENT.

Settlement agreements that provide incentive payments for representative plaintiffs are a red flag because they do not "treat[] class members equitably relative to each other." FRCP 23(e)(2)(D). Class representatives Debora Granja and Sandra Campos did not seek an incentive payment in connection with the original settlement and do no seek one now. The Court thanks Granja and Campos for their service to the class.

### E. SCOPE OF RELEASE.

The proposed agreement, like the original class settlement, contains a release of claims that exceeds the scope of the certified class claim. Specifically, although the class was certified only as to the breach of contract claim, under the proposed settlement, supplemental class members — as well as their spouses, children, heirs, devisees, and so forth — will release the bank and its officers, directors, legal representatives, successors, subsidiaries, and assigns of (Dkt. No. 312-2 at § II(A) ¶¶ 32, 47):

> any and all claims, rights, causes of action, liabilities, actions, suits, damages, or demands (including Unknown Claims as defined in Paragraph 47, herein), of any kind whatsoever that arise out of or are based on the claims set forth in the Action, including claims based on the subject Loan Modification Denials, damages based on any failure to modify the Loans and/or damages based on the foreclosures challenged in this Action.
>
> \*       \*       \*
>
> "Unknown Claims" means any Released Claims that Plaintiffs or any Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties, and any Released Parties Claims that Wells Fargo does not know or suspect to exist in his, her or its favor, which, if known by him, her or it, might have affected his, her or its settlement with and release of the Class Representatives, Settlement Class Members, and Class Counsel, or might have affected his, her or its decisions with respect to the Settlement.

In turn, the bank will release supplemental class members from any claims related to this litigation or Settlement.

13

The undersigned judge usually requires that a release of class claims be "limited only to the claims certified for class treatment" and avoid "releasing claims that 'could have been brought'" (Dkt. No. 12.)  Nonetheless, as with the original settlement, the release here is anchored to claims set forth in this action, including claims based on the subject loan modification denials.  The scope of the release, therefore, is tailored to the conduct at issue in this action — erroneous denials of loan modifications — as well as the harm alleged by supplemental class members — damages stemming from the loss of their homes.  That is, with the exception of the intentional infliction of emotional distress claim, the damages plaintiffs alleged for the remaining claims in the operative complaint were the same as the damages for the breach of contract claim in that they each relate to damages for the loss of supplemental class members' homes.

As to the emotional distress damages plaintiffs sought for their intentional infliction of emotional distress claims and as a component of their damages for wrongful foreclosure claims in California and Georgia, this order, like the original final approval order, finds that the $1,450,000 fund specifically allocated for this type of harm in the supplemental settlement overcomes the undersigned's admonishment that the scope of the release be limited to claims certified for class treatment.

Further, the supplemental settlement provides that the emotional distress claims of the 52 class members whose notices were returned as undeliverable and who have not been located will not be released.  All supplemental class members' economic damages claims will be released and the emotional distress claims of all but 52 of the supplemental class members will be released.  The scope of the release is reasonable.

4.  **ATTORNEY'S FEES.**

To avoid collusive settlements, the Court prefers that all settlements avoid any agreement as to attorney's fees and leave that to the judge.  Our court of appeals has identified three signs of collusive agreements, the so-called *Bluetooth* factors:

> (1) when counsel receives a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing arrangement', under which the defendant agrees not to challenge a

14

> request for an agreed-upon attorney's fee; and (3) when the agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class.

*Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (quoting *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011)).

Here, Wells Fargo has agreed to pay $3,623,865 for attorney's fees separate and apart from the settlement fund. Under the supplemental settlement agreement, an award of a lesser amount than requested does not affect the compensation to the class. Wells Fargo will keep the difference between the fees agreed to and the fees awarded, *i.e.*, if the fee award is less than what the bank agreed to, the difference will "revert" to Wells Fargo, not to the class.

At first blush, this arrangement seems to raise the latter two signs of collusion identified by *Bluetooth*. Namely, the parties have negotiated a clear-sailing arrangement whereby the bank has agreed not to challenge the agreed-upon request for attorney's fees, and any unawarded fees revert to the bank, rather than the class.

In the unusual circumstances of this *supplemental* class settlement, however, this arrangement is not problematic. An agreement as to a set amount of attorney's fees to be paid by the bank separate and apart from the class compensation was the only way for the parties to agree to a specific number, *i.e.*, for the bank to know how much it would have to pay, while also ensuring that original and supplemental class members received the same compensation for the same harm. If the settlement had settled the amount of compensation to the class but left the amount of attorney's fees open, the bank would not have agreed to an undetermined amount of liability. On the other hand, if the settlement had provided that the bank agreed to pay a specific amount of attorney's fees but unawarded fees would go to the supplemental class, original class members could rightly have challenged the supplemental settlement as arbitrarily awarding supplemental class members more for the same harm. *See* FRCP 23(e)(2)(D). Thus, in the context of this supplemental class settlement, the agreement as to attorney's fees does not raise red flags under *Bluetooth*.

Moreover, the fee request is reasonable. "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method

or the percentage-of-recovery method." *In re Bluetooth*, 654 F.3d at 942. Our court of appeals has established 25% of the total, gross settlement fund as the benchmark for a reasonable attorney's fee. *Ibid.*; *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 953 (9th Cir. 2015). Here, the total, gross supplemental settlement fund is $21,864,673. The fee request of $3,623,865 equals about 16.6% of the fund, well below the benchmark.

The original settlement created a total, gross settlement fund of $18.5M, and the original attorney's fee award was $4,525,000. So, the aggregate fee as a percentage of the aggregate, gross settlement equals:

$$\$4{,}525{,}000 \;+\; \$3{,}623{,}865 \div \$18{,}500{,}000 \;+\; \$21{,}864{,}673 = \mathbf{20.2\%}.$$

Thus, the aggregate fees as a percentage of the aggregate, gross settlement amount is well below the 25% benchmark, confirming that the current fee request is reasonable.

## CONCLUSION

For the foregoing reasons, final approval of the supplemental class action settlement is **GRANTED**. Notice has been implemented in accordance with the Court-approved notice plan and FRCP 23(c)(2) and (e)(1). The motion for attorney's fees is **GRANTED**. Class counsel Gibbs Law Group LLP and Paul LLP are awarded **$3,623,865 FOR ATTORNEY'S FEES**. Half of this amount shall be paid after the "effective date," as defined in the settlement agreement. The other half shall be paid when class counsel certify that all supplemental settlement funds have been properly distributed and the file can be completely closed. Settlement administration expenses in the amount of $70,000 are **APPROVED**. Class counsels' litigation expenses in the amount of $1,483 are **APPROVED**.

**IT IS SO ORDERED.**

Dated: January 9, 2022

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

16